**RECORD NO. 13-1982**

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**BEST MEDICAL INTERNATIONAL, INC., A Virginia
Corporation, HUESTIS MACHINE CORP., A Rhode
Island Corporation and KRISHNAN SUTHANTHIRAN,
an individual,**

*Plaintiffs-Appellants,*

**Bruce W. Henry, Chapt. 11 Trustee
for Gunston Hall Realty, Inc.
and Best Industries, Inc.**

*Plaintiff*

v.

**WELLS FARGO BANK, N.A. as successor of interest to
Wachovia Bank, N.A. and J. KENT THOMPSON,**

*Defendants-Appellees.*

———————————

**JOINT APPENDIX
VOLUME I**

———————————

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA**

**(COUNSEL LISTED - INSIDE COVER)**

James M. Brady
Lauri M. Luxton
BEST MEDICAL
  INTERNATIONAL, INC.
7643 Fullerton Road
Springfield, Virginia 22153
(703) 451-2378 (Telephone)
james@teambest.com
lauri@teambest.com

**Counsel for Plaintiffs-Appellants**

Anastasia P. Cordova
Margaret M. Glassman
Stephen P. Mulligan
John D. Wilburn
McGUIREWOODS, LLP
Suite 1800
1750 Tysons Boulevard
Tysons Corner, Virginia 22102-3915
(703) 712-5000 (Telephone)
acordova@mcguirewoods.com
mglassman@mcguirewoods.com
smulligan@mcguirewoods.com
jwilburn@mcguirewoods.com

**Counsel for Defendants-Appellees**

# JOINT APPENDIX TABLE OF CONTENTS
## VOLUME I

Civil Docket ………………………………………………………….…..JA0001

Wells Fargo's Objections and Answers to Plaintiffs' First Set of Interrogatories dated August 3, 2012 (ECF 76-7)…………………………………………..…..33

Second Amended Complaint against Wells Fargo Bank, N.A. and J. Kent Thompson filed August 20, 2012 (ECF 77) ........................................................48

    Exhibit 1- Letter from Shawn Weingast to J. Kent Thompson dated May 6, 2010.......................................................................................................82

    Exhibit 2- Letter from Krishnan Suthanthiran to J. Kent Thompson dated June 24, 2010...................................................................................................84

    Exhibit 3- Dissertation by T. David Reese titled, "Minority-Owned Businesses, Trade Credit and Discrimination: An Empirical Study of the Impact of Racial Discrimination on Access to Trade Credit For Minority-Owned Vs. Non-Minority-Owned Firms" April 2007 ................................86

    Exhibit 4- "Do Minority and Woman Entrepreneurs Face Discrimination in Credit Markets? Improved Estimates Using Matching Methods" by Yue Hu, Long Liu, Jan Ondrich, and John Yinger, March 2010..............................164

    Exhibit 5- Reese, T. David, Abstract: Minority-owned businesses, trade credit and discrimination: an empirical study of the impact of racial discrimination on access to trade credit for minority-owned v. non-minority-owned firms dated April 2007 .................................................................208

    Exhibit 6- Affidavit of Alexander Arapoglou dated March 22, 2012 and June 4, 2012..................................................................................................211

    Exhibit 7-Subpoena Duces Tecum to United Bank from Douglas Foley dated May 3, 2012..................................................................................................227

    Exhibit 8- Letter from J. Kent Thompson to Best NOMOS customers transferring servicing of account to Receivables Control Corporation dated

i

June 13, 2012; Notice of Payment directions from Receivables Control Corporation to BMI Customer dated July13, 2012 .................................... 230

Wells Fargo's Answer and Affirmative Defenses to Counts I & III of Plaintiffs' Second Amended Complaint filed September 4, 2012 (ECF 87) ........................ 234

Stipulation of Uncontested Facts filed October 26, 2012 (ECF 136) .............. 246

Order on Wells Fargo's Motion to Dismiss Counts II, IV, V, and VI of Plaintiffs' Second Amended Complaint (Granted as to Counts V and VI only) filed on October 26, 2012 (ECF 139) ................................................................. 253

J. Kent Thompson's Answer and Affirmative Defenses To Counts II and IV of Plaintiffs' Second Amended Complaint filed November 9, 2012 (ECF 145) ...... 254

Motion for Summary Judgment by J. Kent Thompson, WF filed November 13, 2012 (ECF 150) .................................................................................. 263

Exhibit 1- Proposed Order ............................................................... 265

Memorandum in Support of Defendants' Motion for Summary Judgment filed on November 13, 2012 (ECF 151) ........................................................ 266

Affidavit of Kent Thompson ................................................... 294

Exhibit A - Security Agreement between BMI and Wachovia dated October 29, 2004 .................................................................. 303

Exhibit B - Financing and Security Agreement between Huestis and Wachovia dated December 1, 2006 ..................................... 310

Exhibit C - May 8, 2009 Default Letters to BMI, Huestis, et al. ........... 372

Exhibit D - Email from S. Weingast to R. Pollak dated May 18, 2009 re: right to cure default ............................................................. 386

Exhibit E - Waiver and Amendment Agreement dated July 31, 2009 ... 388

## JOINT APPENDIX TABLE OF CONTENTS
## VOLUME II

Exhibit F - Guaranty of Payment Agreement between Krishnan Suthanthiran and Wachovia Bank dated July 31, 2009; Guaranty of Payment Agreement between Borrowers and Wachovia Bank dated July 31, 2009; Guaranty of Payment Agreement for Affiliates dated July 31, 2009..........................403

Exhibit G - Email from J. Thompson to Bob Martins dated March 18, 2010 attaching outline of terms for extension...................................................476

Exhibit H - Email from K. Suthanthiran to K. Thompson dated March 30, 2010 re: offer to extend loan for six months ...........................................478

Exhibit I - Email from K. Thompson to K. Suthanthiran dated April 6, 2010 stating loans have matured .....................................................................480

Exhibit J - Demand for Payment Letter dated April 21, 2010 ......................486

Exhibit K - Email from K. Thompson to S. Weingast dated June 11, 2010 re: Best Medical Agreement ........................................................................490

Exhibit L - Email from K. Thompson to S. Weingast dated June 15, 2010 re: proceed with cash flow review ..............................................................509

Exhibit M - Letter from K. Suthanthiran to K. Thompson dated June 24, 2010 alleging discrimination ........................................................................511

Exhibit N - Letter from Wells Fargo's counsel dated July 1, 2010 disagreeing with discrimination charge ...................................................................512

Exhibit O - Subpoena Duces Tecum issued to United Bank by D. Foley dated May 3, 2012 ........................................................................................514

Exhibit P - Letter from J. Kent Thompson to Best NOMOS customers transferring servicing of account to Receivables Control Corporation dated June 13, 2012 ........................................................................................516

[1]Exhibit 1 - Excerpts of J. Puckhaber deposition transcript dated October 2, 2012 *see JA1497*...........................................................................517

Exhibit 2 – Excerpts of Shawn Weingast deposition transcript dated October 1, 2012 ...........................................................................................518

Exhibit 3 – Excerpts of Robert Martins deposition transcript dated October 17, 2012 – *see JA1116*...................................................................544

Exhibit 4 - Originally filed under seal; re-filed unredacted as ECF 199.  See JA1001.

Exhibit 5 – Excerpts K. Suthanthiran deposition transcript dated October 12, 2012 ...........................................................................................546

Exhibit 6 – Excerpts of J. Kent Thompson deposition transcript dated October 4, 2012 – *see JA1765*...................................................................575

Exhibit 7 – Excerpts of Nancy Ross deposition transcript dated October 3, 2012 ...........................................................................................576

Exhibit 8 – Excerpts of Steven Kohlhagen deposition transcript dated September 28, 2012...............................................................................614

Affidavit of Douglas Foley.......................................................................660

Exhibit A1- Letter from James Brady to BMI customers dated June 21, 2012 ...............................................................................................663

Expert Witness Report of Alexander Arapoglou (ECF 166-1).....................664

Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment filed on November 27, 2012 (ECF 188) .............................................676

Affidavit of Lauri Luxton .......................................................................707

---

[1] In order to avoid duplication, excerpts of depositions have been omitted where the entire deposition transcript is included in the appendix; please refer to the pages in full transcript as indicated for the excerpted pages.

Exhibit 1 - February 2007 e-mails re: amendment of Huestis loan documents ...................................................................................................709

Exhibit 2 - Emails re: $250,000 additional payment receipt........................713

Exhibit 3 - May 10, 2010 e-mail from Thompson to Puckhaber (haven't gotten to our ultimatum yet) ..........................................................................718

Exhibit 4 - E-mail from Thompson to Shawn Weingast re: proceed with cash flow review *See JA0509*.......................................................................720

Exhibit 5 - Excerpts of J. Puckhaber deposition transcript dated October 2, 2012 (pages 109-110) *see JA1605*.......................................................721

Exhibit 6 - Excerpts of J. Puckhaber deposition transcript dated October 2, 2012 (pages 132-133) *see JA1628*.......................................................722

Exhibit 7 - Modification 1 to Promissory Note dated August 31, 2005........723

Exhibit 8 - Modification 2 to Promissory Note dated September 5, 2006 ....727

Exhibit 9 - Renewal Agreement between BMI and Wachovia dated September 26, 2007 .................................................................................................731

Exhibit 10 - Renewal Agreement between GHR and Wachovia dated October 22, 2007 .................................................................................................734

Exhibit 11 - Excerpts of K. Thompson deposition transcript dated October 2, 2012 *see JA1765* ...................................................................................737

Exhibit 12 - Default letters dated May 8, 2009 ...........................................738

Exhibit 13 - Term Note and Supplemental Term Note between Huestis and Wachovia dated December 1, 2006.....................................................743

Exhibit 14- BMI et al Extension Outline .....................................................780

Exhibit 15 - Subpoena Duces Tecum issued to United Bank by Doug Foley dated May 3, 2012 *see JA0228* .........................................................783

v

Exhibit 16 - Amended Financing and Security Agreement between Huestis and Wachovia.........................................................................................784

Exhibit 17 - Access National Bank Term Sheet dated July 15, 2010 re: Fullerton Rd. properties........................................................................850

# JOINT APPENDIX TABLE OF CONTENTS
## VOLUME III

Exhibit 18 - Excerpt of K. Suthanthiran deposition transcript dated October 11, 2012 (pages 33-34) .......................................................................854

Exhibit 19 - K. Thompson deposition transcript dated October 4, 2012 (page 35) *see JA1799*.....................................................................................857

Exhibit 20 - Problem Asset Report ..............................................................858

Exhibit 21 - Excerpt of K. Suthanthiran deposition transcript dated October 11, 2012 (pages 37-39) .......................................................................860

Exhibit 22 - Excerpt of A. Arapoglou deposition transcript dated September 17, 2012 (page 101) *see JA1391* .........................................................864

Exhibit 23 - Excerpt of S. Weingast deposition transcript dated October 1, 2012 (pages 74-75) ...............................................................................865

Exhibit 24 - 10/11/12 K. Suthanthiran deposition transcript pgs: 54-59, 60, 68-70, 74.................................................................................................868

Exhibit 25 - Excerpt of K. Thompson deposition transcript dated October 4, 2012 (page 105) *see JA1869* ............................................................880

Exhibit 26- Excerpt of S. Weingast deposition transcript dated October 1, 2012 (page. 12-24)..............................................................................881

Exhibit 27- Excerpt of Nancy Harrison deposition transcript dated October 18, 2012 (pages 18-21) *See JA1691-1694*...............896

Exhibit 28- Excerpt of N. Harrison deposition transcript dated October 18, 2012 (pages 21-25) *See JA1694-1698* ................................................897

Exhibit 29- Excerpt of N. Harrison deposition transcript dated October 18, 2012 (pages 25-31) *See JA1698-1704* ................................................898

Exhibit 30- E-mail dated July 6, 2010 from the Office of the President of Wells Fargo re: discrimination complaint – policy is to support the line of business .................................................................................................899

Exhibit 31 - Excerpt of S. Kohlhagen deposition transcript dated September 28, 2012 (page 135) ...........................................................................901

Exhibit 32 - Excerpt of R. Bergin deposition transcript October 12, 2012 (pages 23-24) .................................................................................903

Exhibit 33 - Excerpt of A. Arapoglou deposition transcript dated September 17, 2012 (pg. 43) *See JA1333* ...............................................................906

Exhibit 34 - Excerpt of A. Arapoglou deposition transcript dated September 17, 2012 (page 57) *See JA1347* ...........................................................907

Exhibit 35 - Excerpt of A. Arapoglou deposition transcript dated September 17, 2012 (page 118) *See JA1408* .........................................................908

Exhibit 36 - Excerpt of Kohlhagen deposition transcript dated September 28, 2012 (page 93) ....................................................................909

Exhibit 37 - Excerpt of A. Arapoglou deposition transcript dated September 17, 2012 (page 60) *See JA1350* ...........................................................911

Exhibit 38 - Excerpt of K. Thompson deposition transcript October 4, 2012 (page 132) *See JA1896* ....................................................................912

Exhibit 39 - Excerpt of K. Thompson deposition transcript dated October 4, 2012 (page 169) *See JA1933* ..............................................................913

Exhibit 40 - Excerpt of K. Thompson deposition transcript dated October 4, 2012 (pg. 117) *See JA1881* ...............................................................914

Exhibit 41 - Excerpt of N. Harrison deposition transcript dated October 18, 2012 (page 12) *See JA1685* ...............................................................915

Exhibit 42 - Excerpt of K. Thompson deposition transcript dated October 4, 2012 (page 240) *See JA2004* .............................................................916

Exhibit 43 - Excerpt of K. Thompson deposition transcript dated October 4, 2012 (pg. 134) *See JA1898* .................................................................917

Exhibit 44 - Excerpt of R. Martins deposition transcript dated October 17, 2012 (pages 140-141,145) *See JA1255-1256, 1260*.............................918

Exhibit 45 - Order dated March 31, 2011 denying Wells Fargo's demurrer in part .................................................................................................919

Exhibit 46 - Wells Fargo Problem Asset Report ...........................................925

Exhibit 47 - Wells Fargo letter to customers re: Notice of Assignment dated June 13, 2012.................................................................................927

Exhibit 48 - Prologics Sales Summary ........................................................929

Reply Brief in Support of Defendants' Motion for Summary Judgment filed December 3, 2012 (ECF 198) .........................................................................935

Exhibit A - Motions Hearing Transcript dated March 16, 2012.................953

Exhibit B - Excerpt of R. Martins deposition transcript dated October 17, 2012 (pages 1-4, 45-48, 53-56, 93-96, 137-140, 165) *See JA1116-1119, 1160-1163, 1168-1171, 1208-1211, 1252-1255, 1280*...............................958

Exhibit C - Motions Hearing Transcript dated December 7, 2012.............959

Exhibit D - Excerpt of N. Ross deposition transcript dated October 3, 2012 (pages 1, 70-73, 110-111) .......................................................................964

Exhibit E – Excerpt of K. Thompson deposition transcript dated October 4, 2012 (pages 1, 234-241, 266-269) *See JA1998-2005, 2030-2033*..............972

Memorandum in Support of Motion for Summary Judgment, Filed unredacted on December 6, 2012 (ECF 199) .........................................................................973

Exhibit 4 – September 27, 2012 letter to Brian Boland from R. Scott Ritter re: Krishnan Suthanthiran/Best Industries Loan request .........................1001

ix

Order granting Defendants' Motion for Summary Judgment filed December 18, 2012 (ECF 201) ............................................................................................1005

Motions Hearing Transcript for hearing held on December 14, 2012 filed on January 2, 2013 (ECF 202) ...........................................................................1007

Memorandum Opinion by Judge Gerald Bruce Lee filed March 29, 2013 (ECF 203) ......................................................................................................................1037

Final Judgment in favor of Wells Fargo filed March 29, 2013 (ECF 204).........1068

Motion to Alter Judgment Rule 59(e) Alter, Amend, and/or Reconsider filed April 25, 2013 (ECF 212) ......................................................................................1069

Plaintiffs' Memorandum in Support of Their Rule 59(e) Motion to Alter Judgment Alter, Amend, and/or Reconsider Judgment filed on April 25, 2013 (ECF 213)1071

    Exhibit 1 - Monument Bank Term Sheet dated July 23, 2010 .................1107

    Exhibit 2 - Virginia Commerce Bank Term Sheet dated August 20, 2010 ....................................................................................................................1110

    Exhibit 3 - R. Martins deposition transcript dated October 17, 2012 .......1115

# JOINT APPENDIX TABLE OF CONTENTS
## VOLUME IV

Exhibit 4 - Consolidated Statements of Income for Best Medical International and Subsidiaries for Years Ending 2008 and 2009................................1281

Exhibit 5 - Huestis Combined Statement of Cash Flows for the five month period ended May 24, 2008 ................................................................1284

Exhibit 6 – Gunston Hall Realty, Inc. and Subsidiary Consolidated Statements of Income for Years Ended December 31, 2009 and 2008....................1286

Exhibit 7 - Consolidating Statements of Income for Real Estate Companies Gunston Hall Realty and Subsidiary for the six month period ending June 30, 2010 ......................................................................................1288

Exhibit 8 - A. Arapoglou deposition transcript dated September 17, 2012.1290

Exhibit 9 - E-mail to K. Suthanthiran from K. Thompson  dated December 20, 2008 re: what is your exit plan ............................................................1454

Exhibit 10 - CATerms – Standard Approval dated December 26, 2008.....1456

Exhibit 11 - E-mail from R. Bergin to K. Thompson dated January 22, 2009 re: returning call .................................................................................1464

Exhibit 12 - Huestis Group Covenant Calculation dated December 31, 2007 ..........................................................................................................1466

Exhibit 13 - 04/27/09 E-mails from Kent Thompson to Krish dated April 27, 2009 re: response date extended to May 5, 2009 ..................................1468

Exhibit 14 - E-mail from K. Suthanthiran to K. Thompson dated April 9, 2009 re: just learned you want us to move our banking relationship to another bank ......................................................................................................1471

Exhibit 15 - 12/01/06 Financing and Security Agreement between Huestis and Wachovia – *See JA0310* ....................................................................1474

Exhibit 16 - Loan Agreement dated August 5, 2005 between Gunston Hall Realty and Wachovia; Loan Agreement dated October 29, 2004 between Best Medical International and Wachovia ...........................................1475

Exhibit 17 - E-mail from Anne Marie DiFusco to K. Thompson dated April 14, 2009 re: Letter of credit, new accounts ...........................................1484

Exhibit 18 - Wachovia Problem Asset Report ...........................................1488

Exhibit 19 - CATerms Short Term Extension Approval for Best Medical International dated March 21, 2010 ......................................................1490

Exhibit 20 - Email from K. Thompson to R. Martins dated March 18, 2010 re: Kent would consider $300M monthly curtail plus $1 of curtail for each dollar spent on R & D.........................................................................1492

Exhibit 21 - E-mail From K. Thompson to J. Puckhaber dated May 10, 2010 re: haven't gotten to our ultimatum yet.................................................1494

Exhibit 22 - J. Puckhaber deposition transcript dated October 2, 2012 ......1496

Exhibit 23 - N. Harrison deposition transcript dated October 18, 2012......1673

## JOINT APPENDIX TABLE OF CONTENTS
## VOLUME V

Exhibit 24 - Letter from Wells Fargo's counsel dated July 1, 2010 disagreeing with discrimination charge ...............................................1719

Exhibit 25 – Wells Fargo Fair and Responsible Lending Policy dated February 28, 2011 ........................................................................1722

Exhibit 26 - Unconditional Guaranty dated October 29, 2004 between BMI, K. Suthanthiran and Wachovia ...........................................1736

Exhibit 27 - Personal Financial Statement as of December 31, 2008 .........1744

Exhibit 28 - TEAMBEST Consolidating Balance Sheets – All companies dated March 31, 2009........................................................1747

Exhibit 29 - Unconditional Guaranty dated August 5, 2005 between Gunston Hall Realty, Inc., K. Suthanthiran and Wachovia ................................1750

Exhibit 30 - Extension Outline terms (prior to the end of March).............1759

Exhibit 31 - Extension Outline term (prior to end of April) ......................1761

Exhibit 32 - K. Thompson deposition transcript dated October 4, 2012.....1764

Exhibit 33 - Confessions of Judgment dated June 30, 2010, against K. Suthanthiran, Gunston Hall Realty, Inc., and Best Industries, Inc. .......2079

Exhibit 34 – E-mail from Kenya Crenshaw dated June 9, 2010 requesting all original guaranty documents be sent to Kent Thompson .....................2086

Defendants' Memorandum in Opposition to Plaintiffs' Rule 59(e) Motion to Alter Judgment Alter, Amend, and/or Reconsider Judgment filed May 9, 2013 (ECF 217) ........................................................................2088

Exhibit 1- Proposed Order………………………………………..…2103

Order dated July 2, 2013 denying Plaintiffs' Motion to Alter, Amend, and/or Reconsider Judgment (ECF 228) ...................................................2104

xiii

Notice of Appeal filed July 31, 2013 (ECF 229) ...............................................2105

APPEAL,CLOSED,JURY

# U.S. District Court
# Eastern District of Virginia − (Alexandria)
# CIVIL DOCKET FOR CASE #:  1:11−cv−01277−GBL−TRJ

| | |
|---|---|
| Best Medical International, Inc. et al v. Wells Fargo, Bank, N.A. | Date Filed: 11/22/2011 |
| Assigned to: District Judge Gerald Bruce Lee | Date Terminated: 03/29/2013 |
| Referred to: Magistrate Judge Thomas Rawles Jones, Jr | Jury Demand: Plaintiff |
| Demand: $12,000,000 | Nature of Suit: 440 Civil Rights: Other |
| Case in other court:  4th Circuit, 13−01982 | Jurisdiction: Federal Question |
| Cause: 42:1981 Civil Rights | |

**Plaintiff**

**Best Medical International, Inc.**          represented by     **James Michael Brady**
*A Virginia Corporation*                                         Best Medical International Inc
                                                                 7643 Fullerton Rd.
                                                                 Springfield, VA 22153
                                                                 703−451−2378
                                                                 Fax: 703−451−8421
                                                                 Email: james@teambest.com
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Lauri Michele Luxton**
                                                                 Best Medical International Inc
                                                                 7643 Fullerton Rd.
                                                                 Springfield, VA 22153
                                                                 703−451−2378
                                                                 Fax: 703−451−8421
                                                                 Email: lauri@teambest.com
                                                                 *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Huestis Machine Corp.**          represented by     **James Michael Brady**
*a Rhode island Corporation*                          (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Lauri Michele Luxton**
                                                      (See above for address)
                                                      *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Gunston Hall Realty, Inc.**          represented by     **James Michael Brady**
*a Virginia Corpration*                                   (See above for address)
*TERMINATED: 06/24/2013*                                  *ATTORNEY TO BE NOTICED*

                                                          **Lauri Michele Luxton**
                                                          (See above for address)
                                                          *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Best Industries Inc.**
*a Virginia Corporation*
*TERMINATED: 06/24/2013*

represented by **James Michael Brady**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauri Michele Luxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Krishnan Suthanthiran**
*an individual*

represented by **James Michael Brady**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lauri Michele Luxton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Bruce W. Henry**
*Chapter 11 Trustee for Gunston Hall*
*Realty, Inc. and Best Industries, Inc.*

represented by **Jeffery Thomas Martin , Jr.**
Henry &O'Donnell PC
300 N. Washington Street
Suite 204
Alexandria, VA 22314
(703) 548−2100
Fax: (703) 548−2105
Email: jtm@henrylaw.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Wells Fargo, Bank, N.A.**
*as successor in interest to Wachovia*
*Bank, N.A.*

represented by **Margaret Melissa Glassman**
McGuireWoods LLP
1750 Tysons Blvd
Suite 1800
McLean, VA 22102−4215
(703) 712−5000
Email: mglassman@mcguirewoods.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anastasia Poushkareva Cordova**
McGuireWoods LLP (McLean)
1750 Tysons Blvd
Suite 1800
McLean, VA 22102−4215
703−712−5004
Email: acordova@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Casey Jordan Jennings**
McGuireWoods LLP (McLean)
1750 Tysons Blvd
Suite 1800
McLean, VA 22102−4215
703−512−5000
Fax: 703−712−5201
Email: cjennings@mcguirewoods.com
*TERMINATED: 07/20/2012*

**Courtney South Schorr**
McGuireWoods LLP (McLean)
1750 Tysons Blvd
Suite 1800
McLean, VA 22102−4215
703−712−5000
Fax: 703−712−5050
Email: cschorr@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**John David Wilburn**
McGuireWoods LLP
1750 Tysons Blvd
Suite 1800
McLean, VA 22102−4215
(703) 712−5000
Email: jwilburn@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Kevin James Daniel**
McGuireWoods LLP (McLean)
1750 Tysons Blvd
Suite 1800
McLean, VA 22102−4215
703−712−5386
Email: KDaniel@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Stephen Phillip Mulligan**
McGuireWoods LLP (McLean)
1750 Tysons Blvd
Suite 1800
McLean, VA 22102−4215
703−712−5321
Fax: 703−712−5280
Email: smulligan@mcguirewoods.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**J. Kent Thompson**                 represented by   **Anastasia Poushkareva Cordova**
(See above for address)
*ATTORNEY TO BE NOTICED*

JA0003

**Courtney South Schorr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephen Phillip Mulligan**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 11/22/2011 | 1 | 33 | COMPLAINT against Wells Fargo, Bank, N.A. ( Filing fee $ 350 receipt number 14683025544.), filed by Best Medical International, Inc., Huestis Machine Corp., Best Industries Inc., Krishnan Suthanthiran, Gunston Hall Realty, Inc.. (Attachments: # 1 Civil Cover Sheet, # 2 Receipt)(jwil, ) (Entered: 11/23/2011) |
| 11/22/2011 | 2 | | Financial Interest Disclosure Statement (Local Rule 7.1) by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp.. (jwil, ) (Entered: 11/23/2011) |
| 01/12/2012 | 3 | | Summons Issued for service by SPS as to Wells Fargo, Bank, N.A. (pmil) (Entered: 01/13/2012) |
| 02/03/2012 | | | Case Reassigned to District Judge Gerald Bruce Lee. District Judge Liam O'Grady no longer assigned to the case. (rban, ) (Entered: 02/03/2012) |
| 02/03/2012 | 4 | | MOTION to Dismiss by Wells Fargo, Bank, N.A.. (Glassman, Margaret) (Entered: 02/03/2012) |
| 02/03/2012 | 5 | | Memorandum in Support re 4 MOTION to Dismiss filed by Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Glassman, Margaret) (Entered: 02/03/2012) |
| 02/03/2012 | 6 | | Notice of Hearing Date set for February 24, 2012 re 4 MOTION to Dismiss (Glassman, Margaret) (Entered: 02/03/2012) |
| 02/03/2012 | 7 | | MOTION to abstain by Wells Fargo, Bank, N.A.. (Glassman, Margaret) (Entered: 02/03/2012) |
| 02/03/2012 | 8 | | Memorandum in Support re 7 MOTION to abstain filed by Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L)(Glassman, Margaret) (Entered: 02/03/2012) |
| 02/03/2012 | 9 | | Notice of Hearing Date set for February 24, 2012 re 7 MOTION to abstain (Glassman, Margaret) (Entered: 02/03/2012) |
| 02/03/2012 | 10 | | Financial Interest Disclosure Statement (Local Rule 7.1) by Wells Fargo, Bank, N.A.. (Glassman, Margaret) (Entered: 02/03/2012) |
| 02/03/2012 | 11 | | NOTICE of Appearance by John David Wilburn on behalf of Wells Fargo, Bank, N.A. (Wilburn, John) (Entered: 02/03/2012) |
| 02/06/2012 | | | |

| | | |
|---|---|---|
| | | Set Deadlines as to 7 MOTION to abstain, 4 MOTION to Dismiss. Motion Hearing set for 2/24/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 02/06/2012) |
| 02/10/2012 | 12 | Notice of Hearing Date *(Notice of Amended Hearing)* set for 3/9/2012 re 7 MOTION to abstain (Glassman, Margaret) (Entered: 02/10/2012) |
| 02/10/2012 | 13 | Notice of Hearing Date *(Amended Notice of Hearing)* set for 3/9/2012 re 4 MOTION to Dismiss (Glassman, Margaret) (Entered: 02/10/2012) |
| 02/13/2012 | | Reset Deadlines as to 7 MOTION to abstain, 4 MOTION to Dismiss. Motion Hearing set for 3/9/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 02/13/2012) |
| 02/14/2012 | 14 | Reply to Motion re 7 MOTION to abstain *(PLAINTIFF'S MEMORANDUM IN OPPOSITON AND RESPONSE TO DEFENDANT'S MOTION TO ABSTAIN)* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 02/14/2012) |
| 02/14/2012 | 15 | Opposition to 4 MOTION to Dismiss filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 02/14/2012) |
| 02/14/2012 | 16 | Memorandum in Opposition re 4 MOTION to Dismiss filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 EXHIBIT 1, # 2 EXHIBIT 2, # 3 EXHIBIT 3, # 4 EXHIBIT 4, # 5 EXHIBIT 5)(Brady, James) (Entered: 02/14/2012) |
| 02/21/2012 | 17 | REPLY to Response to Motion re 7 MOTION to abstain filed by Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Glassman, Margaret) (Entered: 02/21/2012) |
| 02/21/2012 | 18 | REPLY to Response to Motion re 4 MOTION to Dismiss filed by Wells Fargo, Bank, N.A.. (Glassman, Margaret) (Entered: 02/21/2012) |
| 03/01/2012 | 19 | Notice of Hearing Date *(Amended Notice of Hearing)* set for 03/16/2012 re 7 MOTION to abstain (Glassman, Margaret) (Entered: 03/01/2012) |
| 03/01/2012 | 20 | Notice of Hearing Date *(Amended Notice of Hearing)* set for 03/16/2012 re 4 MOTION to Dismiss (Glassman, Margaret) (Entered: 03/01/2012) |
| 03/02/2012 | | Reset Deadlines as to 7 MOTION to abstain, 4 MOTION to Dismiss. Motion Hearing set for 3/16/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 03/02/2012) |
| 03/16/2012 | 21 | Minute Entry for proceedings held before District Judge Gerald Bruce Lee: Motion Hearing held on 3/16/2012 re: 4 MOTION to Dismiss filed by Wells Fargo, Bank, N.A., 7 MOTION to abstain filed by Wells Fargo, Bank, N.A. Appearances: James Brady for Pltff; John Wilburn for Deft. Heard, findings stated, and granted. Pltff's oral motion to refile: Court stated that it will specify in its order that the case is dismissed without prejudice. (Court Reporter R. Wilson.) (tbul, ) (Entered: 03/19/2012) |
| 03/19/2012 | 22 | ORDER, for reasons stated in open court on 3/16/12, granting Deft Wells |

| | | | |
|---|---|---|---|
| | | | Fargo, Bank, N.A.'s 4 Motion to Dismiss, and DISMISSING WITH PREJUDICE any claims based on events predating 7/31/09, and DISMISSING WITHOUT PREJUDICE Pltff's discrimination claim under 42 U.S.C. 1981; denying Deft Wells Fargo, Bank, N.A.'s 7 Motion to Abstain. /s/ by District Judge Gerald Bruce Lee on 3/19/12. (tbul, ) (Entered: 03/19/2012) |
| 03/23/2012 | 23 | | First MOTION to Amend/Correct *COMPLAINT* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 03/23/2012) |
| 03/23/2012 | 24 | | Memorandum in Support re 23 First MOTION to Amend/Correct *COMPLAINT* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit Proposed Complaint, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2, # 4 Exhibit Exhibit 3, # 5 Exhibit Exhibit 4, # 6 Exhibit Exhibit 5, # 7 Exhibit Exhibit 6)(Brady, James) (Entered: 03/23/2012) |
| 03/23/2012 | 25 | | Notice of Hearing Date set for 04/06/2012 re 23 First MOTION to Amend/Correct *COMPLAINT* (Brady, James) (Entered: 03/23/2012) |
| 03/23/2012 | 26 | | First MOTION for Preliminary Injunction by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 03/23/2012) |
| 03/23/2012 | 27 | | Memorandum in Support re 26 First MOTION for Preliminary Injunction filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit EXHIBIT 1, # 2 Exhibit EXHIBIT 2)(Brady, James) (Entered: 03/23/2012) |
| 03/26/2012 | | | Set Deadlines as to 23 First MOTION to Amend/Correct *COMPLAINT*. Motion Hearing set for 4/6/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (clar, ) (Entered: 03/26/2012) |
| 03/26/2012 | | | MOTIONS REFERRED to Magistrate Judge: Jones. 23 First MOTION to Amend/Correct *COMPLAINT* (clar, ) (Entered: 03/26/2012) |
| 03/26/2012 | | | Notice of Correction re: 26 First MOTION for Preliminary Injunction. Counsel has notified the Clerk's Office that a Notice of Hearing will be filed as to this motion. (pmil) (Entered: 03/26/2012) |
| 03/26/2012 | 28 | | Notice of Hearing Date set for APRIL 6, 2012 re 26 First MOTION for Preliminary Injunction (Brady, James) (Entered: 03/26/2012) |
| 03/26/2012 | 29 | | MOTION to Expedite *HEARING FOR EXPEDITED HEARING FOR MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 03/26/2012) |
| 03/26/2012 | 30 | | Memorandum in Support re 26 First MOTION for Preliminary Injunction, 29 MOTION to Expedite *HEARING FOR EXPEDITED HEARING FOR MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION*, 23 First MOTION to |

| | | | |
|---|---|---|---|
| | | | Amend/Correct *COMPLAINT* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 03/26/2012) |
| 03/27/2012 | | | Set Deadlines as to 26 First MOTION for Preliminary Injunction. Motion Hearing set for 4/6/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 03/27/2012) |
| 03/27/2012 | 31 | | TRANSCRIPT of proceedings for dates of March 16, 2012, before Judge Gerald Bruce Lee, Court Reporter/Transcriber Renecia Wilson, Telephone number,703−501−1580. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 4/26/2012. Redacted Transcript Deadline set for 5/29/2012. Release of Transcript Restriction set for 6/25/2012.(wilson, renecia) (Entered: 03/27/2012)** |
| 03/28/2012 | | | Set/Reset Hearings: Telephone Conference Call set for 3/28/2012 at 10:30 AM in Chambers before District Judge Gerald Bruce Lee. (tbul, ) (Entered: 03/28/2012) |
| 03/28/2012 | | | Reset Deadlines as to 23 First MOTION to Amend/Correct *COMPLAINT*. Motion Hearing set for 4/6/2012 at 10:00 AM in Alexandria Courtroom 701 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 03/28/2012) |
| 03/28/2012 | 32 | | Minute Entry for proceedings held before District Judge Gerald Bruce Lee: Telephone Status Conference / Motion Hearing held on 3/28/2012 held on 3/28/2012 re: 29 MOTION to Expedite *HEARING FOR EXPEDITED HEARING FOR MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION* filed by Krishnan Suthanthiran, Best Medical International, Inc., Best Industries Inc., Gunston Hall Realty, Inc., Huestis Machine Corp. Appearances: Jim Brady for Pltff; John Wilburn for Deft. Court granted the motion for an expedited hrg. (Oral Order), and a brief will be filed before noon today, w/ the reply waived. The hearing is set for 4:00 p.m. today in open court, w/ a substitute court reporter. (Court Reporter R. Wilson.) (tbul, ) (Entered: 03/28/2012) |
| 03/28/2012 | | | Reset Deadlines as to 23 First MOTION to Amend/Correct *COMPLAINT*, 26 First MOTION for Preliminary Injunction. Motion Hearing set for 3/28/2012 at 04:00 PM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 03/28/2012) |
| 03/28/2012 | 33 | | Opposition to 26 Motion for Preliminary Injunction, 29 MOTION to Expedite *HEARING FOR EXPEDITED HEARING FOR MOTION FOR LEAVE TO FILE FIRST AMENDED COMPLAINT AND REQUEST FOR PRELIMINARY INJUNCTION* filed by Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A − February 24, 2012 Order, # 2 Exhibit B − March 16, 2012 Order)(Glassman, Margaret) Modified on 3/29/2012 to add |

| | | | relationship to doc#26(pmil). (Entered: 03/28/2012) |
|---|---|---|---|
| 03/28/2012 | 34 | | Minute Entry for proceedings held before District Judge Gerald Bruce Lee: Motion Hearing held on 3/28/2012 re 26 First MOTION for Preliminary Injunction filed by Krishnan Suthanthiran, Best Medical International, Inc., Best Industries Inc., Gunston Hall Realty, Inc., Huestis Machine Corp. (heard, findings stated, and denied) and 23 First MOTION to Amend/Correct *COMPLAINT* filed by Krishnan Suthanthiran, Best Medical International, Inc., Best Industries Inc., Gunston Hall Realty, Inc., Huestis Machine Corp. (heard, findings stated, and granted). Appearances: James Brady for Pltff; John Wilburn and Melissa Glassman for Deft. Order to follow. (Court Reporter Tracy Westfall.) (tbul, ) (Entered: 03/28/2012) |
| 03/28/2012 | 35 | 49 | ORDER, for the reasons stated in open court, denying 26 Motion for Preliminary Injunction; granting 29 Motion to Expedite; granting 23 Motion to Amend/Correct. Signed by District Judge Gerald Bruce Lee on 3/28/2012. (rban, ) (Entered: 03/30/2012) |
| 04/13/2012 | 36 | | TRANSCRIPT of proceedings for dates of March 28, 2012, before Judge Lee, Court Reporter/Transcriber Tracy Westfall, Telephone number 703−549−2080. **NOTICE RE REDACTION OF TRANCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 5/14/2012. Redacted Transcript Deadline set for 6/13/2012. Release of Transcript Restriction set for 7/12/2012.**(westfall, tracy) (Entered: 04/13/2012) |
| 04/17/2012 | 37 | | MOTION to Dismiss for Failure to State a Claim by Wells Fargo, Bank, N.A.. (Jennings, Casey) (Entered: 04/17/2012) |
| 04/17/2012 | 38 | | Memorandum in Support re 37 MOTION to Dismiss for Failure to State a Claim filed by Wells Fargo, Bank, N.A.. (Jennings, Casey) (Entered: 04/17/2012) |
| 04/18/2012 | 39 | | NOTICE by Wells Fargo, Bank, N.A. re 38 Memorandum in Support *of Submission of Exhibits* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Jennings, Casey) (Entered: 04/18/2012) |
| 04/18/2012 | | | Notice of Correction re: 37 MOTION to Dismiss for Failure to State a Claim. The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. (pmil) (Entered: 04/18/2012) |
| 04/18/2012 | 40 | | Notice of Hearing Date set for May 11, 2012 re 37 MOTION to Dismiss for Failure to State a Claim (Glassman, Margaret) (Entered: 04/18/2012) |
| 04/19/2012 | | | Set Deadlines as to 37 MOTION to Dismiss for Failure to State a Claim. Motion Hearing set for 5/11/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 04/19/2012) |

| 04/30/2012 | 41 | Memorandum in Opposition re 37 MOTION to Dismiss for Failure to State a Claim filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit 1)(Brady, James) (Entered: 04/30/2012) |
|---|---|---|
| 05/07/2012 | 42 | REPLY to Response to Motion re 37 MOTION to Dismiss for Failure to State a Claim filed by Wells Fargo, Bank, N.A.. (Glassman, Margaret) (Entered: 05/07/2012) |
| 05/11/2012 | 43 | Notice of Hearing Date *Amended* re 37 MOTION to Dismiss for Failure to State a Claim (Glassman, Margaret) (Entered: 05/11/2012) |
| 05/11/2012 | | Set Deadline as to 37 MOTION to Dismiss for Failure to State a Claim. – Motion Hearing set for 5/23/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (tche) (Entered: 05/14/2012) |
| 05/18/2012 | 44 | Notice of Hearing Date *AMENDED* set for June 15, 2012 re 37 MOTION to Dismiss for Failure to State a Claim (Glassman, Margaret) (Entered: 05/18/2012) |
| 05/21/2012 | | Reset Deadlines as to 37 MOTION to Dismiss for Failure to State a Claim. Motion Hearing set for 6/15/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 05/21/2012) |
| 05/24/2012 | 45 | Notice of Hearing Date *AMENDED* set for June 19, 2012 re 37 MOTION to Dismiss for Failure to State a Claim (Glassman, Margaret) (Entered: 05/24/2012) |
| 05/25/2012 | | Reset Deadlines as to 37 MOTION to Dismiss for Failure to State a Claim. Motion Hearing set for 6/19/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 05/25/2012) |
| 06/04/2012 | 46 | MOTION for Leave to File *SECOND AMENDED COMPLAINT* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 06/04/2012) |
| 06/04/2012 | 47 | Memorandum in Support re 46 MOTION for Leave to File *SECOND AMENDED COMPLAINT* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit A– Plaintiff's Second Amended Complaint, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7)(Brady, James) (Entered: 06/04/2012) |
| 06/05/2012 | | Notice of Correction re: 46 MOTION for Leave to File *SECOND AMENDED COMPLAINT*. The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. (pmil) (Entered: 06/05/2012) |
| 06/12/2012 | 48 | Notice of Hearing Date re 46 MOTION for Leave to File *SECOND AMENDED COMPLAINT* (Brady, James) (Entered: 06/12/2012) |
| 06/13/2012 | | Set Deadlines as to 46 MOTION for Leave to File *SECOND AMENDED COMPLAINT*. Motion Hearing set for 6/19/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: |

| | | | |
|---|---|---|---|
| | | | 06/13/2012) |
| 06/14/2012 | 49 | | RESPONSE in Opposition re 46 MOTION for Leave to File *SECOND AMENDED COMPLAINT* filed by Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B)(Jennings, Casey) (Entered: 06/14/2012) |
| 06/18/2012 | 50 | | Reply to 49 Response in Opposition to Motion filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 06/18/2012) |
| 06/19/2012 | 51 | | Withdrawal of Motion by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran re 46 MOTION for Leave to File *SECOND AMENDED COMPLAINT*, 47 Memorandum in Support, 50 Reply, 48 Notice of Hearing Date (Brady, James) (Entered: 06/19/2012) |
| 06/19/2012 | 52 | | Minute Entry for proceedings held before District Judge Gerald Bruce Lee:Motion Hearing held on 6/19/2012 re: 37 MOTION to Dismiss for Failure to State a Claim filed by Wells Fargo, Bank, N.A. Appearances: James Brady / Shaun Weingast for Pltff; Margaret Glassman / John Wilburn for Deft. Heard. Findings stated − granted in part and denied in part. Pltff to file a notice of withdrawal as noted in open court. Order to follow. (Court Reporter Tracy Westfall.)(tbul, ) (Entered: 06/20/2012) |
| 06/26/2012 | 53 | | SCHEDULING ORDER:Initial Pretrial Conference set for 7/18/2012 at 11:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. Final Pretrial Conference set for 10/18/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. Discovery due by 10/12/2012. Signed by District Judge Gerald Bruce Lee on 06/26/12. (Attachments: # 1 Pretrial Notice, # 2 Magistrate Consent Form)(pmil) (Entered: 06/26/2012) |
| 06/26/2012 | 54 | | ORDER, for reasons stated in open court on 6/19/12, DENYING Deft's 37 Motion to Dismiss for Failure to State a Claim. /s/ by District Judge Gerald Bruce Lee on 6/26/12. (tbul, ) (Entered: 06/28/2012) |
| 07/02/2012 | 55 | 51 | *Wells Fargo's* ANSWER to Complaint *First Amended Complaint* by Wells Fargo, Bank, N.A..(Jennings, Casey) (Entered: 07/02/2012) |
| 07/03/2012 | | | Notice of Correction re: 55 Answer to Complaint. The signature block on the document − Certificate of Service − does not match the filing users login. The filing user has been notified and has been asked to either refile the document − Certificate of Service only − or to have the attorney whose signature block appears on the document refile the document. (pmil) (Entered: 07/03/2012) |
| 07/03/2012 | 56 | | CERTIFICATE of Service re 55 Answer to Complaint by Casey Jordan Jennings on behalf of Wells Fargo, Bank, N.A. (Jennings, Casey) (Entered: 07/03/2012) |
| 07/03/2012 | 57 | | AMENDED ORDER. The Court hereby Amends the ORDER entered 4/30/12. This matter is before the court on Defendant's Motion to Dismiss the First Amended Complaint 37 , for the reasons stated in open court on 6/19/12, that Defendant's Motion to Dismiss IS GRANTED IN PART and |

| | | | |
|---|---|---|---|
| | | | DENIED IN PART. ORDERED that Defendant's Motion to Dismiss is GRANTED as to Plaintiffs' harassment claims in Count I of the First Amended Complaint. Plaintiffs' harassment claims are DISMISSED WITH PREJUDICE; that Defendant's Motion to Dismiss is DENIED as to Plaintiffs' race discrimination claims in Count I and retaliation claim in Count II of the First Amended Complaint. Signed by District Judge Gerald Bruce Lee on 7/3/2012. (rban, ) (Entered: 07/05/2012) |
| 07/11/2012 | <u>58</u> | | Discovery Plan by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran, Wells Fargo, Bank, N.A..(Glassman, Margaret) (Entered: 07/11/2012) |
| 07/17/2012 | <u>59</u> | | Rule 16(b) Scheduling Order – Pursuant to the Rule 16(b) Conference it is ordered that **parties shall deliver to my chambers (not to the Clerk's office) a copy of every non–dispositive motion and every document relating to such a motion within one business day of filing it** ; Rule 26(a) disclosures, depositions, interrogatories, requests for documents and admissions, and answers thereto shall not be filed except on order of the court, or for use in a motion or at trial; The Rule 26(f) report filed by the parties is approved, and shall control discovery to the extent of its application unless modified by the court herein or hereafter; Any motion to amend the pleadings or to join a party shall be made as soon as possible after counsel becomes aware of the grounds for the motion (see Order for details). Signed by Magistrate Judge Thomas Rawles Jones, Jr on 07/17/12. (pmil) (Entered: 07/17/2012) |
| 07/20/2012 | <u>60</u> | | Notice of Substitution of Counsel of Kevin J. Daniel by Kevin James Daniel on behalf of Wells Fargo, Bank, N.A. (Daniel, Kevin) (Entered: 07/20/2012) |
| 08/03/2012 | <u>61</u> | 60 | MOTION for Leave to File *SECOND AMENDED COMPLAINT* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 08/03/2012) |
| 08/03/2012 | <u>62</u> | 63 | Memorandum in Support re <u>61</u> MOTION for Leave to File *SECOND AMENDED COMPLAINT* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit 1, # <u>3</u> Exhibit 2, # <u>4</u> Exhibit 3, # <u>5</u> Exhibit 4, # <u>6</u> Exhibit 5, # <u>7</u> Exhibit 6, # <u>8</u> Exhibit 7, # <u>9</u> Exhibit 8)(Brady, James) (Entered: 08/03/2012) |
| 08/03/2012 | <u>63</u> | | Notice of Hearing Date set for AUGUST 17, 2012 re <u>61</u> MOTION for Leave to File *SECOND AMENDED COMPLAINT* (Brady, James) (Entered: 08/03/2012) |
| 08/03/2012 | <u>64</u> | | MOTION to Strike *WELLS FARGO'S OBJECTIONS*, MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 08/03/2012) |
| 08/03/2012 | <u>65</u> | | Memorandum in Support re <u>64</u> MOTION to Strike *WELLS FARGO'S OBJECTIONS* MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Exhibit C, # <u>4</u> Exhibit |

| | | | |
|---|---|---|---|
| | | | D)(Brady, James) (Entered: 08/03/2012) |
| 08/03/2012 | 66 | | Notice of Hearing Date set for SEPTEMBER 7, 2012 re 64 MOTION to Strike *WELLS FARGO'S OBJECTIONS* MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* (Brady, James) (Entered: 08/03/2012) |
| 08/06/2012 | | | Set Deadlines as to 61 MOTION for Leave to File *SECOND AMENDED COMPLAINT*. Motion Hearing set for 8/17/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (clar, ) (Entered: 08/06/2012) |
| 08/06/2012 | | | MOTIONS REFERRED to Magistrate Judge: Jones. 61 MOTION for Leave to File *SECOND AMENDED COMPLAINT* (clar, ) (Entered: 08/06/2012) |
| 08/06/2012 | 67 | | Withdrawal of Motion by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran re 66 Notice of Hearing Date, 65 Memorandum in Support, 64 MOTION to Strike *WELLS FARGO'S OBJECTIONS* MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* (Brady, James) (Entered: 08/06/2012) |
| 08/06/2012 | 68 | 249 | MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 08/06/2012) |
| 08/06/2012 | 69 | 251 | Memorandum in Support re 68 MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Brady, James) (Entered: 08/06/2012) |
| 08/06/2012 | 70 | | Notice of Hearing Date set for September 7, 2012 re 68 MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* (Brady, James) (Entered: 08/06/2012) |
| 08/07/2012 | | | Set Deadlines as to 68 MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY*. Motion Hearing set for 9/7/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (clar, ) (Entered: 08/07/2012) |
| 08/07/2012 | | | MOTIONS REFERRED to Magistrate Judge: Jones. 68 MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* (clar, ) (Entered: 08/07/2012) |
| 08/13/2012 | 71 | | TRANSCRIPT of proceedings for dates of June 19, 2012, before Judge Lee, Court Reporter/Transcriber Tracy Westfall, Telephone number 703–549–2080. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER** |

| | | | |
|---|---|---|---|
| | | | Redaction Request due 9/12/2012. Redacted Transcript Deadline set for 10/15/2012. Release of Transcript Restriction set for 11/13/2012.(westfall, tracy) (Entered: 08/13/2012) |
| 08/14/2012 | 72 | 327 | Opposition to 61 MOTION for Leave to File *SECOND AMENDED COMPLAINT (Wells Fargo's Opposition to Plaintiffs' Motion for Leave to File Second Amended Complaint)* filed by Wells Fargo, Bank, N.A.. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F, #7 Exhibit G)(Glassman, Margaret) (Entered: 08/14/2012) |
| 08/16/2012 | 73 | | Reply to 72 Opposition, filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: #1 Exhibit A, #2 Exhibit B)(Brady, James) (Entered: 08/16/2012) |
| 08/17/2012 | 74 | | NOTICE of Appearance by Lauri Michele Luxton on behalf of Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran (Luxton, Lauri) (Entered: 08/17/2012) |
| 08/20/2012 | 75 | 380 | ORDER granting 61 Motion for Leave to File. Plaintiff shall electronically file their second amended complaint forthwith. Signed by Magistrate Judge Thomas Rawles Jones, Jr on 8/20/2012. (rban, ) (Entered: 08/20/2012) |
| 08/20/2012 | 76 | 381 | Opposition to 68 MOTION to Compel *WELLS FARGO TO ANSWER DISCOVERY* filed by Wells Fargo, Bank, N.A.. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F, #7 Exhibit G, #8 Exhibit H, #9 Exhibit I, #10 Exhibit J, #11 Exhibit K)(Glassman, Margaret) (Entered: 08/20/2012) |
| 08/20/2012 | 77 | 610 | AMENDED COMPLAINT against Wells Fargo, Bank, N.A., J. Kent Thompson filed by Best Medical International, Inc., Huestis Machine Corp., Best Industries Inc., Krishnan Suthanthiran, Gunston Hall Realty, Inc.. (Attachments: #1 Exhibit 1, #2 Exhibit 2, #3 Exhibit 3, #4 Exhibit 4, #5 Exhibit 5, #6 Exhibit 6, #7 Exhibit 7, #8 Exhibit 8)(Brady, James) Modified on 8/21/2012 to edit text to reflect additional deft (pmil). (Entered: 08/20/2012) |
| 08/20/2012 | 78 | | MOTION for Protective Order by Wells Fargo, Bank, N.A.. (Attachments: #1 Proposed Order)(Glassman, Margaret) (Entered: 08/20/2012) |
| 08/20/2012 | 79 | | Memorandum in Support re 78 MOTION for Protective Order filed by Wells Fargo, Bank, N.A.. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C)(Glassman, Margaret) (Entered: 08/20/2012) |
| 08/20/2012 | 80 | | Notice of Hearing Date set for September 7, 2012 re 78 MOTION for Protective Order (Glassman, Margaret) (Entered: 08/20/2012) |
| 08/21/2012 | | | Set Deadlines as to 78 MOTION for Protective Order. Motion Hearing set for 9/7/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (clar, ) (Entered: 08/21/2012) |
| 08/21/2012 | | | MOTIONS REFERRED to Magistrate Judge: Jones. 78 MOTION for Protective Order (clar, ) (Entered: 08/21/2012) |

| 08/21/2012 | | | Notice of Correction re:_77 Amended Complaint. The text and docket sheet have been modified to reflect the addition of J. Kent Thompson as a party deft. Also, the filing user has been notified to file a separate Certificate of Service. (pmil) (Entered: 08/21/2012) |
|---|---|---|---|
| 08/28/2012 | 81 | | RESPONSE in Opposition re_78 MOTION for Protective Order filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 08/28/2012) |
| 08/30/2012 | 82 | | SECOND AMENDED COMPLAINT Summons Issued for service by SPS as to J. Kent Thompson. (pmil) (Entered: 08/31/2012) |
| 09/04/2012 | 83 | | REPLY to Response to Motion re_78 MOTION for Protective Order filed by Wells Fargo, Bank, N.A.. (Glassman, Margaret) (Entered: 09/04/2012) |
| 09/04/2012 | 84 | | NOTICE of Appearance by Stephen Phillip Mulligan on behalf of J. Kent Thompson, Wells Fargo, Bank, N.A. (Mulligan, Stephen) (Entered: 09/04/2012) |
| 09/04/2012 | 85 | | MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT* by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #_1 Proposed Order)(Mulligan, Stephen) (Entered: 09/04/2012) |
| 09/04/2012 | 86 | | Brief in Support to_85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #_1 Exhibit A, #_2 Exhibit B, #_3 Exhibit C, #_4 Exhibit D, #_5 Exhibit E, #_6 Exhibit F, #_7 Exhibit G, #_8 Exhibit H, #_9 Exhibit I, #_10 Exhibit J, #_11 Exhibit K, #_12 Exhibit L, #_13 Exhibit M, #_14 Exhibit N, #_15 Exhibit O)(Mulligan, Stephen) (Entered: 09/04/2012) |
| 09/04/2012 | 87 | | *Wells Fargo's* ANSWER to Complaint *(ANSWER AND AFFIRMATIVE DEFENSES TO COUNTS I &III OF PLAINTIFFS SECOND AMENDED COMPLAINT)* by Wells Fargo, Bank, N.A..(Mulligan, Stephen) (Entered: 09/04/2012) |
| 09/05/2012 | | | Notice of Correction re:_85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT.* The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument. (pmil) (Entered: 09/05/2012) |
| 09/07/2012 | 88 | | Minute Entry for proceedings held before Magistrate Judge Thomas Rawles Jones, Jr: Motion Hearing held on 9/7/2012 re_68 MOTION to Compel filed by Krishnan Suthanthiran, Best Medical International, Inc., Best Industries Inc., Gunston Hall Realty, Inc., Huestis Machine Corp.,_78 MOTION for Protective Order filed by Wells Fargo, Bank, N.A. Appearances of counsel. Plaintiff's Motion to Compel is granted in part and denied in part. Defendant's Motion for Protective Order is granted. Order to follow. (Court Reporter FTR.)(dper) (Entered: 09/10/2012) |
| 09/10/2012 | 89 | | ORDER, for the reasons stated from the bench, and in accord with specific rulings made at that time, it is ORDERED as follows: 1) Plaintiff's_68 Motion to Compel certain discovery is GRANTED IN PART and DENIED |

| | | |
|---|---|---|
| | | IN PART. 2) Defendant's 78 Motion for Protective Order to quash certain deposition notices is GRANTED, and the deposition notices are quashed, without prejudice to plaintiffs' ability to seek further relief after conducting a Rule 30(b)(6) deposition. Signed by Magistrate Judge Thomas Rawles Jones, Jr on 9/10/12. (dper) (Entered: 09/10/2012) |
| 09/11/2012 | 90 | Notice of Hearing Date set for Friday, September 28, 2012 re 85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT* (Mulligan, Stephen) (Entered: 09/11/2012) |
| 09/12/2012 | | Set Deadline as to 85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT*. Motion Hearing set for 9/28/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (stas) (Entered: 09/12/2012) |
| 09/12/2012 | 91 | TRANSCRIPT of proceedings for dates of September 7, 2012, before Judge Thomas R. Jones, Court Reporter/Transcriber Renecia Wilson, Telephone number,703−501−1580. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 10/12/2012. Redacted Transcript Deadline set for 11/13/2012. Release of Transcript Restriction set for 12/11/2012.(wilson, renecia) (Entered: 09/12/2012)** |
| 09/13/2012 | 92 | Memorandum in Opposition re 85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Brady, James) (Entered: 09/13/2012) |
| 09/18/2012 | | Reset Deadlines as to 85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT*. Motion Hearing set for 10/12/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (Per GBL chambers) (clar, ) (Entered: 09/18/2012) |
| 09/19/2012 | 93 | Reply to Motion re 85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit 1)(Mulligan, Stephen) (Entered: 09/19/2012) |
| 09/21/2012 | | Reset Deadlines as to 85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT*. Motion Hearing set for 10/26/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (Per GBL chambers) (clar, ) (Entered: 09/21/2012) |
| 09/21/2012 | 94 | NOTICE of Appearance by Courtney South Schorr on behalf of J. Kent Thompson, Wells Fargo, Bank, N.A. (Schorr, Courtney) (Entered: 09/21/2012) |

| 09/21/2012 | 95 | | MOTION for Protective Order by Wells Fargo, Bank, N.A.. (Attachments: # 1 Proposed Order)(Glassman, Margaret) Modified text on 10/11/2012 (clar, ). (Entered: 09/21/2012) |
|---|---|---|---|
| 09/21/2012 | 96 | | Memorandum in Support re 95 MOTION for Protective Order filed by Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Glassman, Margaret) (Entered: 09/21/2012) |
| 09/21/2012 | 97 | | MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 09/21/2012) |
| 09/21/2012 | 98 | | Memorandum in Support re 97 MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Brady, James) (Entered: 09/21/2012) |
| 09/21/2012 | 99 | | Notice of Hearing Date set for October 5, 2012 re 97 MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order* (Brady, James) (Entered: 09/21/2012) |
| 09/21/2012 | 100 | | Notice of Hearing Date *for October 5, 2012* re 95 MOTION for Protective Order (Schorr, Courtney) (Entered: 09/21/2012) |
| 09/24/2012 | | | Notice of Correction re 99 Notice of Hearing Date. Attorney was notified the Judge Jones is not hearing motions on Octover 5, 2012 due to the Judicial Conference and to Please re−notice the motion that was set for 10/5/12. (clar, ) (Entered: 09/24/2012) |
| 09/24/2012 | | | Notice of Correction re 100 Notice of Hearing Date. Attorney was notifed the Judge JOnes is not hearing motion on October 5, 2012 due to the Judicial Conference and to Please re−notice the motion that was set for 10/5/12.(clar, ) (Entered: 09/24/2012) |
| 09/24/2012 | | | Set Deadlines as to 97 MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order*, 95 MOTION for Protective Order. Motion Hearing set for 10/5/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (Attorneys have been notified to file an Amended Notice of Hearing for 10/5/12 due to the Judicial Conference − Deadlines Terminated) (clar, ) (Entered: 09/24/2012) |
| 09/24/2012 | | | MOTIONS REFERRED to Magistrate Judge: Jones. 97 MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order*, 95 MOTION for Protective Order (clar, ) (Entered: 09/24/2012) |
| 09/24/2012 | 101 | | Notice of Hearing Date set for October 12, 2012 re 97 MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order* (Brady, James) (Entered: 09/24/2012) |
| 09/24/2012 | 102 | | Notice of Hearing Date *(Amended)* set for October 12, 2012 re 95 MOTION for Protective Order (Schorr, Courtney) (Entered: 09/24/2012) |

| 09/25/2012 | | | Reset Deadlines as to 97 MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order*, 95 MOTION for Protective Order. Motion Hearing set for 10/12/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (clar, ) (Entered: 09/25/2012) |
| 10/01/2012 | 103 | | *Consent Motion for Entry of Protective Order* by J. Kent Thompson, Wells Fargo, Bank, N.A. (Attachments: # 1 Proposed Order And Exhibit A)(Schorr, Courtney) Modified on 10/2/2012 to correct event and edit text (pmil). (Entered: 10/01/2012) |
| 10/02/2012 | | | Notice of Correction re: 103 Stipulation. The filing user selected the wrong event. Stipulation was selected and Motion for Protective Order should have been selected. The docket has been corrected. (pmil) (Entered: 10/02/2012) |
| 10/02/2012 | 104 | | STIPULATED PROTECTIVE ORDER re: the handling and labeling of confidential materials (see Order for details). Signed by Magistrate Judge Thomas Rawles Jones, Jr on 10/02/12. (pmil) (Entered: 10/02/2012) |
| 10/05/2012 | 105 | | RESPONSE in Opposition re 97 MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order*, Memorandum in Opposition filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Schorr, Courtney) (Entered: 10/05/2012) |
| 10/05/2012 | 106 | | MOTION to Strike *Plaintiff Suthanthiran's Objections to Discovery Requests and Motion To Compel* by J. Kent Thompson. (Attachments: # 1 Proposed Order)(Schorr, Courtney) (Entered: 10/05/2012) |
| 10/05/2012 | 107 | | Memorandum in Support re 106 MOTION to Strike *Plaintiff Suthanthiran's Objections to Discovery Requests and Motion To Compel* filed by J. Kent Thompson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Schorr, Courtney) (Entered: 10/05/2012) |
| 10/05/2012 | 108 | | Notice of Hearing Date set for Friday, October 12, 2012 re 106 MOTION to Strike *Plaintiff Suthanthiran's Objections to Discovery Requests and Motion To Compel* (Schorr, Courtney) (Entered: 10/05/2012) |
| 10/09/2012 | | | Set Deadlines as to 106 MOTION to Strike *Plaintiff Suthanthiran's Objections to Discovery Requests and Motion To Compel*. Motion Hearing set for 10/12/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (clar, ) (Entered: 10/09/2012) |
| 10/09/2012 | | | MOTIONS REFERRED to Magistrate Judge: Jones. 106 MOTION to Strike *Plaintiff Suthanthiran's Objections to Discovery Requests and Motion To Compel* (clar, ) (Entered: 10/09/2012) |
| 10/09/2012 | | | Notice of Correction re: 105 Response in Opposition to Motion, Memorandum in Opposition. The signature block on the document − Certificate of Service − does not match the filing users login. The filing user has been notified and has been asked to either refile the document − Certificate of Service only − or to have the attorney whose signature block appears on the document refile the document. (pmil) (Entered: 10/09/2012) |
| 10/09/2012 | 109 | | CERTIFICATE of Service *(Amended)* re 105 Response in Opposition to Motion, Memorandum in Opposition,, by Courtney South Schorr on behalf |

| | | |
|---|---|---|
| | | of J. Kent Thompson, Wells Fargo, Bank, N.A. (Attachments: #_1 Exhibit Amended Certificate of Service)(Schorr, Courtney) (Entered: 10/09/2012) |
| 10/09/2012 | 110 | MOTION to Quash *Defendant's Motion To Strike Objections and Compel From the October 12, 2012 Docket* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 10/09/2012) |
| 10/09/2012 | 111 | Brief in Support to_110 MOTION to Quash *Defendant's Motion To Strike Objections and Compel From the October 12, 2012 Docket* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: #_1 Exhibit 1, #_2 Exhibit 2)(Brady, James) (Entered: 10/09/2012) |
| 10/10/2012 | | Notice of Correction re:_110 MOTION to Quash *Defendant's Motion To Strike Objections and Compel From the October 12, 2012 Docket*,_111 Brief in Support. The filing user has been notified to file a separate Certificate of Service. (pmil) (Entered: 10/10/2012) |
| 10/10/2012 | 112 | ORDER, it appearing that deft Thompson's Motion to Compel (no. 106) was filed late and without leave, it is ORDERED that the hearing on the motion is continued to 10/19/12, at 10:00 a.m.; and pltf's_110 Motion to Strike is therefore moot. Signed by Magistrate Judge Thomas Rawles Jones, Jr on 10/10/12. (pmil) (Entered: 10/10/2012) |
| 10/10/2012 | | Reset Deadline as to_106 MOTION to Strike *Plaintiff Suthanthiran's Objections to Discovery Requests and Motion To Compel*. Motion Hearing set for 10/19/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (pmil) (Entered: 10/10/2012) |
| 10/10/2012 | 113 | CERTIFICATE of Service re_111 Brief in Support, by James Michael Brady on behalf of Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran (Brady, James) (Entered: 10/10/2012) |
| 10/10/2012 | 114 | MOTION to Expedite *Hearing* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 10/10/2012) |
| 10/10/2012 | 115 | MOTION for Sanctions *Pursuant to Rule 37(d), (or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #_1 Proposed Order)(Schorr, Courtney) (Entered: 10/10/2012) |
| 10/10/2012 | 116 | Brief in Support to_114 MOTION to Expedite *Hearing* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 10/10/2012) |
| 10/10/2012 | 117 | Memorandum in Support re_115 MOTION for Sanctions *Pursuant to Rule 37(d), (or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #_1 Exhibit A, #_2 Exhibit B, #_3 Exhibit C, #_4 Exhibit D, #_5 Exhibit E, #_6 Exhibit F)(Schorr, Courtney) (Entered: 10/10/2012) |
| 10/10/2012 | 118 | |

| | | |
|---|---|---|
| | | Notice of Hearing Date *October 12, 2012* re 114 MOTION to Expedite *Hearing* (Brady, James) (Entered: 10/10/2012) |
| 10/10/2012 | 119 | Notice of Hearing Date set for October 19, 2012 re 115 MOTION for Sanctions *Pursuant to Rule 37(d), (or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* (Schorr, Courtney) (Entered: 10/10/2012) |
| 10/10/2012 | 120 | MOTION to Quash *Subpoena/Deposition Notice for Deposition Scheduled After Expiration of Discovery* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 10/10/2012) |
| 10/10/2012 | 121 | Brief in Support to 120 MOTION to Quash *Subpoena/Deposition Notice for Deposition Scheduled After Expiration of Discovery* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 10/10/2012) |
| 10/10/2012 | 122 | Notice of Hearing Date set for October 12, 2012 re 120 MOTION to Quash *Subpoena/Deposition Notice for Deposition Scheduled After Expiration of Discovery* (Brady, James) (Entered: 10/10/2012) |
| 10/10/2012 | 123 | MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Proposed Order)(Schorr, Courtney) (Entered: 10/10/2012) |
| 10/10/2012 | 124 | Memorandum in Support re 123 MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Schorr, Courtney) (Entered: 10/10/2012) |
| 10/10/2012 | 125 | Notice of Hearing Date set for October 19, 2012 re 123 MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* (Schorr, Courtney) (Entered: 10/10/2012) |
| 10/10/2012 | 126 | MOTION for Protective Order by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 10/10/2012) |
| 10/10/2012 | 127 | Memorandum in Support re 126 MOTION for Protective Order filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Brady, James) (Entered: 10/10/2012) |

| 10/10/2012 | 128 | Notice of Hearing Date set for October 26, 2012 re 126 MOTION for Protective Order (Brady, James) (Entered: 10/10/2012) |
|---|---|---|
| 10/11/2012 | | Set/Reset Deadlines as to 120 MOTION to Quash *Subpoena/Deposition Notice for Deposition Scheduled After Expiration of Discovery*, 114 MOTION to Expedite *Hearing*, 106 MOTION to Strike *Plaintiff Suthanthiran's Objections to Discovery Requests and Motion To Compel*, 97 MOTION for Sanctions *Against Defendants for Failure to Comply with Court's Discovery Order*, 95 MOTION for Protective Order, 115 MOTION for Sanctions *Pursuant to Rule 37(d), (or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)*, 123 MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)*, 126 MOTION for Protective Order. Motion Hearing set for 10/19/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (Per TRJ chambers) (clar, ) (Entered: 10/11/2012) |
| 10/11/2012 | | MOTIONS REFERRED to Magistrate Judge: Jones. 126 MOTION for Protective Order, 120 MOTION to Quash *Subpoena/Deposition Notice for Deposition Scheduled After Expiration of Discovery*, 123 MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)* MOTION to Compel *30(b)(6) Depositions of Plaintiffs (Defendants' Motion for Sanctions Pursuant to Rule 37(d), or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)*, 115 MOTION for Sanctions *Pursuant to Rule 37(d), (or, in the Alternative, Motion to Compel 30(b)(6) Depositions of Plaintiffs)*, 114 MOTION to Expedite *Hearing* (clar, ) (Entered: 10/11/2012) |
| 10/11/2012 | 129 | CERTIFICATE of Service *for Docket Number 110* by James Michael Brady on behalf of Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran (Brady, James) (Entered: 10/11/2012) |
| 10/15/2012 | 130 | RESPONSE in Opposition re 106 MOTION to Strike *Plaintiff Suthanthiran's Objections to Discovery Requests and Motion To Compel* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit 1)(Brady, James) (Entered: 10/15/2012) |
| 10/16/2012 | | Per TRJ chambers motions set for 10/19/12 Deft's motion (106) to strike and Deft's motion (115) for sanctions have been resolved (clar, ) (Entered: 10/16/2012) |
| 10/18/2012 | | Per TRJ chambers motions set for 10/19/12 (document #123) has been resolved (clar, ) (Entered: 10/18/2012) |
| 10/18/2012 | | Per TRJ chambers motions (document #s 97,114,120 and 126) for 10/19/12 have been resolved (clar, ) (Entered: 10/18/2012) |
| 10/18/2012 | 131 | Minute Entry for proceedings held before District Judge Gerald Bruce Lee:Final Pretrial Conference held on 10/18/2012. Appearances: Counsel for |

| | | Pltff and Deft. Jury Trial set for 1/14/2013 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. 4 days. Magistrate Judge to handle filing of witness lists and exhibits. Summary Judgment Hearing set for 12/14/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. All briefs must be in by 12/3/12. Parties to submit a briefing schedule. Parties to deliver 2 hard copies of all briefs and exhibits directly to chambers after electronic filing. (Court Reporter None.)(tbul, ) (Entered: 10/18/2012) |
|---|---|---|
| 10/18/2012 | 132 | FINAL PRETRIAL ORDER. See Order for more details. Signed by District Judge Gerald Bruce Lee on 10/18/2012. (rban, ) (Entered: 10/19/2012) |
| 10/19/2012 | 133 | Minute Entry for proceedings held before Magistrate Judge Thomas Rawles Jones, Jr:Motion Hearing held on 10/19/2012 re 95 MOTION for Protective Order filed by Wells Fargo, Bank, N.A. Appearances of counsel. Motion argued and GRANTED. Order to follow. (Tape #FTR.)(cmar, ) (Entered: 10/19/2012) |
| 10/19/2012 | 134 | For the reasons stated from the bench, and in accord with specific rulings made at that time, it is ORDERED that Defendants Motion for a Protective Order (no. 95 ) is GRANTED, and deposition topics 1 and 23 are quashed. Signed by Magistrate Judge Thomas Rawles Jones, Jr on 10/19/12. (cmar, ) (Entered: 10/19/2012) |
| 10/26/2012 | 135 | Rule 26 Disclosure by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Schorr, Courtney) (Entered: 10/26/2012) |
| 10/26/2012 | 136 | Statement of Undisputed Facts by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran, J. Kent Thompson, Wells Fargo, Bank, N.A.. (Schorr, Courtney) (Entered: 10/26/2012) |
| 10/26/2012 | 137 | Rule 26 Disclosure by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 10/26/2012) |
| 10/26/2012 | 138 | Minute Entry for proceedings held before District Judge Gerald Bruce Lee:Motion Hearing held on 10/26/2012 re: 85 MOTION to Dismiss *COUNTS II, IV, V, AND VI OF PLAINTIFFS SECOND AMENDED COMPLAINT* filed by Wells Fargo, Bank, N.A., J. Kent Thompson. Appearances: James Brady for Pltff; M. Glassman for Deft. Heard, findings stated, and granted in part and denied in part. Order to follow. (Court Reporter R. Wilson.)(tbul, ) (Entered: 10/31/2012) |
| 10/26/2012 | 139 | ORDER, for reasons granting in part and denying in part 85 Motion to Dismiss Counts II, IV, V, and VI of Plaintiff's Second Amended Complaint (granted as to Count V and VI, and those claims are dismissed with prejudice) (denied as to Count II and Count IV). /s/ by District Judge Gerald Bruce Lee on 11cv1277. (tbul, ) (Entered: 10/31/2012) |
| 11/01/2012 | 140 | Consent MOTION for Extension *of Time for Defendants To File Objections To Plaintiffs' Exhibits* by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Proposed Order)(Schorr, Courtney) (Entered: 11/01/2012) |
| 11/01/2012 | 141 | Consent MOTION For Entry Of A Briefing Schedule On Pretrial Motions re |

| | | | |
|---|---|---|---|
| | | | 132 Order by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #_1 Proposed Order)(Schorr, Courtney) (Entered: 11/01/2012) |
| 11/02/2012 | 142 | | Objection to 135 Rule 26 Disclosure filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/02/2012) |
| 11/05/2012 | 143 | | ORDER that the 140 Consent Motion for Extension of Time for Defts to File Objections to Pltfs' Trial Exhibits is GRANTED; Defts Wells Fargo Bank, N.A.'s and J. Kent Thompson's Objections to Pltf's Exhibits must be filed on or before 11/07/12. Signed by Magistrate Judge Thomas Rawles Jones, Jr on 11/05/12. (pmil) (Entered: 11/05/2012) |
| 11/07/2012 | 144 | | Objection to 137 Rule 26 Disclosure filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Schorr, Courtney) (Entered: 11/07/2012) |
| 11/09/2012 | 145 | | ANSWER to Complaint by J. Kent Thompson.(Mulligan, Stephen) (Entered: 11/09/2012) |
| 11/13/2012 | 146 | | MOTION to Seal *FILED CONFIDENTIAL DOCUMENTS* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 147 | | Notice of Hearing Date set for November 30, 2012 re 146 MOTION to Seal *FILED CONFIDENTIAL DOCUMENTS* (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 148 | | MOTION for Leave to File *Motion for Summary Judgment Under Seal Pursuant to the Stipulated Protective Order* by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #_1 Proposed Order)(Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 149 | | Memorandum in Support re 148 MOTION for Leave to File *Motion for Summary Judgment Under Seal Pursuant to the Stipulated Protective Order* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 150 | | MOTION for Summary Judgment by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #_1 Proposed Order)(Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 151 | | Memorandum in Support re 150 MOTION for Summary Judgment *(REDACTED)* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #_1 Affidavit of J. Kent Thompson, #_2 Exhibit 2, #_3 Exhibit 2, #_4 Exhibit 3, #_5 Exhibit 4 (UNDER SEAL), #_6 Exhibit 5, #_7 Exhibit 6, #_8 Exhibit 7, #_9 Exhibit 8, #_10 Affidavit of Douglas M. Foley)(Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 152 | | MOTION to Exclude *STEVEN W. KOHLHAGEN AS AN EXPERT WITNESS* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 153 | | Memorandum in Support re 152 MOTION to Exclude *STEVEN W. KOHLHAGEN AS AN EXPERT WITNESS* filed by Best Industries Inc., Best |

| | | | |
|---|---|---|---|
| | | | Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: #1 Exhibit A, #2 Exhibit B)(Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 154 | | Notice of Hearing Date *December 14, 2012* re 150 MOTION for Summary Judgment (Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 155 | | Notice of Hearing Date set for December 14, 2012 re 152 MOTION to Exclude *STEVEN W. KOHLHAGEN AS AN EXPERT WITNESS* (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 156 | | MOTION to Exclude *NANCY A. ROSS AS AN EXPERT WITNESS* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 157 | | Memorandum in Support re 156 MOTION to Exclude *NANCY A. ROSS AS AN EXPERT WITNESS* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: #1 Exhibit A, #2 Exhibit B)(Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 158 | | MOTION in Limine by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #1 Proposed Order)(Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 159 | | Notice of Hearing Date set for December 14, 2012 re 156 MOTION to Exclude *NANCY A. ROSS AS AN EXPERT WITNESS* (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 160 | | Memorandum in Support re 158 MOTION in Limine filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F)(Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 161 | | MOTION in Limine *No. 1 to Bar Evidence and Argument Before the Jury of Any Mention of the Fairfax Circuit Court Case and All Motions Filed in that Case* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 162 | | Memorandum in Support re 161 MOTION in Limine *No. 1 to Bar Evidence and Argument Before the Jury of Any Mention of the Fairfax Circuit Court Case and All Motions Filed in that Case* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 163 | | Notice of Hearing Date *December 14, 2012* re 158 MOTION in Limine (Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 164 | | Notice of Hearing Date set for December 14, 2012 re 161 MOTION in Limine *No. 1 to Bar Evidence and Argument Before the Jury of Any Mention of the Fairfax Circuit Court Case and All Motions Filed in that Case* (Brady, James) (Entered: 11/13/2012) |
| 11/13/2012 | 165 | | MOTION to Exclude *the Testimony of Alexander Arapoglou and to Strike Mr. Arapoglou's Expert Report* by J. Kent Thompson, Wells Fargo, Bank, |

| | | |
|---|---|---|
| | | N.A.. (Attachments: #1 Proposed Order)(Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 166 | Memorandum in Support re 165 MOTION to Exclude *the Testimony of Alexander Arapoglou and to Strike Mr. Arapoglou's Expert Report* filed by J. Kent Thompson, Wells Fargo, Bank, N.A. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C)(Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 167 | Notice of Hearing Date set for December 14, 2012 re 165 MOTION to Exclude *the Testimony of Alexander Arapoglou and to Strike Mr. Arapoglou's Expert Report* (Schorr, Courtney) (Entered: 11/13/2012) |
| 11/13/2012 | 168 | MOTION to Strike *Plaintiffs' Evidence of Damages* by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #1 Proposed Order)(Mulligan, Stephen) (Entered: 11/13/2012) |
| 11/13/2012 | 169 | Memorandum in Support re 168 MOTION to Strike *Plaintiffs' Evidence of Damages* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F, #7 Exhibit G, #8 Exhibit H, #9 Exhibit I, #10 Exhibit J)(Mulligan, Stephen) (Entered: 11/13/2012) |
| 11/13/2012 | 173 | Sealed Document re: 151 Memorandum in Support. (Attachments: #1 Exhibit 4)(pmil) (Entered: 11/14/2012) |
| 11/14/2012 | 170 | Notice of Hearing Date set for December 14, 2012 re 168 MOTION to Strike *Plaintiffs' Evidence of Damages* (Schorr, Courtney) (Entered: 11/14/2012) |
| 11/14/2012 | | Set Deadlines as to 146 MOTION to Seal *FILED CONFIDENTIAL DOCUMENTS*. Motion Hearing set for 11/30/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 11/14/2012) |
| 11/14/2012 | | Set Deadlines as to 161 MOTION in Limine *No. 1 to Bar Evidence and Argument Before the Jury of Any Mention of the Fairfax Circuit Court Case and All Motions Filed in that Case*, 156 MOTION to Exclude *NANCY A. ROSS AS AN EXPERT WITNESS*, 152 MOTION to Exclude *STEVEN W. KOHLHAGEN AS AN EXPERT WITNESS*, 158 MOTION in Limine, 165 MOTION to Exclude *the Testimony of Alexander Arapoglou and to Strike Mr. Arapoglou's Expert Report*, 150 MOTION for Summary Judgment. Motion Hearing set for 12/14/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 11/14/2012) |
| 11/14/2012 | 171 | TRANSCRIPT of proceedings for dates of October 26, 2012, before Judge Gerald Bruce Lee, Court Reporter/Transcriber Renecia Wilson, Telephone number,703−501−1580. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER Redaction Request due 12/14/2012. Redacted Transcript Deadline set for** |

| | | | |
|---|---|---|---|
| | | | 1/14/2013. Release of Transcript Restriction set for 2/12/2013.(wilson, renecia) (Entered: 11/14/2012) |
| 11/14/2012 | 172 | | ORDER that the 141 Consent Motion for Entry of Briefing Schedule on Pretrial Motions is GRANTED; the Parties' pretrial motions, including dispositive motions, shall be briefed as follows: Motions and Briefs in Support: 11/13/12; Opposition Briefs: 11/27/12; Replies (if any): 12/03/12 by 5:00 P.M.; Hearing: 12/14/12 at 10:00 a.m. Signed by District Judge Gerald Bruce Lee on 11/14/12. (pmil) (Entered: 11/14/2012) |
| 11/14/2012 | | | Alexandria Set Hearing: Pretrial Motion Hearing set for 12/14/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (pmil) (Entered: 11/14/2012) |
| 11/15/2012 | | | Set Deadlines as to 168 MOTION to Strike *Plaintiffs' Evidence of Damages*. Motion Hearing set for 12/14/2012 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 11/15/2012) |
| 11/15/2012 | | | Reset Deadlines as to 146 MOTION to Seal *FILED CONFIDENTIAL DOCUMENTS*. Motion Hearing set for 11/30/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (Per GBL chambers) (clar, ) (Entered: 11/15/2012) |
| 11/15/2012 | | | MOTIONS REFERRED to Magistrate Judge: Jones. 146 MOTION to Seal *FILED CONFIDENTIAL DOCUMENTS* (clar, ) (Entered: 11/15/2012) |
| 11/15/2012 | 174 | | Notice of Hearing Date set for November 30, 2012 re 148 MOTION for Leave to File *Motion for Summary Judgment Under Seal Pursuant to the Stipulated Protective Order* (Schorr, Courtney) (Entered: 11/15/2012) |
| 11/16/2012 | | | Set Deadlines as to 148 MOTION for Leave to File *Motion for Summary Judgment Under Seal Pursuant to the Stipulated Protective Order*. Motion Hearing set for 11/30/2012 at 10:00 AM in Alexandria Courtroom 301 before Magistrate Judge Thomas Rawles Jones Jr. (clar, ) (Entered: 11/16/2012) |
| 11/16/2012 | | | MOTIONS REFERRED to Magistrate Judge: Jones. 148 MOTION for Leave to File *Motion for Summary Judgment Under Seal Pursuant to the Stipulated Protective Order* (clar, ) (Entered: 11/16/2012) |
| 11/19/2012 | 175 | | Memorandum in Support re 146 MOTION to Seal *FILED CONFIDENTIAL DOCUMENTS* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/19/2012) |
| 11/19/2012 | 176 | | RESPONSE to Motion re 146 MOTION to Seal *FILED CONFIDENTIAL DOCUMENTS* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Schorr, Courtney) (Entered: 11/19/2012) |
| 11/21/2012 | 177 | | MOTION for Leave to File Excess Pages by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/21/2012) |
| 11/21/2012 | 178 | | Memorandum in Support re 177 MOTION for Leave to File Excess Pages filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Proposed Order)(Brady, James) (Entered: 11/21/2012) |

| | | | |
|---|---|---|---|
| 11/21/2012 | 179 | | MOTION to Expedite *Hearing on Plaintiffs' Motion for Leave to File Excess Pages* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/21/2012) |
| 11/21/2012 | 180 | | Memorandum in Support re 179 MOTION to Expedite *Hearing on Plaintiffs' Motion for Leave to File Excess Pages* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 11/21/2012) |
| 11/26/2012 | 181 | | Opposition to 177 MOTION for Leave to File Excess Pages filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Schorr, Courtney) (Entered: 11/26/2012) |
| 11/27/2012 | 182 | | ORDER denying 177 Motion for Leave to File Excess Pages, upon consideration and review. /s/ by District Judge Gerald Bruce Lee on 11/27/12. (tbul, ) (Entered: 11/27/2012) |
| 11/27/2012 | 183 | | Memorandum in Opposition re 168 MOTION to Strike *Plaintiffs' Evidence of Damages* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12)(Brady, James) (Entered: 11/27/2012) |
| 11/27/2012 | 184 | | Memorandum in Opposition re 158 MOTION in Limine filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Brady, James) (Entered: 11/27/2012) |
| 11/27/2012 | 185 | | Opposition to 156 MOTION to Exclude *NANCY A. ROSS AS AN EXPERT WITNESS* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit 1)(Schorr, Courtney) (Entered: 11/27/2012) |
| 11/27/2012 | 186 | | Opposition to 152 MOTION to Exclude *STEVEN W. KOHLHAGEN AS AN EXPERT WITNESS* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit 1)(Schorr, Courtney) (Entered: 11/27/2012) |
| 11/27/2012 | 187 | | Memorandum in Opposition re 161 MOTION in Limine *No. 1 to Bar Evidence and Argument Before the Jury of Any Mention of the Fairfax Circuit Court Case and All Motions Filed in that Case* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Mulligan, Stephen) (Entered: 11/27/2012) |
| 11/27/2012 | 188 | | Memorandum in Opposition re 150 MOTION for Summary Judgment filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Affidavit Affidavit of L. Luxton, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 |

| | | |
|---|---|---|
| | | Exhibit 27, #_29 Exhibit 28, #_30 Exhibit 29, #_31 Exhibit 30, #_32 Exhibit 31, #_33 Exhibit 32, #_34 Exhibit 33, #_35 Exhibit 34, #_36 Exhibit 35, #_37 Exhibit 36, #_38 Exhibit 37, #_39 Exhibit 38, #_40 Exhibit 39, #_41 Exhibit 40, #_42 Exhibit 41, #_43 Exhibit 42, #_44 Exhibit 43, #_45 Exhibit 44, #_46 Exhibit 45, #_47 Exhibit 46, #_48 Exhibit 47, #_49 Exhibit 48)(Brady, James) (Entered: 11/27/2012) |
| 11/27/2012 | 189 | Memorandum in Opposition re_165 MOTION to Exclude *the Testimony of Alexander Arapoglou and to Strike Mr. Arapoglou's Expert Report* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: #_1 Exhibit 1, #_2 Exhibit 2, #_3 Exhibit 3, #_4 Exhibit 4, #_5 Exhibit 5, #_6 Exhibit 6, #_7 Exhibit 7, #_8 Exhibit 8, #_9 Exhibit 9, #_10 Exhibit 10, #_11 Exhibit 11, #_12 Exhibit 12, #_13 Exhibit 13, #_14 Exhibit 14, #_15 Exhibit 15, #_16 Exhibit 16, #_17 Exhibit 17, #_18 Exhibit 18)(Brady, James) (Entered: 11/27/2012) |
| 11/30/2012 | 190 | Minute Entry for proceedings held before Magistrate Judge Thomas Rawles Jones, Jr:Motion Hearing held on 11/30/2012 re_146 MOTION to Seal *FILED CONFIDENTIAL DOCUMENTS* filed by Krishnan Suthanthiran, Best Medical International, Inc., Best Industries Inc., Gunston Hall Realty, Inc., Huestis Machine Corp.,_148 MOTION for Leave to File *Motion for Summary Judgment Under Seal Pursuant to the Stipulated Protective Order* filed by Wells Fargo, Bank, N.A., J. Kent Thompson. Appearances of counsel. Motions argued and DENIED. Order to follow. (Tape #FTR.)(cmar, ) (Entered: 11/30/2012) |
| 11/30/2012 | 191 | For the reasons stated from the bench, and in accord with specific rulings made at that time, it is ORDERED that Plaintiffs' Motion to Seal (no._146 ) and Defendants' Motion for Leave to File Under Seal (no._148 ) are DENIED. Signed by Magistrate Judge Thomas Rawles Jones, Jr on 11/30/12. (cmar, ) (Entered: 11/30/2012) |
| 12/03/2012 | 192 | REPLY to Response to Motion re_161 MOTION in Limine *No. 1 to Bar Evidence and Argument Before the Jury of Any Mention of the Fairfax Circuit Court Case and All Motions Filed in that Case* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: #_1 Exhibit 1, #_2 Exhibit 2, #_3 Exhibit 3, #_4 Exhibit 4, #_5 Exhibit 5)(Brady, James) (Entered: 12/03/2012) |
| 12/03/2012 | 193 | REPLY to Response to Motion re_156 MOTION to Exclude *NANCY A. ROSS AS AN EXPERT WITNESS* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: #_1 Exhibit 1, #_2 Exhibit 2, #_3 Exhibit 3)(Brady, James) (Entered: 12/03/2012) |
| 12/03/2012 | 194 | REPLY to Response to Motion re_152 MOTION to Exclude *STEVEN W. KOHLHAGEN AS AN EXPERT WITNESS* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: #_1 Exhibit 1)(Brady, James) (Entered: 12/03/2012) |
| 12/03/2012 | 195 | Reply to Motion re_168 MOTION to Strike *Plaintiffs' Evidence of Damages* |

| | | | |
|---|---|---|---|
| | | | filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Mulligan, Stephen) (Entered: 12/03/2012) |
| 12/03/2012 | 196 | | REPLY to Response to Motion re 165 MOTION to Exclude *the Testimony of Alexander Arapoglou and to Strike Mr. Arapoglou's Expert Report* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Schorr, Courtney) (Entered: 12/03/2012) |
| 12/03/2012 | 197 | | REPLY to Response to Motion re 158 MOTION in Limine filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Schorr, Courtney) (Entered: 12/03/2012) |
| 12/03/2012 | 198 | | REPLY to Response to Motion re 150 MOTION for Summary Judgment filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Schorr, Courtney) (Entered: 12/03/2012) |
| 12/05/2012 | | | Reset Deadlines as to 152 MOTION to Exclude *STEVEN W. KOHLHAGEN AS AN EXPERT WITNESS,* 156 MOTION to Exclude *NANCY A. ROSS AS AN EXPERT WITNESS,* 165 MOTION to Exclude *the Testimony of Alexander Arapoglou and to Strike Mr. Arapoglou's Expert Report*. Motion Hearing set for 1/4/2013 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (Per GBL chambers) (clar, ) (Entered: 12/05/2012) |
| 12/06/2012 | 199 | | Memorandum in Support re 150 MOTION for Summary Judgment *FILED UNREDACTED PER JUDGES ORDER OF NOVEMBER 30, 2012 (DKT # 191)* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Exhibit 4 (UNREDACTED))(Schorr, Courtney) (Entered: 12/06/2012) |
| 12/14/2012 | 200 | | Minute Entry for proceedings held before District Judge Gerald Bruce Lee:Motion Hearing held on 12/14/2012 re: 150 MOTION for Summary Judgment filed by Wells Fargo, Bank, N.A., J. Kent Thompson and. Appearances: John Wolburn for Pltff; James Brady, Lori Luxton, and Sean Winegast for Deft. Heard and T.U.A. (Court Reporter R. Wilson.)(tbul, ) (Entered: 12/18/2012) |
| 12/18/2012 | 201 | | ORDER, for the reasons to be stated in a forthcoming Memorandum Order, Defts' 150 Motion for Summary Judgment is **GRANTED** and Pltf's claims are **DISMISSED with prejudice** ; Defts' 158 Motion in Limine, 165 Motion to Exclude, and 168 Motion to Strike are **DENIED** as moot; Pltfs' 152 156 Motions to Exclude, 161 Motion in Limine, and 179 Motion to Expedite are **DENIED** as moot. **IT IS SO ORDERED.** (see Order for details). Signed by District Judge Gerald Bruce Lee on 12/18/12. (pmil) (Entered: 12/19/2012) |
| 01/02/2013 | 202 | | TRANSCRIPT of proceedings for dates of December 14, 2012, before Judge Gerald Bruce Lee, Court Reporter/Transcriber Renecia Wilson, Telephone number,703−501−1580. **NOTICE RE REDACTION OF TRANSCRIPTS:The parties have thirty(30) calendar days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.vaed.uscourts.gov Transcript may be viewed at the court public terminal or purchased through the court reporter/transcriber before the deadline for Release of Transcript** |

| | | | |
|---|---|---|---|
| | | | **Restriction. After that date it may be obtained through PACER Redaction Request due 2/1/2013. Redacted Transcript Deadline set for 3/4/2013. Release of Transcript Restriction set for 4/2/2013.(wilson, renecia) (Entered: 01/02/2013)** |
| 03/29/2013 | 203 | | MEMORANDUM OPINION. Signed by District Judge Gerald Bruce Lee on 3/29/2013. (rban, ) (Entered: 03/29/2013) |
| 03/29/2013 | 204 | | ORDERED that Judgment be entered in favor of Defendants Wells Fargo Bank, N.A. and Kent Thompson against Plaintiffs Best Medical International, Incorporated; Huestis Machine Corporation; Gunston Hall Realty, Incorporated; Best Industries Incorporated; and Krishnan Suthanthiran pursuant to Fed. R. Civ. P. 58. Signed by District Judge Gerald Bruce Lee on 3/29/2013. (rban, ) (Entered: 03/29/2013) |
| 04/12/2013 | 205 | | MOTION for Attorney Fees by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Proposed Order)(Schorr, Courtney) (Entered: 04/12/2013) |
| 04/12/2013 | 206 | | Memorandum in Support re 205 MOTION for Attorney Fees filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Declaration of Richard Holzheimer, # 2 Affidavit M. Melissa Glassman, # 3 Affidavit John D. Wilburn, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E)(Schorr, Courtney) (Entered: 04/12/2013) |
| 04/12/2013 | 207 | | Notice of Hearing Date set for Friday, May 31, 2013 re 205 MOTION for Attorney Fees (Schorr, Courtney) (Entered: 04/12/2013) |
| 04/15/2013 | | | Set Deadlines as to 205 MOTION for Attorney Fees . Motion Hearing set for 5/31/2013 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 04/15/2013) |
| 04/18/2013 | 208 | | MOTION for Extension of Time to File Response/Reply as to 205 MOTION for Attorney Fees *and Reply Brief to Same* by Best Medical International, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Proposed Order Order to Extend Time)(Brady, James) (Entered: 04/18/2013) |
| 04/18/2013 | 209 | | Notice of Hearing Date re 208 MOTION for Extension of Time to File Response/Reply as to 205 MOTION for Attorney Fees *and Reply Brief to Same* (Brady, James) (Entered: 04/18/2013) |
| 04/18/2013 | 210 | | Emergency MOTION to Expedite *DECISION ON PLAINTIFFS' MOTION TO EXTEND THE TIME TO FILE A RESPONSE TO THE MOTION FOR ATTORNEY'S FEES AND REPLY BRIEF TO SAME* by Best Medical International, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 04/18/2013) |
| 04/19/2013 | 211 | | ORDER that Pltf's 208 Motion to Extend the Time to File a Response is **GRANTED** ; Pltfs shall file their response to Defts' Motion for Attorneys' Fees **on or before 05/10/13** ; Defts shall file their reply thereto **on or before 05/24/13**; the hearing on this matter scheduled for 05/31/13 is **CANCELED** . Signed by District Judge Gerald Bruce Lee on 04/19/13. (pmil) (Entered: 04/22/2013) |
| 04/25/2013 | 212 | | MOTION to Alter Judgment *Rule 59(e) Alter, Amend, and/or Reconsider Judgment* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, |

| | | | |
|---|---|---|---|
| | | | James) (Entered: 04/25/2013) |
| 04/25/2013 | 213 | | Memorandum in Support re 212 MOTION to Alter Judgment *Rule 59(e) Alter, Amend, and/or Reconsider Judgment* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33)(Brady, James) (Entered: 04/25/2013) |
| 04/25/2013 | 214 | | Notice of Hearing Date set for May 31, 2013 re 212 MOTION to Alter Judgment *Rule 59(e) Alter, Amend, and/or Reconsider Judgment* (Brady, James) (Entered: 04/25/2013) |
| 04/25/2013 | 215 | | NOTICE of Appearance by Anastasia Poushkareva Cordova on behalf of J. Kent Thompson, Wells Fargo, Bank, N.A. (Cordova, Anastasia) (Entered: 04/25/2013) |
| 04/26/2013 | | | Set Deadlines as to 212 MOTION to Alter Judgment *Rule 59(e) Alter, Amend, and/or Reconsider Judgment*. Motion Hearing set for 5/31/2013 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 04/26/2013) |
| 04/29/2013 | 216 | | Notice of Hearing Date set for June 21, 2013 re 212 MOTION to Alter Judgment *Rule 59(e) Alter, Amend, and/or Reconsider Judgment* (Brady, James) (Entered: 04/29/2013) |
| 04/30/2013 | | | Reset Deadlines as to 212 MOTION to Alter Judgment *Rule 59(e) Alter, Amend, and/or Reconsider Judgment*. Motion Hearing set for 6/21/2013 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (clar, ) (Entered: 04/30/2013) |
| 05/09/2013 | 217 | | Memorandum in Opposition re 212 MOTION to Alter Judgment *Rule 59(e) Alter, Amend, and/or Reconsider Judgment* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Proposed Order)(Cordova, Anastasia) (Entered: 05/09/2013) |
| 05/10/2013 | 218 | | Memorandum in Opposition re 205 MOTION for Attorney Fees filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Affidavit Susan Richards Salen, # 15 Exhibit O)(Brady, James) (Entered: 05/10/2013) |
| 05/13/2013 | 219 | | REPLY to Response to Motion re 212 MOTION to Alter Judgment *Rule 59(e) Alter, Amend, and/or Reconsider Judgment* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Brady, James) (Entered: |

| | | | |
|---|---|---|---|
| | | | 05/13/2013) |
| 05/24/2013 | 220 | | REPLY to Response to Motion re 205 MOTION for Attorney Fees filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Attachments: # 1 Supplemental Declaration of Richard Holzheimer, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D)(Schorr, Courtney) (Entered: 05/24/2013) |
| 05/28/2013 | 221 | | MOTION to Strike 220 Reply to Response to Motion, *or in the Alternative, Motion for Leave to File Response to Defendants' Reply Brief* by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 05/28/2013) |
| 05/28/2013 | 222 | | Memorandum in Support re 221 MOTION to Strike 220 Reply to Response to Motion, *or in the Alternative, Motion for Leave to File Response to Defendants' Reply Brief* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 05/28/2013) |
| 05/28/2013 | 223 | | Notice of Hearing Date set for May 31, 2013 re 221 MOTION to Strike 220 Reply to Response to Motion, *or in the Alternative, Motion for Leave to File Response to Defendants' Reply Brief* (Brady, James) (Entered: 05/28/2013) |
| 05/29/2013 | | | Set Deadlines as to 221 MOTION to Strike 220 Reply to Response to Motion, *or in the Alternative, Motion for Leave to File Response to Defendants' Reply Brief*. Motion Hearing set for 5/31/2013 at 10:00 AM in Alexandria Courtroom 601 before District Judge Gerald Bruce Lee. (Attorney has been notified to file an Amended Notice of Hearing − filed untimely and Judge Lee is not hearing motions on 5/31/13 − **Deadlines Terminated** (clar, ) (Entered: 05/29/2013) |
| 05/29/2013 | | | Notice of Correction re 223 Notice of Hearing Date. The filing user has been notified to file an Amended Notice of Hearing Date, as the Notice of Hearing Date set an untimely hearing. (clar, ) (Entered: 05/29/2013) |
| 05/31/2013 | 224 | | Opposition to 221 MOTION to Strike 220 Reply to Response to Motion, *or in the Alternative, Motion for Leave to File Response to Defendants' Reply Brief* filed by J. Kent Thompson, Wells Fargo, Bank, N.A.. (Schorr, Courtney) (Entered: 05/31/2013) |
| 06/03/2013 | 225 | | REPLY to Response to Motion re 221 MOTION to Strike 220 Reply to Response to Motion, *or in the Alternative, Motion for Leave to File Response to Defendants' Reply Brief* filed by Best Industries Inc., Best Medical International, Inc., Gunston Hall Realty, Inc., Huestis Machine Corp., Krishnan Suthanthiran. (Brady, James) (Entered: 06/03/2013) |
| 06/20/2013 | | | Per GBL chambers motion set for 6/21/13 on papers. (klau, ) (Entered: 06/20/2013) |
| 06/21/2013 | 226 | | MOTION to Substitute Party by Bruce W. Henry. (Attachments: # 1 Proposed Order)(Martin, Jeffery) (Entered: 06/21/2013) |
| 06/24/2013 | | | Notice of Correction re: 226 MOTION to Substitute Party . The filing user has been notified to file a Notice of Hearing Date or a Notice of Waiver of Oral Argument.(pmil) (Entered: 06/24/2013) |

| 06/24/2013 | <u>227</u> | | CONSENT ORDER that the <u>226</u> Motion to Substitute Party is GRANTED. The Trustee is hereby substituted as a party pltf for Gunston Hall and Best Industries (Best Industries Inc. (a Virginina Corporation) and Gunston Hall Realty, Inc. (a Virginia Corpration) terminated). Signed by Magistrate Judge Thomas Rawles Jones, Jr on 06/24/13. (pmil) (Entered: 06/24/2013) |
| 07/02/2013 ` | <u>228</u> | | ORDER that Pltfs' <u>212</u> Motion to Alter, Amend, and/or Reconsider Judgment is **DENIED** (see Order for details). Signed by District Judge Gerald Bruce Lee on 07/02/13. (pmil) (Entered: 07/02/2013) |
| 07/31/2013 | <u>229</u> | | NOTICE OF APPEAL as to <u>203</u> Memorandum Opinion and <u>204</u> Order by Best Medical International, Inc., Huestis Machine Corp., Krishnan Suthanthiran. Filing fee $ 455, receipt number 0422−3612825. (Brady, James) Modified on 8/2/2013 to add relationship to doc. no. 204 (pmil). (Entered: 07/31/2013) |
| 08/02/2013 | <u>230</u> | | Transmission of Notice of Appeal to US Court of Appeals re: <u>229</u> Notice of Appeal (All case opening forms, plus the transcript guidelines, may be obtained from the Fourth Circuit's website at www.ca4.uscourts.gov) (pmil) (Entered: 08/02/2013) |
| 08/06/2013 | <u>231</u> | | USCA Case Number 13−1982 4th Circuit, Case Manager Cathi Bennett for <u>229</u> Notice of Appeal, filed by Krishnan Suthanthiran, Best Medical International, Inc., Huestis Machine Corp. (pmil) (Entered: 08/07/2013) |

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### *Alexandria Division*

BEST MEDICAL INTERNATIONAL, INC.,
*et al.*,

         *Plaintiffs*,

    v.

WELLS FARGO BANK, N.A.

         *Defendant*.

Civil Action No. 1:11-cv-01277
GBL/TRJ

### WELLS FARGO BANK, N.A's OBJECTIONS AND ANSWERS TO PLAINTIFFS' FIRST SET OF INTERROGATORIES.

Defendant Wells Fargo Bank, N.A. ("Wells Fargo") pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and Local Rule 26(C), hereby answers the First Set of Interrogatories propounded upon it by Plaintiffs Best Medical International, Inc., Huestis Machine Corp., Gunston Hall Realty, Best Industries, Inc., and Krishnan Suthanthiran ("Plaintiffs").

### INTERROGATORY RESPONSES

**INTERROGATORY NO. 1:**    Please identify the person or persons providing information, assisting with the preparation of the Objections, and/or answering these Interrogatories.

**OBJECTION:**  Wells Fargo objects to the extent this Interrogatory seeks information that is protected by the attorney-client privilege and/or the work product doctrine.

**RESPONSE:**

Subject to and without waiving the foregoing objection, the following persons provided information with answering these Interrogatories with assistance from internal and external counsel:

1

Kent Thompson
Senior Vice President – Credit Management Group
Wells Fargo Bank, N.A.
1753 Pinnacle Drive, 5th Floor
R3076-053
McLean, Virginia 22102
Tel: (703) 760-5452

John Puckhaber
Loan Adjuster Manager – Credit Management Group
Wells Fargo Bank, N.A.
MAC J2153-01H
190 River Road
1st Floor
Summit, NJ 07901-1444
Tel: (908) 598-3208

**INTERROGATORY NO. 2:**    Please describe fully all actions taken to investigate the charge of discrimination lodged by Krishnan Suthanthiran on June 24, 2010 including, but not limited to, the names of all persons interviewed in connection with the discrimination charge.

**OBJECTION:**  Wells Fargo objects to the extent this Interrogatory seeks information that is protected by the attorney-client privilege and/or the work product doctrine.

**RESPONSE:**

Subject to and without waiving the foregoing objection, Wells Fargo received Mr. Suthanthiran's letter on or about Friday, June 25, 2010. Several considerations guided the nature and extent of Wells Fargo's investigation and response into Mr. Suthanthiran's unsupported charge of discrimination. The letter accused Wells Fargo of engaging in "racial discrimination" in its handling of its commercial lending relationship with Best Medical and Mr. Suthanthiran. The letter did not (i) specifically identify adverse action(s) allegedly taken by Wells Fargo against Plaintiffs, (ii) refer to or attach any specific evidence of discriminatory animus by any Wells Fargo employee, or (iii) otherwise substantiate Mr. Suthanthiran's racial discrimination charge with any specific facts or information. Instead, the letter summarily concluded that Wells Fargo's actions "can only be interpreted as racial discrimination." Moreover, Plaintiffs' loan

2

obligations to Wells Fargo, which exceeded $12 million, had fully matured under the parties'
July 31, 2009 Waiver and Amendment Agreement several months earlier, when Plaintiffs failed
to repay the obligations in full by January 1, 2010. In accordance with Wells Fargo's rights
under the Waiver and Amendment Agreement, Wells Fargo had demanded full repayment of
Plaintiffs' obligations and reserved its rights to pursue any remedies available due to Plaintiffs'
continuing default. Since that date, Wells Fargo's Credit Management Group had engaged in
numerous unsuccessful efforts to restructure and extend Plaintiffs' loan obligations. Wells Fargo
required a significant paydown and detailed payment plan from Plaintiffs for any additional
extensions of the time to repay in full the debt as agreed in the July 31, 2009 Waiver and
Amendment Agreement, but Plaintiffs repeatedly refused to agree to Wells Fargo's proposed
terms.

After receiving Mr. Suthanthiran's June 24, 2010 letter, Wells Fargo consulted with its
internal counsel and its external counsel, Richard Pollak of Troutman Sanders, to develop a
detailed and accurate response to Mr. Suthanthiran's complaint. Kent Thompson, John
Puckhaber, and Robert Shotkus were also involved in this process. Mr. Thompson is the loan
adjuster / Senior Vice President that handled Wells Fargo's lending relationship with Plaintiffs.
Mr. Puckhaber is Mr. Thompson's immediate supervisor. Mr. Shotkas was, at the time, the
executive in charge of the Credit Management Group.

After reviewing its interactions with Plaintiffs subsequent to their January 1, 2010
default, as well as the Plaintiffs' historical inability to payoff the loans in full at or before
maturity or provide satisfactory evidence of ability to promptly payoff the loans at or before the
maturity and extended maturity dates which Plaintiffs agreed to, Wells Fargo concluded that Mr.
Suthanthiran's discrimination complaint lacked merit because the bank's actions were purely

driven by nondiscriminatory factors, including without limitation, Wells Fargo's contractual rights to enforce its loan documents, declare defaults and confess judgment due to the failure to repay the loans in full at maturity, Plaintiffs' apparent inability and/or unwillingness to timely repay their fully-matured $12 million loan obligations, and Plaintiffs' failure to reach any agreement with Wells Fargo for the resolution of the loans. It was determined by the Credit Management Group that (i) Plaintiffs' accounts had been identified and analyzed in several Problem Asset Reports, and that on around June 15, 2010 (ii) Plaintiffs' accounts were moved to "non-accrual" status due to non-payment of the matured loans based on Mr. Thompson's recommendation, which were reviewed and approved, (iii) Wells Fargo's Credit Management Group Projection Committee had discussed and authorized Mr. Thompson to proceed with enforcement of Wells Fargo's rights and remedies against Plaintiffs, including litigation prior to the receipt of the alleged "discrimination complaint" in the June 24, 2010 letter, and (iv) that Mr. Thompson had notified the Plaintiffs in writing that Wells Fargo was proceeding with the exercise of its legal remedies due to the failure to repay the loans at maturity prior to the Plaintiffs' issuance of the alleged "discrimination complaint" in the June 24, 2010 letter, and (v) Wells Fargo thereafter proceeded with confessing judgment against Plaintiffs. The Projection Committee's responsibilities include reviewing and approving loan officer recommendations for handling past due accounts. Wells Fargo's actions including their decision to proceed with legal remedies and their determination of the lack of merit to the alleged "discrimination complaint" as set forth in the June 24, 2010 letter, were guided by the knowledge and review of the foregoing, as well as the facts that (i) Plaintiffs' loan obligations had fully matured, (ii) Wells Fargo had made repeated efforts to reach agreement with Plaintiffs which were unsuccessful, (iii) the Plaintiffs unilaterally proposed unreasonable repayment terms in response to Wells Fargo's

4

efforts, which Wells Fargo did not accept, and (iv) that the parties' loan documents and Waiver

and Amendment Agreement granted Wells Fargo the right to initiate remedies against Plaintiffs,

upon default, including without limitation a failure to repay the loans in full at maturity, which

Wells Fargo had continually reserved its rights with respect to, and did not waive in any of its

communications with Plaintiffs.  On July 1, 2010, Wells Fargo sent a letter to Mr. Suthanthiran

that responded to his complaint.

Mr. Suthanthiran also carbon-copied the June 24, 2010 letter to the office of John

Stumpf, who is Wells Fargo's Chief Executive Officer.  Mr. Stumpf's office forwarded Mr.

Suthanthiran's letter to the Credit Management Group for review and appropriate action.  His

office also forwarded a copy of a March 30, 2010 e-mail sent by Mr. Suthanthiran to the office of

Wachovia Bank's President for review and appropriate action.  Dee Dunlap consulted with the

Credit Management Group regarding its resolution process and replied to Mr. Suthanthiran on

July 15, 2010.

Wells Fargo reserves its right to supplement this interrogatory response.


**INTERROGATORY NO. 3:**        Please identify all Commercial Borrowers (see definition
No. 21 above), that were declared in default for failure to maintain a debt service coverage ratio
in 2008, 2009, 2010 and 2011 (see definition No. 22 above) in the Relevant Location (see
definition No. 20 above).

|  |  |
|---|---|
| **OBJECTION:** | The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment, for a period of time that postdates the Confession of Judgment, and because the propriety of the default has been fully litigated in the Circuit Court of Fairfax County and is not properly the subject of this action.  Further, the request seeks irrelevant information that goes beyond what is required to state a prima facie case of lending discrimination under *Anderson v. Wachovia Mortgage Corp.*  It is overly burdensome in the context of a lending discrimination claim because it asks Wells Fargo to |

5

identify all Commercial Borrowers without regard to the volume or whether any other such Commercial Borrowers, or their loans or loan status, bore sufficient relevance or relation to Plaintiffs, their loans or loan status. The request also seeks confidential financial information.

**RESPONSE:**    Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 4:**    Please identify all Commercial Borrowers that were declared in default for failure to maintain a liquidity requirement in 2008, 2009, 2010 and 2011 in the Relevant Location.

**OBJECTION:**    The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment, for a period of time that postdates the Confession of Judgment, and because the propriety of the default has been fully litigated in the Circuit Court of Fairfax County and is not properly the subject of this action. Further, the request seeks irrelevant information that goes beyond what is required to state a prima facie case of lending discrimination under *Anderson v. Wachovia Mortgage Corp.* It is overly burdensome in the context of a lending discrimination claim because it asks Wells Fargo to identify all Commercial Borrowers without regard to the volume or whether any other such Commercial Borrowers, or their loans or loan status, bore sufficient relevance or relation to Plaintiffs, their loans or loan status. The request also seeks confidential financial information.

**RESPONSE:**    Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 5:**    Please identify all Commercial Borrowers that were declared in default for failure to provide audited financial statements in 2008, 2009, 2010 and 2011 in the Relevant Location.

**OBJECTION:**    The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment, for a period of time that postdates the Confession of Judgment, and because the propriety of the default has been fully litigated in the Circuit Court of Fairfax County and is not properly the subject of this action. Further, the request seeks irrelevant information that goes beyond what is required to state a prima facie case of lending discrimination under *Anderson v. Wachovia*

6

*Mortgage Corp.* It is overly burdensome in the context of a lending discrimination claim because it asks Wells Fargo to identify all Commercial Borrowers without regard to the volume or whether any other such Commercial Borrowers, or their loans or loan status, bore sufficient relevance or relation to Plaintiffs, their loans or loan status. The request also seeks confidential financial information.

**RESPONSE:**         Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 6:**      If you contend that Huestis Machine Corporation failed to timely make the required payment(s) of interest and/or principal under any loan facility prior to July 31, 2009, please state the date any such payment was due, the date when such payment was made, the amount that was due, and the amount that was paid.

> **OBJECTION:**         The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment.

**RESPONSE:**

Subject to and without waiving the foregoing objection, Wells Fargo responds as follows:

Huestis Machine Corporation failed to make the payment of $6,710,160.17, which amount was demanded by Wells Fargo's May 8, 2009 default notice and was due on or before May 15, 2009.

**INTERROGATORY NO. 7:**      Please fully describe all requirements, conditions, or terms that Huestis Machine Corporation would have had to agree to in order to prevent acceleration of the Huestis Term Loan and Huestis Supplemental Term Loans.

> **OBJECTION:**         Wells Fargo objects to this Interrogatory because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory is vague and ambiguous.

**RESPONSE:**         Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 8:**      In ¶51 of the Answer, Wells Fargo admitted that it sent a letter to Huestis Machine Corporation on May 8, 2009 that contained a "non-exhaustive list" of

7

Huestis' defaults. Please fully describe all defaults that Wells Fargo will rely on at trial to justify its acceleration of the Huestis Term Loan and the Huestis Supplemental Term Loan.

**OBJECTION:**     Wells Fargo objects to this Interrogatory because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence because it seeks information that predates the Waiver and Amendment and because the propriety of the default has been fully litigated in the Circuit Court of Fairfax County and is not properly the subject of this action. The Interrogatory is vague and ambiguous.

**RESPONSE:**

Subject to and without waiving the foregoing objection, Wells Fargo responds as follows:

In addition to the defaults identified in Wells Fargo's May 8, 2009 letter, Huestis Machine

Corporation was also in default under Paragraph 7.1.4 of the December 1, 2006 Financing and

Security Agreement by reason of Gunston Hall Realty and Best Medical International, Inc.'s

defaults. Wells Fargo reserves its right to supplement this Interrogatory response.

**INTERROGATORY NO. 9:**     Please identify all Commercial Borrowers that Wells Fargo confessed judgment against in 2008, 2009, 2010, and 2011 in the Relevant Location.

**OBJECTION:**     The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment and for a period of time that postdates the Confession of Judgment. Further, the request seeks irrelevant information that goes beyond what is required to state a prima facie case of lending discrimination under *Anderson v. Wachovia Mortgage Corp*. It is overly burdensome in the context of a lending discrimination claim because it asks Wells Fargo to identify all Commercial Borrowers without regard to the volume or whether any other such Commercial Borrowers, or their loans or loan status, bore sufficient relevance or relation to Plaintiffs, their loans or loan status. The request also seeks confidential financial information

**RESPONSE:**     Wells Fargo stands on its July 23, 2012 objections.

8

**INTERROGATORY NO. 10:**      Please fully describe all requirements, conditions, or terms that Plaintiff(s) would have been required to accept in exchange for Wells Fargo extending the line of credit previously issued to Gunston Hall Realty, Inc.

> **OBJECTION:**      Wells Fargo objects to this Interrogatory because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory is vague and ambiguous.

> **RESPONSE:**      Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 11:**      Please fully describe all requirements, conditions, or terms that Plaintiff(s) would have been required to accept in exchange for Wells Fargo extending the line of credit to Best Medical International, Inc.

> **OBJECTION:**      Wells Fargo objects to this Interrogatory because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence. The Interrogatory is vague and ambiguous.

> **RESPONSE:**      Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 12:**      Please identify all Commercial Borrowers that Wells Fargo declared in default in 2008, 2009, 2010, and 2011 in which Wells Fargo subsequently entered into a Forbearance Agreement, Waiver and Amendment Agreement or other similarly titled agreement with the Commercial Borrower.

> **OBJECTION:**      The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment and for a period of time that postdates the Confession of Judgment. Further, the request seeks irrelevant information that goes beyond what is required to state a prima facie case of lending discrimination under *Anderson v. Wachovia Mortgage Corp.* It is overly burdensome in the context of a lending discrimination claim because it asks Wells Fargo to identify all Commercial Borrowers without regard to the volume or whether any other such Commercial Borrowers, or their loans or loan status, bore sufficient relevance or relation to Plaintiffs, their loans or loan status. The request also seeks confidential financial information.

> **RESPONSE:**      Wells Fargo stands on its July 23, 2012 objections.

9

JA0041

**INTERROGATORY NO. 13:**     Please identify all persons who were involved in the decision to declare an event of default had occurred relative to any of the loan facilities in this matter.

         **OBJECTION:**     Wells Fargo objects to this Interrogatory because it seeks information that is not relevant and is not reasonably calculated to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment and for a period of time that postdates the Confession of Judgment, and because the propriety of the default has already been fully litigated in the Circuit Court of Fairfax County and is not properly the subject of this action.

         **RESPONSE:**

Subject to and without waiving the foregoing objection, Wells Fargo responds as follows:

         Kent Thompson
         Senior Vice President
         Wells Fargo Bank, N.A.
         1753 Pinnacle Drive, 5th Floor
         McLean, VA 22102
         703 760-5452

         John Puckhaber
         Loan Adjuster Manager – Credit Management Group
         Wells Fargo Bank, N.A.
         MAC J2153-01H
         190 River Road
         1st Floor
         Summit, NJ 07901-1444
         Tel: (908) 598-3208

Wells Fargo reserves its right to supplement this Interrogatory response.

**INTERROGATORY NO. 14:**     Please identify all Commercial Borrowers in the Relevant Location who were sent a default notice in 2008, 2009, 2010, and 2011 where the Commercial Borrower had an Interest Rate Swap Agreement connected to the loan that was declared in default.

         **OBJECTION:**     The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment and for a period of time that postdates the Confession of Judgment. Further, the request seeks irrelevant information that

goes beyond what is required to state a prima facie case of lending discrimination under *Anderson v. Wachovia Mortgage Corp.*  It is overly burdensome in the context of a lending discrimination claim because it asks Wells Fargo to identify all Commercial Borrowers without regard to the volume or whether any other such Commercial Borrowers, or their loans or loan status, bore sufficient relevance or relation to Plaintiffs, their loans or loan status.  The request also seeks confidential financial information.

**RESPONSE:**        Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 15:**        Please identify all Commercial Borrowers who alleged discrimination against Wachovia or Wells Fargo following any event of default or confession of judgment during 2008, 2009, 2010, and 2011.

**OBJECTION:**        The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence.  The Interrogatory also seeks information for years that predate the Waiver and Amendment and for a period of time that postdates the Confession of Judgment.  The phrase "alleged discrimination" is overly broad, vague and ambiguous.

**RESPONSE:**        Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 16:**        Please identify all Commercial Borrowers in the Relevant Location in which J. Kent Thompson was copied on the default notices be sent to such Commercial Borrowers in 2008, 2009, 2010, and 2011.

**OBJECTION:**        The request seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence.  The Interrogatory also seeks information for years that predate the Waiver and Amendment and for a period of time that postdates the Confession of Judgment.  The request is overly broad and places an undue burden on Wells Fargo.

**RESPONSE:**        Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 17:**        In ¶25 of the Answer, you denied that Plaintiff began making extra payments of $250,000.00 per month towards the principle [sic] on the loans. Please set forth all facts you will rely on at trial that support your denial of this allegation.

**OBJECTION:**        None.

**RESPONSE:**

Wells Fargo denies that acceptance of the referenced payments indicated agreement to additional terms proposed by Plaintiffs in or around April 2010. Wells Fargo communicated to the Plaintiffs that these terms were not acceptable and were rejected, and that Wells Fargo reserved all rights and remedies under the loan documents available to it as a result of Plaintiffs' continuing defaults. Wells Fargo reserves its right to supplement this Interrogatory response.

**INTERROGATORY NO. 18:** Please identify all Commercial Borrowers in the Relevant Location that were notified of being in default for failure to comply with any term of a loan agreement other than failure to make the required payments on time in 2008, 2009, 2010, and 2011.

> **OBJECTION:** The Interrogatory seeks information that is neither relevant nor likely to lead to the discovery of admissible evidence because Plaintiffs seek information for years that predate the Waiver and Amendment and for a period of time that postdates the Confession of Judgment. Further, the request seeks irrelevant information that goes beyond what is required to state a prima facie case of lending discrimination under *Anderson v. Wachovia Mortgage Corp.* It is overly burdensome in the context of a lending discrimination claim because it asks Wells Fargo to identify all Commercial Borrowers without regard to the volume or whether any other such Commercial Borrowers, or their loans or loan status, bore sufficient relevance or relation to Plaintiffs, their loans or loan status. The request also seeks confidential financial information.

> **RESPONSE:** Wells Fargo stands on its July 23, 2012 objections.

**INTERROGATORY NO. 19:** Please identify all reasons you will rely [sic] to explain why Wells Fargo refused to allow Plaintiffs to meet with the person responsible for making the decision as to whether to extend the Plaintiffs' loan facilities as requested by Plaintiffs in May 2010.

12

**OBJECTION:**    Wells Fargo objects to this Interrogatory because it is vague, ambiguous and argumentative.

**RESPONSE:**    Wells Fargo stands on its July 23, 2012 objections.

Dated: August 3, 2012.

Respectfully submitted,

WELLS FARGO BANK, N.A.

MCGUIREWOODS LLP

M. Melissa Glassman (VSB # 27526)
John D. Wilburn (VSB # 41141)
Kevin J. Daniel (VSB # 82911)
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22101-3892
Tel:  (703) 712-5000
Fax:  (703) 712-5050
mglassman@mcguirewoods.com
jwilburn@mcguirewoods.com
kdaniel@mcguirewoods.com
*Counsel for Wells Fargo Bank, N.A.*

13

## INTERROGATORY VERIFICATION

I, Kent Thompson, hereby certify the following:

1.     I am a Senior Vice President for Wells Fargo Bank, N.A.;

2.     I am authorized to execute this verification on behalf Wells Fargo Bank, N.A.;

3.     That the facts stated in the foregoing answers to Plaintiffs' First Set of Interrogatories have been assembled by authorized employees and the attorneys of Wells Fargo Bank, N.A.;

4.     That certain of the matters stated therein are not within my personal knowledge and are not within the knowledge of Wells Fargo Bank, N.A.; and

5.     That I am informed and verify that the facts stated herein are true and correct to the best of my information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Date: _Aug 3, 2012_                                   _[signature]_
                                                          Kent Thompson
                                                          Senior Vice President
                                                          Wells Fargo Bank, N.A.

COMMONWEALTH OF VIRGINIA

City/County of _FAIRFAX_ , to wit:

        SUBSCRIBED and sworn to before me, the undersigned Notary Public in and for the

jurisdiction aforesaid, by _KENT THOMPSON_ who acknowledged his/her signature to

the foregoing answers to Interrogatories.

        GIVEN under my hand and seal this _3_ day of August 2012.

                                                          _[signature]_
                                                          Notary Public

My Commission Expires: _12 / 31 / 2015_

```
REX MARSHALL
Notary Public
Commonwealth of Virginia
7025520
My Commission Expires Dec 31, 2015
```

14

### CERTIFICATE OF SERVICE

I hereby certify that on this 3d day of August 2012, a true and accurate copy of the foregoing was sent via email and Federal Express delivery to:

> Shawn R. Weingast, Esq.
> James Michael Brady, Esq.
> Best Industries, Inc.
> 7643 Fullerton Rd
> Springfield, VA 22153
> Tel: 703 451-2378
> Fax: 703-451-5228

Kevin J. Daniel (VSB # 82911)
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22101-3892
Tel: (703) 712-5000
Fax: (703) 712-5050
kdaniel@mcguirewoods.com
*Counsel for Wells Fargo Bank, N.A.*

\40804929.1

15

Case 1:11-cv-01277-GBL-TRJ Document 67-1 Filed 08/02/12 Page 2 of 35 PageID# 1035

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

|  |  |
|---|---|
| BEST MEDICAL INTERNATIONAL, INC., a<br>Virginia Corporation; HUESTIS MACHINE CORP.,<br>a Rhode Island Corporation, GUNSTON HALL<br>REALTY, a Virginia Corporation; BEST<br>INDUSTRIES, INC.,a Virginia Corporation, and<br>KRISHNAN SUTHANTHIRAN, an Individual<br><br>        Plaintiffs,<br><br>v.<br><br>WELLS FARGO, NA, as successor in interest to<br>WACHOVIA BANK, N.A and J. KENT THOMPSON<br><br>        Defendants. | CASE NO.: 1:11-cv-1277<br><br>Honorable Gerald Bruce Lee |

## SECOND AMENDED COMPLAINT

Now come the Plaintiffs, by and through their attorney, and hereby states as
follows for their Second Amended Complaint.

### JURISDICTION AND PARTIES

1.      Plaintiff Best Medical International, Inc. (hereafter "BMI") is a Virginia
corporation doing business on a regular and systematic basis in Fairfax County, Virginia. Best
Medical International, Inc. is certified as a bona fide Minority Business Enterprise as adopted by
the Virginia Minority Supplier Development Council.  BMI is a manufacturer and supplier of
medical treatments and devices used by cardiologists and oncologists to save lives.  BMI entered
into a series of line of credit contracts with Wachovia to borrow and/or guarantee certain loans
and lines of credit beginning on or about October 29, 2004 and which were modified by the
Waiver and Amendment Agreement of July 31, 2009.

2.      Plaintiff Huestis Machine Corporation ("Huestis"), is a Rhode Island corporation.

1

Huestis Machine Corporation also entered into term loans in 2006 with Wachovia Bank to

borrow and/or guarantee certain term loans which were modified by the Waiver and Amendment

Agreement of July 31, 2009.

3.      Plaintiff Gunston Hall Realty, Inc. ("Gunston") is a Virginia corporation also

certified as a Minority Business Enterprise doing business on a regular and systematic basis in

Fairfax County, Virginia.  Gunston entered into a line of credit contract with Wachovia Bank to

borrow and/or guarantee certain loans and/or lines of credit which were modified by the Waiver

and Amendment Agreement of July 31, 2009.

4.      Plaintiff Best Industries, Inc. ("BII") is a Virginia corporation, whose primary

place of business is Fairfax County, Virginia.  Best Industries, Inc. entered into a contract first

with Wachovia Bank and then with the Defendant Wells Fargo Bank, N.A. as successor to

Wachovia Bank, N.A. to borrow and/or guarantee certain loans and/or lines of credit which were

modified by the Waiver and Amendment Agreement of July 31, 2009.

5.      Plaintiff Krishnan Suthanthiran ("Krish") is an individual who is sole owner, sole

shareholder and president of Plaintiff corporations Best Medical International, Inc., Huestis

Machine Corporation, Gunston Hall Realty, Inc. and Best Industries, Inc. and who does business

on a regular and systematic basis in  Fairfax Country, Virginia and is also an individual of Asian

(Indian) descent, non-white skin color and immigrant status and is therefore a member of a

protected class of persons as defined by the  laws of the United States, specifically, 42 U.S.

§1981 *et. seq.*  In addition, Krish is the President and sole shareholder of  all the corporate

Plaintiffs who therefore also have standing to claim race discrimination pursuant to 42 U.S.C.

§1981 *et. seq.*

6.      Defendant, Wells Fargo Bank, N. A. is a foreign corporation that does business

2

on a systematic and regular basis in Fairfax County, Virginia and on or about December 31, 2008 purchased and merged with Wachovia Bank, N.A.  Wells Fargo Bank, N.A. is therefore liable for any and all wrongdoing attributable to Wachovia Bank, N.A.

7.    J. Kent Thompson ("Thompson") is an individual employed as, and at all times relevant to this Complaint was employed as, a Senior Vice President for Wells Fargo Bank, N.A. located at 1753 Pinnacle Drive, 3rd Floor, McLean, Virginia. To the best of Plaintiffs' information and belief, Defendant Thompson resides in Fairfax County or Prince William County, Virginia and does business in Fairfax County, Virginia.

8.    That on or about January 1, 2009 Wells Fargo Bank, N.A., assumed obligations as the Lender for all Loan and Guarantee Agreements between Wachovia Bank and the Plaintiffs. Said loan agreements pertained to loans and/or lines of credit to the Plaintiff in sums totaling $15,000,000.00 in the aggregate.

9.    That the transactions and/or occurrences related to this cause of action occurred in Fairfax County, Virginia and venue is proper in the Federal District Court for the Eastern District of Virginia, Alexandria Division.

10.    That jurisdiction this Complaint alleges a violation of 42 U.S.C. §1981 *et. seq.* and therefore presents a federal question and subject matter jurisdiction is proper pursuant to 28 U.S.C. §1331.

11.    That Plaintiffs are protected persons as defined by 42 U.S.C. §1981 *et. seq.*

12.    That the Plaintiffs were involved in a protected activity as defined by 42 U.S.C. §1981 when on or about January 1, 2010 they applied for or requested an extension of the loan agreement between the parties following the expiration of the prior agreement.

3

## FACTUAL ALLEGATIONS

13.    Plaintiff hereby incorporates by reference preceding paragraphs 1-12.

14.    The parties had a long standing banking relationship of about 35 years that primarily consisted of providing traditional banking services to the Plaintiffs, including checking and savings accounts. Plaintiffs had limited experience in borrowing money and only borrowed money in late 2004 following the Defendant's solicitation. Plaintiffs were not sophisticated in the complicated aspects of such financing.

15.    Prior to the Wells Fargo purchase of Wachovia, Plaintiffs were provided regular renewals of all their debt and lines of credit based on their excellent repayment record and sound business practices.  In fact, Wachovia affirmatively solicited the Plaintiffs business relative to the loans because of the Plaintiffs excellent repayment history and record of business growth, acumen and profitability.  Specifically, Plaintiffs had the following term loans and credit lines as of January, 2009:

A.    Promissory Note between BMI and Wachovia Bank for $3,000,000.00 dated October 29, 2004.

B.    Promissory Note between Gunston and Wachovia Bank for $5,000,000.00 dated August 5, 2005.

C.    Term Note between Huestis and Wachovia bank for $5,000,000.00 dated December 1, 2006 to be paid in full by 2016, along with its ancillary Financing and Security Agreement.

D.    Supplemental Term Note between Huestis and Wachovia Bank for $2,000,000 dated December 1, 2006 to be paid in full by February 28, 2017.

E.    Interest Rate Swap Agreements of December, 2006 and February, 2007.

16.    The above transactions resulted in loans amounting to $15,000,000.00 between the parties.

17.    Krish also entered into an agreement with Wachovia Bank personally

4

guaranteeing payment of the loans.

18.     Soon after Defendant Wells Fargo purchased Wachovia on or about December 31, 2008, the relationship between the parties significantly deteriorated.  Defendant Thompson became Wells Fargo's representative relative to the Wachovia loans. On May 8, 2009 Wells Fargo informed the Plaintiffs they were in default of the loans despite the fact that **all monthly payments were made on time or early and the loans were over collateralized.**

19.     Specifically, on May 8, 2009, Wells Fargo, by and through Defendant Thompson, claimed that the Huestis loan was in default because (1) the borrower failed to provide 'audited' financial statements; (2) Huestis did not maintain a Debt Service Coverage Ratio of not less that 1.24 to 1.00 (customary ratio is 2.0 to 1.0); and (3) the personal guarantor, Krish, failed to maintain a liquidity requirement.  Wells Fargo, through Defendant Thompson, also refused to renew the BMI and Gunston lines of credit which had become due on March 6, 2009. These claims were immaterial and unsubstantial. Reasonable and customary banking practice considers such issues 'technical defaults' and not subject to hasty foreclosure actions and draconian modifications.  Also, yearly notes were routinely renewed in light of the fact that *Plaintiffs made all loan payments on time or early*. Also, the loan documents did not require 'audited' financial statements.  Plaintiffs' perfect payment history, the amount of Plaintiffs' deposits held by Wells Fargo in addition to the value of the collateral dictated yearly extensions. Meanwhile, the Huestis loans were not due until 2016 and 2017, respectively, but Wells Fargo, by and through Defendant Thompson, unreasonably and wrongfully accelerated payment of those loans.

20.     On May 8, 2009, Wells Fargo, by and through Defendant Thompson, wrongfully demanded immediate payment of the following amounts: $2,719,305.58 on the BMI revolving line of credit; $4,286,596.50 on the Gunston revolving line of credit and a total of $6,710,161.10

5

on the Huestis term loans that were not due until 2016 and 2017 and continued to be paid on time.

21.    The Plaintiffs, as in the past with Wachovia Bank, requested renewal of the loans. Wells Fargo, by and through Defendant Thompson, however, took advantage of their ill-gotten bargaining power and demanded the following in exchange for a mere six month extension:

(a)    increased interest percentage rates (from LIBOR plus 2.00 to LIBOR plus 5.00);

(b)    $7-10 million dollars in additional collateral, secured by deeds of trust;

(c)    pre-payment penalties;

(d)    unconscionable attorney fees of 15%;

(e)    confessed judgment clause;

(f)    releases of all claims and waivers of basic rights; and

(g)    additional guarantees and stock pledges.

22.    On or about July 31, 2009, in violation of reasonable and customary banking practices, Wells Fargo required the Plaintiffs to sign a Waiver and Amendment Agreement that required payment of all the above credit facilities within five (5) months, including the term loans, despite having never missed a payment and a history of making payments early. The pretext for requiring the agreement were alleged technical defaults that under reasonable and customary banking standards would not result in foreclosure or draconian acceleration of payments. This Waiver and Amendment Agreement, in addition to accelerating $12,000,000.00 of loan payments, essentially doubled the interest rate, required significant additional collateral over and above the value of the loans, added unreasonable pre-payment penalties and attorney fees in addition to requiring that the Plaintiffs waive all legal rights and claims. In the event Plaintiffs refused to sign the Waiver and Amendment Agreement, Wells Fargo threatened

6

foreclosure on all the loans placing the Plaintiffs businesses at risk along with several hundred jobs. This was threatened despite the fact Plaintiffs still had not missed a payment.

23.    Plaintiffs were, therefore, presented with a Hobson's choice. Either immediately pay $13,716,063.00 despite never missing a payment, along with an additional $718,642.00 demanded as a result of the swap agreement, or capitulate and consent to the aforementioned onerous, unreasonable conditions of the Waiver and Amendment Agreement. This Waiver and Amendment Agreement gave Wells Fargo the right to abruptly foreclose on the Plaintiffs property and business operations via confessed judgments in exchange for a mere five (5) month extension to January 1, 2010.  Plaintiffs had no choice but to accept the five (5) month extension and sign the Waiver and Amendment Agreement in order to forestall immediate foreclosure.

24.    The Waiver and Amendment Agreement of July 31, 2009 also incorporated all the other credit facilities relevant to this litigation including the Promissory Note between BMI, Inc. and Wachovia Bank for $3,000,000.00 dated October 29th, 2004; the Promissory Note between Gunston and Wachovia Bank for $5,000,000, dated August 5, 2005; the Term Note between Huestis and Wachovia bank for $5,000,000.00 dated December 1, 2006 to be paid by 2016, along with its ancillary Financing and Security Agreement; the Supplemental Term Note between Huestis and Wachovia Bank for $2,000,000.00 dated December 1, 2006, scheduled to mature on February 28, 2017; and the Interest Rate Swap Agreements of December, 2006 and February, 2007.

25.    Wells Fargo knew the purposes for which the Plaintiffs procured the loans was to expand and finance their businesses including hiring employees.

26.    When the onerous Waiver and Amendment Agreement expired on or about January 1, 2010 the Plaintiffs again applied/requested a renewal of the loans given Plaintiffs'

7

perfect payment history. Wells Fargo again refused to renew the loans in violation of reasonable and customary banking practice. Instead, Wells Fargo, by and through Defendant Thompson, made more unreasonable demands relative to the Plaintiffs research and development expenditures, inventory levels, cash flow, and required the pledging of other, unrelated real property. Wells Fargo Bank, at Defendant Thompson's direction, virtually attempted to take day to day control of the Plaintiffs' business operations as a result of substantially performing loans that never, to this very day, have had a late payment. Meanwhile, on April 1, 2010, Plaintiff Huestis began making extra payments of $250,000.00 per month towards the principal on the Term loans as a showing of good faith.

27.    On April 21, 2010, Wells Fargo, at Defendant Thompson's urging, alleged that Plaintiffs were in default of the onerous Waiver and Amendment Agreement they were compelled to sign under duress and Plaintiffs again requested an extension of the loans.

28.    On May 6, 2010, Plaintiffs contacted Defendant Thompson reiterating their good faith efforts to pay significant sums toward retirement of the debt while attempting to negotiate an extension. Plaintiffs further requested a meeting with the individual responsible for making the decision relative to the loan extension. However, the Plaintiffs' good faith efforts were ignored and belittled by Thompson and no decision maker was identified.

29.    Wells Fargo, by and through Defendant Thompson, continued to unreasonably deny Plaintiffs' efforts to extend the loans despite Plaintiffs stellar repayment history over six years and past practices of routinely granting extensions and renewals.

30.    In April and May, 2010, whenever Defendant Thompson communicated with Krish he did so in a loud, hostile, disrespectful and condescending manner whereas when Defendant Thompson spoke to Caucasian employees of the Plaintiffs his demeanor was

8

professional and courteous.

31.     On June 24, 2010, Krish contacted Defendant Thompson and informed him that

he believed Wells Fargo's acceleration of the loans and refusal to negotiate in good faith were

motivated by racial discrimination.  Krish based these allegations on the following facts:

**A.      Facts Prior to July 31, 2009 Waiver and Amendment Agreement**[1]

a.     The Plaintiffs relationship with Wachovia Bank was professional and based on
reasonable and customary banking practices. The yearly notes were renewed and
minor, technical variations with the loan requirements were renegotiated or
waived.  On May 8, 2009 however, about four months after Wells Fargo took
over Wachovia, Wells Fargo claimed that the Huestis loan was in default because
(i) Plaintiffs failed to provide 'audited' statements (which were not required by
the loan documents); (ii) Huestis did not maintain a Debt Service Coverage Ratio
of less than 1.24 to 1.00 and (iii) the personal guarantor failed to maintain a
certain liquidity requirement. Wachovia, consistent with reasonable and
customary banking practice extended the yearly notes and did not threaten
foreclosure or demand acceleration for any minor variations with the loan
documents.  Wells Fargo also claimed that the BMI and Gunston lines of credit
had become due on March 6, 2009.

b.     The aforementioned alleged defaults however were non-substantial and in fact are
considered immaterial or 'technical' defaults that would not require or result in
foreclosure actions according to reasonable and customary banking practices
which would have required the continuation of the Best Medical and Gunston
Hall lines of credit and a waiver or renegotiation of the technical default on the
Huestis loan. This is especially true for loans, such as here, that were never
behind in payments, had more than sufficient security, the debtor maintained
sufficiently large deposits in their bank accounts with the creditor bank and the
loans were subject to a personal guaranty.

c.     Instead of extending the loans and/or renegotiating the ratio requirements, as
dictated by reasonable and customary banking practices, Wells Fargo demanded
that all the loan balances, which totaled over $12,000,000.00, be paid
immediately.

d.     Plaintiffs attempted in good faith to renegotiate the loans. Wells Fargo, however,
unreasonably demanded the following:

---

[1] The court indicated that the Waiver Agreement released all claims of action that were incurred prior to July 31,
2009. Instances that occurred prior to July 31, 2009 however can still be used as background evidence to establish
factual basis for an inference that race was a factor in the Defendant's decision to refuse to extend the Plaintiffs
loans *after* July 31, 2009, *Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 117, 122 S. Ct. 2061, 153 L. Ed.
106 (2002).

9

      i.       increased interest percentage rates from LIBOR plus 2.00 to LIBOR plus 5 which effectively more than doubled the interest rate;

      ii.      $7 - $10 million more in collateral secured by deeds of trust;

      iii.    pre-payment penalties after accelerating the payments;

      iv.    unconscionable attorney fees of 15% of the balance;

      v.     inclusion of confession of judgment clauses which heretofore had been omitted relative to the 2004 loan;

      vi.    releases of all claims and waivers of basic rights including that of a jury trial; and

      vii.   additional corporate guarantees and stock pledges.

e.    On July 31, 2009 the Plaintiffs had no choice but to agree to the Waiver and Amendment Agreement or lose their businesses through foreclosure despite never missing a payment.

**B.**    **Facts after the July 31, 2009 Waiver and Amendment Agreement**

a.    The $11.2 million balance on Plaintiffs loans is secured by real property with a value of over $17 million according to Wells Fargo's appraisals. In addition to real estate, the loans are secured by assets and accounts of the Plaintiff corporations and the personal assets of the guarantor, Krish. The combined value of these assets are several times the current loan balance.

b.    On March 16, 2010, Wells Fargo informed the Plaintiffs they wanted the entire Wachovia loan to be repaid within six months despite the fact the loans continued to be paid on time or early. Wells Fargo essentially wanted to jettison a substantially performing loan. This included the two Huestis Loans totaling $7,000,000.00 even though the loans were not scheduled to mature until 2016 and 2017, respectively. Wells Fargo also effectively doubled the interest rate on the loans even though a payment was never missed or late.

c.    In March 2010, Wells Fargo unreasonably demanded the following in exchange for another short extension:

      i.       payment of $1,000,000.00 in cash;
      ii.     another $1,000,000.00 in collateral;
      iii.    assignment of interest in real estate;
      iv.    payment of $250,000.00 in cash at closing;
      v.     control of the Plaintiffs research and development budget;

10

      vi.     control of the Plaintiffs inventory;

      vii.    an extension fee of $300,000.00;

      viii.   an interest floor of 8% *added* to the loans;

      ix.     additional monthly payments of $250,000.00 per month;

      xi.     an additional $475,000.00 payment by June 15;

      xii.    payments of $6,000,000.00 in 90 days;

      xiii.   additional fees of 1% on the balance outstanding on May 31, 2010, 1.50 % on the outstanding balance as of July 31, 2010 and a fee of 2.0% on the balance outstanding as of September 30, 2010.

These fees alone would add up to $500,000.00 and amounted to a racial surtax to the Plaintiffs whose primary place of business is located in a geographical area where the population consists of an above-average density of persons of Asian descent. These demands were wholly draconian, unreasonable and far outside the bounds of reasonable and customary banking practices.

d.     On May 6, 2010, Plaintiffs contacted Defendant Thompson reiterating their good faith efforts to pay significant sums toward retirement of the debt while attempting to negotiate an extension. Plaintiffs further requested a meeting with the individual responsible for making the decision relative to the loan extension. However, the Plaintiff's good faith efforts were ignored and belittled by Defendant Thompson and no decision maker was identified.

e.     On April 1, 2010, Plaintiff Huestis began paying $250,000.00 per month extra toward the loans yet Wells Fargo still refused to negotiate in good faith and continued to make outrageous and unreasonable demands relative to continuing the financing.

f.     There is no logical or reasonable purpose for the treatment Wells Fargo inflicted upon the Plaintiffs who have been who have been reliable and timely with all their payments. At one point, Defendant Thompson refused to allow Krish to open a new bank account at Wells Fargo for a new company he had formed. Krish reasonably concluded that Wells Fargo's and Defendant Thompson's behavior was motivated by racial discrimination.

g.     On or about April 2011, the Plaintiffs attempted to provide some payments toward the loans in exchange for a release of some of the collateral in order to refinance some of the debt. Wells Fargo, however, refused to negotiate in good faith the release of the collateral and required the Plaintiffs to sign another waiver of liability relative to any information it divulged to another prospective lender. This hampered Plaintiffs ability to obtain replacement financing.

h.     On or about October 1, 2011, Wells Fargo abruptly, without notice or explanation, ceased accepting payments that were being made toward the loans.

i.     Wells Fargo's acceleration of the loans and refusal to negotiate in good faith were

11

the result of an attempt by Defendant Thompson to personally harm Krish and his businesses based on his race.

32.     Wells Fargo and Defendant Thompson, then retaliated against Krish for making

his civil rights complaint on June 24, 2010 in the following manner:

a.      By promptly filing Confessed Judgments against the Plaintiffs a mere six (6) days after the discrimination charge was written despite the fact that all payments were made on time or early. The Confessed Judgment filing was in violation all of reasonable and customary banking practices for substantially performing loans such as the loans at issue here.

b.      By essentially ignoring the Plaintiffs complaint of race discrimination and conducting no reasonable investigation of the matter.

33.     Defendant further retaliated against the Plaintiffs for the discrimination complaint

made on June 24, 2010 as well as the discrimination allegation within the August 3, 2010 lawsuit

in the following manner:

a.      On or about April, 2011 the Plaintiff attempted to provide some payments toward the loans in exchange for a release of some of the collateral. Wells Fargo, however, refused to negotiate in good faith the release of the collateral and required the Plaintiff to sign another waiver of liability relative to any information it divulged to another prospective lender; and

b.      That on or about October 1, 2011, Wells Fargo abruptly, without notice or explanation, ceased accepting payments that were being made toward the loans.

34.     In June 2012, Defendant Wells Fargo, by and through Defendant Thompson

began contacting Plaintiffs' customers in connection with their alleged right to collect BMI's

accounts receivables to satisfy their judgment. Defendant Thompson began contacting Plaintiffs

customers, both personally and through his agents, Receivables Control Corporation, advising

Plaintiffs' customers to stop making their payments to BMI for products they had ordered and

received from BMI and further ordered Plaintiffs' customers to forward those payments to Wells

Fargo.

12

35.     Soon thereafter, Plaintiffs' customers began calling Plaintiffs and reporting that they were being harassed by Wells Fargo and their collection agency, Receivables Control Corporation ("RCC"). Plaintiffs' customers reported that RCC was calling them on a daily basis, making unreasonable demands for information, and threatening them with liability if they did not pay the monies due to BMI to RCC.

36.     Plaintiffs' customers are now concerned about whether BMI will continue to be able to provide them with the medical devices and treatments they need to treat their patients are seeking other sources for these critical medical treatments.

37.     Defendant Thompson's motivation for using this method for satisfying the judgment was his racial animus toward Krish which fuels his desire to destroy Krish and his minority-owned companies. The most efficient way to accomplish that goal is to deprive BMI of the revenue they need to operate the business and continue to supply their customers. Moreover, by interfering in the relationship between BMI and Plaintiffs' customers, Thompson can ensure that Krish's reputation, as well as that of his companies, is sufficiently tarnished to ensure that he will not be able to continue to operate his businesses. Accordingly, BMI and Krish have suffered severe harm to their reputations as a result of Defendant Thompson's discriminatory actions.

## COUNT I

## VIOLATION OF 42 U.S.C. §1981 AS TO ALL PLAINTIFFS

## RACE DISCRIMINATION BY WELLS FARGO

38.     Plaintiffs hereby incorporate by reference all prior paragraphs 1-33.

39.     The corporate borrowers have standing to allege a discrimination claim in that the sole shareholder is a non-white minority as contemplated by the act and the corporations have suffered damages as a result of Defendants' Wells Fargo and Thompson's wrongdoing.

13

40.    The individual Plaintiff, Krish, also has standing to allege a discrimination claim because he is the non-white personal guarantor of the loans as well as the sole shareholder and president of the corporate Plaintiffs.

41.    The credit transactions and request for extension as described above is subject to 42 U.S.C. §1981 which states:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territories to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.

42.    That on or about May 8, 2009, Plaintiffs applied for and were qualified for an extension of the lines of credit previously extended to BMI and Gunston.

43.    That on July 31, 2009, Wells Fargo threatened foreclosure if the Plaintiffs did not sign the Waiver and Amendment Agreement which included the aforementioned unreasonable conditions set forth above.

44.    That on or about January 1, 2010, upon expiration of the Waiver and Amendment Agreement, the Plaintiffs were qualified for and requested and/or reapplied for an extension of the July 30, 2009 Agreement.

45.    On April 10, 2010, Wells Fargo demanded payment of all the loans and the Plaintiffs again applied for and were qualified for extension.  Wells Fargo demanded even more unreasonable conditions in the form of increased collateral, interest, fees and pledges of certain real property. These unreasonable conditions were required despite the fact all payments were being made on time, or early, and the loans collateral was already worth significantly more than the balance of the debt.

46.    The application for extension was denied and the Plaintiffs refused to agree to Wells Fargo's unreasonably burdensome conditions and demands which were cultivated by

14

Wells Fargo's practice of discriminating against minorities.

47.    The Plaintiffs qualification for the loan extension was evidenced by the fact that they never missed or were late on a payment; paid an extra $250,000.00 per month towards the principal on the Huestis loans, and provided collateral that was valued at many times the value of the loan balances. Reasonable and customary banking practice required that the loans be extended pursuant to their original terms.

48.    The Plaintiffs, each and all of them, are members of a protected class for the purposes of 42 U.S.C. §1981 *et. seq.*

49.    That the Plaintiffs, each and all of them, applied for available credit or to guarantee credit on, or about May 8, 2009, January 1, 2010 and April 10, 2010.

50.    That the Plaintiffs, each and all of them were qualified for the credit applied for. In fact, all payments were made in a timely manner, or early, and the original notes were all substantially performing loans.

51.    That the application for the credit for all Plaintiffs was denied, or its approval was made subject to unreasonable or overly burdensome conditions that were outside the bounds of reasonable and customary banking practices.

52.    That in this case the unreasonable and overly burdensome conditions included the following:

A.    **Conditions Prior to July 30, 2009**

i.    increasing the interest percentage rates from LIBOR plus 2.0 to LIBOR plus 5.0, which effectively more than doubled the interest;

ii.    requiring $7-$10 million additional collateral;

iii.    requiring pre-payment penalties after accelerating the payments;

iv.    requiring unconscionable attorney fees of 15% of the balance;

15

v.    requiring a confessed judgment clause which heretofore had been omitted relative to the 2004 loan;

vi.   requiring releases of all claims and waivers of basic rights including that of a jury trial; and

vii.  On July 31, 2009 the Plaintiffs were forced to agree to the Waiver and Amendment Agreement or lose their businesses through foreclosure despite never missing a payment.

**B.    Conditions After July 30, 2009**

i.    On March 16, 2010, Wells Fargo informed the Plaintiffs they wanted the entire Wachovia loan to be repaid within six months despite the fact the loans continued to be paid on time or early. Wells Fargo essentially wanted to jettison a substantially performing, over-secured loan. In fact, the loans which now have a balance of about $11.2 million are secured with over $17 million of real estate in addition to the personal property and accounts of the Plaintiff corporations and the assets of the personal guarantor. The combined value of these assets is several times the balance due on the loans.

ii.   In March 2010, Wells Fargo required the following in exchange for another short extension period:
(a) payment of $1,000,000.00 in cash;
(b) another $1,000,000.00 in collateral;
(c) assignment of interest in real estate;
(d) payment of $250,000.00 cash at closing;
(e) control of the Plaintiffs research and development budget;
(f) control of the Plaintiffs inventory;
(g) an extension fee of $300,000.00;
(h) an interest floor of 8% *added* to the loans;
(i) additional monthly payments of $250,000.00 per month;
(j) an additional $475,000.00 payment by June 15;
(k) payments of $6,000,000.00 in 90 days;
(l) additional fees of 1% on balance outstanding as of May 31, 2010, 1.50 % on the outstanding balance as of July 31, 2010 and a fee of 2.0% on balance outstanding on September 30, 2010.

These demands were wholly unreasonable and far outside the bounds of reasonable and customary banking practices. These fees alone would add up to $500,000.00 and amounted to a racial surtax to the Plaintiffs whose primary place of business is located in a geographical area where the population consists of an above-average density of persons of Asian descent.

iii.  On April 1, 2010 the Plaintiff began paying $250,000.00 per month extra toward

16

JA0063

the loans yet Wells Fargo refused to negotiate in good faith and continued to make outrageous and unreasonable demands relative to continuing the financing.

iv.    Wells Fargo insisted that Plaintiffs pay off or refinance all the loans since the ownership change from Wachovia to Wells Fargo despite all payments being made on time or early.

v.     The value of the collateral securing the loans significantly increased in value. In fact, the current $11,200,000.00 balance is now secured by over $17,000,000.00 in property. Despite the loans being over-collateralized and always paid on time, Wells Fargo continued to insist that the loans be paid off immediately.

vi.    On May 6, 2010, Plaintiffs General Manager and Counsel, Shawn Weingast wrote to Wells Fargo asking for a meeting with the person empowered to make decisions relative to the Plaintiffs' loans. Wells Fargo ignored this request.

vii.   As of May 26, 2010, Wells Fargo was still demanding more collateral for an already over-secured loan, demanding control of where business operating funds would be deposited and requiring draconian interest rates of 9% and punitive fees that would cost Plaintiffs in excess of $400,000.00. These various costs resulted in an effective annual interest rate of 14.18% at a time when interest rates generally are at all-time lows.

viii.  That on June 24, 2010 Plaintiff Krish wrote a letter to Defendant Thompson outlining the unreasonable and burdensome conditions demanded by Wells Fargo in return for renewing the loans and complained about racial harassment and discrimination.

ix.    There is no logical or reasonable purpose for the treatment Wells Fargo inflicted upon the Plaintiffs who have been who have been on time or early with all their payments. Krish reasonably concluded that Well Fargo's behavior was motivated by racial discrimination.

x.     On or about October 1, 2011, Wells Fargo abruptly, without notice or explanation, ceased accepting payments that were being made toward the loans.

xi.    On or about April, 2011 the Plaintiffs attempted to provide some payments toward the loans in exchange for a release of some of the collateral. Wells Fargo, however, refused to negotiate in good faith the release of the collateral and required the Plaintiffs to sign another waiver of liability relative to any information it divulged to another prospective lender.

xii.   Wells Fargo's actions of calling the loans and refusing to negotiate in good faith were the result of an attempt to personally harm Krish and his businesses based on his race.

17

JA0064

Case 1:11-cv-01277-GBL-TRJ  Document 67-1  Filed 08/20/12  Page 18 of 35  PageID# 9792

53.    That the following facts and circumstances amount to additional evidence that establishes a causal nexus between the harm suffered and the Plaintiffs membership in a protected class, from which a reasonable juror could infer, in light of common experience, that Wells Fargo, by and through Defendant Thompson, acted with discriminatory intent:

**A.    Prior to July 30, 2009**

   i.    Refusing to grant, or reasonably negotiate, renewals or extensions of loans and/or lines of credit with Krish, a member of a protected class, on or after May 8, 2009 while at the same time agreeing to extend loans to white customers. Specifically, loans were successfully negotiated with Oncology Med, Inc. of Lovettsville, Va. which is a company operated by a white, non-minority CEO who, to the best of Plaintiffs information and belief, was less creditworthy than Plaintiffs, but received less onerous terms and conditions for loan extensions than Plaintiffs.

   ii.   Requiring minority business owners, such as Krish, to agree to onerous, unreasonable and unfair conditions as expressed in the Waiver and Amendment Agreement. These include requiring a Confession of Judgment provision, demanding excessive collateral, more than doubling the interest rate, and demanding waivers of basic rights under law such as a jury trial to resolve disputes despite the fact that these demands were typically not made in prior years. These demands were made although Plaintiffs were making all payments on time and the loans were well collateralized.

   iii.  By retaliating against Krish for making a Civil Rights complaint by unreasonably filing a confessed judgment a mere six (6) days after the civil rights issue was raised with Well Fargo specifically regarding Defendant Thompson. To the best of Plaintiff's information and belief, Defendant Thompson contributed to the decision to file the confessed judgments.

   iv.   Wells Fargo did not follow reasonable and customary banking practices in formulating and demanding the unreasonable conditions of the Waiver and Amendment Agreement of July 31, 2009.

   v.    By unreasonably accelerating the $7mm Huestis Machine Corp. loans and requiring payment within six months when they were not due until 2016 and 2017 respectively.

   vi.   By requiring the Plaintiffs to pay unreasonably excessive interest rates and fees pursuant to the Waiver and Amendment Agreement despite all

18

payments being made on time and the loans being fully collateralized.

**B.**   <u>After July 29, 2009</u>

i.   On March 16, 2010, Wells Fargo informed the Plaintiffs they wanted all Wachovia loans to be repaid within six months despite the fact the loans continued to be paid on time or early. Wells Fargo essentially wanted to jettison a substantially performing loan.

ii.   In March 2010, Wells Fargo demanded the following unreasonable conditions in exchange for another short extension:

a.   $1,000,000.00 in cash;
b.   Another $1,000,000.00 in collateral;
c.   Assignment of interest in real estate;
d.   $250,000.00 cash at closing;
e.   Control of the Plaintiffs research and development budget;
f.   Control of the Plaintiffs inventory;
g.   An extension fee of $300,000.00;
h.   An interest floor of 8% *added* to the loans,
i.   Additional monthly payments of $250,000.00 per month;
j.   An additional $475,000.00 payment by June 15;
k.   Payments of $6,000,000.00 in 90 days;
l.   Additional fees of 1% on the outstanding balance on May 31, 2010, 1.50 % of the outstanding balance on July 31, 2010 and a fee of 2.0% of the outstanding balance on September 30, 2010.

These demands were wholly unreasonable and far outside the bounds of reasonable and customary banking practices. These fees alone would add up to $500,000.00 and amounted to a racial surtax to the Plaintiffs whose primary place of business is located in a geographical area where the population consists of an above-average density of persons of Asian descent.

iii.   On April 1, 2010 Plaintiff Huestis began paying $250,000.00 per month extra toward the loans yet Wells Fargo still refused to negotiate in good faith and continued to make outrageous and unreasonable demands relative to continuing the financing.

iv.   The value of the collateral securing the loans significantly increased in value. In fact, the current $11,200,000.00 that is outstanding is now secured by $17,000,000.00 in real estate in addition to several ties that in corporate property and personal guarantees. In spite of the loans being over-collateralized and always paid on time Wells Fargo continued to insist that the loans be paid off immediately.

19

v.     On May 6, 2010 Plaintiffs Vice President and General Counsel, Shawn Weingast wrote to Defendant Thompson asking for a meeting with the person empowered to make decisions relative to the Plaintiffs loans. Wells Fargo ignored this request.

vi.    On June 24, 2010, Krish wrote to Wells Fargo complaining about race discrimination. *See letter at Exhibit 2.*

vii.   There is no logical or reasonable purpose for the treatment Wells Fargo inflicted upon the Plaintiffs who have been who have been on time or early with all their payments. Krish reasonably concluded that Wells Fargo's behavior was based on racial discrimination.

viii.  On or about October 1, 2011, Wells Fargo abruptly, without notice or explanation, ceased accepting payments that were being made toward the loans.

ix.    On or about April, 2011 the Plaintiffs attempted to provide some payments toward the loans in exchange for a release of some of the collateral. Wells Fargo, however, refused to negotiate in good faith the release of the collateral and required the Plaintiffs to sign another waiver of liability relative to any information it divulged to another prospective lender.

x.     Wells Fargo's acceleration of the loans and refusing to negotiate in good faith were the result of racial discrimination directed toward Krish and his businesses.

xi.    That on or about October 1, 2011 Wells Fargo refused to accept the payments that were timely made on the outstanding loans.

xii.   On or about April, 2010 the Plaintiffs attempted to provide payments for some of the loans in exchange for a release of the appropriate amount of collateral. Wells Fargo refused to negotiate the collateral in good faith and provide the releases.

xiii.  On June 30, 2010, Wells Fargo filed confessed judgments against Gunston, BII and Krish contrary to reasonable and customary banking practices.

xiv.   To the best of Plaintiffs knowledge and belief the aforementioned conditions, demands and circumstances are unreasonable and not imposed upon white borrowers.

54.    In addition to the above case specific facts recent empirical studies have confirmed the likelihood of discrimination occurring within the commercial lending field.  *See,*

20

Reese, David, *Minority Owned Businesses, Trade Credit and Discrimination, an Empirical Study of the Impact of Racial Discrimination on Access to Trade Credit vs. Non-Minority Owned Firms,* which is a dissertation submitted to The School of Community Economic Development of Southern New Hampshire University in April 2007. *See Exhibit 3.* Another study involving credit discrimination for minorities is entitled *Do Minority and Woman Entrepreneurs Face Discrimination in Credit Markets,* which was submitted by Jan Ondrich of the Center for Policy Research, Syracuse University in March, 2010. *See Exhibit 4.*

55.     These studies demonstrate that minority businesses pay higher interest rates and have more difficulty obtaining credit than firms operated by Caucasians. The study by David Reese found that this disparity also pertained specifically to Asian minority business owners. *See Exhibit 5.*

56.     The reasons stated by Wells Fargo for issuing the default notice and refusing to fairly negotiate loan terms was the Plaintiffs failure to provide "audited financial statements," failure to maintain a Debt Service Coverage Ratio of not less that 1.24 to 1.00, and the failure of the personal guarantor to maintain a liquidity requirement.

57.     These aforementioned reasons are pretextual and designed to hide or cover up its discriminatory practices.

58.     Pretext is demonstrated by the following facts:

a.      The reasons stated by Defendant for the default are not true. The original loan documents did not require audited financial statements.

b.      The original loan documents allowed for a 10 day period to cure any alleged defect in performance which was denied the Plaintiff upon request.

c.      The unrealistic demands of interest, increased collateral, extra fees and prepayment penalties and refusal to extend yearly lines of credit provided to Plaintiff both before and after July 30, 2009 were in violation of reasonable and customary banking practices which typically require a minor renegotiation of the

21

debt service ratio requirements and the liquidity requirements. In this instance, where the loan payments were always on time or early and the balances were over-collateralized, the draconian actions of Wells Fargo are even more suspect.

d.   Plaintiffs have provided an affidavit (incorporated herein by reference) from Alex Arapoglou, a banking expert, who testifies that not only are Well Fargo' actions wholly unreasonable but completely outside the bounds of reasonable and customary banking practices. In addition, the facts and circumstances here are such that one can conclude that race was a significant factor in motivating Wells Fargo's conduct toward the Plaintiffs. *See Affidavit at Exhibit 6.*

e.   Plaintiffs past payment performance, amount of security attached to the loans, balances that were held in the Plaintiffs bank accounts with Wells Fargo all indicate that Wells Fargo's conduct was not related to the Plaintiffs credit worthiness.

59.   That Wells Fargo's conduct has denied and will continue to deny Plaintiffs equal protection and the right to be free from discrimination as expressed in 42 U.S.C. §1981 and constitute discrimination and harassment because of the Plaintiffs race, skin color and/or national origin .

60.   Wells Fargo's conduct was willful, malicious, and intentional as such terms are defined by law.

61.   As a direct and proximate result of Wells Fargo's unlawful racial discrimination as described above, Plaintiffs have suffered damage to their reputations, lost and will continue to lose substantial monies including, but not limited to, increased interest costs fees and penalties.

62.   As a further direct and proximate result of Wells Fargo's unlawful business and lending practices, Krish has suffered the indignity of discrimination, severe humiliation, injury to his person and feelings, loss of standing and status in the community, irreparable harm to his reputation, and invasion of his right to be free from discrimination and retaliation.

WHEREFORE, Plaintiffs pray that this Court enter an Order providing relief as described in the 'Prayer for Relief' section below.

22

## COUNT II

### VIOLATION OF 42 U.S.C. §1981 AS TO ALL PLAINTIFFS

### RACIAL DISCRIMINATION BY DEFENDANT THOMPSON

63.    Plaintiffs hereby incorporate by reference all preceding paragraphs herein.

64.    Individuals can be held liable under 42 U.S.C. §1981 if they intentionally cause a corporation to infringe up the rights secured by that statute. *See Tillman v. Wheaton-Haven Recreation Ass'n,* 517 F.2d 1141, 1146 (4th Cir. 1975).

65.    Defendant Thompson is liable to Plaintiffs because he intentionally inflicted his racial animus against Plaintiffs. Wells Fargo Bank, N.A., however, remains liable for the wrongdoing of Defendant Thompson pursuant to *respondeat superior*.

66.    Defendant Thompson's racial animus towards Plaintiffs is evidenced by the following:

a.    Defendant Thompson's demeanor when dealing with Krish was hostile and condescending. By contrast, when communicating with Krish's Caucasian employees, Defendant Thompson was polite and respectful;

b.    Defendant Thompson' refusal to negotiate with Krish in good faith an extension of the loan facilities although Defendant Thompson routinely negotiated in good faith with Caucasian borrowers;

c.    Defendant Thompson required minority business owners, specifically Krish, to agree to onerous and unfair conditions to obtain a short extension of the loan facilities.  The onerous and unfair conditions imposed by Defendant Thompson on Krish in March 2010 include, but are not limited to, the following:

i.    Demanding excessive collateral to secure the loan facilities;
ii.    Increasing the interest rate;
iii.    Requiring a Confession of Judgment provision that Wachovia had agreed to eliminate from the original loan documents in 2004;
iv.    Demanding waivers of basic rights such as the right to a jury trial;
v.    Demanding unreasonable terms such as a prepayment penalty after accelerating the loans;
vi.    Demanding unreasonable and onerous extension fees and

23

                payments;

        vii.     Accelerating loans that had never had a late payment; and

        viii.    Requiring control over Plaintiffs' inventory as well as Plaintiffs' research and development budget.

    d.     Defendant Thompson retaliated against Krish for lodging a discrimination complaint by unreasonably filing confessed judgments against Krish, BII, and Gunston a mere six (6) days after Krish wrote to Wells Fargo complaining of discrimination;

    e.     Defendant Thompson ignored Plaintiffs' request to speak to the person empowered to make the decision regarding the loan facilities;

    f.     Defendant Thompson's reasons for requiring the aforementioned draconian measures are pretextual and designed to hide Defendant Thompson's racial animus toward Plaintiffs and others in a protected class in violation of 42 U.S.C. §1981.

    g.     Since February 24, 2012, Defendant Thompson has, under the guise of collecting on the judgments, been systematically and intentionally trying to put Plaintiffs out of business by (1) destroying any opportunity Plaintiffs have to obtain alternative financing to retire the debt to Wells Fargo; (2) interfering in Plaintiffs' business by harassing Plaintiffs' customers; and (3) unreasonably siphoning money from Plaintiffs' accounts receivables, money which Plaintiffs need to stay in business, when Wells Fargo holds several parcels of real property that could be sold and would more than satisfy the judgment without endangering Plaintiffs businesses.

67.    As a direct and proximate result of Defendant Thompson's unlawful racial discrimination as described above, Plaintiffs have suffered damage to their reputations, lost and will continue to lose substantial profits needed to run their businesses as a result of Defendant Thompson's harassment of Plaintiffs' customers, and loss of sales resulting from loss of customers, as well as increased costs, fees, and penalties.

68.    As a further direct and proximate result of Defendant Thompson's unlawful actions, Krish has suffered the indignity of discrimination, severe humiliation, injury to his person and feelings, loss of standing and status in the community, irreparable harm to his reputation, loss of profits, and invasion of his right to be free from discrimination and retaliation.

24

WHEREFORE, Plaintiffs pray that this Court enter an Order providing relief as described in the 'Prayer for Relief' section below.

## COUNT III

### RETALIATION IN VIOLATION OF 42 U.S.C. §1981 BY WELLS FARGO

69.    Plaintiffs hereby incorporates all prior paragraphs by reference.

70.    Plaintiffs are protected persons as defined by 42 U.S. 1981 *et. seq.*

71.    The act of contracting, requesting or reapplying for extensions of credit on or about January 22, 2010 is a protected activity as defined by 42 U.S. §1981 *et. seq.*

72.    Wells Fargo however required terms that were unreasonable and wholly beyond the bounds of customary banking practices.

73.    These unreasonable demands included the following:

    i.    On March 16, 2010 Wells Fargo informed the Plaintiffs they wanted the entire Wachovia loan to be repaid within six months despite the fact the loans continued to be paid on time or early. Wells Fargo essentially wanted to jettison a substantially performing loan.

    ii.    In March 2010 Wells Fargo demanded the following in exchange for another short extension:

        a.    $1,000,000.00 in cash;
        b.    Another $1,000,000.00 in collateral;
        c.    Assignment of interest in real estate;
        d.    $250,000.00 cash at closing;
        e.    Control of the Plaintiffs research and development budget;
        f.    Control of the Plaintiffs inventory;
        g.    An extension fee of $300,000.00;
        h.    An interest floor of 8% *added* to the loans,
        i.    Additional monthly payments of $250,000.00 per month;
        j.    An additional $475,000.00 payment by June 15;
        k.    Payments of $6,000,000.00 in 90 days;
        l.    Additional fees of 1% on the outstanding balance on May 31, 2010, 1.50 % of the outstanding balance on July 31, 2010 and a fee of 2.0% of the outstanding balance on September 30, 2010.

These fees alone would add up to $500,000.00 and amounted to a racial

25

surtax to the Plaintiffs whose primary place of business is located in a geographical area where the population consists of an above-average density of persons of Asian descent. These demands were wholly unreasonable and far outside the bounds of reasonable and customary banking practices.

iii.    On April 1, 2010 the Plaintiff began paying $250,000.00 per month extra toward the loans yet Wells Fargo still refused to negotiate in good faith and continued to make outrageous and unreasonable demands relative to continuing the financing.

iv.    The value of the collateral securing the loans significantly increased in value. In fact, the current balance of $11,200,000.00 is now secured by over $17,000,000.00 in real estate in addition to several times that in corporate property and personal guarantees.  In spite of the loans being over-collateralized and always paid on time Wells Fargo continued to insist that the loans be paid off immediately.

v.    On May 6, 2010 Plaintiffs General Manager and Counsel, Shawn Weingast wrote to Defendant Thompson asking for a meeting with the person empowered to make decisions relative to the Plaintiffs loans. Defendant Thompson ignored this request. *See letter at Exhibit 1*

vi.    There is no logical or reasonable purpose for the treatment Wells Fargo inflicted upon the Plaintiffs who have been reliable and timely with all their payments.  Krish reasonably concluded that Wells Fargo's behavior was based on racial discrimination.

vii.    On or about October 1, 2011 Wells Fargo abruptly, without notice or explanation, ceased accepting payments that were being made toward the loans.

viii.    On or about April, 2011 the Plaintiffs attempted to provide some payments toward the loans in exchange for a release of some of the collateral. Well Fargo, by and through Defendant Thompson, however, refused to negotiate in good faith the release of the collateral and required the Plaintiffs to sign another waiver of liability relative to any information it divulged to another prospective lender.

ix.    Wells Fargo's actions of calling the loans and refusing to negotiate in good faith were the result of racial discrimination against Krish and his businesses.

x.    That on or about October 1, 2011 Wells Fargo refused to accept the payments that were timely made on the outstanding loans.

26

xi.    On or about April, 2010 the Plaintiffs attempted to provide payments for some of the loans in exchange for a release of the appropriate amount of collateral. Wells Fargo, however, refused to negotiate the collateral in good faith and provide the releases.

xii.    To the best of Plaintiffs knowledge and belief, the aforementioned conditions, demands and circumstances are unreasonable and not imposed upon white borrowers.

74.    In that there was no rational or legitimate business reason for Wells Fargo to make such unreasonable demands on the Plaintiffs, Krish reasonably concluded that he was being discriminated against by Wells Fargo.

75.    On June 24, 2010 Plaintiff Krishnan Suthanthirnan wrote a letter to Defendant Thompson complaining of race discrimination. *See Exhibit 2.*

76.    A mere six days later Wells Fargo, by and through Defendant Thompson, filed confessed Judgments against the Plaintiffs although all payments had been made on time and the notes were all substantially performing loans. Wells Fargo's filing of the confessed judgments was outside reasonable and customary banking practice.

77.    Wells Fargo retaliated against Krish for making his civil rights complaint on June 24, 2010 in the following manner.

a.    By promptly filing Confessed Judgments against the Plaintiffs a mere six days after the discrimination charge was written despite the fact that all payments were made on time or early. The Confessed Judgment filing was in violation all of reasonable and customary banking practices for substantially performing loans such as this.

b.    By essentially ignoring the Plaintiffs complaint of race discrimination and conducting no reasonable investigation of the matter.

78.    Wells Fargo further retaliated against the Plaintiffs for the discrimination allegation of June 24, 2010 as well as the discrimination allegation set forth in the August 3, 2010 lawsuit in the following manner:

a.    On or about April, 2011 the Plaintiffs attempted to provide some payments

27

toward the loans in exchange for a release of some of the collateral. Wells Fargo, however, refused to negotiate in good faith the release of the collateral and required the Plaintiffs to sign another waiver of liability relative to any information it divulged to another prospective lender.

b.  On or about October 1, 2011 Wells Fargo abruptly, without notice or explanation, ceased accepting payments that were being made toward the loans.

79.    That Wells Fargo's retaliatory conduct has denied and will continue to deny Plaintiffs equal protection and the right to be free from discrimination as expressed in U.S. law pursuant to 42 U.S.C. §1981.

80.    Wells Fargo's retaliatory conduct was willful, malicious, and intentional as such terms are defined by law.

81.    As a direct and proximate result of Wells Fargo's retaliatory acts as described above, Plaintiffs have suffered damage to their reputations, lost and will continue to lose substantial monies including, but not limited to, increased interest costs.

82.    As a further direct and proximate result of Wells Fargo's retaliation, Krish has suffered the indignity of discrimination, severe humiliation, injury to his person and feelings, loss of standing and status in the community, irreparable harm to his reputation, and invasion of his right to be free from discrimination and retaliation.

WHEREFORE, Plaintiffs pray that this Court enter an Order providing relief as described in the 'Prayer for Relief' section below.

## COUNT IV

## RETALIATION IN VIOLATION OF 42 U.S.C. §1981  BY DEFENDANT THOMPSON

83.    Plaintiffs incorporate herein by reference and in full all prior paragraphs.

84.    Individuals can be held liable under 42 U.S.C. §1981 if they intentionally cause a corporation to infringe up the rights secured by that statute. *See Tillman v. Wheaton-Haven*

28

*Recreation Ass'n,* 517 F.2d 1141, 1146 (4th Cir. 1975). Wells Fargo, however, remains liable for the wrongful conduct of Defendant Thompson pursuant to *respondeat superior.*

85.   Defendant Thompson is liable to Plaintiffs for retaliation because he intentionally caused Wells Fargo to retaliate against Plaintiffs for filing this lawsuit in the following manner:

a.   Causing Wells Fargo's attorneys' to issue a Subpoena Duces Tecum to United Bank for the sole purpose of destroying the relationship between Plaintiffs and United Bank and substantially eliminating the likelihood that United Bank would provide replacement financing for the Wells Fargo loans to Plaintiffs;

b.   By directly contacting Plaintiffs customers and directing them to make payments due to Best Medical to Wells Fargo although Plaintiffs continue to make their loan payments on time. This was done for the improper purpose of destroying Krish's reputation with his customer base and to harass Krish's customers; See *Exhibit 7.*

c.   By causing Receivables Control Corporation to directly contact Plaintiffs' customers and harass them in connection with making payments directly to Wells Fargo as opposed to Plaintiffs and further advising Plaintiffs' customers to listen to any instructions provided by Plaintiffs' counsel; *See Exhibit 8.*

d.   By purposely setting out to destroy Krish and the Plaintiff minority-owned corporations for alleging racial discrimination by unnecessarily diverting funds from customers to pay the loans when Wells Fargo holds substantial collateral in the form of real property that could be sold and would more than satisfy the loans but would not put Plaintiffs at risk of loss of their businesses and the concomitant loss of jobs and would not result in degradation of Plaintiffs' reputation with their customers and in the medical community as a whole. Defendant Thompson's action are being done under the pretext of collecting the debt but the real reason is the complete destruction of Krish and the Plaintiff corporations which is motivated by Defendant Thompson' racial animus.

WHEREFORE, Plaintiffs pray that this Court enter an Order providing relief as described in the 'Prayer for Relief' section below.

29

## COUNT V

## TORTIOUS INTERFERENCE WITH CONTRACT EXPECTANCY

## BY ALL DEFENDANTS

86.    Plaintiffs incorporate all prior paragraphs herein by reference.

87.    Beginning on or before June 13, 2012, Defendant Thompson began contacting Plaintiffs' customers, both personally and through his agents, advising them to stop reimbursing Plaintiffs for products they ordered and received from Plaintiffs and to start forwarding those monies to Wells Fargo.  *See Exhibit 7.*

88.    Plaintiffs' customers soon thereafter called Plaintiffs' and reported that they were being harassed by Wells Fargo and they were uncertain as to whether to pay Wells Fargo or Plaintiffs.  Plaintiffs' customers were in a quandary because they rely on the life-saving medical treatments and devices manufactured by Plaintiffs to treat patients and did not want to risk Plaintiffs cutting off their access to these life-saving treatments and devices as there are no other manufacturers of these same medical treatments and devices in the world.

89.    Plaintiffs' customers realized, as Defendants likely do as well, that cutting off BMI's source of operating funds would result in BMI not being able to produce these life-saving products which are relied on by Plaintiffs' customers and their patients.

90.    Defendant Thompson elected to pursue this alternative under the guise of collecting the debt but his real purpose is to destroy BMI's reputation with their customers, destroy the customers' confidence that BMI can continue to produce the products on which they rely, and to cast doubt that BMI is a going concern that will be around in the long term.

91.    Unsurprisingly, many customers have started to investigate alternative suppliers.

92.    Those customers that remain loyal to BMI are paying for it by being harassed by

30

Defendant Thompson and/or his agents, RCC.

93.    Wells Fargo obviously knew of the existence of a contract between BMI and the customers in question because they intentionally and directly targeted those customers.

94.    The purpose of contacting Plaintiffs' customers, while using the pretext of legally collecting the judgment, was to interfere with BMI's contractual relations with their customers and to destroy Plaintiffs heretofore profitable business.

95.    Defendant Thompson's harassment of Plaintiffs' customers, whether directly or through his agents, RCC, constitutes an improper means of interference. Many of Plaintiffs' customers report that they continue to be harassed by Wells Fargo's agents, RCC.

96.    Defendant Thompson's conduct is even more onerous given that Defendant Thompson could have ordered foreclosure on any of numerous pieces of vacant real estate owned by BII or Gunston that would have more than sufficiently satisfied the judgment and would not have affected Plaintiffs' business operations at all.

97.    Defendant Thompson's motivation for his conduct is racial animus directed at Krish and his companies.

98.    Plaintiffs have been and continue to be damaged from loss of profits and loss of customers to competitors.

99.    As a direct and proximate result of Defendant Thompson's tortious acts as described above, Plaintiffs have suffered damage to their reputations, lost and will continue to lose substantial profits.  Plaintiffs are also entitled to punitive damages because of Defendant Thompson's intentional, willful and wanton conduct in this matter.

WHEREFORE, Plaintiffs pray that this Court enter an Order providing relief as described in the 'Prayer for Relief' section below.

31

## COUNT VI

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OR ECONOMIC ADVANTAGE BY ALL DEFENDANTS

100.    Plaintiffs incorporate all prior paragraphs herein by reference.

101.    Beginning on or before June 13, 2012, Defendant Thompson began contacting Plaintiffs' customers, both personally and through his agents, advising them to stop reimbursing Plaintiffs for products they ordered and received from Plaintiffs and to start forwarding those monies to Wells Fargo.  *See Exhibit 7.*

102.    Plaintiffs' customers soon thereafter called Plaintiffs' and reported that they were being harassed by Defendant Thompson and they were uncertain as to whether to pay Wells Fargo or Plaintiffs.  Plaintiffs' customers were in a quandary because they rely on the life-saving medical treatments and devices manufactured by Plaintiff BMI to treat patients and did not want to risk Plaintiffs cutting off their access to these life-saving treatments and devices as there are no other manufacturers of these same medical treatments and devices in the world.

103.    Defendant Thompson, who possessed detailed knowledge of Plaintiffs' finances, knew that BMI relied on those funds to operate its businesses and had detailed knowledge of the existence of a business relationship between the customers contacted, or to be contacted in the future, and Plaintiffs' future economic well-being.

104.    Although Defendant Thompson certainly knew or should have known that contacting Plaintiffs' customers and advising that Plaintiffs had assigned their accounts receivable as collateral would have a significant negative impact on Plaintiffs' business, Defendant Thompson proceeded to do so because of his motivation to destroy Krish and the Plaintiff corporations based on racial animus.

105.    As a direct result of Defendant Thompson's intentional misconduct, many of

32

Plaintiffs' customers have stopped placing orders while others are refusing to pay either Plaintiffs or Wells Fargo as they do not want to become embroiled in this matter.

106.   Defendant Thompson has pursued this alternative under the guise of collecting the debt but the real motivation is to destroy BMI's reputation with their customers, destroy the customers' confidence that BMI can continue to produce the products on which they rely, to cast doubt that BMI is a going a concern and ultimately to destroy Krish and his companies. Defendant Thompson's motivation is fueled by his racial animus towards Krish and his companies.

107.   Defendant Wells Fargo Bank, N.A. is liable for the wrongful conduct of Defendant Thompson pursuant to *respondeat superior*.

WHEREFORE, Plaintiffs pray that this Court enter an Order providing relief as described in the 'Prayer for Relief' section below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an Order providing the following relief:

A.   Wells Fargo and Defendant Thompson are to be permanently enjoined from discriminating or retaliating against Plaintiffs on any basis forbidden by 42 U.S.C. §1981 including enjoining the enforcement of confessed judgments.

B.   Wells Fargo is to compensate Plaintiffs, reimburse Plaintiffs, and make each and every Plaintiff whole for any and all additional interest costs, fees and penalties related to the Waiver and Amendment Agreement, that is the difference between Libor plus 2 and Libor plus 5.

C.   Wells Fargo is to compensate each and every Plaintiff for all costs associated with obtaining alternative financing as a result of Wells Fargo's discriminatory actions.

D.   Corporate Plaintiffs are to be awarded actual damages whereas Krish is to be awarded damages for pain, suffering, mental anguish and humiliation caused by Wells Fargo's wrongful actions.

33

Case 1:11-cv-00227-GBL-TRJ Document 271 Filed 08/03/12 Page 35 of 35 PageID# 9868

E.   Plaintiffs are to be awarded punitive damages as permitted by applicable law in an amount believed by the Court, or trier of fact, to be appropriate to punish Wells Fargo for its willful, deliberate conduct and to deter Wells Fargo from engaging in such conduct in the future.

F.   Plaintiffs are to be awarded damages for loss of profits caused by Defendant Thompson's wrongful and intentional retaliation against Plaintiffs as wells as for loss of reputation, humiliation, embarrassment, mental anguish, and pain and suffering.

G.   Plaintiffs are to be awarded other equitable and legal relief as the Court deems proper, just and appropriate.

H.   Plaintiffs are to be awarded costs and expenses related to this action and reasonable attorney fees as provided by statute and applicable law.

**PLAINTIFFS HEREBY DEMAND A TRIAL BY JURY**

Respectfully Submitted:


/s/ _____,
James M. Brady, Esq.
Virginia State Bar No. 80002
*Counsel for Plaintiffs*
Best Medical International, Inc.
7643 Fullerton Road
Springfield, VA 22153
Telephone: (703) 451-2378
Facsimile: (703) 451-8421
Email: james@teambest.com

34

# EXHIBIT 1

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 99 of 418

Case 1:11-cv-01277-GBL-TRJ  Document 62-2  Filed 08/03/12  Page 1 of 1 PageID# 1309
Case 1:11-cv-01277-GBL-TRJ  Document 77-1  Filed 08/20/12  Page 2 of 2  PageID 1988

*Best medical international*

May 6, 2010

J. Kent Thompson
Senior Vice President
Wachovia Bank, N.A.
1753 Pinnacle Drive, 3rd Floor - VA 1936
McLean, VA 22102

Dear Kent:

Based on your comments during our recent meeting, I understand that your proposals with respect to terms of an extension agreement for the Best Medical and Huestis loans are subject to the approval of your boss. The purpose of this letter is twofold: first, to set forth what we see as our significant and sincere offer to reduce Wachovia's total exposure as rapidly as possible without endangering the viability of Best Medical and our related companies; and second, to request the opportunity to meet with the individual who has authority to approve an extension agreement.

As a 30+ year customer of Wachovia, with the collateral and debt amortization schedule summarized below, and because of the critical importance of an agreement at this time, we feel compelled to leave no stone unturned with respect to a solution that works for Wachovia and Best Medical.

Additional principal payments of $250K/month begun in April and an additional amount of $475K by June 15 will result in a minimum of $2,725K reduction in principal outstanding by December 31. Approximately $480K in principal will be paid on the Best Medical Line of Credit secured by the Fullerton Road property, for a total of about $3.2 million in amortization from operating cash flow including the effect of potential R&D expense reductions you asked about.

In terms of existing collateral securing approximately $12.5 million in loan outstanding are the business assets of BMI and Huestis, primarily accounts receivable of $4 million, inventory of $9 million and PP&E of $2.5 million, plus the Fullerton Road property appraised for Wachovia in May 2009 for $3.9 million, plus three properties totaling over $10 million based on recent appraisals. Counting only accounts receivable and the appraised properties, there is approximately $18 million in collateral value securing Wachovia's loans.

In conjunction with the principal reductions noted above, we continue to aggressively seek refinancing of any or all Wachovia debt from bank and non-bank sources. This effort will continue and can be documented for you. It is our goal to pay off Wachovia as soon as possible and we offer proven cash flow which can amortize the total debt at a rate of at least $3.2 million per year, plus a significantly increasing collateral coverage margin over time.

Best Medical and its related companies have made every payment of principal and interest as agreed over a long period of time and we will be doing the same with the additional principal payments described above. We hope this can be considered, together with Wachovia's collateral, as essentially sufficient for an extension of our credit facilities.

Yours truly,

Shawn Weingast
General Counsel

7642 Fullerton Road, Springfield, VA 22150 USA
phone 703 451 2378   800 336 4970   fax 703 451 5228
www.bestmedical.com

TATUM 001079

JA0083

# EXHIBIT 2

*Best* ® *medical international*

June 24, 2010

Mr. J. Kent Thompson
Senior Vice President
Wells Fargo
1753 Pinnacle Drive, 3rd floor
McLean, VA 22102

Dear Kent:

This is a follow up to my e-mail dated March 30, 2010, a copy of which is enclosed for your reference. Beginning in April, we have been paying down $250,000 a month towards our loan principal. We plan to make our next payment on July 1st, next week. Our goal is to continue to do so and work with other banks to transition all of our business from Wachovia to another bank, as you have been forcing us to do. During the past three years, we paid about $3 million in interest and an equal amount in principal. Just during the last three months, we paid $750,000.

For 35 years your bank aggressively sought our business and wanted to lend us money. Your staff has been encouraged to lend money. For instance, four years ago our building in Springfield, Virginia was appraised at $3.5 million. Your bank provided us a $5 million loan with my personal guarantee. Today this same building is worth more than $5 million and has a triple net income of $525,000; our loan amount on this property is approximately $4 million. You have been forcing us to repay this loan.

You gave us a 10-year term loan on our Huestis and ARI companies in Rhode Island. Every payment of principal and interest has been paid on this loan. In spite of this, you increased our interest and are forcing us to repay this loan in full and charging us a prepayment penalty.

I have had a banking relationship with Wachovia and its predecessors since 1973. During this period of 37 years, your bank has never lost a penny in your dealings with us. In spite of this, you continue to harass us. I have more than $100 million in personal net worth, and you received a personal guarantee and substantial portions of my assets as collateral for a loan of approximately $12 million. We continue to pay down this loan by approximately $250,000 per month for principal and additional sums for interest. Your actions constitute blackmail, harassment and racial discrimination. You have been engaging in discrediting my reputation and that of my companies. This can only be interpreted as racial discrimination. Your continued harassment will force us into nonexistence. We will proactively challenge your harassment, blackmail and racial discrimination.

With kind regards,

Krishnan Suthanthiran
President

cc:     John G. Stumpf
        Tim Butturini
        Robert King Steel
        Kenya Crenshaw
        Ruth Bergin
        Shawn Weingast

7643 Fullerton Road, Springfield, VA 22153 USA
phone 703 451 2378   800 336 4970   fax 703 451 5228
www.bestmedical.com

AFRICA | ASIA | EUROPE | LATIN AMERICA | MIDDLE EAST | NORTH AMERICA

*Best* ®
healthcare for everyone

JA0085

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 102 of 418

# EXHIBIT 3

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 103 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 62-4   Filed 08/03/12   Page 1 of 77   PageID# 1511
Case 1:11-cv-01277-GBL-TRJ   Document 77-3   Filed 08/20/12   Page 2 of 78   PageID 1992



---

MINORITY-OWNED BUSINESSES, TRADE CREDIT AND DISCRIMINATION:
AN EMPIRICAL STUDY OF THE IMPACT OF RACIAL DISCRIMINATION ON ACCESS
TO TRADE CREDIT FOR MINORITY-OWNED VS. NON-MINORITY-OWNED FIRMS

---

A DISSERTATION SUBMITTED TO
THE SCHOOL OF COMMUNITY ECONOMIC DEVELOPMENT
OF SOUTHERN NEW HAMPSHIRE UNIVERSITY IN PARTIAL
FULFILLMENT OF THE REQUIREMENTS FOR THE DEGREE OF
DOCTOR OF PHILOSOPHY IN COMMUNITY ECONOMIC DEVELOPMENT

By

T. David Reese

Bachelor of Arts
Dartmouth College, 1978
Master of Science
Southern New Hampshire University, 1994

Chair: Dean Michael Swack
Southern New Hampshire University

April 2007
Southern New Hampshire University
Manchester, New Hampshire

ii-

JA0087

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 104 of 418

Case 1:11-cv-01277-GBL-IDD    Document 62-4    Filed 08/09/12    Page 2 of 77 PageID# 1312
Case 1:11-cv-01277-GBL-TRJ    Document 77-3    Filed 08/20/12    Page 3 of 78    PageID 1993

## TABLE OF CONTENTS

Page

LIST OF TABLES ............................................................................VII
ABSTRACT ..................................................................................VIII
1.  INTRODUCTION................................................................................ 1
2.  THE RESEARCH QUESTION ............................................................... 4
  2.1.  Hypotheses ............................................................................. 4
  2.2.  Limitations .............................................................................. 6
3.  REVIEW OF LITERATURE..................................................................... 7
  3.1.  Theoretical Literature on Discrimination in Credit Markets .............. 7
    3.1.1.  Neoclassical Theoreticians and Prejudicial Discrimination ......... 8
    3.1.2.  The Economics of Information and Statistical Discrimination .... 11
    3.1.3.  Summary of Theoretical Literature on Discrimination .............. 18
  3.2.  Empirical Research on Discrimination in Credit Markets ................. 23
    3.2.1.  Principal Research Methods Employed ..................................... 23
    3.2.2.  Availability of Empirical Data ................................................ 28
    3.2.3.  Home Mortgage Disclosure Act of 1975 (HMDA) Data............ 29
    3.2.4.  The Characteristics of Business Owners Survey (CBO)............ 31
    3.2.5.  Community Reinvestment Act (CRA) Data ............................... 33
    3.2.6.  Survey of Small Business Finances (SSBF) Data ..................... 38
    3.2.7.  Summary of Empirical Research on Discrimination................... 45
    3.2.8.  Prior Research on Trade credit and Discrimination .................. 45
4.  RESEARCH METHODOLOGY AND RESULTS................................................ 51
  4.1.  The Data................................................................................. 51
  4.2.  Our Study Sample ................................................................... 55
  4.3.  Methodology and Model ............................................................ 55
  4.4.  Variables of Interests .............................................................. 58
  4.5.  Descriptive Statistics............................................................... 59
    4.5.1.  Firm Characteristics ............................................................ 60
    4.5.2.  Industrial Classifications and Organizational form ................... 60
    4.5.3.  Owner Characteristics ......................................................... 61
    4.5.4.  Use of Trade Credit ............................................................ 61
  4.6.  Hypotheses.............................................................................. 62
  4.7.  Empirical Results ..................................................................... 64
5.  CONCLUSIONS ................................................................................ 67
REFERENCES: .................................................................................... 69
APPENDIX A: VARIABLES AND DEFINITIONS ............................................... 74
APPENDIX B: DESCRIPTIVE STATISTICS – FIRM CHARACTERISTICS ..................... 76
APPENDIX C: DESCRIPTIVE STATISTICS – CHARACTERISTICS OF FIRM OWNERS ..... 80
APPENDIX D: DESCRIPTIVE STATISTICS – INDUSTRY BREAKDOWN........................ 81
APPENDIX E: DESCRIPTIVE STATISTICS – USE OF TRADE CREDIT........................ 83
APPENDIX F: RESULTS OF LOGISTIC REGRESSION ANALYSIS .............................. 85

## LIST OF TABLES

|  | | Page |
|---|---|---|
| Table 1. | Major Theoretical Research on Discrimination in Mortgage Lending | 20 |
| Table 2. | Total Endowment Effect | 25 |
| Table 3. | Availability of Major Empirical Datasets for the study of Discrimination | 29 |
| Table 4. | Description of available SSBF Datasets | 39 |
| Table 5. | Trade Credit Regression Models estimated by Aaronson et al. | 46 |
| Table 6. | Trade Credit Regression Model estimated by Coleman | 49 |
| Table 7. | Description of the 1993 & 1998 SSBF Datasets | 52 |
| Table 8. | An Abridged Variable Dictionary | 59 |
| Table 9. | Logistic Regression: Estimates of Trade Credit Use | 64 |

Appeal: 13-1982     Doc: 14-1     Filed: 10/21/2013     Pg: 106 of 418

Case 1:11-cv-01277-CBL-TRJ   Document 62-4   Filed 08/03/12   Page 4 of 78  PageID# 1314
Case 1:11-cv-01277-CBL-TRJ   Document 77-3   Filed 08/20/12   Page 5 of 78  PageID# 1995

ABSTRACT

MINORITY-OWNED BUSINESSES, TRADE CREDIT AND DISCRIMINATION:
AN EMPIRICAL STUDY OF THE IMPACT OF RACIAL DISCRIMINATION ON ACCESS
TO TRADE CREDIT FOR MINORITY-OWNED VS. NON-MINORITY-OWNED FIRMS

T. David Reese, Ph.D.
Southern New Hampshire University, 2006

Dissertation Chair: Dean Michael Swack

Access to credit in particular and capital in general is a major determinant of the rate of both the formation and survival of small businesses. During the last thirty years a growing body of theoretical and empirical research has developed that explores how a firm's access to credit varies by the business owner's race and/or ethnicity and test specific hypotheses about why these variations might occur. The overwhelming majority of empirical studies show that on average African-American and Hispanic borrowers receive credit in amounts and on terms less favorable than those obtained by non-minority borrowers.  Much of this research asks, "*does racial discrimination in part account for the observed disparities in credit outcomes for various racial and ethnic groups?*"

While numerous studies have tested for the existence of discrimination in commercial bank lending to firms, to date, this author has found only two empirical studies that explore how access to trade credit varies with the race and/or ethnicity of a firm's owner.  This study begins the process of addressing this gap in the literature.  This study explores if and how the amount of trade credit obtained by small businesses varies by the owner's race and/or ethnicity. Our findings clearly shows that firms owned by African-American men, Hispanic white men and Asian-Americans on average receive significantly lower levels of trade credit relative to those owned by non-Hispanic white men.   After controlling for industry, the owner's human capital, the creditworthiness of the firm and the firm's owner, this study finds no statistically significant evidence that the race/ethnicity of a firm's owner explains the observed disparity in the levels of trade credit provided to firms owned by Hispanic whites and African-Americans. For firms owned by Asian-Americans, this study does find statistically significant evidence that race explains in part the observed disparities after controlling for industry, the owner's human capital, the creditworthiness of the firm and the firm's owner.  This finding is noteworthy because many scholars suggest that Asian-Americans do not experience difficulties in accessing credit comparable to those experienced by other minorities.

JA0090

Appeal: 13-1982     Doc: 14-1     Filed: 10/21/2013     Pg: 107 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 92-4   Filed 08/03/12   Page 5 of 77 PageID# 1315
Case 1:11-cv-01277-GBL-TRJ   Document 97-3   Filed 08/20/12   Page 6 of 78   PageID# 1996

## 1. Introduction

The purpose of this study is to determine if and how the amount of trade credit obtained by small businesses varies by the owner's race and/or ethnicity.   Trade credit can be defined as the "*credit extended by a seller who does not require immediate payment for delivery of a product*" *(Elliehausen and Wolken 1993, pg. 1).*  "*[Both] trade and bank credit are critical sources of funding for small firms because they are primary sources of working capital*" *(Chant and Walker 1988, pg. 861).*

Access to credit in particular and capital in general is a major determinant of the rate of both formation and survival of small businesses (Bates 1993, pg. 41; Bates 1997; Christopher 1998).   During the last thirty years a growing body of theoretical and empirical research has developed that explores how access to credit varies by owner's race and/or ethnicity and test specific hypotheses about why these variations might occur.  The overwhelming majority of empirical studies show that on average African-American and Hispanic-American borrowers receive credit in amounts and on terms less favorable than those obtained by non-minority borrowers.  Much of this research asks, "*does racial discrimination in part account for the observed disparities in credit outcomes for various racial and ethnic groups?*"  This widespread interest in discrimination is a direct consequence of the role of race in U.S. history.  As recently as the early 1960s (less than fifty years ago), substantially all financial institutions in the South and many in the North, Midwest and West actively discouraged the patronage of Blacks and Hispanics (Lemann 1991, pg. 314).

To date, due to the availability of bank loan data and the interest of both bank regulators and various communities of color in the quantity and type of credit facilities (mortgages, business loans, credit cards, etc.) provided to communities of color, there exists a sizeable body of research examining how access to bank credit varies by owner's race and/or ethnicity.  That said, most of the existing studies focus on home mortgages.  Up until 1995, banks were only required to collect and publicly disclose details about residential mortgage loans and borrowers in a fashion that allowed researchers to test hypotheses about the existence of racial/ethnic discrimination.  Only recently, have lenders begun to provide similarly detailed data for other types of loans (e.g. business loans).

Since 1997, an increasing number of empirical studies have focused on small business lending, a direct outgrowth of changes in the Community Reinvestment Act ("CRA") adopted in 1995.  Under the modified CRA provisions adopted in 1995, banks with assets totaling more than $250 million or affiliated with a holding company with more than $1 billion in total assets are required to report small business and small farm loans to their primary regulatory agency (e.g. Comptroller of the Currency, Federal Reserve, etc.) commencing in 1996

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 108 of 418

Case 1:11-cv-01277-CBL-TRJ    Document 62-3    Filed 08/28/12    Page 6 of 78    PageID# 1376
Case 1:11-cv-01277-CBL-TRJ    Document 47-3    Filed 08/23/12    Page 6 of 78    PageID# 1399

(Squires and O'Connor 2001, pg. 3). This newly available category of data has allowed researchers to test for the existence of discrimination in small business lending. This new stream of data is important because access to credit (both bank and trade credit) is major determinant of the rate of both formation and survival of small businesses.

While the numerous studies have tested for the existence of discrimination in commercial bank lending, to date, this author has found only two empirical studies that explore how access to trade credit varies with the race and/or ethnicity of a firm's owner (Coleman 2003; Aaronson, Bostic et al. 2004). And, neither of these two studies was designed to determine if any observed disparities in trade credit usage between non-minority- and minority-owned firms was a function of discrimination. This study begins to address this gap in the literature.

Specifically, this study tests for differences in the amount of trade credit obtained by minority-owned[1] versus non minority-owned firms after controlling for creditworthiness.

Trade credit refers to the informal credit extended to a firm when a supplier of a firm provides goods or services and allows payment at a later date. So, if *Maytag* delivers a truckload of washers to *Home Depot* at the beginning of a month and allows *Home Depot* to pay for that delivery thirty days later, *Maytag* has provided trade credit to *Home Depot* for that month.

As the preceding example illustrates, 'trade credit' arises as a result of a supplier providing raw materials, parts, supplies and/or finished goods to another firm (a customer) and allowing the customer to pay at some later date (e.g. 30 days after

---

[1] In this publication, the term 'Minority' refers collectively to African-Americans, Hispanics whites and Asian-Americans. While we include observations for American Indians and Native Alaskans, these groups are not of primary interest for the purposes of this study. The results for American Indians and Native Alaskans are not discussed because the dataset used for this research contains too few observations for either group to be statistically useful. While observations for Asian-Americans are included and discussed, several studies argue convincingly that Asian-Americans do not experience difficulties in accessing capital comparable to those experienced by African-Americans and Hispanics Chen, G. M. and J. A. Cole (1988). "The myths, facts, and theories of ethnic, small-scale enterprise financing." Review of Black Political Economy 16(4): 5-9.

Bates, T. (1989). "The changing nature of minority-owned business: a comparative analysis of Asian, nonminority, and Black-owned businesses." Ibid. 18(2): 25-42.

Bates, T. (1993). Major Studies of Minority Business: A Bibliographic Review. Washington D.C., University Press of America, Inc.

Bates, T. (1993). Banking on black enterprise. Washington DC, Joint Center for Political and Economic Studies.

Bates, T. (1997). Race, self-employment, and upward mobility: an illusive american dream. Baltimore, MD, John Hopkins University Press.

Christopher, J. E. (1998). "Minority business formation and survival: evidence on business performance and viability." Review of Black Political Economy 26(Summer (1)): pp. 37-73..

-2-

shipment).  From the perspective of the firm receiving the goods, the amount of 'trade credit' provided is the purchase price of the shipment and equals the amount of the associated 'Account Payable' due to the supplier.  From the perspective of the supplier, the amount of the trade credit extended to the customer is the amount billed for that shipment and equals the amount of the 'Account Receivable' due from the customer.

Given limited access to the capital markets, small firms[2] depend heavily on trade and bank credit to meet their credit needs.

> "Primary and secondary money and capital markets often pose insurmountable financial and regulatory barriers to small businesses and , therefore, trade and bank credit become primary sources of working capital. . . . Therefore, because traditional capital and money markets are often not accessible to small businesses, small firms have a substantial demand for short-term credit and bank credit" (Chant and Walker 1988, pg. 861).

So, understanding if and how access to trade credit varies with the race of a firm's owner is central to the issue of minority business development.

In the next section, we identify and discuss the specific research questions addressed by this study.

---

[2] The U. S. Small Business Administration defines a firm as a small business if it employs less than 500 workers.  As of December 31, 2002, there are less than thirty African-American-owned firms that employed 500 or more workers in all of the U.S. Dingle, D. T. (2003). B.E. 100s Overview: Reinvention through Innovation. Black Enterprise. 33: pp. 94 – 106..  In other words, substantially all African-American-owned businesses meet the SBA's definition of a 'small business.'

3-

## 2.   The Research Question

While trade credit in an important source of financing for small businesses, little
is known about how discrimination might impact access to trade credit for
minority-owned firms.  This study begins the process of addressing this issue.

This study examines two separate bodies of research and combines them to
create a platform for considering a new question that to date has not been
addressed: *"Is there empirical evidence of racial discrimination in the extension
of trade credit?"*

The first of these two bodies of research seeks to identify the factors that
determine who receives trade credit (Emery 1984; Walker 1985; Chant and
Walker 1988; Elliehausen and Wolken 1993; Peterson and Rajan 1997; Ng,
Smith et al. 1999; Wilson 2002).  The second body of research seeks to
determine if there is evidence of racial and/or gender discrimination in various
credit markets (e.g. mortgage loans, consumer loans, etc.) (Becker 1971;
Peterson and Peterson 1981; Handy and Swinton 1984; Ando 1988; Elliehausen
and Lawrence 1990; Bates 1993; Dymski 1995; Munnell, Tootell et al. 1996;
Bates 1997; Bates 1997; Kijakazi 1997; Blanchflower, Levine et al. 1998; Bostic
and Lampani 1999; Immergluck 1999; Coleman 2000; Han 2001; Squires and
O'Connor 2001; Cavalluzzo 2002).

### 2.1.  Hypotheses

Based on a review of these two bodies of literature, a model has been crafted
that allows us to address the basic research question.  Specifically, the quantity
of trade credit supplied to a firm is a function, F, of several characteristics of the
firm in question:

(Quantity of Trade Credit supplied to a firm)  = F(U, I, R).

Where,

I. Creditworthiness  (U).  To some extent, all credit providers use some combination
of quantitative and qualitative data about a prospective borrower to assess the
creditworthiness of a prospective borrower.  We include variables that measure
the following: age of the firm; legal form of organization; the firm's total assets;
and, the owner's human capital and creditworthiness.
II. Industry  (I):  Controlling for creditworthiness, the terms and quantity of trade
credit supplied vary significantly from industry to industry (Ng, Smith et al. 1999,
pp. 1117-1119).  That said, within an industry, the terms of trade credit are
generally quite uniform (Chant and Walker 1988, pg. 864; Ng, Smith et al. 1999,
pp. 1117-1119).

-4-

III. **Race/Ethnicity (R).** The purpose of this study is to determine if race is a significant factor in determining the quantity of trade credit supplied.

A review of the two bodies of literature suggests that the relationship between the dependent variable and the independent variables can be modeled by a logistic regression model of the following form:

$$\ln\left(\frac{D_i}{1-D_i}\right) = \beta_0 + \beta_1 U_i + \beta_2 R_i + \varepsilon_i \quad \text{where,}$$

1) $D_i$ is dummy variable that identifies the level (high or low) of trade credit supplied to firm "i" at time "t"

2) $\beta_1$ is the coefficient for the creditworthiness vector. It should be noted in the actual model several variables are included to control for creditworthiness. These variables are identified and discussed in some detail in the Methodology section of this paper.

3) $\beta_2$ is the coefficient for the dummy variable used to capture the impact of race. It should be noted that in the actual model two dummy variables are included that we might distinguish between the Hispanics and African-Americans. These various racial/ethnic categories are discussed in more detail in the Methodology section of this paper.

4) $\varepsilon_i$ is the stochastic error term of the ith observations.

Specifically, this study tests two hypotheses:

1) Is race a significant determinant of trade credit? In other words, is the coefficient associated with the race variable ($\beta_2$) significant? The study uses the Small Business Finances[3] dataset for 1998 to test this hypotheses. Formally, the Null and Alternative hypotheses would be stated as follows:

$$H_0 : \beta_2 \geq 0$$

$$H_A : \beta_2 < 0$$

2) Has the importance of race declined over time? Using the Survey of Small Business Finances datasets for 1993 and 1998, we can generate

---

[3] The Survey of Small Business Finances has been co-sponsored by the Board of Governor of the Federal Reserve (the "Federal Reserve") and the U. S. Small Business Administration and each dataset includes data collected from more than 3,000 firms that were selected to provide a representative sample of the population of small businesses in the U.S. To date, there datasets for the years 1987, 1993 and 1998. For a more detailed discussion of these datasets see pages 51 through 58.

-5-

estimate logistic regression models for each period. By comparing the results for these two set of cross sectional data, we can see if there is a significant difference in the coefficient associated with the race variable for the two periods. Formally, the Null and Alternative hypotheses would be stated as follows:

$$H_0 : \beta_{2,98} > \beta_{2,93}$$

$$H_A : \beta_{2,98} \leq \beta_{2,93}$$

## 2.2. Limitations

i.   Because of the relatively small number of minority-owned firms included in the various industry sub-samples of the dataset, this study must content itself to examine one sample that includes firms that fall into five broad industry groupings: construction; manufacturing; retail; transportation and, wholesale (Cole and Wolken 1995, pp. 630-633). Observations contained in the dataset for firms in the financial sector and service sector were excluded: services (SIC 7000-8000); and, finance, insurance and real estate (SIC 6000 – 6999). Observations for firms with no industry classification were also excluded.

ii.  Given the 1993 and 1998 SSBF datasets only includes a small number of firms owned by minority women, only observations for male-owned firms were examined for this study.

iii. Ideally, when testing for decreases in the level of discrimination from 1993 to 1998, it would be preferable to have panel data. Unfortunately, the cross-sectional SSBF datasets were not constructed to ensure that observations for the same firms are included in both the 1993 and 1998 datasets.

JA0096

### 3. Review of Literature

For more than thirty years, empirical researchers and mainstream microeconomic theorists have debated a question with important public policy implications: *"Does racial discrimination exist in various credit markets?"* The fact that this important question remains unresolved reflects three factors worth noting: (a) the availability of appropriate empirical data; (b) the difficulty of distinguishing between 'statistical' discrimination and 'prejudicial discrimination; and; claims of specification bias (specifically omitted variable bias).

Prior to 1987, the kind of empirical data needed to adequately address this question was not generally publicly available. During the period from 1987 through 1997, several appropriate datasets became publicly available (e.g. CRA, HMDA and SSBF). Since 1987, with increasing frequency, empirical researchers have found substantial disparities in either the quantity and/or terms of credit extended to minorities versus non-minorities. When presented with these disparities, many mainstream theorists have offered one of two explanations for these reported disparities: (a) these disparities could evidence statistical discrimination rather than prejudicial discrimination; or, (b) these disparities reflect the omission of some important independent variable(s).

The increased availability of appropriate datasets since 1987 increased both the fervor and number of scholars engaged in this debate between empirical researchers and theoreticians. Given the central role of data in this debate, it will prove helpful to organize the review of empirical studies by major datasets. That said, in the beginning, before the data, there was theory. And, there we shall begin.

#### 3.1. Theoretical Literature on Discrimination in Credit Markets

The theoretical framework for examining discrimination in various credit markets was derived from the work of Gary Becker. Becker developed theoretical models for studying discrimination in labor markets (Becker 1971).

Today, theoreticians generally acknowledge the existence of two types of discrimination: taste (prejudicial) discrimination and statistical (economic) discrimination. Becker's initial work focused on prejudicial discrimination. Neoclassical theoreticians in large measure have developed models that explore the possibility of prejudicial discrimination. When we speak of prejudicial discrimination, we mean that individuals or firms have a taste for discrimination (*similar to having a preference for chocolate ice cream rather than vanilla*). Employing conventional neoclassical theoretical logic, theoreticians generally have concluded that prejudicial discrimination will not exist in a competitive market in

-7-

equilibrium. In contrast, theorists generally have concluded that statistical discrimination can exist in a competitive market in equilibrium.

The second type of discrimination (statistical) is the primary focus of a newer school of economic thought known as the *Economics of Information.*' The fundamental insight of this school of economic thought rests on the observation that securing information about market participants entails costs. More specifically, it may be more costly to obtain information about some market participants than others. In such instances, group membership may prove a less costly (albeit imperfect) substitute for elements of information about the performance of some market participants. It then follows from conventional neoclassical theoretical logic that any disparity between groups that might result from such a practice would tend to lower costs of a firm or individual engaged in that practice. Such a practice is referred to as 'statistical discrimination.' Thus, disparities between various groups can exist in a competitive market in equilibrium, even without racial prejudice.

### 3.1.1. Neoclassical Theoreticians and Prejudicial Discrimination

All of the theoretical work that examines the operation of prejudicial discrimination in labor, consumer and credit markets builds on the work of Gary Becker, a Chicago School economist (Becker 1971). Becker's initial work involved the development of theoretical models for studying discrimination in labor markets. Becker reasoned that an individual has a taste for discrimination if she acts as if she were willing to either pay something or forego income to be associated with some people rather than others. Becker attempted to isolate and quantify the cost of the taste for discrimination by defining a **'discrimination coefficient.'** One example of a discrimination coefficient is the factor that quantifies the differential in the wage rate paid to a member of an un-favored group versus a member of a favored group assuming equivalent levels of relevant skills.

Employing conventional neoclassical logic, Becker argues that in competitive markets, eventually market forces will eliminate prejudicial discrimination. Becker outlines in some detail how market forces operate to eliminate discrimination under both perfect and imperfect competition.

One easily can outline how this would occur in practice. Assume there is one non-discriminating employer in a market, that employer will replace white workers with equally qualified (but cheaper) black workers thus lowering the firm's expenses vis-à-vis its competitors.

In a competitive market characterized by decreasing or constant marginal cost, Becker argues that the firm with the smallest discrimination coefficient would have the lowest unit cost, thus, allowing it to undersell firms with a higher discrimination coefficients. Over time, the firm with the least 'taste' for

8-

discrimination would undersell more and more firms and capture more and more
market share. Eventually, the firm with the smallest discrimination coefficient in a
market would produce the total market output. If one firm has a discrimination
coefficient of zero, all other things being equal, the discrimination coefficient for
the entire market eventually would shrink to zero.

Becker also argues that at equilibrium the market's discrimination coefficient
could also equal zero in an imperfectly competitive market if the following three
assumptions hold:

    1) one or more firms in the market has discrimination coefficient of zero;

    2) assets can easily be transferred from one market participant to another;
      and,

    3) the capital markets are characterized by perfect competition.

All other factors being equal, a firm with a high discrimination coefficient would
have higher costs and lower profits relative to other firms. Let us call this firm
'Company D.' The owners of Company D could increase their return on
investment by selling the operation to another firm with a lower discrimination
coefficient. Further, if the owners of Company D do decide to sell, they could
maximize their return by selling to the firm with the lowest discrimination
coefficient ('Company A') because that firm would make the highest offer.
Company A will make the highest bid because all other things being equal
Company A will have the lowest costs and the highest return on assets. Thus,
whether a labor market is perfectly or imperfectly competitive, if at least one
market participant has a discrimination coefficient of zero, then at equilibrium the
market discrimination coefficient would also be zero.

While neoclassical theorists uniformly subscribe to Becker's models for perfectly
competitive markets, there was and is less coherence regarding the disposition
of discrimination in imperfectly competitive markets. The work of Alchian[4] and
Kessel is emblematic of the reasoning of those theorists that questioned the
applicability of Becker's model to imperfect markets (Alchian and Kessel 1960).
Like Becker, Alchian and Kessel reasoned that discrimination is costly, not only
for those discriminated against, but also for those who discriminate. Thus, they

---

[4] Alchian also used the analysis of property rights to explain the incidence of
discrimination. Alchian was himself subject to discrimination as an Armenian.
Alchian and Kessel argued that discrimination would be more prevalent in situations
where those who discriminate do not bear much of the cost from doing so. Alchian
and Kessel used this analysis to explain why regulated utilities discriminated against
Jews and why labor unions discriminated against blacks. This analysis explains why
Alchian has never trusted government—but has trusted free markets—to reduce
discrimination Alchian, A. A. and R. A. Kessel (1960). Competition, Monopoly, and
the Pursuit of Money. Aspects of Labor Economics: a conference of the Universities-
National Bureau Committee for Economic Research. N. B. o. E. Research. Princeton,
NJ, Princeton University Press. 14: pp. 349.
Liberty Fund, I. (n.d.). www.econlib.org/library/Enc/bios/Alchian.html, Liberty Fund,
Inc. 2003..

-9-

concluded that discrimination would be more prevalent in markets where firms that discriminate do not suffer much of the cost of doing so. Following that logic, Alchian and Kessel reasoned that the government regulation of certain imperfectly competitive product markets may prove conducive to prejudicial discrimination. Like Becker, they argued that a for-profit firm whose profits are subject to government regulation would see the cost of discrimination in the form of lower profits; however, a firm whose profits were limited by rate of return regulations and that was already at the limit would face no cost from discrimination. Government regulation typically protects firms from competition, while simultaneously it set prices at levels designed to preclude excessive rates of return (as cited in Elliehausen and Durkin 1989, pg. 94). Alchian and Kessel suggested that in an imperfectly competitive market subject to public regulations, the constraints on permissible levels of profitability may lower the effective cost of indulging in prejudicial discrimination; and, therefore, encourage the practice.

In the final analysis, Alchian and Kessel reasoned that the constraints on the permissible levels of profitability frequently associated with public regulation may preclude firms with lower discrimination coefficients from making large enough bids to persuade the owners firms with higher discrimination coefficients to sell their firms.

In general, credit markets in the U.S. are highly regulated. Public regulations control the chartering and licensing of most financial institutions (e.g. commercial banks, finance companies and various thrifts). In addition, regulations designating an institution's service area and the size and types of loans that a given institution may provide serve as potent barriers to entry, exit and participation in the various credit markets. Applying Alchian and Kessel's model to credit markets, one might reasonably conclude that given the various imperfections that characterize most credit markets, a creditor with a taste for discrimination might be able to indulge this taste with minimal impact on the firm's profitability and market share; and thus, the discrimination coefficient of a such a firm might not decrease over time as Becker's work would suggest.

> "Monopolists who appear to be too profitable are likely to face pressures
> to reduce prices; and consequently may prefer to take potential excess
> profits in nonpecuniary forms which can be treated as costs. In the credit
> area, creditors with even a small taste for discrimination might be induced
> to ignore profitable loans to unfavored groups and to prefer loans to more
> marginal risk among favored classes" (Elliehausen and Durkin 1989, pg.
> 94).

That said, Alchian and Kessel did not focus on credit markets. Richard Peterson and Carol Peterson, were among the first to employ Becker's theoretical model as a framework for investigating possible discrimination in consumer credit markets (Peterson and Peterson 1981; Elliehausen and Durkin 1989). Like Becker, the Petersons focused only on prejudicial discrimination. Building on Becker's work, they argued that a lender with a taste for discrimination would

10

demand a higher return and/or a lower risk profile from a member of an un-favored group versus a member of a favored group. Specifically, the Petersons reasoned that a discriminating creditor would apply more stringent underwriting criteria and offer less favorable credit terms on loans granted to members of an un-favored group versus members of a favored group. Like Becker, the Petersons reasoned that even if some lenders have a taste for discrimination, market forces would act to shrink or eliminate equilibrium discrimination coefficients of market participants over time.

To summarize, neoclassical theoreticians uniformly agree and argue that even if many firms operating in a 'near-perfectly' competitive market have a taste for discrimination, competition in the market will eliminate prejudicial discrimination over time.   This unanimity among neoclassical theoreticians dissolves when the focus shifts to markets characterized by increasing degrees of imperfection. Some neoclassical theoreticians have argued that in highly regulated markets (e.g. credit markets) a firm with a taste for discrimination might be able to indulge this taste with minimal impact on the firm's profitability and market share; and, therefpre, the discrimination coefficient of a such a firm might not decrease over time as Becker's work suggest.

Neoclassical models are characterized by two other important limitations that should be noted.  First, neoclassical models do not quantify the time period required to eliminate prejudicial discrimination from a market.  If the time periods are long because competitive forces work slowly, then firms with a taste for discrimination may survive for a long time before their market share and profitability erode sufficiently to drive them out.  Second, neoclassical models do not offer reasons for the existence of prejudicial discrimination which is costly to those who practice it. "*Costly preferences for discrimination are simply postulated for theoretical purposes, and their implications are explored, leading to the conclusions that markets will eliminate such tastes*" (Elliehausen and Durkin 1989, pg. 95). While the neoclassical models do not address the reasons for discrimination, another school of thought does: the information-cost school.  The proponents of this school argue that sometimes firms engage in discriminatory practices because it can reduce costs.  The next section provides a brief overview of the major findings of the information-cost school.

### 3.1.2. The Economics of Information and Statistical Discrimination

Above, we juxtaposed the 'information-cost' and the 'neoclassical' schools of thought. This is a bit misleading. Information-cost models are best understood as variants of neoclassical thought that have been informed by the framework and logic of game theory (Bierman and Fernandez 1993). All information-cost models attempt two tasks: (1) to characterize the type, timing and quality of information available to various classes of market participants; and, (2) to predict the behavior of these classes of participants as each market participant attempts to optimize his/her risk-adjusted return.  While the information-cost models

11

developed for various credit markets generally acknowledge that there may be significant disparities in the terms and/or quantity of credit extended to various racial/ethnic groups, these models all suggest that these disparities reflect statistical rather than prejudicial discrimination. Statistical discrimination can occur in many different settings and markets (product, labor, etc), but we will confine our discussion to credit markets and offer a description relevant only to those markets. Statistical discrimination, sometimes referred to as economic discrimination, occurs when a creditor uses a credit applicant's race (or some other protected characteristic – age, gender, etc.) as a proxy for measures of creditworthiness that cannot be directly observed.

The information-cost models may be seen as a logical extension of the work of Alchian and Kessel, as opposed to Becker. All of the information-cost models acknowledge that credit markets are characterized by a number of imperfections and thus, may operate stably over long periods of time at interest rates other the Walrasian equilibrium interest rate[5]. In other words, equilibrium interest rates in credit markets tend to be below the market clearing rate.

Today, many financial markets theorists recognize that credit markets cannot be usefully modeled as *perfectly competitive markets.* Credit markets deviate from the specifications of a perfectly competitive market in three important ways.

> "Credit is not freely available at the equilibrium rate of interest . . . . [because credit markets are] characterized by non-simultaneous exchange and the existence of imperfect and costly information. . . In perfectly competitive markets, goods and money are exchanged simultaneous and perfect information exists. However, in financial markets, the required [assumption] of simultaneous exchange is violated by the nature of the transaction itself. When money is borrowed today, it is exchanged for a promise to repay the note in the future" (Nesiba 1996, pg. 60).

As stated by Nesiba (1996), the first of these three imperfections observed in credit markets is that the prevailing interest rate consistently falls below the 'Walrasian' equilibrium interest rate (i.e. the interest rate at which the quantity of loan funds demanded equals the quantity of loanable funds supplied). Therefore,

---

[5] A Walrasian Economy is a decentralized market economy characterized by price-taking consumers and firms and the private ownership of capital and labor, which operates in a such a fashion that the following things are true: (1) property rights are well established and costlessly enforced; (2) potentially disruptive behavior such as incorrect expectations, the breaking of contracts, theft, power struggles, and status competition is not permitted; (3) all consumers are maximizing their utility; (4) all firms are maximizing their profits; and, (5) all markets clear. The level of supply and demand for various economic factors where conditions 3, 4, and 5 are true are referred as the Walrasian equilibrium. The Walrasian equilibrium interest rate would be the rate for capital in a credit market in an Walrasian economy where conditions 3, 4 and 5 were true Tesfatsion, L. (2003). Walrasian Equilibrium: A Critique, www.econ.iastate.edu/tesfatsi/wal604.pdf. 2003..

12

credit markets are characterized by credit rationing because the quantity of loan funds demanded exceeds the quantity of loanable funds supplied. After we discuss the other two imperfections inherent in credit markets, we will return to the topic of credit rationing.

The second imperfection is the lack of simultaneity inherent in a loan transaction. The creditor advances funds to a borrower today in exchange for the borrower's promise to pay in the coming months or years.

The third imperfection of credit market deals with the distribution of information among market participants. In a perfectly competitive market, information is costless and equally available to all participants. Many of the proponents of the information-cost school begin *"with a particular assumption of asymmetric information (i.e. borrowers have better information about the value of the property being purchased and their likelihood of repayment than do lenders)* (Nesiba 1996, pp. 60-61)."

The existence of asymmetric information gives rise to two concerns that ultimately explain why credit is rationed (i.e. why prevailing interest rates in credit markets fall short of Walrasian equilibrium interest rates). The two concerns are adverse selection and adverse incentives. Adverse selection impacts which credit applicants are in the loan portfolio (composition), whereas, adverse incentives (moral hazard) influences the behavior of those already in the loan portfolio (Nesiba 1996, pg. 61). The concept of adverse incentives is linked to the notion of 'moral hazard.' An example of the type of action that invites moral hazard is the rescue operation carried out by U.S. Government to address the 1994-1995 Mexican currency crises. Such actions can encourage risky lending, if lenders know that in case of serious problems they will not have to take losses.

Having introduced the concepts of adverse selection and adverse incentive, let us return to the topic of credit rationing (the first credit market imperfections). Jaffee and Stiglitz (1990) offer an explanation for the existence of credit rationing by examining the relationship between adverse selection, adverse incentives, interest rates and underwriting risk (Jaffee and Stiglitz 1990). Ultimately, Jaffee and Stiglitz show that a credit market in equilibrium may be characterized by credit rationing. Their argument can be summarized as follows: A lender providing a loan cares about the interest rate he/she receives on the loan and the riskiness of the loan. However, the interest charged may itself affect the riskiness of a lender's loan portfolio by either: 1) sorting potential debtors (adverse selection); or, 2) affecting the actions of debtors (the incentive effect). The relationship between adverse selection and the interest rates charged rests primarily on one assumption: *those willing to pay high interest rates may, on average, be either involved in or proposing riskier transactions.* In other words, as the interest rate rises, the average riskiness of transactions increases, possibly lowering the bank's profits (Stiglitz and Weiss 1981, pp. 408-409).

13

Now, let us turn our attention to adverse incentives. Another way of talking about the 'incentive effect' is 'moral hazard.' Moral hazard occurs when party "A" (one of two parties to an agreement) can and does engage in reckless behavior unobserved by the other party (Party "B") to the agreement and that behavior can significantly and negatively impact the payoff of party "B." The authors argue that the risk of moral hazard increases as the interest rates charged increase. For example, raising the interest rate on debt employed to finance a project reduces the borrower's net return on a project ceteris paribus, thereby encouraging borrowers to undertake projects with higher returns on investment (if they succeed) but a lower likelihood of success (Stiglitz and Weiss 1981, 408-409; Jaffee and Stiglitz 1990, pp. 858-859).

Jaffee and Stiglitz built on a model that Stiglitz & Weiss developed and described in 1981. Specifically, Stiglitz & Weiss crafted a model that explains racial disparities in the mortgage markets as a function of statistical discrimination as opposed to prejudicial discrimination. The model begins with seven specific assumptions:

1) The credit market is characterized by asymmetric information (the borrowers know the expected return and risk of their project, whereas the lender knows only the expected return and risk of the average project associated with a particular group).
2) Racial prejudice by bankers does not exist (i.e. no banker has a 'taste' for discrimination).
3) The market contains an array of deals with varying risks and expected rates of return.
4) All projects associated with a group have the same expected rate of return; however, the risk may vary (and the risk can be quantified).
5) Lenders have a "bank optimal" interest rate ($r^*$) at which they maximize their return. Exceeding this bank optimal rate exposes the lender to increased losses as result of adverse selection and moral hazard, thus reducing the bank's rate of return.
6) There are n distinguishable groups of borrowers each characterized by different expected return functions.
7) Even if two of more groups of borrowers have equal expected rates of return, the average variance of returns (measure of risk) of the projects for each group is unique.

Stiglitz and Weiss' major findings follow:

If the risk-adjusted interest rate for a particular (racial) group's projects exceeds the bank optimal interest rate, credit rationing may occur such that member of that group will not receive access to credit until another group's credit needs are first met. In the most extreme case, a bank may set a 'bank optimal' interest rate, which prohibits lending to a particular group because the interest rate is set lower than the bank's required return for that particular group. In short, loaning to

14

member of that group is too risky given the "bank optimal" interest rate (Stiglitz and Weiss 1981).

In contrast to models of Stiglitz and Weiss, Stiglitz and Jaffee, and Becker, the work of Guttentag and Wachter and of Lang and Nakamura focus on the spatial manifestation of discrimination, redlining. Strictly speaking, *redlining* refers to the practice by mortgage lenders of identifying an area within which they would not extend credit. In the past, some mortgage lenders traced on a map the boundaries of an area within which they would not lend with a red crayon or pen, giving rise to the term 'redlining' (Guttentag and Wachter 1980, pg. 11).

In current parlance, the term (redlining) is used to describe the practice by mortgage lenders of penalizing mortgage applicants from a designated area, without regard to an individual applicant's creditworthiness. The importance of redlining is a direct result of the persistence of de facto residential and social segregation between non-minorities and minorities. Dymski offers a more precise formulation:

> "[Imagine that a lender serves two communities X and Y; the occupants of X are primarily African-American and the occupants of Y are primarily White.] . . . redlining occurs when the probability of financing a residential transaction in X is lower than in Y, with all economic factors held constant, or when borrowers face more stringent terms on a residential transaction in X than if the same transaction were made in Y" (Dymski 1995, pg. 40).

Guttentag and Wachter (1980) developed an argument that attempts to explain how redlining might persist in a credit market. At the onset of their argument, they divide redlining into two broad categories: irrational and rational redlining. Irrational redlining is synonymous with prejudicial discrimination, and Guttentag and Wachter assume that the combination of competitive market forces (per Becker) and activism on the part of affected communities would eliminate irrational discriminatory redlining. Given that assumption, they focus their energy on trying to explain how 'rational' redlining might persist in credit markets. Rational redlining is synonymous with statistical discrimination.

Guttentag and Wachter argue that redlining results from coordination failures among lenders (Guttentag and Wachter 1980, pg. 1). Their argument rests in part on two related observations:

- In part, the value of housing in a given area is a function of the collective willingness of lenders to provide mortgages in that area.
- The riskiness of any given loan held by a lender is a function in part of the willingness of other lenders to provide mortgages in the area where that particular borrower resides.

15

Thus, it can be said that lenders are engaged in a **'coordination game,'** where their payoffs (returns) depend in part on their success in anticipating and adopting the same strategy as the other 'players' in the game (Bierman and Fernandez 1993, pp.202-204). The Guttentag and Wachter model can be summarized as follows. There are two neighborhoods, X and Y, and there is a lender with no information about the actual risks and returns of providing credit in either neighborhood. This lender will gather "*information [about credit applications] up to the point at which its anticipated marginal gain from information-gathering equals its marginal cost*" (Dymski 1995, pg. 48). If this lender anticipates that other lenders will be more inclined to provide loans for transactions in neighborhood Y versus neighborhood X, then the lender might reason that the risk of lending in neighborhood Y might be lower than that associated with neighborhood X, ceteris paribus. As this kind of reasoning repeats itself, it becomes a self-fulfilling prophecy. As a result, neighborhood X is redlined (Guttentag and Wachter 1980, pp. 7-9).

Like Guttentag and Wachter, Lang and Nakamura also offer a theory that attempts to explain how redlining might persist in a credit market.

The model developed by Lang and Nakamura (1993) begins with two specific assumptions: 1) asymmetric information results from the home appraisal process; and, 2) racial prejudice by bankers does not exist (i.e. no banker has a 'taste' for discrimination).

Like Guttentag and Wachter, Lang and Nakmura's model rests in part on two related observations:
- In part, the value of housing in a given area is a function of the collective willingness of lenders to provide mortgages in that area.
- The riskiness of any given loan held by a lender is a function in part of the willingness of other lenders to provide mortgages in the area where that particular borrower resides.

Lenders are continually engaged in the process of determining the true values of the homes that serve as collateral for mortgages. Estimates of values must be made. Since estimates are noisy, the more transactions (housing sales) in a particular neighborhood ceteris paribus, the more accurate a lender's estimates of true home values in that neighborhood. Thus the Lang and Nakmura argue that: if there have been more housing sales in neighborhood Y compared with neighborhood X, the estimates of value (housing appraisals) for neighborhood Y will be more accurate than those for neighborhood X ceteris paribus. As a result, a lender will require higher down payments to compensate them for the greater risk (lower quality estimates) associated with mortgage requests from neighborhood X, ceteris paribus. This, in turn decreases the number of sales in the neighborhood X and further reinforces the lending bias toward neighborhood Y which is perceived as lower risk because of the higher quality of collateral estimates (Lang and Nakamura 1993, pp. 225-231).

16

To summarize, if banks do little lending in low-income and minority neighborhoods, their estimates of housing values in these areas will be less accurate. As a result, they will require higher down payments and/or higher interest rates to compensate them for the greater risk (lower quality estimates) associated with mortgage requests from those neighborhoods. This in turn will decrease the number of sales in the low-income and minority neighborhoods and further reinforce the lending bias toward neighborhoods that already receive credit and are perceived as lower risk because of the higher quality of collateral estimates.

Table 1 (page 20) summarizes the three Information-Cost school models of discrimination that were discussed in the proceeding pages and the major elements of each of the models.

Dymski outlines a unified model that explains both discrimination against applicants based on race or ethnicity and redlining. Thus, this model intends to supercede the models of Becker, Stiglitz and Jaffee, Stiglitz and Weiss, Guttentag and Wachter, and Lang and Nakamura. Ultimately, Dymski's model rests on the observation that labor markets, credit markets and the process of wealth accumulation are inextricably intertwined[6]. According to Dymski, labor markets, credit markets and the process of wealth accumulation are interdependent because "*creditworthiness rests on borrowers' overall economic capacity, and hence depends on outcomes in all other markets*" (Dymski 1995, pg. 50).

Dymski's model can be summarized as follows: we have a population that consists of blacks and whites, where most of the whites reside in area Y and most of the blacks reside in area X. Let us assume the blacks are subjected to prejudicial discrimination in labor markets or in the markets that they engage in as entrepreneurs; and this discrimination impinges on their ability to earn income in any of the following ways:

a) Blacks earn lower wages than whites in the labor market;
b) Blacks receive lower earnings than whites when they are self-employed;
c) More black than whites work as entrepreneurs, and the variance for entrepreneurial earnings is greater than that for wages.

Collectively, these forms of earned-income discrimination indicate that on average blacks have poorer prospects for future earnings than whites. One implication of this differential in future earnings prospects is that likelihood of

---

[6] It should be noted that Becker recognized the interdependence of labor and capital markets and employs that relationship to explain how market forces would eliminate prejudicial discrimination over time in an imperfect competitive market Becker, G. S. (1971). The economics of discrimination. Chicago, University of Chicago.
Elliehausen, G., E. and T. A. Durkin (1989). "Theory and Evidence of Impact of Equal Credit Opportunity: An Agnostic Review of the Literature." Journal of Financial Services Research(2): pp. 89-114..

17

default on a mortgage loan is higher for blacks than whites with identical earnings levels and employment histories. That said, even if lenders do not engage in prejudicial discrimination, they may engage in statistical discrimination which constrains the amount credit available to blacks relative whites, due to prejudicial discrimination in other markets like the labor markets. To 'equalize' the risk-adjusted return between black and white borrowers, lenders may require higher interest rates and/or downpayments from blacks relative to whites (Dymski 1995, pp. 50-52).

Over time, the higher interest rates and/or downpayments will reduce demand for mortgage loans, constrain the number of homes sold and limit the appreciation of home values in area X, where most of the blacks reside, relative to area Y, where white reside, ceteris paribus. The sale of a home is one of the principal means by which individuals realize wealth. So, over time, discrimination in the mortgage markets can contribute to differentials in wealth between blacks and whites.

Finally, Dymski also considers a scenario in which racial income prospects are assumed to be the same for both blacks and whites; however, on average, whites inherit more wealth than blacks do.[7] One implication of this differential in wealth holdings is that likelihood of default on a mortgage loan is higher for blacks than whites who have identical earnings levels and employment histories. Ultimately, the effects of differential wealth holdings on blacks in the credit market are the same as those of differential earned income. To 'equalize' the risk-adjusted return between black and white borrowers, lenders may require higher interest rates and/or downpayments from blacks relative to whites (Dymski 1995, pp. 53-54).

To summarize, Dymski's model addresses both prejudicial and statistical discrimination. His model predicts that if either lenders or white homeowners have a 'taste' for discrimination, discrimination may appear and persist in credit markets. Turning to statistical discrimination, the Dymski model suggests that if there are racial differentials in either income or wealth, discrimination may appear and persist in credit markets (Dymski 1995, pp.57-61).

### 3.1.3. Summary of Theoretical Literature on Discrimination

Before we begin our discussion of empirical research, a brief summary of the theoretical literature might be helpful. Theoreticians generally acknowledge the existence of two types of discrimination: taste (prejudicial) discrimination and statistical (economic) discrimination. When we speak of prejudicial

---

[7] Both Conley and Oliver and Shapiro present compelling quantitative data that on average whites inherit more wealth than blacks do Oliver, M. L. and T. M. Shapiro (1997). Black Wealth / White Wealth: A New Perspective on Racial Inequality. New York, Routledge.
Conley, D. (1999). Being Black, living in the red: race, wealth, and social policy in America. Berkeley, CA, University of California Press..

18

discrimination, we mean that individuals or firms have a taste for discrimination. Employing conventional neoclassical theoretical logic, theoreticians generally have concluded that prejudicial discrimination will not exist in a competitive market in equilibrium. The second type of discrimination (statistical) is the primary focus of a newer school of economic thought known as the '*Economics of Information*.' The fundamental insight of this school of economic thought rests on the observation that securing information about market participants entails costs. More specifically, the cost of obtaining information about market participants may vary from one person to another or one group to another. In such instances, group membership may prove a less costly (albeit imperfect) substitute for elements of information about the performance of some market participants. It then follows from conventional neoclassical theoretical logic that a firm or individual engaged in the practice of using group membership as a proxy for types of information that might be costly to obtain otherwise would tend to lower their costs compared with those who do not engage in this practice. Such a practice is referred to as 'statistical discrimination.' Thus, disparities between various groups can exist in a competitive market in equilibrium, even if no market participant engages in prejudicial discrimination.

Finally, many financial markets theorists acknowledge that credit markets cannot not be usefully modeled as '*perfectly competitive markets*,' thus, allowing for the possibility of prejudicial and/or statistical discrimination at equilibrium. Credit markets deviate from the specifications of a perfectly competitive market in three important ways: the prevailing interest rate consistently falls below the 'Walrasian' equilibrium interest rate; lack of simultaneous exchanges; and, asymmetric information. And, these deviations from the specifications of a perfectly competitive market give rise to credit rationing in credit markets, allowing for the possibility of prejudicial and/or statistical discrimination at equilibrium.

In our study, we test for the existence of prejudicial discrimination in the provision of trade credit. Our methodology is discussed more fully in the "Research Methodology and Result" chapter which begins on page 51.

In the next section, a synopsis of major empirical research is presented.

Table 1. Major Theoretical Research on Discrimination in Mortgage Lending

| A Summary of Major Theoretical Research on Discrimination in Mortgage Lending[8] by Proponents of the Information-Cost School | | |
|---|---|---|
| Theorist(s) [discrimination type modeled] | Major Assumptions | Major Findings |
| Stiglitz & Weiss [Statistical discrimination] (Stiglitz and Weiss 1981) | 1) The market is characterized by asymmetric information. 2) Lender has no 'taste' for discrimination. 3) The market contains an array of projects with varying risks and expected rates of return. 4) All projects associated with a group have the same expected rate of return; however, the risk may vary (and can be quantified). 5) Given adverse selection and moral hazard, lenders have a "bank optimal" interest rate (r*) at which they maximize their return. r* is always below the Walrasian equilibrium interest rate. 6) There are n distinguishable groups | If the risk-adjusted interest rate for Group "X's" projects exceeds the bank optimal interest rate, credit rationing may occur such that members of Group X will not receive access to credit until another group's credit need are first met. In the most extreme case, a bank may set a "bank optimal" interest rate, which prohibits lending to a particular group because the interest rate is set lower than the bank's required return for that particular group. In short, lending to a member of that group is too risky given the "bank optimal" interest rate. |
| Guttentag and Wachter [Statistical discrimination (Guttentag and Wachter 1980) | 1) The market is characterized by asymmetric information. 2) No Lender has a 'taste' for discrimination. 3) Lenders fail to coordinate information gathering and lending activities. | Two types of redlining are possible: neighborhood effects and social discrimination. The failure of lenders to pool resources in gathering underwriting information in certain communities may result in neighborhood effects redlining. Rational social discrimination redlining occurs when protected borrower characteristics are: (a) correlated with risk and (b) employed in the lender's underwriting process. Establishing social discrimination (s.d.) redlining is difficult because s.d. redlining variables are closely correlated with neighborhood effects redlining (given the spatial segregation of various racial and ethnic populations). |

[8] The format and contents of this table benefits significantly from a table included in an excellent article by Reynold Nesiba Nesiba, R. F. (1996). "Racial Discrimination in Residential Lending Markets: Why Empirical Researchers always see it and Economic Theorists never do." Journal of Economic Issues XXX(1): pp. 51 - 77.. The Prejudicial and Statistical discrimination are synonymous with Non-economic and Economic discrimination, respectively.

20

JA0110

Case 1:11-cv-01277-GBL-TRJ    Document 61-24    Filed 03/23/12    Page 26 of 78    PageID 1342

| Lang and Nakamura [Statistical discrimination] (Lang and Nakamura 1993) | 1) The market is characterized by asymmetric information. 2) No lender has a "taste" for discrimination, however, in the past, there was prejudicial discrimination. 3) Home appraisals are imperfect estimates of true value. 4) The accuracy of a lender's underwriting in a given area is positively correlated with the number of real estate transactions previously completed in that neighborhood, ceteris paribus. | As the number of home sales in a given neighborhood increases, the accuracy of appraisals improve and lenders are better able to assess risk, ceteris paribus. If lenders have historically done little lending in a neighborhood of color and few transactions have occurred, appraisals for that neighborhood will be less accurate compared with those for other neighborhoods. Thus, lenders will perceive more risk, and seek higher down payments which will discourage transactions in that area |

21

JA0111

Appeal: 13-1982　　Doc: 14-1　　Filed: 10/21/2013　　Pg: 128 of 418

## 3.2. Empirical Research on Discrimination in Credit Markets

While there has been much empirical research on discrimination in home mortgage markets and a growing body of empirical research on discrimination in bank loans to small businesses, this author has found no empirical research that tests for discrimination in provision of trade credit. And, only two empirical studies were found that address (even tangentially) the primary research questions that motivate our study (Coleman 2003; Aaronson, Bostic et al. 2004). Given the preceding, in this section, we will briefly outline some major findings for discrimination in home mortgage lending and some major findings for discrimination in business lending. Then we will discuss in more detail the findings of Aaronson *et. al.* and Coleman *et. al.*

Before reviewing and discussing the various empirical studies, one area of controversy demands our attention. This area of contention is how best to detect discrimination, if it exists. In other words, *what method of analysis is appropriate*. The majority of the empirical studies can be grouped into three broad categories: (1) various types of *Rejection Rate Analyses*[9], (2) Fair Share Analyses, and (3) Loan Performance Analyses.

### 3.2.1. Principal Research Methods Employed

One of the three broad categories of analysis is *Rejection Rate Analyses*. Essentially, all of the methods that fall into this category quantify and compare the likelihood of rejection or approval of a credit request by a member of a minority group versus a non-minority group. Underlying this approach is the assumption that a higher rejection rate (however calculated) for minorities versus non-minorities implies the existence of discrimination (Nesiba 1996, pg. 56).

The specific methods of analysis that fall into this category vary in sophistication.

The simplest form of Rejection Rate Analysis entails the calculation of a "simple rejection rate" for minority credit applicants and the comparison of the minority simple rejection rate to that for non-minority credit applicants (Ross and Yinger 2002, pp. 94-106). The simple rejection rate for minority credit applicants would be calculated as follows: (1) Determine the total number of credit requests submitted to an institution from minority group members during some period of time. (2) Determine how many of those requests were denied. (3) Divide the number obtained in Step #2 by the number obtained in Step #1 to determine the simple rejection rate for minority credit applicants. By following an analogous process, the simple rejection rate for non-minority applicants can be determined. With both the minority and non-minority simple rejection rates in hand, they can be compared. If simple rejection rate for minorities exceeds that observed for

---

[9] Approval rates analyses and *Rejection Rate Analyses* are essentially one and the same: one is the mirror image of the other.

non-minorities then discrimination is a possible explanation of the observed disparity. That said, any observed disparities may reflect other factors (e.g. differences in average income levels, wealth, employment stability, etc.).

The apparent limitations of simple Rejection Rate Analysis led empirical researchers to develop more sophisticated methods that allow a researcher to account for (control) some of the other factors that may account for observed disparities in simple rejection rates across racial/ethnic groups.

At the other end of the spectrum of sophistication are those studies that employ binomial logit (and/or probit) regression models. Typically, the dependent variable in these studies is the probability[10] of a credit request being denied. In the most straightforward applications of binomial logit models, the independent variables typically include various measures of creditworthiness and demographic descriptors including race. If a race variable coded to identify minority applicants proves statistically significant, it suggests that discrimination is a possibility.

Another common application of the binomial logit models entails estimating separate regression models and denial rates for non-minority and minority credit applicants. This allows a researcher to quantify the influence of the differences in credit applicants' endowments on differences in denial rates for minority and non-minority group members (Cavalluzzo 2002, pg. 15). The term 'endowments' refers to various creditworthiness-related characteristics of a credit applicant (e.g. credit history, net worth, etc.) Ultimately, this procedure allows the researcher to decompose the differences in denial rates between minority and non-minority applicants into two components, one component due to differences in endowments between minority and non-minority applicants, and, a second component due to differences in the treatment of applicants given those endowments (Cavalluzzo 2002, pg. 15).

The procedure requires that the sample of credit applicants be divided (*at minimum*) into two sub-samples: a minority sub-sample and a non-minority sub-sample. Then a separate regression model and denial rate is calculated for non-minority and minority credit applicants, respectively. Frequently, the denial rate for the sub-sample of minority credit applicants is higher than that estimated for the non-minority sub-sample. Then the mean values of the independent variables for the minority credit applicants sub-sample are plugged into the non-minority regression model to determine the denial rate for minority credit applicants in a world that is '*color-blind*.' The resulting '*color-blind*' denial rate for the minority credit applicants sub-sample typically is lower than the original denial rate for the sub-sample of minority credit applicants but higher than the non-minority denial rate, reflecting differences in the average level of

---

[10] Specifically, the dependent variable in a binomial logit regression model is the log of the odds that a credit request will be denied Studenmund, A. H. (2001). Using Econometrics: a practical guide. New York, Addison Wesley Longman, Inc..

- 24 -

creditworthiness of minorities versus non-minorities (the 'endowment effect').
The results of this procedure are best illustrated by looking at an actual example.
Table 2 is based on a table included in a 2002 study by Calvalluzzo et al. (see
Table 6 2002, pg. 32).

Table 2. Total Endowment Effect

| Total Endowment Effect | | | | |
|---|---|---|---|---|
| Row | | White | African-American | Hispanic | Asian |
| 1 | Actual Denial Rates[a] for sub-samples | 0.241 | 0.618 | 0.497 | 0.524 |
| 2 | Differences in Denial Rates[a] for Minorities versus Whites | 0.000 | 0.377 | 0.256 | 0.283 |
| 3 | "Color Blind" Denial Rates[a] 0.241 | | 0.367 | 0.317 | 0.317 |
| 4 | Differences in Denial Rates[a] (explained by differences in endowments) | n/a | 0.126 | 0.076 | 0.076 |
| 5 | % Differences in Denial Rates[a] (explained by differences in endowments) | n/a | 33.5% | 29.7% | 27.0% |

Notes:
   a)  Point estimate for sub-sample means of independent variables.
   b)  Source: (Table 6 in Cavalluzzo 2002, pg. 32)

In this study, Cavalluzzo et al. divided their sample of credit applicants into four
sub-samples: White credit applicants; African-American credit applicants;
Hispanic credit applicants; and, Asian credit applicants.   For each sub-sample a
separate regression model was calculated.  Then the mean values for each
independent variable for given sub-sample were plugged into the corresponding
regression model to determine the mean denial rate for each sub-sample (the
'Actual' denial rates).  The resulting 'Actual' denial rates for each racial/ethnic
group are shown in Row #1.  In Row #2, the numerical difference in the denial
rate relative to 'Whites' is calculated for each minority group.  Row #3 shows the
denial rates for each minority group if the mean independent variable values for
each minority sub-sample are plugged into the 'White' regression model. (the
"Color Blind" denial rates)  Row #4 contains the difference between the Color
Blind denial rate for each minority group and the 'White' denial rate.  Finally,
using the figures in Row # 2 and #4, the portion of the difference between the
'White' denial rate and the 'Actual' denial rate for each minority group that can be
explained by differences in endowment can be calculated.  Row #5 shows, for
each minority group, the percentage of the difference between the 'White' denial
rate and the 'Actual' denial rate for the minority group that can be explained by
differences in endowments.  For example, the actual denial rate for African-
American is more than two and one-half times higher than the actual denial rates
for Whites.  Clearly, a portion reflects differences in average levels of

- 25 -

endowments between African-Americans and Whites. Cavalluzzo *et al.* estimate that these differences in average levels of endowments account for approximately one-third of the observed disparity in loan denial rates between Whites and African-Americans. The remaining two-thirds of the disparity in denial rates between African-Americans and Whites result from other causes. Cavalluzzo *et al.* argue that primary among those other causes is discrimination.

The analysis by Cavalluzzo *et al.* discussed in the preceding paragraphs is representative of the more sophisticated versions of rejection analyses. Essentially, all Rejection Rate Analyses methods quantify and compare the likelihood of rejection or approval of a credit request by a member of a minority group versus a non-minority group. Underlying this approach is the assumption that a higher rejection rate (however calculated) for minorities versus non-minorities implies the existence of discrimination (Nesiba 1996, pg. 56).

The second of the three broad categories of analysis is "Fair Share Analyses." Broadly speaking, all of the various methods of Fair Share Analyses quantify and compare the distribution of outstanding credit across either racial/ethnic groups or geographic space (e.g. census tracts). The methods of Fair Share Analyses range along two dimensions: (a) the extent to which the study tries to control for differences in endowments, and (b) the applicable unit of analysis which may consist of individuals, firms or census tracts.

Fair Share Analyses range in sophistication. To illustrate Fair Share Analyses in its most elementary form, it would be helpful to look at the home mortgage market. A study might focus on a metropolitan area (MSA), identifying the number and proportion of mortgages made in each census tract in that MSA controlling for income, the number of mortgageable housing units and race/ethnicity. The number and the proportion of mortgages for various census tracts are compared to each other and the average for the MSA (Nesiba 1996, pg. 57).

After controlling for income, the number of mortgageable housing units and race/ethnicity, if there are a smaller number and/or proportion of mortgages in census tracts with high levels of minorities (relative to the average for the MSA) then discrimination may be a possible explanation of the observed disparity.

In its most sophisticated form, a Fair Share analysis might look like the 1997 empirical study by Bates where he presents a regression model to explain the loan amounts extended to start-up firms by financial institutions. (Bates 1997) In this study, the dependent variable is *"the dollar amount of debt used to start or become owner of the business"* (see Table 1 in Bates 1997, pg. 489). The unit of analysis is the firm and the sample includes firms owned by Blacks and Whites. The regression model includes four types of independent variables: *"(1) owner equity capital investment, (2) owner human capital traits, (3) loan source, and (4) owner demographic traits"* (Bates 1997, pg. 489). Ultimately, Bates found that *"Black-*

- 26 -

*owned businesses received [significantly] smaller loans than white-owned firms with identical measured characteristics"* (Bates 1997, pg. 487 and 491).

Underlying this approach are two important assumptions: (a) discrimination may exist if, after controlling for differences in endowments across demographic groups, the distribution of outstanding credit does not closely mirror the distribution of the relevant population across racial/ethnic groups; and (b) the demand among various racial/ethnic groups is the same. If the analysis focuses on the spatial distribution of outstanding credit within an MSA, then the preceding assumptions would be restated as follows: (a) discrimination may exist if, after controlling for three types of independent variables (measures of mean income for the appropriate unit of observation (e.g. individuals, firms, families, etc.), the number of potential borrowers and demographics measures including race), the race variable is statistically significant in explaining the aggregate amount of outstanding credit in an area; and, (b) the demand among various areas (e.g. census tracts) within an MSA is the same (Nesiba 1996, pp. 57-58).

The third broad categories of analysis is 'Loan Performance Analyses.' Essentially, all of the methods that fall into this category attempt to quantify the profitability of loans and/or the incidence and cost of defaults for minority and non-minority borrowers (Ross and Yinger 2002, pp. 235-239). Underlying this approach is the assumption that either a higher average level of profitability or a lower average frequency of default for minority borrowers compared with non-minority borrower is symptomatic of taste-based discrimination.

> "The commonly held view has been that if there exists taste-based discrimination, loans approved to minority borrowers would have higher expected profitability than to majorities with comparable credit background. . . . We also show that there must exist taste-based discrimination if loans to minority borrowers have higher expected rate[s] of return or lower expected rate[s] of default loss than to majorities with the same exogenous characteristics observed at the time of loan origination" (see the abstract of Han 2001).

Loan Performance Analyses vary in sophistication. To illustrate Loan Performance Analyses in its most elementary form, it would be helpful to look at the home mortgage market. Loan Performance Analyses might entail the estimation of the interest rate paid on an outstanding mortgage after controlling for difference in endowments, etc. The sample for such a study would include data for both minority and non-minority borrowers covering at least six classes of independent variables: (1) measures of creditworthiness, (2) neighborhood descriptors, (3) collateral descriptors (single-family, two-family dwelling, etc.), (4) non-interest credit terms, (5) prevailing interest rates at the time of origination, and (6) a borrower's demographic traits.

- 27 -

Underlying this approach is the assumption that a higher average interest rate (after controlling for creditworthiness, etc.) for minorities versus non-minorities implies the existence of discrimination.

More complex versions of Loan Performance Analyses employ multivariate analysis that includes multiple dependent variables (e.g. measures of profitability, and rates and cost of default - For an example, see Han 2001).

To summarize, the majority of the empirical studies can be grouped into three broad categories: (1) Rejection Rate Analyses[11], (2) Fair Share Analyses, and (3) Loan Performance Analyses.

Having outlined this catalogue of methodological approaches, we can describe and discuss several of the significant empirical studies.

The increased availability of appropriate datasets has increased both the fervor and the ranks of scholars engaged in the debate between empirical researchers and theoreticians. Given the central role of data in fueling this debate, it will prove helpful to organize the review of empirical studies by major datasets.

### 3.2.2. Availability of Empirical Data

Prior to 1987, the work of theoreticians stood largely unvetted by empirical data. In 1987, the first of several major datasets that would allow researchers to test for discrimination in credit markets became widely available: the **1982 Characteristics of Business Owners** (the "CBO") survey. By 1989, the results of several empirical studies employing the **1982 CBO** dataset had been published. It was the publication in 1989 of these empirical studies that ignited the debate regarding the existence or non-existence of discrimination in credit markets that continues to this day. The following table identifies five major datasets and indicates the year during which each became widely available.

---

[11] Approval rates analyses and *Rejection Rate Analyses* are essentially one and the same: one is the mirror image of the other.

- 28 -

Table 3. Availability of Major Empirical Datasets for the study of Discrimination

| Availability of Major Empirical Datasets for the Study of Discrimination in various Credit Markets | | | | |
|---|---|---|---|---|
| Credit Market | The Year the Dataset became widely available | | | |
| | 1987 | 1991 | 1997 | 2001 |
| Home Mortgage | | HMDA | | |
| Small business loans | CBO | NSSBF | CRA | SSBF |

Notes:

CBO (Characteristics of Business Owners) datasets were generated for the years 1982, 1987 and 1992 by the U.S. Census Bureau (Yazdipour 1991, pg. 173).

CRA (Community Reinvestment Act): Under the modified CRA provisions adopted in 1995, banks with assets totaling more than $250 million or affiliated with a holding company with more than $1 billion in total assets are required to report small business and small farm loans to their primary regulatory agency. Datasets are generated annually (Squires and O'Connor 1999, pp. 85-88).

HMDA (Home Mortgage Disclosure Act of 1975): Pursuant to the 1989 amendments to HMDA per certain provisions of the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), all mortgage lenders located in urban areas with assets totaling at least $10 million in total assets are required to track and report data about mortgage loans applications received and mortgage loans provided, including the location of each property associated with an application, the ultimate disposition of an application and loan denial rates broken down by race/ethnicity, as well as location. HMDA data captures more than 80 percent of the residential mortgage lending in the country (Ross and Yinger 2002, pp. 3-4). Datasets are generated annually.

NSSBF (National Survey of Small Business Finances) was co-sponsored by the Board of Governor of the Federal Reserve and the Small Business Administration. There are datasets for the years 1987 and 1993 (Yazdipour 1991, pg. 172).

SSBF (Survey of Small Business Finances): Prior to 1998, this survey was known as, the NSSBF. While the name has changed, the survey instrument and methodology remains largely unchanged (Bitler, Robb et al. 2001). Datasets are generated on a five-year cycle. Currently, the 1998, 1993 and 1987 datasets are publicly available.

As Table 3 illustrates, all but one of these major datasets focus on business lending. Only the HMDA dataset examines the home mortgage market. We will look at one major study that employs HMDA data and then identify and discuss various studies that have used the datasets that focus on small business lending. Specifically, studies employing CBO datasets will be discussed second; research employing CRA datasets will be discussed third; and studies employing SSBF datasets will be discussed last.

### 3.2.3. Home Mortgage Disclosure Act of 1975 (HMDA) Data

In the late 1960s, concerns about redlining and discrimination against communities of color by mortgage lenders gave rise to grassroots groups in urban communities across the country that advocated for increased access to mortgage credit for low-income communities and communities of color (Williams

- 29 -

and Nesiba 1997, pp. 74-75). Among other things, these grassroots community groups pushed for the passage of two acts of legislation that became law in the 1970s: the Community Reinvestment Act of 1977; and, the Home Mortgage Disclosure Act of 1975.

The Community Reinvestment Act (CRA) as amended over the intervening years has been instrumental in providing researchers with empirical data about small business and consumer lending activity around the country. However, in the case of both the CRA and HMDA, the amendments that would transform these laws into effective regulatory tools came more than a decade after the initial legislation. The CRA data is discussed at more length later in this section of the paper.

Pursuant to the 1989 amendments to HMDA per certain provisions of the *Financial Institutions Reform, Recovery, and Enforcement Act* (FIRREA) and various other amendments in 1980, 1988, 1999 and 2000, most mortgage lenders located in urban areas are required to track and report data about mortgage loans applications received (FFIEC n.d.).

HMDA captures information about mortgage lending by a range of financial institutions, including banks, savings associations, credit unions, and other mortgage lending institutions. All depository institutions with at least $33 million in total assets located in urban areas and all non-depository institutions with at least $10 million in total assets located in urban areas are required to track and submit HMDA data (FFIEC n.d.). The datasets for the years 1991 through 2004 are largely comparable and contain the range of information including the location of each property associated with an application, the income of applicants, the ultimate disposition of an application, the amount of the mortgage provided (if an application is approved) and loan denial rates broken down by race/ethnicity, gender and location (FFIEC n.d.).

HMDA data captures more than 80 percent of the residential mortgage lending in the country (Ross and Yinger 2002, pp. 3-4). Datasets are generated annually. The latest publicly available dataset contains information for the year 2004.

One of the most widely-cited studies employing HMDA data is the so called 'Boston Fed Study' (Munnell, Tootell et al. 1996). Munnell *et al.* estimate a regression model for the probability of being denied a mortgage (the loan denial rate), minimizing omitted-variable bias, to determine the principal source(s) of the significant disparities in loan denial rates for various ethnic groups as reported by the HMDA data. The study's research methodology falls into the "Rejection Rate Analyses" category.

Ultimately, Munnell *et al.* (1996) concluded that Black and Hispanic applicants were about 80 percent more likely to be turned down than were white applicants

- 30 -

who had comparable property and personal characteristics (Munnell, Tootell et al. 1996, pg. 26).

The strength of this study is that it minimizes the likelihood of omitted variable bias. No fundamental flaws have ever been identified in the Boston Fed Study. And, for that reason, the Boston Fed Study invariably is mentioned in discussions about discrimination in mortgage markets (Ross and Yinger 2002).

### 3.2.4 The Characteristics of Business Owners Survey[12] (CBO)

Prior to 1997, most of the empirical research on discrimination in business lending employed data from the **Characteristics of Business Owners** Survey (CBO) (Bates 1989; Bates 1993,a; Bates 1993,b; Bates 1997; Bates 1997; Robb 2000). The U.S. Census Bureau generated CBO datasets for the years 1882, 1987 and 1992.

The CBO survey drew its samples from those individuals and firms captured by the **Survey of Minority-Owned Business Enterprises** (the "SMOBE") which was also administered by the U.S. Census Bureau. From 1977 through 1997, SMOBE datasets were generated every five years (Bates 1993, pg. 38). The latest publicly available SMOBE[13] dataset contains information for the year 1997.

The latest publicly available CBO dataset contains information for the year 1992. (U.S. Bureau of the Census ) In total each CBO dataset contains data on more than 116,000 individuals divided into five panels. Each of the five panels contains data more than 20,000 persons who were self-employed during the study year [U. S. Census Bureau, 1997 #290, pg. 7].

> "The five panels are as follows: Panel One, Hispanic; Panel Two, other minority (largely Asian); Panel Three, Black; Panel Four, female (minority as well as non-minority); Panel Five, white male" (Bates 1993, pg. 116).

The datasets include more than thirty variables that attempt to capture both quantitative and qualitative information about either the firm or its owner: owner's demographics (e.g. age, sex, marital status, etc.); owner's human capital (e.g. years of schooling); firms' labor force (e.g. size, gender mix, etc.); and, business characteristics (e.g. the firms four-digit SIC code, its legal form of organization, etc.)

---

[12] In February 2005, the U.S. Census Bureau made available the "**Advance Report on Characteristics of Employers Business Owners: 2002.**" The Characteristics of Employer Business Owners provides information about firms and their owners for year 2002 and in effect replaces the CBO. The CBO data for 1997 was never made publicly available.

[13] In July 2005, the U.S. Census Bureau made available the 2002 Survey of Business Owners (SBO). The SBO in effect replaces the SMOBE and SWOBE, Survey of Women-Owned Business Enterprises U.S. Census Bureau (2005). 2002 Survey of Business Owners. Washington (D.C.), U.S. Census Bureau. 2006..

- 31 -

Bates (1997) published the results of a study that is representative of those employing CBO datasets.

One of the primary motivations for this study is to determine if and how the size of a commercial loan obtained by a start-up businesses varies by owner's race and/or ethnicity (Bates 1997, pp. 487-488). Put more simply, the Bates study attempts to determine if the CBO data provides any evidence of discrimination in the small business lending. To address this question, Bates presents a regression model for explaining the size (amount) of a loan made to a small business[14] at start-up after controlling for following types of factors: owner's human capital; owner's equity investment in the start-up; loan source; owner's demographic traits; and firm characteristics (Bates 1997, pp. 488-489). The principal research methodology employed by the Bates study falls into the Fair Share Analyses[15] category.

The Bates study generated two findings that are relevant to our study:

- Black-owned firms receive smaller loans at start-up than non-minority-owned firms, after controlling for the following factors: owner's human capital; owner's equity investment in the start-up; loan source; and firm characteristics (Bates 1997, pp. 488-489).

- Returns to management experience differ for African-Americans relative to non-minorities. All other things being equal, average loan size increases as management experience increases for both blacks and non-minorities. While greater management experience does translate into increased loan amounts for blacks and non-minorities, compared with blacks, non-minority borrowers receive approximately 35%[16] more in incremental loan dollars for each year of additional management experience.

---

[14] Bates defines small business as any firm in the CBO database with annual total sales greater than $4,999 Bates, T. (1997). "Unequal access: financial institution lending to Black- and White-owned small business start-ups." Journal of Urban Affairs 19(4): 487-495. Bates' definition, in operation, is more restrictive than the standard used by the U.S. Small Business Administration because CBO datasets only capture information for individuals that file tax returns for their interest in businesses organized as sole proprietorships, partnerships or subchapter "S" business corporations. By comparison, the U. S. Small Business Administration defines a firm as a small business if it employs less than 500 workers without regard to how the business is legally organized. So, the SBA's definition of a small business includes firms organized as "C" corporations as well as those captured in the CBO datasets.

[15] For a detailed description of Fair Share Analyses – see pp. 26-27 of this publication.

[16] This author's calculation based on the values for the dependent variable when the mean values of the independent variables are inserted in the regression model that Bates developed Bates, T. (1997). "Unequal access: financial institution lending to Black- and White-owned small business start-ups." Journal of Urban Affairs 19(4): 487-495..

- 32 -

This study has two strengths: (a) it employs large samples of both African-American and non-minority borrowers: and (b) it uses an extensive set of independent variables to explore the sources of disparities between minority and non-minority business owners in accessing commercial bank loans at start-up; thereby, reducing the likelihood of omitted variable bias.

A limitation of the Bates study involves sample selection. The samples analyzed in the Bates study only include African-American- and non-minority-owned firms that had successfully borrowed from a financial institution. The sample excludes firms that have been unsuccessful in obtaining loans and potentially underestimating the full impact of discrimination. So, the findings of the Bates study must be viewed in that light.

While new studies employing CBO datasets continue to appear, much of the recent research on discrimination in business lending employs data from two relatively new sources: the Survey of Small Business Finances (SSBF)[17] and, the small business lending data mandated by the Community Reinvestment Act (CRA). In the next section, we turn our attention to the CRA. First, we describe the CRA datasets. Then, we identify and discuss two major studies the employ CRA datasets.


### 3.2.5. Community Reinvestment Act (CRA) Data

CRA, formally Title VIII of the Housing and Community Development Act of 1977, explicitly states that financial institutions have a duty to help meet the credit needs of the local communities in which they are operation . . . consistent with safe and sound operations of such institutions  (Williams and Nesiba 1997, pg. 75). This legislation as amended over the intervening years has been instrumental in providing researchers with empirical data about small business and consumer lending activity around the country.

Under the modified CRA provisions adopted in 1995, banks with assets totaling more than $250 million or affiliated with a holding company with more than $1 billion in total assets are required to report small business and small farm loans to their primary regulatory agency (e.g. Comptroller of the Currency, Federal Reserve, etc.) commencing in 1996 (Squires and O'Connor 2001, pg. 3).

Since 1995, several empirical studies have examined small business lending, a direct outgrowth of changes in the Community Reinvestment Act ("CRA"). Among other things, this newly available source of data has allowed researchers to test for the existence of discrimination in small business lending. This new stream of data is important because access to credit (both bank and trade credit)

---

[17] In 1998, this survey was renamed the **"Survey of Small Business Finances."** Prior to 1998, this survey was known as, the **National Survey of Small Business Finances.** While the name has changed the survey instrument and methodology remains largely unchanged.

We

is a major determinant of the rate of formation and of survival of small businesses.

Below we identify and discuss two studies that are representative of those using CRA datasets: Immergluck(1999) and Squires and O'Connor (2001).

The Immergluck study analysis CRA data for any evidence of either redlining or discrimination in the small business lending in Metro Chicago. Immergluck estimates a regression model for determining the number of loans made to small businesses[18] in a given neighborhood per year, after controlling for firm density, firm size and industrial mix (Immergluck 1999, pg. 128). Specifically, this study explores if and how the number of commercial loans obtained by small businesses in the six-county Chicago area varies by either the income-level or the racial/ethnic composition of the neighborhood where the firm is located (Immergluck 1999, pp. 123-125).

Strictly speaking, *redlining* refers to the practice by mortgage lenders of identifying an area within which they would not extend credit. In the past, some mortgage lenders would trace on a map the boundaries of an area within which they would not lend with a red crayon or pen, giving rise to the term 'redlining' (Guttentag and Wachter 1980, pg. 11). In general parlance, redlining refers to the practice by a financial institution of constraining the quantity of credit extended to borrowers located in a given neighborhood based on considerations other than objective measures of creditworthiness.

The principal research methodology employed by the Immergluck study falls into the "Fair Share Analyses" category. (*For a detailed description of Fair Share Analyses -- see pp. 26-27 of this publication.*) Specifically, Immergluck engaged in somewhat sophisticated forms of Fair Share Analyses that employed either ordinary least squares (OLS) or weighted least squares (WLS) estimations (Immergluck 1999, pp. 128-131).

Using OLS estimations, Immergluck concluded the following:

  □ All other variables held constant, going from an all White to an equivalent all Black neighborhood is accompanied by an 18% decrease in the number of loans made in a census tract.

---

[18] Immergluck's definition of small business is a firm with annual total sales of less than $1,000,000. Immergluck, D. (1999). Intraurban patterns of small business lending: findings from the new Community Reinvestment Act data. Business Access to Capital and Credit: A Federal Reserve System Research Conference, Arlington, VA, Federal Reserve System. Immergluck's definition, in operation, is more restrictive than the standard used by the U.S. Small Business Administration. The U. S. Small Business Administration defines a firm as a small business if it employs less than 500 workers.

- 34 -

    ❑  All other variables held constant, going from an all White to an equivalent all Hispanic neighborhood is accompanied by a 39% decrease in the number of loans made in a census tract.

In addition to the OLS estimates, Immergluck also used WLS estimators to remedy any bias that might result from spatial autocorrelation.

> ". . . the problem of spatial autocorrelation . . . occurs when the regression residuals of a pair of nearby observations are more similar than those of more-distant pairs and can result in biased coefficient estimates.
>
> . . . [spatial autocorrelation is a direct consequence of] the fact that bank branches, which tend to be located in middle- and upper-income areas, [typically] serve [several] census tracts. Thus, the demographics of surrounding areas may be an important determinant of a neighborhood's lending level" (Immergluck 1999, pp. 129-130).

To address the problem of spatial autocorrelation, Immergluck estimated two spatial lag models. Specifically, these models "*account for the lending levels for other [census tracts] within a distance of approximately 7 miles and weights these neighboring observations by an inverse distance function*" (Immergluck 1999, pg. 129). In the first model, the spatial lag variable is equal to the inverse distance squared; and, in the second model, the spatial lag variable is equal to the inverse distance cubed.

Correcting spatial autocorrelation with the addition of a spatial lag variable equal to the inverse distance squared, Immergluck again found statistically significant differences between comparable Hispanic and White neighborhoods; however, the differences for comparable Black and White neighborhoods were not statistically significant.

With the spatial lag variable equaling the inverse distance cubed, the differences for both comparable Hispanic and White neighborhoods and comparable Black and White neighborhoods were statistically significant (see Table III on pg. 135 in Immergluck 1999, pg. 130).

In sum, one can conclude from the Immergluck study that Hispanic neighborhoods experience lower lending rates than non-minority neighborhoods, after controlling for firm size, industrial mix and firm density. The findings for Black neighborhoods are not as conclusive as those for Hispanic neighborhoods.

The strength of the Immergluck study is that it provides a macro-view of the flow of small business loans across a major metropolitan area. That said, both the study's author admits and the critics of the study assert that the lack of a variable(s) to account for the creditworthiness of firms within a given census tract severely limits the study's ability to determine the cause of the observed

- 35 -

disparities in lending volumes between minority and non-minority neighborhoods (Yezer 1999).

Now, we turn our attention to a study by Squires and O'Connor, published in 2001. Compared with the Immergluck study, the Squires and O'Connor study is much less sophisticated. The Squires and O'Connor study explores if and how the number of commercial loans obtained by small businesses varies by either the income-level and/or the racial/ethnic composition of a firm's neighborhood (Squires and O'Connor 2001, pp. 2-3). Put more simply, the Squires and O'Connor study attempts to determine if the CRA data provides any evidence of either redlining[19] or discrimination in the small business lending in Metro Milwaukee.

The Squires and O'Connor "*study examines small business loans[20] [for the years 1996 and 1999] in the four-county Milwaukee metropolitan statistical area (MSA). The four counties are Milwaukee, Ozaukee, Washington, and Waukesha*" (Squires and O'Connor 2001, pp. 3-4). Banks and thrifts made 15,181 loans during 1996 to firms located in the Milwaukee MSA. In 1999, banks and thrifts made 17,356 loans in Metro Milwaukee (see Table 1 in Squires and O'Connor 2001, pp. 6-7).

The principal research methodology employed by the Squires and O'Connor study falls into the "Fair Share Analyses" category. (*For a detailed description of Fair Share Analyses – see pp. 26-27 of this publication.*) Specifically, Squires and O'Connor engaged in a very elementary form of Fair Share Analyses that calculate the actual lending volumes by either the income-level or the racial composition of a neighborhood (Squires and O'Connor 2001, pp. 3-21).

Squires and O'Connor study includes one finding that bears upon our proposed research which is an observation about the distribution of small business lending volume by neighborhood racial/ethnic composition. Relative to the population density, small business lending in Milwaukee was disproportionately concentrated in non-minority neighborhoods in 1996 and in 1999.

---

[19] Strictly speaking, '*redlining*' refers to the practice by mortgage lenders of identifying an area within which they would not extend credit. In the past, some mortgage lenders would trace on a map the boundaries of an area within which they would not lend with a red crayon or pen, giving rise to the term 'redlining' Guttentag, J. M. and S. M. Wachter (1980). Redlining and Public Policy. New York, New York University, Graduate School of Business Administration, Salomon Brothers Center for the Study of Financial Institutions: pp. 53.. In general parlance, redlining refers to the practice by a financial institution of constraining the quantity of credit extended to borrowers located in a given neighborhood based on considerations other than objective measures of creditworthiness.

[20] Squires and O'Connor define small business loans as those whose original amounts are $1 million or less and which are secured by nonfarm or nonresidential real estate. In practice, the Squires and O'Connor definition is more restrictive than that of the U.S. Small Business Administration and only captures those loans that meet the definition of "loans to small businesses" that are reported in 'Call Reports' Squires, G. D. and S. O'Connor (2001). Access to capital: Milwaukee's continuing small business lending gaps, Woodstock Institute. 2004: 26..

- 36 -

While the descriptive statistics presented in the Squires and O'Connor study make clear that small business lending volumes are lower in minority neighborhoods compared with non-minority neighborhoods, the findings do not explain why these disparities exist. This is the fundamental weakness of this study. The observed differences could be a function of several factors including: redlining, discrimination, variations in the average level of creditworthiness of the firms located in various neighborhoods and/or variations in mix of types of firms across neighborhoods. The Squires and O'Connor study sheds no light on this question.

As was stated earlier, much of the recent research on discrimination in business lending employs data from two relatively new sources: the small business lending data mandated by the CRA and the Survey of Small Business Finances (SSBF).[21] Having completed our discussion of research using CRA data, we turn our attention the SSBF in the next section. This data is of particular interest because we will use both the 1993 and the 1998 SSBF datasets to conduct our study.

First, we will describe the SSBF datasets. Then, we identify and briefly discuss five studies that employ SSBF datasets.

---

[21] In 1998, this survey was renamed the "Survey of Small Business Finances." Prior to 1998, this survey was known as, the National Survey of Small Business Finances. While the name has changed the survey instrument and methodology remains largely unchanged.

### 3.2.6. Survey of Small Business Finances (SSBF) Data

SSBF datasets are generated approximately every five years. The first SSBF dataset contains information for the year 1987. The latest available dataset covers the year 1998. To date, the SSBF has been co-sponsored by the Board of Governors of the Federal Reserve (the "Federal Reserve") and the U. S. Small Business Administration. Each dataset includes data collected from more than 3,000 firms that were selected to provide a representative sample of the population of small businesses in the U.S. The firms included in the datasets were selected from the population of all for-profit, non-financial, non-farm, business enterprises with fewer than 500 employees that were listed in Dun's Market Identifier file[22] during the relevant study year (Cole and Wolken 1995, pg. 640).

---

[22] The Dun's Market Identifier file, compiled and maintained by Dun and Bradstreet, Inc., contains more than ten million business enterprises and is broadly representative of all business Cole, R. A. and J. D. Wolken (1995). "Financial services used by small businesses: evidence from the 1993 National Survey of Small Business Finances." Federal Reserve Bulletin(July 1995): 629-667..

**Table 4. Description of available SSBF Datasets**

| Description of Available SSBF Datasets: racial/ethnic breakdown of firm owners | | | |
|---|---|---|---|
| **Survey Year/Dataset Title** | **1987/NSSBF (i)** | **1993/NSSBF (ii)** | **1998/SSBF (iii)** |
| **Total # of Observations (a)** | 3,103 | 5,276 | 3,550 |
| **Non-Hispanic White (b)** | 2,968 | 4,045 | 2,790 |
| Hispanic White (b) | N/A (b) | 326 | 243 |
| Hispanic Other (c) | N/A (b) | 43 | 17 |
| **Hispanic, Total (b)** | 41(d) | 369 | 260 |
| **Black (c)** | 45 (d) | 523 | 273 |
| **Asian & Pacific Islander (c)** | 49 (d) | 336 | 214 |
| American Indian & Native Alaskans (c) | (d) | 45 | 24 |
| **Year the dataset became publicly available** | 1991 (e) | 1997 (f) | 2001 |

Sources:
i)      (Cavalluzzo and Cavalluzzo 1998, pp. 775-776)
ii)     (See Table 1 in Cole and Wolken 1995, pg. 632)
iii)    (Derived from Table 2 in Bitler, Robb et al. 2001, pg. 186)

Notes:
(a) The sum of the various racial/ethnic categories of owners does not equal the "Total" because the observations reflected in the row labeled "Hispanic Other" are also included in the amounts shown for "**Black, Asian & Pacific Islander or American Indian & Native Alaskan.**"
(b) Commencing with the 1990 Census, the U.S. Census Bureau considers 'Hispanic' to be an ethnic classification not a racial classification. As a result, there are White Hispanics, Black Hispanics, Asian Hispanics, etc. However, for the purposes of most government activities and agencies (e.g. the Small Business Administration), all Hispanics are considered minorities. Prior to the 1990 Census, "Hispanic" was treated as a racial category.
(c) The observations reflected in the row labeled "**Hispanic Other**" are also included in the amounts shown for "**Black, Asian & Pacific Islander or American Indian & Native Alaskan.**"
(d) These figures represent only male-owned firms. Based on comments regarding the dataset by Cavalluzzo, the author concludes that in the aggregate there are less than ninety minority female-owned businesses in the dataset. Again, based on comments by Cavalluzzo, there are less than thirty firms owned by **American Indian and Native Alaskans** in the dataset (Cavalluzzo and Cavalluzzo 1998).
(e) (See "Available Financial Data Bases for Research on Small Business" in Yazdipour 1991, pg. 172).
(f) Author's determination based on note in a Federal Reserve Bulletin: (See Note 3 in Cole and Wolken 1996, pg. 984). The current version of the Public-Use dataset became available in 1999 and only includes observations for 4,637 firms (U.S. Federal Reserve System 1999, pp. 1-4).

- 39 -

Each of the SSBF dataset contains more than 300 hundred variables that capture the following types of information for each firm:

- Demographic Information on the owner(s)
- Firm Characteristics (e.g. industry, firm age, location, etc.)
- An inventory of the firm's various deposit and savings accounts
- An inventory of the firm's various credit obligations (including credit lines, mortgages, vehicle loans, equipment loans, etc.)
- Characteristics of the firm's financial services suppliers (e.g. type – bank, finance company, etc.)
- Firm's recent experience applying for credit (e.g. number of loan applications and the disposition of those requests)
- Firm's recent experience applying for trade credit
- Data from the Firm's income statement and balance sheet for the relevant study period; and
- Information regarding the recent credit history of the firm and its owner(s) (U.S. Federal Reserve System 1996; U.S. Federal Reserve System 1999; U.S. Federal Reserve System 2002).

In the following pages, we will discuss five studies that employ SSBF datasets. Three of the five studies are representative of the major empirical studies that have tested for evidence of discrimination in credit markets. (Blanchflower, Levine et al. 1998; Bostic and Lampani 1999; Cavalluzzo 2002) The remaining two studies are included because these are the only two empirical studies that this author has found that address (even tangentially) the primary research question of our study (Coleman 2003; Aaronson, Bostic et al. 2004).

The Blanchflower study explores if and how the size of a commercial loan obtained by small businesses varies by the owner's race and/or ethnicity (Blanchflower, Levine et al. 1998, pp. 7-9). Blanchflower *et al.* estimate a regression model for determining the probability of a commercial bank loan being denied[23] (the loan denial rate), after controlling for creditworthiness (Blanchflower, Levine et al. 1998, pg. 1).

The principal research methodology employed by Blanchflower study falls into the "Rejection Rate Analyses" category. Specifically, Blanchflower *et al.* engaged in a sophisticated form of Rejection Rate Analysis that employs binomial probit models (Blanchflower, Levine et al. 1998, pp. 11-12).

The Blanchflower study generated three major findings of interest:

- Blanchflower *et al.* determined that compared with non-minorities, minorities are more likely to have unmet credit needs.

---

[23] Approval rates analyses and *Rejection Rate Analyses* are essentially one and the same: one is the mirror image of the other.

- 40 -

        ❑ After controlling for a number of creditworthiness factors, Blanchflower *et al.* found that there was no statistically significant difference between non-minorities and Hispanics; however, blacks remained much more likely to be denied credit than non-minorities.

        ❑ They also, found that if loans were granted, Blacks paid a higher interest rate compared with non-minority-owned firms.

The strength of this study is that it employs such an extensive set of variables to explore the sources of disparities between minority and non-minority business owners in accessing commercial bank loans; thus, lowering the likelihood of omitted variable bias. That said, critics of the study assert that the lack of a measure of the personal net worth of a firm's owner(s) could result in overestimation of unwarranted disparities between black-owned and non-minority-owned firms. (Avery 1999) These critics raise a legitimate issue. Assessing the owner's personal net worth is typically an integral part of the underwriting process for small business loans, and in omitting this variable, the model used by Blanchflower *et al.* potentially over-estimates the role of discrimination (Cavalluzzo 2002, pg. 3).

Aware of the concerns raised about the Blanchflower study, Cavalluzzo *et al.* (2002) published the result of a study that addressed the perceived weaknesses of the Blanchflower study.

Like Blanchflower study, the Cavalluzzo study explores if and how the amount of commercial loans obtained by small businesses varies by owner's race and/or ethnicity. Cavalluzzo *et al.* estimate a regression model for determining the probability of a commercial bank loan being denied[24] (the loan denial rate), after controlling for creditworthiness (Cavalluzzo 2002, pp. 3-5). However, unlike the Blanchflower study, Cavalluzzo *et al.* included among their independent variables some measures of both the personal net worth and credit history of the firm's owner.

In addition to analyzing the variations in loan denial rates across various racial/ethnic groups, the Cavalluzzo study also tested if credit market concentration impacts any observed disparities in denial rates across racial/ethnic groups (Cavalluzzo 2002, pg. 4). Essentially, Cavalluzzo *et al.* sought to test the relationship between market concentration and the exercise of prejudicial discrimination hypothesized by Becker (1957).

> " The level of bank concentration in the firm's local area is of particular interest because small businesses tend to borrow locally, rather than nationally. It is important therefore to understand more fully the possible implications of high levels of concentration in local banking markets for

---

[24] Approval rates analyses and *Rejection Rate Analyses* are essentially one and the same: one is the mirror image of the other.

- 41 -

[small businesses]. One reason that differences in access to credit across demographic groups could widen with lender concentration comes from Becker (1957), who showed that exercising prejudicial tastes can cut into firm profits. As such, one would expect highly competitive markets to eventually purge discriminatory behavior from the market place. In less competitive markets, however, prejudicial discrimination could be sustained in the long run. By controlling for the level of lender market concentration, we can test for ceteris paribus differences in denial rates [across racial/ethnic groups] according to the level of competition faced by lenders" (Cavalluzzo 2002, pg. 4).

The Cavalluzzo study analyzed observations for 948 firms contained in the 1998 SSBF dataset.[25]  Given that one of the primary objectives of the study is the analysis of loan denial rates, Cavalluzzo *et al.* selected only those firms that had applied for loans within the same three-year period (Cavalluzzo 2002, pg. 6).

The 1998 SSBF dataset differs from the 1987 and the 1993 datasets in one important respect. In addition to the extensive collection of explanatory variables referenced above, the 1998 dataset contains data on the personal net worth of the principal owner of each firm.

The principal research methodology employed by Cavalluzzo study falls into the "Rejection Rate Analyses" category. (*For a detailed description of Rejection Rate Analyses – see pp. 23-26 of this publication.*)  Specifically, Cavalluzzo *et al.* engaged in a sophisticated form of Rejection Rate Analysis that employed binomial logit models.

The Cavalluzzo study generated three major findings.

- ▫ Cavalluzzo *et al.* observed substantial disparities in loan denial rates between non-minority- and minority-owned firms even after controlling for the following: (i) the creditworthiness, credit history and characteristics of the firm; and (ii) the personal net worth, credit history and demographic characteristics of the owner (Cavalluzzo 2002, pp. 11-15).

- ▫ Cavalluzzo *et al.* also found some evidence that lender market concentration can explain some of the observed disparities between non-minority- and African-American-owned firms as Becker[26] would predict. No evidence was found that lender market concentration significantly impacts the observed disparities between non-minority- and Hispanic- and

---

[25] In total, the 1998 SSBF dataset contains observations on 3,550. (see Table 6 on pg. 41 for more details about the composition of the 1998 dataset)

[26] Becker hypothesize that the distinguishing feature of prejudicial discrimination versus statistical discrimination is the willingness to pay something, either directly or in the form of reduced income, to indulge one's taste for discrimination Becker, G. S. (1971). The economics of discrimination. Chicago, University of Chicago..

- 42 -

Case 1:11-cv-01277-GBL-TRJ  Document 62-4  Filed 08/20/12  Page 48 of 73 PageID# 2058

Asian-owned firms (Cavalluzzo 2002, pp. 11-15 and see Table 5 on pg. 31).

□ Cavalluzzo *et al.* observed that including a measure of "*the owner's personal wealth did explain some differences between Hispanic-/Asian-owned businesses and those owned by whites, but almost none for the African-American[-owned firms]*" (Cavalluzzo 2002, pg. 21).

The strength of this study is that it employs such an extensive set of variables to explore the sources of disparities between minority and non-minority business owners in accessing commercial bank loans thus, lowering the likelihood of omitted variable bias. As a result, it is difficult to attribute the observed disparities between non-minority- and minority-owned firms to omitted variable bias.

That said, the study's finding regarding impact of lender market concentration on the observed disparities between non-minority- and minority-owned firms may be open to some question because of the limited number of observations for minority-owned firms.

Like the Cavalluzzo study, the Bostic and Lampani study estimates a regression model for determining the probability of a commercial bank loan being denied[27] (the loan denial rate), after controlling for creditworthiness (Bostic and Lampani 1999, pp. 149-151). This study explores if and how the amount of commercial loans obtained by small businesses varies by owner's race and/or ethnicity. However, unlike the Blanchflower study, Bostic and Lampani included among their independent variables some measures of a firm's local geography. Bostic and Lampani included two types of local geography variables: economic characteristics of the area where a firm is located and, measures of the racial composition of the area where a firm is located (Bostic and Lampani 1999, pg. 155). Bostic and Lampani clearly indicate that one of the primary motivations for their study is to determine if the inclusion of a measure of a firm's local geography will impact observed disparities between various racial/ethnic groups.

Given their interest in the impact of geography on observed disparities in loan denial rates across demographic groups, Bostic and Lampani augmented the 1993 SSBF dataset with economic and demographic data from the 1990 Census and measures of the market structure of various local credit markets obtained from call reports[28].

---

[27] Approval rates analyses and *Rejection Rate Analyses* are essentially one and the same: one is the mirror image of the other.

[28] A Call Report is a quarterly report submitted by commercial banks to various federal and state banking regulators that details the financial condition and performance of a bank and includes, among other things, a breakdown of outstanding loans (segmented by type -- e.g. residential mortgage, automobile loans, etc.).

The principal research methodology employed by Bostic and Lampani study falls into the "*Rejection Rate Analyses*" category. (*For a detailed description of Rejection Rate Analyses – see pp. 23-26 of this publication.*) Specifically, Bostic and Lampani engaged in a sophisticated form of Rejection Rate Analysis that employs binomial logit models (Bostic and Lampani 1999, pp. 158-161).

The four major findings of the Bostic and Lampani study are:

    ❑ Compared with non-minority-owned firms, minority-owned firms, on average, "*have fewer assets, worse credit history, and other features that make them appear more risky to prospective lenders*" (Bostic and Lampani 1999, pg. 161).

    ❑ After controlling for a number of factors (including "*firm, owner, loan and banking market characteristics*"), Bostic and Lampani found that there was no statistically significant difference in loan denial rates between non-minorities and Asians and Hispanics (Bostic and Lampani 1999, pg. 161).

    ❑ However, after controlling for a number of factors (including "*firm, owner, loan and banking market characteristics*"), Bostic and Lampani found that blacks remained much more likely to be denied credit than non-minorities (Bostic and Lampani 1999, pg. 161).

    ❑ Finally, the study's results show that "*considerations of the local geography are important in measuring differences in credit market experiences across firms.*" Bostic and Lampani estimated that the inclusion of various measures of local geography reduced the disparity in the Black-White loan approval rate by approximately 20 percent (Bostic and Lampani 1999, pg. 161).

The virtue of this study is that it identifies and includes a new class of variables (local geography) in loan denial rate analysis. The authors persuasively argue that this class of variable may be a source of the observed disparities in commercial loan approval rates between minority and non-minority business owners thereby, lowering the likelihood of omitted variable bias. That said, given the pervasive residential segregation that characterizes major MSAs throughout the United States, variables that identify and/or characterize various geographical locales may be highly correlated with race (especially so, when considering various differences between blacks and non-minorities) (Massey and Denton 1993). So, one might reasonably speculate that much of the apparent explanatory power of these local geography measures is ultimately attributable to race. In other words, local geography measures may share most of their explanatory power with 'race' variables . . . so, it might be redundant to add them to a loan approval model.

- 44 -

### 3.2.7. Summary of Empirical Research on Discrimination

To summarize this discussion of the empirical research regarding discrimination in credit markets, we can say the following:

Empirical research in this area began in earnest in 1987 when appropriate datasets became widely available to researchers. Much of the empirical research to date has attempted in one way or another to determine if there is any evidence of prejudicial discrimination in various credit markets. From 1987 to the present, a preponderance of the major empirical studies have found significant disparities in access to credit between Blacks and non-minorities. In most instances, the researchers who have found these disparities generally have suggested that the observed disparities are evidence of prejudicial discrimination. In response to those suggestions that prejudicial discrimination is alive and well in various credit markets, the critics of those empirical studies generally have replied that the observed disparities reflect either omitted variables bias or statistical discrimination not prejudicial discrimination.

In the end, this author concludes that it is difficult to dismiss the possibility of prejudicial discrimination after a careful review of the major empirical studies.

### 3.2.8. Prior Research on Trade credit and Discrimination

Now, we will discuss the only two empirical studies that we have found that address (even tangentially) the primary research questions to be addressed by our proposed research (Coleman 2003; Aaronson, Bostic et al. 2004). Our research questions are:

- Is there any disparity in the quantity of trade credit extended to minority-owned firms compared with non-minority-owned firms?
- After controlling for creditworthiness, is there any disparity in the quantity of trade credit extended to minority-owned firms compared with non-minority-owned firms?
- If, in fact, disparities exist after controlling for creditworthiness, have these disparities narrowed over time as Becker would predict?

As was true of the preceding three studies, both of these studies employ SSBF datasets.

Aaronson *et al.* explore if participation by small firms in networks that include potential suppliers impact a firm's access to trade credit.

> "Our study explores the importance of social relationships, including geographic and ethnic ties, for urban, minority small businesses accessing [trade credit]" (Aaronson, Bostic et al. 2004, pg 47).

- 45 -

To address this question, Aaronson *et al.*, in essence, designed, completed and reported the results of two separate empirical studies in one paper (Aaronson, Bostic et al. 2004). Given that the primary study exclusively employed survey data collected in two small neighborhoods in Chicago, Aaronson *et al.* recognized that the findings from the primary study might not be representative of the general population of small businesses across the country (Aaronson, Bostic et al. 2004, pg. 58). To vet that possibility, Aaronson *et al.* completed a secondary study that employed data from the 1993 SSBF dataset. It is this secondary study that is of interest to us.

Among other things, the secondary study includes estimations of regression models for determining either: (i) the number of trade credit supplier that a firm has; or (ii) the percentage of purchases made on account (see Table 4 of Aaronson, Bostic et al. 2004, pg. 60).

To generate the two regressions referenced in the preceding paragraph, Aaronson *et al.* analyzed observations for 2,986 firms contained in the 1993 SSBF dataset.[29] Given that one of the purposes of the study is the analysis of access to and use of trade credit, Aaronson *et al.* selected only those firms that used some trade credit during the survey period.

In total, Aaronson *et al.* estimated eleven different models with eleven different dependent variables, using a variety of estimation techniques. Only two of the eleven regressions directly bear on our research study: models #3 and #5. The dependent variables for those two models are identified in Table 5 below.

Table 5. Trade Credit Regression Models estimated by Aaronson et al.

| Trade Credit Regression Models estimated by Aaronson *et al.* | | | |
|---|---|---|---|
| Regression # | Dependent Variable | Estimation Technique | Sample Size |
| 3 | Ln(number of suppliers on account +1) (i) | WLS (ii) | 2,986 (i) |
| 5 | Percentage of purchases on account (i) | WLS (ii) | 2,986 (i) |

Notes:
(i) Only those with at least $1 of outstanding trade credit were include in this sample.
(ii) WLS is an abbreviation for the Weighted Least Squares (an estimation method). WLS often is employed as a remedy for heteroskedasticity (Studenmund 2001, pp. 362-365).

Source: (The content presented in this Table was derived from Table # 4 in Aaronson, Bostic et al. 2004, pg. 60).

The dependent variable for model #3 is: the natural log of the number of trade credit suppliers that a firm has. The dependent variable for model #5 is: the

---

[29] In total, the 1993 SSBF dataset contains observations for approximately 5,300 firms. (see Table 6 on pg. 41 for more details about the composition of the 1993 dataset)

percentage of purchases made on account (Aaronson, Bostic et al. 2004, see Table 4 pg. 60).

To derive the coefficients for models #3 and # 5, Aaronson *et al.* used the Weighted Least Squares (WLS) estimation method.

Relative to models # 3 and # 5, Aaronson *et al.* report the following two findings:

☐ After controlling for firm size, owner and firm credit history, and industry classification, there was no evidence that there is a statistically significant difference in the use of trade credit between non-minority- and Hispanic-owned firms (Aaronson, Bostic et al. 2004, pg. 61).

☐ After controlling for firm size, owner and firm credit history, and industry classification, there was evidence that there is a statistically significant difference in the use of trade credit between non-minority- and Black-owned firms. Compared with Non-minority-owned firms, Black-owned firms that use trade credit have 10.5 fewer suppliers and make 6.4 percent fewer purchases on account (Aaronson, Bostic et al. 2004, pg. 61).

Clearly, these findings suggest that even after controlling for industry and the creditworthiness of a firm and its owner, access to trade credit may vary with the race/ethnicity of the owner as a result of discrimination and/or other factors. However Aaronson *et al.* did not design their study to determine directly if the quantity of trade credit varies with the race/ethnicity of the owner. Clearly, more research is needed to determine if the quantity of trade credit varies with the race/ethnicity of the owner.

Now, we discuss an empirical study completed by Coleman[30] [2003]. This is the only other empirical study that we have found that addresses in part the primary research questions to be addressed by our study. As was true of the study by Aaronson *et al.*, the Coleman study employs a SSBF dataset.

The Coleman study attempts to identify the characteristics of those firms that are most likely to repay trade credit within the *'discount period'* and of those firms which are most likely to pay late thus incurring late payment penalties. Coleman refers to trade credit repaid within the *'discount period'* as "Free" and trade credit repaid with late payment penalties as "Costly." Using Coleman's parlance, the primary purpose of the study can be restated as follows: to categorize the firms most likely to use **'free'** trade credit and those most likely to use **'costly'** trade credit. Coleman's study compares the usage of trade credit by types of firms (i.e.

---

[30] Susan Coleman is currently an Associate Professor at the Barney School of Business, University of Hartford. She has written numerous articles regarding the development and financing of small, women-owned firms University of Hartford (n.d.). www.hartford.edu, University of Hartford. 2004..

firms owned by non-minority men, non-minority women, black men, Hispanic men or Asian-American men) using data from the 1998 SSBF.

Among other things, the Coleman study includes estimations of regression models for determining if a firm either: (i) has any outstanding trade credit; or, (ii) has been denied trade credit during the period specified by the 1998 SSBF (Coleman 2003, pp. 9-10). Both of these dependent variables are estimated using binomial logit models. Table 6 (below) identifies both the dependent variable and independent variables for these two models estimated by Coleman.

-48-

Table 6. Trade Credit Regression Model estimated by Coleman

| Access to Trade Credit as a function of Firm Owner's Characteristics | | |
|---|---|---|
| **Model** | **A** | **B** |
| **Dependent Variable** ⟹ | Ln (Trade Credit?) 1= yes, firm has some 0 = no, firm has none | Ln (Denied Trade Credit?) 1= Denied Trade Credit 0= Not Denied Trade Credit |
| | Coefficients Coefficients | ents |
| Intercept -1.0193** | | -2.2416** |
| Owner's Age | -0.0154** | -0.0107 |
| Education 0.1109 | | 0.2937 |
| Experience 0.0188** | | -0.0192* |
| Owner: White Women 1= yes; 0 = no | -0.4520** | 0.0073 |
| Owner: Black Men 1= yes; 0 = no | -0.5269** | 0.9517** |
| Owner: Hispanic Men 1= yes; 0 = no | -0.7734** | 0.2236 |
| Owner: Asian Men 1= yes; 0 = no | -0.1552 | -0.1950 |

Notes: * results significant at the 0.05 level  ** results significant at the 0.01 levels
Source: (contents of in this table was derived from Table VI in Coleman 2003, pg. 23)

The regression estimates shown in Table 9 are based on observations for 3,252 firms contained in the 1998 SSBF dataset.[31]  While the overall sample size is large, it contains a relatively small number of firms owned by minority women, therefore, no observations for firms owned by Black, Hispanic, or Asian women were analyzed (Coleman 2003, pg. 4).

Based on analyses of the two models identified in Table 9, Coleman concluded the following:

- ❑ Controlling for various measures of human capital (education, experience and age), firms owned by white women, black men, and Hispanic men were significantly less likely to have trade credit than firms owned by white men (Coleman 2003, pp. 10-11).

- ❑ Controlling for various measures of human capital (education, experience and age), firms owned by black men were significantly more likely to be denied trade credit (Coleman 2003, pp. 10-11).

---

[31] In total, the 1998 SSBF dataset contains observations on 3,550. (see Table 6 on pg. 41 for more details about the composition of the 1998 dataset)

- 49 -

□ Controlling for various measures of human capital (education, experience and age), firms owned by black men were significantly more likely to payoff trade credit late (Coleman 2003, pp. 10-11).

Coleman does not specify and/or discuss a single model that controls for the creditworthiness of both the firm and the owner, and characteristics of the firm as well as owner. As a result, it is impossible to determine from the Coleman study if the observed disparities arise from discrimination and/or other factors. The preceding observation is not meant as a criticism. The Coleman study was not designed to examine discrimination in access to trade credit. The primary objective of the Coleman study is to characterize those firms that are most likely to use 'free' trade credit and those most likely to use '*costly*' trade credit.

Ultimately, the findings of Coleman and Aaronson *et al.* allow for the possibility of discrimination in access to trade credit and make it clear that little is known about how discrimination might impact access to trade credit for minority-owned firms. Our research study begins the process of addressing this gap in the literature directly.

In the next section of this paper, our research methodology and results are presented.

- 50 -

4.    Research Methodology and Results

This study consists of a quantitative analysis of empirical data from the 1993 and 1998 SSBF datasets.

Our study falls into the "Fair Share Analyses" category and required the development of a regression model to estimate the amount of trade credit that a firm will receive after controlling industry and creditworthiness of the firm and owner. The applicable unit of analysis is the firm.

While trade credit is an important source of financing for small businesses, little is known about how discrimination might impact access to trade credit for minority-owned firms.  This study begins the process of addressing this issue by focusing on the following three research questions:

- Is there any disparity in the quantity of trade credit extended to minority-owned firms compared with non-minority-owned firms?
- After controlling for creditworthiness, is there any disparity in the quantity of trade credit extended to firms owned by minorities compared with those owned by non-Hispanic whites?
- If in fact disparities exist after controlling for creditworthiness, have these disparities narrowed over time?

### 4.1. The Data

The study examined data collected via 1993 and 1998 Survey of Small Business Finances (SSBF)[32], co-sponsored by the Federal Reserve Board and the U.S. Small Business Administration.  The main purposes of the SSBF are to provide information on the use of credit by small and minority-owned firms and to create a general-purpose database on the finances of such firms.  The survey was structured to yield sufficient numbers of minority-owned firms to conduct separate analyses of minority- and non-minority-owned small businesses.  Survey datasets are generated approximately every five years, commencing with the year 1987 (U.S. Federal Reserve System 1996; Haggerty, Grigorian et al. 2001). The latest available dataset contains observations for the year 1998.  Table 7 on page 52 provides a breakdown of the racial/ethnic composition of the 1993 and 1998 SSBF datasets.

---

[32] Formally, the two datasets are entitled the 1993 National Survey of Small Business Finances and the1998 Survey of Small Business Finances.  In this document, for ease of exposition, we refer to the two datasets as the 1993 SSBF dataset and the 1998 SSBF dataset.

**Table 7. Description of the 1993 & 1998 SSBF Datasets**

| Description of the 1993 & 1998 SSBF Datasets (racial/ethnic breakdown of firm owners) | | | |
|---|---|---|---|
| | Survey Year/Dataset Title | 1993/NSSBF (1) | 1998/SSBF (2) |
| | Total # of Observations (a) | 5,276 | 3,550 |
| Ethnicity of Owners | Non-Hispanic White (b) | 4,045 | 2,790 |
| | Hispanic White (b) | 326 | 243 |
| | Hispanic Other (c) | 43 | 17 |
| | Hispanic, Total (b) | 369 | 260 |
| | Black (c) | 523 | 273 |
| | Asian & Pacific Islander (c) | 336 | 214 |
| | American Indian & Native Alaskans (c) | 45 | 24 |
| | Year the dataset became publicly available | 1997 (d) | 2001 |

Sources:
1)  (See Table 1 in Cole and Wolken 1995, pg. 632)
2)  (Derived from Table 2 in Bitler, Robb et al. 2001, pg. 186)

Notes:
(a) The sum of the various racial/ethnic categories of owners do not equal the "Total" because the observations reflected in the row labeled "Hispanic Other" are also included in the amounts shown for **"Black, Asian & Pacific Islander or American Indian & Native Alaskan."**
(b) Commencing with the 1990 Census, the U.S. Census Bureau considers 'Hispanic' to be an ethnic classification not a racial classification.  As a result, there are White Hispanics, Black Hispanics, Asian Hispanics, etc.  However, for the purposes of most government activities and agencies (e.g. the Small Business Administration), all Hispanics are considered minorities.  Prior to the 1990 Census, "Hispanic" was treated as a racial category.
(c) The observations reflected in the row labeled "Hispanic Other" are also included in the amounts shown for **"Black, Asian & Pacific Islander or American Indian & Native Alaskan."**
(d) Author's determination based on a note in a Federal Reserve Bulletin: (See Note 3 in Cole and Wolken 1996, pg.984).  The current version of the Public-Use dataset became available in 1999 and only includes observations for 4,637 firms (U.S. Federal Reserve System 1999, pp. 1-4).

The 1993 SSBF dataset includes information from approximately 5,300[33] completed interviews of a random sample of small businesses, with stratification by firm size, location (urban or rural), and geographic region of the country.

---

[33] A little more than fifty percent of the firms contacted responded  U.S. Federal Reserve System (1996). National Survey of Small Business Finances: Methodology Report. Washington, Board of Governors of the Federal Reserve System: 113..

Included among the approximately 5,300 completed surveys are responses from 523 African-American-owned firms, 336 Asian-American-owned firms, and 369 Hispanic-owned firms. The survey drew its sample from the population of all for-profit, non-financial, non-farm business enterprises that were listed in Dun's Market Identifier (DMI) file and that were in operation as of year-end 1992 with fewer than 500 employees.[34] More than 14,000 firms were contacted, of which about 10,200 met the definition of small business as used in this study.

The 1998 SSBF dataset includes information from approximately 3,550[35] completed interviews. Included among those completed surveys are responses from 273 African-American-owned firms, 214 Asian-American-owned firms, and 260 Hispanic-owned firms (Bitler, Robb et al. 2001, pp. 185-187).

The data in both datasets are organized into four partitions:

**Main Partition:**
While this partition consists primarily of non-minority-owned firms, it does include minority firms. As a result, it is referred to as the "Main Partition" as opposed to the "White Partition."

This partition includes 90 sampling strata defined by:
- ✓ 9 Census Regions
- ✓ Urban/Rural Businesses (2 groups)
- ✓ 5 Size Groups (1-19, 20-49, 50-99, 100-499 employees, and Unknown)

**African-American Partition:**

This partition contains two sampling strata: Urban/Rural Businesses.

**Asian-American Partition:**

This partition contains two sampling strata: Urban/Rural Businesses.

**Hispanic Partition:**

This partition contains two sampling strata: Urban/Rural Businesses.

---

[34] Dun's Marketing Service, Dun and Bradstreet, Inc. The DMI list, containing nearly 10 million businesses, is broadly representative of all businesses but does not include many of the newest start-up firms or the self-employed individuals filing business tax returns. In contrast, the Internal Revenue Service reports that for 1991 about 20 million individuals filed business tax returns, including about 13 million sole proprietorships, of which about 3 million reported less than $2,500 in annual receipts.

[35] Approximately 33% of the firms contacted responded Bitler, M. P., A. M. Robb, et al. (2001). Financial services used by small businesses: evidence from the 1998 Survey of Small Business Finances, Board of Governors of the Federal Reserve System. 2002..

A firm was classified as being owned by individuals of a specific race, ethnic group, or sex if more than 50 percent of the ownership shares belonged to such individuals during the survey period.

The SSBF datasets include information on the availability and use of credit by small and minority-owned businesses. Both datasets provide detailed information on the types and sources of financial services used by small businesses, with emphasis on the use of credit. The SSBF datasets also contain information regarding each firm's employment, assets, liabilities, equity, income and expenses; firm characteristics, including location, organizational form, and age; and demographic characteristics of each firm's primary owner, including sex, age, education, experience, ethnicity, and race.

For both the 1993 and 1998 datasets, business size is measured in three ways. For the 1993 dataset, the average number of full-time-equivalent employees for 1993, revenues for fiscal year (FY) 1992, and year-end FY 1992 total assets. The employment size of the vast majority of firms in the population of small businesses is near the bottom of the 0–499 range. For 1993 dataset, nearly 70 percent of firms employed fewer than five full-time-equivalent workers and only 3 percent had more than fifty. For the 1998 dataset, the frequency distribution for this variable is similar.

For the 1993 dataset, size in terms of sales and assets reveals a similar skew in distribution. For example, more than half of the firms reported revenues of less than $250,000, whereas fewer than 5 percent had annual revenues in excess of $5 million. For the 1998 dataset, the frequency distribution for this variable is similar.

A business can be organized as a corporation (C-type or S-type), a proprietorship, or a partnership. For the 1993 dataset, most small businesses were organized as sole proprietorships. Sole proprietorships accounted for more than 40 percent of firms. About 30 percent were organized as "C" corporations, 20 percent as "S" corporations, and the remainder as partnerships (Cole and Wolken 1995, pg. 631). For the 1998 dataset, the proportion of firms that were organized as sole proprietorships was even higher. Sole proprietorships accounted for approximately half of firms; "C" corporations accounted for about 24 percent; "S" corporations accounted for 20 percent; and, the remainder were organized as partnerships (Bitler, Robb et al. 2001, pg.185).

Firms were classified by industry using Standard Industrial Classification (SIC) system. For the 1993 dataset, the majority of firms (60 percent) were distributed among the business services, retail trade, and professional services industries. Only about ten percent were in manufacturing or transportation industries. (Cole and Wolken 1995, pg. 632) The distribution of firms by industry was similar for the 1998 dataset (Bitler, Robb et al. 2001, pg. 186).

- 54 -

For both the 1993 and 1998 datasets, firms less than five years old (that is, whose current ownership had been in place less than five years) accounted for about 15 percent of the sample, as did firms twenty-five years old or older. More than one-quarter of all firms were between five and ten years old, and the mean value was 14.5 years (Cole and Wolken 1995, pg. 632; Bitler, Robb et al. 2001, pg. 186).

For both the 1993 and 1998 datasets, about 80 percent of all small businesses were located in urban areas, with approximately 90 percent having a single office and an owner-manager. Fewer than one in ten small businesses reported export sales (Cole and Wolken 1995, pg. 632; Bitler, Robb et al. 2001, pg. 186).

### 4.2. Our Study Sample

The samples that we used to address our research questions were drawn from the SSBF datasets; however, they did not use all of the observations contained in the SSBF dataset.   For example, the 1998 SSBF dataset contains 3,561 observations, and our 1998 study sample includes observations for 1,072 firms.  Observations for firms in the following industries were excluded from our study sample: service; FIRE (financial services, insurance and real estate); and, mining.  Firms in these three industries were excluded because on average the compositions of their balance sheets differ significantly from those included in our sample.  The study sample also only included observations for firms that majority-owned by males.  The 1998 SSBF dataset only include observations for a small number of firms majority-owned by minority women.  So, to eliminate any possible influence of gender discrimination on any research findings, firms owned by women were excluded from our study sample.  Finally, our study sample only includes firms that sought trade credit during the 1998 to ensure that any observed disparity did not result from demand-side differences[36].  Ultimately, the study sample consists of 1,072 observations for firms majority-owned by males active in one of the following five industries: construction, manufacturing, retail, transportation and wholesale.

### 4.3. Methodology and Model

---

[36] The 1998 SSBF dataset includes responses to the following the question: "**Did the firm purchase any goods or services on account during 1998 rather than pay for the purchase before or at the time of delivery?**" U.S. Federal Reserve System (2002). Codebook for 1998 National Survey of Small Business Finances (SSBF). Washington, Board of Governors of the Federal Reserve System: 147..  See Appendix A for a complete list of all variables employed by this study.  We recognize that excluding firms that were unsuccessful in obtaining any trade credit in 1998 potentially underestimating the full impact of discrimination; however, this is preferable to incorrectly attributing to discrimination disparities that result from minority-owned firms that did not request any trade credit during 1998.

With access to the SSBF data, we developed a model that allowed us to address the primary research question: "*Is there empirical evidence of racial discrimination in the extension of trade credit?*"

To address this question, a measure of amount of trade credit provided to a firm that was sensitive to variation in the size of firms was needed. Our model uses **TC_PCT** as the primary measure of the quantity of trade credit provided. **TC_PCT** measures the percentage of all of a firm's purchases made with trade credit. For example, if a firm was granted trade credit for all of its purchases, **TC_PCT** would equal 100% and if a firm was never granted trade credit, **TC_PCT** would equal 0%. The dependent variable (**High_TC-use**) used in our model is a dummy variable that identifies those firms whose use of trade credit (as measured by **TC_PCT**) equals or exceeds the median value for non-Hispanic white men. Consistent with prior research, we control for firm creditworthiness, industrial classification, owner's human capital and/or owner's creditworthiness.

To identify the appropriate independent variables for this model, two separate bodies of research were reviewed.

The first of these two bodies of research seeks to identify the factors that determine who receives trade credit (Emery 1984; Walker 1985; Chant and Walker 1988; Elliehausen and Wolken 1993; Peterson and Rajan 1997; Ng, Smith et al. 1999; Wilson 2002). The second body of research seeks to determine if there is evidence of racial and/or gender discrimination in various credit markets (e.g. mortgage loans, consumer loans, etc.) (Becker 1971; Peterson and Peterson 1981; Handy and Swinton 1984; Ando 1988; Elliehausen and Lawrence 1990; Bates 1993; Dymski 1995; Munnell, Tootell et al. 1996; Bates 1997; Bates 1997; Kijakazi 1997; Blanchflower, Levine et al. 1998; Bostic and Lampani 1999; Immergluck 1999; Coleman 2000; Han 2001; Squires and O'Connor 2001; Cavalluzzo 2002).

Based on a review of these two bodies of literature, a model was developed that allowed us to address the basic research question.

A logistic regression model was crafted having the following form:

$$High\_TC\_use_i = \beta_0 + \beta_1 SIC\_C_i + \beta_2 SIC\_R_i + \beta_3 SIC\_T_i + \beta_4 SIC\_W_i + \beta_5 ORG_i$$
$$+ \beta_6 Ln\_tot\_ast\_1_i + \beta_7 Ln\_F\_age\_2_i + \beta_8 SLOPAY\_3_i + \beta_9 \exp + \beta_{10} aa\_own_i$$
$$+ \beta_{11} lat\_own_i + \beta_{12} asia\_own_i + \beta_{13} other\_race_i + \varepsilon_i$$

Logistic regression was used because the dependent variable (**High_TC_use**) is a dummy variable that identifies those firms whose use of trade credit is 'high' or 'low.' Specifically, the dependent variable (**High_TC-use**) identifies those firms whose use of trade credit (as measured by **TC_PCT**) equals or exceeds the median value for non-Hispanic white men.

- 56 -

JA0146

Industry dummies are included in the model because prior research clearly demonstrates that terms and quantity of trade supplied vary significantly from industry to industry (Ng, Smith et al. 1999, pp. 1117-1119). That said, within an industry, trade credit terms are generally quite uniform. Typically, suppliers address variations in creditworthiness of their customers by vary the quantity of trade credit provided rather the terms (Chant and Walker 1988, pg. 864; Ng, Smith et al. 1999, pp. 1117-1119). The base/reference industry is manufacturing for this model, therefore the coefficients for the other industry dummies indicate whether firms in that industry receive more or less trade credit than a manufacturing firm, ceteris paribus. The model includes dummies for the following industries: construction, retail, transportation and wholesale. It should be noted that the study sample excludes observations for the following industries: service; FIRE (financial services, insurance and real estate); and, mining. Firms in these three industries were excluded because on average the compositions of their balance sheets differ significantly from those included in our sample.

ORG, a dummy variable that identifies those firms set up as corporations or other limited liability entities, is included in our model because Petersen and Rajan (1997, pg. 679) have demonstrated that this a significant determinant of the amount of trade credit provided to small firms. While no consensus exists on why firms organized as corporations and/or other limited liability entities are provided more trade credit on average than those organized as proprietorships and partnerships, several researchers suggest that the limited liabilities entities as a group may be more perceived by suppliers as more 'sophisticated' and 'established' (Walker 1985, pg. 38; Coleman 2003, pg. 11).

Variables (Ln_tot-ast_1 and Ln_F_age_2) that account for variation in a firm's total assets and age are included in our model as measures of a firm's creditworthiness. The size of a firm (as measured by sales and total assets) is an important factor in assessing the firm's creditworthiness. Prior research provides evidence that both total assets and firm age are significant determinants of the amount of trade credit provided to small firms (Walker 1985, pg. 38; Peterson and Rajan 1997, pp. 678-679). The preference for older firms is supported by evidence that a firm likelihood of failure drops with each passing year of operation (see Bates' chapter, Financing Capital Structure and Small Business Viability, in Yazdipour 1991, pp. 63-77).

The model also includes measures of the owner's human capital (exp) and creditworthiness (SLOPAY_3). Aaronson et al. (2004, pp. 46-48) suggest that as owners spend more time working in an industry and/or market, he or she may develop social capital with suppliers that increases their access to trade credit, ceteris paribus. Cavaluzzo and Wolken (Cavalluzzo 2002) clearly demonstrate that the creditworthiness of firm owners is a significant determinant of whether small firms can obtain bank financing. It seems reasonable that suppliers of trade credit also might conclude that the creditworthiness of the owner of a small firm should be a factor in their decision to provide trade credit to that firm.

- 57 -

Finally, the model includes four race dummies to identify firms owned by African-Americans, Hispanic whites, Asian-Americans and other minorities, respectively: **aa_own, lat_own, asia_own** and **other_race.** The base/reference group is non-Hispanic whites, therefore the coefficients for these race/ethnicity dummies indicate whether firms owned by that group receive more or less trade credit than non-Hispanic whites, ceteris paribus.

## 4.4. Variables of Interests

While the 1993 and 1998 SSBF datasets were not specifically designed to address this study's central research question, they both contain detailed information on firm and owner characteristics required to address this question. The firm characteristics include the industrial classification, the firm's age, measures of creditworthiness, information about the quantity, the nature and sources of the funds that capitalize a firm. Owner data includes gender, ethnicity/race, management experience, education and past financial problems.

Several of the questions in both the 1993 and 1998 SSBF address a firm's use of trade credit, including:

- Did the firm purchase any goods or services on account last year?
- Has any supplier that offers trade credit denied a request by your firm?
- From how many suppliers did the firm make purchases on account during 1993 or 1998?
- What percentage of purchases was made on account in 1993 or 1998?
- What portion of suppliers offered cash discounts for prompt payment?
- What portion of the cash discount offered did the firm take advantage of?
- What portion of payments on account was made after the due date in 1993 or 1998?

On page 59, Table 8 lists most of the variables to be used in this study. Some of the variables shown on the next page are those used in the SSBF datasets and others variables were derived for this study using one or more of the variables contained in the SSBF datasets. (Appendix A contains a complete list of the variables used in this study and also identifies the corresponding variable names for the 1993 and 1998 SSBF datasets)

- 58 -

Case 1:11-cv-01277-GBL-TRJ   Document 24-4   Filed 03/23/12   Page 64 of 78 PageID# 680

Table 8. An Abridged Variable Dictionary

| Type | Variable Name | Variable Description/Definition | Row |
|---|---|---|---|
| **An Abridged Variable Dictionary (a)** | | | |
| Dependent Variable | TC_High_use | Identifies those firms whose use of trade credit (as measured by TC_PCT) equals or exceeds the median value for non-Hispanic white men (dummy) | 1 |
| | TC_PCT | Measures the percentage of all of a firm's purchases made with trade credit. | 2 |
| Owner's Race | aa_own | Identifies firms owned by African-Americans (dummy) | 3 |
| | lat_own | Identifies firms owned by Hispanic whites (dummy) | 4 |
| | asia_own | Identifies firms owned by Asian-American (dummy) | 5 |
| | non_min_own | Identifies firms owned by non-Hispanic whites (dummy) | 6 |
| Owner Characteristics | exp | Owner's management experience (measured in years) | 7 |
| | SLOPAY_3 | Identifies # of an Owner with three or more personal accounts that were 60 days or more past due within the past 3 years (dummy) | 8 |
| Industry and Firm Info | SIC_C | Identifies firms engaged in Construction (dummy) | 9 |
| | SIC_Mfg | Identifies firms engaged in Manufacturing (dummy) | 10 |
| | SIC_R | Identifies firms engaged in Retail (dummy) | 11 |
| | SIC_T | Identifies firms engaged in Transportation (dummy) | 12 |
| | SIC_W | Identifies firms engaged in Wholesale  (dummy) | 13 |
| | ORG | Identifies corporations and other limited liability entities (dummy) | 14 |
| Firm's Creditworthiness Variables | F_age | Years since firm was started/purchased/acquired by current management | 15 |
| | Ln_F_age_2 | Ln (F_age squared) | 16 |
| | tot_ast | Total Assets at fiscal year-end 1998 | 17 |
| | tot_ast_1 | Total Assets at fiscal year-end 1998 (excluding firms with negative values which not indicative of going concerns) | 18 |
| | Ln_tot_ast_1 | Ln(tot_ast_1) | 19 |
| (a)  This is table contains most the variables that will be used to conduct this study. For a more complete list see Appendix A. | | | |

## 4.5. Descriptive Statistics

The first of our three research questions asks, '*Is there any disparity in the quantity of trade credit extended to minority-owned firms compared with those*

*owned by non-Hispanic whites?*' To address that question, we looked at the use of trade credit by firms owned by non-Hispanic white, African-Americans, Hispanic whites and Asian-Americans, respectively, to determine if there were any statistically significant differences in their levels of use. In other words, we determined the mean value of the dependent variable (**TC_High_use**) and a few other measures of trade credit use and tested for any statistically significant differences in the values for firms owned by African-Americans, Hispanic whites and Asian-Americans relative to those owned by non-Hispanic whites.

Similarly, we also calculated the mean values for the various independent variables that were used to assess a firm's creditworthiness, industry classification, owner's creditworthiness or owner's human capital. And, for each of these independent variables, we tested for any statistically significant differences in the values for firms owned by African-Americans, Hispanic whites and Asian-Americans relative to those owned by non-Hispanic whites.

For expositional ease, the variables are grouped into four categories: firm characteristics; industrial classifications; owner's characteristics; and, use of trade credit.

### 4.5.1. Firm Characteristics

Table X reveals that the firms owned by non-Hispanic white men are significantly larger than those owned by minorities as measured by sales or total assets. These disparities are of interest because size is a primary indicator of creditworthiness and therefore a principal determinant of if and how much trade credit a firm will receive. The sales of firms owned by Hispanic white men and African-American men average approximately one-third of those of non-Hispanic white men. Similarly, the total assets of firms owned by Hispanic white men and African-American men average approximately one-fourth of those of non-Hispanic white men. Comparing firms owned by Asian-Americans with those owned by non-Hispanic whites, no statistically significant differences were observed for either sales or total assets.

### 4.5.2. Industrial Classifications and Organizational form

Only a few noteworthy differences were observed relative to the distribution of firms across industrial classifications. Firms owned by Hispanic men or Asian-American men were significantly less likely to be involved in the construction field than those owned by non-Hispanic white men. Whereas, firms owned by African-Americans were significantly less likely to be wholesalers than those owned by non-Hispanic whites.

- 60 -

### 4.5.3. Owner Characteristics

One measure of human capital is years of management experience (exp). No significant differences were observed in the level of management experience between non-Hispanic whites, African-Americans and Hispanic whites. However, on average non-Hispanic whites had almost twice as much management experience as Asian-Americans.

One measure of an owner's creditworthiness is their payment history relative to their personal debts. The variable SLOPAY_3 identifies those owners who have been late (60 days or more) on three or more personal obligations. Using this measure, no significant differences were observed in the level of creditworthiness between non-Hispanic whites, African-Americans and Hispanic whites. However, on average non-Hispanic whites were ten times more likely to be delinquent on their debts than Asian-Americans.

### 4.5.4. Use of Trade Credit

Table X we report the mean values for two variables: TC_PCT and High_TC_yes. TC_PCT measures the percentage of all of a firm's purchases made with trade credit. For example, if a firm was granted trade credit for all of its purchases, TC_PCT would equal 100% and if a firm was never granted trade credit, TC_PCT would equal 0%. As measured by TC_PCT, firms owned non-Hispanic white men were granted trade credit for a significantly higher percentage of their purchases than those owned by either African-American men, Hispanic white men or Asian-American men. The variable High_TC-use is a dummy variable that identifies those firms whose use of trade credit (as measured by TC_PCT) equals or exceeds the median value for non-Hispanic white men. As measured by High_TC-use, the use of trade credit by firms owned African-American men did not differ significantly from those owned by non-Hispanic white men. However, significant differences were observed for firms owned by Hispanic white men and Asian-American men relative to those owned by non-Hispanic white men. Using High_TC_use as a measure, the use of trade credit by non-Hispanic white men was roughly twice that observed for firms owned by either Hispanic white men or Asian-American men.

The finding that firms owned by Asian-American men received significantly less trade credit (as measured by TC_PCT and High_TC_use) than those owned by non-Hispanic white men is noteworthy because many scholars suggest that Asian-Americans do not experience difficulties in accessing credit comparable to those experienced by other minorities (Chen and Cole 1988; Bates 1989, pp. 25-42; Bates 1993; Bates 1993; Bates 1997; Christopher 1998).

To summarize, we observed that there were some significant differences in access to trade credit for firms owned by minorities compared with those owned

by non-Hispanic white men. We also observed that firms owned by non-Hispanic white men were larger (as measured by sales or total assets) than those owned by either African-American men or Hispanic white men. However, no significant differences in size were observed between firms owned by non-Hispanic white men and Asian-American men. Turning to industrial classifications, we observed some significant differences in the level of participation in various industries by firms owned by African-American men, Hispanic white men and Asian-American men relative to those owned by non-Hispanic white men. Continuing we observed that non-Hispanic men had significantly more business experience than either Hispanic white men or Asian-American men. However, no significant differences in management experience were observed between firms owned by non-Hispanic white men and African-American men. Turning to owner's creditworthiness, no significant differences were observed between non-Hispanic white men and African-American men or Hispanic white men. In contrast, Asian-American men were found to be significantly more creditworthy than non-Hispanic white men as measured by **SLOPAY_3.**

This review of the descriptive statistics for access to trade credit provides an answer to first of our three research questions: *'Is there any disparity in the quantity of trade credit extended to minority-owned firms compared with those owned by non-Hispanic whites?'* Clearly, the answer is 'yes.'

So this brings us to the second research question: *'After controlling for creditworthiness and other salient factors, is there any disparity in the quantity of trade credit extended to firms owned by minorities compared with those owned by non-Hispanic whites?'*

In the next section, we will discuss the model used to test for differences in access to trade credit between firms owned by non-Hispanic whites men and those owned by either African-American men, Hispanic white men and Asian-American men after controlling for firm creditworthiness, industrial classification, owner's human capital and/or owner's creditworthiness.


### 4.6. Hypotheses

Our second research question can be formally stated as a hypothesis. Prior to doing so, it would be helpful to revisit the model that we developed. A logistic regression model was crafted having the following form:

$$High\_TC\_use_i = \beta_0 + \beta_1 SIC\_C_i + \beta_2 SIC\_R_i + \beta_3 SIC\_T_i + \beta_4 SIC\_W_i + \beta_5 ORG_i$$
$$+ \beta_6 Ln\_tot\_ast\_1_i + \beta_7 Ln\_F\_age\_2_i + \beta_8 SLOPAY\_3_i + \beta_9 \exp + \beta_{10} aa\_own_i$$
$$+ \beta_{11} lat\_own_i + \beta_{12} asia\_own_i + \beta_{13} other\_race_i + \varepsilon_i$$

Logistic regression was used because the dependent variable (**High_TC_use**) is a dummy variable that identifies those firms whose use of trade credit is 'high' or

- 62 -

'low.' Specifically, the dependent variable (**High_TC-use**) identifies those firms whose use of trade credit (as measured by **TC_PCT**) equals or exceeds the median value for non-Hispanic white men.

Stated formally, we tested the following hypothesis, for firms owned by African-Americans:

$$H_0 : \beta_{10} \geq 0$$
$$H_A : \beta_{10} < 0$$

And, we tested the following hypothesis for firms owned by Hispanic whites:

$$H_0 : \beta_{11} \geq 0$$
$$H_A : \beta_{11} < 0$$

And, we tested the following hypothesis for firms owned by Asian-Americans:

$$H_0 : \beta_{12} \geq 0$$
$$H_A : \beta_{12} < 0$$

In the next section, we report the findings of our analysis.

- 63 -

## 4.7. Empirical Results

The results of our analysis of factors influencing the quantity of trade credit
provided to a firm is outline in Table 9. All of the reported coefficients carry the
expect signs that prior research would suggest.

**Table 9. Logistic Regression: Estimates of Trade Credit Use**

| Independent Variables | Coefficient | Wald Statistic | Significance p value | EXP (B) |
|---|---|---|---|---|
| Dependent Variable: TC_High_use (a dummy variable that identifies those firms whose use of trade credit (as measured by TC_PCT) equals or exceed s the m edian valu e for n on-Hispanic white men) | | | | |
| Industry | | | | |
| SIC_C | 0.684** | 12.863 | .000 | 1.981 |
| SIC_R -0.214 | | 1.345 | .246 | 0.807 |
| SIC_T -0.491 | | 2.367 | .124 | 0.612 |
| SIC_W | 0.620** | 8.055 | .005 | 1.859 |
| Organizational Form | | | | |
| ORG | 0.340* | 5.651 | .017 | 1.405 |
| Firm Creditworthiness | | | | |
| Ln_tot_ast_1 | 0.078* | 5.756 | .016 | 1.081 |
| Ln_F_age_2 | 0.119* | 4.917 | .027 | 1.126 |
| Owner's Characteristics | | | | |
| Exp | 0.015* | 4.097 | .043 | 1.015 |
| SLOPAY_3 -0.290 | | 1.104 | .293 | 0.748 |
| Race/Ethnicity of Owner | | | | |
| aa_own -0.503 | | 1.495 | .221 | 0.605 |
| lat_own -0.706 | | 3.667 | .055 | 0.494 |
| asia_own -0.811* | | 3.868 | .049 | 0.444 |
| Other_race -1.220* | | 4.826 | .028 | 0.295 |
| Constant -1.868 | | 18.274 | .000 | 0.155 |

N = 1,072

\* differences from Non-Hispanic, White men significant at the .05 level

\*\* differences from Non-Hispanic, White men significant at the .01 level

The coefficient for ORG (which identifies firms organized as corporations or other
limited liability entities) is positive and significant.

The coefficients associated with both of the measures of firm creditworthiness
(Ln_tot_ast_1 and Ln_F_age_2) are positive and significant.

- 64 -

JA0154

The coefficient associate exp (owner's management experience in years) is positive and significant.

While the coefficient associate SLOPAY_3 (a measure of a owner's creditworthiness) is positive, it is not significant the 5% level.

The primary purpose of this study was determined if race/ethnicity significantly influences the amount of trade credit provided to a firm, ceteris paribus. The results are mixed and not completely consistent with prior research.

While the coefficient for aa_own (which identifies firms owned by African-Americans) is negative as prior research would suggest, it is not significant.

The same can be said of lat_own. While the coefficient for lat_own (which identifies firms owned by Hispanic whites) is negative as prior research would suggest, it also is not significant.

Interestingly, the coefficient associated with asia_own offer strong evidence of that firms owned by Asian-Americans received less trade credit those owned by non-Hispanic whites, ceteris paribus. The coefficient associated with asia_own is negative and significant.

The finding that firms owned by Asian-American men received significantly less trade credit than those owned by non-Hispanic white men is noteworthy because many scholars suggest that Asian-Americans do not experience difficulties in accessing credit comparable to those experienced by other minorities (Chen and Cole 1988; Bates 1989, pp. 25-42; Bates 1993; Bates 1993; Bates 1997; Christopher 1998).

To quantify the disparity, we calculated the mean probability of being provided a 'high' level of trade credit for firms owned by non-Hispanic white men and Asian-American men[37]. The probability of being provided a high level of trade credit for non-Hispanic white men is 62%. For firms owned by Asian-Americans, the probability of being provided a high level of trade credit is 32%

One way to quantity the portion of the disparity directly attributable to the race/ethnicity of the owner is to calculate the probability of being provided a 'high' level of trade credit for firms owned by Asian-American men if the mean values of those firms were identical to those of non-Hispanic white men. When we do that the probability for firms owned by Asian-American men rises from 32% to 42%; however, it still falls well below the 62% probability rate for firms owned by non-Hispanic white men.

---

[37] To calculate these values, the mean values for each group were plugged into the logistic regression model and the reported probabilities for the dependent variable (TC_High_use) are the end result of that exercise.

- 65 -

At the onset of this study, a third research question was posed: *'If in fact disparities in the amounts of trade credit provided to firms owned by minorities versus those owned by non-Hispanic whites did exist in 1998, ceteris paribus, have these disparities narrowed over time?'* To address this third questions, we had proposed to analyze the 1993 SSBF dataset with the same model that we used to analyze the 1998 SSBF dataset and determine if there were any statistically significant disparities in the quantity of trade credit extended in 1993 to firms owned by minorities compared with those owned by non-Hispanic whites. If so, we could address the third research question: *'Did the disparities in the amounts of trade credit provided to firms owned by minorities versus those owned by non-Hispanic whites narrow during the period from 1993 to 1998?*

Our analysis of the 1998 study sample did not reveal any statistically significant disparity in the provision of trade credit to firms owned by either African-American men or Hispanic white men compared with firms owned by non-Hispanic white men, ceteris paribus. So, for these two groups, the third research question cannot be addressed.

Our analysis of the 1998 study sample does reveal a statistically significant disparity in the provision of trade credit to firms owned by Asian-American men compared with firms owned by non-Hispanic white men, ceteris paribus. So for this group, the third research question should be addressed. Unfortunately, our study design did not anticipate this finding and we did not include observations for firms owned by Asian-Americans in the 1993 study sample. So, this analysis must be deferred.

- 66 -

Appeal: 13-1982      Doc: 14-1      Filed: 10/21/2013      Pg: 173 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 67-4   Filed 08/03/12   Page 71 of 77   PageID# 1981
Case 1:11-cv-01277-GBL-TRJ   Document 77-3   Filed 08/20/12   Page 72 of 78   PageID 2082

## 5. Conclusions

Our examination of various descriptive statistics that measure access to trade credit clearly demonstrates that on average firms owned by minorities receive less trade credit than those owned by non-Hispanic white men.  Our analysis also indicates that most if not all of the observed disparities for firms owned by African-Americans and Hispanic whites compared with those owned non-Hispanic whites can be attributed to differences in either firm creditworthiness, owner's human capital and/or distribution by industry.  For firms owned by Asian-Americans, this is not the case.  Significant disparities in access to trade credit remain after controlling for firm creditworthiness, owner's human capital and distribution by industry for firms owned by Asian-American men compared with those owned non-Hispanic white men

But does the evidence suggest that prejudicial discrimination is the cause of the observed disparities.  While our findings are consistent with the existence of prejudicial behavior, other factors may also explain these findings.  For example, the Asian-American business community may include a significant percentage of owners for whom English is not their first language.  If so, the associated language barriers may retard the development of relationships with some suppliers who are non-Hispanic whites, and thereby limit access to trade credit for firms owned by Asian-Americans.  The preceding comment is pure speculation and the SSBF datasets do not contain any observations regarding the language skills of firm owners.  However, this armchair exercise does illustrate that there may be other explanations that account for these findings.  Clearly, more research is required.

Like all empirical research, this study has some limitations.  One of these limitations involves sample selection.  We estimated a model using data that included observations for firms in five different industries.  Prior research clearly demonstrates that terms and quantity of trade supplied vary significantly from industry to industry (Ng, Smith et al. 1999, pp. 1117-1119).  That said, within an industry, trade credit terms are generally quite uniform.  Typically, suppliers address variations in creditworthiness of their customers by vary the quantity of trade credit provided rather the terms (Chant and Walker 1988, pg. 864; Ng, Smith et al. 1999, pp. 1117-1119).  This suggests that it would be preferable to estimate models for each industry separately because the coefficients associated with various model variables (e.g. measure of firm creditworthiness) might differ significantly from industry to industry.  Unfortunately, the SSBF datasets do not contain sufficient numbers of observations for minority-owned firms to allow one to safely infer much about the population of minority-owned businesses for most industries.  If and when appropriate datasets are available, industry specific samples clearly would be preferable.

Some readers of our findings might have an additional concern about the sample used to complete this study. The sample analyzed only includes firms that had successfully obtained at least one dollar of trade credit in 1998. The sample excluded firms that may have sought trade credit in 1998 and received none; thereby, potentially underestimating the full impact of discrimination. So, our findings must be viewed in that light.

In sum, our findings must be interpreted with some cautions given the limitations outlined. That said, our findings are consistent with the existence of prejudicial behavior and make it difficult to dismiss this possibility for now.

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 175 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 62-4   Filed 08/03/12   Page 73 of 77 PageID# 1383
Case 1:11-cv-01277-GBL-TRJ   Document 77-3   Filed 08/20/12   Page 74 of 78   PageID 2064

References:

Aaronson, D., R. W. Bostic, et al. (2004). "Supplier relationships and small business use of trade credit." Journal of Urban Economics 55(1): 46-67.

Alchian, A. A. and R. A. Kessel (1960). Competition, Monopoly, and the Pursuit of Money. Aspects of Labor Economics: a conference of the Universities-National Bureau Committee for Economic Research. N. B. o. E. Research. Princeton, NJ, Princeton University Press. 14: pp. 349.

Ando, F. H. (1988). "Capital issues and the minority-owned business." Review of Black Political Economy 16(4): 77-109.

Avery, R. B. (1999). Access to credit for minority-owned businesses: discussion comments. Business Access to Capital and Credit: A Federal Reserve System Research Conference, Arlington, VA, Federal Reserve System.

Bates, T. (1989). "The changing nature of minority-owned business: a comparative analysis of Asian, nonminority, and Black-owned businesses." Review of Black Political Economy 18(2): 25-42.

Bates, T. (1989). "Small Business Viability in the Urban Ghetto." Journal of Regional Science 29(4): 625-643.

Bates, T. (1993). Banking on black enterprise. Washington DC, Joint Center for Political and Economic Studies.

Bates, T. (1993). Major Studies of Minority Business: A Bibliographic Review. Washington D.C., University Press of America, Inc.

Bates, T. (1997). Race, self-employment, and upward mobility: an illusive american dream. Baltimore, MD, John Hopkins University Press.

Bates, T. (1997). "Unequal access: financial institution lending to Black- and White-owned small business start-ups." Journal of Urban Affairs 19(4): 487-495.

Becker, G. S. (1971). The economics of discrimination. Chicago, University of Chicago.

Bierman, S. and L. Fernandez (1993). Game Theory with economic applications. Reading (MA), Addision-Wesley Publishing Company, Inc.

Bitler, M. P., A. M. Robb, et al. (2001). Financial services used by small businesses: evidence from the 1998 Survey of Small Business Finances, Board of Governors of the Federal Reserve System. 2002.

Blanchflower, D. G., P. B. Levine, et al. (1998). Discrimination in the small business credit market, National Bureau of Economic Research. 2002.

Bostic, R. W. and K. P. Lampani (1999). Racial differences in patterns of small business finance: the importance of local geography.

Business Access to Capital and Credit: A Federal Reserve System Research Conference, Arlington, VA, Federal Reserve System.

Cavalluzzo, K. (2002). Small business loans turndowns, personal wealth and discrimination, Board of Governors of the Federal Reserve System. 2002: 42.

Cavalluzzo, K. and L. Cavalluzzo (1998). "Market Structure and Discrimination: The Case of Small Business." Journal of Money, Credit and Banking 30(4): 771-792.

Chant, E. M. and D. A. Walker (1988). "Small business demand for trade credit." Applied Economics 20(7): pp. 861-876.

Chen, G. M. and J. A. Cole (1988). "The myths, facts, and theories of ethnic, small-scale enterprise financing." Review of Black Political Economy 16(4): 5-9.

Christopher, J. E. (1998). "Minority business formation and survival: evidence on business performance and viability." Review of Black Political Economy 26(Summer (1)): pp. 37-73.

Cole, R. A. and J. Wolken (1996). "Bank and Nonbank Competition for Small Business Credit: Evidence from the 1987 and 1993 National Surveys of Small Business Finances." Federal Reserve Bulletin(November): 983-995.

Cole, R. A. and J. D. Wolken (1995). "Financial services used by small businesses: evidence from the 1993 National Survey of Small Business Finances." Federal Reserve Bulletin(July 1995): 629-667.

Coleman, S. (2000). "Access to Capital and Terms of Credit: A Comparison of Men- and Women-Owned Small Businesses." Journal of Small Business Management 38(3): pp. 37-53.

Coleman, S. (2003). Free and Costly Trade Credit: A Comparison of Small Firms. Academy of Entrepreneurial Finance, Chicago, IL, Academy of Entrepreneurial Finance.

Conley, D. (1999). Being Black, living in the red: race, wealth, and social policy in America. Berkeley, CA, University of California Press.

Dingle, D. T. (2003). B.E. 100s Overview: Reinvention through Innovation. Black Enterprise. 33: pp. 94 - 106.

Dymski, G. A. (1995). "The Theory of Bank Redlining and Discrimination: An Exploration." The Review of Black Political Economy 23(3): pp. 37-74.

Elliehausen, E. and J. D. Wolken (1993). "The demand for trade credit: an investigation of motives for trade credit use by small business. (a summary of a Federal Reserve staff study)." Federal Reserve Bulletin 79(10): pp. 929-931.

Elliehausen, G., E. and T. A. Durkin (1989). "Theory and Evidence of Impact of Equal Credit Opportunity: An Agnostic Review of the Literature." Journal of Financial Services Research(2): pp. 89-114.

- 70 -

Elliehausen, G., E. and E. C. Lawrence (1990). "Discrimination in Consumer
    Lending." The Review of Economics and Statistics 72(1): pp.
    156-160.
Emery, G. W. (1984). "A Pure Financial Explanation for Trade Credit." Journal of
    Financial and Quantitative Analysis 19(3): pp. 271-285.
FFIEC (n.d.). www.ffiec.gov/hmda/default.htm, Federal Financial Institution
    Examination Council. 2004.
Guttentag, J. M. and S. M. Wachter (1980). Redlining and Public Policy. New
    York, New York University, Graduate School of Business
    Administration, Salomon Brothers Center for the Study of
    Financial Institutions: pp. 53.
Haggerty, C., K. Grigorian, et al. (2001). 1998 Survey of Small Business
    Finances: Methodology Report. Washington, Board of
    Governors of the Federal Reserve System.
Han, S. (2001). On the Economics of Discrimination in Credit Markets.
    Washington D.C., Federal Reserve Board: 47.
Handy, J. and D. H. Swinton (1984). "The determinants of the rate of growth of
    black-owned businesses: a preliminary analysis." Review of
    Black Political Economy 12(4): 85-110.
Immergluck, D. (1999). Intraurban patterns of small business lending: findings
    from the new Community Reinvestment Act data. Business
    Access to Capital and Credit: A Federal Reserve System
    Research Conference, Arlington, VA, Federal Reserve
    System.
Jaffee, D. and J. Stiglitz (1990). Credit Rationing. Handbook of Monetary
    Economics. B. M. Friedman and F. H. Hahn. New York,
    Elsevier Science Publishers B.V. 2: pp. 837-888.
Kijakazi, K. (1997). African-American economic development and small business
    ownership. New York, Garland Publishing, Inc.
Lang, W. W. and L. I. Nakamura (1993). "Housing Appraisals and Redlining."
    Journal of Urban Economics 33(2): 223 - 234.
Lemann, N. (1991). The Promised Land. New York, Alfred A. Knopf, Inc.
Liberty Fund, I. (n.d.). www.econlib.org/library/Enc/bios/Alchian.html, Liberty
    Fund, Inc. 2003.
Massey, D. S. and N. A. Denton (1993). American Apartheid: segregation and
    making of the underclass. Cambridge (MA), Harvard
    University Press.
Munnell, A. H., G. M. B. Tootell, et al. (1996). "Mortgage Lending in Boston:
    Interpreting HMDA Data." The American Economic Review
    86(1): pp. 89-114.
Nesiba, R. F. (1996). "Racial Discrimination in Residential Lending Markets: Why
    Empirical Researchers always see it and Economic Theorists
    never do." Journal of Economic Issues XXX(1): pp. 51 - 77.
Ng, C. K., J. K. Smith, et al. (1999). "Evidence on the Determinants of Credit
    Terms Used in Interfirm Trade." The Journal of Finance
    LIV(3): pp. 1109-1129.

- 71 -

Oliver, M. L. and T. M. Shapiro (1997). Black Wealth / White Wealth: A New
        Perspective on Racial Inequality. New York, Routledge.
Peterson, M. A. and R. G. Rajan (1997). "Trade Credit: Theories and Evidence."
        The review of Financial Studies 10(3): pp. 661-691.
Peterson, R. L. and C. Peterson (1981). "An investigation of sex discrimination in
        commercial banks' direct consumer lending." The Bell Journal
        of Economics 12(Autumn 1981): pp. 547-561.
Robb, A. M. (2000). The role of race, gender, and discrimination in business
        survival. Department of Economics. Chapel Hill, University of
        North Carolina: 135.
Ross, S. and J. Yinger (2002). The Color of Credit: mortgage discrimination,
        research methodology, and fair-lending enforcement.
        Cambridge (MA), The MIT Press.
Squires, G. D. and S. O'Connor (1999). Access to capital: Milwaukee's small
        business lending gaps. Business Access to Capital and
        Credit: A Federal Reserve System Research Conference,
        Arlington, VA, Federal Reserve System.
Squires, G. D. and S. O'Connor (2001). Access to capital: Milwaukee's
        continuing small business lending gaps, Woodstock Institute.
        2004: 26.
Stiglitz, J. and A. Weiss (1981). "Credit Rationing in Markets with Imperfect
        Information." American Economic Review, June '81 71(3): pp.
        393-410.
Studenmund, A. H. (2001). Using Econometrics: a practical guide. New York,
        Addison Wesley Longman, Inc.
Tesfatsion, L. (2003). Walrasian Equilibrium: A Critique,
        www.econ.iastate.edu/tesfatsi/wal604.pdf. 2003.
U.S. Bureau of the Census Characteristics of Business Owners Survey, U.S.
        Bureau of the Census. 2004.
U.S. Census Bureau (2005). 2002 Survey of Business Owners. Washington
        (D.C.), U.S. Census Bureau. 2006.
U.S. Federal Reserve System (1996). National Survey of Small Business
        Finances: Methodology Report. Washington, Board of
        Governors of the Federal Reserve System: 113.
U.S. Federal Reserve System (1999). Codebook for 1993 National Survey of
        Small Business Finances (NSSBF). Washington, Board of
        Governors of the Federal Reserve System: 147.
U.S. Federal Reserve System (2002). Codebook for 1998 National Survey of
        Small Business Finances (SSBF). Washington, Board of
        Governors of the Federal Reserve System: 147.
University of Hartford (n.d.). www.hartford.edu, University of Hartford. 2004.
Walker, D. A. (1985). "Trade credit supply for small businesses." American
        Journal of Small Business IX(3): 30 - 40.
Williams, R. A. and R. F. Nesiba (1997). "Racial, Economic, and Institutional
        Differences in Home Mortgage Loans: St. Joseph County,
        Indiana." Journal of Urban Affairs 19(1): pp. 73-103.

-72-

Wilson, N. (2002). "An Empirical Investigation of Trade Credit Demand." International Journal of the Economics of Business 9(2): pp. 257-271.

Yazdipour, R., Ed. (1991). Advances in Small Business Finance. Financial and Monetary Policy Studies. Norwell (MA), Kluwer Academic Publishers.

Yezer, A. M. J. (1999). Studies on CRA Data on Small Business Lending: discussion comments. Business Access to Capital and Credit: A Federal Reserve System Research Conference, Arlington, VA, Federal Reserve System.

# EXHIBIT 4

Case 1:11-cv-01277-GBL-TRJ   Document 74-5   Filed 08/23/12   Page 2 of 44   PageID# 2076

# Do Minority and Woman Entrepreneurs Face Discrimination in Credit Markets?

## Improved Estimates Using Matching Methods*

Yue Hu and Long Liu

Department of Economics
University of Texas at San Antonio


Jan Ondrich and John Yinger

Center for Policy Research
and
Department of Economics
Syracuse University


March 2010


**Corresponding Author:**

Jan Ondrich
Center for Policy Research
426 Eggers Hall
Syracuse University
Syracuse, NY 13244

* The authors gratefully acknowledge support from the Ewing Marion Kauffman Foundation. They thank Coady Wing for helpful discussion.

## ABSTRACT

This paper uses propensity score matching methods to address an unrecognized methodological challenge in estimating discrimination in small business credit markets. The matching methods relax the functional form assumptions implicit in regression-based estimates. We analyze interest rates paid on approved loans pooling 1993, 1998 and 2003 waves of the Survey of Small Businesses Finances. Our findings indicate that, on average, Black and Hispanic-owned firms pay an interest rate that is, respectively, 0.791 and 0.486 percentage point higher than the rate paid by White-owned firms. We find no evidence of discrimination against White women in small businesses loans.

*Key Words:* Small Business Credit; Lending Discrimination; Blinder-Oaxaca Decomposition; Propensity Score Matching.

## Introduction

Given the important role that small business plays in the U.S. economy, lending discrimination against small businesses owned by people in legally protected classes can undermine economic growth as well as violate legislated civil rights. Several recent articles have examined this type of lending discrimination, but these articles have not considered all the biases that may arise when comparing White-owned and minority-owned firms with different characteristics. This paper makes use of propensity score matching to eliminate these biases, thereby providing more accurate estimates of discrimination in the interest rates on small business loans.

About half of private-sector output is attributable to small businesses, defined as nonfarm establishments with fewer than 500 employees,[1] and the share of these businesses owned by people in minority groups and by women has been growing over time (Olson 2005). Researchers find consistent evidence that businesses owned by people in legally protected classes are more likely to be denied credit than are businesses owned by Whites, even controlling for characteristics related to credit worthiness.[2] Evidence concerning discrimination in the interest rates charged to small businesses is more mixed. Some studies find no evidence of discrimination in setting interest rates (Cavalluzzo and Cavalluzzo 1998; Cavalluzzo et al. 2002; Blanchard et al. 2007), while other studies find that minority and women business owners pay higher interest rates than do comparable firms owned by White men (Blanchflower et al. 2003).

Barsky et al. (2002) point out that studies of discrimination fail to address problems that arise because behavioral relationships may be nonlinear and because groups being compared may have little overlap in their characteristics. They show that these problems can be addressed

---

[1] According to "Frequently Asked Questions" at the website of the U.S. Small Business Administration (SBA), Office of Advocacy, http://appl.sba.gov/faqs/faqIndexAll.cfm?areaid=24.

[2] This evidence is reviewed in Blanchard et al. (2007).

1

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 184 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 24-5   Filed 03/23/12   Page 5 of 43 PageID# 699
Case 1:11-cv-01277-GBL-TRJ   Document 77-4   Filed 08/20/12   Page 5 of 44   PageID# 2073

using propensity-score matching and other matching techniques. Black et al. (2006) use nonparametric matching techniques to study wage discrimination, but matching techniques have not yet appeared in the literature on small business credit.

When the relationship between the interest rate and its determinants are nonlinear, then failure to account for this nonlinearity can result in biased estimates. Blanchflower et al. (2003) and Blanchard et al. (2007) provide a partial solution to this problem by splitting their sample in various ways and running separate regressions for each part of the sample. This strategy, which is equivalent to introducing a set of interaction terms, is less general than the approach we use in this paper, which is to estimate the interest-rate equation using nonparametric methods.

Second, the existing literature ignores the support condition, that is, it ignores the problems that arise when dissimilar observations are compared. Previous studies point out that minority-owned firms tend to differ from White-owned firms in credit worthiness, firm size, firm age, and many other characteristics. Moreover, Blanchflower et al. (2003) and Blanchard et al. (2007) find that discriminatory treatment varies with the characteristics of the business. Under these conditions, standard regression techniques may yield biased results.

In this study we attempt to address these two empirical problems using propensity-score matching and nonparametric estimation using data from the 1993, 1998, and 2003 waves of the Survey of Small Business Finances (SSBF). Matching allows us to examine the support condition in a straightforward way. In addition, unlike previous studies, our semi-parametric matching method does not impose assumptions on the functional form of the interest rate equation.

We also take advantage of the large sample obtained from pooling all three waves of the SSBF data. The increased sample size allows us to produce more precise estimates of the extent of discrimination in the small business. We can also check the robustness of our model under

2

alternative assumptions with this relatively large sample, in which the minority firms are well represented. The number of minority-owned firms is 185, 130, and 146 respectively in the 1993, 1998, and 2003 waves of the data. By pooling these data, we obtain a sample size of 461 minority-owned firms.

The study is organized as follows. In section 2 we examine the empirical challenges by reviewing the methodologies adopted in studying discrimination. In section 3, we provide a conceptual framework used to investigate discrimination in small business. The data set used for this study is described in section 4. In the next section we introduce the propensity-score matching method and its assumptions. Estimation results are provided in section 6. Concluding remarks can be found in section 7.

We find that minority-owned firms have to pay systematically higher interest rates on approved loans than do White-owned firms. Unlike previous studies, however, our study shows that White female owners of small businesses are not likely to be treated differently than their male counterparts.

## 2. Previous Literature

Discrimination is defined to be the unfavorable treatment of an individual solely on the basis of race or gender. As pointed out by Ross and Yinger (2002, 2006), the best models for detecting the presence of lending discrimination incorporate information on loan performance. They also show, however, that credible estimates can also be obtained using only loan pricing information, as long as one takes into account the possibility that different lenders draw on different applicant pools. The Equal Credit Opportunity Act of 1974 (ECOA) establishes two broad types of discrimination, disparate treatment (different rules for different groups) and disparate impact (rules that lead to different outcomes across groups and that are not justified by

3

business necessity). Although several methods exist for detecting discrimination generally, these two types are difficult to distinguish.

To identify discrimination in the setting of interest rates, this study, like previous studies, identifies the interest rate that would have been offered to a minority-owned (female-owned) small business if it had been owned instead by a White (male). The task then is to create this *ceteris paribus* condition so that the unexplainable differences in the outcome are attributable to discrimination. The implication for a study on discrimination is that it should first find pairs of individuals, one from the majority class and one from the protected class, with otherwise identical characteristics. Second, the study should construct pairwise differences in loan outcomes, such as denial of the loan or the interest rate obtained. Third, the study must aggregate the information in a meaningful way to make a determination about the presence of discrimination.

Our approach to this issue can be illuminated by first considering an alternative, namely an audit study, which is a quasi-experimental design that controls for observed differences across pairs. In this type of study, audit teams typically consist of two teammates, one from the White majority and one from a protected class. To achieve the ceteris paribus condition within each audit, the teammates are chosen to have the same observable demographic characteristics, such as gender and age, and, for the purposes of the audit, are assigned similar demographic and economic characteristics, such as income, occupation, and marital status. Each audit teammate is sent to visit an employer to apply for a job or to a real estate agent to inquire about an available housing. Discrimination is measured by comparing the incidence of less favorable treatment for the teammate from the protected class and for their majority teammate.

In addition to being a research methodology to examine the existence of discrimination prevailing in the society, audits also serve as a legal tool to collect evidence against firms or

4

institutions, against which cases have been filed alleging discrimination. This latter function is more consistent with our civil rights laws, which target individual firms rather than averages. But its value as a methodology is also crucial for policy purposes, because it helps to identify the existence of discrimination, which policymakers can then try to eliminate.

Although audits have been widely used in investigating discrimination in labor and housing markets,[3] they have not been used to investigate the existence and the degree of discrimination in the context of small business loans.

Using the audit methodology for the study of small business loans in the United States is problematic for two reasons. First, the number of credit-relevant variables involved is extremely large, making it difficult to create fully comparable teammates. Second, it is against the law to lie on a credit application for purposes of fraud. Whether testing for discrimination constitutes fraud is debatable, but it is a point on which no court has yet ruled. Because of this, nonprofit anti-discrimination organizations and government agencies are understandably reluctant to force the issue. If it is not possible to assign teammates fictional financial characteristics, an agency faces a virtually insurmountable problem in assembling teams with "similar" teammates.

Instead, existing research has used a standard regression approach. The goal of this study is to employ matching to approximate a quasi experiment, such as an audit, to estimate the existence and extent of discrimination in interest rates on loans to small business owners. This study also contributes to the literature by pooling three different Surveys of Small Business Finances to produce more precise estimates.

Existing studies of discrimination in small-business are based on regression methods in which credit denial or interest rates charged on a loan are a function of the credit worthiness assessment criteria used by financial institutions and the owner's race. The coefficient on the

---

[3] For discussions of the audit methodology, see Ondrich et al. (2000, 2003), Ross and Turner (2005), and Yinger (1995) on housing markets; Heckman (1998), and Bertrand and Mullainathan (2004) on labor markets; Galster et al. (2001) in insurance markets; and Ross et al. (2005) on mortgage markets.

5

owner's race captures discrimination. For simplicity, many studies assume a linear functional form in the econometric model, although no theorem suggests this is the case. Some studies, for example, Blanchflower et al. (2003) and Blanchard et al. (2007), challenge this linearity assumption by running separate regressions for subsamples defined by organization type, firm size, firm age, the scope of the market in which the firms operate, etc. The findings in Blanchflower et al. (2003) indicate that discrimination is not the same under all circumstances. For instance, Black owners of firms that were recently established are 36 percentage points more likely to be charged higher interest rate than Black owners of firms that have existed for more than 12 years.

Split-sample regressions only address one specific form of nonlinearity, namely, interactions between one explanatory variable and all the others. The researcher must decide which variables to interact with each other, i.e., along which dimension the sample should be split. Because of the difficulty of attempting all possible combinations, some potentially important heterogeneous effects might not be included in the study. In this case, the split-sample regressions may still suffer from bias because of the unmodeled non-linearity.

Another source of nonlinearity comes from higher order terms. For instance, in labor economics, in order to test the hypothesis that experience affects earnings in a nonlinear way, squares and even higher-order terms in experience are usually included in the earnings equation. Split-sample regressions cannot capture this type of nonlinearity. A model with a sufficient number of higher-order and interactive terms might be able to approximate an underlying nonlinear relationship fairly well, but it becomes difficult to construct when there are many explanatory variables, and no-one has attempted to construct such a model for the analysis of interest rates.

6

A more general approach to relaxing the linearity assumption is to conduct semi-parametric estimation; instead of imposing a specific functional form on the relationship between the dependent variable and regressors, this approach allows the data to speak for themselves through a data-generating process. A semi-parametric approach also has the advantage that it automatically accounts for variation in underwriting standards across lenders that takes the form of interactions between lender characteristics and underwriting variables (Ross and Yinger 2002). We pool the Survey of Small Business Finances (SSBF) data from three years to obtain a sample size large enough to implement semi-parametric estimation.

### 3. Conceptual Framework

An investigation into the existence and extent of discrimination in some market frequently involves two equations characterizing two stages of economic transactions: a denial model that features the screening process that determines whether a customer or employee is eligible for an economic transaction; and a price equation representing the equilibrium prices, such as wage rates or interest rates, which can only be observed for those who pass the screening process.

Following Ross and Yinger (2006), the equations indicating the two behavioral models can be expressed as follows.

$$\text{Screening:} \quad S_i = 1 \text{ if } S_i^* > 0, \text{ where } S_i^* = \beta_s X_i + \gamma_s M_i + \delta_s P_i + \psi_{si} \ , \tag{1}$$

where the dependent variable is binary, such as a job offer or an approval on a loan or mortgage. The vector $X_i$ indicates factors based on which the firm makes its decision on hiring or granting the loan. The variable $M_i$ is a minority group indicator, and $P_i$ is the price associated with the transaction.

Moving to the second equation, we have

7

Price: $P_t = \beta_p X_t + \gamma_p M_t + \varepsilon_{st}$, if $S_t = 1$ .            (2)

The transaction price, $P_t$, such as the wage or interest rate on a loan, is determined by the same

factors $X_t$ as in the screening model, as well as minority status, $M_t$. The variables $\psi_{st}$ and $\varepsilon_{st}$

are the error terms. The incidence of discrimination is identified by finding a negative $\gamma_s$ and a

positive $\gamma_p$ in an application to discrimination in small-business, for instance.

These two equations are really a simplification; in labor markets or credit markets,

discrimination might take many forms at many stages, and one can not get a full appreciation of

discrimination without analysis covering each and every stage.[4] The presence of discrimination

in one stage does not imply the presence of discrimination in another stage. But discrimination in

various stages may be connected. If an economic transaction is composed of a sequence of

actions, so that discrimination is likely to be present in various stages, the failure to account for

potential discrimination in an earlier set of actions may lead to an underestimate of

discrimination for a later set of actions. In econometric research this is known as selection bias.[5]

Another problem arises when minority-owned firms that encounter an initial denial of

credit eventually end up getting a loan with more stringent terms, such as a substantially higher

interest rate. In this case, the denial model underestimates the underlying discrimination in the

screening process facing individuals from a protected class. The interest rate model, on the other

---

[4] The complexity involved in mortgage transactions is discussed in Ross and Yinger (2002).
[5] The importance of accounting for selection bias is based on the observation that agents who are aware of a
tradition of discrimination in a market may go out of their way to avoid such discrimination. According to the SSBF,
black-owned firms are 40 percentage points more likely than their white counterparts to report that they did not
apply for a loan for fearing of denial in 1993, and the statistic is 32 percentage points in 1998 (Blanchflower et al.
(2003)). The issue here is the number of firms that would have applied and been granted a loan had there no
awareness of discrimination. The group of firms that meet the standards of getting a loan but do not apply
constitutes the set of "missing" observations that would otherwise appear in the screening and price equation.
Cavalluzzo et al. (2002) and Blanchard et al. (2007) test for selection bias in the approval model and find that
accounting for it does not alter estimates of discrimination.

8

hand, provides a much more reliable framework for estimating discrimination in small-business lending.[6]

There is much less debate about whether discrimination exists in access to credit markets than in interest rates charged on approved loans. This is partly due to data limitations. The sample size on approved loans among minority-owned firms is usually much smaller than that used for the denial model, making it difficult to conduct specification checks on interest rate models (see Blanchflower et al. 2003). One way to deal with this issue is to pool data from multiple years to increase the sample size, which can be done as long as the observations in the survey are independent. Another way to deal with this is to estimate treatment effects using methods that are robust to specification error.

The present study attempts to improve the estimation of discrimination in the interest-rate model by adopting a more sophisticated methodology and using a more complete set of data.

### 4. The SSBF Data

The principle data set used in the econometric analysis of this study is the Survey of Small Business Finance (SSBF) from 1993, 1998, and 2003.[7] Two related concerns motivate the data pooling strategy. First, the number of minority-owned firms is relatively small in the sample from each single year, making it difficult to obtain precise estimates. Second, it is well known that nonparametric methods require a large sample to perform reasonably well, and the goal of our study is to address nonlinearity by implementing a semi-parametric analysis, in which a nonparametric approach is employed in the second stage. Pooling data is also reasonable because the survey sample was drawn from more than 7.5 million firms each year. This makes it unlikely

---

[6] In order to take this situation into account, data on firms' credit application history would need to be collected. But even the SSBF, the most comprehensive data set available on the credit utilization of small businesses does not collect such information.
[7] The 1987 survey is not included in our sample mainly because some of the variables in firms' credit histories that are critical in assessing creditworthiness were not available.

9

that a firm would appear in two surveys and nearly impossible that a firm would be sampled in all four surveys.[8]

The sample is nationally representative, and contains rich information regarding the firm, such as its age, location, employment, industry. In addition, the data set also includes the term and type of the most recent loan each firm obtained.

Since we focus on the interest-rate equation, our sample is limited to the most recent loan that the firm obtained in the past 3 years. Thus the time span for the aggregate repeated cross section data runs from 1991 until 2005.[9] Our complete sample contains 4,193 nonfinancial, nonfarm small businesses.

Table 2 presents the descriptive statistics from the pooled SSBF data for all firms that had an active loan during the survey years, by race/ethnicity, and gender. These statistics are not weighted. On average, firms owned by minority groups pay a higher interest rate than those owned by Whites. In particular, the interest rates charged to Black-owned firms are on average 2.5 percentage points higher than those charged to White-owned firms. The Hispanic-White difference in interest rates is 1.4 percentage points. The interest rates paid by other race/ethnic groups are also higher than those paid by Whites, in this case by 0.8 percentage points. Differences in interest rates by gender are relatively small. The interest rates charged to firms owned by women are in fact 0.07 percentage points lower than those charged to male-owned firms. Firms owned by minority groups also differ from White-owned firms in other characteristics. For example, minority-owned firms are generally younger and smaller. In terms of credit history, minority-owned firms seem less creditworthy than their White counterparts as measured by whether the owner had been delinquent for more than 60 days on personal

---

[8] http://www.zentralbank.us/pubs/oss/oss3/nssbffaq.html.
[9] All dollar variables are measured in real terms (year 2003=100), and a year indicator is included to account for potential fluctuation of the nominal interest rates across years.

10

obligations over the past three years, or had legal judgments against him or her over the preceding three years.

## 5. Empirical Strategy

### 5.1 The Methodology of Matching and Its Assumptions

This study uses matching methods to examine whether, on average, minority-owned firms have to pay higher interest rates on business loans than do equally qualified White-owned firms. Matching methods have been used widely in the program-evaluation literature as a way to approximate an experiment with non-experimental data (Heckman, Ichimura, and Todd 1997, 1998; Smith and Todd 2001, 2005). This approach has the advantages that it is less expensive and less intrusive than an experiment. Conventional matching estimators match each program participant with an observably similar nonparticipant and derive the average difference in their outcomes to measure the effect of the program.

The evaluation problem arises when we investigate discrimination in small business because, at any time, a firm may be either White-owned or minority-owned, but not both. We are interested in the interest rate minority-owned firms would pay if they were White-owned. This is called the effect of "treatment on the treated".

Formally, let $Y_1$ be the potential interest rate paid by a minority-owned firm, and let $Y_0$ be the potential interest rate if the firm had been White-owned. Let the indicator variable $D = 1$ when the firm is minority-owned and let $D = 0$ when the firm is White-owned. Finally, let $X$ be a vector of observed characteristics that affect both the minority status of the firm and the interest rate paid. The mean impact of treatment on the treated is defined as

$$TT = E(Y_1 - Y_0 \,|\, X, D = 1) = E(Y_1 \,|\, X, D = 1) - E(Y_0 \,|\, X, D = 1), \qquad (3)$$

11

which estimates the average impact of the program among those participating in it. The mean outcome in the minority-owned firm, $E(Y_1 \mid X, \, D = 1)$, can be obtained using data on minority-owned firm. However, a direct estimate of its counterfactual mean, $E(Y_0 \mid X, \, D = 1)$, is not available. In the next section, we discuss two matching approaches for estimating the missing counterfactual mean.

Matching estimators rely on the assumption that non-treatment outcomes, $Y_0$, are independent of the treatment $D$, which indicates ownership by a protected class, conditional on a set of observable characteristics, $X$. This selection on observables assumption is also called the Conditional Independence Assumption (CIA), expressed as follows:

$$\text{Assumption 1:} (Y_0 \perp D) \mid X \qquad . \qquad\qquad\qquad (4)$$

In particular, it implies that the potential interest rate that a White-owned firm must pay is independent of the firm's race-ownership status conditional on a relevant set of observable characteristics. This assumption produces a comparison group that resembles the control group in an experiment in one key respect: conditional on $X$ the distribution of $Y_0$ given $D = 1$ is the same as the distribution of $Y_0$ given $D = 0$. (Note, of course, that we do not observe $Y_0$ given $D = 1$.) In addition, it is also assumed that for all $X$ there is a positive probability of either getting treated ($D = 1$) or not ($D = 0$), which can be written as follows:

$$\text{Assumption 2:} \Pr(D = 1 \mid X) \, < \, 1 \text{ for all } X. \qquad\qquad\qquad (5)$$

This is called the "common support" assumption, and it is an important assumption that linear regression fails to address. The support condition implies that a match from the White-owned group can be found for each and every minority-owned firm.

12

If Assumptions 1 and 2 are satisfied, after conditioning on $X$, the $Y_0$ distribution observed for the matched firms owned by Whites can be substituted for the missing $Y_0$ distribution for minority-owned firms. The mean effect is then identified by taking differences.

## 5.2 Propensity Scores and the Common Support Condition

Matching is plausible only when the data contains rich enough information for one to condition on in order to construct a comparable counterfactual group. It is hard to select matched samples when the dimension of $X$ is high. In particular, if matching is employed directly on all the characteristics included in $X$ one would run into the problem commonly known as the "curse of dimensionality," where some observations will have no corresponding untreated firm with exactly the same values of $X$.

In an important paper Rosenbaum and Rubin (1983) introduced the propensity score as a means of reducing the dimension of the conditioning problem by matching on the probability of treatment. They showed that the distributions of $X$ are the same in the treatment and comparison group conditional on the probability of treatment. Thus, propensity-score matching combines groups of firms with potentially different values of $X$ but identical values of $\Pr(D=1|X)$. Matching on the scalar propensity score in this way avoids the curse of dimensionality.

The evaluation of the presence of discrimination proceeds in two steps. In the first step a logit model is used to estimate the propensity score of minority-ownership status based on the SSBF data. Variable selection for the propensity-score estimation is based on two considerations: theory and evidence about the variables related to treatment and the outcome and goodness-of-fit. What we are trying to do is to construct a model that approximates a lender's decision-making process based on the firm's creditworthiness. The existing literature on discrimination in small business (Cavalluzzo et al. 2002, Blanchflower et al. 2003, and Blanchard et al. 2007) suggest

13

that variables in the following categories should be used to predict a firm's creditworthiness: the firm's credit history, the firm's characteristics, and the features of the specific loan. Within each category, the variables are chosen based on the criterion of goodness-of-fit, that is, whether the coefficient of the included variable is statistically significant at conventional levels and whether it increases the model's prediction power by a substantial amount (Heckman 1998). We do not include the Dunn and Bradstreet credit score in our specification because this credit score is based on the firm's entire credit history, including default or delinquent events on the loan under consideration. Such information postdates the information available to the lender and is likely to introduce bias.

We present the propensity-score estimation results only for the probability of a firm being owned by a member of a protected class in Tables 4A-4C.

The histograms of the estimated propensity scores for each group are shown in Fig.1 through Fig.6, which are used to examine the support condition. In all but the last two groups, the left histogram presents propensity scores for firms owned by Whites (the $D=0$ group), while the right histogram presents the propensity scores for minority-owned firms (the $D=1$ group). For the last two groups, treatment refers to the firm being (White) female-owned; the comparison group consists of (White) male-owned firms. The horizontal axis indicates intervals of the propensity score and the height of each bar on the vertical axis defines the fraction of the corresponding sample with scores in the corresponding interval.

The histograms are important because they examine the support condition for the propensity score. Along the dimension of race, the mean propensity score given $D=1$ is about 0.15, while the mean propensity score for $D=0$ is about 0.06. In the case of gender, the mean propensity score given $D=1$ is about 0.27 while the mean propensity score for $D=0$ is about 0.20. This disproportional concentration of the propensity score at the lower tail (especially

14

among the racial/ethnic groups) is not surprising. The sample consists of 461 minority-owned firms and 3,266 firms owned by Whites. As discussed in greater detail below, the kernel estimation techniques that we use can handle oversampling.

In addition to the histograms regression-based balancing tests are conducted to check whether the distributions of the covariates are balanced, conditional on the value of the propensity score. The logic of the regression-based balancing test is simple: it regresses each conditioning variable on a polynomial in the propensity score and an interaction between the treatment dummy and the same polynomial. If balance has been achieved, then the coefficients on all the interactions should equal zero.[10] Almost all of the covariates pass the balancing test. For reasons of parsimony, the results of the balancing tests are not presented, but are available from the authors upon request.

## 5.3 Comparison of Two Matching Methods

We can choose from a variety of consistent matching methods. As the sample gets arbitrarily large, all matching estimators are conducting exact cell matching. In a finite sample, the choice of a matching estimator is more of a practical issue, in the sense that it not only depends on the data but also on the capability of the particular matching estimator to deal with specific data issues.

We present two estimates: one from the Blinder-Oaxaca Decomposition and one using semi-parametric propensity-score matching. The two techniques are similar in the sense that they both conduct out-of-sample prediction. The mechanism is as follows: an interest-rate equation is estimated using a subsample containing only Whites, the coefficients of the determinants of interest rates obtained from the Whites are then used to generate the counterfactual effect, which is the predicted interest rates that minority would have to pay had they been White. The mean

---

[10] See Smith and Todd (2005) for a discussion of other standard balancing tests.

15

difference between the actual and the predicted interest rates thus constitutes the estimates of the disparate treatment.

The Blinder-Oaxaca Decomposition method is a regression-based matching method that assumes a linear functional form. Write the model for the unprotected class as:

$$Y_0 = \iota \alpha_0 + X_0 \beta_0 + \varepsilon_0,$$
$$E(\varepsilon_0) = 0 ; \ V(\varepsilon_0) = \sigma_0^2 I, \tag{6}$$

where $Y_0$ is the $N_0 \, x \, 1$ dependent variable vector, $\iota$ is an $N_0 \, x \, 1$ vector of ones, $\alpha_0$ is the intercept for the unprotected class, $X_0$ is the $N_0 \, x \, k$ regressor matrix, and $\beta_0$ is the $k \, x \, 1$ coefficient vector. OLS is best linear unbiased and satisfies the following equation:

$$\overline{Y}_0 = \hat{\alpha}_0 + \overline{X}_0 \hat{\beta}_0, \tag{7}$$

where $\overline{Y}_0$ is the sample mean of the dependent variable and $\overline{X}_0$ is the row vector of regressor means.

Write the model for the protected class as:

$$Y_1 = \iota \alpha_1 + X_1 \beta_1 + \varepsilon_1,$$
$$E(\varepsilon_1) = 0 ; \ V(\varepsilon_1) = \sigma_1^2 I, \tag{8}$$

where $Y_1$ is the $N_1 \, x \, 1$ dependent variable vector, $\iota$ is an $N_1 \, x \, 1$ vector of ones, $\alpha_1$ is the intercept for the protected class, $X_1$ is the $N_1 \, x \, k$ regressor matrix, and $\beta_1$ is $k \, x \, 1$. Again, ordinary least squares (OLS) is the best linear unbiased estimator and satisfies the following equation:

$$\overline{Y}_1 = \hat{\alpha}_1 + \overline{X}_1 \hat{\beta}_1 \tag{9}$$

where $\overline{Y}_1$ is the sample mean of the dependent variable, $\overline{X}_1$ is the row vector of regressor means, and the "hat" again signifies OLS estimator.

16

Let $\Delta \bar{Y} = \bar{Y}_1 - \bar{Y}_0$ denote the difference in mean outcomes across classes, let $\Delta \bar{X} = \bar{X}_1 - \bar{X}_0$ denote the difference in mean endowments, and let $\Delta \hat{\beta} = \hat{\beta}_1 - \hat{\beta}_0$ denote the differences in coefficients. Then the difference in mean outcomes can be decomposed as follows:

$$\Delta \bar{Y} = \hat{\alpha}_1 - \hat{\alpha}_0 + \bar{X}_0 \Delta \hat{\beta} + \Delta \bar{X} \hat{\beta}_1 \quad , \tag{10}$$

where the sum of the first three terms on the right-hand side of equation (10) is the total effect of discrimination on the difference in mean outcomes and the final term is the total effect of the difference in endowments.

An alternative method, perhaps simpler, for obtaining the Blinder-Oaxaca discrimination effect starts by including the constant term in the regressor matrix with the other slope variables. The model for the unprotected class can then be written as:

$$\begin{aligned} Y_0 &= Z_0 \beta + \varepsilon_0, \\ E(\varepsilon_0) &= 0 \; ; \; V(\varepsilon_0) = \sigma_0^2 I, \end{aligned} \tag{11}$$

where $Y_0$ is $N_0 \, x \, 1$, $Z_0$ is a $N_0 \, x \, (k+1)$ matrix that includes a constant term, and $\beta$ is $(k+1) \, x \, 1$.

Write the model for the protected class as:

$$\begin{aligned} Y_1 &= \iota \alpha + Z_1 \beta + \varepsilon_1, \\ E(\varepsilon_1) &= 0 \; ; \; V(\varepsilon_1) = \sigma_1^2 I, \end{aligned} \tag{12}$$

where $Y_1$ is $N_1 \, x \, 1$, $\iota$ is $N_1 \, x \, 1$, $\alpha$ is a scalar, $Z_1$ is a $N_1 \, x \, (k+1)$ matrix that includes a constant term, and $\beta$ is $(k+1) \, x \, 1$. By replacing the conditional expectations in equation (3) by their corresponding finite sample analogues, an estimator for the effect of treatment on the treated can be derived as

$$\frac{1}{N_1} \sum_{i \in I_1} \left( Y_{1i} - Z_{1i}' \hat{\beta} \right) \quad , \tag{13}$$

where $I_1$ denote the set of program participants. It can be obtained from the following two-step method. First, run an OLS estimation of the model for the unprotected class to get the estimated coefficient vector $\hat{\beta}$. Next, regress $Y_1 - Z_1 \hat{\beta}$ on constant vector $\iota$ to get an estimate of the

17

Blinder-Oaxaca discrimination effect. To see that this gives the correct answer, note that the

estimate of the intercept is $\bar{Y}_1 - \hat{a}_0 + \bar{X}_1 \hat{\beta}_0$. Substituting for $\bar{Y}_1$ from equation (9) and rearranging

gives $\hat{a}_1 - \hat{a}_0 + \bar{X}_1 (\hat{\beta}_1 - \hat{\beta}_0)$, which is exactly the Blinder-Oaxaca discrimination effect.

The most appealing feature of the Blinder-Oaxaca method is its apparent simplicity,

although this simplicity is a by-product of a restrictive linearity assumption. Moreover, standard

errors have to be adjusted to account for the two steps involved in the model. This is discussed in

the Appendix.

The second method that we use is semi-parametric propensity-score matching. As shown

in Smith and Todd (2001), under Assumptions 1 and 2, the mean impact of treatment (being a

member of a minority class) can be rewritten as

$$E(Y_1 - Y_0 \mid D = 1) = E(Y_1 \mid D = 1) - E_P \left[ E_Y (Y \mid D = 0, P) \right], \qquad (14)$$

where $P = \Pr(D = 1 \mid X)$. The second term can be estimated from the mean outcomes of the

matched (on $P$) comparison group. Matching estimators take the form

$$\frac{1}{N_1} \sum_{i \in I_1 \cap S_P} \left[ Y_{1i} - \hat{E}(Y_{0i} \mid D = 0, P_i) \right] , \qquad (15)$$

where $\hat{E}(Y_{0i} \mid D = 0, P_i) = \sum_{j \in I_0} W(i, j) Y_{0j}$ is the matched outcome. $I_0$ and $I_1$ denote the set of

majority and minority respectively, $S_P$ is the common support region, and $N_1$ is the number of

individuals in both the sets $I_1$ and $S_P$ (see Smith and Todd 2005). The match for each minority

individual $i$ in the summation of (15) is a weighted average over the outcomes of members of

the majority class, where the weights $W(i, j)$ depend on the distance between $P_i$ and $P_j$. In the

kernel-matching method used by Heckman et al. (1997, 1998) and Heckman et al. (1998), the

weighting function is

18

$$W(i,j) = K\left(\frac{P_j - P_i}{h}\right) / \sum_{k \in I_0} K\left(\frac{P_k - P_i}{h}\right),  \tag{16}$$

where $K$ is a kernel function with bandwidth parameter $h$.[11] This semi-parametric propensity-score matching method that we use involves two steps. The first step is propensity-score estimation using a logit model (as discussed above). The second step uses a kernel function to estimate the average treatment effect of minority ownership on interest rates. The semi-parametric propensity-score matching results provide a robustness check on the Blinder-Oaxaca method. The key advantage of the propensity-score matching method is that it avoids imposing the restrictive linear functional form assumption.

The optimal choice of bandwidth parameter $h$ for the given kernel function $K$ is critical, even in a large sample. As shown by Li and Racine (2007) and Pagan and Ullah (1999), the Least-Squares Cross-Validation procedure selects optimal bandwidth by minimizing mean-squared error $\frac{1}{N_0} \sum_{i \in I_0} \left(Y_{0i} - \hat{Y}_{0i,-i}\right)^2$, where $\hat{Y}_{0i,-i}$ is the "leave-one-out" estimator that omits the $i$th observation in the comparison group and uses the remaining comparison-group observations to generate $\hat{Y}_{0i,-i}$, the estimate of $Y_{0i}$. Because the $i$th observation is not included in the estimation, this "out-of-sample" forecast avoids the "overfitting" problem at $h = 0$. As explained in Black and Smith (2004), this "leave-one-out" estimator does a good job of replicating the essential features of the estimation problem. In comparison, the choice of bandwidth by other methods, such as the Nearest Neighbor approach, is more arbitrary.

In the SSBF data, we have substantially fewer observations belonging to protected classes than to Whites. In fact, there are only 130 Black-owned firms in the pooled SSBF data

---

[11] We use the second-order Epanechnikov kernel defined as $K(\psi) = \begin{cases} \frac{3}{4}\left(1 - \psi^2\right), & |\psi| \leq 1, \\ 0, & otherwise. \end{cases}$

19

compared to over 3,266 firms owned by Whites. Kernel matching is more efficient in handling this asymmetrically distributed sample because it uses sample information efficiently. Using Monte Carlo analysis, Froelich (2004) shows that kernel matching, or a variant called "ridge" matching, consistently performs well on a mean-squared error criterion.[12]

The propensity-score matching is more computationally intensive than Blinder-Oaxaca, because it requires a choice of optimal bandwidth and bootstrapped standard errors. In addition, the speed of convergence is slower using a semi-parametric approach than regression-based estimates. However, the payoffs of using matching are also considerable. First, matching allows us to examine the support condition in a straightforward way. In other words, it prevents us from making predictions outside of the data support.[13]

## 6. Results

First-stage Blinder-Oaxaca estimation results for all groups are presented in Tables 3A-3C. The results for Whites, Blacks and Hispanics are in Table 3A, Table 3B contains the results for other races (including comprised of Asians, Native Americans, Alaska natives, and Hawaiian/Pacific Islanders) and minorities generally, while Table 3C has the results for females and White females. While results vary across groups, prior personal delinquency generally increases the interest rate charged and firms with more highly educated owners are generally charged lower interest rates on business loans.

---

[12] An alternative way of addressing the over-sampling issue is to use radius matching, a variant of Nearest Neighbor caliper matching, which tends to use all of the comparison members within the caliper to construct the counterfactual. Abadie and Imbens (2006) show that bootstrapping, the most readily available technique of calculating standard errors for matching methods, gives incorrect results for nearest neighbor matching because of lack of smoothness. Therefore, radius matching is problematic. In addition, Froelich (2004) shows that Nearest Neighbor matching performs least desirably over a wide range of possible data-generating processes.

[13] Estimating the wealth gap between black and white households, Barsky et al. (2002) show that support problems can exacerbate misspecification of the parametric model.

20

The propensity score estimation results for the protected classes are shown in Table 4A-
4C. The results for Blacks and Hispanics are in Table 4A, those for other races and minorities are
in Table 4B, and Table 4C has the results for females and White females. More highly educated
owners are less likely to be Hispanic or from a minority race more generally. The greater the
owner's business experience, the less likely the owner is from a racial minority. When a firm
receives a fixed interest-rate loan, the more likely its owner is Black, Hispanic, from a racial
minority generally, or a White female. Finally, when a firm locates in a metropolitan area, the
more likely its owner is from a racial minority.

The race discrimination results using the SSBF data are shown in Table 5. Panel A
presents estimates of the Blinder-Oaxaca discrimination effect for interest rates on approved
loans, and Panel B shows the estimates of the discrimination effect estimated by the semi-
parametric propensity-score matching method.

From Panel A of Table 5 minority-owned firms pay an interest rate that is 0.599
percentage points higher than the rate paid by White-owned firms. After breaking down the
analysis by racial category, we find businesses owned by Blacks, Hispanics, and other races all
have to pay higher interest rates than businesses owned by Whites, controlling for credit
worthiness and other factors appearing in Table 1. Black-owned firms face the largest degree of
discrimination; the interest rates they pay are 1.109 percentage points higher than the rates paid
by their White counterparts. On average, firms owned by Hispanics and other races pay interest
rates 0.453 and 0.349 percentage point more than firms owned by Whites. These estimates are all
statistically significant at conventional levels.

The results using semi-parametric propensity-score matching method are shown in Panel
B of Table 5. The bandwidths are chosen using leave-one-out cross validation and standard
errors are bootstrapped with 2000 replications. Again the key difference between regression-

21

based estimates, such as Blinder-Oaxaca, and propensity-score matching is that propensity score matching does not depend on a linear functional form assumption.

·   The semi-parametric propensity-score matching estimates differ from those of Blinder-Oaxaca decomposition in the following ways. For minority firms the discrimination effect is slightly larger than that from Blinder-Oaxaca. Minority-owned firms pay on average 0.671 percentage points more interest on approved loans than do White-owned firms. The estimate is statistically significant at the 1% level. A similar result applies to Hispanic-owned firms; the magnitude of the estimate is slightly larger and significant at conventional levels.

In contrast the estimated treatment effect of Black-ownership decreases from 1.109 to 0.791 using propensity-score matching. The effect of discrimination against other races disappears once we relax the linear functional form assumption.

The results for gender discrimination appear in Table 6. The data suggest that businesses owned by women pay an interest rate that is significantly lower than the rate paid by male-owned firms. The propensity-score matching method produces a larger effect, 0.27, than does Blinder-Oaxaca, which yields 0.17. When the sample is limited to Whites, the discrimination effect declines and becomes insignificant, as shown in the second column of Table 6. Of the 814 female-owned businesses in our sample, only 112 are owned by minorities, so we cannot estimate a separate effect for minority females. Nevertheless, a comparison of the two columns in Table 6 suggests that there is a large and significant male-female disparity in interest rates among minority-owned firms, if not among White-owned firms.

Overall, these results suggests, but do not definitively prove, that our matching methods, which are preferable on conceptual grounds, produce significantly different results than results based on more traditional regressions methods. The study with the set of controls that are most comparable to ours, namely, Blanchard et al. (2008), finds interest-rate gaps of 0.459 for Black-

22

Case 1:11-cv-01277-CBL-TRJ  Document 24-5  Filed 08/28/12  (Page 206 of 44  PageID# 2694

owned firms compared to white-owned firms, -0.169 for Hispanic-owned firms compared to white-owned firms, and -0.769 for firms owned by White women compared to firms owned by White men.[14] Only the last of these three estimates is statistically significant. Thus, using matching appears to increase the magnitude of the gap for Black-owned firms (and to make this gap significant), to reverse and make significant the gap for Hispanic-owned firms, and to reduce and make insignificant the gap for firms owned by White women. We cannot rule out the possibility that these results differ from ours because they refer to 1998 instead of 1993-2003; but, because these results refer to the year in the middle of our sample, it is unlikely that they differ from ours because of a trend over this period.

## 7. Conclusions

This study improves the existing literature on racial and sex discrimination in small-business lending by using semi-parametric propensity score matching with data from the Survey of Small Business Finances from 1993, 1998 and 2003. Matching methods can relax the linear functional form assumption and address data support problems. These issues have been largely ignored in regression-based estimation. Unlike previous studies, we also aggregate the data from the three surveys in order to produce more precise estimates. These methodological innovations lead to new findings. More specifically we find that Black-owned and Hispanic-owned businesses pay significantly higher interest rates on approved loans than do equally creditworthy firms owned by Whites. However, we cannot reject the hypothesis that there is no discrimination in small business lending against other racial/ethnic groups or against White women.

---

[14] These estimates come from Blanchard et al. (2008, Table 6, row (9)). Blanchard et al. also investigate whether some of the controls for loan terms are endogenous. Corrections for endogeneity have little impact on their estimates. Blanchflower et al. (2003) find significant interest-rate discrimination against blacks and Hispanics in 1998, but they do not use as extensive a set of control variables.

23

## APPENDIX ON
## CORRECT STANDARD ERRORS
## FOR THE BLINDER-OAXACA MODEL

Write the model for the unprotected class as:

$$Y_0 = X_0\beta + \varepsilon_0,$$
$$E(\varepsilon_0) = 0; \quad V(\varepsilon_0) = \sigma_0^2 I,$$

where $Y_0$ is $N_0 \, x1$, $X_0$ is $N_0 \, xk$, and $\beta$ is $k \, x1$.

Write the model for the protected class as:

$$Y_1 = \iota\alpha + X_1\beta + \varepsilon_1,$$
$$E(\varepsilon_1) = 0; \quad V(\varepsilon_1) = \sigma_1^2 I,$$

where $Y_0$ is $N_1 \, x1$, $\iota$ is $N_1 \, x1$, $\alpha$ is a scalar, $X_1$ is $N_1 \, xk$, and $\beta$ is $k \, x1$.

OLS estimation of the model for the unprotected class gives $\hat{\beta}$, with variance matrix $\sigma_0^2 (X_0'X_0)^{-1}$, which is estimated by $s_0^2(X_0'X_0)^{-1}$. Now regress $Y_1 - X_1\hat{\beta}$ on $\iota$ to get an estimator of $\alpha$. Then

$$\hat{\alpha} = (\iota'\iota)^{-1}\iota'(Y_1 - X_1\hat{\beta}).$$

Therefore,

$$var(\hat{\alpha}) = (\iota'\iota)^{-1}\iota'V(Y_1 - X_1\hat{\beta})\iota(\iota'\iota)^{-1}$$
$$= \frac{1}{N_1^2}\iota'\left(V(Y_1) + X_1 V(\hat{\beta})X_1'\right)\iota$$
$$= \frac{1}{N_1^2}\iota'\left(\sigma_1^2 I + \sigma_0^2 X_1(X_0'X_0)^{-1}X_1'\right)\iota.$$

This matrix is estimated by $\frac{1}{N_1^2}\iota'\left(s_1^2 I + s_0^2 X_1(X_0'X_0)^{-1}X_1'\right)\iota$. Now note that for any

$N_1 \, x N_1$ matrix A, $\iota'A\iota$ gives the sum of the elements of A. Hence, to estimate $var(\hat{\alpha})$, add the

elements of $s_0^2 X_1(X_0'X_0)^{-1}X_1'$, divide the sum by $N_1^2$, and add the resulting ratio to $s_1^2 / N_1^2$.

24

## References

Abadie, A., and G. Imbens. 2006. "Large Sample Properties of Matching Estimators for Average Treatment Effects," *Econometrica* 74 (1), 235-267.

Barsky, R., J. Bound, K. Charles, and J. Lupton. 2002. "Accounting for the Black-White Wealth Gap: A Non-Parametric Approach," *Journal of the American Statistical Association* 97, 663-673.

Bertrand, M. and S. Mullainathan. 2004. "Are Emily and Greg More Employable Than Lakisha and Jamal? A Field Experiment on Labor Market Discrimination," *American Economic Review* 94, 991-1013.

Black, D., H. Amelia, S. Saunders, and T. Lowell. 2006. "Why Do Minority Men Earn Less? A Study of Wage Differentials among the Highly Educated," *Review of Economics and Statistics*, 88(2), 300-313.

Black, D., and J. Smith. 2004. "How Robust Is the Evidence on the Effects of College Quality? Evidence from Matching," *Journal of Econometrics* 121, 99-124.

Blanchard, L., B. Zhao, and J. Yinger. 2007. "Do Lenders Discriminate Against Minority and Woman Entrepreneurs?" *Journal of Urban Economics* 63(2), 467-497.

Blanchflower, D., P. Levine, and D. Zimmerman. 2003. "Discrimination in the Small-Business Credit Market," *Review of Economics and Statistics* 85, 930-943.

Cavalluzzo, K., and L. Cavalluzzo. 1998. "Market Structure as A Tool To Discern The Role of Discrimination in Credit Markets: The Case of Small Businesses," *Journal of Money, Credit and Banking* 30, 771-792.

Cavalluzzo, K., L. Cavalluzzo, and J. Wolken. 2002. "Competition, Small Business Financing, and Discrimination: Evidence from a New Survey," *Journal of Business* 75, 641-680.

25

Frohlich, M. 2004. "Finite Sample Properties of Propensity-Score Matching and Weighting Estimators," *Review of Economics and Statistics* 86 (1), 77-90.

Galster, G., D. Wissoker, and W. Zimmerman. 2001. "Testing For Discrimination In Home Insurance: Results from New York City and Phoenix," *Urban Studies* 38, 141C56.

Heckman, J. 1998. "Detecting Discrimination," *Journal of Economic Perspectives* 12, 101-16.

Heckman, J., H. Ichimura, and P. Todd. 1997. "Matching as an Econometric Evaluation Estimator: Evidence from Evaluating a Job Training Program," *Review of Economic Studies* 64, 605-654.

Heckman, J., H. Ichimura, and P. Todd. 1998. "Matching as an Econometric Evaluation Estimator," *Review of Economic Studies* 65, 261-294.

Heckman, J., H. Ichimura, J. Smith, and P. Todd. 1998. "Characterizing Selection Bias Using Experimental Data," *Econometrica* 66, 1017-1098.

Li, Q., and J. Racine. 2007. *Nonparametric Econometrics: Theory and Practice*. Princeton, N.J.: Princeton University Press.

Olson, E., July 29, 2005. "Minority-Owned Businesses Are On The Rise," *New York Times*.

Ondrich, J., S. Ross, and J. Yinger. 2000. "How Common Is Housing Discrimination? Improving On Traditional Measures," *Journal of Urban Economics* 47(2), 470-500.

Ondrich, J., S. Ross, and J. Yinger. 2003. "Now You See It, Now You Don't': Why Do Real Estate Agents Withhold Houses from Black Customers," *Review of Economics and Statistics* 85(4), 854-73.

Pagan, A., and A. Ullah. 1999. *Nonparametric Econometrics*. Cambridge, U.K.: Cambridge University Press.

26

Rosenbaum, P., and D. Rubin. 1983. "The Central Role of the Propensity Score in Observational Studies for Causal Effects," *Biometrika* 70, 41-55.

Ross, S., and M. Turner. 2005. "Housing Discrimination in Metropolitan American: Explaining Changes between 1989 and 2000," *Social Problems* 52, 152-80.

Ross, S., M. Turner, E. Godfrey, and R. Smith. 2005. "Mortgage Lending in Chicago and Los Angeles: A Paired Testing Study of the Pre-Application Process," Working Paper No. 2005C03, Department of Economics, University of Connecticut, Storrs, CT.

Ross, S., and J. Yinger. 2002. *The Color of Credit: Mortgage Lending Discrimination, Research Methodology, and Fair-Lending Enforcement.* Cambridge, MA: MIT Press.

Ross, S., and J. Yinger. 2006. "Detecting Discrimination: A Comparison of Methods Used By Scholars and Civil Rights Enforcement Officials," *American Law and Economics Review* 8, 562-614.

Smith, J., and P. Todd. 2001. "Reconciling Conflicting Evidence on the Performance of Propensity-Score Matching Methods," *American Economic Review* 91(2), 112-118.

Smith, J., and P. Todd. 2005. "Does Matching Overcome Lalonde's Critique of Nonexperimental Methods?" *Journal of Econometrics* 125, 305-353.

Yinger, J. 1995. *Closed Doors, Opportunities Lost: The Continuing Costs of Housing Discrimination.* New York: Russell Sage Foundation.

27

## Table 1: Variable Definitions from the Pooled SSBF Data

| | |
|---|---|
| Interest rate | Interest rate on the most recent loan (%) |
| **Credit History** | |
| Personal delinquency | Whether the owner had delinquent personal obligations in the past three years |
| Judgments | Whether there was judgment against the firm owner |
| **Firm Characteristics** | |
| Sales | Firm's sales of the fiscal year in $1000 |
| Profit | Firm's profit of the fiscal year in $1000 |
| Net worth | Firm's net worth of the fiscal year in $1000 |
| Firm age | The age of the firm in years |
| Employment | The number of employees and owners |
| **Owner Characteristics** | |
| Education indicator | Whether the owner's education level was high school dropout / high school/ graduate / some college / college / post-graduate degree |
| Business experience | Owner's years of business experience |
| **Loan Characteristics** | |
| Loan amount | The amount of loan granted in $1000 |
| Purpose of loan | Whether the loan was new line of credit/ capital lease / mortgage / vehicle/ loan / equipment loan / other type of loan |
| Fixed-interest-rate loan | Whether the interest rate was fixed |
| Collateral required | Whether collateral were required |
| Guarantor required | Whether a guarantor is required to co-sign on the loan |
| Points paid at closing (%) | The points (in interest percentage terms) paid at closing |
| **Lender Characteristics** | |
| Type of lender | Whether the lender was commercial bank, saving bank, loan association or credit union / finance company / other type of institution or source. |
| Years firm has business relationship with lender | Years the lender had business relationship with the borrower |
| **Geographic Variables** | |
| Metropolitan area | Whether the firm was in a Metropolitan Statistical Area (MSA) |
| Region indicator | Whether the firm was located in Northeast / North Central / South / West |

*Source:* Survey of Small Business Finances of 1993, 1998, and 2003.

28

JA0194

**Table 2: Means and Standard Deviations for Pooled SSBF Data**
*(standard deviations in parentheses)*

|  | All | White | Blacks | Hispanic | Other Races | Men | Women |
|---|---|---|---|---|---|---|---|
| Sample size | 3727 | 3266 | 130 | 159 | 172 | 2913 | 702 |
| *Dependent Variable* | | | | | | | |
| Interest rate on the most recent loan (%) | 7.41 | 7.23 | 9.73 | 8.62 | 8.03 | 7.39 | 7.32 |
|  | 2.92 | 2.78 | 3.68 | 3.52 | 3.16 | 2.90 | 2.83 |
| *Credit History* | | | | | | | |
| % Personal delinquency | 0.18 | 0.16 | 0.52 | 0.32 | 0.19 | 0.18 | 0.16 |
|  | (0.67) | (0.63) | (1.03) | (0.89) | (0.70) | (0.66) | (0.61) |
| % Judgments | 0.02 | 0.02 | 0.06 | 0.06 | 0.05 | 0.03 | 0.02 |
|  | (0.16) | (0.14) | (0.24) | (0.23) | (0.21) | (0.16) | (0.13) |
| *Firm Characteristics* | | | | | | | |
| Sales | 7392.71 | 7790.90 | 2025.25 | 3614.94 | 7380.88 | 8355.59 | 4073.46 |
|  | (17779.96) | (18374.70) | (4647.83) | (8641.30) | (17837.89) | (18613.93) | (14512.94) |
| Profit | 686.97 | 723.98 | 348.63 | 435.61 | 472.22 | 800.15 | 283.48 |
|  | (4177.16) | (4396.14) | (1391.53) | (2795.50) | (1514.80) | (4673.18) | (1249.10) |
| Net worth | 1277.04 | 1367.96 | 189.12 | 477.01 | 1112.29 | 1451.45 | 720.34 |
|  | (5020.25) | (5260.08) | (760.32) | (1733.07) | (3997.19) | (5362.68) | (3705.36) |
| Firm age | 16.45 | 17.08 | 12.16 | 12.53 | 11.46 | 17.05 | 14.86 |
|  | (12.75) | (13.08) | (8.29) | (9.75) | (8.52) | (13.13) | (11.20) |
| Employment | 49.05 | 51.01 | 33.82 | 31.49 | 39.55 | 53.95 | 31.99 |
|  | (73.32) | (74.05) | (72.07) | (54.64) | (71.63) | (77.27) | (53.58) |
| *Owner Characteristics* | | | | | | | |
| % High school dropout | 0.02 | 0.02 | 0.03 | 0.08 | 0.01 | 0.02 | 0.01 |
|  | (0.14) | (0.14) | (0.17) | (0.26) | (0.08) | (0.14) | (0.12) |
| % High school graduate | 0.17 | 0.17 | 0.09 | 0.19 | 0.10 | 0.16 | 0.20 |
|  | (0.37) | (0.38) | (0.29) | (0.40) | (0.31) | (0.37) | (0.40) |
| % Some college | 0.28 | 0.28 | 0.30 | 0.31 | 0.20 | 0.25 | 0.38 |
|  | (0.45) | (0.45) | (0.46) | (0.46) | (0.40) | (0.43) | (0.49) |
| % College degree | 0.34 | 0.34 | 0.35 | 0.25 | 0.32 | 0.35 | 0.26 |
|  | (0.47) | (0.47) | (0.48) | (0.44) | (0.47) | (0.48) | (0.44) |
| % Post-graduate degree | 0.20 | 0.19 | 0.22 | 0.17 | 0.37 | 0.21 | 0.14 |
|  | (0.40) | (0.39) | (0.42) | (0.38) | (0.48) | (0.41) | (0.35) |
| Business experience | 21.20 | 21.87 | 15.61 | 17.42 | 16.28 | 22.02 | 18.74 |
|  | (10.94) | (10.96) | (8.69) | (10.63) | (8.94) | (10.86) | (10.80) |

29

Table 2: Means and Standard Deviations for Pooled SSBF Data (cont'd)
(standard deviations in parentheses)

*Loan Characteristics*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Loan amount | 921.94 | 979.84 | 362.54 | 265.20 | 852.45 | 1048.44 | 502.12 |
| | (4297.08) | (4545.18) | (1787.31) | (739.06) | (2066.40) | (4739.32) | (2111.54) |
| % Loan was new line of credit | 0.53 | 0.52 | 0.55 | 0.52 | 0.62 | 0.53 | 0.50 |
| | (0.50) | ( 0.50) | (0.50) | (0.50) | (0.49) | (0.50) | (0.50) |
| % Loan was capital lease | 0.03 | 0.02 | 0.05 | 0.03 | 0.05 | 0.03 | 0.02 |
| | (0.16) | (0.15) | (0.21) | (0.18) | (0.21) | (0.16) | (0.14) |
| % Loan was mortgage | 0.10 | 0.11 | 0.05 | 0.08 | 0.11 | 0.10 | 0.12 |
| % Loan was vehicle loan | 0.11 | 0.12 | 0.08 | 0.14 | 0.06 | 0.11 | 0.13 |
| | ( 0.32) | (0.32) | (0.28) | (0.35) | (0.23) | (0.32) | (0.34) |
| % Loan was equipment loan | 0.12 | 0.13 | 0.07 | 0.13 | 0.07 | 0.12 | 0.12 |
| | (0.33) | (0.33) | (0.25) | (0.33) | (0.26) | (0.33) | (0.33) |
| % Loan was other type | 0.11 | 0.10 | 0.20 | 0.11 | 0.09 | 0.11 | 0.10 |
| | (0.31) | (0.30) | (0.40) | (0.31) | (0.29) | (0.31) | (0.30) |
| % Fixed-interest-rate loan | 0.51 | 0.50 | 0.70 | 0.62 | 0.45 | 0.49 | 0.58 |
| | ( 0.50) | (0.50) | (0.46) | (0.49) | (0.50) | (0.50) | (0.49) |
| % Collateral required | 1.62 | 1.60 | 1.98 | 1.60 | 1.62 | 1.62 | 1.60 |
| | (1.85) | (1.83) | (2.27) | (1.85) | (1.88) | (1.83) | (1.91) |
| % Guarantor required | 0.57 | 0.58 | 0.54 | 0.52 | 0.58 | 0.57 | 0.58 |
| | (0.49) | (0.49) | (0.50) | (0.50) | ( 0.49) | (0.49) | (0.49) |
| Points paid at closing | 0.28 | 0.25 | 0.58 | 0.40 | 0.47 | 0.26 | 0.30 |
| | ( 0.93) | (0.84) | (1.40) | (1.42) | (1.27) | (0.86) | (1.02) |

*Lender Characteristics*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| % Lender was commercial bank | 0.77 | 0.78 | 0.71 | 0.74 | 0.73 | 0.78 | 0.74 |
| | (0.42) | (0.41) | (0.46) | (0.44) | (0.45) | (0.41) | (0.44) |
| %Lender was saving bank, loan association or credit union | 0.07 | 0.07 | 0.02 | 0.06 | 0.05 | 0.07 | 0.09 |
| | (0.25) | (0.26) | (0.12) | (0.23) | (0.22) | (0.25) | (0.29) |
| % Lender was finance company | 0.09 | 0.08 | 0.14 | 0.12 | 0.09 | 0.08 | 0.10 |
| | (0.28) | (0.27) | (0.35) | ( 0.33) | (0.29) | (0.27) | (0.30) |
| % Lender was other type of institution | 0.07 | 0.06 | 0.14 | 0.09 | 0.13 | 0.07 | 0.07 |
| | (0.26) | (0.24) | (0.35) | (0.28) | (0.33) | (0.25) | (0.25) |
| Years firm has business relation with lender | 8.10 | 8.41 | 4.70 | 6.88 | 5.91 | 8.41 | 7.20 |
| | (9.21) | (9.47) | (5.71) | (7.67) | ( 6.54) | (9.37) | (8.77) |
| % in metropolitan area | 0.77 | 0.75 | 0.92 | 0.89 | 0.92 | 0.77 | 0.72 |
| | ( 0.42) | (0.43) | (0.28) | (0.32) | (0.27) | (0.42) | (0.45) |
| % Northeast | 0.16 | 0.17 | 0.15 | 0.11 | 0.13 | 0.17 | 0.15 |
| | (0.37) | (0.37) | (0.36) | (0.31) | (0.33) | (0.37) | (0.36) |
| % North Central | 0.26 | 0.28 | 0.19 | 0.13 | 0.13 | 0.27 | 0.25 |
| | (0.44) | (0.45) | (0.40) | (0.33) | ( 0.34) | (0.44) | (0.43) |
| % South | 0.35 | 0.34 | 0.54 | 0.42 | 0.30 | 0.35 | 0.35 |
| | ( 0.48) | (0.47) | (0.50) | (0.50) | (0.46) | (0.48) | (0.48) |
| % West | 0.23 | 0.21 | 0.12 | 0.35 | 0.44 | 0.22 | 0.25 |
| | (0.42) | (0.41) | (0.32) | (0.48) | (0.50) | (0.41) | (0.44) |

*Source:* Survey of Small Business Finances of 1993, 1998, and 2003. These statistics do not reflect sample weights.

30

Appeal: 13-1982   Doc: 14-1   Filed: 10/21/2013   Pg: 213 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 62455   Filed 08/23/12   Page 334 of 44 PageID# 1728
Case 1:11-cv-01277-GBL-TRJ   Document 77-4   Filed 08/26/12   Page 34 of 44   PageID# 2162

Table 3A. Blinder-Oaxaca Estimation Results for Whites, Blacks and Hispanics

| | Whites* | | Blacks** | | Hispanics*** | |
|---|---|---|---|---|---|---|
| | Coefficient | Standard Error | Coefficient | Standard Error | Coefficient | Standard Error |
| Personal delinquency | 0.134 | 0.063 | 0.603 | 0.295 | 0.084 | 0.324 |
| Judgments | 0.686 | 0.276 | 0.216 | 1.326 | 0.785 | 1.220 |
| Sales | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Profit | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 |
| Net worth | -0.015 | 0.009 | 0.491 | 0.418 | -0.221 | 0.216 |
| Firm age | -0.004 | 0.004 | -0.038 | 0.057 | 0.052 | 0.047 |
| Employment | -0.003 | 0.001 | -0.005 | 0.005 | -0.009 | 0.008 |
| High school graduate | -0.888 | 0.297 | -2.993 | 2.055 | -0.341 | 1.167 |
| Some college | -0.855 | 0.293 | -2.158 | 1.937 | 0.522 | 1.100 |
| College degree | -1.240 | 0.291 | -2.961 | 1.971 | -0.898 | 1.139 |
| Postgraduate degree | -1.240 | 0.298 | -2.170 | 1.934 | -0.796 | 1.249 |
| Business experience | -0.019 | 0.004 | -0.069 | 0.050 | -0.090 | 0.038 |
| Loan amount granted | 0.000 | 0.000 | 0.000 | 0.000 | 0.000 | 0.001 |
| Loan was capital lease | 0.466 | 0.273 | -1.140 | 1.569 | 0.841 | 1.701 |
| Loan was mortgage | 0.097 | 0.148 | 0.764 | 1.580 | -0.664 | 1.142 |
| Loan was vehicle loan | -0.644 | 0.142 | 1.366 | 1.239 | -2.576 | 1.032 |
| Loan was equipment loan | -0.136 | 0.130 | 0.967 | 1.226 | 0.073 | 0.975 |
| Loan was other type | 0.356 | 0.140 | 1.834 | 0.856 | 1.485 | 0.931 |
| Fixed-interest-rate loan | 0.764 | 0.091 | 0.577 | 0.675 | 0.622 | 0.653 |
| Points paid at closing | 0.129 | 0.047 | 0.031 | 0.224 | -0.010 | 0.195 |
| Collateral required | -0.026 | 0.024 | -0.233 | 0.145 | -0.182 | 0.161 |
| Guarantor required | -0.045 | 0.082 | 0.713 | 0.639 | -0.288 | 0.594 |
| Lender was saving bank, loan assn. or credit union | -0.070 | 0.155 | -2.619 | 2.357 | 1.109 | 1.347 |
| Lender was finance company | 0.247 | 0.153 | 3.548 | 1.041 | 1.541 | 0.968 |
| Lender was other type of institution | 0.593 | 0.170 | 1.153 | 1.051 | -0.745 | 1.110 |
| Years firm has business relation with lender | -0.003 | 0.005 | 0.087 | 0.061 | 0.036 | 0.046 |
| in metropolitan area | -0.105 | 0.092 | 0.167 | 1.122 | -0.588 | 0.859 |
| North Central | -0.034 | 0.122 | -1.439 | 1.057 | -0.586 | 1.138 |
| South | -0.015 | 0.118 | -1.416 | 0.847 | 1.167 | 0.954 |
| West | 0.341 | 0.129 | -1.177 | 1.175 | 1.508 | 0.960 |
| Survey year 1998 | 0.187 | 0.114 | 0.658 | 0.735 | 0.803 | 0.764 |
| Survey year 2003 | -2.640 | 0.093 | -2.880 | 0.877 | -1.543 | 0.690 |
| Constant | 9.849 | 0.329 | 12.998 | 2.579 | 9.990 | 1.954 |

*Note: Author's calculations using unweighted SSBF data. $N = 3,266$. The dependent variable is the interest rate. The sample is limited to White-owned firms.
** Note: Author's calculations using unweighted SSBF data. $N = 130$. The dependent variable is the interest rate. The sample is limited to Black-owned firms.
** Note: Author's calculations using unweighted SSBF data. $N = 159$. The dependent variable is the interest rate. The sample is limited to Hispanic-owned firms.

31

| Table 3B. Blinder-Oaxaca Estimation Results for Other Races and Minorities | | | | |
|---|---|---|---|---|
| | Other Races* | | Minorities** | |
| | Coefficient | Standard Error | Coefficient | Standard Error |
| Personal delinquency | 0.613 | 0.302 | 0.516 | 0.164 |
| Judgments | -0.060 | 1.000 | 0.545 | 0.632 |
| Sales | 0.000 | 0.000 | 0.000 | 0.000 |
| Profit | 0.000 | 0.000 | 0.000 | 0.000 |
| Net worth | -0.073 | 0.081 | -0.122 | 0.069 |
| Firm age (years) | -0.033 | 0.040 | 0.010 | 0.025 |
| Employment | -0.005 | 0.004 | -0.007 | 0.003 |
| High school graduate | -0.735 | 2.868 | -0.553 | 0.833 |
| Some college | -1.119 | 2.833 | -0.200 | 0.790 |
| College degree | -1.539 | 2.826 | -0.880 | 0.791 |
| Postgraduate degree | -2.183 | 2.808 | -1.049 | 0.800 |
| Business experience | -0.031 | 0.031 | -0.074 | 0.021 |
| Loan amount granted | 0.000 | 0.000 | 0.000 | 0.000 |
| Loan was capital lease | -1.887 | 1.053 | -0.993 | 0.768 |
| Loan was mortgage | -0.797 | 0.752 | -0.691 | 0.551 |
| Loan was vehicle loan | -1.838 | 0.976 | -1.107 | 0.559 |
| Loan was equipment loan | 0.011 | 0.860 | -0.016 | 0.529 |
| Loan was other type | 0.030 | 0.788 | 1.312 | 0.448 |
| Fixed-interest-rate loan | 1.156 | 0.446 | 0.878 | 0.312 |
| Points paid at closing | 0.330 | 0.165 | 0.135 | 0.106 |
| Collateral required | -0.062 | 0.122 | -0.154 | 0.076 |
| Guarantor required | -0.385 | 0.448 | -0.145 | 0.293 |
| Lender was saving bank, loan assn. or credit union | -0.059 | 1.011 | -0.086 | 0.720 |
| Lender was finance company | 1.406 | 0.800 | 2.117 | 0.504 |
| Lender was other type of institution | 0.829 | 0.679 | 0.644 | 0.488 |
| Years firm has business relation with lender | 0.007 | 0.043 | 0.032 | 0.026 |
| in metropolitan area | 0.726 | 0.797 | 0.005 | 0.491 |
| North Central | 0.567 | 0.868 | -0.623 | 0.538 |
| South | -0.159 | 0.732 | -0.279 | 0.452 |
| West | 0.102 | 0.690 | -0.188 | 0.471 |
| Survey year 1998 | 0.624 | 0.568 | 0.486 | 0.360 |
| Survey year 2003 | -3.111 | 0.532 | -2.448 | 0.365 |
| Constant | 10.492 | 3.030 | 10.678 | 1.115 |

* *Note:* Author's calculations using unweighted SSBF data. $N = 172$. The dependent variable is the interest rate. The sample is limited to firms owned by other races.

**Note:* Author's calculations using unweighted SSBF data. $N = 461$. The dependent variable is the interest rate. The sample is limited to minority-owned firms.

32

| Table 3C. Blinder-Oaxaca Estimation Results for Females and White Females | | | | |
|---|---|---|---|---|
| | Females* | | White Females** | |
| | Coefficient | Standard Error | Coefficient | Standard Error |
| Personal delinquency | 0.204 | 0.066 | 0.117 | 0.069 |
| Judgments | 0.529 | 0.274 | 0.419 | 0.299 |
| Sales | 0.000 | 0.000 | 0.000 | 0.000 |
| Profit | 0.000 | 0.000 | 0.000 | 0.000 |
| Net worth | -0.016 | 0.009 | -0.014 | 0.009 |
| Firm age (years) | -0.003 | 0.004 | -0.003 | 0.004 |
| Employment | -0.003 | 0.001 | -0.003 | 0.001 |
| High school graduate | -0.858 | 0.313 | -0.764 | 0.320 |
| Some college | -0.733 | 0.307 | -0.725 | 0.315 |
| College degree | -1.141 | 0.304 | -1.109 | 0.312 |
| Postgraduate degree | -1.185 | 0.310 | -1.108 | 0.319 |
| Business experience | -0.024 | 0.005 | -0.018 | 0.005 |
| Loan amount granted | 0.000 | 0.000 | 0.000 | 0.000 |
| Loan was capital lease | 0.144 | 0.283 | 0.521 | 0.298 |
| Loan was mortgage | 0.105 | 0.163 | 0.153 | 0.166 |
| Loan was vehicle loan | -0.547 | 0.159 | -0.504 | 0.160 |
| Loan was equipment loan | -0.230 | 0.145 | -0.174 | 0.144 |
| Loan was other type | 0.474 | 0.151 | 0.370 | 0.156 |
| Fixed-interest-rate loan | 0.882 | 0.100 | 0.833 | 0.102 |
| Points paid at closing | 0.194 | 0.051 | 0.127 | 0.056 |
| Collateral required | -0.053 | 0.026 | -0.032 | 0.027 |
| Guarantor required | -0.089 | 0.090 | -0.062 | 0.091 |
| Lender was saving bank, loan assn. or credit union | -0.071 | 0.178 | -0.048 | 0.177 |
| Lender was finance company | 0.572 | 0.167 | 0.239 | 0.172 |
| Lender was other type of institution | 0.520 | 0.181 | 0.451 | 0.191 |
| Years firm has business relation with lender | -0.003 | 0.005 | -0.005 | 0.005 |
| in metropolitan area | 0.022 | 0.105 | -0.030 | 0.103 |
| North Central | -0.111 | 0.134 | -0.052 | 0.133 |
| South | -0.060 | 0.129 | -0.067 | 0.130 |
| West | 0.308 | 0.140 | 0.347 | 0.143 |
| Survey year 1998 | 0.230 | 0.122 | 0.193 | 0.126 |
| Survey year 2003 | -2.679 | 0.101 | -2.696 | 0.102 |
| Constant | 9.908 | 0.349 | 9.708 | 0.355 |

\* *Note:* Author's calculations using unweighted SSBF data. $N = 2,913$. The dependent variable is the interest rate. The sample is limited to female-owned firms.

\*\* *Note:* Author's calculations using unweighted SSBF data. $N = 2,564$. The dependent variable is the interest rate. The sample is limited to White female-owned firms.

33

Table 4A. Propensity Score Estimation Results for Blacks and Hispanics

| | Blacks* | | Hispanics** | |
|---|---|---|---|---|
| | Coefficient | Standard Error | Coefficient | Standard Error |
| Personal delinquency | 0.234 | 0.102 | 0.160 | 0.102 |
| Judgments | 0.526 | 0.441 | 0.576 | 0.397 |
| Sales | 0.000 | 0.000 | 0.000 | 0.000 |
| Square of sales | 0.000 | 0.000 | | |
| Profit | 0.000 | 0.000 | 0.000 | 0.000 |
| Net worth | -0.057 | 0.138 | -0.027 | 0.038 |
| Square of net worth | -0.033 | 0.033 | | |
| Firm age years | 0.085 | 0.075 | -0.026 | 0.019 |
| Square of firm age years | -0.002 | 0.004 | 0.000 | 0.000 |
| Cube of firm age years | 0.000 | 0.000 | | |
| Employment | -0.002 | 0.004 | 0.000 | 0.002 |
| Square of employment | 0.000 | 0.000 | | |
| High school graduate | -0.717 | 0.678 | -1.276 | 0.390 |
| Some college | 0.187 | 0.635 | -1.185 | 0.376 |
| College degree | 0.025 | 0.632 | -1.607 | 0.384 |
| Postgraduate degree | 0.099 | 0.642 | -1.538 | 0.402 |
| Business experience | -0.053 | 0.014 | -0.022 | 0.011 |
| Loan amount granted | 0.000 | 0.000 | 0.000 | 0.000 |
| Loan was capital lease | -0.657 | 0.511 | -0.375 | 0.519 |
| Loan was mortgage | -1.642 | 0.463 | -0.363 | 0.344 |
| Loan was vehicle loan | -1.156 | 0.374 | -0.310 | 0.287 |
| Loan was equipment loan | -1.138 | 0.388 | -0.325 | 0.277 |
| Loan was other type | 0.038 | 0.269 | -0.222 | 0.291 |
| Fixed-interest-rate loan | 0.832 | 0.225 | 0.353 | 0.195 |
| Points paid at closing | 0.706 | 0.189 | 0.112 | 0.069 |
| Square of points paid at closing | -0.065 | 0.025 | | |
| Collateral required | 0.080 | 0.050 | -0.001 | 0.050 |
| Guarantor required | -0.264 | 0.201 | -0.190 | 0.175 |
| Lender was saving bank, loan assn. or credit union | -1.608 | 0.733 | -0.274 | 0.368 |
| Lender was finance company | 0.479 | 0.325 | 0.170 | 0.291 |
| Lender was other type of institution | 0.398 | 0.326 | -0.083 | 0.324 |
| Years firm has business relation with lender | -0.072 | 0.065 | 0.013 | 0.012 |
| Square of years firm has business relation with lender | 0.002 | 0.005 | | |
| Cube of years firm has business relation with lender | 0.000 | 0.000 | | |
| Metropolitan area | 1.360 | 0.334 | 1.137 | 0.263 |
| North Central | -0.292 | 0.330 | -0.368 | 0.341 |
| South | 0.522 | 0.280 | 0.589 | 0.284 |
| West | -0.701 | 0.369 | 0.908 | 0.292 |
| Survey year 1998 | -0.062 | 0.235 | -0.173 | 0.220 |
| Survey year 2003 | -1.261 | 0.265 | -0.609 | 0.202 |
| Constant | -3.523 | 0.865 | -1.936 | 0.547 |

*Note: Author's calculations using unweighted SSBF data. $N = 3,396$. A logit model is used to predict the probability of being a Black-owned firm. The sample is limited to White-owned and Black-owned firms.

**Note: Author's calculations using unweighted SSBF data. $N = 3,425$. A logit model is used to predict the probability of being a Hispanic-owned firm. The sample is limited to White-owned and Hispanic-owned firms.

34

Table 4B.  Propensity Score Estimation Results for Other Races and Minorities

| | Other Races* | | Minorities** | |
|---|---|---|---|---|
| | Coefficient | Standard Error | Coefficient | Standard Error |
| Personal delinquency | -0.019 | 0.123 | 0.165 | 0.066 |
| Judgments | 0.512 | 0.416 | 0.563 | 0.267 |
| Sales | 0.000 | 0.000 | 0.000 | 0.000 |
| Profit | 0.000 | 0.000 | 0.000 | 0.000 |
| Net worth | 0.009 | 0.020 | -0.017 | 0.019 |
| Firm age years | -0.017 | 0.037 | -0.016 | 0.007 |
| Square of firm age years | 0.000 | 0.001 | — | — |
| Cube of firm age years | 0.000 | 0.000 | — | — |
| Employment | -0.002 | 0.002 | -0.001 | 0.001 |
| High school graduate | 0.612 | 1.051 | -0.938 | 0.332 |
| Some college | 0.750 | 1.038 | -0.678 | 0.319 |
| College degree | 0.943 | 1.033 | -0.822 | 0.318 |
| Postgraduate degree | 1.554 | 1.033 | -0.495 | 0.322 |
| Business experience | -0.038 | 0.011 | -0.035 | 0.007 |
| Loan amount granted | 0.000 | 0.000 | 0.000 | 0.000 |
| Loan was capital lease | -0.046 | 0.440 | -0.410 | 0.302 |
| Loan was mortgage | -0.224 | 0.300 | -0.604 | 0.210 |
| Loan was vehicle loan | -0.759 | 0.370 | -0.690 | 0.202 |
| Loan was equipment loan | -0.873 | 0.330 | -0.765 | 0.193 |
| Loan was other type | -0.266 | 0.294 | -0.131 | 0.172 |
| Fixed-interest-rate loan | -0.078 | 0.188 | 0.351 | 0.120 |
| Points paid at closing | 0.160 | 0.066 | 0.182 | 0.045 |
| Collateral required | 0.026 | 0.046 | 0.044 | 0.029 |
| Guarantor required | -0.148 | 0.173 | -0.182 | 0.110 |
| Lender was saving bank, loan assn. or credit union | -0.297 | 0.367 | -0.497 | 0.254 |
| Lender was finance company | 0.253 | 0.307 | 0.303 | 0.188 |
| Lender was other type of institution | 0.399 | 0.277 | 0.295 | 0.188 |
| Years firm has business relation with lender | 0.005 | 0.013 | 0.001 | 0.008 |
| Metropolitan area | 1.139 | 0.289 | 1.187 | 0.173 |
| North Central | -0.341 | 0.311 | -0.313 | 0.195 |
| South | 0.201 | 0.268 | 0.445 | 0.167 |
| West | 0.941 | 0.258 | 0.648 | 0.174 |
| Survey year 1998 | 0.321 | 0.222 | 0.071 | 0.137 |
| Survey year 2003 | 0.023 | 0.199 | -0.500 | 0.128 |
| Constant | -4.069 | 1.121 | -1.448 | 0.400 |

* *Note:* Author's calculations using unweighted SSBF data. $N = 3,438$. A logit model is used to predict the probability of being a firm owned by another race. The sample is limited to White-owned firms and firms owned by other races.
***Note:* Author's calculations using unweighted SSBF data. $N = 3,727$. A logit model is used to predict the probability of being a minority-owned firm. The sample is limited to White-owned and minority-owned firms.

Table 4C. Propensity Score Estimation Results for Females and White Females

| | Females* | | White Females** | |
|---|---|---|---|---|
| | Coefficient | Standard Error | Coefficient | Standard Error |
| Personal delinquency | -0.063 | 0.062 | -0.107 | 0.072 |
| Judgments | -0.235 | 0.278 | -0.368 | 0.337 |
| Sales | 0.000 | 0.000 | 0.000 | 0.000 |
| Square of sales | 0.000 | 0.000 | 0.000 | 0.000 |
| Cube of sales | 0.000 | 0.000 | 0.000 | 0.000 |
| Fourth power of sales | 0.000 | 0.000 | 0.000 | 0.000 |
| Profit | 0.000 | 0.000 | 0.000 | 0.000 |
| Square of profit | 0.000 | 0.000 | 0.000 | 0.000 |
| Cube of profit | 0.000 | 0.000 | 0.000 | 0.000 |
| Net worth | -0.002 | 0.016 | 0.004 | 0.016 |
| Firm age years | 0.015 | 0.010 | 0.021 | 0.011 |
| Square of firm age years | 0.000 | 0.000 | 0.000 | 0.000 |
| Employment | 0.000 | 0.001 | -0.001 | 0.001 |
| High school graduate | 0.180 | 0.290 | 0.496 | 0.365 |
| Some college | 0.337 | 0.285 | 0.724 | 0.360 |
| College degree | -0.215 | 0.287 | 0.114 | 0.363 |
| Postgraduate degree | -0.427 | 0.295 | -0.039 | 0.371 |
| Business experience | -0.070 | 0.014 | -0.079 | 0.015 |
| Square of business experience | 0.001 | 0.000 | 0.001 | 0.000 |
| Loan amount granted | 0.000 | 0.000 | 0.000 | 0.000 |
| Loan was capital lease | -0.349 | 0.290 | -0.409 | 0.329 |
| Loan was mortgage | 0.041 | 0.151 | 0.067 | 0.163 |
| Loan was vehicle loan | -0.156 | 0.146 | -0.153 | 0.157 |
| Loan was equipment loan | -0.053 | 0.136 | -0.188 | 0.149 |
| Loan was other type | -0.149 | 0.147 | -0.102 | 0.160 |
| Fixed-interest-rate loan | 0.155 | 0.094 | 0.206 | 0.103 |
| Points paid at closing % | 0.021 | 0.041 | 0.032 | 0.048 |
| Collateral required | 0.003 | 0.025 | -0.005 | 0.027 |
| Guarantor required | 0.039 | 0.086 | 0.020 | 0.094 |
| Lender was saving bank, loan assn. or credit union | 0.120 | 0.156 | 0.129 | 0.163 |
| Lender was finance company | 0.179 | 0.153 | 0.260 | 0.169 |
| Lender was other type of institution | 0.077 | 0.170 | 0.065 | 0.191 |
| Years firm has business relation with lender | -0.009 | 0.006 | -0.010 | 0.006 |
| Metropolitan area | -0.074 | 0.098 | -0.094 | 0.102 |
| North Central | 0.012 | 0.136 | -0.041 | 0.145 |
| South | 0.178 | 0.129 | 0.205 | 0.138 |
| West | 0.327 | 0.136 | 0.381 | 0.147 |
| Survey year 1998 | 0.016 | 0.120 | -0.089 | 0.133 |
| Survey year 2003 | 0.272 | 0.099 | 0.192 | 0.106 |
| Constant | -0.462 | 0.347 | -0.660 | 0.417 |

*Note: Author's calculations using unweighted SSBF data. $N = 3,727$. A logit model is used to predict the probability of being a female-owned firm.

**Note: Author's calculations using unweighted SSBF data. $N = 3,266$. A logit model is used to predict the probability of being a White female-owned firm. The sample is limited to White-owned firms.

36

| Table 5: Estimates of Race Discrimination in Interest Rates, SSBF Data | | | | |
|---|---|---|---|---|
| | Minority | Blacks | Hispanic | Other Races |
| *Panel A:* Binder–Oaxaca Estimates | | | | |
| Coefficient | 0.599 | 1.109 | 0.453 | 0.349 |
| Standard Error | (0.151) | (0.301) | (0.260) | (0.204) |
| $N$ | 3,727 | 3,396 | 3,425 | 3,438 |
| | | | | |
| *Panel B:* Propensity Score Matching Estimates * | | | | |
| Coefficient | 0.671 | 0.791 | 0.486 | 0.353 |
| Standard Error | (0.176) | (0.369) | (0.273) | (0.253) |
| Bandwidth | 0.013 | 0.005 | 0.008 | 0.029 |
| $N$ | 3,727 | 3,396 | 3,425 | 3,438 |

*Source:* Survey of Small Business Finances of 1993, 1998, and 2003. The omitted racial/ethnic group in column (1) through column (4) is White. The standard errors are corrected according to the procedure in the Appendix.
*The standard errors are obtained by bootstrapping based on 2,000 replications.

37

JA0203

**Table 6: Estimates of Gender Discrimination in Interest Rates**

|  | Females | White Females |
|---|---|---|
| *Panel A*: Binder –Oaxaca Estimates | | |
| Coefficient | -0.174 | -0.132 |
| Standard Error | (0.101) | (0.104) |
| *N* | 3,727 | 3,266 |
| | | |
| *Panel B*: Propensity Score Matching Estimates | | |
| Coefficient | -0.266 | -0.188 |
| Standard Error | (0.129) | (0.135) |
| Bandwidth | 0.034 | 0.039 |
| *N* | 3,727 | 3,266 |

*Source:* Survey of Small Business Finances of 1993, 1998, and 2003. The reference gender group in column (1) is male, and the omitted group in column (2) is White males. The standard errors are corrected according to the procedure in the Appendix.

*The standard errors in Panel B are obtained by bootstrapping based on 2,000 replications.

38

Figure 1: The Distributions of the Propensity Scores for Minority



Figure 2: The Distributions of the Propensity Scores for Black



39

Figure 3: The Distributions of the Propensity Scores for Hispanic



Figure 4: The Distributions of the Propensity Scores for Other Races



40

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 223 of 418

Figure 5: The Distributions of the Propensity Scores for Female



Figure 6: The Distributions of the Propensity Scores, White Females



41

# EXHIBIT 5

Case 1:11-cv-01277-GBL-TRJ   Document 62-6   Filed 08/03/12   Page 1 of 2 PageID# 1431
Case 1:11-cv-01277-GBL-TRJ   Document 77-5   Filed 08/20/12   Page 2 of 3   PageID 2114

# Minority-owned businesses, trade credit and discrimination : an empirical study of the impact of racial discrimination on access to trade credit for minority-owned vs. non-minority-owned firms

## DSpace/Manakin Repository

- Academic Archive Home
- Community Economic Development
- Dissertations in Community Economic Development
- View Item

Login

**Minority-owned businesses, trade credit and discrimination : an empirical study of the impact of racial discrimination on access to trade credit for minority-owned vs. non-minority-owned firms**

Show full item record

## Files in this item

| Files | Size | Format | View |
|---|---|---|---|
| sced2007reese.pdf | 761.7Kb | PDF | View/Open |
| sced2007reese_apdx.pdf | 192.3Kb | PDF | View/Open |

## About this item

| | |
|---|---|
| Title: | Minority-owned businesses, trade credit and discrimination : an empirical study of the impact of racial discrimination on access to trade credit for minority-owned vs. non-minority-owned firms |
| Author: | Reese, T. David |
| Date: | 2007 |
| Abstract/Description: | Access to credit in particular and capital in general is a major determinant of the rate of both the formation and survival of small businesses. During the last thirty years a growing body of theoretical and empirical research has developed that explores how a firm's access to credit varies by the business owner's race and/or ethnicity and test specific hypotheses about why these |

Appeal: 13-1982     Doc: 14-1     Filed: 10/21/2013     Pg: 226 of 418

variation might occur. The overwhelming majority of empirical studies show that on average African-American and Hispanic borrowers receive credit in amounts and on terms less favorable than those obtained by non-minority borrowers. Much of this research asks, "does racial discrimination in part account for the observed disparities in credit outcomes for various racial and ethnic groups?"

While numerous studies have tested for the existence of discrimination in commercial bank lending to firms, to date, this author has found only two empirical studies that explore how access to trade credit varies with the race and/or ethnicity of a firm's owner. This study begins the process of addressing this gap in the literature. This study explores if and how the amount of trade credit obtained by small businesses varies by the owner's race and/or ethnicity. Our findings clearly shows that firms owned by African-American men, Hispanic white men and Asian-Americans on average receive significantly lower levels of trade credit relative to those owned by non-Hispanic white men. After controlling for industry, the owner's human capital, the creditworthiness of the firm and the firm's owner, this study finds no statistically significant evidence that the race/ethnicity of a firm's owner explains the observed disparity in the levels of trade credit provided to firms owned by Hispanic whites and African-Americans. For firms owned by Asian-Americans, this study does find statistically significant evidence that race explains in part the observed disparities after controlling for industry, the owner's human capital, the creditworthiness of the firm and the firm's owner. This finding is noteworthy because many scholars suggest that Asian-Americans do not experience difficulties in accessing credit comparable to those experienced by other minorities. (Author abstract)

| | |
|---|---|
| | access to credit |
| | capital markets |
| | African-American men |
| Subject: | discrimination |
| | creditworthiness |
| | trade credit |
| | commercial lending |
| Citation Link: | http://hdl.handle.net/10474/334 |
| APA Citation: | Reese, T. D. (2007). Minority-owned businesses, trade credit and discrimination: an empirical study of the impact of racial discrimination on access to trade credit for minority-owned vs. non-minority-owned firms. Retrieved from http://academicarchive.snhu.edu |
| Advisor: | Swack, Michael |
| Committee Member: | Karush, Gerald |
| | Buchele, Robert |

## Files in this item

| Files | Size | Format | View |
|---|---|---|---|
| sced2007reese.pdf | 761.7Kb | PDF | View/Open |
| sced2007reese_apdx.pdf | 192.3Kb | PDF | View/Open |

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 227 of 418

# EXHIBIT 6

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

BEST MEDICAL INTERNATIONAL
INC., a Virginia Corporation;
HUESTIS MACHINE CORP., a Rhode Island
Corporation, GUNSTON HALL REALTY, INC. a
Virginia Corporation; BEST INDUSTRIES INC.,     Case No. 1:11-cv-01277
a Virginia Corporation and KRISHNAN
SUTHANTHIRAN, an individual,                    Hon. Gerald Bruce Lee

        Plaintiffs,

v.

WELLS FARGO, BANK, N.A., as successor
in interest to WACHOVIA BANK, N.A.

        Defendant.

---

## AFFIDAVIT OF ALEXANDER T. ARAPOGLOU

Now comes the affiant, Alexander T. Arapoglou, who testifies as follows:

1. That my name is Alexander T. Arapoglou, I am over 18 years of age and competent to testify as to the following. My vita is attached to this affidavit and labeled as Exhibit A. It is a true and accurate description of my education and professional experience and training.

2. That I earned a MBA degree in 1980 from the Kenan-Flager School of Business at the University of North Carolina and an Engineering degree from McGill University in Montreal, Quebec, Canada.

3. That I am a Professor of Finance at the Kenan-Flager School of Business at the University of North Carolina at Chapel Hill. I also have been an expert witness relative to banking and finance matters in Texas, North Carolina and New York. I am also on the Board of Directors of Harrington Bank in North Carolina where I serve on the Board's loan committee.

4. That I have also served as Treasurer and Head of Risk Management worldwide for Mizuho Capitol Markets Corporation. As treasurer, I was responsible for firm

investments, funding, liquidity risk management as well as all non trading foreign exchange and interest rate risk. As the Head of Risk Management I managed the market risk department and implemented a variety of metrics and techniques for the analysis of trading, credit and liquidity risks.

5.    Prior to joining Mizuho I traded interest rate derivatives in dollars, yen and other currencies for Chemical Bank and later Chase after they merged. I joined Chemical Bank as Global Head of Risk Management in 1989 and managed risk incidents in the United States, Europe, Asia and South America.

6.    I have also had positions as Head of the Financial Analysis group at Salmon Brothers and Head of Consumer Sector Treasury at Chase where I was on the bank-wide Treasury Strategy Committee.

7.    Prior to my financial career I was a Management Consultant with Accenture.

8.    As a result of my training, education and experience I am very familiar with the type of credit facilities that are relevant to this case as well as reasonable and customary banking practices that apply to the parties an loans in question.

9.    I have reviewed the Amended Complaint, relevant loan documents, correspondence between the parties and the Plaintiffs relevant financial statements.

10.    As a result of my training, education and experience, as well as a review of the aforementioned documents, I have formulated the following facts and opinions.

    A.    That the relationship between the parties abruptly deteriorated after Wachovia merged with Wells Fargo on December 31, 2008.

    B.    By the Spring of 2009, a few months after the Wachovia purchase, Wells Fargo's stock had declined more than 75 % and they accepted public sector bailouts totaling $31 billion with the purpose of lending money to businesses such as the Plaintiffs. In addition low interest and LIBOR rates resulted in virtually free money to banks such as Wells Fargo to lend.

    C.    The Plaintiffs were credit worthy. They had never missed a payment and after April 1, 2010 had made advanced payments on principal of $250,000.00 per month for seven months totaling $1.75 million as a gesture of good faith.

    D.    That after the July 30, 2009 Waiver and Amendment Agreement Wells Fargo requested and received additional collateral to the degree that the loans were over-secured.

    E.    The strategy and actions taken by Wells Fargo Bank against the Plaintiff in this matter is exceedingly outside the bounds of normal, reasonable or customary banking practices.

F.    Even in times of extreme credit tightening the normal process is to gradually escalate credit requirements in proportional stages. It is neither a reasonable nor a customary banking practice to precipitate a foreclosure or a demise of an operating business that has substantially performing, over-secured loans.

G.    That on or about March 16, 2010 Wells Fargo demanded an excessive interest floor rate of 8%; prepayment demands of $1,000,000.00; a $6,000,000.00 payment within 90 days fee; demands that would total about $500,000.00 and increased collateral of 1,000,000.00 for an already over-secured, substantially performing loan. These demands required by the bank were all draconian, punitive and not within reasonable and customary banking practices especially for customers who were over-secured and paying on time and early.

H.    As of May 26, 2010 Wells Fargo was still demanding more collateral for an already over-secured loan, demanding control of where business operating funds would be deposited and requiring draconian interest rates of 9% and punitive fees that would cost Plaintiffs in excess of $400,000.00. These various costs resulted in an effective annual interest rate of 14.18% at a time when interest generally were at all time lows.

I.    There is no logical or even rational explanation for Wells Fargo to force a foreclosure fire sale in this instance especially with economy in recession or a period of low growth.

J.    The proffered reasons given by Wells Fargo for declaring defaults were due to unsubstantial, immaterial technical variations with certain Debt-Service Coverage Ratios and Liquidity Ratios relative to the personal guarantor, Mr. Suthanthiran.

K.    No rational bank would foreclose, or even call these loans for the because of these minor variations with the original loan documents to an otherwise fully performing loan with significant principal prepayments.

L.    The financial effects of such a foreclosure will have a disastrous effect on the Plaintiffs operating businesses and likely result in significant job loss.

11.    In reviewing the facts of this case, and taking into consideration the following information:

a.    Plaintiffs minority status;
b.    Plaintiffs discrimination complaint of June 24, 2010:
c.    The filing of confessed judgments six days after the discrimination complaint;
d.    The bank's unreasonable demands of increased interest, prepayment, fees and collateral
e.    The complete lack of any rational business reason for the foreclosures

I can reasonably infer that race must have been a significant factor in Wells Fargo's decision to call the loans and foreclose on Plaintiffs properties. It can also be inferred that Wells Fargo's decision to file the confessed judgments when they did was in retaliation for the civil rights complaint filed on June 24, 2010.

12.    The foregoing opinions are not the only opinions I hold in this matter but are those that appear to be most relevant at this time.

Alexander T. Arapoglou,
Affiant

Subscribed and sworn to before me this _22_ day of March, 2012,

_Marion E Strandh_, a notary in the County of _Orange_,

State of _North Carolina_. My commission expires on _September 24, 2015_.

Notary Public

Cell 1-919-452-8259
Email alexa@arapoglou.com

# Alexander T. Arapoglou

| | |
|---|---|
| **Professional experience** | <u>2007 to present University of North Carolina, Kenan-Flagler Business School,     Chapel Hill, NC</u> |

**Professor, Finance department**

- Teaching responsibilities include MBA Applied Investment Management course where students manage year round a portion of the University endowment, investing globally in equities, fixed income, foreign exchange, derivatives and commodities.
  Current teaching responsibilities also include MBA and BSBA Risk Management where students learn market, credit and liquidity risk management as it applies to individuals, financial institutions, investment management firms and corporations.

- Participate in curriculum, admissions, placement and scholarship award activities.

<u>2002 to present      Aland Corporation,    Durham NC</u>

**Principal**
- Activities include financial consulting and investment.

<u>1996- 2002_____ Mizuho Capital Markets Corporation, (formerly Fuji Capital  Markets), New York, London, Hong Kong</u>

**Director, Treasurer**
- Developed new function responsible for firm investments, funding, collateral, liquidity risk management as well as all non-trading foreign exchange and interest rate hedging. Adjust balance sheet at holding company and subsidiary level to improve BIS and other financial ratios as well as to increase revenue. Interface with regulators on issues of liquidity. Chairman of Treasury strategy committee. (The 2000 and 2001 department net trading income was in excess of $47 mm ). Registered with FSA in UK as Treasurer of UK subsidiary.

**Director, Risk Management**
- Managed Market Risk department, which includes a staff of 10 professionals monitoring market risk in New York, London and Hong Kong. Introduced value at risk, scenario analysis, risk until unwind and a variety of monte carlo analyses to define forward counterparty credit and firmwide liquidity risk. Represented firm to US regulators on issues of market risk.

**1989- 1996          Chase Manhattan Bank, NA,      New York**

**Vice-President, Trader**
- Responsible for the yen trading bay, Including JPY interest rate swaps, Fras and FX forwards; trading strategies included arbitrage, market making and positioning.

**Vice-President, Risk Management**
- Responsible for risk management function for Chemical bank capital markets products worldwide. Developed global position limits and risk reporting consistent with business plans. Advised senior management with respect to market risk incidents in Germany, South America, Japan, Brazil, Korea and USA. Represented the bank to market risk regulators.

- Managed US dollar interest rate options trading following a major catastrophe; improved systems, identified unhedged market risks, reduced exposures and restored profitability prior to merger with Manufacturers Hanover

**1987- 1989          Drexel Burnham Lambert,      New York**

**Vice-President, Treasury Planning and Analysis**
- Responsible for organizing and staffing a new department. Managed the planning and analysis of liquidity, foreign exchange and interest rate risk and the development of alternative funding opportunities. Series 7 and Series 3 registered.

**1985-1987          Salomon Inc,                  New York**

**Vice-President, Manager, Financial Analysis**
Organized and staffed a new department to perform treasury and risk analysis. Managed firm asset/liability management staff group. Regularly interfaced with credit, systems, sales, trading, bond portfolio analysis and the rest of the finance department. Assignments included:
- Review of pricing and hedging strategies for caps and floors. Made recommendations for potential improvement.
- Development of new technology for differential pricing of contractual commitments according to counterparty credit quality. Methodology applies to futures, forwards, options and swaps.
- Presentation of capital adequacy criteria for interest rate swaps to the Federal Reserve Bank, Securities exchange Commission and Bank of England.
- Development of credit line usage criteria for interest rate swaps and other contractual commitments.

**1982-1985             Chase Manhattan Bank, NA,     New York**

**Vice-President, Manager Retail Product Development**
- Responsible for a staff of 15 product managers, marketing consumer bank products. Coordinated advertising, product development, legal, systems, operations and sales support.

**Vice-President, Consumer Sector Funding**
- Coordinated pricing and pricing policy for consumer sector liabilities nationwide following deregulation. Member bank-wide Treasury Strategy Committee, representing consumer sector. Created strategic pricing formula for MMDA accounts that reduced funding costs in excess of $5 mm per annum.
- Developed a market based pool transfer pricing concept to support asset/liability pricing consistent with a centralized interest rate risk management approach.

**1980-1982             Accenture Consulting,          Washington, D.C.**

**Senior Consultant**
Developed business plans and corresponding systems requirements for multi-billion dollar International energy projects.
- Provided management consulting services to initiate policies for capital budgeting, cost control, performance measurement, scheduling and progress control for a European oil company building a major refinery in Saudi Arabia.
- Evaluated and recommended strategic improvements to controls and management information systems for the management of engineering, purchasing and construction of nuclear power plants in the United States and Canada. Analyzed why costs had escalated and schedules were not being met and recommended a strategy for control.
- Developed a management plan and management information systems requirements for a major US oil company planning to build an LNG plant in Africa.

Edited Andersen Consulting firm wide reference binders on Organization and Responsibility Assignment and Project Control.

**1977-1978             James F. Maclaren Limited    Toronto, Canada**

Project Engineer, Flood studies, Water supply.

**1975- 1977             Tower Arctic              Montreal, Canada**

Project Engineer, Canadian high Arctic construction including airports, schools and water supply.

JA0218

| | | |
|---|---|---|
| **Education** | **University of North Carolina** | **Chapel Hill, NC** |
| | Masters of Business Administration, 1980 | |
| | ▪ Concentration in finance and Marketing | |
| | **University of Toronto** | **Toronto, Canada** |
| | Graduate Studies, 1977 | |
| | ▪ Concentration in operations research applications to Civil Engineering | |
| | **McGill University** | **Montreal, Canada** |
| | Bachelor of Engineering, 1975 | |
| | ▪ Concentration in Civil Engineering | |
| **Community Activities** | Trustee, Finance Committee, Private School, Durham, NC | |
| | Building Committee, Saint Barbara's Church, Durham, NC | |
| **Languages** | French, Modern Greek, some Spanish. | |
| **Hobbies** | History, Travel, Scuba Diving, Underwater photography, fishing. | |

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 236 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 77-6    Filed 06/08/12   Page 10 of 18 PageID# 2020
Case 1:11-cv-01277-GBL-TRJ    Document 62-6    Filed 06/08/12   Page 9 of 16 PageID# 1407

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

BEST MEDICAL INTERNATIONAL
INC., a Virginia Corporation;
HUESTIS MACHINE CORP., a Rhode Island
Corporation, GUNSTON HALL REALTY, INC. a
Virginia Corporation; BEST INDUSTRIES INC.,
a Virginia Corporation and KRISHNAN
SUTHANTHIRAN, an individual,

        Plaintiffs,

Case No. 1:11-cv-01277

Hon. Gerald Bruce Lee

WELLS FARGO, BANK, N.A.,
as successor in interest to WACHOVIA BANK, N.A.

        Defendant.

_____\

### AFFIDAVIT OF ALEXANDER T. ARAPOGLOU

Now comes the affiant, Alexander T. Arapoglou, who testifies as follows:

1. That my name is Alexander T. Arapoglou, I am over 18 years of age and competent to testify as to the following. My curricula vita is attached to this affidavit and labeled as Exhibit A. It is a true and accurate description of my education and professional experience and training.

2. That the affidavit provided in the prior complaint dated March 22, 2012 is hereby incorporated by reference.

3. That on May 3, 2012 Wells Fargo Bank issued an attorney only executed subpoena duces tecum to United Bank. United Bank was negotiating with Plaintiffs to refinance the debt owed to Wells Fargo that would have satisfied the $12 million judgment entered against the Plaintiffs in the Fairfax County Circuit Court

4.  The subpoena duces tecum demanded that United Bank provide to Wells Fargo, by May 17, 2012, "All records or documents relating to the financial condition of any of the following persons/entities submitted to you in connection with a request for financing from January 1, 2011 to present." (See attached subpoena).

5.  Upon receiving the subpoena the representatives of United Bank expressed concern and regret about the subpoena and indicated that the bank did not want to be involved in any litigation with Wells Fargo.

6.  That as a result of my training, education and experience I am very familiar with the type of credit facilities that are relevant to this case as well as reasonable, customary, ethical and proper banking practices that apply to these parties relative to the loans in question.

7.  Pursuant to my review of the materials as previously described in my affidavit of March 22, 2012 and my review of the Subpoena of May 7, 2012 as well as my training, education and experience I have formulated the following opinions within a reasonable degree of financial certainty:

    a.  The issuance of the subpoena to Plaintiffs' potential lender, United Bank was improper, unethical, malicious, vindictive, discriminatory, and retaliatory in light of reasonable and customary banking practices.

    b.  Wells Fargo Bank was intimately and comprehensively aware of all the assets the debtor Plaintiffs had available as a result of the voluminous financial information that was provided as part of the application process, the Waiver and Amendment Agreement, and the collections process that Wells Fargo is waging against the Plaintiffs. In fact, Wells Fargo had issued almost 60 garnishment summons as well as attempted to certify the judgment in several other states where Plaintiffs have real property. In addition, the Plaintiffs have provided Wells Fargo with over 7,000 pages of confidential and sensitive financial documents while producing the corporate accountant and eventually, Mr. Suthanthiran himself for a debtor's examination. Wells Fargo was well aware of numerous assets that were in fact worth substantially more than the actual judgment amount.

    c.  Despite this knowledge of available assets Wells Fargo decided to issue a subpoena to the banking institution most likely to refinance the loan that would allow Plaintiffs to satisfy the judgment.

    d.  The improper conduct of issuing the subpoena provides further evidence that Wells Fargo continues to retaliate against the Plaintiffs for alleging their discrimination complaints against the bank. In addition, given the circumstances

of this case, it is further evidence that Wells Fargo continues to discriminate against the Plaintiffs.

e.    Wells Fargo had to have known that the issuance and serving of the subpoena in these circumstances would have a negative or chilling impact on the refinancing application.

_____

Alexander T. Arapoglou,
Affiant

Subscribed and sworn to before me this __4th__ day of __June__, 2012,
__Marion E. Strandh__, a notary in the County of

__Orange__, State of __North Carolina__. My Commission
expires on __September 24, 2015__.

Cell 1-919-452-8259
Email alexa@arapoglou.com

# Alexander T. Arapoglou

| | |
|---|---|
| **Professional experience** | <u>**2007 to present University of North Carolina, Kenan-Flagler Business School,     Chapel Hill, NC**</u> |

**Professor, Finance department**

- Teaching responsibilities include MBA Applied Investment Management course where students manage year round a portion of the University endowment, investing globally in equities, fixed income, foreign exchange, derivatives and commodities.
  Current teaching responsibilities also include MBA and BSBA Risk Management where students learn market, credit and liquidity risk management as it applies to individuals, financial institutions, investment management firms and corporations.

- Participate in curriculum, admissions, placement and scholarship award activities.

<u>**2002 to present      Aland Corporation,     Durham NC**</u>

**Principal**
- Activities include financial consulting and investment.

<u>**1996- 2002           Mizuho Capital Markets Corporation, (formerly Fuji Capital  Markets), New York, London, Hong Kong**</u>

**Director, Treasurer**
- Developed new function responsible for firm investments, funding, collateral, liquidity risk management as well as all non-trading foreign exchange and interest rate hedging. Adjust balance sheet at holding company and subsidiary level to improve BIS and other financial ratios as well as to increase revenue. Interface with regulators on issues of liquidity. Chairman of Treasury strategy committee. (The 2000 and 2001 department net trading income was in excess of $47 mm ). Registered with FSA in UK as Treasurer of UK subsidiary.

**Director, Risk Management**
- Managed Market Risk department, which includes a staff of 10 professionals monitoring market risk in New York, London and Hong Kong. Introduced value at risk, scenario analysis, risk until unwind and a variety of monte carlo analyses to define forward counterparty credit and firmwide liquidity risk. Represented firm to US regulators on issues of market risk.

**1989- 1996            Chase Manhattan Bank, NA,      New York**

**Vice-President, Trader**
- Responsible for the yen trading bay, including JPY interest rate swaps, Fras and FX forwards; trading strategies included arbitrage, market making and positioning.

**Vice-President, Risk Management**
- Responsible for risk management function for Chemical bank capital markets products worldwide. Developed global position limits and risk reporting consistent with business plans. Advised senior management with respect to market risk incidents in Germany, South America, Japan, Brazil, Korea and USA. Represented the bank to market risk regulators.

- Managed US dollar interest rate options trading following a major catastrophe; improved systems, identified unhedged market risks, reduced exposures and restored profitability prior to merger with Manufacturers Hanover

**1987- 1989            Drexel Burnham Lambert,      New York**

**Vice-President, Treasury Planning and Analysis**
- Responsible for organizing and staffing a new department. Managed the planning and analysis of liquidity, foreign exchange and interest rate risk and the development of alternative funding opportunities. Series 7 and Series 3 registered.

**1985-1987            Salomon Inc,              New York**

**Vice-President, Manager, Financial Analysis**
Organized and staffed a new department to perform treasury and risk analysis. Managed firm asset/liability management staff group. Regularly interfaced with credit, systems, sales, trading, bond portfolio analysis and the rest of the finance department. Assignments included:
- Review of pricing and hedging strategies for caps and floors. Made recommendations for potential improvement.
- Development of new technology for differential pricing of contractual commitments according to counterparty credit quality. Methodology applies to futures, forwards, options and swaps.
- Presentation of capital adequacy criteria for interest rate swaps to the Federal Reserve Bank, Securities exchange Commission and Bank of England.
- Development of credit line usage criteria for interest rate swaps and other contractual commitments.

**1982-1985**          **Chase Manhattan Bank, NA,      New York**

**Vice-President, Manager Retail Product Development**
- Responsible for a staff of 15 product managers, marketing consumer bank products. Coordinated advertising, product development, legal, systems, operations and sales support.

**Vice-President, Consumer Sector Funding**
- Coordinated pricing and pricing policy for consumer sector liabilities nationwide following deregulation. Member bank-wide Treasury Strategy Committee, representing consumer sector. Created strategic pricing formula for MMDA accounts that reduced funding costs in excess of $5 mm per annum.
- Developed a market based pool transfer pricing concept to support asset/liability pricing consistent with a centralized interest rate risk management approach.

**1980-1982**          **Accenture Consulting,          Washington, D.C.**

**Senior Consultant**
Developed business plans and corresponding systems requirements for multi-billion dollar international energy projects.
- Provided management consulting services to initiate policies for capital budgeting, cost control, performance measurement, scheduling and progress control for a European oil company building a major refinery in Saudi Arabia.
- Evaluated and recommended strategic improvements to controls and management information systems for the management of engineering, purchasing and construction of nuclear power plants in the United States and Canada. Analyzed why costs had escalated and schedules were not being met and recommended a strategy for control.
- Developed a management plan and management information systems requirements for a major US oil company planning to build an LNG plant in Africa.

Edited Andersen Consulting firm wide reference binders on Organization and Responsibility Assignment and Project Control.

**1977-1978**          **James F. Maclaren Limited      Toronto, Canada**

Project Engineer, Flood studies, Water supply.

**1975- 1977**          **Tower Arctic**          **Montreal, Canada**

Project Engineer, Canadian high Arctic construction including airports, schools and water supply.

| Education | **University of North Carolina** | **Chapel Hill, NC** |
|---|---|---|

**Masters of Business Administration, 1980**
- Concentration in finance and Marketing

**University of Toronto**        **Toronto, Canada**
Graduate Studies, 1977
- Concentration in operations research applications to Civil Engineering

**McGill University**        **Montreal, Canada**
Bachelor of Engineering, 1975
- Concentration in Civil Engineering

**Community Activities**

Trustee, Finance Committee, Private School, Durham, NC

Building Committee, Saint Barbara's Church, Durham, NC

**Languages**

French, Modern Greek, some Spanish.

**Hobbies**

History, Travel, Scuba Diving, Underwater photography, fishing.

# EXHIBIT 7

Case 1:11-cv-01277-GBL-TRJ   Document 57-8   Filed 08/20/12   Page 15 of 18 PageID# 1138

| | |
|---|---|
| **SUBPOENA DUCES TECUM (CIVIL) –** **ATTORNEY ISSUED** VA. CODE §§ 8.01-413, 16.1-49, 16.1-265; Commonwealth of Virginia   Supreme Court Rules 1:4, 4:9 | Case No.:_____ CL 2010-9395 |

_____ **HEARING DATE AND TIME**

_____ Fairfax County Circuit _____ Court

4110 Chain Bridge Road, Fairfax, VA 22030
**COURT ADDRESS**

Best Medical International, Inc., et al. __v./In re:__          Wells Fargo

## TO THE PERSON AUTHORIZED BY LAW TO SERVE THIS PROCESS:

You are commanded to summon

United Bank c/o Neil I. Title
**NAME**
1840 Wilson Blvd. #205, P.O. Box 990
**STREET ADDRESS**

| Arlington | | VA | | 22216 |
|---|---|---|---|---|
| **CITY** | | **STATE** | | **ZIP** |

**TO the person summoned:** You are commanded to make available the documents and tangible things designated and described below:

All records or documents relating to the financial condition of any of the following persons/entities, submitted to you in connection with a request for financing from January 1, 2011 to present:
1. Krishnan Suthanthiran
2. Gunston Hall Realty, Inc.
3. Best Industries, Inc.
4. Best Medical International, Inc.

at       M. Melissa Glassman, McGuireWoods LLP       at       May 17, 2012 at 10:00 am
1750 Tysons Blvd., Suite 1800, Tysons Corner, VA 22102
**LOCATION**                                                          **DATE AND TIME**

to permit such party or someone acting in his or her behalf to inspect and copy, test or sample such tangible things in your possession, custody or control.

This Subpoena Duces Tecum is issued by the attorney for and on behalf of

Wells Fargo
**PARTY NAME**

| Douglas M. Foley | 34364 |
|---|---|
| **NAME OF ATTORNEY** | **VIRGINIA STATE BAR NUMBER** |
| 101 W. Main Street | 757-640-3715 |
| **OFFICE ADDRESS** | **TELEPHONE NUMBER OF ATTORNEY** |
| Suite 9000 | 757-640-3957 |
| **OFFICE ADDRESS** | **FACSIMILE NUMBER OF ATTORNEY** |
| May 3, 2012 | |
| **DATE ISSUED** | **SIGNATURE OF ATTORNEY** |

**Notice to Recipient:** See page two for further information.

## RETURN OF SERVICE (see page two of this form)

FORM DC-498 (MASTER, PAGE ONE OF TWO) 7/01

JA0228

Case 1:11-cv-01277-GBL-TRJ   Document 77-5   Filed 08/08/12   Page 16 of 18 PageID# 2488

TO the person summoned:
    If you are served with this subpoena less than 14 days prior to the date that compliance with this subpoena is required, you may object by notifying the party who issued the subpoena of your objection in writing and describing the basis of your objection in that writing.

☒ This SUBPOENA DUCES TECUM is being served by a private process server who must provide proof of service in accordance with Va. Code § 8.01-325.

TO the person authorized to serve this process: Upon execution, the return of this process shall be made to the clerk of court.

NAME: ......................................................................................................................................

ADDRESS: ................................................................................................................................

.............................................................................................................................................

| ☐ PERSONAL SERVICE | Tel. No. |
|---|---|

Being unable to make personal service, a copy was delivered in the following manner:

☐    Delivered to family member (not temporary sojourner or guest) age 16 or older at usual place of abode of party named above after giving information of its purport. List name, age of recipient, and relation of recipient to party named above:

☐    Posted on front door or such other door as appear to be the main entrance of usual place of abode, address listed above. (Other authorized recipient not found.)

☐    NOT FOUND ........................................................................, Sheriff

.............. by.................................................................., Deputy Sheriff
DATE

## CERTIFICATE OF COUNSEL

I, _____Douglas M. Foley_____ , counsel for _____Wells Fargo_____ , hereby certify

that a copy of the foregoing subpoena duces tecum was _____mailed via first class mail, postage prepaid_____
DELIVERY METHOD

to _____James M. Brady_____ , counsel of record for _____Best Medical International, Inc._____ ,

on the _____3rd_____ day of _____May_____ , _____2012_____

SIGNATURE OF ATTORNEY

NOTICE: Upon receipt of the subpoenaed documents, the requesting party must, if requested, provide true and full copies of those documents to any other party or to the attorney for any other party, provided the other party or attorney for the other party pays the reasonable cost of copying or reproducing those documents. This does not apply when the subpoenaed documents are returnable to and maintained by the clerk of the court in which the action is pending. Va. Code § 8.01-417

FORM DC-498 (MASTER, PAGE TWO OF TWO) 07/04

Appeal: 13-1982    Doc: 14-1       Filed: 10/21/2013      Pg: 246 of 418

# EXHIBIT 8



June 13, 2012

Re: Notice of Assignment Best Nomos.

Dear Best Nomos Customer:

Please be advised that Best Nomos (A division of Best Medical International, Inc.), ("'Best Nomos"), has assigned your account to Wells Fargo Bank, National Association ("Wells Fargo") as collateral and that Wells Fargo has a security interest in your account. Wells Fargo has transferred the servicing and administration of your account to Receivables Control Corporation ("RCC").

Receivables Control Corporation, on behalf of Wells Fargo, will bill for, collect and receive the payments due under your account. Effective immediately, all future payments on your account must be made to Receivables Control Corporation only and not to Best Nomos or any other party. You can make payments on your account to Best Medical International, Inc using any of the following methods:

- Pay by Phone: Pay with your checking account by calling 763-315-9600.
- Pay by Mail: Make your check or money order payable to "Best Nomos" and send it to the following address:
  - Receivables Control Corporation
  - 7373 Kirkwood Court Suite 200
  - Maple Grove, MN 55369
- Pay by On-Line Payment: www.rccgab.com
- Other Options: Please call 763-315-9600 to discuss other payment options.

This letter may be revoked, modified or otherwise amended only by a writing signed by Wells Fargo.

Please contact Receivables Control Corporation at 763-315-9600 if you have any questions regarding this letter or otherwise with respect to your account or payment obligations thereunder.

Sincerely,

WELLS FARGO BANK, N.A.

J. Kent Thompson
Senior Vice President

JA0231

7373 Kirkwood Court, Suite 20                    P.O. Box 9658                    763 315-9600
Minneapolis, MN 55369                    Minneapolis, MN 55440-9658                    FAX 763 315-9699

July 13, 2012

**NOTICE OF PAYMENT DIRECTIONS**

PREMIER BRACHYTHERAPY SUPPLY
265 WILLOW BROOK ROAD
UNIT 10
FREEHOLD, NJ  7728


RE:   **Best Medical, Inc.**
      *RCC* #3521627

Dear Best Medical, Inc. Customer:

Please see the attached letter from Wells Fargo Bank to notify you that they entered into a
certain loan agreement with Best Medical, Inc.  Pursuant to that Commercial Security
Agreement, Wells Fargo received, among other things, a security interest in all of Best
Medical, Inc.'s present and future accounts receivable, as well as the right to directly
collect such accounts receivable.

Wells Fargo Bank makes demand under the Commercial Security Agreement for your
company to tender to Wells Fargo Bank all payments currently due or that may become
due to Best Medical, Inc.  Payment should be sent to Wells Fargo in care of Receivables
Control Corporation at the following address:


          Remittance Address:

          Wells Fargo
          c/o Receivables Control Corporation
          7373 Kirkwood Court
          Minneapolis, MN 55369


Please be advised that pursuant to Section 9-406 of the Uniform Commercial Code, if
your company pays Best Medical, Inc. directly in connection with accounts that are Wells
Fargo Bank's collateral after the date that Wells Fargo Bank has notified you that the
amounts due or to become due had been assigned to Wells Fargo Bank, your company, as
an account debtor, will not have discharged its obligation to pay the amounts in question
and will remain liable to Wells Fargo Bank for payment of such amounts.  Also, please
note that your company's obligation to pay these amounts to Wells Fargo Bank cannot be
modified by any unilateral instructions received from Best Medical, Inc. Until Wells
Fargo Bank has released its security interest in its accounts or collateral, your company
should disregard any instructions from Best Medical, Inc. to change the remittance of
such payments.

Case 1:11-cv-01277-GBL-TRJ   Document 62-3   Filed 08/23/12   Page 2 of 3 PageID# 1152

Page 2

More specifically, please note Section 9-406(a) of the Uniform Commercial Code, which
provides in relevant part as follows:

> [A]n account debtor on an account, chattel paper, or a
> payment intangible may discharge its obligation by paying
> the assignor until, but not after, the account debtor receives
> a notification, authenticated by the assignor or the assignee,
> that the amount due or to become due has been assigned
> and that payment is to be made to the assignee. After
> receipt of the notification, the account debtor may
> discharge its obligation by paying the assignee and may not
> discharge the obligation by paying the assignor.

We thank you in advance for your cooperation. Please contact Receivables Control
Corporation at 763-315-9600 with any questions regarding this notification on your Best
Medical, Inc. account.

Jim Mlenek
Receivables Control Corporation
7373 Kirkwood Court
2nd Floor
Minneapolis MN 55369

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |
|---|---|
| BEST MEDICAL INTERNATIONAL, INC., *et al.*,<br><br>*Plaintiffs,*<br><br>v.<br><br>WELLS FARGO BANK, N.A., *et al.*,<br><br>*Defendants.* | Civil Action No. 1:11-cv-01277<br>GBL/TRJ |

## WELLS FARGO'S ANSWER AND AFFIRMATIVE DEFENSES
## TO COUNTS I & III OF PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendant Wells Fargo Bank, N.A. ("Wells Fargo"), by and through the undersigned counsel and pursuant to Rule 8 of the Federal Rules of Civil Procedure, provides the following answer and affirmative defenses to Counts I & III of Plaintiffs' Second Amended Complaint:[1]

### JURISDICTION AND PARTIES

1.      Wells Fargo admits that Best Medical International, Inc. is a Virginia corporation.  The remaining allegations in the first two sentences of paragraph 1 of the Amended Complaint are denied for lack of sufficient information.  The remaining allegations in paragraph 1 are admitted.

2.      Wells Fargo admits the allegations in paragraph 2.

---

[1] Defendant J. Kent Thompson ("Mr. Thompson") has filed a Motion to Dismiss all counts asserted against him pursuant to Fed. R. Civ. P. 12(b)(6).    Therefore,    Mr. Thompson will file an answer or other responsive pleading to Plaintiffs' Second Amended Complaint, if necessary, pursuant to Fed. Rule Civ. P. 12(a)(4)(A) or within the time prescribed by the appropriate Order.   Likewise, Wells Fargo has filed a Rule 12(b)(6) Motion to Dismiss Counts II, IV, V, and VI.   Wells Fargo will file an answer or other appropriate responsive pleading to these counts, if necessary, pursuant to Fed. Rule Civ. P. 12(a)(4)(A) or within the time prescribed by the appropriate Order.

3.    Wells Fargo admits that Gunston Hall Realty, Inc. ("Gunston") is a Virginia corporation. The remaining allegations in the first sentence of paragraph 3 are denied for lack of sufficient information. The remaining allegations in paragraph 3 are admitted.

4.    Wells Fargo admits that Best Industries, Inc. is a Virginia corporation. Wells Fargo denies the remaining allegations of the first sentence of paragraph 4 for lack of sufficient information. The remaining allegations in paragraph 4 are admitted.

5.    The allegations in paragraph 5 are denied because the allegations state a legal conclusion to which no response is required. To the extent that paragraph 5 states any factual allegations, Wells Fargo denies those allegations for lack of sufficient information.

6.    Wells Fargo admits that it merged with Wachovia Bank, N.A. ("Wachovia") effective December 31, 2008. The remaining allegations in paragraph 6 are denied.

7.    In response to the allegations in paragraph 7, Wells Fargo admits that J. Kent Thompson ("Mr. Thompson") is an individual and is employed as Senior Vice President for Wells Fargo in a location at 1753 Pinnacle Drive, 3rd Floor, McLean, Virginia. Wells Fargo admits Mr. Thompson resides in Fairfax County or Prince William County, Virginia. Wells Fargo denies Mr. Thompson does business in Fairfax County, Virginia in his personal capacity.

8.    The allegations in paragraph 8 are denied because they state a legal conclusion to which no response is required. To the extent they contain factual allegations, Wells Fargo admits the allegations.

2

9.      The allegations in paragraph 9 are denied because they state a legal conclusion to which no response is required.   To the extent they contain factual allegations, Wells Fargo denies the allegations for lack of sufficient information.

10.     The allegations in paragraph 10 are denied because they state a legal conclusion to which no response is required.   To the extent they contain factual allegations, Wells Fargo denies the allegations for lack of sufficient information.

11.     The allegations in paragraph 11 are denied because they state a legal conclusion to which no response is required. To the extent they contain factual allegations, Wells Fargo denies the allegations for lack of sufficient information.

12.     The allegations in paragraph 12 are denied because they state a legal conclusion to which no response is required.   To the extent they contain factual allegations, Wells Fargo denies the allegations for lack of sufficient information.

## FACTUAL ALLEGATIONS

13.     Wells Fargo hereby incorporates by reference its responses to preceding paragraphs 1-12.

14.     Wells Fargo admits that Plaintiffs had banking accounts with Wachovia and Wells Fargo.  The remaining allegations in paragraph 14 are denied.

15.     The allegations in the first two sentences of paragraph 15 are denied.  The remaining allegations in paragraph 15 are admitted; however, the terms and conditions of the term loans and credit lines speak for themselves and are not as Plaintiffs may characterize.

16.     The allegations in paragraph 16 are admitted.

17.     The allegations in paragraph 17 are admitted.

3

18.    Wells Fargo admits that Mr. Thompson, a Senior Vice President of Wells Fargo, was one of Wells Fargo's representatives involved with Plaintiffs' loans.  The remaining allegations in paragraph 18 are denied.

19.    Wells Fargo admits that on May 8, 2009 it sent a letter to Plaintiffs.  The letter is a written document that speaks for itself and is not as Plaintiffs characterize.  The remaining allegations in paragraph 19 are denied.

20.    Wells Fargo admits that on May 8, 2009 it sent a letter to Plaintiffs.  The letter is a written document that speaks for itself and is not as Plaintiffs characterize.  The remaining allegations in paragraph 20 are denied.

21.    The allegations in paragraph 21 are denied.

22.    Wells Fargo admits that it entered into a Waiver and Amendment Agreement with Plaintiffs.  The Waiver and Amendment Agreement is a written document that speaks for itself and is not as Plaintiffs characterize.  The remaining allegations in paragraph 22 are denied.

23.    Wells Fargo admits that it entered into a Waiver and Amendment Agreement with Plaintiffs.  The Waiver and Amendment Agreement is a written document that speaks for itself and is not as Plaintiffs characterize.  The remaining allegations in paragraph 23 are denied.

24.    In response to the allegations in paragraph 24, Wells Fargo asserts the Waiver and Amendment Agreement is a written document that speaks for itself and is not as Plaintiffs characterize.

25.    Wells Fargo denies the allegations in paragraph 25.

4

26.    Wells Fargo admits that it did not extend the loans.   The remaining allegations in paragraph 26 are denied.

27.    Wells Fargo admits that it notified Plaintiffs that they were in default of the Waiver and Amendment Agreement.   The remaining allegations in paragraph 27 are denied.

28.    The allegations in paragraph 28 are denied.

29.    The allegations in paragraph 29 are denied.

30.    The allegations in paragraph 30 are denied.

31.    Wells Fargo admits that on June 24, 2010 Plaintiffs sent a letter to Wells Fargo.  The letter is a written document that speaks for itself and is not as Plaintiffs characterize.  The remaining allegations in paragraph 31 are denied.

32.    The allegations in paragraph 32 are denied.

33.    The allegations in paragraph 33 are denied.

34.    In response to the allegations in paragraph 34, Wells Fargo admits that it has exercised its right under the Uniform Commercial Code to collect Plaintiffs' accounts receivable.   Wells Fargo denies Plaintiffs' characterization of the contact between Plaintiffs' customers and Wells Fargo and Receivables Control Corporation ("RCC"). Wells Fargo denies all remaining allegations in this paragraph 34.

35.    The allegations in paragraph 35 are denied for lack of sufficient information.

36.    The allegations in paragraph 36 are denied for lack of sufficient information.

37.    The allegations in paragraph 37 are denied.

## COUNT I

### VIOLATION OF 42 U.S.C. § 1981 AS TO ALL PLAINTIFFS

### RACE DISCRIMINATION BY WELLS FARGO

38.    Wells Fargo hereby incorporates by reference its responses to preceding paragraphs 1-38.

39.    The allegations in paragraph 39 are denied because they state a legal conclusion to which no response is required.    To the extent they contain factual allegations, those allegations are denied.

40.    The allegations in paragraph 40 are denied because they state a legal conclusion to which no response is required.    To the extent they contain factual allegations, those allegations are denied.

41.    The allegations in paragraph 41 are denied because they state a legal conclusion to which no response is required.    To the extent they contain factual allegations, those allegations are denied.

42.    The allegations in paragraph 42 are denied.

43.    The allegations in paragraph 43 are denied.

44.    The allegations in paragraph 44 are denied.

45.    Wells Fargo admits it requested payment on the Waiver and Amendment Agreement.  The remaining allegations in paragraph 45 are denied.

46.    Wells Fargo admits that it declined to extend Plaintiffs further credit.  The remaining allegations in paragraph 46 are denied.

47.    The allegations in paragraph 47 are denied.

6

48.    The allegations in paragraph 48 are denied because the allegations state a legal conclusion to which no response is required.  To the extent they contain factual allegations, those allegations are denied.

49.    In response to the allegations in paragraph 49, Wells Fargo admits that Plaintiffs discussed applying for and/or applied for credit or to guarantee credit.  Wells Fargo denies that the credit for which Plaintiffs applied was available.  Wells Fargo denies all remaining allegations in this paragraph.

50.    The allegations in paragraph 50 are denied.

51.    The allegations in paragraph 51 are denied.

52.    The allegations in paragraph 52 are denied.

53.    The allegations in paragraph 53 are denied.

54.    The allegations in paragraph 54 are denied for lack of sufficient information.

55.    The allegations in paragraph 55 are denied for lack of sufficient information.

56.    Wells Fargo admits that on May 8, 2009 it sent Huestis a non-exhaustive list of Huestis's defaults.  The letter is a written document that speaks for itself and is not necessarily as Plaintiffs characterize.  Therefore the allegations in paragraph 56 are denied.

57.    The allegations in paragraph 57 are denied.

58.    The allegations in paragraph 58 are denied.

JA0240

59.    The allegations in paragraph 59 are denied because they state a legal conclusion to which no response is required.    To the extent they contain factual allegations, these allegations are denied.

60.    The allegations in paragraph 60 are denied because they state a legal conclusion to which no response is required.    To the extent they contain factual allegations, those allegations are denied.

61.    The allegations in paragraph 61 are denied.

62.    The allegations in paragraph 62 are denied.

## COUNT II

### VIOLATION OF 42 U.S.C. § 1981 AS TO ALL PLAINTIFFS

### RACIAL DISCRIMINATION BY DEFENDANT THOMPSON

63.    Wells Fargo hereby incorporates by reference its responses to paragraphs 1-62 above.

64. – 68.  The allegations in paragraphs 64 through 68 are not directed at Wells Fargo and are the subject of Defendants' pending Motion to Dismiss.    Accordingly, no response is required.

## COUNT III

### RETALIATION IN VIOLATION OF 42 U.S.C. § 1981 BY WELLS FARGO

69.    Wells Fargo hereby incorporates by reference its responses to paragraphs 1-68 above.

70.    The allegations in paragraph 70 are denied because the allegations state a legal conclusion to which no response is required.

71.    The allegations in paragraph 71 are denied because the allegations state a legal conclusion to which no response is required.

72.    The allegations in paragraph 72 are denied.

73.    The allegations in paragraph 73 are denied.

74.    The allegations in paragraph 74 are denied.

75.    In response to the allegations in paragraph 75, Wells Fargo admits that Krish wrote a letter to Mr. Thompson on June 24, 2010.  Krish's June 24, 2010 letter is a written document that speaks for itself and not as Plaintiffs have characterized it.

76.    Wells Fargo admits that it confessed judgment against Best Industries, Inc., Gunston Hall Realty, Inc., and Krishnan Suthanthiran on June 30, 2010.  The remaining allegations in paragraph 76 are denied.

77.    The allegations in paragraph 77 are denied.

78.    The allegations in paragraph 78 are denied.

79.    The allegations in paragraph 79 are denied because the allegations state a legal conclusion to which no response is required.  To the extent they contain any factual allegations, the allegations are denied.

80.    The allegations in paragraph 80 are denied because the allegations state a legal conclusion to which no response is required.  To the extent they contain any factual allegations, the allegations are denied.

81.    The allegations in paragraph 81 are denied.

82.    The allegations in paragraph 82 are denied.

## COUNT IV

## RETALIATION IN VIOLATION OF

## 42 U.S.C. § 1981 BY DEFENDANT THOMPSON

83.    Wells Fargo hereby incorporates by reference its responses to paragraphs 1-82 above.

84. – 85.  The allegations in paragraphs 84 through 85 are not directed at Wells Fargo and are the subject of Defendants' pending Motion to Dismiss.    Therefore, no response is required.

## COUNT V

## TORTIOUS INTERFERENCE WITH CONTRACT EXPECTANCY

## BY ALL DEFENDANTS

86.    Wells Fargo hereby incorporates by reference its responses to paragraphs 1-85 above.

87. – 99.   The allegations in paragraphs 87 through 99 are the subject of Defendants' pending Motion to Dismiss.   Therefore, no response is required.

## COUNT VI

## TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OR

## ECONOMIC ADVANTAGE BY ALL DEFENDANTS

100.    Wells Fargo hereby incorporates by reference its responses to paragraphs 1-99 above.

101. – 107.  The allegations in paragraphs 101 through 107 are the subject of Defendants' pending Motion to Dismiss.   Therefore, no response is required.

## PRAYER FOR RELIEF

Wells Fargo denies that Plaintiffs are entitled to any relief.

## ADDITIONAL DENIAL

10

Wells Fargo denies any all other allegations except those expressly admitted herein.

### AFFIRMATIVE DEFNSES

Wells Fargo asserts the following affirmative defenses:

1.    Plaintiffs have failed to state a claim upon which relief may be granted.

2.    Plaintiffs' claims are barred by the doctrines of res judicata and collateral estoppel.

3.    Plaintiffs' claims are barred by the doctrines of release, waiver and estoppel.

Dated: September 4, 2012                    Respectfully submitted,

                                            **WELLS FARGO BANK, N.A.**

                                            _____/s/_____
                                            M. Melissa Glassman (VSB # 27526)
                                            John D. Wilburn (VSB # 41141)
                                            Kevin J. Daniel (VSB # 82911)
                                            Stephen P. Mulligan (VSB # 78858)
                                            MCGUIREWOODS LLP
                                            1750 Tysons Boulevard, Suite 1800
                                            McLean, Virginia  22101-3892
                                            Tel:  (703) 712-5000
                                            Fax:  (703) 712-5050
                                            mglassman@mcguirewoods.com
                                            jwilburn@mcguirewoods.com
                                            kdaniel@mcguirewoods.com
                                            smulligan@mcguirewoods.com
                                            *Counsel for Wells Fargo Bank, N.A.*

## CERTIFICATE OF SERVICE

I hereby certify that on the 4th day of September, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Shawn R. Weingast, Esq.
James Michael Brady, Esq.
Best Industries, Inc.
7643 Fullerton Rd
Springfield, VA 22153
Tel:  703 451-2378
Fax:  703-451-5228

*Counsel for Plaintiffs*

<div align="right">

_____/s/_____
Stephen P. Mulligan (VSB # 78858)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22101-3892
Tel:  (703) 712-5000
Fax:  (703) 712-5050
smulligan@mcguirewoods.com
*Counsel for Wells Fargo Bank, N.A.*

</div>

\41704407.2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
*Alexandria Division*

BEST MEDICAL INTERNATIONAL, INC.,          )
*et al.,*                                   )
                                            )
          *Plaintiffs*                      )
                                            )
v.                                          )     Civil Action No.  1:11-cv-01277
                                            )     GBL/TRJ
WELLS FARGO BANK, N.A., *et al.,*           )
                                            )
          *Defendant.*                      )
_____  )

## STIPULATION OF UNCONTESTED FACTS

Plaintiffs and Defendants, by and through their attorneys, hereby submit the following as Stipulated Facts:

1.    Plaintiff Best Medical International, Inc. (hereafter "BMI") is a Virginia corporation doing business in Fairfax County, Virginia.

2.    BMI is a manufacturer and supplier of medical treatments and devices.

3.    BMI entered into a series of lines of credit contracts with Wells Fargo, N.A.'s predecessor in interest, Wachovia Bank, to borrow and/or guarantee certain loans and lines of credit beginning on or about October 29, 2004 (the "BMI Loans").

4.    The BMI Loans were modified by the Waiver and Amendment Agreement dated July 31, 2009.

5.    Plaintiff Huestis Machine Corporation ("Huestis") is a Rhode Island corporation.

6.    Huestis entered into certain term notes in 2006 with Wachovia Bank to borrow and/or guarantee certain term loans (the "Huestis Loans").

7.    The Huestis Loans were modified by the Waiver and Amendment Agreement

1

dated July 31, 2009.

      8.     Plaintiff Gunston Hall Realty, Inc. ("Gunston") is a Virginia corporation doing business in Fairfax County, Virginia.

      9.     Gunston entered into a line of credit contract with Wachovia Bank to borrow and/or guarantee certain loans and/or lines of credit (the "Gunston Loans").

      10.    The Gunston Loans were modified by the Waiver and Amendment Agreement dated July 31, 2009.

      11.    Plaintiff Best Industries, Inc. ("BII") is a Virginia corporation, whose primary place of business is Fairfax County, Virginia.

      12.    BII entered into a contract with Wachovia Bank to borrow and/or guarantee certain loans and/or lines of credit (the "BII Loans").

      13.    The BII Loans were modified by the Waiver and Amendment Agreement dated July 31, 2009.

      14.    Plaintiff Krishnan Suthanthiran is an individual and president of Plaintiff corporations BMI, Huestis, Gunston and BII.

      15.    Defendant Wells Fargo Bank, N.A. is a foreign corporation that does business in Fairfax County, Virginia.

      16.    On or about December 31, 2008 Well Fargo merged with Wachovia Bank, N.A.

      17.    J. Kent Thompson ("Mr. Thompson") is an individual employed as a Senior Vice President for Wells Fargo Bank, N.A.

      18.    Mr. Thompson is a resident of the Commonwealth of Virginia.

      19.    Plaintiffs had the following term loans and/or credit lines with Wells Fargo as of January, 2009 (the "Loans"):

A.   Promissory Note between BMI and Wachovia Bank for $3,000,000.00 dated October 29, 2004.

B.   Promissory Note between Gunston and Wachovia Bank for $5,000,000.00 dated August 5, 2005.

C.   Ten year Term Note between Huestis and Wachovia Bank for $5,000,000.00 dated December 1, 2006 along with an ancillary Financing and Security Agreement.

D.   Ten year Supplemental Term Note between Huestis and Wachovia Bank for $2,000,000.00 dated December 1, 2006.

E.   Interest Rate Swap Agreements of December, 2006 and February, 2007 governed by the Master Agreement dated November 30, 2006 (the "Swap Agreements").

20.   The above transactions resulted in loans (collectively "the Loans") between Wells Fargo and the Plaintiffs totaling $15,000,000.00.

21.   Mr. Suthanthiran entered into an agreement with Wachovia Bank personally guaranteeing payment of the Loans.

22.   On May 8, 2009 Wells Fargo notified the Plaintiffs that they were in default of the Loans.

23.   The grounds of default for the Huestis Loans, as alleged by Wells Fargo, are as follows:

A.   Huestis failed to provide audited financial statements;

B.   Huestis did not maintain a Debt Service Coverage Ratio of not less than 1.24 to 1.00; and

C.   The personal guarantor, Mr. Suthanthiran, failed to maintain the specified liquidity requirement.

24.   Wells Fargo also alleged that the BMI and Gunston Loans were in default because they matured on March 6, 2009.

25.   On May 8, 2009, Wells Fargo, by and through Defendant Thompson, demanded

3

payment of the following amounts:

      A.     $2,719,305.48 on the BMI Loan;

      B.     $4,286,596.50 on the Gunston Loan; and

      C.     $6,710,160.17 on the Huestis Loans.

26.     On or about July 31, 2009, Plaintiff and Wells Fargo entered into a Waiver and Amendment Agreement. The Waiver and Amendment Agreement extended the Loans and required payment in full of all the Loans by January 1, 2010.

27.     The Waiver and Amendment Agreement dated July 31, 2009 incorporated the terms and conditions of credit facilities and loan documents described as Huestis Loans, the Gunston Loans, the BII Loans, the BMI Loans, and the Swap Agreements. The Waiver and Amendment Agreement was guaranteed by Huestis, BMI, Gunston, BII, Brachytherapy Services, Inc., Best Medical Engineering, Inc., Best Medical Research, Inc., CNMC Co., Inc., Best Vascular, Inc., Best Theratronics, Inc., One Best Drive, L.P., Arplay USA, Inc., and Mr. Suthanthiran.

28.     When the Waiver and Amendment Agreement expired on January 1, 2010 the Plaintiffs and Defendants attempted to negotiate an additional extension of the Loans.

29.     The negotiations for an extension of Loans past January 1, 2010 were unsuccessful.

30.     On April 21, 2010, Wells Fargo sent Plaintiffs Notices of Default alleging that Plaintiffs were in default of the Waiver and Amendment Agreement.

31.     Pursuant to a letter dated June 24, 2010, Mr. Suthanthiran contacted Defendant Thompson and informed him that he believed Wells Fargo's acceleration of the Loans and refusal to negotiate in good faith were motivated by racial discrimination.

4

32.    On July 1, 2010, counsel for Wells Fargo responded to Mr. Suthanthiran's June 24, 2010 allegation denying that Wells Fargo's or Mr. Thompson's actions were motivated by racial discrimination.

33.    On July 2, 2010 and July 6, 2010, the Circuit Court of Fairfax County entered orders confessing judgments against Mr. Suthanthiran, Gunston and BMI respectively, in the sum of $12,119,254.01.

34.    On or about June 13, 2012, Mr. Thompson sent a letter to various Plaintiffs' customers notifying them that Wells Fargo had a security interest in their accounts and that Receivables Control Corporation, on behalf of Wells Fargo, would be collecting and receiving payments due on their accounts.

Dated: October 26, 2012                Respectfully Submitted:


                                       By:  _____/s/_____
                                       James M. Brady (VSB # 80002)
                                       Best Medical International, Inc.
                                       7643 Fullerton Road
                                       Springfield, VA  22153
                                       Tel:  (703) 451-2378
                                       Fax:  (703) 451-8421
                                       james@teambest.com
                                       *Counsel for Best Medical International, Inc.,
                                       Huestis Machine Corp., Gunston Hall Realty, Best
                                       Industries, Inc. and Krishnan Suthanthiran*

5

JA0250

WELLS FARGO BANK, N.A., individually
J. KENT THOMPSON, individually


By: _____/s/_____
M. Melissa Glassman (VSB # 27526)
John D. Wilburn (VSB # 41141)
Courtney S. Schorr (VSB #65971)
Kevin J. Daniel (VSB # 82911)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22101-3892
Tel:  (703) 712-5000
Fax:  (703) 712-5050
mglassman@mcguirewoods.com
jwilburn@mcguirewoods.com
cschorr@mcguirewoods.com
kdaniel@mcguirewoods.com
*Counsel for Wells Fargo Bank, N.A. and
J. Kent Thompson*

6

## CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of October, 2012, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Shawn R. Weingast, Esq.
James Michael Brady, Esq.
Best Industries, Inc.
7643 Fullerton Rd
Springfield, VA 22153
Tel:  703 451-2378
Fax:  703-451-5228

*Counsel for Plaintiffs*

<div style="margin-left:40%">

            /s/
_____
Courtney S. Schorr (VSB #65971)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22101-3892
Tel:  (703) 712-5000
Fax:  (703) 712-5050
CSchorr@mcguirewoods.com
*Counsel for Defendants, Wells Fargo Bank, N.A.*
*and J. Kent Thompson*

</div>

\43057045.1

7

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

BEST MEDICAL                        )
INTERNATIONAL, INC. *et al.*,       )
                                    )
        Plaintiffs,                 )
                                    )        Case No. 1:11-cv-1277-GBL-TRJ
        v.                          )
                                    )
WELLS FARGO BANK, N.A.,             )
as successor in interest to         )
Wachovia Bank, N.A., *et al.*,      )
                                    )
        Defendants.                 )

## ORDER

THIS MATTER is before the Court on Defendants' Motion to Dismiss Counts II, IV, V,

and VI of Plaintiffs' Second Amended Complaint.  (Dkt. No. 85.)  For the reasons stated in open

Court on October 26, 2012,

IT IS HEREBY ORDERED that Defendants' Motion is GRANTED in part and DENIED

in part.

IT IS FURTHER ORDERED that Defendants' Motion is GRANTED as to Count V and

Count VI and those claims are DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Defendants' Motion is DENIED as to Count II and

Count IV.

The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this *26th* day of October, 2012.

Alexandria, Virginia
10 *26* / 2012

                                        _____/s/_____
                                        Gerald Bruce Lee
                                        United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

BEST MEDICAL
INTERNATIONAL, INC., *et al.*,

　　　　*Plaintiffs,*

　　　　v.

WELLS FARGO BANK, N.A., *et al.*,

　　　　*Defendants.*

Civil Action No. 1:11-cv-01277
GBL/TRJ

### J. KENT THOMPSON'S ANSWER AND
### AFFIRMATIVE DEFENSES TO COUNTS II AND IV
### OF PLAINTIFFS' SECOND AMENDED COMPLAINT

Defendant J. Kent Thompson ("Defendants"), by and through the undersigned counsel and pursuant to Rules 8 and 12(a)(4) of the Federal Rules of Civil Procedure, provide the following answer and affirmative defenses to Counts II & IV of Plaintiffs' Second Amended Complaint ("Complaint" or "Amended Complaint"):

### JURISDICTION AND PARTIES

1.　　Defendant admits that Best Medical International, Inc. is a Virginia corporation. The remaining allegations in the first two sentences of paragraph 1 of the Amended Complaint are denied for lack of sufficient information. The remaining allegations in paragraph 1 are admitted.

2.　　Defendant admits the allegations in paragraph 2.

3.　　Defendant admits that Gunston Hall Realty, Inc. ("Gunston") is a Virginia corporation. The remaining allegations in the first sentence of paragraph 3 are denied for lack of sufficient information. The remaining allegations in paragraph 3 are admitted.

4.      Defendant admits that Best Industries, Inc. is a Virginia corporation. Defendant denies the remaining allegations of the first sentence of paragraph 4 for lack of sufficient information.  The remaining allegations in paragraph 4 are admitted.

5.      The allegations in paragraph 5 are denied because the allegations state a legal conclusion to which no response is required.  To the extent that paragraph 5 states any factual allegations, Defendant denies those allegations for lack of sufficient information.

6.      Defendant admits that Wells Fargo merged with Wachovia Bank, N.A. ("Wachovia") effective December 31, 2008.  The remaining allegations in paragraph 6 are denied.

7.      In response to the allegations in paragraph 7, Defendant admits that he is an individual and is employed as Senior Vice President for Wells Fargo in a location at 1753 Pinnacle Drive, 3rd Floor, McLean, Virginia.  Defendant admits he resides in Fairfax County or Prince William County, Virginia. Defendant denies he does business in Fairfax County, Virginia in his personal capacity.

8.      The allegations in paragraph 8 are denied because they state a legal conclusion to which no response is required. To the extent they contain factual allegations, Defendant admits the allegations.

9.      The allegations in paragraph 9 are denied because they state a legal conclusion to which no response is required.  To the extent they contain factual allegations, Defendant denies the allegations for lack of sufficient information.

2

10.     The allegations in paragraph 10 are denied because they state a legal conclusion to which no response is required.   To the extent they contain factual allegations, Defendant denies the allegations for lack of sufficient information.

11.     The allegations in paragraph 11 are denied because they state a legal conclusion to which no response is required. To the extent they contain factual allegations, Defendant denies the allegations for lack of sufficient information.

12.     The allegations in paragraph 12 are denied because they state a legal conclusion to which no response is required.   To the extent they contain factual allegations, Defendant denies the allegations for lack of sufficient information.

## FACTUAL ALLEGATIONS

13.     Defendant hereby incorporates by reference his responses to preceding paragraphs 1-12.

14.     Defendant admits that Plaintiffs had banking accounts with Wachovia and Wells Fargo.  The remaining allegations in paragraph 14 are denied.

15.     The allegations in the first two sentences of paragraph 15 are denied.  The remaining allegations in paragraph 15 are admitted; however, the terms and conditions of the term loans and credit lines speak for themselves and not as Plaintiffs may characterize.

16.     The allegations in paragraph 16 are admitted.

17.     The allegations in paragraph 17 are admitted.

18.     Defendant admits that he was one of Wells Fargo's representatives involved with Plaintiffs' loans.  The remaining allegations in paragraph 18 are denied.

19.     Defendant admits that on May 8, 2009, Wells Fargo sent a letter to Plaintiffs.  The letter is a written document that speaks for itself and is not as Plaintiffs characterize.  The remaining allegations in paragraph 19 are denied.

20.     Defendant admits that on May 8, 2009, Wells Fargo sent a letter to Plaintiffs.  The letter is a written document that speaks for itself and is not as Plaintiffs characterize.  The remaining allegations in paragraph 20 are denied.

21.     The allegations in paragraph 21 are denied.

22.     Defendant admits that Wells Fargo entered into a Waiver and Amendment Agreement with Plaintiffs.   The Waiver and Amendment Agreement is a written document that speaks for itself and is not as Plaintiffs characterize.   The remaining allegations in paragraph 22 are denied.

23.     Defendant admits that Wells Fargo entered into a Waiver and Amendment Agreement with Plaintiffs.   The Waiver and Amendment Agreement is a written document that speaks for itself and is not as Plaintiffs characterize.   The remaining allegations in paragraph 23 are denied.

24.     In response to the allegations in paragraph 24, Defendant asserts the Waiver and Amendment Agreement is a written document that speaks for itself and is not as Plaintiffs characterize.

25.     Defendant denies the allegations in paragraph 25.

26.     Defendant admits that Wells Fargo did not extend the loans.   The remaining allegations in paragraph 26 are denied.

27.      Defendant admits that Wells Fargo notified Plaintiffs that they were in default of the Waiver and Amendment Agreement.   The remaining allegations in paragraph 27 are denied.

28.      The allegations in paragraph 28 are denied.

29.      The allegations in paragraph 29 are denied.

30.      The allegations in paragraph 30 are denied.

31.      Defendant admits that on June 24, 2010 Plaintiffs sent a letter to Wells Fargo.  The letter is a written document that speaks for itself and is not as Plaintiffs characterize.  The remaining allegations in paragraph 31 are denied.

32.      The allegations in paragraph 32 are denied.

33.      The allegations in paragraph 33 are denied.

34.      In response to the allegations in paragraph 34, Defendant admits that Wells Fargo has exercised its right under the Uniform Commercial Code to collect Plaintiffs' accounts receivable.   Defendant denies Plaintiffs' characterization of the contact between Plaintiffs' customers and Wells Fargo and Receivables Control Corporation ("RCC").  Defendant denies all remaining allegations in this paragraph 34.

35.      The allegations in paragraph 35 are denied for lack of sufficient information.

36.      The allegations in paragraph 36 are denied for lack of sufficient information.

37.      The allegations in paragraph 37 are denied.

## COUNT I

## VIOLATION OF 42 U.S.C. § 1981 AS TO ALL PLAINTIFFS

5

## RACE DISCRIMINATION BY WELLS FARGO

38-62.  The allegations in paragraphs 38-62 are not directed at Defendant, and therefore no response is required.  To the extent a further response is required, Defendant denies the factual allegations contained in these paragraphs.

## COUNT II

## VIOLATION OF 42 U.S.C. § 1981 AS TO ALL PLAINTIFFS

## RACIAL DISCRIMINATION BY DEFENDANT THOMPSON

63.    Defendant hereby incorporates by reference his response to paragraphs 1-62 above.

64.    The allegations in paragraph 64 are denied because the allegations state a legal conclusion to which no response is required. To the extent they contain any factual allegations, the allegations are denied.

65.    The allegations in paragraph 65 are denied because the allegations state a legal conclusion to which no response is required. To the extent they contain any factual allegations, the allegations are denied.

66.    The allegations in paragraph 66 are denied.

67.    The allegations in paragraph 67 are denied.

68.    The allegations in paragraph 68 are denied.

## COUNT III

## RETALIATION IN VIOLATION OF 42 U.S.C. § 1981 BY WELLS FARGO

69-81.  The allegations in paragraphs 69-81 are not directed at Defendant, and therefore no response is required.  To the extent a further response is required, Defendant denies the factual allegations contained in these paragraphs.

6

## COUNT IV

### RETALIATION IN VIOLATION OF

### 42 U.S.C. § 1981 BY DEFENDANT THOMPSON

83.     Defendant hereby incorporates by reference his response to paragraphs 1-82 above.

84.     The allegations in paragraph 84 are denied because the allegations state a legal conclusion to which no response is required. To the extent they contain any factual allegations, the allegations are denied.

85.     The allegations in paragraph 85 are denied.

## COUNT V

### TORTIOUS INTERFERENCE WITH CONTRACT EXPECTANCY

### BY ALL DEFENDANTS

86. – 99.  The allegations in paragraphs 86 through 99 were dismissed, (ECF No. 139), therefore no response is required.    To the extent a further response is required, the factual allegations contained in these paragraphs are denied.

## COUNT VI

### TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS OR

### ECONOMIC ADVANTAGE BY ALL DEFENDANTS

100. – 107.  The allegations in paragraphs 100 through 107 were dismissed, (ECF No. 139), therefore no response is required.    To the extent a further response is required, the factual allegations contained in these paragraphs are denied.

### PRAYER FOR RELIEF

Defendant denies that Plaintiffs are entitled to any relief.

7

JA0260

## ADDITIONAL DENIAL

Defendant denies any all other allegations except those expressly admitted herein.

## AFFIRMATIVE DEFNSES

Defendant asserts the following affirmative defenses:

1.    Plaintiffs have failed to state a claim upon which relief may be granted.

2.    Plaintiffs' claims are barred by the doctrines of res judicata and collateral estoppel.

3.    Plaintiffs' claims are barred by the doctrines of release, waiver and estoppel.

Dated: November 9, 2012          Respectfully submitted,

**J. KENT THOMPSON**

_____/s/_____
M. Melissa Glassman (VSB # 27526)
John D. Wilburn (VSB # 41141)
Courtney S. Schorr (VSB # 65971)
Stephen P. Mulligan (VSB # 78858)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia 22101-3892
Tel: (703) 712-5000
Fax: (703) 712-5050
mglassman@mcguirewoods.com
jwilburn@mcguirewoods.com
cschorr@mcguirewoods.com
acordova@mcguirewoods.com

*Counsel for Wells Fargo Bank, N.A. and J. Kent Thompson*

8

JA0261

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of November, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Shawn R. Weingast, Esq.
James Michael Brady, Esq.
Best Industries, Inc.
7643 Fullerton Rd
Springfield, VA 22153
Tel: 703 451-2378
Fax: 703-451-5228

*Counsel for Plaintiffs*

                                        /s/
                              Stephen P. Mulligan (VSB # 78858)
                              MCGUIREWOODS LLP
                              1750 Tysons Boulevard, Suite 1800
                              McLean, Virginia 22101-3892
                              Tel: (703) 712-5000
                              Fax: (703) 712-5050
                              smulligan@mcguirewoods.com
                              *Counsel for Wells Fargo Bank, N.A. and J. Kent Thompson*

\41704407.2

9

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Alexandria Division*

| | |
|---|---|
| BEST MEDICAL INTERNATIONAL, INC., *et al.*, | |
| *Plaintiffs*, | Civil Action No. 1:11-cv-01277 GBL/TRJ |
| v. | |
| WELLS FARGO BANK, N.A., *et al.* | |
| *Defendants*. | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants Wells Fargo Bank, N.A. and J. Kent Thompson, by counsel, submit this motion for summary judgment. The grounds and reasons for granting this relief are stated in the accompanying Memorandum.

Dated: November 13, 2012

Respectfully submitted,

**WELLS FARGO BANK, N.A.**
**J. KENT THOMPSON**

/s/
M. Melissa Glassman (VSB # 27526)
John D. Wilburn (VSB # 41141)
Courtney S. Schorr (VSB # 65971)
Anastasia P. Cordova (VSB # 78936)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22101-3892
Tel:  (703) 712-5000
Fax:  (703) 712-5050
mglassman@mcguirewoods.com
jwilburn@mcguirewoods.com
cschorr@mcguirewoods.com
acordova@mcguirewoods.com
*Counsel for Wells Fargo Bank, N.A. and J. Kent Thompson*

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of November 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

Shawn R. Weingast, Esq.
James Michael Brady, Esq.
Best Industries, Inc.
7643 Fullerton Rd
Springfield, VA 22153
Tel:  703 451-2378
Fax:  703-451-5228

*Counsel for Plaintiff*

_____/s/_____
Courtney S. Schorr (VSB # 65971)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22101-3892
Tel:  (703) 712-5000
Fax:  (703) 712-5050
cschorr@mcguirewoods.com
*Counsel for Wells Fargo Bank, N.A. and J. Kent Thompson*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### *Alexandria Division*

|  |  |
|---|---|
| BEST MEDICAL INTERNATIONAL, INC., *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> WELLS FARGO BANK, N.A., *et al.* <br><br> *Defendants*. | Civil Action No. 1:11-cv-01277 <br> GBL/TRJ |

## [PROPOSED] ORDER

UPON CONSIDERATION of Defendants Wells Fargo Bank, N.A. and J. Kent Thompson's ("Defendants") Motion for Summary Judgment, it is this _____ day of _____, 2012, HEREBY ORDERED THAT:

1)      Defendants' Motion for Summary Judgment is GRANTED; and

2)      Plaintiffs' Second Amended Complaint against Defendants is dismissed with prejudice.

_____
Hon. Gerald Bruce Lee
U.S. District Court for the Eastern
District of Virginia

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Alexandria Division*

| | |
|---|---|
| BEST MEDICAL INTERNATIONAL, INC., *et al.*, | |
| *Plaintiffs,* | Civil Action No. 1:11-cv-01277 |
| v. | GBL/TRJ |
| WELLS FARGO BANK, N.A., *et al.* | |
| *Defendants.* | |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY**
**JUDGMENT**

Defendants Wells Fargo Bank, N.A. ("Wells Fargo") and J. Kent Thompson ("Mr. Thompson") (collectively "Defendants") file this Memorandum in Support of their Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56.

**STATEMENT OF UNDISPUTED FACTS**

**A.      The Parties' Contractual Relationship.**

1.      This case arises out of several loans and lines of credit Plaintiffs obtained from Wells Fargo's predecessor Wachovia Bank, N.A. ("Wachovia") between 2004 and 2006.  *See* Affidavit of J. Kent Thompson ("Thompson Aff.") ¶¶ 4-6.  Plaintiffs executed the following documents (collectively the "Loan Documents"):

(i) Promissory Note between Plaintiff Best Medical International, Inc. ("Best Medical") and Wachovia for $3,000.000 dated October 29, 2004;

(ii) Promissory Note between Plaintiff Gunston Hall Realty, Inc. ("Gunston") and Wachovia for $5,000,000 dated August 5, 2005;

1

(iii) Term Note between Plaintiff Huestis Machine Corporation ("Huestis") and Wachovia for $5,000,000 dated December 1, 2006, along with a Financing and Security Agreement[1] ("Huestis Note");

(iv) Supplemental Term Note between Huestis and Wachovia for $2,000,000 dated December 1, 2006 ("Huestis Supplemental Note");

(v) ISDA Master Agreement ("Swap Agreement"), which was subsequently supplemented by Swap Transaction Confirmations on December 8, 2006, and February 23, 2007.

Second Am. Compl. ("SAC") ¶ 15.

2.    The Best Medical Note was secured by the Best Medical Security Agreement. Thompson Aff., Ex. A.

3.    Plaintiff Krishnan Suthanthiran ("Mr. Suthanthiran") personally and unconditionally guaranteed Plaintiffs' obligations under the Loan Documents. *Id.* ¶ 7.

4.    Plaintiff Best Industries, Inc. ("Best Industries") guaranteed the Best Medical Loan. *Id.*

**B.    Plaintiffs' Defaults and the Waiver and Amendment Agreement.**

5.    In 2009, Plaintiffs defaulted on the Huestis Notes by failing to maintain the required debt service coverage ratio. In addition, Mr. Suthanthiran failed to maintain the liquidity requirement contained in the Personal Guaranty. *Ex. 1*, Puckhaber Dep. 28:5-14, Oct. 2, 2012. Plaintiffs also defaulted on the Best Medical and Gunston loans by failing to repay the debt in full when the loans matured on March 6, 2009. Thompson Aff. ¶ 10.

6.    On May 8, 2009, Wells Fargo notified Plaintiffs of the defaults. *See* Thompson Aff., Ex. C.

7.    In response, Plaintiffs requested that Wells Fargo give Plaintiffs an extension. *Id.*, Ex. D.

---

[1]    The Huestis Security Agreement is attached to the Thompson Aff. as Exhibit B.

2

8.      Between May and July 2009, the parties engaged in extensive negotiations which culminated in execution of the Waiver and Amendment Agreement on July 31, 2009. *Id.*, Ex. E; *Ex.* 2, Weingast Dep. 58:18-59:3, Oct. 1, 2012.

9.      During the negotiations, Plaintiffs were represented by outside counsel, Rees Broome. *Ex.* 2, Weingast Dep. 58:14-17.

10.     By entering into the Waiver and Amendment Agreement, Wells Fargo reserved the rights and remedies available to it as a result of Plaintiffs' default of the Loan Documents. Thompson Aff., Ex. E ¶ 23.

11.     Pursuant to the Waiver and Amendment Agreement, Wells Fargo waived the defaults identified in the May 8, 2009, notices and extended Plaintiffs' loans until January 1, 2010.  Thompson Aff., Ex. E ¶¶ G-H.

12.     In return, Plaintiffs promised to satisfy certain conditions, including providing additional collateral to secure the various loans and maintaining a certain minimum net income. Thompson Aff., Ex. E ¶¶ 12-13.

13.     Additionally, Plaintiffs agreed to refinance the outstanding loans and repay Wells Fargo by January 1, 2010.  Thompson Aff., Ex. E ¶¶ 17-19.

14.     In addition to the Waiver and Amendment Agreement, Mr. Suthanthiran, the Plaintiff entities, and several other companies affiliated with Plaintiffs executed three Guaranty of Payment Agreements ("Guaranty Agreements") personally and unconditionally guaranteeing Plaintiffs' obligations under the Loan Documents.  Thompson Aff., Ex. F.

15.     In late 2009, Plaintiffs hired Tatum LLC to assist them in locating alternate financing.  Robert Martins from Tatum LLC worked with Plaintiffs to apply for refinancing with

3

Case 1:11-cv-01277-GBL-TRJ   Document 151   Filed 11/13/12   Page 4 of 28 PageID# 3243

other lenders, as well as to seek an extension of their loans from Wells Fargo.  Thompson Aff. ¶ 16; *Ex. 3*, Martins Dep. 8:11-9:17, Oct. 17, 2012.

16.    Plaintiffs sought financing from approximately two dozen lenders.  *Ex.* 2, Weingast Dep. 67:8-13.

17.    In evaluating Plaintiffs' applications for financing, the lenders approached by Plaintiffs expressed concern regarding Plaintiffs' inadequate cash flow, debt-to-tangible-equity ratio, and lack of transparency in the corporate structure.  *Ex. 3*, Martins Dep. 21:5-14, 47:3-14; 94:4-9.

18.    Ultimately, none of these lenders provided a loan or line of credit to Plaintiffs. *Ex. 2*, Weingast Dep. 67:19-68:4.

19.    One of the lenders from whom Plaintiffs sought refinancing was United Bank.  In a letter dated August 27, 2012, United Bank provided the following reasons for denying Plaintiffs' application for refinancing:

# REDACTED

4

# REDACTED

*See Ex. 4*, Pl.'s 2nd Suppl. Resp. to Def. Thompson's 1st Interrog. No. 13.

> **C.   Plaintiffs' Default of the Waiver and Amendment Agreement, Negotiations for a Further Extension of Plaintiffs' Loans, and Wells Fargo's Decision to Confess Judgment Against Plaintiffs.**

20.    As of January 1, 2010, Plaintiffs had not repaid or refinanced the loans and thus were in default of the Waiver and Amendment Agreement.  Thompson Aff. ¶ 17; *see also Ex. 2*, Weingast Dep. 70:3-6; *Ex.* 5, Suthanthiran Dep. 94:2-4, Oct. 11, 2012.

21.    Notwithstanding Plaintiffs' defaults, the parties attempted to negotiate yet another extension and restructure the loans in a manner that would waive Plaintiffs' default under the Waiver and Amendment Agreement.  Thompson Aff. ¶ 18; *Ex. 2*, Weingast Dep. 70:16-71:13. Over the course of several months, Wells Fargo negotiated with Plaintiffs regarding the terms for another extension of Plaintiffs' loans.  Thompson Aff. ¶ 19; *Ex. 2*, Weingast Dep. 70:16-71:13.

22.    Between March and June 2010, the parties exchanged a series of outlines and several versions of the proposed forbearance/modification agreement.  Thompson Aff. ¶ 19.

23.    On or about March 18, 2010, Mr. Thompson prepared and circulated to Plaintiffs' consultant, Robert Martins, an outline of proposed terms for a forbearance agreement that would restructure the loans, waive Plaintiffs' defaults, extend Plaintiffs' loans to October 31, 2010, and establish a plan for repayment.  *Id.*, Ex. G.

24.    On March 30, 2010, Plaintiffs rejected Wells Fargo's extension terms and offered only to pay an additional $250,000 a month.  Thompson Aff., Ex. H.

25.    On April 6, 2010, Wells Fargo rejected Plaintiffs' offer.  In addition, Wells Fargo reminded Plaintiffs that their loans had matured and that Wells Fargo was entitled to exercise its

rights and remedies under the Loan Documents, the Waiver Agreement, and the Guaranty Agreements. Thompson Aff., Ex. I.

26.     Fifteen days later, on April 21, 2010, Wells Fargo's counsel sent Plaintiffs a demand letter requesting full payment of the loans. The letter again advised Plaintiffs that, absent full repayment by April 30, 2010, Wells Fargo would exercise its rights and remedies. Thompson Aff., Ex. J.

27.     Despite this, Wells Fargo continued to negotiate with Plaintiffs to restructure the loans. Thompson Aff. ¶ 24.

28.     As of June 2010, nearly six months after the Waiver and Amendment Agreement expired, Plaintiffs still had not repaid Wells Fargo or refinanced the loans. Thompson Aff. ¶ 25.

29.     On June 10, 2010, Wells Fargo approved the decision to proceed with its rights and remedies, including filing confessed judgments against Plaintiffs. *Ex. 6*, Thompson Dep. 233:12-236:9, Oct. 4, 2012; *Ex. 1*, Puckhaber Dep. 75:4-7. This decision was based on the fact that: (i) Plaintiffs' loan obligations had fully matured, (ii) there was no meeting of the minds between the parties with respect to repayment terms; (iii) Plaintiffs' loans were more than 90 days past due; and (iv) the parties' loan documents and the Waiver Agreement granted Wells Fargo the right to initiate remedies against Plaintiffs. *Ex. 1*, Puckhaber Dep. 89:6-15.

30.     On June 11, 2010, before confessing judgment, Mr. Thompson sent yet another version of Wells Fargo's proposed terms for Plaintiffs to review. Thompson Aff., Ex. K.

31.     On June 15, 2010, not having received a response to the June 11, 2010, proposal, Mr. Thompson advised Shawn Weingast that Plaintiffs' efforts to work with the Bank were unsatisfactory and that he had instructions to proceed with rights and remedies. Thompson Aff. Ex. L.

**D.      Plaintiffs' Discrimination Complaint and Wells Fargo's Investigation and Response.**

32.      On June 24, 2010, Mr. Suthanthiran sent a letter to Wells Fargo accusing Wells Fargo of racial discrimination.  Thompson Aff., Ex. M.

33.      On July 1, 2010, after conducting an investigation, counsel for Wells Fargo sent Plaintiffs a letter denying the discrimination claim.  *Id.*, Ex. N.

**E.      The Filing of Confessed Judgments and State Court Litigation.**

34.      On June 30, 2010, after all efforts to work with Plaintiffs had proven futile, Wells Fargo exercised its rights under section 1.9 of the Guaranty Agreements and confessed judgment against Best Industries, Gunston, and Mr. Suthanthiran.  Thompson Aff. ¶ 32, Ex. F § 1.9.

35.      On August 3, 2010, Plaintiffs sued Wells Fargo in the Fairfax County Circuit Court.  Thompson Aff. ¶ 33.

36.      On February 24, 2012, the circuit court dismissed the case with prejudice and entered judgment in Wells Fargo's favor for $ 12,119,254.01 plus $800,086.78 in attorney's fees. Thompson Aff. ¶ 34.

**F.      Wells Fargo's Lawful Efforts to Collect the Judgment.**

37.      Under the Best Medical and Huestis Security Agreements, Plaintiffs gave Wachovia a security interest in Plaintiffs' accounts receivable.  Thompson Aff., Exs. A ¶ 2 & B § 3.2.

38.      Beginning in June 2012, Wells Fargo exercised its rights under the Best Medical and Huestis Security Agreements to take assignment of Plaintiffs' accounts receivable. Thompson Aff. ¶ 38.

39.      On June 13, 2012, Wells Fargo sent a letter to Plaintiffs' customers informing them of the assignment of Plaintiffs' accounts receivables to Wells Fargo and directing the

7

customers to make payments to Receivables Control Corporation, Wells Fargo's agent. Thompson Aff., Ex. P.

40.     Despite Wells Fargo's rights under the Security Agreements, on June 21, 2012, Plaintiffs sent a letter advising their customers to disregard the instructions in the letter from Wells Fargo.  Affidavit of Douglas Foley ("Foley Aff."), Ex. A1.

## STANDARD OF REVIEW

To prevail on summary judgment, the moving party must show that "there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party.  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  The court must, however, fulfill its duty to "prevent factually unsupported claims and defenses from proceeding to trial."  *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003).

## ARGUMENT

Defendants are entitled to Summary Judgment for three reasons.  First, Plaintiffs have failed to establish a prima facie case of § 1981 discrimination because Plaintiffs did not qualify for a loan extension.  Second, even if a prima facie case of discrimination has been made, Defendants have produced sufficient nondiscriminatory reasons for their actions, and Plaintiffs have failed to show pretext.  Lastly, the evidence negates Plaintiffs' retaliation claims.

## I.    PLAINTIFFS' § 1981 DISCRIMINATION CLAIM FAILS AS A MATTER OF LAW

In cases involving lending discrimination claims, courts have applied the *McDonnell Douglas* burden-shifting framework.  *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 268 (3d Cir. 2010).  Plaintiffs' discrimination claim fails as a matter of law under this test.

8

### A.    The *McDonnell Douglas* Framework.

The *McDonnell Douglas* test involves a three-step burden-shifting process.  First, the plaintiff must establish a prima facie case of discrimination.  *Anderson*, 621 F.3d at 270-71 (citations omitted).  Second, if the plaintiff sets forth a prima facie case, the burden shifts to the defendant to introduce evidence of nondiscriminatory reasons for its action.  *Id.* (citations omitted).  Third, the burden shifts back to the plaintiff to demonstrate by a preponderance of the evidence that the nondiscriminatory reasons offered by the defendant are pretextual.  *Id.* at 271. At this stage, the plaintiff must either invalidate the nondiscriminatory reasons proffered by the defendant or present evidence that the purported discrimination more likely than not caused the defendant to pursue the action being challenged.  *Id.*

To establish a prima facie case of discrimination at the first stage of the *McDonnell Douglas* test, a plaintiff must show that: (1) he belongs to a protective class; (2) he applied and qualified for a loan from the defendant; (3) his application was denied or he was subjected to unreasonable or overly burdensome conditions; and (4) there is some additional evidence that establishes "a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent."  *Anderson*, 621 F.3d at 275.

### B.    Plaintiffs' Claims Fail under the *McDonnell Douglas* Framework.

Plaintiffs have failed to establish a prima facie case of intentional discrimination because they were not qualified for a renewed loan.  Additionally, Defendants have proffered legitimate, nondiscriminatory reasons for their actions, and Plaintiffs have failed to show that these reasons were pretextual.

9

i.     *Prima facie case of discrimination.*

Plaintiffs were obligated to prove that they applied for and were qualified for credit. *Anderson*, 621 F.3d at 275. Plaintiffs claim that "on or about January 1, 2010 the Plaintiffs were qualified for and requested or reapplied for an extension of the July 30, 2009 agreement pursuant to its expiration." SAC ¶ 44. Plaintiffs further claim that they applied for and were qualified for an extension on April 10, 2010. *Id.* ¶ 45.

The evidence in this case contradicts Plaintiffs' unsupported claims. Pursuant to the Waiver Agreement, Plaintiffs were required to repay the debt they owed Wells Fargo and refinance their loans by January 1, 2010. *See* Thompson Aff., Ex. E ¶ 17-19. As of January 1, 2010, Plaintiffs failed to either repay or refinance their loans and were thus in default of the Waiver Agreement and the original Loan Documents. *Id.* ¶ 17. Unable to meet the requirements of the Waiver Agreement, Plaintiffs asked Wells Fargo yet for another extension of credit. *Id.*; SAC ¶ 44. Contrary to what Plaintiffs allege, however, they were not qualified for this credit.

In their efforts to refinance, Plaintiffs applied for a loan with *15 to 25* different lenders, none of whom extended a loan or a line of credit to Plaintiffs. *Ex. 2*, Weingast Dep. 67:19-68:4. Robert Martins, the former Chief Financial Officer of Tatum LLC, who was employed by Plaintiffs to help them obtain refinancing, testified that Plaintiffs' financial condition would give "pause" to any lender. *Ex. 3*, Martins Dep. 20:15-19. Plaintiffs' cash flow, debt-to-tangible equity ratio, and lack of transparency in the corporate structure were a concern for any prospective lender. *Id.* at 21:5-14, 47:3-14; 94:4-9.

Plaintiffs' failure to obtain refinancing from two dozen disinterested lenders indicates that Plaintiffs simply were not qualified for such a loan, either from those lenders or Wells Fargo. As a result, the fact that Plaintiffs did not qualify for a loan extension after January 1,

2010, cannot be in dispute, and Plaintiffs have thus failed to satisfy the second prong of the prima facie case.

With respect to the fourth prong of the prima facie case, Plaintiffs had to show that a "causal nexus" existed between the harm Plaintiffs allegedly suffered and their membership in a protected class, as to lead the factfinder to believe that Defendants' actions were more likely than not motivated by a discriminatory animus. *Anderson*, 621 F.3d at 275.  In *Anderson*, the additional evidence establishing the required nexus consisted of comments by the defendant's employees that people were unhappy with the plaintiffs moving into a white community and that the defendant was getting a lot of pressure because of the plaintiffs' application.  *Id.* Notwithstanding these comments, however, the court declined to conclude that the evidence established the necessary causal nexus.  *Id.*

The evidence Plaintiffs proffer to establish a nexus between Suthanthiran's race and the denial of an extension is even weaker than the additional evidence offered in *Anderson*.  In fact, Suthanthiran admitted that Defendants never used racially-charged language toward him:

> Q:    Other than the tone you are complaining about
>        did [Thompson] say any words that you thought were racially
>        insensitive?
> A:    My word was that he was demeaning and
>        insulting to me. From day one we met he was just
>        insulting to me.
> Q:    Okay. Did he say any words to you that were
>        racially insensitive?
> A:    I can remember what he said about racially
>        insensitive. I cannot remember, okay.
> Q:    You said you cannot remember him ever saying
>        anything that was racially and insensitive; correct?
> A:    Right.

*Ex. 5*, Suthanthiran Dep. 58:4-16.

11

In his testimony, Mr. Suthanthiran identified three separate meetings with Mr. Thompson. *Id.* 60:3-5. At the outset, all the meetings occurred prior to July 31, 2009. Any reliance by Plaintiffs in support of their discrimination claim on facts and occurrences that predate July 31, 2009, is in violation of this Court's order dismissing with prejudice any discrimination claims based on the facts occurring before July 31, 2009 (ECF No. 22).

Assuming, *arguendo*, that Plaintiffs may rely on facts that pre-date July 31, 2009, none of the meetings between Mr. Thompson and Mr. Suthanthiran establish the causal nexus necessary to Plaintiffs' discrimination claims. During the first two meetings in 2008, Mr. Thompson was introduced to Mr. Suthanthiran and asked Mr. Suthanthiran to continue the relationship with Wachovia. *Id.* 62:14-64:3. Mr. Suthanthiran admitted that at neither of these two meetings Mr. Thompson said or did anything that was racially insensitive or discriminatory. *Id.* 63:15-64:10.

The third meeting between Mr. Thompson and Mr. Suthanthiran occurred in 2009. *Id.* 74:10-12. With respect to that meeting, Mr. Suthanthiran could not recall any racially insensitive language Mr. Thompson used toward him and testified that the only things Mr. Thompson said to him were that he wanted more collateral and that he wanted to see a copy of a certain email. *Id.* 75:3-76:10. While Mr. Suthanthiran could not identify a single discriminatory statement or action by Mr. Thompson, he characterized Mr. Thompson's interaction with him as "insulting," "demeaning," or "hostile." *See, e.g., id.* 69:17-20; 74:3-5.

This Court has previously held, however, that rude or insulting conduct alone is not actionable as discrimination. *Holleman v. Colonial Heights Sch. Bd.*, 3:11-CV-414, 2012 U.S. Dist. LEXIS 23325, at *19-20 (E.D. Va. Feb. 23, 2012). In addition to the absence of discriminatory words, the facts offered in support of the alleged causal nexus demonstrate nothing more than Defendants' race-neutral efforts to work out yet another extension with

Plaintiffs. SAC ¶ 52. The terms complained of in Paragraph 52 had nothing to do with Suthanthiran's race. Instead, these terms were necessitated by Plaintiffs' defaults of the Loan Documents and their subsequent defaults of the Waiver Agreement. As a result, Plaintiffs' allegation that there was no "reasonable purpose for the treatment Wells Fargo inflicted upon Plaintiffs" (SAC ¶ 52(B)(ix)) is without merit.

Under these facts, no reasonable juror would find a connection between Suthanthiran's race and Wells Fargo's actions. To the contrary, the evidence establishes that Wells Fargo declined to extend credit due to Plaintiffs' refusal to agree to terms acceptable to Wells Fargo and numerous failures to honor their obligations. As a result, Plaintiffs have failed to satisfy the fourth prong of the prima facie case, and their discrimination claim fails as a matter of law.

> *ii. Wells Fargo had nondiscriminatory reasons to declare Plaintiffs in default and refuse an extension of credit.*

If the plaintiff establishes a prima facie case of discrimination, the second stage of the *McDonnell Douglas* standard shifts the burden to the defendant to offer nondiscriminatory reasons for its actions. *Anderson*, 621 F.3d at 271. The evidence required at this juncture must warrant a conclusion that there was a nondiscriminatory reason for the adverse action. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). In *Anderson*, for example, the defendant carried this burden by showing that the allegedly onerous conditions it imposed on the plaintiffs were in fact required by Fannie Mae. 621 F.3d at 276-77; *see also Austin v. Bd. of Educ. of Howard Cnty.*, ELH-10-1185, 2011 U.S. Dist. LEXIS 146641, at * 16 (D. Md. Dec. 21, 2011) (holding that the repeated unsatisfactory ratings the plaintiff received on her job performance presented sufficient evidence to rebut the prima facie case of racial discrimination).

Like the defendants in *Anderson* and *Austin*, Defendants have carried their burden and produced legitimate reasons for declaring Plaintiffs in default, not granting another credit extension, and pursuing the rights and remedies that were available to Wells Fargo.

Plaintiffs do not dispute that, as of January 1, 2010, they failed to repay and refinance the loans. *Ex. 2*, Weingast Dep. 70:6; *Ex. 5*, Suthanthiran Dep. 94:2-4. Additionally, Plaintiffs' file demonstrated covenant defaults, insufficient liquidity, insufficient cash flow, and collateral shortfalls. *Ex. 6*, Thompson Dep. 35:15-36:1.

On several occasions, Wells Fargo advised Plaintiffs of these defaults and issues, while at the same time attempting to work out yet another extension and waive the defaults. Between March and June 2010, Wells Fargo prepared and circulated several drafts of the forbearance agreement that would restructure the loans and allow for another extension of the maturity deadline. Thompson Aff. ¶ 19. During this time, Wells Fargo also informed Plaintiffs in April and June 2010 that it was entitled to exercise its rights and remedies, including foreclosure and collections efforts. *Id.*, Exs. J & L. Despite Wells Fargo's efforts, Plaintiffs rejected the bank's terms, while at the same time continuing to be in violation of the Loan Documents and the Waiver Agreement. The totality of this evidence warrants a conclusion that Defendants had nondiscriminatory reasons for not extending Plaintiffs' loans. Defendants have thus carried their burden to rebut the claims of discrimination. *Fuentes*, 32 F.3d at 763.

Furthermore, the testimony provided by Wells Fargo's experts and Mr. Martins, a consultant employed by Plaintiffs, clearly demonstrates that Wells Fargo's terms and decisions with respect to Plaintiffs' loans were proper and reasonable. *See Ex. 7*, Ross Dep. 74:3-5, Oct. 3, 2012 ("I really did not see anything outside the ordinary with the way Wells Fargo dealt with this

14

loan"); *Ex. 8*, Kohlhagen Dep. 123:22-124:2, Sept. 28, 2012; *Ex. 3*, Martins Dep. 129:10-14

("the only thing that [Wells Fargo was] asking for were things that [it] had the right to get.").

Notwithstanding the reasonableness of Defendants' actions, in the Second Amended Complaint, Plaintiffs alleged a litany of facts and events, each of which they claim evinces Defendants' discriminatory animus toward Plaintiffs. As discussed below, each of these instances of discrimination is refuted by a nondiscriminatory legitimate reason for Defendants' actions.

First, Plaintiffs allege that Defendants discriminated against them by including "unreasonable and overly burdensome conditions" in the Waiver Agreement. SAC ¶ 52(A)(i)-(vii). Defendants had the following nondiscriminatory reasons for proposing the conditions:

- Plaintiffs' loans matured in 2009 and Plaintiffs were in default on the debt service coverage ratio and liquidity covenants. Thompson Aff. ¶¶ 9-10.
- Plaintiffs failed to maintain sufficient cash flow. *Ex. 6*, Thompson Dep. 35:15:36:1.
- Plaintiffs had insufficient collateral. *Ex. 6*, Thompson Dep. 35:16-17.
- Plaintiffs were in financial distress. *Ex. 7*, Ross Dep. 40:7-11.
- Without liquidity, Plaintiffs' net-worth was insufficient. *Ex. 7*, Ross Dep. 89:13-17.
- Gunston and Huestis had negative incomes in 2008. *Ex. 6*, Thompson Dep. 54:9-15.
- Wells Fargo already "bent over backwards" granting Plaintiffs the initial extension after covenant defaults. *Ex. 8*, Kohlhagen Dep. 59:9-14.

Second, Plaintiffs allege that Defendants discriminated against them by accelerating the Huestis loans. SAC ¶ 53(A)(v). Defendants accelerated the loans and sought to terminate the relationship with Plaintiffs for the following legitimate reasons:

- Wells Fargo had a legitimate right to exit the relationship after Plaintiffs' profits were sliding. *Ex. 8*, Kohlhagen Dep. 140:19-22.
- Plaintiffs' default on the debt service coverage ratio was an indication that Plaintiffs' assets were substandard. *Ex. 1*, Puckhaber Dep. 128:9-16.
- Plaintiffs' loans received a facility default grade of 7.5, which meant transfer to Special Asset Management, the decision to exit the relationship, and ultimate exit strategy. *Ex. 1*, Puckhaber Dep. 138:12-139:3.

15

JA0280

Third, Plaintiffs claim that Defendants discriminated against them in March 2010 by requiring repayment within six months, even though the loans were fully-collateralized and "substantially performing." SAC ¶ 52(B)(i), 53(B)(i). Defendants had the following nondiscriminatory reasons for their actions:

- Wells Fargo had every right to be paid as soon as possible. *Ex. 7*, Ross Dep. 103:17-22.
- Six-month deadline was absolutely normal to get the parties to start working again. *Ex. 8*, Kohlhagen Dep. 89:8-12.
- Plaintiffs' loans were not "performing" because they went to nonaccrual, nonperforming status in June 2010. *Ex. 1*, Puckhaber Dep. 86:22-87:8.

Fourth, Plaintiffs contend that in March 2010, Defendants discriminated against them by proposing unreasonable terms before agreeing to grant another extension. SAC ¶ 52(B)(ii), 53(B)(ii). Defendants' terms were necessary and supported by the following nondiscriminatory reasons:

- Wells Fargo's offer was not unreasonable based on the limited financial information it received from Plaintiffs. *Ex. 7*, Ross Dep. 71:2-7.
- The deposit of $1,000,000 was required to determine the borrowers' good faith in extending the maturity date. *Ex. 1*, Puckhaber Dep. 95:21-96:2.
- $1,000,000 in extra collateral was necessary due to collateral discounts attributed to raw land. *Ex. 6*, Thompson Dep. 142:11-19.
- Higher interest rates and fees were necessary because Plaintiffs were proposing to proceed with significant research and development instead of paying the debt. *Ex. 6*, Thompson Dep. 157:6-11.
- Demanding payment on a matured loan is typical and not extreme. *Ex. 3*, Martins Dep. 126:12-17.

Fifth, Plaintiffs allege that Defendants discriminated against them by refusing to accept Plaintiffs' offer to pay an extra $250,000 a month. SAC ¶¶ 52(B)(iii), 53(B)(iii). Defendants rejected Plaintiffs offer not because of a discriminatory motive but because the offer was unreasonable and did not reflect on Plaintiffs' ability to repay the debt in the long run. *Ex. 7*, Ross Dep. 70:4-17; *Ex. 1*, Puckhaber Dep. 95:8-11.

16

Sixth, Plaintiffs claim that Defendants were driven by a discriminatory animus when they demanded pay-off or refinancing of the loans even though Plaintiffs allegedly made their payments on time or early. SAC ¶ 52(B)(iv). Plaintiffs' past payment history, however, was not a determinative factor in deciding whether they qualified for credit. *Ex. 7*, Ross Dep. 41:14-20; *Ex. 8*, Kohlhagen Dep. 69:23-70:7 ("the bank is responsible. . . to look out into the future, not just today, not just a missed payment, but what is the creditworthiness of this customer going forward."). Because Plaintiffs' present ability to pay was important, Defendants had a legitimate reason to discount Plaintiffs' past history. *Id.*

Seventh, Plaintiffs contend that Defendants discriminated against them by demanding pay-off even though the loans were allegedly fully collateralized. SAC ¶¶ 52(B)(v), 53(B)(iv). Wells Fargo, however, as a cash flow lender, had a legitimate nondiscriminatory reason in requesting other sources of repayment, such as available cash flow, in addition to collateral. *Ex. 6*, Thompson Dep. 41:13-17; *Ex. 8*, Kohlhagen Dep. 84:3-8 (noting banks' preference to be repaid in cash and that banks are generally "not in the business of owning properties").

Eighth, Plaintiffs allege that Defendants discriminated against them by not allowing Plaintiffs to speak with a person authorized to make decisions regarding their loans. SAC ¶¶ 52(B)(vi), 53(B)(v), 66(e). Defendants' decision to conduct all communications with Plaintiffs through Mr. Thompson was based on the legitimate reason that Mr. Thompson was the officer assigned to Plaintiffs' loans and that he acted as the officer of record for Wells Fargo. *Ex. 1*, Puckhaber Dep. 91:9-18. Moreover, Mr. Thompson's superior, Mr. Puckhaber, was informed of the negotiations and discussions Mr. Thompson had with Plaintiffs. *Id.* 91:19-92:17

17

Ninth, Plaintiffs claim that the penalty fees and interest rate Defendants requested in May 2010 were indicative of a discriminatory motive. SAC ¶ 52(B)(vii). Defendants requested the fees and increased interest for the following legitimate reasons:

- The fees were customary and aimed to motivate Plaintiffs to repay. *Ex. 7*, Ross Dep. 98:20-99:2.
- The fees were reasonable because they were applied to a matured loan *Ex. 3*, Martins Dep. 159:9-19.
- Equity interest rates are applied to higher risk loans. *Ex. 3*, Martins Dep. 60:15-21.

Tenth, Plaintiffs allege that Defendants discriminated against them by not accepting payments from Plaintiffs beginning in October 2011. SAC ¶¶ 52(B)(x), 53(B)(xi). This conduct by Defendants was not motivated by discrimination. Rather, after Wells Fargo switched to its new system in 2011, it could no longer automatically debit for payments that had matured. *Ex. 6*, Thompson Dep. 209:16-20.

Next, Plaintiffs contend that discriminatory animus is evidenced by Defendants' refusal to release collateral in April 2011 in return for payment. SAC ¶¶ 52(B)(xi), 53(B)(ix). As discussed above, Plaintiffs' payment terms were unreasonable and, therefore, unacceptable to Wells Fargo. As a result, Defendants had legitimate reasons not to release Plaintiffs' collateral. *Ex. 7*, Ross Dep. 70:4-17; *Ex. 1*, Puckhaber Dep. 95:8-11.

Plaintiffs also allege that Defendants extended loans to white customers and refused to extend Plaintiffs' loans because of the race and national origin of Mr. Suthanthiran. SAC ¶ 53(A)(i). As the evidence demonstrates, Defendants ultimately chose not to extend Plaintiffs' loans due to race-neutral reasons, such as covenant defaults, insufficient cash flow, and collateral shortfalls. Morever, Plaintiffs have never identified a single similarly-situated Caucasian customer that received different treatment. There simply is no evidence of that allegation in this

case. There are no documents related to such a customer, no such person has been deposed, and none was identified in discovery to be deposed.[2]

Further, Plaintiffs claim that Defendants discriminated against them by filing the confessions of judgment on June 30, 2010.    SAC ¶ 53(B)(xiii).    Contrary to Plaintiffs' allegations, Wells Fargo had the following nondiscriminatory reasons for confessing judgments:

- Plaintiffs' repeated defaults under the Loan Documents and the Waiver Agreement, failure to refinance, and failure to cure covenant violations *Ex. 8*, Kohlhagen Dep. 134:19-25.
- The loans' past due status and the parties' inability to agree on another extension. *Ex. 1*, Puckhaber Dep. 89:6-13.

Finally, Plaintiffs claim that Defendants destroyed their opportunity to obtain refinancing and directed Plaintiffs' customers to pay directly to Wells Fargo.    SAC ¶ 66(g).    To the extent Plaintiffs refer to the subpoena duces tecum Defendants sent to United Bank, Defendants sent the subpoena to obtain financial information that Plaintiffs had consistently failed to provide. Thompson Aff. ¶ 37.    Similarly, Defendants instructed Plaintiffs' customers to pay Wells Fargo directly because of Wells Fargo's statutory and contractual right to collect on Plaintiffs' accounts receivable, and not because of the alleged discriminatory motive. *Id.*, Exs. A & B.

Overall, every single inference of discrimination Plaintiffs raised in the Second Amended Complaint has been refuted by a nondiscriminatory legitimate reason.    Defendants have thus carried their burden of production as required by the *McDonnell Douglas* framework.

---

[2] On the last day of discovery, Plaintiffs identified Dr. Williams Walker of Oncology Med, Inc.  Because of the delay in identifying Dr. Walker, Defendants did not have an opportunity to depose him.  For this reason, Defendants are moving to exclude the testimony of Dr. Walker.  *See* Defs.' Mot. in Limine, filed Nov. 13, 2012.  Moreover, the circumstances of the relationship between Wells Fargo and Oncology Med, Inc. are not comparable to Plaintiffs' loans with Wells Fargo.  Oncology Med, Inc.'s loan totals $300,000, a small fraction of Plaintiffs' debt. *Ex. 2*, Weingast Dep. 13:22-14:2.

> *iii. Plaintiffs have failed to demonstrate that Wells Fargo's*
> *nondiscriminatory reasons were pretextual.*

At the final stage of the *McDonnell Douglas* analysis, a plaintiff can overcome a motion for summary judgment by either "(i) discrediting the proffered reasons, either circumstantially or directly, *or* (ii) adducing evidence, whether circumstantial or direct, that discrimination was more likely than not a . . . determinative cause of the adverse . . . action." *Anderson*, 621 F.3d at 277 (quoting *Fuentes*, 32 F.3d at 764)). Plaintiffs have failed to satisfy either of these prongs by a preponderance of the evidence.

Plaintiffs' raise the following allegations of pretext in the Second Amended Complaint:

> (i)     The loans did not require audited financial statements, and were declared in default for "technical" reasons in contravention of reasonable banking practices;
>
> (ii)    The Loan Documents provided for a 10-day cure option;
>
> (iii)   Demands of increased interest, fees, increased collateral, and penalties before and after the Waiver Agreement; and
>
> (iv)    Ignoring Plaintiffs' past payment performance when evaluating Plaintiffs' creditworthiness;

SAC ¶¶ 31(A)(b), 58.

These allegations are insufficient to either discredit the nondiscriminatory reasons offered in the previous section or adduce evidence that discrimination was more likely than not the driving force behind Defendants' decision to declare default and not extend the loans. As discussed above, the increased interest and collateral, fees, and penalties, both before and after the Waiver Agreement, were necessary in light of the uncured covenant defaults, failure to maintain sufficient cash flow, and discounted collateral. *Ex. 6*, Thompson Dep. 35:15:36:1, 142:11-19; *Ex. 1*, Puckhaber Dep. 95:21-96:2. Furthermore, the terms complained of were

20

JA0285

necessary to motivate Plaintiffs to repay and to ensure that Plaintiffs were seeking another extension in good faith. *Ex. 6*, Thompson Dep. 157:6-11; *Ex. 1*, Puckhaber Dep. 95:21-96:2. None of these actions are pretextual. To the contrary, they demonstrate Defendants' extensive efforts to save a nonperforming, high risk loan.

Plaintiffs also allege that declaring the loans in default for "technical" reasons shows pretext. SAC ¶¶ 33(A)(b), 58(i). The covenants, which Plaintiffs write off as "technical," are, in fact, indicators of Plaintiffs' ability to repay. *Ex. 7*, Ross Dep. 66:14-16 ("one of the reasons you have covenants is to monitor the ongoing ability of the borrower and the guarantors to repay the loan."); *Ex. 8*, Kohlhagen Dep. 130:10-12 (no such thing as a "technical" legal right). Plaintiffs' default of the debt service coverage ratio and liquidity requirements raised concerns regarding Plaintiffs' ability to perform on their obligations. Given the importance of the covenants, it is impossible for Plaintiffs to claim that Defendants' concern with the defaults was pretextual.

Lastly, Plaintiffs allege that Defendants ignored Plaintiffs' payment history. SAC ¶ 58(iv). Plaintiffs' payment history, however, was not a key factor in determining whether Plaintiffs qualified for an extension, because Plaintiffs' past payments did not reflect on their ability to repay the loan in the future. *Ex. 7*, Ross Dep. 41:14-20. Defendants' decision not to place emphasis on Plaintiffs' payment history was thus not pretextual. Moreover, Plaintiffs' payment history supports Defendants' decisions. Indeed, Plaintiffs failed to pay the Best Medical and Gunston Loans when they matured in March 2009. Thompson Aff. ¶ 10. They also failed to pay all of the loans when they matured on January 1, 2010, after an extension. *Ex. 2*, Weingast Dep.70:3-6; *Ex. 5*, Suthanthiran Dep. 94:2-4. Simply put, Plaintiffs failed to pay their loans when they were due.

21

JA0286

Given Plaintiffs' repeated defaults and Wells Fargo's repeated efforts to help Plaintiffs with yet another extension or waiver, the only reasonable conclusion is that Wells Fargo's reasons for ultimately denying an extension and declaring default were driven by Plaintiffs' failures to satisfy their obligations and not by a discriminatory motive. As Defendants' expert put it, Wells Fargo simply "ran out of patience." *Ex. 8*, Kohlhagen Dep. 60:3. Plaintiffs have thus failed to show pretext, and their discrimination claim fails as a matter of law.

In sum, Plaintiffs cannot make out a prima facie case of discrimination because they were not qualified for an extension. Further, Defendants have rebutted the claim of discrimination by providing legitimate and nondiscriminatory reasons for its decision to declare a default and not grant another extension to Plaintiffs. Even after the burden shifted back to Plaintiffs to show pretext, Plaintiffs cannot show that Wells Fargo's nondiscriminatory reasons are not credible or that discrimination was more likely than not the deciding cause of Wells Fargo's actions. Consequently, Wells Fargo is entitled to summary judgment in its favor.

## II.    PLAINTIFFS' RETALIATION CLAIMS FAIL AS A MATTER OF LAW

In Counts III and IV of the SAC, Plaintiffs claim that Defendants retaliated against Plaintiffs.

### A.    Retaliation Claim Against Wells Fargo (Count III).

Plaintiffs allege that Wells Fargo retaliated against Suthanthiran in response to the June 24, 2010, complaint by: (1) confessing judgment against Plaintiffs on June 30, 2010; and (2) ignoring the discrimination complaint. SAC ¶ 77. Further, Plaintiffs allege that Wells Fargo retaliated against Plaintiffs for filing the state court discrimination lawsuit on August 3, 2010, by: (1) refusing to release collateral in April 2011; and (2) not accepting payments from Plaintiffs as of October 1, 2011. SAC ¶ 78.

22

To prove retaliation under § 1981, a plaintiff must show: (1) protected activity; (2) adverse action; and (3) a causal link between the protected activity and the unfavorable action. *Hartnett v. Brunswick Cnty. Public Sch.*, 3:08CV128-HEH, 2008 U.S. Dist. LEXIS 86267, at * 8 (E.D. Va. Oct. 24, 2008). The last prong of this test necessarily means that the adverse action must occur ***after*** the protected activity. *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 309 (4th Cir. 2006); *Hartnett*, 2008 U.S. Dist. LEXIS 86267, at *9. Where the adverse action begins before the protected activity, a claim for retaliation does not arise. *Francis*, 452 F.3d at 309 (quotations omitted).

In *Francis*, for example, the plaintiff argued that the defendant terminated her employment after she informed the defendant that her rights under the Uniformed Services Employment and Reemployment Rights Act ("USERRA") were being violated. 452 F.3d at 309. The court found that the evidence established that the plaintiff was reprimanded for unprofessional conduct several times before she submitted her USERRA complaint. *Id.* at 301-302. Thus, the court concluded that the actions that led to the termination began ***before*** the protected activity, and thus no reasonable factfinder could conclude that the termination was retaliatory. *Id.* at 309. The court affirmed the award of summary judgment to the defendant.

Similarly in *Hartnett*, the plaintiff filed her discrimination claim ***after*** the defendant already demoted her. Thus, because the adverse action occurred before the discrimination claim, this Court held that "the protected activity could not have caused the adverse action, and Plaintiff's claims of retaliation under Title VII and 42 U.S.C. § 1981 accordingly fail as a matter of law." 2008 U.S. Dist. LEXIS 86267, at *9; *see also Austin*, 2011 U.S. Dist. LEXIS 146641, at *22 (holding that where the plaintiff received negative performance feedback before the protected activity, no evidence of causation existed as to satisfy the third element of the

23

retaliation claim); *Chao v. Int'l Bus., Machines Corp.*, 5:09-CV-77-BO, 2010 U.S. Dist. LEXIS 59297, at * 12 (E.D. N.C. June 15, 2010) (finding no retaliation where the adverse action of employment termination occurred after the discrimination complaint).

Plaintiffs' retaliation claims fail for the same reason similar claims failed in the cases cited above. The protected activity Plaintiffs allege, to wit Suthanthiran's June 24, 2010, discrimination claim, occurred *after* Wells Fargo decided to exercise its rights as a result of Plaintiffs' defaults, and certainly *after* Wells Fargo informed Plaintiffs of the defaults. Specifically, Wells Fargo informed Plaintiffs at least three times, on April 6, April 21, and June 15, 2010, that they were in default of the Waiver Agreement and the Loan Documents. Thompson Aff., Exs. I, J, L. Further, on June 15, 2010, nine days *before* Suthanthiran filed the discrimination claim, Wells Fargo again informed Plaintiffs of the defaults and told Plaintiffs that its agents were already authorized to proceed with rights and remedies under the respective documents. *Id.*, Ex. L. Even though Wells Fargo did not exercise its remedies by confessing judgment until after June 24, 2010, its intent and readiness to do so on June 15, 2010, demonstrate that the confessions of judgment were not retaliatory. *Ex. 8*, Kohlhagen Dep. 111:18-23.

Additionally, no causal nexus exists between the discrimination complaints and the events following the confessions of judgment. SAC ¶ 78. First, Wells Fargo's alleged "refusal" to negotiate and release collateral, after Plaintiffs attempted to make payments in 2011, was caused by the facts that Plaintiffs' negotiation terms were unacceptable. Defendants' experts have testified that a further extension of the loans could not be supported only by paying $250,000 a month, and that Plaintiffs' terms were unreasonable. *Ex. 7*, Ross Dep. 70:3-17; *Ex. 8*, Kohlhagen Dep. 85:19-86:8. Thus, the negotiations failed not because of Wells Fargo's

24

discriminatory or retaliatory motives, but because of the unreasonableness of Plaintiffs' terms. Second, after October 1, 2011, Wells Fargo was simply unable to accept payments on loans that had matured. *Ex. 6*, Thompson Dep. 209:16-20. Thus, Wells Fargo's alleged "refusal" to accept payments was related to technological reasons and not Plaintiffs' discrimination claims.

### B.    Retaliation Claim Against Thompson.

Plaintiffs claim that Thompson retaliated against them for filing this lawsuit on November 22, 2011, by: (1) causing Wells Fargo to issue a subpoena to United Bank from whom Plaintiffs sought financing; (2) contacting Plaintiffs' customers and directing them to pay Wells Fargo; (3) causing Receivables Control Corporation ("RCC"), an entity performing collections work for Wells Fargo, to contact Plaintiffs customers; and (4) "unnecessarily diverting funds from customers to pay the loans." SAC ¶ 85.

Defendants and RCC began contacting Plaintiffs' customers to exercise Wells Fargo's assignment rights in accordance with the Best Medical and Huestis Security Agreements and Va. Code §§ 8.9A-406 and -607 which authorize a secured party to contact account debtors. This alleged "unnecessary diversion" of funds is actually an effort by Wells Fargo to collect a debt that has been outstanding since January 1, 2010. As discussed above, Wells Fargo had formed and communicated its intent to pursue its rights under the Loan Documents and the Waiver Agreement, including the right to collect on Plaintiffs' accounts receivable, in June 2010. Thompson Aff., Ex. L; *Ex. 1*, Puckhaber Dep. 75:4-7. Because Wells Fargo had made its decision to exercise its collections rights as early as June 15, 2010, more than a year *before* Plaintiffs filed this suit, Defendants' collections activity, including assignment of Plaintiffs' customers' accounts, cannot be retaliatory as a matter of law. *Price*, 380 F.3d at 213.

25

JA0290

Further, the subpoena duces tecum Wells Fargo issued to United Bank on May 3, 2012, bears no causal link to the filing of this lawsuit in November 2011. For Plaintiffs' retaliation claim to survive, there has to be a causal connection between this lawsuit and the issuance of the subpoena. *Hartnett*, 2008 U.S. Dist. LEXIS 86267, at * 8. Wells Fargo issued the subpoena hoping to obtain financial information Plaintiffs had persistently failed to provide, not because it wished to retaliate against Plaintiffs for bringing this action. Thompson Aff. ¶ 37.

## REDACTED

Because Plaintiffs have failed to establish the elements of a cause of action for retaliation, and because Plaintiffs' allegations have been rebutted by numerous facts and evidence, no fact is genuinely in dispute that Defendants' actions were not retaliatory as a matter of law. As a consequence, this Court should grant Defendants' motion for summary judgment.

### CONCLUSION

For the foregoing reasons this Court should grant Defendants' Motion, dismiss Plaintiffs' Second Amended Complaint with prejudice, and award Defendants any other relief this Court deems just and proper.

Dated: November 13, 2012                     Respectfully submitted,

                                             **WELLS FARGO BANK, N.A.**
                                             **J. KENT THOMPSON**

                                             _____/s/_____

26

M. Melissa Glassman (VSB # 27526)
John D. Wilburn (VSB # 41141)
Courtney S. Schorr (VSB # 65971)
Anastasia P. Cordova (VSB # 78936)
MCGUIREWOODS LLP
1750 Tysons Boulevard, Suite 1800
McLean, Virginia  22101-3892
Tel:  (703) 712-5000
Fax:  (703) 712-5050
mglassman@mcguirewoods.com
jwilburn@mcguirewoods.com
cschorr@mcguirewoods.com
acordova@mcguirewoods.com
*Counsel for Wells Fargo Bank, N.A. and J. Kent Thompson*

<u>**CERTIFICATE OF SERVICE**</u>

   I hereby certify that on the <u>13th</u> day of November 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will then send a notification of such filing (NEF) to the following:

   Shawn R. Weingast, Esq.
   James Michael Brady, Esq.
   Best Industries, Inc.
   7643 Fullerton Rd
   Springfield, VA 22153
   Tel:  703 451-2378
   Fax:  703-451-5228

   *Counsel for Plaintiff*


                 /s/
            Courtney S. Schorr (VSB # 65971)
            MCGUIREWOODS LLP
            1750 Tysons Boulevard, Suite 1800
            McLean, Virginia  22101-3892
            Tel:  (703) 712-5000
            Fax:  (703) 712-5050
            cschorr@mcguirewoods.com
            *Counsel for Wells Fargo Bank, N.A. and J. Kent*
            *Thompson*

\41199803.1

# AFFIDAVIT OF
# J. KENT THOMPSON

### TO

### WELLS FARGO BANK AND J. KENT THOMPSON'S MOTION
### FOR SUMMARY JUDGMENT

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
*Alexandria Division*

---

BEST MEDICAL INTERNATIONAL, INC.,
*et al.*,

        *Plaintiffs,*

    v.

WELLS FARGO BANK, N.A.

        *Defendant.*

---

Civil Action No. 1:11-cv-01277
GBL/TRJ

## AFFIDAVIT OF J. KENT THOMPSON

I, J. Kent Thompson, state and declare as follows:

1.    I am over the age of 18 years and am competent to testify in this matter.

2.    I am a resident of the Commonwealth of Virginia.

3.    I am the Senior Vice President and Loan Adjuster in the Credit Management Group, a department within Wells Fargo Bank, N.A. ("Wells Fargo"). Beginning in late 2008, I was one of the executives with principal responsibility for overseeing and managing Plaintiffs' loans and Plaintiffs' banking relationship with Wachovia Bank, N.A. ("Wachovia") and Wells Fargo, as successor to Wachovia. I make this affidavit based on personal knowledge and review of pertinent documents.

Loan Documents

4.    On or about October 29, 2004, Plaintiff Best Medical International, Inc. ("Best Medical") signed a Promissory Note with Wachovia for $3,000,000. The Best Medical Note was

1

governed and secured by the Security Agreement dated October 29, 2004. The Best Medical Security Agreement is attached hereto as **Exhibit A**.

5.    On or about August 5, 2005, Plaintiff Gunston Hall Realty, Inc. ("Gunston") signed a Promissory Note with Wachovia for $5,000,000. The Gunston Note was secured by the Deed of Trust and Security Agreement dated August 5, 2005, and by the Deed of Trust and Security Agreement dated August 7, 2008.

6.    On or about December 1, 2006, Plaintiff Huestis Machine Corporation ("Huestis") signed a Term Note with Wachovia for $5,000,000 and a Supplemental Term Note for $2,000,000. The Huestis Notes were governed and secured by the Financing and Security Agreement dated December 1, 2006, and the Mortgage, Assignment, Security Agreement and Fixture Filing dated December 1, 2006[1]. The Huestis Security Agreement is attached hereto as **Exhibit B**.

7.    All of Plaintiffs' outstanding loans and lines of credit were personally and unconditionally guaranteed by Mr. Suthanthiran. Additionally, the Best Medical loan was unconditionally guaranteed by Plaintiff Best Industries, Inc. ("Best Industries") pursuant to the Unconditional Guaranty dated October 29, 2004.

8.    On or about November 30, 2006, Wachovia and Huestis entered into the ISDA Master Agreement ("Swap Agreement"), which was subsequently supplemented via Swap Transaction Confirmations on or about December 8, 2006, and February 23, 2007. Pursuant to the Swap Agreement, Huestis committed to pay Wachovia a fixed interest rate on the Notes, and Wachovia agreed to pay Huestis one month LIBOR plus 2%.

---

[1] For the Court's convenience, all the Notes referenced herein will be collectively referred to as "Loan Documents."

2

Plaintiffs' Default under the Loan Documents

9.    In 2009, Plaintiffs defaulted on all their loans under the appropriate Loan Documents. Specifically, Huestis defaulted on the Term Note and the Supplemental Term Note and the Financing and Security Agreement by failing to maintain a required debt service coverage ratio. In addition, Mr. Suthanthiran defaulted on the personal guaranty by failing to maintain the liquidity requirement.

10.    The Best Medical and Gunston Notes matured on March 6, 2009. Best Medical and Gunston were in default on the respective Notes by failing to tender the outstanding principal balance and the accrued interest by March 6, 2009.

11.    On May 8, 2009, Wells Fargo advised Plaintiffs of the defaults on the Loan Documents and demanded payment of the outstanding loan amounts. True and correct copies of the default letters Wells Fargo sent Plaintiffs are attached as **Exhibit C**.

12.    On May 18, 2009, in response to the default letters, Plaintiffs requested that Wells Fargo give Plaintiffs an extension. A true and correct copy of the May 18, 2009 e-mail from Shawn Weingast to Richard Pollack and me is attached as **Exhibit D**.

The Waiver and Amendment Agreement

13.    On July 31, 2009, following extensive negotiations, Plaintiffs and Wells Fargo entered into the Waiver and Amendment Agreement. A true and correct copy of the Waiver Agreement is attached as **Exhibit E**. By entering into the Waiver and Amendment Agreement, Wells Fargo retained and reserved all of the rights and remedies available to it under the Loan Documents, except as set forth in the Waiver and Amendment Agreement.

14.    Pursuant to the Waiver and Amendment Agreement, Wells Fargo waived the defaults and extended Plaintiffs' lines of credit until January 1, 2010. Ex. E ¶ 18. In return,

3

Plaintiffs promised to abide by certain conditions, including additional collateral and minimum income requirements. In addition, the waiver of defaults and the extension of the lines of credit were contingent upon Plaintiffs refinancing the outstanding loans by January 1, 2010. *Id.* ¶ 17.

15.    Additionally, on July 31, 2009, Mr. Suthanthiran, the Plaintiff entities, and several companies affiliated with Plaintiffs executed three Guaranty of Payment Agreements personally and unconditionally guaranteeing Plaintiffs' obligations under the Loan Documents. True and correct copies of the Guaranty Agreements are attached as **Exhibit F**.

16.    Upon information and belief, Plaintiffs hired Tatum LLC to assist them in locating alternate financing. Robert Martins from Tatum LLC worked with Plaintiffs to apply for refinancing, as well as to seek an extension of their loans from Wells Fargo.

Plaintiffs' Default Of the Waiver and Amendment Agreement and Negotiations for an Additional Extension

17.    Plaintiffs failed to repay their loans by January 1, 2010, and thus were in default of the Waiver Agreement. Plaintiffs then sought another extension of their loans.

18.    Notwithstanding Plaintiffs' defaults, Wells Fargo continued to negotiate with Plaintiffs to restructure the loans in a manner that would waive the defaults and permit another extension of the matured loans.

19.    Between March and June 2010, Wells Fargo prepared and circulated at least four versions of forbearance/modification agreements and a series of extension outlines that set forth the proposed repayment and extension terms.

20.    On March 18, 2010, I circulated to Plaintiffs' consultant, Robert Martins, an outline of proposed terms for a forbearance agreement that would restructure the loans, waive Plaintiffs' defaults, extend Plaintiffs' loans to October 31, 2010, and establish a plan for repayment. A true and accurate copy of the March 18, 2010, e-mail is attached as **Exhibit G**.

21.    On March 30, 2010, Plaintiffs rejected Wells Fargo's extension terms and offered only to pay an additional $250,000 a month. A true and correct copy of the March 30, 2010 e-mail from Mr. Suthanthiran to me is attached as **Exhibit H**.

22.    Plaintiffs' proposed payment of $250,000 was insufficient to cover the outstanding debt, or to demonstrate Plaintiffs' long-term ability to repay. As a result, on April 6, 2010, I advised Plaintiffs that their offer, without significant repayment efforts and required information, was not acceptable to Well Fargo. A true and correct copy of my April 6, 2010 correspondence is attached as **Exhibit I**.

23.    On April 21, 2010, Wells Fargo's counsel sent Plaintiffs a demand letter requesting full payment of the loans. The letter again advised Plaintiffs that, absent full repayment by April 30, 2010, Wells Fargo would exercise its rights and remedies. A true and correct copy of the April 21, 2010, letter, on which I was copied, is attached as **Exhibit J**.

24.    Despite the demand letter, Wells Fargo continued to negotiate with Plaintiffs in an effort to restructure the loans.

25.    As of June 2010, Plaintiffs had still not repaid the debt they owed Wells Fargo or refinanced the loans as required by the Waiver Agreement.

26.    As a result, in early June 2010, Wells Fargo's Projection Committee authorized me to proceed with Wells Fargo's rights and remedies, including filing confessed judgments against Plaintiffs.

27.    On June 11, 2010, before filing confessed judgments, I sent yet another extension proposal for Plaintiffs to review. A true and correct copy of the June 11, 2010, e-mail to Shawn Weingast, with a copy to Robert Martins, and revised forbearance/modification agreement is attached as **Exhibit K**.

5

28.    Plaintiffs did not respond to the revised agreement.

29.    On June 15, 2010, I again advised Plaintiffs that their efforts to work with Wells Fargo were unsatisfactory and that I had instructions to proceed with the bank's rights and remedies. A true and correct copy of the June 15, 2010, email from me to Shawn Weingast is attached as **Exhibit L**. Additionally, on or about June 15, 2010, I gave payout instructions to Wells Fargo's counsel to be used for confession of judgment.

Plaintiffs' Discrimination Claim

30.    On June 24, 2010, approximately ten days after I advised Plaintiffs that I had received instructions to exercise Wells Fargo's rights and remedies, Mr. Suthanthiran sent a letter to me accusing Wells Fargo and/or me of racial discrimination. A true and correct copy of the June 24, 2010, letter is attached as **Exhibit M**.

31.    On July 1, 2010, after conducting an investigation, counsel for Wells Fargo sent Plaintiffs a letter denying the discrimination claim. A true and correct copy of the July 1, 2010 letter, on which I was copied, is attached as **Exhibit N**.

The Filing of Confessed Judgments and State Court Litigation

32.    On June 30, 2010, pursuant to the Huestis and Best Medical Security Agreements, Wells Fargo filed confessions of judgment against Best Industries, Gunston, and Mr. Suthanthiran.

33.    On August 3, 2010, Plaintiffs sued Wells Fargo in the Fairfax County Circuit Court.

34.    On February 24, 2012, the circuit court dismissed the case with prejudice and entered judgment in Wells Fargo's favor for $12,199,254.01, the total amount of the confessed judgments, plus $800,086.78 in attorney's fees.

6

Subpoena to United Bank

35.    During my involvement with Plaintiffs' loans, Plaintiffs did not or could not provide complete financial information that would permit Wells Fargo to evaluate Plaintiffs' repeated requests for an extension, assess Plaintiffs' ability to perform on the loans, and pursue its lawful collections efforts.

36.    As a result, on May 3, 2012, Wells Fargo issued a subpoena duces tecum to United Bank. Through the subpoena, Wells Fargo sought to obtain documents relating to the financial condition of Krishnan Suthanthiran, Gunston Hall Realty, Inc., Best Industries, Inc., and Best Medical International, Inc. which Plaintiffs refused to provide Wells Fargo. A true and correct copy of the subpoena duces tecum to United Bank is attached as **Exhibit O**.

37.    Neither I nor Wells Fargo interposed the subpoena for any improper purpose, such as retaliating against or harassing Plaintiffs or interfering with Plaintiffs' refinancing efforts. The sole purpose was to obtain the information Wells Fargo had requested from Plaintiffs in connection with its judgment collection efforts but that Plaintiffs refused to provide.

Wells Fargo's Collection Efforts

38.    Beginning in June 2012, Wells Fargo exercised its rights under the Best Medical and Huestis Security Agreements to take assignment of Plaintiffs' accounts receivable that Plaintiffs had pledged as collateral for the loans.

39.    On or about June 13, 2012, I sent a letter to Plaintiffs' customers informing them of Plaintiffs' assignment of their accounts receivables to Wells Fargo and directing them to make payments to Receivables Control Corporation, Wells Fargo's agent. A true and correct copy of my June 13, 2012 letter is attached as **Exhibit P**.

7

**FURTHER THE AFFIANT SAYETH NOT.**

Executed this 2 day of November, 2012.

J. Kent Thompson

STATE OF VA _____ )
CITY/COUNTY OF FAIRFAX )

**TO WIT:**

    This day, personally appeared before me, J. Kent Thompson, who made oath that, under penalty of perjury, the foregoing statements are true and correct to the best of his knowledge, information and belief.

    Subscribed and sworn to before me this 1 day of November, 2012.

Notary
Registration No: _____

My commission expires: 12-31-15

REX MARSHALL
Notary Public
Commonwealth of Virginia
7025520
My Commission Expires Dec 31, 2015

8

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 319 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 10 of 223 PageID#
Case 1:11-cv-01277-GBL-TRJ   Document 86-7   Filed 09/04/12   Page 1 of 7
3277



EXHIBIT
A

## SECURITY AGREEMENT

October 29, 2004

Best Medical International, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
(Individually and collectively "Debtor")

Wachovia Bank, National Association
201 S. Jefferson Street
Roanoke, Virginia 24011
(Hereinafter referred to as "Bank")

For value received and to secure payment and performance of any and all obligations of Debtor (also referred to herein as "Borrower") to Bank however created, arising or evidenced, whether direct or indirect, absolute or contingent, now existing or hereafter arising or acquired, including swap agreements (as defined in 11 U.S.C. § 101, as in effect from time to time), future advances, and all costs and expenses incurred by Bank to obtain, preserve, perfect and enforce the security interest granted herein and to maintain, preserve and collect the property subject to the security interest (collectively, "Obligations"), Debtor hereby grants to Bank a continuing security interest in and lien upon the following described property, whether now owned or hereafter acquired, and any additions, replacements, accessions, or substitutions thereof and all cash and non-cash proceeds and products thereof (collectively, "Collateral"):

All of the personal property of Debtor of every kind and nature including, without limitation, all accounts, equipment, accessions, inventory, chattel paper, instruments, investment property, documents, letter-of-credit rights, deposit accounts, and general intangibles, wherever located.

Debtor hereby represents and agrees that:

**OWNERSHIP.** Debtor owns the Collateral or Debtor will purchase and acquire rights in the Collateral within ten days of the date advances are made under the Loan Documents. If Collateral is being acquired with the proceeds of an advance under the Loan Documents, Debtor authorizes Bank to disburse proceeds directly to the seller of the Collateral. The Collateral is free and clear of all liens, security interests, and claims except those previously reported in writing to and approved by Bank, and Debtor will keep the Collateral free and clear from all liens, security interests and claims, other than those granted to or approved by Bank.

**NAME AND OFFICES; JURISDICTION OF ORGANIZATION.** The name and address of Debtor appearing at the beginning of this Agreement are Debtor's exact legal name and the address of its chief executive office. There has been no change in the name of Debtor, or the name under which Debtor conducts business, within the five years preceding the date hereof except as previously reported in writing to Bank. Debtor has not moved its chief executive office within the five years preceding the date hereof except as previously reported in writing to Bank. Debtor is organized under the laws of the Commonwealth of Virginia and has not changed the jurisdiction of its organization within the five years preceding the date hereof except as previously reported in writing to Bank.

**TITLE/TAXES.** Debtor has good and marketable title to Collateral and will warrant and defend same against all claims. Debtor will not transfer, sell, or lease Collateral (except as permitted herein). Debtor agrees to pay promptly all taxes and assessments upon or for the use of Collateral and on this Security Agreement. At its option, Bank may discharge taxes, liens, security interests or other encumbrances at any time levied or placed on Collateral. Debtor agrees to reimburse Bank, on demand, for any such payment made by Bank. Any amounts so paid shall be added to the Obligations.

535095 (Rev 19.0)
SAGR

Secagr.doc

TR_010937

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 320 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 11 of 223 PageID# 3278
Case 1:11-cv-01277-GBL-TRJ    Document 86-7    Filed 09/04/12    Page 2 of 7 PageID# 2388

**WAIVERS.** Debtor agrees not to assert against Bank as a defense (legal or equitable), as a set-off, as a counterclaim, or otherwise, any claims Debtor may have against any seller or lessor that provided personal property or services relating to any part of the Collateral or against any other party liable to Bank for all or any part of the Obligations. Debtor waives all exemptions and homestead rights with regard to the Collateral. Debtor waives any and all rights to any bond or security which might be required by applicable law prior to the exercise of any of Bank's remedies against any Collateral. All rights of Bank and security interests hereunder, end all obligations of Debtor hereunder, shall be absolute and unconditional, not discharged or impaired irrespective of (and regardless of whether Debtor receives any notice of): (i) any lack of validity or enforceability of any Loan Document; (ii) any change in the time, manner or place of payment or performance, or in any term, of all or any of the Obligations or the Loan Documents or any other amendment or waiver of or any consent to any departure from any Loan Document; or (iii) any exchange, insufficiency, unenforceability, enforcement, release, impairment or non-perfection of any collateral, or any release of or modifications to or insufficiency, unenforceability or enforcement of the obligations of any guarantor or other obligor. To the extent permitted by law, Debtor hereby waives any rights under any valuation, stay, appraisement, extension or redemption laws now existing or which may hereafter exist and which, but for this provision, might be applicable to any sale or disposition of the Collateral by Bank; and any other circumstance which might otherwise constitute a defense available to, or a discharge of any party with respect to the Obligations.

**NOTIFICATIONS; LOCATION OF COLLATERAL.** Debtor will notify Bank in writing at least 30 days prior to any change in: (i) Debtor's chief place of business and/or residence; (ii) Debtor's name or identity; (iii) Debtor's corporate/organizational structure; or (iv) the jurisdiction in which Debtor is organized. In addition, Debtor shall promptly notify Bank of any claims or alleged claims of any other person or entity to the Collateral or the institution of any litigation, arbitration, governmental investigation or administrative proceedings against or affecting the Collateral. Debtor will keep Collateral at the location(s) previously provided to Bank until such time as Bank provides written advance consent to a change of location. Debtor will bear the cost of preparing and filing any documents necessary to protect Bank's liens.

**COLLATERAL CONDITION AND LAWFUL USE.** Debtor represents that the Collateral is in good repair and condition and that Debtor shall use reasonable care to prevent Collateral from being damaged or depreciating, normal wear and tear excepted. Debtor shall immediately notify Bank of any material loss or damage to Collateral. Debtor shall not permit any item of Collateral to become a fixture to real estate or an accession to other personal property unless such property is also Collateral hereunder. Debtor represents it is in compliance in all respects with all laws, rules and regulations applicable to the Collateral and its properties, operations, business, and finances.

**RISK OF LOSS AND INSURANCE.** Debtor shall bear all risk of loss with respect to the Collateral. The injury to or loss of Collateral, either partial or total, shall not release Debtor from payment or other performance hereof. Debtor agrees to obtain and keep in force property insurance on the Collateral with a Lender's Loss Payable Endorsement in favor of Bank and commercial general liability insurance naming Bank as Additional Insured and such other insurance as Bank may require from time to time. Such insurance is to be in form and amounts satisfactory to Bank and issued by reputable insurance carriers satisfactory to Bank with a Best Insurance Report Key Rating of at least "A-". All such policies shall provide to Bank a minimum of 30 days written notice of cancellation. Debtor shall furnish to Bank such policies, or other evidence of such policies satisfactory to Bank. If Debtor fails to obtain or maintain in force such insurance or fails to furnish such evidence, Bank is authorized, but not obligated, to purchase any or all insurance or "Single Interest Insurance" protecting such interest as Bank deems appropriate against such risks and for such coverage and for such amounts, including either the loan amount or value of the Collateral, all at its discretion, and at Debtor's expense. In such event, Debtor agrees to reimburse Bank for the cost of such insurance and Bank may add such cost to the Obligations. Debtor shall bear the risk of loss to the extent of any deficiency in the effective insurance coverage with respect to loss or damage to any of the Collateral. Debtor hereby assigns to Bank the proceeds of all property insurance covering the Collateral up to the amount of the Obligations and directs any insurer to make payments directly to Bank. Debtor hereby appoints Bank its attorney-in-fact, which appointment shall be irrevocable and coupled with an interest for so long as Obligations are unpaid, to file proof of loss and/or any other forms required to collect from any insurer any amount due from any damage or

TR_010938

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 321 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12 . Page 12 of 223 PageID# 3279
Case 1:11-cv-01277-GBL-TRJ    Document 86-7    Filed 09/04/12   Page 3 of 7 PageID# 2389

destruction of Collateral, to agree to and bind Debtor as to the amount of said recovery, to designate payee(s) of such recovery, to grant releases to insurer, to grant subrogation rights to any insurer, and to endorse any settlement check or draft. Debtor agrees not to exercise any of the foregoing powers granted to Bank without Bank's prior written consent.

**FINANCING STATEMENTS, CERTIFICATES OF TITLE, POWER OF ATTORNEY.** No financing statement (other than any filed or approved by Bank) covering any Collateral is on file in any public filing office. Debtor authorizes the filing of one or more financing statements covering the Collateral in form satisfactory to Bank, and without Debtor's signature where authorized by law, agrees to deliver certificates of title on which Bank's lien has been indicated covering any Collateral subject to a certificate of title statute, and will pay all costs and expenses of filing or applying for the same or of filing this Security Agreement in all public filing offices, where filing is deemed by Bank to be desirable. Debtor hereby constitutes and appoints Bank the true and lawful attorney of Debtor with full power of substitution to take any and all appropriate action and to execute any and all documents, instruments or applications that may be necessary or desirable to accomplish the purpose and carry out the terms of this Security Agreement, including, without limitation, to complete, execute, and deliver any Control Agreement(s) by Bank, Debtor and Third Party(ies) that may be or become required in connection herewith (individually and collectively the "Control Agreement"), and any instructions to Third Party(ies) regarding, among other things, control and disposition of any Collateral which is the subject of such Control Agreement(s). The foregoing power of attorney is coupled with an interest and shall be irrevocable until all of the Obligations have been paid in full. Neither Bank nor anyone acting on its behalf shall be liable for acts, omissions, errors in judgment, or mistakes in fact in such capacity as attorney-in-fact. Debtor ratifies all acts of Bank as attorney-in-fact. Debtor agrees to take such other actions, at Debtor's expense, as may be requested for the perfection, continuation and assignment, in whole or in part, of the security interests granted herein and to assure and preserve Bank's intended priority position. If certificates, passbooks, or other documentation or evidence is/are issued or outstanding as to any of the Collateral, Debtor will cause the security interests of Bank to be properly protected, including perfection by notation thereon or delivery thereof to Bank.

**LANDLORD/MORTGAGEE WAIVERS.** Debtor shall cause each mortgagee of real property owned by Debtor and each landlord of real property leased by Debtor to execute and deliver instruments satisfactory in form and substance to Bank by which such mortgagee or landlord subordinates its rights, if any, in the Collateral.

**CONTROL.** Debtor will cooperate with Bank in obtaining control with respect to Collateral consisting of electronic chattel paper. Debtor authorizes and directs Third Party to comply with the terms of this Security Agreement, to enter into a Control Agreement, to mark its records to show the security interest of and/or the transfer to Bank of the property pledged hereunder.

**CHATTEL PAPER, ACCOUNTS, GENERAL INTANGIBLES.** Debtor warrants that Collateral consisting of chattel paper, accounts, or general intangibles is (i) genuine and enforceable in accordance with its terms; (ii) not subject to any defense, set-off, claim or counterclaim of a material nature against Debtor except as to which Debtor has notified Bank in writing; and (iii) not subject to any other circumstances that would impair the validity, enforceability, value, or amount of such Collateral except as to which Debtor has notified Bank in writing. Debtor shall not amend, modify or supplement any lease, contract or agreement contained in Collateral or waive any provision therein, without prior written consent of Bank. Debtor will not create any tangible chattel paper without placing a legend on the chattel paper acceptable to Bank indicating that Bank has a security interest in the chattel paper. Debtor will not create any electronic chattel paper without taking all steps deemed necessary by Bank to confer control of the electronic chattel paper upon Bank in accordance with the UCC.

**ACCOUNT INFORMATION.** From time to time, at Bank's request, Debtor shall provide Bank with schedules describing all accounts, including customers' addresses, created or acquired by Debtor and at Bank's request shall execute and deliver written assignments of contracts and other documents evidencing such accounts to Bank. Together with each schedule, Debtor shall, if requested by Bank,

TR_010939

furnish Bank with copies of Debtor's sales journals, invoices, customer purchase orders or the equivalent, and original shipping or delivery receipts for all goods sold, and Debtor warrants the genuineness thereof.

**ACCOUNT DEBTORS.** If a Default should occur, Bank shall have the right to notify the account debtors obligated on any or all of the Collateral to make payment thereof directly to Bank and Bank may take control of all proceeds of any such Collateral, which rights Bank may exercise at any time. The cost of such collection and enforcement, including attorneys' fees and expenses, shall be borne solely by Debtor whether the same is incurred by Bank or Debtor. If a Default should occur or upon demand of Bank, Debtor will, upon receipt of all checks, drafts, cash and other remittances in payment on Collateral, deposit the same in a special bank account maintained with Bank, over which Bank also has the power of withdrawal.

If a Default should occur, no discount, credit, or allowance shall be granted by Debtor to any account debtor and no return of merchandise shall be accepted by Debtor without Bank's consent. Bank may, after Default, settle or adjust disputes and claims directly with account debtors for amounts and upon terms that Bank considers advisable, and in such cases Bank will credit the Obligations with the net amounts received by Bank, after deducting all of the expenses incurred by Bank. Debtor agrees to indemnify and defend Bank and hold it harmless with respect to any claim or proceeding arising out of any matter related to collection of Collateral.

**GOVERNMENT CONTRACTS.** If any Collateral covered hereby arises from obligations due to Debtor from any governmental unit or organization, Debtor shall immediately notify Bank in writing and execute all documents and take all actions deemed necessary by Bank to ensure recognition by such governmental unit or organization of the rights of Bank in the Collateral.

**INVENTORY.** So long as no Default has occurred, Debtor shall have the right in the regular course of business, to process and sell Debtor's Inventory. If a Default should occur or upon demand of Bank, Debtor will, upon receipt of all checks, drafts, cash and other remittances, in payment of Collateral sold, deposit the same in a special bank account maintained with Bank, over which Bank also has the power of withdrawal. Debtor agrees to notify Bank immediately in the event that any inventory purchased by or delivered to Debtor is evidenced by a bill of lading, dock warrant, dock receipt, warehouse receipt or other document of title and to deliver such document to Bank upon request.

**INSTRUMENTS, CHATTEL PAPER, DOCUMENTS.** Any Collateral that is, or is evidenced by, instruments, chattel paper or negotiable documents will be properly assigned to and the originals of any such Collateral in tangible form deposited with and held by Bank, unless Bank shall hereafter otherwise direct or consent in writing. Bank may, without notice, before or after maturity of the Obligations, exercise any or all rights of collection, conversion, or exchange and other similar rights, privileges and options pertaining to such Collateral, but shall have no duty to do so.

**COLLATERAL DUTIES.** Bank shall have no custodial or ministerial duties to perform with respect to Collateral pledged except as set forth herein; and by way of explanation and not by way of limitation, Bank shall incur no liability for any of the following: (i) loss or depreciation of Collateral (unless caused by its willful misconduct or gross negligence), (ii) failure to present any paper for payment or protest, to protest or give notice of nonpayment, or any other notice with respect to any paper or Collateral.

**TRANSFER OF COLLATERAL.** Bank may assign its rights in Collateral or any part thereof to any assignee who shall thereupon become vested with all the powers and rights herein given to Bank with respect to the property so transferred and delivered, and Bank shall thereafter be forever relieved and fully discharged from any liability with respect to such property so transferred, but with respect to any property not so transferred, Bank shall retain all rights and powers hereby given.

**INSPECTION, BOOKS AND RECORDS.** Debtor will at all times keep accurate and complete records covering each item of Collateral, including the proceeds therefrom. Bank, or any of its agents, shall have the right, at intervals to be determined by Bank and without hindrance or delay, at Debtor's expense, to inspect, audit, and examine the Collateral and to make copies of and extracts from the books, records,

TR_010940

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 323 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 14 of 223 PageID#
3281
Case 1:11-cv-01277-GBL-TRJ    Document 86-7    Filed 09/04/12    Page 5 of 7 PageID# 2391

journals, orders, receipts, correspondence and other data relating to Collateral, Debtor's business or any other transaction between the parties hereto. Debtor will at its expense furnish Bank copies thereof upon request. For the further security of Bank, it is agreed that Bank has and is hereby granted a security interest in all books and records of Debtor pertaining to the Collateral.

**COMPLIANCE WITH LAW.** Debtor will comply with all federal, state and local laws and regulations, applicable to it, including without limitation, environmental and labor laws and regulations, in the creation, use, operation, manufacture and storage of the Collateral and the conduct of its business.

**REGULATION U.** None of the proceeds of the credit secured hereby shall be used directly or indirectly for the purpose of purchasing or carrying any margin stock in violation of any of the provisions of Regulation U of the Board of Governors of the Federal Reserve System ("Regulation U"), or for the purpose of reducing or retiring any indebtedness which was originally incurred to purchase or carry margin stock or for any other purchase which might render the Loan a "Purpose Credit" within the meaning of Regulation U.

**CROSS COLLATERALIZATION LIMITATION.** As to any other existing or future consumer purpose loan made by Bank to Debtor, within the meaning of the Federal Consumer Credit Protection Act, Bank expressly waives any security interest granted herein in Collateral that Debtor uses as a principal dwelling and household goods.

**ATTORNEYS' FEES AND OTHER COSTS OF COLLECTION.** Debtor shall pay all of Bank's reasonable expenses incurred in enforcing this Security Agreement and in preserving and liquidating Collateral, including but not limited to, reasonable arbitration, paralegals', attorneys' and experts' fees and expenses, whether incurred with or without the commencement of a suit, trial, arbitration, or administrative proceeding, or in any appellate or bankruptcy proceeding.

**DEFAULT.** If any of the following occurs, a default ("Default") under this Security Agreement shall exist: **Loan Document Default.** A default under any Loan Document. **Collateral Loss or Destruction.** Any loss, theft, substantial damage, or destruction of Collateral not fully covered by insurance, or as to which insurance proceeds are not remitted to Bank within 30 days of the loss. **Collateral Sale, Lease or Encumbrance.** Any sale, lease, or encumbrance of any Collateral not specifically permitted herein without prior written consent of Bank. **Levy, Seizure or Attachment.** The making of any levy, seizure, or attachment on or of Collateral which is not removed within 10 days. **Unauthorized Collection of Collateral.** Any attempt to collect, cash in or otherwise recover deposits that are Collateral. **Third Party Breach.** Any default or breach by a Third Party of any provision contained in any Control Agreement executed in connection with any of the Collateral. **Unauthorized Termination.** Any attempt to terminate, revoke, rescind, modify, or violate the terms of this Security Agreement or any Control Agreement without the prior written consent of Bank.

**REMEDIES ON DEFAULT (INCLUDING POWER OF SALE).** If a Default occurs Bank shall have all the rights and remedies of a secured party under the Uniform Commercial Code. Without limitation thereto, Bank shall have the following rights and remedies: (i) to take immediate possession of Collateral, without notice or resort to legal process, and for such purpose, to enter upon any premises on which Collateral or any part thereof may be situated and to remove the same therefrom, or, at its option, to render Collateral unusable or dispose of said Collateral on Debtor's premises; (ii) to require Debtor to assemble the Collateral and make it available to Bank at a place to be designated by Bank; (iii) to exercise its right of set-off or bank lien as to any monies of Debtor deposited in accounts of any nature maintained by Debtor with Bank or affiliates of Bank, without advance notice, regardless of whether such accounts are general or special; (iv) to dispose of Collateral, as a unit or in parcels, separately or with any real property interests also securing the Obligations, in any county or place to be selected by Bank, at either private or public sale (at which public sale Bank may be the purchaser) with or without having the Collateral physically present at said sale.

Any notice of sale, disposition or other action by Bank required by law and sent to Debtor at Debtor's address shown above, or at such other address of Debtor as may from time to time be shown on the

TR_010941

JA0307

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 324 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 15 of 223 PageID# 3282
Case 1:11-cv-01277-GBL-TRJ    Document 86-7    Filed 09/04/12    Page 6 of 7 PageID# 2392

records of Bank, at least 5 days prior to such action, shall constitute reasonable notice to Debtor. Notice shall be deemed given or sent when mailed postage prepaid to Debtor's address as provided herein. Bank shall be entitled to apply the proceeds of any sale or other disposition of the Collateral, and the payments received by Bank with respect to any of the Collateral, to Obligations in such order and manner as Bank may determine. Collateral that is subject to rapid declines in value and is customarily sold in recognized markets may be disposed of by Bank in a recognized market for such collateral without providing notice of sale. Bank sell or dispose of all or any part of the Collateral at any particular time, regardless of whether Debtor has requested such sale or disposition.

**REMEDIES ARE CUMULATIVE.** No failure on the part of Bank to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise by Bank of any right, power or remedy hereunder preclude any other or further exercise thereof or the exercise of any right, power or remedy. The remedies herein provided are cumulative and are not exclusive of any remedies provided by law, in equity, or in other Loan Documents.

**INDEMNIFICATION.** Debtor shall protect, indemnify and save harmless Bank from and against all losses, liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) (collectively, "Damages") imposed upon, incurred by or asserted against Bank on account of (i) the Loan Documents or any failure or alleged failure of Debtor to comply with any of the terms or representations of this Agreement; (ii) any claim of loss or damage to the Collateral or any injury or claim of injury to, or death of, any person or property that may be occasioned by any cause whatsoever pertaining to the Collateral, or the use, occupancy or operation thereof, (iii) any failure or alleged failure of Debtor to comply with any law, rule or regulation applicable to the Collateral or the use, occupancy or operation of the Collateral (including, without limitation, the failure to pay any taxes, fees or other charges), (iv) any Damages whatsoever by reason of any alleged action, obligation or undertaking of Bank relating in any way to or any matter contemplated by the Loan Documents, or (v) any claim for brokerage fees or such other commissions relating to the Collateral or any other Obligations; provided that such indemnity shall be effective only to the extent of any Damages that may be sustained by Bank in excess of any net proceeds received by it from any insurance of Debtor (other than self-insurance) with respect to such Damages. Nothing contained herein shall require Debtor to indemnify Bank for any Damages resulting from Bank's gross negligence or its willful misconduct. The indemnity provided for herein shall survive payment of the Obligations and shall extend to the officers, directors, employees and duly authorized agents of Bank. In the event Bank incurs any Damages arising out of or in any way relating to the transaction contemplated by the Loan Documents (including any of the matters referred to in this section), the amounts of such Damages shall be added to the Obligations, shall bear interest, to the extent permitted by law, at the interest rate borne by the Obligations from the date incurred until paid and shall be payable on demand.

**MISCELLANEOUS.** (i) **Amendments and Waivers.** No waiver, amendment or modification of any provision of this Security Agreement shall be valid unless in writing and signed by Debtor and an officer of Bank. No waiver by Bank of any Default shall operate as a waiver of any other Default or of the same Default on a future occasion. (ii) **Assignment.** All rights of Bank hereunder are freely assignable, in whole or in part, and shall inure to the benefit of and be enforceable by Bank, its successors, assigns and affiliates. Debtor shall not assign its rights and interest hereunder without the prior written consent of Bank, and any attempt by Debtor to assign without Bank's prior written consent is null and void. Any assignment shall not release Debtor from the Obligations. This Security Agreement shall be binding upon Debtor, and the heirs, personal representatives, successors, and assigns of Debtor. (iii) **Applicable Law; Conflict Between Documents.** This Security Agreement shall be governed by and construed under the law of the jurisdiction named in the address of the Bank shown on the first page hereof (the "Jurisdiction") without regard to that jurisdiction's conflict of laws principles, except to the extent that the UCC requires the application of the law of a different jurisdiction. If any terms of this Security Agreement conflict with the terms of any commitment letter or loan proposal, the terms of this Security Agreement shall control. (iv) **Jurisdiction.** Debtor irrevocably agrees to non-exclusive personal jurisdiction in the state identified as the Jurisdiction above. (v) **Severability.** If any provision of this Security Agreement shall be

TR_010942

prohibited by or invalid under applicable law, such provision shall be ineffective but only to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Security Agreement. (vi) **Notices.** Any notices to Debtor shall be sufficiently given, if in writing and mailed or delivered to the address of Debtor shown above or such other address as provided hereunder; and to Bank, if in writing and mailed or delivered to Wachovia Bank, National Association, Mail Code VA7628, P. O. Box 13327, Roanoke, VA  24040 or Wachovia Bank, National Association, Mail Code VA7628, 10 South Jefferson Street, Roanoke, VA  24011 or such other address as Bank may specify in writing from time to time. Notices to Bank must include the mail code. In the event that Debtor changes Debtor's mailing address at any time prior to the date the Obligations are paid in full, Debtor agrees to promptly give written notice of said change of address by registered or certified mail, return receipt requested, all charges prepaid. (vii) **Captions.** The captions contained herein are inserted for convenience only and shall not affect the meaning or interpretation of this Security Agreement or any provision hereof. The use of the plural shall also mean the singular, and vice versa. (viii) **Joint and Several Liability.** If more than one party has signed this Security Agreement, such parties are jointly and severally obligated hereunder. (ix) **Binding Contract.** Debtor by execution and Bank by acceptance of this Security Agreement, agree that each party is bound by all terms and provisions of this Security Agreement. **FINAL AGREEMENT.** This Agreement and the other Loan Documents represent the final agreement between the parties and may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

**DEFINITIONS. Loan Documents.** The term "Loan Documents" refers to all documents, including this Agreement, whether now or hereafter existing, executed in connection with or related to the Obligations, and may include, without limitation and whether executed by Debtor or others, commitment letters that survive closing, loan agreements, promissory notes, guaranty agreements, deposit or other similar agreements, other security agreements, letters of credit and applications for letters of credit, security instruments, financing statements, mortgage instruments, any renewals or modifications, whenever any of the foregoing are executed, but does not include swap agreements (as defined in 11 U.S.C. § 101, as in effect from time to time). **Third Party.** The term "Third Party" means any Broker, Collateral Agent, Securities Intermediary and/or bank which from time to time maintains a securities account; and is acting in such capacity, for Debtor or maintains a deposit account for Debtor with respect to any part of the Collateral. **UCC.** "UCC" means the Uniform Commercial Code as presently and hereafter enacted in the Jurisdiction. **Terms defined in the UCC.** Any term used in this Agreement and in any financing statement filed in connection herewith which is defined in the UCC and not otherwise defined in this Agreement or any other Loan Document has the meaning given to the term in the UCC.

**IN WITNESS WHEREOF,** Debtor, on the day and year first written above, has caused this Security Agreement to be executed under seal.

Best Medical International, Inc.

By: _____    (SEAL)
        Krishnan Suthanthiran, President

Tracking #: 93595RKE
CAT - Deal # 472664  Facility ID 287128

TR_010943

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 326 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 17 of 223 PageID#
3284
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 1 of 62

EXHIBIT

B

## FINANCING AND SECURITY AGREEMENT

THIS FINANCING AND SECURITY AGREEMENT (this "Agreement") is made this 1st day of December, 2006, by and among HUESTIS MACHINE CORPORATION, a corporation organized under the laws of the State of Rhode Island ("Huestis" and a "Borrower"). and ARI HOLDING CORPORATION, a corporation organized under the laws of the State of Rhode Island, ("ARI", and each a "Borrower", and together with Huestis, collectively. the "Borrowers"), and WACHOVIA BANK, NATIONAL ASSOCIATION. a national banking association, its successors and assigns ("Lender").

### RECITALS

A.    Borrowers have applied to Lender for (i) a term loan facility in the maximum principal amount of Five Million Dollars ($5,000,000) and (ii) a supplemental term loan facility in the maximum principal amount of Two Million Dollars ($2,000,000), to be used by Borrowers for the Permitted Uses described in this Agreement.

B.    Lender is willing to make the credit facilities available jointly and severally to Borrowers upon the terms and subject to the conditions set forth in this Agreement.

### AGREEMENTS

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

Section 1.1    Certain Defined Terms.

As used in this Agreement, the terms defined in the Preamble and Recitals hereto shall have the respective meanings specified therein, and the following terms shall have the following meanings:

"Account" individually and "Accounts" collectively mean all presently existing or hereafter acquired or created accounts, accounts receivable, health-care insurance receivables, contract rights, notes, drafts, instruments, acceptances, chattel paper, leases and writings evidencing a monetary obligation or a security interest in, or a lease of, goods, all rights to payment of a monetary obligation or other consideration under present or future contracts (including, without limitation, all rights (whether or not earned by performance) to receive payments under presently existing or hereafter acquired or created letters of credit), or by virtue of property that has been sold, leased, licensed, assigned or otherwise disposed of, services rendered or to be rendered, loans and advances made or other considerations given, by or set forth in or arising out of any present or future chattel paper, note, draft, lease, acceptance, writing, bond, insurance policy, instrument, document or general intangible, and all extensions and renewals of any thereof, all rights under or arising out of present or future contracts,

TYSON01 298990v11 012845-000280

1

**WELLS 000112**

WF-EDVA 000521

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 327 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 18 of 223 PageID#
3285
Case 1:11-cv-01277-GBL-TRJ    Document 86-8    Filed 09/04/12    Page 2 of 62 PageID# 2395

agreements or general interest in goods which gave rise to any or all of the foregoing, including all commercial tort claims, other claims or causes of action now existing or hereafter arising in connection with or under any agreement or document or by operation of law or otherwise, all collateral security of any kind (including, without limitation, real property mortgages and deeds of trust) Supporting Obligations, letter-of-credit rights and letters of credit given by any Person with respect to any of the foregoing, all books and records in whatever media (paper, electronic or otherwise) recorded or stored, with respect to any or all of the foregoing and all equipment and general intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records, and all Proceeds of the foregoing.

"Account Debtor" means any Person who is obligated on a Receivable and "Account Debtors" mean all Persons who are obligated on the Receivables.

"ACH Transactions" means any cash management or related services including the automatic clearing house transfer of funds by Lender for the account of any of Borrowers pursuant to agreement or overdrafts.

"Adjustment Date" has the meaning described in Section 8.5 (Assignments by Lender).

"Affiliate" means, with respect to any designated Person, any other Person, (a) directly or indirectly controlling, directly or indirectly controlled by, or under direct or indirect common control with the Person designated, (b) directly or indirectly owning or holding five percent (5%) or more of any equity interest in such designated Person, or (c) five percent (5%) or more of whose stock or other equity interest is directly or indirectly owned or held by such designated Person. For purposes of this definition, the term "control" (including with correlative meanings, the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or other equity interests or by contract or otherwise.

"Agreement" means this Financing and Security Agreement, as amended, restated, supplemented or otherwise modified in writing in accordance with the provisions of Section 8.2 (Amendments; Waivers).

"Assets" means at any date all assets that, in accordance with GAAP consistently applied, should be classified as assets on a consolidated balance sheet of Borrowers and their respective Subsidiaries.

"Assignee" means any Person to which Lender assigns all or any portion of its interests under this Agreement, any Commitment, and any Loan, in accordance with the provisions of Section 8.5 (Assignments by Lender), together with any and all successors and assigns of such Person; "Assignees" means the collective reference to all Assignees.

"Bankruptcy Code" means Title 11 of the United States Code, as amended from time to time, and any successor Laws.

TYSON01 298990v11 012845-000280

2

**WELLS 000113**

WF-EDVA 000522

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 328 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 19 of 223 PageID# 3286
Case 1:11-cv-01277-GBL-TRJ   Document 88-6   Filed 09/04/12   Page 3 of 62 PageID# 2396

"Borrower" means each Person defined as a "Borrower" in the preamble of this Agreement; "Borrowers" means the collective reference to all Persons defined as "Borrowers" in the preamble to this Agreement.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks in the State are authorized or required to close.

"Capital Adequacy Regulation" means any guideline, request or directive of any central bank or other Governmental Authority, or any other law, rule or regulation, whether or not having the force of law, in each case, regarding capital adequacy of any bank or of any corporation controlling a bank.

"Capital Expenditure" means an expenditure (whether payable in cash or other property or accrued as a liability) for Fixed or Capital Assets, including, without limitation, the entering into of a Capital Lease.

"Capital Lease" means with respect to any Person any lease of real or personal property, for which the related Lease Obligations have been or should be, in accordance with GAAP consistently applied, capitalized on the balance sheet of that Person.

"Cash Equivalents" means (a) securities with maturities of one year or less from the date of acquisition issued or fully guaranteed or insured by the United States Government or any agency thereof, (b) certificates of deposit with maturities of one (1) year or less from the date of acquisition of, or money market accounts maintained with, Lender, any Affiliate of Lender, or any other domestic commercial bank having capital and surplus in excess of One Hundred Million Dollars ($100,000,000.00) or such other domestic financial institutions or domestic brokerage houses to the extent disclosed to, and approved by, Lender and (c) commercial paper of a domestic issuer rated at least either A-1 by Standard & Poor's Corporation (or its successor) or P-1 by Moody's Investors Service, Inc. (or its successor) with maturities of six (6) months or less from the date of acquisition.

"Chattel Paper" means a record or records (including, without limitation, electronic chattel paper) that evidence both a monetary obligation and a security interest in specific goods, a security interest in specific goods and software used in the goods, or a lease of specific goods; all Supporting Obligations with respect thereto; any returned, rejected or repossessed goods and software covered by any such record or records and all proceeds (in any form including, without limitation, accounts, contract rights, documents, chattel paper, instruments and general intangibles) of such returned, rejected or repossessed goods; and all Proceeds of the foregoing.

"Closing Date" means the Business Day, in any event not later than December 1, 2006, on which Lender shall be satisfied that the conditions precedent set forth in Section 5.1 (Conditions to Initial Advance) have been fulfilled or otherwise waived by Lender.

"Collateral" means all property of any Borrower subject from time to time to the Liens of this Agreement, any of the Security Documents and/or any of the other Financing Documents, together with any and all Proceeds thereof.

WELLS 000114

WF-EDVA 000523

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 329 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 20 of 223 PageID# 3287
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 4 of 62 PageID# 2397

"Collateral Disclosure List" has the meaning described in Section 3.3 (Collateral Disclosure List).

"Commitment" means the Term Loan Commitment or the Supplemental Term Loan Commitment, as the case may be, and "Commitments" means the collective reference to the Term Loan Commitment, the Supplemental Term Loan Commitment and the commitment for any loan, letter of credit, interest rate protection, foreign exchange risk, cash management and other Credit Facility now or hereafter provided to any of Borrowers by Lender whether under this Agreement or otherwise.

"Committed Amount" means the Term Loan Committed Amount.

"Compliance Certificate" means a periodic Compliance Certificate described in Section 6.1.1 (Financial Statements).

"Commonly Controlled Entity" means an entity, whether or not incorporated, which is under common control with any Borrower within the meaning of Section 414(b) or (c) of the Internal Revenue Code.

"Copyrights" means and includes, in each case whether now existing or hereafter arising, all of each Borrower's rights, title and interest in and to (a) all copyrights, rights and interests in copyrights, works protectable by copyright, copyright registrations, copyright applications, and all renewals of any of the foregoing, (b) all income, royalties, damages and payments now or hereafter due and/or payable under any of the foregoing, including, without limitation, damages or payments for past, current or future infringements of any of the foregoing, (c) the right to sue for past, present and future infringements of any of the foregoing, and (d) all rights corresponding to any of the foregoing throughout the world.

"Credit Facility" means the Term Loan Facility or the Supplemental Term Loan Facility, as the case may be, and "Credit Facilities" means collectively the Term Loan Facility, the Supplemental Term Loan Facility and any and all other credit facilities now or hereafter extended under or secured by this Agreement.

"Debt Service" means for any period of determination thereof an amount equal to the total of the aggregate amount of all payments of principal and interest with respect to Indebtedness for Borrowed Money of Borrowers and their respective Subsidiaries scheduled to be due and payable during such period.

"Debt Service Coverage Ratio" means as to Borrowers for the period of any determination the ratio of (a) EBITDA to (b) Debt Service.

"Debt to Worth Ratio" means for the date of any determination thereof the ratio of (a) Liabilities, less all sums due to the Personal Guarantor to (b) Tangible Net Worth.

"Default" means an event which, with the giving of notice or lapse of time, or both, could or would constitute an Event of Default under the provisions of this Agreement.

TYSON01 298990v11 012845-000280

4

**WELLS 000115**

**WF-EDVA 000524**

Appeal: 13-1982     Doc: 14-1     Filed: 10/21/2013     Pg: 330 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1 . Filed 11/13/12   Page 21 of 223 PageID#
3288
Case 1:11-cv-01277-GBL-TRJ   Document 86-8  Filed 09/04/12   Page 5 of 62 PageID# 2398

"Documents" means all documents of title or receipts, whether now existing or hereafter acquired or created, and all Proceeds of the foregoing.

"EBITDA" means as to Borrowers for any period of determination thereof, the sum of (a) the net profit (or loss) determined in accordance with GAAP consistently applied, plus (b) interest expense and income tax provisions for such period, plus (c) depreciation and amortization of assets for such period.

"Enforcement Costs" means all reasonable expenses, charges, costs and fees whatsoever (including, without limitation, reasonable outside a counsel attorney's fees and expenses) of any nature whatsoever paid or incurred by or on behalf of Lender in connection with (a) any or all of the Obligations, this Agreement and/or any of the other Financing Documents, (b) the creation, perfection, collection, maintenance, preservation, defense, protection, realization upon, disposition, sale or enforcement of all or any part of the Collateral, this Agreement or any of the other Financing Documents, including, without limitation, those costs and expenses more specifically enumerated in Section 3.6 (Costs) and/or Section 8.10 (Enforcement Costs), and further including, without limitation, amounts paid to lessors, processors, bailees, warehousemen, sureties, judgment creditors and others in possession of or with a Lien against or claimed against the Collateral, and (c) the monitoring, administration, processing and/or servicing of any or all of the Obligations, the Financing Documents, and/or the Collateral.

"Equipment" means all equipment, machinery, computers, chattels, tools, parts, machine tools, furniture, furnishings, fixtures and supplies of every nature, presently existing or hereafter acquired or created and wherever located, whether or not the same shall be deemed to be affixed to real property, and all of such types of property leased by any of Borrowers and all of Borrowers' rights and interests with respect thereto under such leases (including, without limitation, options to purchase), together with all accessions, additions, fittings, accessories, special tools, and improvements thereto and substitutions therefor and all parts and equipment which may be attached to or which are necessary or beneficial for the operation, use and/or disposition of such personal property, all licenses, warranties, franchises and General Intangibles related thereto or necessary or beneficial for the operation, use and/or disposition of the same, together with all Accounts, Chattel Paper, Instruments and other consideration received by Borrower on account of the sale, lease or other disposition of all or any part of the foregoing, and together with all rights under or arising out of present or future Documents and contracts relating to the foregoing and all Proceeds of the foregoing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default" has the meaning described in ARTICLE VII (Default and Rights and Remedies).

"Facilities" means the collective reference to the loan, letter of credit, interest rate protection, foreign exchange risk, cash management, and other credit facilities now or hereafter provided to any one or more of Borrowers by Lender.

TYSON01 298990v11 012845-000280

5

**WELLS 000116**

WF-EDVA 000525

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 331 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 22 of 223 PageID# 3289
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 6 of 62 PageID# 2399

"Fees" means the collective reference to each fee payable to Lender under the terms of this Agreement or under the terms of any of the other Financing Documents.

"Financing Documents" means at any time collectively this Agreement, the Notes, the Mortgage, the Security Documents and any other instrument, agreement or document previously, simultaneously or hereafter executed and delivered by any Borrower, the Personal Guarantor and/or any other Person, singly or jointly with another Person or Persons, evidencing, securing, guarantying or in connection with this Agreement, any Note, any of the Security Documents, any of the Facilities, and/or any of the Obligations but does not include Swap Contracts.

"Fixed or Capital Assets" of a Person at any date means all assets which would, in accordance with GAAP consistently applied, be classified on the balance sheet of such Person as property, plant or equipment at such date.

"GAAP" means generally accepted accounting principles in the United States of America in effect from time to time.

"General Intangibles" means all general intangibles of every nature, whether presently existing or hereafter acquired or created, and without implying any limitation of the foregoing, further means all books and records, commercial tort claims, other claims (including without limitation all claims for income tax and other refunds), payment intangibles, Supporting Obligations, choses in action, claims, causes of action in tort or equity, contract rights, judgments, customer lists, software, patents, trademarks, licensing agreements, rights in intellectual property, goodwill (including goodwill of Borrower's business symbolized by and associated with any and all trademarks, trademark licenses, copyrights and/or service marks), royalty payments, licenses, letter-of-credit rights, letters of credit, contractual rights, the right to receive refunds of unearned insurance premiums, rights as lessee under any lease of real or personal property, literary rights, copyrights, service names, service marks, logos, trade secrets, amounts received as an award in or settlement of a suit in damages, deposit accounts, interests in joint ventures, general or limited partnerships, or limited liability companies or partnerships, rights in applications for any of the foregoing, books and records in whatever media (paper, electronic or otherwise) recorded or stored, with respect to any or all of the foregoing, all Supporting Obligations with respect to any of the foregoing, and all Equipment and General Intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records, and all Proceeds of the foregoing.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government and any department, agency or instrumentality thereof.

"Indebtedness" of a Person means at any date the total liabilities of such Person at such time determined in accordance with GAAP consistently applied.

"Indebtedness for Borrowed Money" of a Person means at any time the sum at such time of (a) Indebtedness of such Person for borrowed money or for the deferred purchase price of property or services, (b) any obligations of such Person in respect of letters of credit, banker's or

TYSON01 298990v11 012845-000280

6

WELLS 000117
WF-EDVA 000526

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 332 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1    Filed 11/13/12   Page 23 of 223 PageID# 3290
Case 1:11-cv-01277-GBL-TRJ   Document 86-2  Filed 09/04/12   Page 7 of 62 PageID# 2400

other acceptances or similar obligations issued or created for the account of such Person, (c) Lease Obligations of such Person with respect to Capital Leases, (d) all liabilities secured by any Lien on any property owned by such Person, to the extent attached to such Person's interest in such property, even though such Person has not assumed or become personally liable for the payment thereof, (e) obligations of third parties which are being guarantied or indemnified against by such Person or which are secured by the property of such Person; (f) any obligation of such Person under an employee stock ownership plan or other similar employee benefit plan; and (g) any obligation of such Person or a Commonly Controlled Entity to a Multi-employer Plan; but excluding trade and other accounts payable in the ordinary course of business in accordance with customary trade terms and which are not overdue (as determined in accordance with customary trade practices) or which are being disputed in good faith by such Person and for which adequate reserves are being provided on the books of such Person in accordance with GAAP.

"Indemnified Parties" has the meaning set forth in Section 8.19 (Indemnification).

"Instrument" means a negotiable instrument or any other writing which evidences a right to payment of a monetary obligation and is not itself a security agreement or lease and is of a type that in the ordinary course of business is transferred by delivery with any necessary endorsement or assignment, and all Supporting Obligations with respect to any of the foregoing and all Proceeds with respect to any of the foregoing.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended from time to time, and the Income Tax Regulations issued and proposed to be issued thereunder.

"Inventory" means all goods of each Borrower and all right, title and interest of each Borrower in and to all of its now owned and hereafter acquired goods and other personal property furnished under any contract of service or intended for sale or lease, including, without limitation, all raw materials, work-in-process, finished goods and materials and supplies of any kind, nature or description which are used or consumed in any Borrower's business or are or might be used in connection with the manufacture, packing, shipping, advertising, selling or finishing of such goods and other personal property and all licenses, warranties, franchises, General Intangibles, personal property and all documents of title or documents relating to the same, together with all Accounts, Chattel Paper, Instruments and other consideration received by any Borrower on account of the sale, lease or other disposition of all or any part of the foregoing, and together with all rights under or arising out of present or future Documents and contracts relating to the foregoing and all Proceeds of the foregoing.

"Investment Property" means a security, whether certificated or uncertificated, security entitlement, securities account, commodity contract or commodity account and all Proceeds of, and Supporting Obligations with respect to, the foregoing.

"Item of Payment" means each check, draft, cash, money, instrument, item, and other remittance in payment or on account of payment of the Receivables or otherwise with respect to any Collateral, including, without limitation, cash proceeds of any returned, rejected or repossessed goods, the sale or lease of which gave rise to a Receivable, and other proceeds of Collateral; and "Items of Payment" means the collective reference to all of the foregoing.

TYSON01 298990v11 012845-000280

7

WELLS 000118

WF-EDVA 000527

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 333 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 24 of 223 PageID# 3291
Case 1:11-cv-01277-GBL-TRJ    Document 86-8    Filed 09/04/12    Page 8 of 62 PageID# 2401

"Laws" means all ordinances, statutes, rules, regulations, orders. injunctions. writs. or decrees of any Governmental Authority.

"Lease Obligations" of a Person means for any period the rental commitments of such Person for such period under leases for real and/or personal property (net of rent from subleases thereof, but including taxes, insurance, maintenance and similar expenses which such Person, as the lessee. is obligated to pay under the terms of said leases, except to the extent that such taxes, insurance, maintenance and similar expenses are payable by sublessees), including rental commitments under Capital Leases.

"Liabilities" means at any date all liabilities that in accordance with GAAP consistently applied should be classified as liabilities on a consolidated balance sheet of Borrowers and their respective Subsidiaries.

"Lien" means any mortgage, deed of trust, deed to secure debt, grant, pledge, security interest, assignment, encumbrance, judgment, lien, financing statement, hypothecation, provision in any instrument or other document for confession of judgment, cognovit or other similar right or other remedy, claim, charge, control over or interest of any kind in real or personal property securing any indebtedness, duties, obligations, and liabilities owed to, or claimed to be owed to, a Person, all whether perfected or unperfected, avoidable or unavoidable, based on the common law, statute or contract or otherwise, including, without limitation, any conditional sale or other title retention agreement, any lease in the nature thereof, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction, excluding the precautionary filing of any financing statement by any lessor in a true lease transaction, by any bailor in a true bailment transaction or by any consignor in a true consignment transaction under the Uniform Commercial Code of any jurisdiction or the agreement to give any financing statement by any lessee in a true lease transaction, by any bailee in a true bailment transaction or by any consignee in a true consignment transaction.

"Loan" means the Term Loan or the Supplemental Term Loan, as the case may be, and "Loans" means collectively the Term Loan or the Supplemental Term Loan.

"Maximum Rate" has the meaning described in Section 2.3.5 (Maximum Interest Rate).

"Mortgage" means that certain Mortgage, Assignment, Security Agreement and Fixture Filing dated the date hereof from Huestis to Lender, as the same may from time to time be amended, restated, supplemented or modified.

"Multi-employer Plan" means a Plan that is a Multi-employer plan as defined in Section 4001(a)(3) of ERISA.

"Net Worth" means the consolidated shareholders' equity, defined in accordance with GAAP, of Borrowers.

"Note" means the Term Note or the Supplemental Term Note, as the case may be, and "Notes" means collectively the Term Note, the Supplemental Term Note, and any other promissory note which may from time to time evidence all or any portion of the Obligations.

TYSON01 298990v11 012845-000280

8

WELLS 000119

WF-EDVA 000528

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 334 of 418

Case 1:11-cv-01277-GBL-TRJ  Document 151-1   Filed 11/13/12  Page 25 of 223 PageID#
3292
Case 1:11-cv-01277-GBL-TRJ  Document 86-8   Filed 09/04/12  Page 9 of 62 PageID# 2402

"Obligations" means all present and future indebtedness, duties, obligations, and liabilities, whether now existing or contemplated or hereafter arising, of any one or more of Borrowers to Lender under, arising pursuant to, in connection with and/or on account of the provisions of this Agreement, each Note, each Security Document, and/or any of the other Financing Documents, the Loans, any Swap Contract and/or any of the Facilities including, without limitation, the principal of, and interest on, each Note, late charges, the Fees, Enforcement Costs, and prepayment fees (if any), letter of credit reimbursement obligations, letter of credit fees or fees charged with respect to any guaranty of any letter of credit; also means all other present and future indebtedness, duties, obligations, and liabilities, whether now existing or contemplated or hereafter arising, of any one or more of Borrowers to Lender or its Affiliates of any nature whatsoever, regardless of whether such indebtedness, duties, obligations, and liabilities be direct, indirect, primary, secondary, joint, several, joint and several, fixed or contingent; and also means any and all renewals, extensions, substitutions, amendments, restatements and rearrangements of any such indebtedness, duties, obligations, and liabilities.

"OFAC" means the U.S. Department of the Treasury's Office of Foreign Assets Control.

"Origination Fee" has the meaning described in Section 2.3.3 (Origination Fee).

"Patents" means and includes, in each case whether now existing or hereafter arising, all of Borrower's rights, title and interest in and to (a) any and all patents and patent applications, (b) any and all inventions and improvements described and claimed in such patents and patent applications, (c) reissues, divisions, continuations, renewals, extensions and continuations-in-part of any patents and patent applications, (d) income, royalties, damages, claims and payments now or hereafter due and/or payable under and with respect to any patents or patent applications, including, without limitation, damages and payments for past and future infringements, (e) rights to sue for past, present and future infringements of patents, and (f) all rights corresponding to any of the foregoing throughout the world.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Permitted Liens" means:  (a) Liens for Taxes which are not delinquent or which Lender has determined in the exercise of its sole and absolute discretion (i) are being diligently contested in good faith and by appropriate proceedings, and such contest operates to suspend collection of the contested Taxes and enforcement of a Lien, (ii) the respective Borrower has the financial ability to pay, with all penalties and interest, at all times without materially and adversely affecting such Borrower, and (iii) are not, and will not be with appropriate filing, the giving of notice and/or the passage of time, entitled to priority over any Lien of Lender; (b) deposits or pledges to secure obligations under workers' compensation, social security or similar laws, or under unemployment insurance in the ordinary course of business; (c) Liens securing the Obligations; (d) judgment Liens to the extent the entry of such judgment does not constitute a Default or an Event of Default under the terms of this Agreement or result in the sale or levy of, or execution on, any of the Collateral; and (e) such other Liens, if any, as are set forth on Schedule 4.1.16 attached hereto and made a part hereof.

"Permitted Uses" means for business purposes of a Borrower and not for personal, family, household or agricultural purposes.

TYSON01 298990v11 012845-000280

9

WELLS 000120

WF-EDVA 000529

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 335 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 26 of 223 PageID# 3293
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 10 of 62 PageID# 2403

"Person" means and includes an individual, a corporation, a partnership, a joint venture, a limited liability company or partnership, a trust, an unincorporated association, a Governmental Authority, or any other organization or entity.

"Personal Guarantor" means Krishnan Suthanthiran, and his heirs and personal representatives.

"Personal Guaranty" means that certain guaranty of payment agreement for the benefit of Lender dated the date hereof to Lender from the Personal Guarantor, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"Plan" means any pension plan that is covered by Title IV of ERISA and in respect of which any Borrower or a Commonly Controlled Entity is an "employer" as defined in Section 3 of ERISA.

"Post-Default Rate" has the meaning set forth in the Term Note.

"Prepayment" means a Term Loan Optional Prepayment, as the case may be, and "Prepayments" mean collectively all Term Loan Optional Prepayments.

"Proceeds" has the meaning described in the Uniform Commercial Code as in effect from time to time.

"Property" means the land and improvements at _____, Rhode Island, as more fully described in the Mortgage.

"Receivable" means one of any Borrower's now owned and hereafter owned, acquired or created Accounts, Chattel Paper, General Intangibles and Instruments; and "Receivables" means all of each Borrower's now or hereafter owned, acquired or created Accounts, Chattel Paper, General Intangibles and Instruments, and all Proceeds thereof.

"Registered Organization" means an organization organized solely under the law of a single state or the United States and as to which the state or the United States must maintain a public record showing the organization to have been organized.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA or the regulations thereunder.

"Responsible Officer" means for each Borrower, the chief executive officer of Borrower or the president of Borrower or, with respect to financial matters, the chief financial officer of Borrower.

"Sanctioned Country" means a country subject to a sanctions program identified on the list maintained by OFAC and available at http://www.treas.gov/offices/enforcement/ofac/sanctions/, or as otherwise published from time to time.

"Sanctioned Person" means (i) a person named on the list of Specially Designated Nationals or Blocked Persons maintained by OFAC available at

TYSON01 298990v11 012845-000280

10

WELLS 000121

WF-EDVA 000530

http://www.treas.gov/offices/enforcement/ofac/sdn/. or as otherwise published from time to time. or (ii) (A) an agency of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a person resident in a Sanctioned Country to the extent subject to a sanctions program administered by OFAC.

"Security Documents" means collectively any assignment, pledge agreement. security agreement, mortgage, deed of trust, deed to secure debt, financing statement and any similar instrument, document or agreement under or pursuant to which a Lien is now or hereafter granted to, or for the benefit of, Lender on any real or personal property of any Person to secure all or any portion of the Obligations, all as the same may from time to time be amended, restated, supplemented or otherwise modified, including without limitation, the Mortgage.

"Solvent" means when used with respect to any Person that at the time of determination:

> (a)     the assets of such Person, at a fair valuation, are in excess of the total amount of its debts (including, without limitation, contingent liabilities); and

> (b)     the present fair saleable value of its assets is greater than its probable liability on its existing debts as such debts become absolute and matured; and

> (c)     it is then able and expects to be able to pay its debts (including, without limitation, contingent debts and other commitments) as they mature; and

> (d)     it has capital sufficient to carry on its business as conducted and as proposed to be conducted.

For purposes of determining whether a Person is Solvent, the amount of any contingent liability shall be computed as the amount that, in light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"State" means the Commonwealth of Virginia.

"Subordinated Indebtedness" means all Indebtedness, incurred at any time by any one or more of Borrowers, which is in amounts, subject to repayment terms, and subordinated to the Obligations, as set forth in one or more written agreements, all in form and substance satisfactory to Lender in its sole and absolute discretion.

"Subsidiary" means any corporation the majority of the voting shares of which at the time are owned directly by any Borrower and/or by one or more Subsidiaries of any Borrower.

"Supplemental Term Loan" has the meaning described in Section 2.2 (Supplemental Term Loan Commitment).

TYSOND1 298990v11 012845-000280

11

**WELLS 000122.**

**WF-EDVA 000531**

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 337 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 28 of 223 PageID# 3295
Case 1:11-cv-01277-GBL-TRJ    Document 86-8    Filed 09/04/12    Page 12 of 62 PageID# 2405

"Supplemental Term Loan Commitment" has the meaning described in Section 2.2 (Supplemental Term Loan Commitment).

"Supplemental Term Loan Committed Amount" has the meaning described in Section 2.2 (Supplemental Term Loan Commitment).

"Supplemental Term Loan Facility" means the facility established by Lender pursuant to Section 2.2 (Supplemental Term Loan Facility).

"Supplemental Term Note" has the meaning described in Section 2.2.2 (The Supplemental Term Note).

"Swap Contract" means any document, instrument or agreement between Borrower and Lender or any affiliate of Lender, in connection with the Credit Facility, including, without limitation, any swap (as defined in 11 U.S.C. § 101), now existing or entered into in the future, relating to an interest rate swap transaction, forward rate transaction, interest rate cap, floor or collar transaction, any similar transaction, any option to enter into any of the foregoing, and any combination of the foregoing, which agreement may be oral or in writing, including, without limitation, any master agreement relating to or governing any or all of the foregoing and any related schedule or confirmation, each as amended from time to time.

"Term Loan Optional Prepayment" and "Supplemental Term Loan Optional Prepayments" have the meanings described in Section 2.2.3 (Optional Prepayments of Supplemental Term Loan).

"Supporting Obligation" means a letter-of-credit right, secondary obligation or obligation of a secondary obligor or that supports the payment or performance of an account, chattel paper, a document, a general intangible, an instrument or investment property.

"Tangible Net Worth" means as to Borrowers at any date of determination thereof, the sum at such time of: Net Worth less the total of (a) all Assets which would be classified as intangible assets under GAAP consistently applied, (b) leasehold improvements, (c) applicable reserves, allowances and other similar properly deductible items to the extent such reserves, allowances and other similar properly deductible items have not been previously deducted by Lender in the calculation of Net Worth, and (d) any revaluation or other write-up in book value of assets subsequent to the date of the most recent financial statements delivered to Lender, and plus all sums due to the Personal Guarantor.

"Taxes" means all taxes and assessments whether general or special, ordinary or extraordinary, or foreseen or unforeseen, of every character (including all penalties or interest thereon), which at any time may be assessed, levied, confirmed or imposed by any Governmental Authority on any of Borrowers or any of their properties or assets or any part thereof or in respect of any of their franchises, businesses, income or profits.

"Term Loan" has the meaning described in Section 2.1.1 (Term Loan Commitment).

"Term Loan Commitment" has the meaning described in Section 2.1.1 (Term Loan Commitment).

TYSON01 258990v11 012845-000280

12

WELLS 000123

WF-EDVA 000532

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 338 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1    Filed 11/13/12   Page 29 of 223 PageID# 3296
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 13 of 62 PageID# 2406

"Term Loan Committed Amount" has the meaning described in Section 2.1.1 (Term Loan Commitment).

"Term Loan Facility" means the facility established by Lender pursuant to Section 2.1 (Term Loan Facility).

"Term Loan Optional Prepayment" and "Term Loan Optional Prepayments" have the meanings described in Section 2.1.3 (Optional Prepayments of Term Loan).

"Term Note" has the meaning described in Section 2.1.2 (The Term Note).

"Uniform Commercial Code" means, unless otherwise provided in this Agreement, the Uniform Commercial Code as adopted by and in effect from time to time in the State or in any other jurisdiction, as applicable.

"Wholly Owned Subsidiary" means any domestic United States corporation, all the shares of stock of all classes of which (other than directors' qualifying shares) at the time are owned directly or indirectly by Borrower and/or by one or more Wholly Owned Subsidiaries of Borrower.

Section 1:2    <u>Accounting Terms and Other Definitional Provisions.</u>

Unless otherwise defined herein, as used in this Agreement and in any certificate, report or other document made or delivered pursuant hereto, accounting terms not otherwise defined herein, and accounting terms only partly defined herein, to the extent not defined, shall have the respective meanings given to them under GAAP, as consistently applied to the applicable Person. All terms used herein which are defined by the Uniform Commercial Code shall have the same meanings as assigned to them by the Uniform Commercial Code unless and to the extent varied by this Agreement. The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, schedule and exhibit references are references to articles, sections or subsections of, or schedules or exhibits to, as the case may be, this Agreement unless otherwise specified. As used herein, the singular number shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders, as the context may require. Reference to any one or more of the Financing Documents shall mean the same as the foregoing may from time to time be amended, restated, substituted, extended, renewed, supplemented or otherwise modified. Reference in this Agreement and the other Financing Documents to the "Borrower", the "Borrowers", "each Borrower" or otherwise with respect to any one or more of Borrowers shall mean each and every Borrower and any one or more of Borrowers, jointly and severally, unless a specific Borrower is expressly identified.

TYSON01298990v11 012845-000280

13

WELLS 000124
WF-EDVA 000533

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 339 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 30 of 223 PageID# 3297
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 14 of 62 PageID# 2407

## ARTICLE II
## THE CREDIT FACILITIES

Section 2.1    The Term Loan Facility.

### 2.1.1    Term Loan Commitment.

Subject to and upon the provisions of this Agreement, Lender agrees to make a loan (the "Term Loan") to Borrowers after the Closing Date and prior to December 31, 2006 in the principal amount of up to Five Million Dollars ($5,000,000) (herein called the "Term Loan Committed Amount"). The obligation of Lender to make the Term Loan is herein called its "Term Loan Commitment". Sums advanced under the Term Loan Commitment, when repaid, may not be readvanced.

### 2.1.2    The Term Note.

The joint and several obligation of Borrowers to pay the Term Loan with interest shall be evidenced by a promissory note (as from time to time extended, amended, restated, supplemented or otherwise modified, the "Term Note") substantially in the form of EXHIBIT A attached hereto and made a part hereof with appropriate insertions.

### 2.1.3    Optional Prepayments of Term Loan.

Borrowers shall have the option, at any time and from time to time, to prepay (each a "Term Loan Optional Prepayment" and collectively the "Term Loan Optional Prepayments") the Term Loan, in whole or in part, only in accordance with the Term Note.

Section 2.2    Supplemental Term Loan Facility

### 2.2.1    Supplemental Term Loan Commitment.

Subject to and upon the provisions of this Agreement, Lender agrees to make an additional term loan (the "Supplemental Term Loan") to Borrowers on the Closing Date in the principal amount of up to Two Million Dollars ($2,000,000) (herein called the "Supplemental Term Loan Committed Amount"). The obligation of Lender to make the Term Loan is herein called its "Supplemental Term Loan Commitment". Sums advanced under the Supplemental Term Loan Commitment, when repaid, may not be readvanced.

### 2.2.2    The Supplemental Term Note.

The joint and several obligation of Borrowers to pay the Supplemental Term Loan with interest shall be evidenced by a promissory note (as from time to time extended, amended, restated, supplemented or otherwise modified, the "Supplemental Term Note") substantially in the form of EXHIBIT B attached hereto and made a part hereof with appropriate insertions.

### 2.2.3    Optional Prepayments of Supplemental Term Loan.

Borrowers shall have the option, at any time and from time to time, to prepay (each a "Supplemental Term Loan Optional Prepayment" and collectively the "Supplemental Term Loan Optional Prepayments") the Supplemental Term Loan, in whole or in

TYSON01 298990v11 012845-000280

14

**WELLS 000125**

**WF-EDVA 000534**

Appeal: 13-1982   Doc: 14-1   Filed: 10/21/2013   Pg: 340 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 31 of 223 PageID# 3298
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 15 of 62 PageID# 2408

part, only in accordance with the Supplemental Term Note and without penalty to the extent provided therein.

Section 2.3    General Financing Provisions.

2.3.1    Borrowers' Representatives.

Lender is hereby irrevocably authorized by Borrowers to make advances under the Loans to any Borrower pursuant to the provisions of this Agreement upon the written, oral or telephone request of any one or more of the Persons who is from time to time a Responsible Officer of Borrower under the provisions of the most recent certificate of corporate resolutions and/or incumbency of any Borrower on file with Lender.

Lender assumes no responsibility or liability for any errors, mistakes, and/or discrepancies in the oral, telephonic, written or other transmissions of any instructions, orders, requests and confirmations between Lender and Borrowers in connection with the Credit Facilities, any Loan or any other transaction in connection with the provisions of this Agreement.

Without implying any limitation on the joint and several nature of the Obligations, Lender agrees that, notwithstanding any other provision of this Agreement, Borrowers may create reasonable inter-company indebtedness between or among Borrowers with respect to the allocation of the benefits and proceeds of the advances and Credit Facilities under this Agreement. Borrowers agree among themselves, and Lender consents to that agreement, that each Borrower shall have rights of contribution from all of the other Borrowers to the extent such Borrower incurs Obligations in excess of the proceeds of the Loans received by, or allocated to purposes for the direct benefit of, such Borrower. All such indebtedness and rights shall be, and are hereby agreed by Borrowers to be, subordinate in priority and payment to the indefeasible repayment in full in cash of the Obligations, and, unless Lender agrees in writing otherwise, shall not be exercised or repaid in whole or in part until all of the Obligations have been indefeasibly paid in full in cash. Borrowers agree that all of such inter-company indebtedness and rights of contribution are part of the Collateral and secure the Obligations. Each Borrower hereby waives all rights of counterclaim, recoupment and offset between or among themselves arising on account of that indebtedness and otherwise. Each Borrower shall not evidence the inter-company indebtedness or rights of contribution by note or other instrument, and shall not secure such indebtedness or rights of contribution with any Lien or security. Notwithstanding anything contained in this Agreement to the contrary, the amount covered by each Borrower under the Obligations shall be limited to an aggregate amount (after giving effect to any collections from, rights to receive contribution from or payments made by or on behalf of any other Borrower in respect of the Obligations) which, together with other amounts owing by such Borrowers to Lender under the Obligations, is equal to the largest amount that would not be subject to avoidance under the Bankruptcy Code or any applicable provisions of any applicable, comparable state or other Laws.

2.3.2    Use of Proceeds of the Loans.

The proceeds of each advance under the Loans shall be used by Borrowers for Permitted Uses, and for no other purposes except as may otherwise be agreed by Lender in writing.

TYSON01 298990v11 012845-000280

15

WELLS 000126

WF-EDVA 000535

### 2.3.3. Origination Fee.

Borrowers shall pay to Lender on or before the Closing Date a loan origination fee (the "Origination Fee") in the amount of Seven Thousand Dollars ($7,000), which fee has been fully earned and is non-refundable.

### 2.3.4   Computation of Interest and Fees.

All applicable Fees and interest shall be calculated on the basis of a year of 360 days for the actual number of days elapsed.

### 2.3.5   Maximum Interest Rate.

In no event shall any interest rate provided for hereunder exceed the maximum rate permissible for corporate borrowers under applicable law for loans of the type provided for hereunder (the "Maximum Rate"). If, in any month, any interest rate, absent such limitation, would have exceeded the Maximum Rate, then the interest rate for that month shall be the Maximum Rate, and, if in future months, that interest rate would otherwise be less than the Maximum Rate, then that interest rate shall remain at the Maximum Rate until such time as the amount of interest paid hereunder equals the amount of interest which would have been paid if the same had not been limited by the Maximum Rate. In the event that, upon payment in full of the Obligations, the total amount of interest paid or accrued under the terms of this Agreement is less than the total amount of interest which would, but for this Section, have been paid or accrued if the interest rates otherwise set forth in this Agreement had at all times been in effect, then Borrowers shall, to the extent permitted by applicable law, pay Lender, an amount equal to the excess of (a) the lesser of (i) the amount of interest which would have been charged if the Maximum Rate had, at all times, been in effect or (ii) the amount of interest which would have accrued had the interest rates otherwise set forth in this Agreement, at all times, been in effect over (b) the amount of interest actually paid or accrued under this Agreement. In the event that a court determines that Lender has received interest and other charges hereunder in excess of the Maximum Rate, such excess shall be deemed received on account of, and shall automatically be applied to reduce, the Obligations other than interest, in the inverse order of maturity, and if there are no Obligations outstanding, Lender shall refund to Borrowers such excess.

### 2.3.6   Payments.

All payments of the Obligations, including, without limitation, principal, interest, and Fees, shall be paid by Borrowers without setoff, recoupment or counterclaim to Lender in immediately available funds not later than 12:00 p.m. (Eastern Time) on the due date of such payment. All payments received by Lender after such time shall be deemed to have been received by Lender for purposes of computing interest and Fees and otherwise as of the next Business Day. Payments shall not be considered received by Lender until such payments are paid to Lender in immediately available funds to Lender's principal office in McLean, Virginia or at such other location as Lender may at any time and from time to time notify Borrowers. Alternatively, at its sole discretion, Lender may charge any deposit account of Borrowers at Lender or any Affiliate of Lender with all or any part of any amount due to Lender under this Agreement or any of the other Financing Documents to the extent that Borrowers shall have not otherwise tendered payment to Lender.

TYSON01 298990v11 012845-000280

16

**WELLS 000127**

WF-EDVA 000536

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 342 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 33 of 223 PageID#
3300
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 17 of 62 PageID# 2410

### 2.3.7   Liens; Setoff.

Borrowers hereby grant to Lender as additional collateral and security for all of the Obligations, a continuing Lien on any and all monies, Investment Property, and other property of Borrowers and any and all proceeds thereof, now or hereafter held or received by or in transit to, Lender, and/or any Affiliate of Lender, from or for the account of, Borrowers, and also upon any and all deposit accounts (general or special) and credits of Borrowers, if any, with Lender or any Affiliate of Lender, at any time existing, excluding any deposit accounts held by Borrowers in their capacity as trustee for Persons who are not Affiliates of Borrowers.  Without implying any limitation on any other rights Lender may have under the Financing Documents or applicable Laws, during the continuance of an Event of Default, Lender is hereby authorized by Borrowers at any time and from time to time, without notice to, or consent of, Borrowers, to set off, appropriate, seize, freeze and apply any or all items hereinabove referred to against all Obligations then outstanding (whether or not then due), all in such order and manner as shall be determined by Lender in its sole and absolute discretion.

### 2.3.8   Requirements of Law.

In the event that Lender shall have determined in good faith that (a) the adoption of any Capital Adequacy Regulation, or (b) any change in any Capital Adequacy Regulation or in the interpretation or application thereof or (c) compliance by Lender or any corporation controlling Lender with any request or directive regarding capital adequacy (whether or not having the force of law) from any central bank or Governmental Authority, does or shall have the effect of reducing the rate of return on the capital of Lender or any corporation controlling Lender, as a consequence of the obligations of Lender hereunder to a level below that which Lender or any corporation controlling Lender would have achieved but for such adoption, change or compliance (taking into consideration the policies of Lender and the corporation controlling Lender, with respect to capital adequacy) by an amount deemed by Lender, in its discretion, to be material, then from time to time, after submission by Lender to Borrowers of a written request therefor and a statement of the basis for Lender's determination, Borrowers shall pay to Lender ON DEMAND such additional amount or amounts in order to compensate Lender or its controlling corporation for any such reduction.

### 2.3.9   ACH Transactions and Swap Contracts.

Borrowers may request and Lender or its Affiliates may, in their sole and absolute discretion, provide ACH Transactions and Swap Contracts.  In the event Borrowers request Lender or its Affiliates to procure ACH Transactions or Swap Contracts, then Borrowers agree to indemnify and hold Lender or its Affiliates harmless from any and all obligations now or hereafter owing to Lender or its Affiliates.  Borrowers agree to pay Lender or its Affiliates all amounts owing to Lender or its Affiliates pursuant to ACH Transactions and Swap Contracts.  In the event Borrowers shall not have paid to Lender or its Affiliates such amounts, Lender may cover such amounts by an advance under the Term Loan, which advance shall be deemed to have been requested by Borrower.  Borrowers acknowledge and agree that the obtaining of ACH Transactions and Swap Contracts from Lender or its Affiliates (a) is in the sole and absolute discretion of Lender or its Affiliates and (b) is subject to all rules and regulations of Lender or its Affiliates.

TYSON01 398990v11 012845-000280

17

**WELLS 000128**

WF-EDVA 000537

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 343 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1    Filed 11/13/12   Page 34 of 223 PageID# 3301
Case 1:11-cv-01277-GBL-TRJ   Document 86-3   Filed 09/04/12   Page 18 of 62 PageID# 2411

## ARTICLE III
### THE COLLATERAL

Section 3.1    Debt and Obligations Secured.

All property and Liens assigned, pledged or otherwise granted under or in connection with this Agreement (including, without limitation, those under Section 3.2 (Grant of Liens)) or any of the Financing Documents shall secure (a) the payment of all of the Obligations, and (b) the performance, compliance, with and observance by Borrowers of the provisions of this Agreement and all of the other Financing Documents or otherwise under the Obligations.

Section 3.2    Grant of Liens.

Each of Borrowers hereby assigns, pledges and grants to Lender, and agrees that Lender shall have a perfected and continuing security interest in, and Lien on, (a) all of Borrowers' Accounts, Inventory, Chattel Paper, Documents, Instruments, Equipment, Investment Property, and General Intangibles and all of Borrowers' deposit accounts with any financial institution with which any of Borrowers maintains deposits, whether now owned or existing or hereafter acquired or arising, (b) all returned, rejected or repossessed goods, the sale or lease of which shall have given or shall give rise to an Account or Chattel Paper, (c) all insurance policies relating to the foregoing and the right to receive refunds of unearned insurance premiums under those policies, (d) all books and records in whatever media (paper, electronic or otherwise) recorded or stored, with respect to the foregoing and all Equipment and General Intangibles necessary or beneficial to retain, access and/or process the information contained in those books and records; and (e) all Proceeds and products of the foregoing. Each of Borrowers further agrees that Lender shall have in respect thereof all of the rights and remedies of a secured party under the Uniform Commercial Code as well as those provided in this Agreement, under each of the other Financing Documents and under applicable Laws.

Section 3.3    Collateral Disclosure List.

On or prior to the Closing Date, each of Borrowers shall deliver to Lender a list (the "Collateral Disclosure List") which shall contain such information with respect to Borrower's business and real and personal property as Lender may require and shall be certified by a Responsible Officer of Borrower, all in the form provided to Borrowers by Lender. Promptly after demand by Lender, Borrowers shall furnish to Lender an update of the information contained in the Collateral Disclosure List at any time and from time to time as may be requested by Lender.

Section 3.4    Personal Property.

Borrowers acknowledge and agree that it is the intention of the parties to this Agreement that Lender shall have a first priority, perfected Lien, in form and substance satisfactory to Lender and its counsel, on all of Borrowers' assets of any kind and nature whatsoever, whether now owned or hereafter acquired, subject only to the Permitted Liens, if any.

Section 3.5    Record Searches.

As of the Closing Date and thereafter at the time any Financing Document is executed and delivered by Borrowers pursuant to this Section, Lender shall have received, in form and

TYSON01 298990v11 012845-000280

18

WELLS 000129

WF-EDVA 000538

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 344 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 35 of 223 PageID#
3302
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 19 of 62 PageID# 2412

substance satisfactory to Lender, such Lien or record searches with respect to all of Borrowers and/or any other Person, as appropriate, and the property covered by such Financing Document showing that the Lien of such Financing Document will be a perfected first priority Lien on the property covered by such Financing Document subject only to Permitted Liens or to such other matters as Lender may approve.

Section 3.6   Real Property.

Borrowers acknowledge and agree that it is the intention of the parties to this Agreement that Lender shall have a first priority, perfected Lien, in form and substance satisfactory to Lender and its counsel, on the Property, subject only to the Permitted Liens, if any.

With respect to the Property, Borrower shall on the Closing Date cause the Mortgage to be executed and delivered to Lender. The Mortgage shall:

      (a)   be in form and substance satisfactory to Lender; and

      (b)   create a first priority Lien in the Property in favor of Lender subject only the Permitted Encumbrances set forth in the Mortgage;.

Section 3.7   Costs.

Borrowers agree to pay, as part of the Enforcement Costs and to the fullest extent permitted by applicable Laws, on demand all costs, fees and expenses incurred by Lender in connection with the taking, perfection, preservation, protection and/or release of a Lien on the Collateral, including, without limitation:

      (a)   customary fees and expenses incurred in preparing Financing Documents from time to time (including, without limitation, reasonable attorneys' fees incurred in connection with preparing the Financing Documents, including, any amendments and supplements thereto);

      (b)   all filing and/or recording taxes or fees;

      (c)   all costs of Lien and record searches;

      (d)   reasonable attorneys' fees in connection with all legal opinions required; and

      (e)   all related costs, fees and expenses.

Section 3.8   Release.

Upon the indefeasible repayment in full in cash of the Obligations and performance of all Obligations of Borrowers and all obligations and liabilities of each other Person, other than Lender, under this Agreement and all other Financing Documents, and the termination and/or expiration of all of the Commitments, upon Borrowers' request and at Borrowers' sole cost and expense, Lender shall release and/or terminate any Financing Document but only if and provided that there is no commitment or obligation (whether or not conditional) of Lender to re-advance amounts which would be secured thereby.

TYSON01 298990v11 012845-000280

WELLS 000130

WF-EDVA 000539

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 345 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 36 of 223 PageID# 3303
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 20 of 62 PageID# 2413

Section 3.9    Inconsistent Provisions.

In the event that the provisions of any Financing Document directly conflict with any provision of this Agreement, the provisions of this Agreement govern.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Section 4.1    Representations and Warranties.

Borrowers, for themselves and for each other, represent and warrant to Lender, as follows:

4.1.1    Subsidiaries.

Borrowers have the Subsidiaries listed on the Collateral Disclosure List and no others. Each of the Subsidiaries is a Wholly Owned Subsidiary except as shown on the Collateral Disclosure List, which correctly indicates the nature and amount of each Borrower's ownership interests therein.

4.1.2    Existence.

Each Borrower (a) is a Registered Organization under the laws of the jurisdiction stated in the Preamble of this Agreement, (b) is in good standing under the laws of the jurisdiction in which it is organized, (c) has the power to own its property and to carry on its business as now being conducted, and (d) is duly qualified to do business and is in good standing in each jurisdiction in which the character of the properties owned by it therein or in which the transaction of its business makes such qualification necessary. Each Borrower is organized under the laws of only one (1) jurisdiction.

4.1.3    Power and Authority.

Each Borrower has full power and authority to execute and deliver this Agreement, and the other Financing Documents to which it is a party, to make the borrowings under this Agreement, and to incur and perform the Obligations whether under this Agreement, the other Financing Documents or otherwise, all of which have been duly authorized by all proper and necessary action. No consent or approval of owners or any creditors of Borrower, and no consent, approval, filing or registration with or notice to any Governmental Authority on the part of Borrower, is required as a condition to the execution, delivery, validity or enforceability of this Agreement, or any of the other Financing Documents, or the performance by Borrower of the Obligations.

4.1.4    Binding Agreements.

This Agreement and the other Financing Documents executed and delivered by Borrowers have been properly executed and delivered and constitute the valid and legally binding obligations of Borrowers and are fully enforceable against each of Borrowers in accordance with their respective terms, subject to bankruptcy, insolvency, reorganization, moratorium and other laws of general application affecting the rights and remedies of creditors

TYSON01 298990v11 012845-000280

20

WELLS 000131
WF-EDVA 000540

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 346 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 37 of 223 PageID# 3304
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 21 of 62 PageID# 2414

and secured parties, and general principles of equity regardless of whether applied in a proceeding in equity or at law.

### 4.1.5 No Conflicts.

Neither the execution, delivery and performance of the terms of this Agreement or of any of the other Financing Documents executed and delivered by Borrower nor the consummation of the transactions contemplated by this Agreement will conflict with, violate or be prevented by (a) any Borrower's organizational or governing documents, (b) any existing mortgage, indenture, contract or agreement binding on any Borrower or affecting its property, or (c) any Laws.

### 4.1.6 No Defaults, Violations.

(a)    No Default or Event of Default has occurred and is continuing.

(b)    None of Borrowers nor any of their respective Subsidiaries is in default under or with respect to any obligation under any existing mortgage, indenture, contract or agreement binding on it or affecting its property in any respect which could be materially adverse to the business, operations, property or financial condition of any Borrower, or which could materially adversely affect the ability of any Borrower to perform its obligations under this Agreement or the other Financing Documents, to which any Borrower is a party.

### 4.1.7 Compliance with Laws.

None of Borrowers nor any of their respective Subsidiaries is in violation of any applicable Laws (including, without limitation, any Laws relating to employment practices, to environmental, occupational and health standards and controls) or order, writ, injunction, decree or demand of any court, arbitrator, or any Governmental Authority affecting any Borrower or any of their properties, the violation of which, considered in the aggregate, could materially adversely affect the business, operations or properties of Borrowers and/or their respective Subsidiaries. None of Borrowers, or any subsidiary or affiliate of any Borrower or any guarantor is a Sanctioned Person or has any of its assets in a Sanctioned Country or does business in or with, or derives any of its operating income from investments in or transactions with, Sanctioned Persons or Sanctioned Countries in violation of economic sanctions administered by OFAC. The proceeds from the Loans will not be used to fund any operations in, finance any investments or activities in, or make any payments to, a Sanctioned Person or a Sanctioned Country.

### 4.1.8 Investment Company Act; Margin Stock.

None of Borrowers nor any of their respective Subsidiaries is an investment company within the meaning of the Investment Company Act of 1940, as amended, nor is it, directly or indirectly, controlled by or acting on behalf of any Person which is an investment company within the meaning of said Act. None of Borrowers nor any of their respective is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock" within the meaning of Regulation U (12 CFR Part 221), of the Board of Governors of the Federal Reserve System.

TYSON01 298990v11 012845-000280

21

**WELLS 000132**

WF-EDVA 000541

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 347 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1    Filed 11/13/12   Page 38 of 223 PageID#
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 22 of 62 PageID# 2415

### 4.1.9   Litigation.

There are no proceedings, actions or investigations pending or, so far as any Borrower knows, threatened before or by any court, arbitrator or any Governmental Authority which, in any one case or in the aggregate, if determined adversely to the interests of Borrower or any Subsidiary, would have a material adverse effect on the business, properties, condition (financial or otherwise) or operations, present or prospective, of Borrower.

### 4.1.10   Financial Condition.

The consolidated financial statements of Borrowers dated December 31, 2005, are complete and correct and fairly present the financial position of Borrowers and their respective Subsidiaries and the results of their operations and transactions in their surplus accounts as of the date and for the period referred to and have been prepared in accordance with GAAP applied on a consistent basis throughout the period involved. There are no liabilities, direct or indirect, fixed or contingent, of any Borrower or any Subsidiary as of the date of such financial statements that are not reflected therein or in the notes thereto. There has been no adverse change in the financial condition or operations of any Borrower or any Subsidiary since the date of such financial statements and to Borrowers' knowledge no such adverse change is pending or threatened. Neither Borrower nor any Subsidiary has guaranteed the obligations of, or made any investment in or advances to, any Person, except as disclosed in such financial statements.

### 4.1.11   Full Disclosure.

The financial statements referred to in Section 4.1.10 (Financial Condition), the Financing Documents (including, without limitation, this Agreement), and the statements, reports or certificates furnished by any Borrower in connection with the Financing Documents (a) do not contain any untrue statement of a material fact and (b) when taken in their entirety, do not omit any material fact necessary to make the statements contained therein not misleading. There is no fact known to any Borrower which such Borrower has not disclosed to Lender in writing prior to the date of this Agreement with respect to the transactions contemplated by the Financing Documents that materially and adversely affects or in the future could, in the reasonable opinion of that Borrower materially adversely affect the condition, financial or otherwise, results of operations, business, or assets of any Borrower or any Subsidiary.

### 4.1.12   Indebtedness for Borrowed Money.

Except for the Obligations and except as set forth in Schedule 4.1.12 attached hereto and made a part hereof, Borrowers have no Indebtedness for Borrowed Money. Lender has received photocopies of all promissory notes evidencing any Indebtedness for Borrowed Money set forth in Schedule 4.1.12, together with any and all subordination agreements, other agreements, documents, or instruments securing, evidencing, guarantying or otherwise executed and delivered in connection therewith.

### 4.1.13   Taxes.

Each of Borrowers and its Subsidiaries has filed all returns, reports and forms for Taxes that, to the knowledge of Borrowers, are required to be filed, and has paid all

TYSON01 298990v11 012845-000280

22

WELLS 000133

WF-EDVA 000542

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 348 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 39 of 223 PageID#
3306
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 23 of 62 PageID# 2416

Taxes as shown on such returns or on any assessment received by it, to the extent that such Taxes have become due, unless and to the extent only that such Taxes, assessments and governmental charges are currently contested in good faith and by appropriate proceedings by a Borrower, such Taxes are not the subject of any Liens other than Permitted Liens, and adequate reserves therefor have been established as required under GAAP. All tax liabilities of Borrowers were as of the date of audited financial statements referred to in Section 4.1.10 (Financial Condition), and are now, adequately provided for on the books of Borrowers or their Subsidiaries, as appropriate. No tax liability has been asserted by the Internal Revenue Service or any state or local authority against Borrower for Taxes in excess of those already paid.

### 4.1.14 ERISA.

With respect to any Plan that is maintained or contributed to by Borrower and/or by any Commonly Controlled Entity or as to which Borrower retains material liability: (a) no "accumulated funding deficiency" as defined in Code §412 or ERISA §302 has occurred, whether or not that accumulated funding deficiency has been waived; (b) no Reportable Event has occurred other than events for which reporting has been waived; (c) no termination of any plan subject to Title IV of ERISA has occurred; (d) neither Borrower nor any Commonly Controlled Entity has incurred a "complete withdrawal" within the meaning of ERISA §4203 from any Multi-employer Plan; (e) neither Borrower nor any Commonly Controlled Entity has incurred a "partial withdrawal" within the meaning of ERISA §4205 with respect to any Multi-employer Plan; (f) no Multi-employer Plan to which Borrower or any Commonly Controlled Entity has an obligation to contribute is in "reorganization" within the meaning of ERISA §4241 nor has notice been received by Borrower or any Commonly Controlled Entity that such a Multi-employer Plan will be placed in "reorganization".

### 4.1.15 Title to Properties.

Borrowers have good and marketable title to all of their respective properties, including, without limitation, the Collateral and the properties and assets reflected in the balance sheets described in Section 4.1.10 (Financial Condition). Borrowers have legal, enforceable and uncontested rights to use freely such property and assets. All of such properties, including, without limitation, the Collateral that were purchased, were purchased for fair consideration and reasonably equivalent value in the ordinary course of business of both the seller and Borrowers and not, by way of example only, as part of a bulk sale.

### 4.1.16 Perfection and Priority of Collateral.

Lender has, or upon execution and recording of this Agreement and the Security Documents will have, and will continue to have as security for the Obligations, a valid and perfected Lien on and security interest in all Collateral, free of all other Liens, claims and rights of third parties whatsoever except Permitted Liens.

### 4.1.17 Collateral Disclosure List.

The information contained in the Collateral Disclosure List is complete and correct. Each Collateral Disclosure List completely and accurately identifies (a) the type of entity, the state of organization and the chief executive office of the applicable Borrower, (b) each other place of business of the applicable Borrower, (c) the location of all books and records

TYSON01 298990v11 012843-000280

**WELLS 000134**

WF-EDVA 000543

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 349 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 40 of 223 PageID#
Case 1:11-cv-01277-GBL-TRJ   Document 86-3807 Filed 09/04/12   Page 24 of 62 PageID# 2417

pertaining to the Collateral, and (d) each location, other than the foregoing, where any of the Collateral is located.

### 4.1.18  Business Names and Addresses.

In the five (5) years preceding the date hereof, no Borrower has changed its name, identity or corporate structure, has to the best of its knowledge conducted business under any name other than its current name, and has conducted its business in any jurisdiction other than those disclosed on the Collateral Disclosure List.

### 4.1.19  Equipment.

All Equipment is personalty and is not and will not, other than in the ordinary course of business, be affixed to real estate in such manner as to become a fixture or part of such real estate, unless such real estate is subject to a Lien in favor of the Lender.  No Equipment is held by any Borrower on a sale on approval basis.

### 4.1.20  Inventory.

The Inventory of Borrowers is (a) of good and merchantable quality, free from defects, (b) not stored with a bailee, warehouseman, carrier, or similar party other than in the ordinary course of business, (c) not on consignment, sale on approval, or sale or return other than in the ordinary course of business, and (d) located at the places of business set forth on the Collateral Disclosure List.  No goods offered for sale by any Borrower are consigned to or held on sale or return terms by that Borrower.

### 4.1.21  Accounts.

With respect to all Accounts and to the best of Borrowers' knowledge (a) they are genuine, and in all respects what they purport to be, and are not evidenced by a judgment, an Instrument, or Chattel Paper (unless such judgment has been assigned and such Instrument or Chattel Paper has been endorsed and delivered to Lender); (b) they represent bona fide transactions completed in accordance with the terms and provisions contained in the invoices, purchase orders and other contracts relating thereto, and the underlying transaction therefor is in accordance with all applicable Laws; (c) the amounts shown on the respective Borrower's books and records, with respect thereto are actually and absolutely owing to that Borrower and are not contingent or subject to reduction for any reason other than regular discounts, credits or adjustments allowed by that Borrower in the ordinary course of its business; (d) no payments have been or shall be made thereon except payments turned over to Lender by Borrowers; (e) all Account Debtors thereon have the capacity to contract; and (f) the goods sold, leased or transferred or the services furnished giving rise thereto are not subject to any Liens except the security interest granted to Lender by this Agreement and Permitted Liens.

### 4.1.22  Solvency

Each of Borrowers is Solvent prior to and after the making of the Loans.

### Section 4.2    Survival; Updates of Representations and Warranties.

All representations and warranties contained in or made under or in connection with this Agreement and the other Financing Documents shall survive the Closing Date, the making of

TYSON01 298990v11 012845-000280

24

**WELLS 000135**

WF-EDVA 000544

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 350 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 41 of 223 PageID#
3308
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 25 of 62 PageID# 2418

any advance under the Loans and extension of credit made hereunder, and the incurring of any other Obligations and shall be deemed to have been made at the time of each request for, and again at the time of the making of, each advance under the Loans, except that the representations and warranties which relate to the financial statements which are referred to in Section 4.1.10 (Financial Condition), shall also be deemed to cover financial statements furnished from time to time to Lender pursuant to Section 6.1.1 (Financial Statements).

## ARTICLE V
### CONDITIONS PRECEDENT

Section 5.1    Conditions to the Initial Advance.

The initial advance under the Term Loan is subject to the fulfillment on or before the Closing Date of the following conditions precedent in a manner satisfactory in form and substance to Lender and its counsel:

5.1.1    Organizational Documents – Borrowers.

Lender shall have received for each Borrower:

(a)    a certificate of good standing certified by the Secretary of State, or other appropriate Governmental Authority, of the state of formation of Borrower;

(b)    a certified copy from the appropriate Governmental Authority under which Borrower is organized, of Borrower's organizational documents and all recorded amendments thereto;

(c)    a certificate of qualification to do business certified by the Secretary of State or other Governmental Authority of each jurisdiction in which Borrower conducts business; and

(d)    a certificate dated as of the Closing Date by the Secretary or an Assistant Secretary of Borrower covering:

(i)    true and complete copies of Borrower's organizational and governing documents and all amendments thereto;

(ii)    true and complete copies of the resolutions of its Board of Directors authorizing (A) the execution, delivery and performance of the Financing Documents to which it is a party, (B) the borrowings hereunder, and (C) the granting of the Liens contemplated by this Agreement and the Financing Documents to which Borrower is a party;

(iii)    the incumbency, authority and signatures of the officers of Borrower authorized to sign this Agreement and the other Financing Documents to which Borrower is a party; and

TYSON01 298990v11 012845-000280

25

**WELLS 000136**

**WF-EDVA 000545**

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 351 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1    Filed 11/13/12   Page 42 of 223 PageID# 3309
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 26 of 62 PageID# 2419

(iv)    the identity of Borrower's current directors, common stock holders and other equity holders, as well as their respective percentage ownership interests.

### 5.1.2    Opinion of Borrowers' Counsel.

Lender shall have received the favorable opinion of counsel for Borrowers addressed to Lender.

### 5.1.3    Consents, Licenses, Approvals, Etc.

Lender shall have received copies of all consents, licenses and approvals, required in connection with the execution, delivery, performance, validity and enforceability of the Financing Documents, and such consents, licenses and approvals shall be in full force and effect.

### 5.1.4    Notes.

Lender shall have received the Term Note and the Supplemental Term Note conforming to the requirements hereof and executed by a Responsible Officer of each Borrower and attested by a duly authorized representative of each Borrower.

### 5.1.5    Financing Documents and Collateral.

Borrower shall have executed and delivered the Financing Documents to be executed by it, and shall have delivered original Chattel Paper, Instruments, Investment Property, and related Collateral and all opinions, and other documents contemplated by ARTICLE III (The Collateral) with the exception of documents required pursuant to Section 5.2 of this Agreement.

### 5.1.6    Other Financing Documents.

In addition to the Financing Documents to be delivered by Borrowers, Lender shall have received the Financing Documents duly executed and delivered by Persons other than Borrowers.

### 5.1.7    Other Documents, Etc.

Lender shall have received such other certificates, opinions, documents and instruments confirmatory of or otherwise relating to the transactions contemplated hereby as may have been reasonably requested by Lender.

### 5.1.8    Payment of Fees.

Lender shall have received payment of any Fees due on or before the Closing Date.

### 5.1.9    Collateral Disclosure List.

Borrower shall have delivered the Collateral Disclosure List required under the provisions of Section 3.3 (Collateral Disclosure List) duly executed by a Responsible Officer of each Borrower.

TYSON01 298990v11 012845-000280

26

**WELLS 000137**

WF-EDVA 000546

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 352 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1    Filed 11/13/12   Page 43 of 223 PageID#
3310
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 27 of 62 PageID# 2420

#### 5.1.10  Recordings and Filings.

Each Borrower shall have: (a) executed and delivered all Financing Documents required to be filed, registered or recorded in order to create, in favor of Lender, a perfected Lien in the Collateral (subject only to the Permitted Liens) in form and in sufficient number for filing, registration, and recording in each office in each jurisdiction in which such filings, registrations and recordations are required, and (b) delivered such evidence as Lender deems satisfactory that all necessary filing fees and all recording and other similar fees, and all Taxes and other expenses related to such filings, registrations and recordings will be or have been paid in full.

#### 5.1.11  Insurance Certificate.

Lender shall have received an insurance certificate in accordance with the provisions of Section 6.1.7 (Insurance).

#### 5.1.12  Landlord's Waivers.

Borrowers shall have used their best efforts to deliver to Lender a waiver from each landlord of each and every business premise leased by each Borrower and on which any of the Collateral is or may hereafter be located, which landlords' waivers must be reasonably acceptable to Lender and its counsel in their sole and absolute discretion.

Section 5.2    Conditions to the Supplemental Term Loan.

The Supplemental Term Loan is subject to the fulfillment, within thirty (30) days of the Closing Date, of the following conditions precedent in a manner satisfactory in form and substance to Lender and its counsel:

#### 5.2.1  Financing Documents and Collateral.

Lender shall have received a title commitment issued by a title insurance company ("Title Insurer") acceptable to Lender, together with copies of all documents identified therein, and pursuant to which the Title Insurer agrees to issue to Lender an ALTA form of Loan Policy acceptable to Lender insuring the Mortgage as a valid first lien for the full amount of the Supplemental Term Loan, free and clear of all liens (including mechanics' and materialmen's liens) and encumbrances, and subject only to such exclusions from coverage and such exceptions to title as may be approved by Lender, and containing such endorsements as Lender may require (and, if required by Lender, with co-insurance or reinsurance with direct access agreements issued by such title insurance companies as are acceptable to Bank), and providing affirmative coverage with respect to mechanic's and materialmen's liens. The title commitment shall name Lender, its successors and/or assigns, as the insured under the Loan Policy. Title to the Property shall be good and marketable.

**WELLS 000138**

WF-EDVA 000547

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 353 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 44 of 223 PageID#
3311
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 28 of 62 PageID# 2421

### 5.2.2   Appraisal.

Lender shall have received a current appraisal of the fair market value of the Property prepared by appraisers satisfactory to Lender.

### 5.2.3   Environmental Assessment.

Lender shall have received an environmental assessment of the Property, ordered by Lender at Borrowers' expense, assessing the environmental condition of the Property. Lender shall have the right to require additional environmental investigations, which additional work shall constitute a part of the environmental assessment.

### 5.2.4   Survey.

Lender shall have received a current boundary and location survey of the Property prepared for Lender, certified to Title Insurer and Lender, its successors and assigns, and insurable by Title Insurer, by a land surveyor licensed in the State of Rhode Island and acceptable to Lender. The survey shall comply with Lender's minimum standards for surveys and shall include, without limitation: (i) the boundaries of the Property by courses and distances, together with a metes and bounds description corresponding to such survey; (ii) the location of all improvements; (iii) the location and width of all easements, utility lines, rights-of-way and building set-back lines and notes referencing the book and page numbers for the instruments granting the same; (iv) the location of all encroachments and restrictions, if any, affecting the Property; and (v) the certification of the surveyor as to (A) whether the roads abutting the Property are publicly dedicated, (B) the acreage of the Property, (C) whether the parcels comprising the Property (if applicable) are contiguous without any gores, gaps, overlaps or strips of land separating them, and (D) such other matters as reasonably requested by Lender or its counsel.

### 5.2.5   Flood Certification.

Lender shall have received satisfactory evidence that the Property is not located within an area that has been identified as a "special flood hazard area" as that term is used in the National Flood Insurance Reform Act of 1994, unless flood insurance will be provided. The flood search shall be ordered by Lender at Borrowers' expense.

### 5.2.6   Opinion.

Lender shall have received an opinion of Borrowers' counsel, satisfactory to Lender, as to the perfection of Lender's security interest in the Collateral.

TYSON01 298990v11 012845-000280

28

**WELLS 000139**

WF-EDVA 000548

Appeal: 13-1982   Doc: 14-1   Filed: 10/21/2013   Pg: 354 of 418

Case 1:11-cv-01277-GBL-TRJ  Document 151-1   Filed 11/13/12   Page 45 of 223 PageID# 3312
Case 1:11-cv-01277-GBL-TRJ  Document 86-8   Filed 09/04/12   Page 29 of 62 PageID# 2422

### 5.2.7 Settlement Statement and Recording Fees.

Huestis shall have delivered to Lender a signed settlement statement evidencing Huestis' payment of all fees, costs and expenses to the Lender in connection with the recording and filing of all documents with respect to Lender's perfection of its security interest in the Property, including but not limited to attorneys fees, title insurance premiums and costs; and appraisal and survey costs.

### Section 5.3    Conditions to all Extensions of Credit.

The making of all advances under the Loans is subject to the fulfillment of the following conditions precedent in a manner satisfactory in form and substance to Lender and its counsel:

### 5.3.1 Compliance.

Each Borrower shall have complied and shall then be in compliance with all terms, covenants, conditions and provisions of this Agreement and the other Financing Documents that are binding upon it.

### 5.3.2 Default.

There shall exist no Event of Default or Default hereunder.

### 5.3.3 Representations and Warranties.

The representations and warranties of each of Borrowers contained among the provisions of this Agreement shall be true and with the same effect as though such representations and warranties had been made at the time of the making of, and of the request for, each advance under the Loans, except that the representations and warranties which relate to financial statements which are referred to in Section 4.1.10 (Financial Condition) shall also be deemed to cover financial statements furnished from time to time to Lender pursuant to Section 6.1.1 (Financial Statements).

### 5.3.4 Adverse Change.

No adverse change shall have occurred in the condition (financial or otherwise), operations or business of any Borrower that would, in the good faith judgment of Lender, materially impair the ability of any Borrower to pay or perform any of the Obligations.

### 5.3.5 Legal Matters.

All legal documents incident to each advance under the Loans and each of the Letters of Credit shall be reasonably satisfactory to counsel for Lender.

### 5.3.6 Authorization Letter.

A letter satisfactory to Lender in form and substance from People's Bank authorizing Borrowers to terminate any liens in favor of People's Bank on property of each Borrower.

TYSON01 298990v11 012845-000280

29

WELLS 000140
WF-EDVA 000549

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 355 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 46 of 223 PageID# 3313
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 30 of 62 PageID# 2423

## ARTICLE VI
## COVENANTS OF BORROWERS

Section 6.1    Affirmative Covenants.

So long as any of the Obligations (or any the Commitments therefor) shall be outstanding hereunder, Borrowers agree jointly and severally with Lender as follows:

### 6.1.1  Financial Statements.

Borrowers shall furnish to Lender:

(a)    Annual Statements and Certificates.    Borrowers shall furnish to Lender as soon as available, but in no event more than one hundred twenty (120) days after the close of each fiscal year of each Borrower, (i) a copy of the annual financial statement in reasonable detail satisfactory to Lender relating to each Borrower, prepared in accordance with GAAP and examined and certified by independent certified public accountants satisfactory to Lender, which financial statement shall include a consolidated and consolidating balance sheet of such Borrower as of the end of such fiscal year and consolidated and consolidating statements of income, cash flows and changes in shareholders equity of each Borrower for such fiscal year, (ii) a Compliance Certificate, in substantially the form attached to this Agreement as EXHIBIT C, as may be amended by Lender from time to time, containing a detailed computation of each financial covenant in this Agreement which is applicable for the period reported, and a certification that no change has occurred to the information contained in the Collateral Disclosure List (except as set forth in a schedule attached to the certification), each prepared by a Responsible Officer of such Borrower, in a format acceptable to Lender and (iii) a management letter in the form prepared by such Borrower's independent certified public accountants.

(b)    Semi-Annual Statements and Certificates.    Borrowers shall furnish to Lender as soon as available, but in no event more than thirty (30) days after the close of the respective Borrower's fiscal second (2nd) quarter, consolidated and consolidating balance sheets of such Borrower as of the close of such period. consolidated and consolidating income, for such period, and a Compliance Certificate, in substantially the form attached to this Agreement as EXHIBIT C, a certification that no change has occurred to the information contained in the Collateral Disclosure List (except as set forth on a schedule attached to the certification), each prepared by a Responsible Officer of such Borrower in a format acceptable to Lender, all as prepared and certified by a Responsible Officer of such Borrower and accompanied by a certificate of that officer stating whether any event has occurred which constitutes a Default or an Event of Default hereunder, and, if so, stating the facts with respect thereto.

(c)    not later than thirty (30) days after filing with the Internal Revenue Service, a true and complete copy of the federal tax returns, including all schedules, of Borrowers and the Personal Guarantor.

(d)    not later than thirty (30) days after the end of each calendar year, the complete personal financial statements of the Personal Guarantor.

TYSON01 298990v11 012845-000280

30

**WELLS 000141**

WF-EDVA 000550

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 356 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 47 of 223 PageID# 3314
Case 1:11-cv-01277-GBL-TRJ    Document 86-8    Filed 09/04/12    Page 31 of 62 PageID# 2424

(e)    Additional Reports and Information.    Borrowers shall furnish to Lender promptly, such additional information. reports or statements as Lender may from time to time reasonably request.

### 6.1.2    Recordkeeping. Rights of Inspection. Field Examination. Etc.

(a)    Borrowers shall maintain (i) a standard system of accounting in accordance with GAAP, and (ii) proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its properties, business and activities.

(b)    Borrowers shall permit authorized representatives of Lender to visit and inspect the properties of Borrowers and their respective Subsidiaries, to review, audit, check and inspect the Collateral at any time with or without notice, to review, audit, check and inspect Borrowers' other books of record at any time with or without notice and to make abstracts and photocopies thereof, and to discuss the affairs, finances and accounts of Borrowers and/or their Subsidiaries, with the officers, directors, employees and other representatives of Borrowers and/or their Subsidiaries and their respective accountants, all at such times during normal business hours and other reasonable times and as often as Lender may reasonably request.

(c)    Each of Borrowers hereby irrevocably authorizes and directs all accountants and auditors employed by Borrowers and/or any of their respective Subsidiaries at any time prior to the repayment in full of the Obligations to exhibit and deliver to Lender copies of any and all of the financial statements, trial balances, management letters, or other accounting records of any nature of any or all of Borrowers and/or any or all of their respective Subsidiaries in the accountant's or auditor's possession, and to disclose to Lender any information they may have concerning the financial status and business operations of Borrower and its Subsidiaries. Further, each Borrower hereby authorizes all Governmental Authorities to furnish to Lender copies of reports or examinations relating to Borrowers and/or any of their respective Subsidiaries, whether made by Borrowers or otherwise.

(d)    Any and all reasonable costs and expenses incurred by, or on behalf of, Lender in connection with the conduct of any of the foregoing, including, without limitation, travel, lodging, meals, and other expenses for each auditor employed by Lender for inspections of the Collateral and Borrowers' operations, shall be part of the Enforcement Costs and shall be payable to Lender upon demand. Borrowers acknowledge and agree that such expenses may include, but shall not be limited to, any and all out-of-pocket costs and expenses of Lender's employees and agents in, and when, traveling to any of Borrowers' facilities.

### 6.1.3    Existence.

Each of Borrowers shall (a) maintain its existence in good standing in the jurisdiction in which it is organized and in each other jurisdiction where it is required to register or qualify to do business if the failure to do so in such other jurisdiction might have a material adverse effect on the ability of Borrowers to perform the Obligations, on the conduct of Borrower's operations, on Borrower's financial condition, or on the value of, or the ability of

TYSON01 298990v11 012845-000280

31

**WELLS 000142**

WF-EDVA 000551

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 357 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 48 of 223 PageID# 3315
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 32 of 62 PageID# 2425

Lender to realize upon, the Collateral and (b) remain a Registered Organization under the laws of the jurisdiction stated in the Preamble of this Agreement.

### 6.1.4   Compliance with Laws.

Each of Borrowers shall comply with all applicable Laws and observe the valid requirements of Governmental Authorities, the noncompliance with or the nonobservance of which might have a material adverse effect on the ability of any Borrowers to perform the Obligations, on the conduct of Borrowers' operations, on Borrowers' financial condition, or on the value of, or the ability of Lender to realize upon, the Collateral.

### 6.1.5   Preservation of Properties.

Each of Borrowers will at all times (a) maintain, preserve, protect and keep its properties, whether owned or leased, in good operating condition, working order and repair (ordinary wear and tear excepted), and from time to time will make all proper repairs, maintenance, replacements, additions and improvements thereto needed to maintain such properties in good operating condition, working order and repair, and (b) do or cause to be done all things necessary to preserve and to keep in full force and effect its material franchises, leases of real and personal property, trade names, Patents, Copyrights and permits which are necessary for the orderly continuance of its business.

### 6.1.6   Line of Business.

Each of Borrowers will continue to engage substantially only in the business of distributing, servicing, manufacturing and remanufacturing medical devices and accessories.

### 6.1.7   Insurance.

(a)     General Provisions.  Borrowers shall maintain insurance satisfactory to Lender as to amount, nature and carrier covering property damage (including loss of use and occupancy) to any of Borrowers' properties, business interruption insurance, public liability insurance including coverage for contractual liability, product liability and workers' compensation, and any other insurance which is usual for Borrowers' business.  Each policy shall provide for at least thirty (30) days prior notice to Lender of any cancellation thereof and name Lender as loss payee or additional insured, as appropriate.

(b)     Insurance Covering Collateral.  In addition to the insurance requirements stated above, Borrowers shall also maintain all risk property damage insurance policies covering the tangible property comprising the Collateral. Each insurance policy must be for the full replacement cost of the collateral and include a replacement cost endorsement. The insurance must be issued by an insurance company acceptable to Lender, must include a lender's loss payable endorsement in favor of Lender in a form acceptable to Lender and shall provide for at least thirty (30) days prior notice to Lender of any cancellation thereof.

(c)     Evidence of Insurance.  Upon the request of Lender, Borrowers shall deliver to Lender a copy of each insurance policy, or, if permitted by Lender, a certificate of insurance listing all insurance in force.

TYSON01 298990v11 012845-000280

32

**WELLS 000143**

WF-EDVA 000552

JA0341

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 358 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 49 of 223 PageID# 3316
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 33 of 62 PageID# 2426

### 6.1.8    Taxes.

Except to the extent that the validity or amount thereof is being contested in good faith and by appropriate proceedings, each of Borrowers will pay and discharge all Taxes prior to the date when any interest or penalty would accrue for the nonpayment thereof. Each of Borrowers shall furnish to Lender at such times as Lender may require proof satisfactory to Lender of the making of payments or deposits required by applicable Laws including, without limitation, payments or deposits with respect to amounts withheld by any of Borrowers from wages and salaries of employees and amounts contributed by any of Borrowers on account of federal and other income or wage taxes and amounts due under the Federal Insurance Contributions Act, as amended.

### 6.1.9    ERISA.

Each Borrower will, and will cause each of its Commonly Controlled Entities to, comply with the funding requirements of ERISA with respect to Plans for its respective employees. Borrowers will not permit with respect to any Plan (a) any prohibited transaction or transactions under ERISA or the Internal Revenue Code, which results, or may result, in any material liability of any Borrower and/or any Subsidiary and/or Affiliate, or (b) any Reportable Event if, upon termination of the Plan or Plans with respect to which one or more such Reportable Events shall have occurred, there is or would be any material liability of Borrower and/or any Subsidiary and/or Affiliate to the PBGC. Upon Lender's request, each Borrower will deliver to Lender a copy of the most recent actuarial report, financial statements and annual report completed with respect to any Plan.

### 6.1.10    Notification of Events of Default and Adverse Developments.

Each Borrower shall promptly notify Lender upon obtaining knowledge of the occurrence of:

(a)    any Event of Default;

(b)    any Default;

(c)    any litigation instituted or threatened against Borrowers or their respective Subsidiaries and of the entry of any judgment or Lien (other than any Permitted Liens) against any of the assets or properties of any of Borrowers or any of their respective Subsidiary where the claims against any Borrower or any of their Subsidiaries exceed Five Hundred Thousand Dollars ($500,000) and are not covered by insurance;

(d)    any event, development or circumstance whereby the financial statements furnished hereunder fail in any material respect to present fairly, in accordance with GAAP, the financial condition and operational results of any of Borrowers or any of their respective Subsidiaries;

(e)    any judicial, administrative or arbitral proceeding pending against any of Borrowers or any of their respective Subsidiaries and any judicial or administrative proceeding known by any of Borrowers to be threatened

TYSON01.298990v11 012845-000280

33

WELLS 000144

WF-EDVA 000553

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 359 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 50 of 223 PageID# 3317
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 34 of 62 PageID# 2427

against it or any of their respective Subsidiaries that, if adversely decided, could materially adversely affect its financial condition or operations (present or prospective);

(f)    the receipt by any Borrower or any of its Subsidiaries of any notice, claim or demand from any Governmental Authority which alleges that any of Borrowers or any Subsidiary is in violation of any of the terms of, or has failed to comply with any applicable Laws regulating its operation and business, including, but not limited to, the Occupational Safety and Health Act and the Environmental Protection Act; and

(g)    any other development in the business or affairs of any of Borrowers and any of their respective Subsidiaries that may be materially adverse;

in each case describing in detail satisfactory to Lender the nature thereof and the action Borrowers propose to take with respect thereto.

6.1.11  Interest Rate Protection Agreements.

On or prior to the Closing Date, Borrowers will obtain and at all times thereafter maintain in full force and effect one or more Swap Contracts with Lender (and/or with a bank or other financial institution having capital, surplus and undivided profits of at least $500,000,000), which effectively enables Borrowers (in a manner satisfactory to Lender), as of any date, to protect itself against fluctuations of interest rates as to a notional principal amount at least equal to 100% of the aggregate amount of the Credit Facilities through the maturity date. Borrowers will not enter into or permit to exist or acquire any Swap Contract except in the ordinary course of business to mitigate fluctuations of interest rates in respect of outstanding Indebtedness.

6.1.12  Financial Covenants.

(a)    *Debt to Worth Ratio.*  Borrowers, on a consolidated basis, will maintain, tested as of the end of each of Borrowers' fiscal quarters, a Debt to Worth Ratio of not more than 2.00 to 1.00.

(b)    *Debt Service Coverage Ratio.*  Borrowers will maintain, on a consolidated basis and tested as of the last day of each of Borrowers' fiscal quarters for the four (4) quarter period ending on that date, a Debt Service Coverage Ratio of not less than 1.25 to 1.00.

(c)    *Capital Expenditures.*  Borrowers will not directly or indirectly (by way of the acquisition of the securities of a Person or otherwise), make any Capital Expenditures in the aggregate for Borrowers in any fiscal year exceeding One Million Dollars ($1,000,000).

6.1.13  Collection of Receivables.

Until such time that Lender shall notify Borrowers of the revocation of such privilege, Borrowers and each of their Subsidiaries shall at their own expense have the privilege for the account of, and in trust for, Lender of collecting their Receivables and receiving

TYSON01 298990v11 012845-000280

34

**WELLS 000145**

WF-EDVA 000554

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 360 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 51 of 223 PageID# 3318
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 35 of 62 PageID# 2428

in respect thereto all Items of Payment and shall otherwise completely service all of the Receivables including (a) the billing. posting and maintaining of complete records applicable thereto, (b) the taking of such action with respect to the Receivables as Lender may request or in the absence of such request, as each of Borrowers and each of their respective Subsidiaries may deem advisable; and (c) the granting, in the ordinary course of business, to any Account Debtor, any rebate, refund or adjustment to which the Account Debtor may be lawfully entitled. and may accept, in connection therewith, the return of goods, the sale or lease of which shall have given rise to a Receivable and may take such other actions relating to the settling of any Account Debtor's claim as may be commercially reasonable. Lender may, at its option, at any time or from time to time after and during the continuance of an Event of Default hereunder, revoke the collection privilege given in this Agreement to Borrowers and any one or more of their Subsidiaries by either giving notice of its assignment of, and lien on the Collateral to the Account Debtors or giving notice of such revocation to Borrowers. Lender shall not have any duty to, and Borrowers hereby release Lender from all claims of loss or damage caused by the delay or failure to collect or enforce any of the Receivables or to preserve any rights against any other party with an interest in the Collateral. Lender shall be entitled at any time and from time to time to confirm and verify Receivables.

### 6.1.14 Assignments of Receivables.

Each Borrower will promptly, upon request, execute and deliver to Lender written assignments, in form and content acceptable to Lender, of specific Receivables or groups of Receivables; provided, however, the Lien and/or security interest granted to Lender under this Agreement shall not be limited in any way to or by the inclusion or exclusion of Receivables within such assignments. Receivables so assigned shall secure payment of the Obligations and are not sold to Lender whether or not any assignment thereof, which is separate from this Agreement, is in form absolute. Borrowers agree that neither any assignment to Lender nor any other provision contained in this Agreement or any of the other Financing Documents shall impose on Lender any obligation or liability of any of Borrowers with respect to that which is assigned and Borrowers hereby agree jointly and severally to indemnify Lender and hold Lender harmless from any and all claims, actions, suits, losses, damages, costs, expenses, fees, obligations and liabilities which may be incurred by or imposed upon Lender by virtue of the assignment of and Lien on any Borrower's rights, title and interest in, to, and under the Collateral.

### 6.1.15 Notice of Returned Goods, etc.

Borrowers will promptly notify, and will cause the Subsidiaries to promptly notify, Lender of the return, rejection or repossession of any goods sold or delivered in respect of any Receivables outside the ordinary course of business.

### 6.1.16 Maintenance of the Collateral.

Borrowers will maintain the Collateral in good working order, saving and excepting ordinary wear and tear, and will not permit anything to be done to the Collateral that may materially impair the value thereof. Lender, or an agent designated by Lender, shall be permitted to enter the premises of each of Borrowers and their Subsidiaries and examine, audit and inspect the Collateral at any reasonable time and from time to time without notice. Lender shall not have any duty to, and Borrowers hereby release Lender from all claims of loss or

**WELLS 000146**

WF-EDVA 000555

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 361 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 52 of 223 PageID# 3319
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 36 of 62 PageID# 2429

damage caused by the delay or failure to collect or enforce any of the Receivables or to, preserve any rights against any other party with an interest in the Collateral.

### 6.1.17  Equipment.

Borrowers shall (a) maintain all Equipment as personalty. (b) not affix any Equipment to any real estate in such manner as to become a fixture or part of such real estate other than in the ordinary course of business, and (c) shall hold no Equipment on a sale on approval basis. Borrowers hereby declare their intent that, notwithstanding the means of attachment, no goods of Borrowers hereafter attached to any realty shall be deemed a fixture, which declaration shall be irrevocable, without Lender's consent. until all of the Obligations have been paid in full and all of the Commitments have been terminated or have expired.

### 6.1.18  Defense of Title and Further Assurances.

At their expense, Borrowers will defend the title to the Collateral (and any part thereof), and will immediately execute, acknowledge and deliver any renewal, affidavit, deed, assignment, security agreement, certificate or other document which Lender may require in order to perfect, preserve, maintain, continue, protect and/or extend the Lien granted to Lender under this Agreement or under any of the other Financing Documents and the first priority of that Lien, subject only to the Permitted Liens. Borrowers hereby authorize the filing of any financing statement or continuation statement required under the Uniform Commercial Code. Borrowers will from time to time do whatever Lender may require by way of obtaining, executing, delivering, and/or filing landlords' or mortgagees' or bailees' waivers, notices of assignment and other notices and amendments and renewals thereof and Borrowers will take any and all steps and observe such formalities as Lender may require, in order to create and maintain a valid Lien upon, pledge of, or paramount security interest in, the Collateral, subject to the Permitted Liens. Borrowers shall pay to Lender on demand all taxes, costs and expenses incurred by Lender in connection with the preparation, execution, recording and filing of any such document or instrument. To the extent that the proceeds of any of the Accounts or Receivables of Borrowers are expected to become subject to the control of, or in the possession of, a party other than Borrowers or Lender, Borrowers shall cause all such parties to execute and deliver on the Closing Date security documents or other documents as requested by Lender and as may be necessary to evidence and/or perfect the security interest of Lender in those proceeds. Each Borrower hereby irrevocably appoints Lender as Borrower's attorney-in-fact, with power of substitution, in the name of Lender or in the name of Borrowers or otherwise, for the use and benefit of Lender, but at the cost and expense of Borrower and without notice to Borrowers, to execute and deliver any and all of the instruments and other documents and take any action which Lender may require pursuant the foregoing provisions of this Section 6.1.18.

### 6.1.19  Business Names; Locations.

Each of Borrowers will notify and cause each of their Subsidiaries to notify Lender not less than thirty (30) days prior to (a) any change in the name under which Borrower or the applicable Subsidiary conducts its business, (b) any change of the location of the chief executive office of the applicable Borrower or the applicable Subsidiary, and (c) the opening of any new place of business or the closing of any existing place of business, and (d) any change in the location of the places where the Collateral, or any part thereof, or the books and records, or any part thereof, are kept.

TYSON01 298990v11 012845-000280

36

WELLS 000147

WF-EDVA 000556

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 362 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 53 of 223 PageID# 3320
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 37 of 62 PageID# 2430

### 6.1.20  Use of Premises and Equipment.

Borrowers agree that until the Obligations are fully paid and all of the Commitments have been terminated or have expired, Lender (a) after and during the continuance of an Event of Default, may use any of Borrowers' owned or leased lifts, hoists, trucks and other facilities or equipment for handling or removing the Collateral; and (b) shall have, and is hereby granted, a right of ingress and egress to the places where the Collateral is located, and may proceed over and through any of Borrowers' owned or leased property.

### 6.1.21  Protection of Collateral.

Borrowers agree that Lender may at any time following an Event of Default take such steps as Lender deems reasonably necessary to protect the interest of Lender in, and to preserve the Collateral, including, the hiring of such security guards or the placing of other security protection measures as Lender deems appropriate, may employ and maintain at any of Borrowers' premises a custodian who shall have full authority to do all acts necessary to protect the interests of Lender in the Collateral and may lease warehouse facilities to which Lender may move all or any part of the Collateral to the extent commercially reasonable. Borrowers agree to cooperate fully with Lender's efforts to preserve the Collateral and will take such actions to preserve the Collateral as Lender may reasonably direct. All of Lender's expenses of preserving the Collateral, including any reasonable expenses relating to the compensation and bonding of a custodian, shall be part of the Enforcement Costs.

### 6.1.22  Principal Depository.

At such times as Lender has branches in the states where Borrowers do business, Borrowers shall maintain their primary depository with Lender until the Obligations have been satisfied in full.

Section 6.2   Negative Covenants.

So long as any of the Obligations or the Commitments shall be outstanding hereunder, Borrowers agree with Lender as follows:

### 6.2.1  Capital Structure, Merger, Acquisition or Sale of Assets.

None of Borrowers will alter or amend its capital structure, authorize any additional class of equity, issue any stock or equity of any class, enter into any merger or consolidation or amalgamation, windup or dissolve itself (or suffer any liquidation or dissolution) or acquire all or substantially all the assets of any Person, or sell, lease or otherwise dispose of any of its assets (except Inventory disposed of in the ordinary course of business prior to an Event of Default). Borrowers may convert to a corporation under Subchapter S of the Internal Revenue Code, if after giving effect to such conversion, Borrowers are not in Default under any Loan Document. Any consent of Lender to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition.

### 6.2.2  Subsidiaries.

None of Borrowers will create or acquire any Subsidiaries other than the Subsidiaries identified on the Collateral Disclosure List.

TYSON01 298990v11 012845-000280

37

**WELLS 000148**

**WF-EDVA 000557**

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 363 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 54 of 223 PageID#
3321
Case 1:11-cv-01277-GBL-TRJ   Document 86-3   Filed 09/04/12   Page 38 of 62 PageID# 2431

6.2.3   Issuance of Stock.

None of Borrowers will issue, or grant any option or right to purchase, any of its capital stock.

6.2.4   Purchase or Redemption of Securities. Dividend Restrictions.

None of Borrowers will purchase, redeem or otherwise acquire any shares of its capital stock or warrants now or hereafter outstanding, declare or pay any dividends thereon (other than stock dividends), apply any of its property or assets to the purchase, redemption or other retirement of, set apart any sum for the payment of any dividends on, or for the purchase, redemption, or other retirement of, make any distribution by reduction of capital or otherwise in respect of, any shares of any class of capital stock of any Borrower, or any warrants, permit any Subsidiary to purchase or acquire any shares of any class of capital stock of, or warrants issued by, any Borrower, make any distribution to stockholders or set aside any funds for any such purpose (other than salaries paid to employees in the ordinary course of business), and not prepay, purchase or redeem any Indebtedness for Borrowed Money other than the Obligations. Notwithstanding the foregoing, at any time a Borrower is a Corporation under Subchapter S of the Internal Revenue Code, such Borrower may make advances to each of its shareholders (the "Shareholder Advances") in an amount sufficient to cover that shareholder's actual tax liability due and payable as a result of income of that Borrower attributed to the shareholder, during any period that such Borrower is eligible for taxation as a corporation under Subchapter S of the Internal Revenue Code, provided, however, that in no event may any Shareholder Advances be made if as a result of any such Shareholder Advances, the Borrowers would be in default under this Agreement.

6.2.5   Indebtedness.

None of Borrowers will create, incur, assume or suffer to exist any Indebtedness for Borrowed Money in excess of One Million Dollars ($1,000,000) in the aggregate except:

(a)    the Obligations;

(b)    current accounts payable arising in the ordinary course;

(c)    Indebtedness secured by Permitted Liens;

(d)    Subordinated Indebtedness; and

(e)    Indebtedness of Borrowers existing on the date hereof and reflected on the financial statements furnished pursuant to Section 4.1.10 (Financial Condition).

6.2.6   Investments. Loans and Other Transactions.

Except as otherwise provided in this Agreement, none of Borrowers will (a) make, assume, acquire or continue to hold any investment in any real property (unless used in connection with its business and treated as a Fixed or Capital Asset of any Borrower or any

TYSON01 298990v1; 012845-000280

38

WELLS 000149

WF-EDVA 000558

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 364 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 55 of 223 PageID# 3322
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 39 of 62 PageID# 2432

Subsidiary) or any Person, whether by stock purchase, capital contribution, acquisition of indebtedness of such Person or otherwise (including, without limitation, investments in any joint venture or partnership), (b) guaranty or otherwise become contingently liable for the Indebtedness or obligations of any Person, or (c) make any loans or advances, or otherwise extend credit to any Person, except:

        (a)    any advance to an officer or employee of any Borrower or any Subsidiary for travel or other business expenses in the ordinary course of business, provided that the aggregate amount of all such advances by all of Borrowers and their Subsidiaries (taken as a whole) outstanding at any time shall not exceed Five Thousand Dollars ($5,000);

        (b)    the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

        (c)    any investment in Cash Equivalents, which are pledged to Lender as collateral and security for the Obligations; and

        (d)    trade credit extended to customers in the ordinary course of business.

        6.2.7   Stock of Subsidiaries.

        None of Borrowers will sell or otherwise dispose of any shares of capital stock of any Subsidiary (except in connection with a merger or consolidation of a Wholly Owned Subsidiary into any of Borrowers or another Wholly Owned Subsidiary or with the dissolution of any Subsidiary) or permit any Subsidiary to issue any additional shares of its capital stock except pro rata to its stockholders.

        6.2.8   Subordinated Indebtedness.

        None of Borrowers will make:

        (a)    any payment of principal of, or interest on, any of the Subordinated Indebtedness if a Default or an Event of Default then exists hereunder or would result from such payment;

        (b)    any payment of the principal or interest due on the Subordinated Indebtedness as a result of acceleration thereunder or a mandatory prepayment thereunder;

        (c)    any amendment or modification of or supplement to the documents evidencing or securing the Subordinated Indebtedness; or

        (d)    payment of principal or interest on the Subordinated Indebtedness other than when due (without giving effect to any acceleration of maturity or mandatory prepayment).

WELLS 000150

WF-EDVA 000559

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 365 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 56 of 223 PageID# 3323
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 40 of 62 PageID# 2433

### 6.2.9   Liens; Confessed Judgment.

Borrower agrees that it (a) will not create, incur, assume or suffer to exist any Lien upon any of its properties or assets, whether now owned or hereafter acquired except for Liens securing the Obligations and Permitted Liens, (b) will not agree to, assume or suffer to exist any provision in any instrument or other document for confession of judgment, cognovit or other similar right or remedy, (c) will not allow or suffer to exist any Permitted Liens to be superior to Liens securing the Obligations, (d) will not enter into any contracts for the consignment of goods, will not execute or suffer the filing of any financing statements or the posting of any signs giving notice of consignments, and will not, as a material part of its business, engage in the sale of goods belonging to others, and (e) will not allow or suffer to exist the failure of any Lien described in the Security Documents to attach to, and/or remain at all times perfected on, any of the property described in the Security Documents.

### 6.2.10   Transactions with Affiliates.

None of Borrowers will enter into or participate in any transaction with any Affiliate or, except in the ordinary course of business, with the officers, directors, employees and other representatives of any Borrower and/or any Subsidiary.

### 6.2.11   Other Businesses.

None of Borrowers will engage directly or indirectly in any business other than its current line of business described elsewhere in this Agreement.

### 6.2.12   ERISA Compliance.

None of Borrowers nor any Commonly Controlled Entity shall:   (a) engage in or permit any "prohibited transaction" (as defined in ERISA); (b) cause any "accumulated funding deficiency" as defined in ERISA and/or the Internal Revenue Code; (c) terminate any pension plan in a manner which could result in the imposition of a lien on the property of any Borrower pursuant to ERISA; (d) terminate or consent to the termination of any Multi-employer Plan; or (e) incur a complete or partial withdrawal with respect to any Multi-employer Plan.

### 6.2.13   Method of Accounting; Fiscal Year.

Each Borrower agrees that it will not:

(a)   change the method of accounting employed in the preparation of any financial statements furnished to Lender under the provisions of Section 6.1.1 (Financial Statements), unless required to conform to GAAP and on the condition that Borrower's accountants shall furnish such information as Lender may request to reconcile the changes with Borrower's prior financial statements.

(b)   change its fiscal year from a year ending on December 31.

TYSON01 298990v11 012845-000280

40

**WELLS 000151**

WF-EDVA 000560

JA0349

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 366 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 57 of 223 PageID# 3324
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 41 of 62 PageID# 2434

#### 6.2.14  Transfer of Collateral.

None of Borrowers and nor any of their respective Subsidiaries will transfer, or permit the transfer, to another location of any of the Collateral or the books and records related to any of the Collateral.

#### 6.2.15  Sale and Leaseback.

None of Borrowers and nor any of their respective Subsidiaries will directly or indirectly enter into any arrangement to sell or transfer all or any substantial part of its fixed assets and thereupon or within one (1) year thereafter rent or lease the assets so sold or transferred.

#### 6.2.16  Disposition of Collateral.

None of Borrowers will sell, discount, allow credits or allowances, transfer, assign, extend the time for payment on, convey, lease, assign, transfer or otherwise dispose of the Collateral, except, prior to an Event of Default, dispositions expressly permitted elsewhere in this Agreement, the sale of Inventory and Equipment in the ordinary course of business.

### ARTICLE VII
### DEFAULT AND RIGHTS AND REMEDIES

Section 7.1    Events of Default.

The occurrence of any one or more of the following events shall constitute an "Event of Default" under the provisions of this Agreement:

#### 7.1.1  Failure to Pay.

The failure of Borrowers to pay any of the Obligations when due , if such failure continues for ten (10 days after notice thereof.

#### 7.1.2  Breach of Representations and Warranties.

Any representation or warranty made in this Agreement or in any report, statement, schedule, certificate, opinion (including any opinion of counsel for Borrowers), financial statement or other document furnished in connection with this Agreement, any of the other Financing Documents, or the Obligations, shall prove to have been false or misleading when made (or, if applicable, when reaffirmed) in any material respect.

#### 7.1.3  Failure to Comply with Covenants.

The failure of Borrowers to perform, observe or comply with any covenant, condition or agreement contained in this Agreement within ten (10) days after written notice thereof is mailed to Borrower by Lender, provided, Borrower shall have the right to cure a default under this section only once during any 12 month period.

TYSON01 298990v11 012845-000280

41

WELLS 000152

WF-EDVA 000561

JA0350

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 367 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 58 of 223 PageID# 3325
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 42 of 62 PageID# 2435

### 7.1.4  Default Under Other Financing Documents or Obligations.

A default shall occur under any of the other Financing Documents or under any other Obligations, and such default is not cured within any applicable grace or cure period provided therein.

### 7.1.5  Receiver; Bankruptcy.

Any Borrower or any Subsidiary shall (a) apply for or consent to the appointment of a receiver, trustee or liquidator of itself or any of its property, (b) admit in writing its inability to pay its debts as they mature, (c) make a general assignment for the benefit of creditors, (d) be adjudicated a bankrupt or insolvent, (e) file a voluntary petition in bankruptcy or a petition or an answer seeking or consenting to reorganization or an arrangement with creditors or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law, or take corporate action for the purposes of effecting any of the foregoing, or (f) by any act indicate its consent to, approval of or acquiescence in any such proceeding or the appointment of any receiver or or trustee for any of its property, or suffer any such receivership, trusteeship or proceeding to continue undischarged for a period of sixty (60) days, or (g) by any act indicate its consent to, approval of or acquiescence in any order, judgment or decree by any court of competent jurisdiction or any Governmental Authority enjoining or otherwise prohibiting the operation of a material portion of any Borrower's or any Subsidiary's business or the use or disposition of a material portion of any Borrower's or any Subsidiary's assets.

### 7.1.6  Involuntary Bankruptcy, etc.

An order for relief shall be entered in any involuntary case brought against any Borrower or any Subsidiary under the Bankruptcy Code, or (b) any such case shall be commenced against Borrower or any Subsidiary and shall not be dismissed within sixty (60) days after the filing of the petition, or (c) an order, judgment or decree under any other Law is entered by any court of competent jurisdiction or by any other Governmental Authority on the application of a Governmental Authority or of a Person other than Borrower or any Subsidiary (i) adjudicating any Borrower, or any Subsidiary bankrupt or insolvent, or (ii) appointing a receiver, trustee or liquidator of any Borrower or of any Subsidiary, or of a material portion of Borrower's or any Subsidiary's assets, or (iii) enjoining, prohibiting or otherwise limiting the operation of a material portion of any Borrower's or any Subsidiary's business or the use or disposition of a material portion of any Borrower's or any Subsidiary's assets, and such order, judgment or decree continues unstayed and in effect for a period of thirty (30) days from the date entered.

### 7.1.7  Judgment.

Unless adequately insured in the opinion of Lender, the entry of a final judgment for the payment of money involving more than One Hundred Thousand Dollars ($100,000) against any Borrower or any Subsidiary, and the failure by such Borrower or such Subsidiary to discharge the same, or cause it to be discharged, within thirty (30) days from the date of the order, decree or process under which or pursuant to which such judgment was entered, or to secure a stay of execution pending appeal of such judgment.

TYSON01 298990v11 012845-000280

42

WELLS 000153

WF-EDVA 000562

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 368 of 418

Case 1:11-cv-01277-GBL-TRJ  Document 151-1    Filed 11/13/12   Page 59 of 223 PageID#
3326
Case 1:11-cv-01277-GBL-TRJ  Document 86-8  Filed 09/04/12   Page 43 of 62 PageID# 2436

### 7.1.8  Execution: Attachment.

Any execution or attachment shall be levied against the Collateral, or any part thereof having an aggregate value in excess of $500,000, and such execution or attachment shall not be set aside, discharged or stayed within thirty (30) days after the same shall have been levied.

### 7.1.9  Default Under Other Borrowings.

Default shall be made with respect to any Indebtedness for Borrowed Money (other than the Loans) of any of Borrowers if the default is a failure to pay at maturity or if the effect of such default is to accelerate the maturity of such Indebtedness for Borrowed Money or to permit the holder or obligee thereof or other party thereto to cause such Indebtedness for Borrowed Money to become due prior to its stated maturity.

### 7.1.10  Challenge to Agreements.

Any Borrower or the Personal Guarantor shall challenge the validity and binding effect of any provision of any of the Financing Documents or shall state its intention to make such a challenge of any of the Financing Documents or any of the Financing Documents shall for any reason (except to the extent permitted by its express terms) cease to be effective or to create a valid and perfected first priority Lien (except for Permitted Liens) on, or security interest in, any of the Collateral purported to be covered thereby.

### 7.1.11  Material Adverse Change.

Lender in its sole discretion determines in good faith that a material adverse change has occurred in the financial condition of any of Borrowers.

### 7.1.12  Impairment of Position.

Lender, in its sole but reasonable discretion, determines in good faith that an event has occurred which impairs the prospect of payment of any of the Obligations and/or the value of the Collateral.

### 7.1.13  Collateral Inadequacy.

The determination in good faith by Lender that the security for the Obligations is inadequate.

### 7.1.14  Change in Ownership.

Any change shall occur in the ownership of any of Borrower which results in the Personal Guarantor directly or indirectly owning or controlling less than one hundred percent (100%) of such Borrower.

### 7.1.15  Liquidation, Termination, Dissolution, Change in Management, etc.

Any Borrower shall liquidate, dissolve or terminate its existence or shall suspend or terminate a substantial portion of its business operations or any change occurs in the management or control of any Borrower without the prior written consent of Lender.

TYSON01 298990v11 012845-000280

43

WELLS 000154

WF-EDVA 000563

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 369 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 60 of 223 PageID#
Case 1:11-cv-01277-GBL-TRJ   Document 86-27Filed 09/04/12   Page 44 of 62 PageID# 2437

7.1.16  Swap Default.

      An event occurs which gives Lender the right or option to terminate any Swap Contract which is secured by the Collateral.

Section 7.2    Remedies.

      Upon the occurrence of any Event of Default, Lender may, in the exercise of its sole and absolute discretion from time to time, at any time thereafter exercise any one or more of the following rights, powers or remedies:

7.2.1    Acceleration.

      Lender may declare any or all of the Obligations to be immediately due and payable, notwithstanding anything contained in this Agreement or in any of the other Financing Documents to the contrary, without presentment, demand, protest, notice of protest or of dishonor, or other notice of any kind, all of which Borrowers hereby waive, other than Obligations under any Swap Contracts, which shall be governed by the default and termination provisions of said Swap Contracts.

7.2.2    Further Advances.

      Lender may from time to time without notice to Borrowers suspend, terminate or limit any further advances, loans or other extensions of credit under the Commitments, under this Agreement and/or under any of the other Financing Documents. Further, upon the occurrence of an Event of Default or Default specified in Section 7.1.5 (Receiver; Bankruptcy) or Section 7.1.6 (Involuntary Bankruptcy, etc.), the Commitments and any agreement in any of the Financing Documents to provide additional credit shall immediately and automatically terminate and the unpaid principal amount of the Notes (with accrued interest thereon) and all other Obligations then outstanding, shall immediately become due and payable without further action of any kind and without presentment, demand, protest or notice of any kind, all of which are hereby expressly waived by Borrowers.

7.2.3    Uniform Commercial Code.

      Lender shall have all of the rights and remedies of a secured party under the applicable Uniform Commercial Code and other applicable Laws. Upon demand by Lender, Borrowers shall assemble the Collateral and make it available to Lender, at a place designated by Lender. Lender or its agents may without notice from time to time enter upon Borrower's premises to take possession of the Collateral, to remove it, to render it unusable, to process it or otherwise prepare it for sale, or to sell or otherwise dispose of it.

      Any written notice of the sale, disposition or other intended action by Lender with respect to the Collateral which is sent by regular mail, postage prepaid, to Borrowers at the address set forth in Section 8.1 (Notices), or such other address of Borrowers which may from time to time be shown on Lender's records, at least ten (10) days prior to such sale, disposition or other action, shall constitute commercially reasonable notice to Borrowers. Lender may alternatively or additionally give such notice in any other commercially reasonable manner. Nothing in this Agreement shall require Lender to give any notice not required by applicable Laws.

TYSON01 298990v11 012845-000280

44

**WELLS 000155**

WF-EDVA 000564

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 370 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 61 of 223 PageID#
3328
Case 1:11-cv-01277-GBL-TRJ    Document 86-8    Filed 09/04/12    Page 45 of 62 PageID# 2438

If any consent, approval, or authorization of any state, municipal or other Governmental Authority or of any other Person or of any Person having any interest therein, should be necessary to effectuate any sale or other disposition of the Collateral, Borrowers agree to execute all such applications and other instruments, and to take all other action, as may be required in connection with securing any such consent, approval or authorization.

Borrower recognizes that Lender may be unable to effect a public sale of all or a part of the Collateral consisting of Investment Property by reason of certain prohibitions contained in the Securities Act of 1933, as amended, and other applicable Federal and state Laws. Lender may, therefore, in its discretion, take such steps as it may deem appropriate to comply with such Laws and may, for example, at any sale of the Collateral consisting of securities restrict the prospective bidders or purchasers as to their number, nature of business and investment intention, including, without limitation, a requirement that the Persons making such purchases represent and agree to the satisfaction of Lender that they are purchasing such securities for their account, for investment, and not with a view to the distribution or resale of any thereof. Borrower covenants and agrees to do or cause to be done promptly all such acts and things as Lender may request from time to time and as may be necessary to offer and/or sell the securities or any part thereof in a manner which is valid and binding and in conformance with all applicable Laws. Upon any such sale or disposition, Lender shall have the right to deliver, assign and transfer to the purchaser thereof the Collateral consisting of securities so sold.

7.2.4    Specific Rights With Regard to Collateral.

In addition to all other rights and remedies provided hereunder or as shall exist at law or in equity from time to time, Lender may (but shall be under no obligation to), without notice to any of Borrowers, and each Borrower hereby irrevocably appoints Lender as its attorney-in-fact, with power of substitution, in the name of Lender and/or in the name of any or all of Borrowers or otherwise, for the use and benefit of Lender, but at the cost and expense of Borrowers and without notice to Borrowers:

(a)    request any Account Debtor obligated on any of the Accounts to make payments thereon directly to Lender, with Lender taking control of the Proceeds thereof;

(b)    compromise, extend or renew any of the Collateral or deal with the same as it may deem advisable;

(c)    make exchanges, substitutions or surrenders of all or any part of the Collateral;

(d)    copy, transcribe, or remove from any place of business of any Borrower or any Subsidiary all books, records, ledger sheets, correspondence, invoices and documents, relating to or evidencing any of the Collateral or without cost or expense to Lender, make such use of any Borrower's or any Subsidiary's place(s) of business as may be reasonably necessary to administer, control and collect the Collateral;

TYSON01 298990v11 012845-000280

45

WELLS 000156

WF-EDVA 000565

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 371 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 62 of 223 PageID#
Case 1:11-cv-01277-GBL-TRJ   Document 86-29   Filed 09/04/12   Page 46 of 62 PageID# 2439

(e)     repair, alter or supply goods if necessary to fulfill in whole or in part the purchase order of any Account Debtor;

(f)     demand, collect, receipt for and give renewals, extensions, discharges and releases of any of the Collateral;

(g)     institute and prosecute legal and equitable proceedings to enforce collection of, or realize upon, any of the Collateral;

(h)     settle, renew, extend, compromise, compound, exchange or adjust claims in respect of any of the Collateral or any legal proceedings brought in respect thereof;

(i)     endorse or sign the name of any Borrower upon any Items of Payment, certificates of title, Instruments, Investment Property, stock powers, documents, documents of title, financing statements, assignments, notices, or other writing relating to or part of the Collateral and on any proof of claim in bankruptcy against an Account Debtor;

(j)     clear Inventory through customs in Lender's or any Borrower's name and to sign and deliver to customs officials powers of attorney in that Borrower's name for such purpose;

(k)     notify the Post Office authorities to change the address for the delivery of mail to Borrower to such address or Post Office Box as Lender may designate and receive and open all mail addressed to any of Borrowers; and

(l)     take any other action necessary or beneficial to realize upon or dispose of the Collateral or to carry out the terms of this Agreement.

7.2.5  Application of Proceeds.

Any proceeds of sale or other disposition of the Collateral will be applied by Lender to the payment first of any and all Enforcement Costs, and any balance of such proceeds will be applied to the Obligations in such order and manner as Lender shall determine. If the sale or other disposition of the Collateral fails to fully satisfy the Obligations, Borrowers shall remain liable to Lender for any deficiency.

7.2.6  Performance by Lender.

Lender without notice to or demand upon Borrowers and without waiving or releasing any of the Obligations or any Default or Event of Default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of Borrowers, and may enter upon the premises of Borrowers for that purpose and take all such action thereon as Lender may consider necessary or appropriate for such purpose and each of Borrowers hereby irrevocably appoints Lender as its attorney-in-fact to do so, with power of substitution, in the name of Lender, in the name of any or all of Borrowers or

TYSON01 298990v11 012845-000280

46

**WELLS 000157**

WF-EDVA 000566

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 372 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 63 of 223 PageID#
Case 1:11-cv-01277-GBL-TRJ   Document 86-30 Filed 09/04/12   Page 47 of 62 PageID# 2440

otherwise, for the use and benefit of Lender, but at the cost and expense of Borrowers and without notice to Borrowers. All sums so paid or advanced by Lender together with interest thereon from the date of payment, advance or incurring until paid in full at the Post-Default Rate and all costs and expenses, shall be deemed part of the Enforcement Costs, shall be paid by Borrowers to Lender on demand, and shall constitute and become a part of the Obligations.

#### 7.2.7   Other Remedies.

Lender may from time to time proceed to protect or enforce its rights by an action or actions at law or in equity or by any other appropriate proceeding, whether for the specific performance of any of the covenants contained in this Agreement or in any of the other Financing Documents, or for an injunction against the violation of any of the terms of this Agreement or any of the other Financing Documents, or in aid of the exercise or execution of any right, remedy or power granted in this Agreement, the Financing Documents, and/or applicable Laws. Lender is authorized to offset and apply to all or any part of the Obligations all moneys, credits and other property of any nature whatsoever of any of all of Borrowers now or at any time hereafter in the possession of, in transit to or from, under the control or custody of, or on deposit with, Lender or any Affiliate of Lender.

### ARTICLE VIII
### MISCELLANEOUS

Section 8.1   Notices.

All notices, requests and demands to or upon the parties to this Agreement shall be in writing and shall be deemed to have been given or made when delivered by hand on a Business Day, or two (2) days after the date when deposited in the mail, postage prepaid by registered or certified mail, return receipt requested, or when sent by overnight courier, on the Business Day next following the day on which the notice is delivered to such overnight courier, addressed as follows:

| | |
|---|---|
| Borrowers: | c/o Huestis Machine Corporation<br>7643 Fullerton Road<br>Springfield, Virginia 22153<br>Attention: Shawn Weingast |
| with a copy to: | Huestis Machine Corporation<br>7643 Fullerton Road<br>Springfield, Virginia 22153<br>Attention: Krishnan Suthanthiran |
| Lender: | Wachovia Bank, National Association<br>1753 Pinnacle Drive, Third Floor<br>McLean, Virginia 22102<br>Attention: John Dumm |
| with a copy to: | Troutman Sanders LLP<br>1660 International Drive, Suite 600<br>McLean, Virginia 22102 |

WELLS 000158

WF-EDVA 000567

Attention:  Richard M. Pollak, Esquire

By written notice, each party to this Agreement may change the address to which notice is given to that party, provided that such changed notice shall include a street address to which notices may be delivered by overnight courier in the ordinary course on any Business Day.

Section 8.2    Amendments; Waivers.

This Agreement and the other Financing Documents may not be amended, modified, or changed in any respect except by an agreement in writing signed by Lender and Borrowers.  No waiver of any provision of this Agreement or of any of the other Financing Documents, nor consent to any departure by Borrowers therefrom, shall in any event be effective unless the same shall be in writing signed by Lender.  No course of dealing between Borrowers and Lender and no act or failure to act from time to time on the part of Lender shall constitute a waiver, amendment or modification of any provision of this Agreement or any of the other Financing Documents or any right or remedy under this Agreement, under any of the other Financing Documents or under applicable Laws.

Without implying any limitation on the foregoing:

(a)    Any waiver or consent shall be effective only in the specific instance, for the terms and purpose for which given, subject to such conditions as Lender may specify in any such instrument.

(b)    No waiver of any Default or Event of Default shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereto.

(c)    No notice to or demand on Borrowers in any case shall entitle Borrowers to any other or further notice or demand in the same, similar or other circumstance.

(d)    No failure or delay by Lender to insist upon the strict performance of any term, condition, covenant or agreement of this Agreement or of any of the other Financing Documents, or to exercise any right, power or remedy consequent upon a breach thereof, shall constitute a waiver, amendment or modification of any such term, condition, covenant or agreement or of any such breach or preclude Lender from exercising any such right, power or remedy at any time or times.

(e)    By accepting payment after the due date of any amount payable under this Agreement or under any of the other Financing Documents, Lender shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement or under any of the other Financing Documents, or to declare a default for failure to effect such prompt payment of any such other amount.

**WELLS 000159**

**WF-EDVA 000568**

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 374 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 65 of 223 PageID#
Case 1:11-cv-01277-GBL-TRJ   Document 86-3832 Filed 09/04/12   Page 49 of 62 PageID# 2442

Section 8.3    <u>Cumulative Remedies.</u>

The rights, powers and remedies provided in this Agreement and in the other Financing Documents are cumulative, may be exercised concurrently or separately, may be exercised from time to time and in such order as Lender shall determine, subject to the provisions of this Agreement, and are in addition to, and not exclusive of, rights, powers and remedies provided by existing or future applicable Laws. In order to entitle Lender to exercise any remedy reserved to it in this Agreement, it shall not be necessary to give any notice, other than such notice as may be expressly required in this Agreement. Without limiting the generality of the foregoing and subject to the terms of this Agreement, Lender may:

(a)    proceed against any one or more of Borrowers with or without proceeding against any other Person (including, without limitation, the Personal Guarantor) who may be liable (by endorsement, guaranty, indemnity or otherwise) for all or any part of the Obligations;

(b)    proceed against any one or more of Borrowers with or without proceeding under any of the other Financing Documents or against any Collateral or other collateral and security for all or any part of the Obligations;

(c)    without reducing or impairing the obligation of Borrowers and without notice, release or compromise with any guarantor or other Person liable for all or any part of the Obligations under the Financing Documents or otherwise;

(d)    without reducing or impairing the obligations of Borrowers and without notice thereof:

(i)    fail to perfect the Lien in any or all Collateral or to release any or all the Collateral or to accept substitute Collateral;

(ii)    approve the making of advances under the Term Loan under this Agreement;

(iii)    waive any provision of this Agreement or the other Financing Documents;

(iv)    exercise or fail to exercise rights of set-off or other rights; or

(e)    accept partial payments or extend from time to time the maturity of all or any part of the Obligations.

Section 8.4    <u>Severability.</u>

In case one or more provisions, or part thereof, contained in this Agreement or in the other Financing Documents shall be invalid, illegal or unenforceable in any respect under any Law, then without need for any further agreement, notice or action:

TYSON01 298990v11 012845-000280

49

**WELLS 000160**

WF-EDVA 000569

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 375 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 66 of 223 PageID# 3833
Case 1:11-cv-01277-GBL-TRJ   Document 86-3   Filed 09/04/12   Page 50 of 62 PageID# 2443

(a)    the validity, legality and enforceability of the remaining provisions shall remain effective and binding on the parties thereto and shall not be affected or impaired thereby;

(b)    the obligation to be fulfilled shall be reduced to the limit of such validity;

(c)    if such provision or part thereof pertains to repayment of the Obligations, then, at the sole and absolute discretion of Lender, all of the Obligations of Borrowers to Lender shall become immediately due and payable; and

(d)    if the affected provision or part thereof does not pertain to repayment of the Obligations, but operates or would prospectively operate to invalidate this Agreement in whole or in part, then such provision or part thereof only shall be void, and the remainder of this Agreement shall remain operative and in full force and effect.

Section 8.5    Assignments by Lender.

Lender may, without notice to or consent of Borrowers, assign to any Person (each an "Assignee" and collectively, the "Assignees") all or a portion of Lender's Commitments. Lender and its Assignee shall notify Borrowers in writing of the date on which the assignment is to be effective (the "Adjustment Date"). On or before the Adjustment Date, Lender, Borrowers and the Assignee shall execute and deliver a written assignment agreement in a form acceptable to Lender, which shall constitute an amendment to this Agreement to the extent necessary to reflect such assignment. Upon the request of Lender following an assignment made in accordance with this Section 8.5, Borrowers shall issue new Notes to Lender and its Assignee reflecting such assignment, in exchange for the existing Notes held by Lender.

In addition, notwithstanding the foregoing, Lender may at any time pledge all or any portion of Lender's rights under this Agreement, any of the Commitments or any of the Obligations to a Federal Reserve Bank.

Section 8.6    Participations by Lender.

Lender may at any time sell to one or more financial institutions participating interests in any of Lender's Obligations or Commitments; provided, however, that (a) no such participation shall relieve Lender from its obligations under this Agreement or under any of the other Financing Documents to which it is a party, (b) Lender shall remain solely responsible for the performance of its obligations under this Agreement and under all of the other Financing Documents to which it is a party, and (c) Borrowers shall continue to deal solely and directly with Lender in connection with Lender's rights and obligations under this Agreement and the other Financing Documents.

Section 8.7    Disclosure of Information by Lender.

In connection with any sale, transfer, assignment or participation by Lender in accordance with Section 8.5 (Assignments by Lender) or Section 8.6 (Participations by Lender),

TYSON01 298990v11 012845-000280

WELLS 000161

WF-EDVA 000570

Lender shall have the right to disclose to any actual or potential purchaser, assignee, transferee or participant all financial records, information, reports, financial statements and documents obtained in connection with this Agreement and/or any of the other Financing Documents or otherwise.

### Section 8.8    Successors and Assigns.

This Agreement and all other Financing Documents shall be binding upon and inure to the benefit of Borrowers and Lender and their respective successors and assigns, except that Borrowers shall not have the right to assign their rights hereunder or any interest herein without the prior written consent of Lender.

### Section 8.9    Continuing Agreements.

All covenants, agreements, representations and warranties made by Borrowers in this Agreement, in any of the other Financing Documents, and in any certificate delivered pursuant hereto or thereto shall survive the making by Lender of the Loans and the execution and delivery of the Notes, shall be binding upon Borrowers regardless of how long before or after the date hereof any of the Obligations were or are incurred, and shall continue in full force and effect so long as any of the Obligations are outstanding and unpaid. From time to time upon Lender's request, and as a condition of the release of any one or more of the Security Documents, Borrowers and other Persons obligated with respect to the Obligations shall provide Lender with such acknowledgments and agreements as Lender may require to the effect that there exists no defenses, rights of setoff or recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against Lender and/or any of its agents and others, or to the extent there are, the same are waived and released.

### Section 8.10    Enforcement Costs.

Borrowers shall pay to Lender on demand all Enforcement Costs, together with interest thereon from the date incurred or advanced until paid in full at a per annum rate of interest equal at all times to the Post-Default Rate. Enforcement Costs shall be immediately due and payable at the time advanced or incurred, whichever is earlier. Without implying any limitation on the foregoing, Borrowers shall pay, as part of the Enforcement Costs, upon demand any and all stamp and other Taxes and fees payable or determined to be payable in connection with the execution and delivery of this Agreement and the other Financing Documents and to save Lender harmless from and against any and all liabilities with respect to or resulting from any delay in paying or omission to pay any Taxes or fees referred to in this Section. The provisions of this Section shall survive the execution and delivery of this Agreement, the repayment of the other Obligations and shall survive the termination of this Agreement.

### Section 8.11    Applicable Law: Jurisdiction.

#### 8.11.1    Applicable Law.

Borrowers acknowledge and agree that the Financing Documents, including, this Agreement, shall be governed by the Laws of the State, as if each of the Financing Documents and this Agreement had each been executed, delivered, administered and performed solely within the State even though for the convenience and at the request of Borrowers, one or more of the Financing Documents may be executed elsewhere. Lender acknowledges, however,

TYSON01 298990v11 012845-000280

51

**WELLS 000162**

WF-EDVA 000571

Appeal: 13-1982     Doc: 14-1     Filed: 10/21/2013     Pg: 377 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 68 of 223 PageID# 3335
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 52 of 62 PageID# 2445

that remedies under certain of the Financing Documents that relate to property outside the State may be subject to the laws of the state in which the property is located.

### 8.11.2  Submission to Jurisdiction.

Borrowers irrevocably submit to the jurisdiction of any state or federal court sitting in the State over any suit, action or proceeding arising out of or relating to this Agreement or any of the other Financing Documents. Each of Borrowers irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and any claim that any such suit, action or proceeding brought in any such court has been brought in an inconvenient forum. Final judgment in any such suit, action or proceeding brought in any such court shall be conclusive and binding upon Borrower and may be enforced in any court in which Borrower is subject to jurisdiction, by a suit upon such judgment, provided that service of process is effected upon Borrower in one of the manners specified in this Section or as otherwise permitted by applicable Laws.

### 8.11.3  Appointment of Agent for Service of Process.

Borrowers hereby irrevocably designates and appoints Krishnan Suthanthiran, as Borrower's authorized agent to receive on Borrower's behalf service of any and all process that may be served in any suit, action or proceeding of the nature referred to in this Section in any state or federal court sitting in the State. If such agent shall cease so to act, Borrower shall irrevocably designate and appoint without delay another such agent in the State satisfactory to Lender and shall promptly deliver to Lender evidence in writing of such other agent's acceptance of such appointment and its agreement that such appointment shall be irrevocable.

### 8.11.4  Service of Process.

Each of Borrowers hereby consents to process being served in any suit, action or proceeding of the nature referred to in this Section by (a) the mailing of a copy thereof by registered or certified mail, postage prepaid, return receipt requested, to Borrower at Borrower's address designated in or pursuant to Section 8.1 (Notices), and (b) serving a copy thereof upon the agent, if any, designated and appointed by Borrower as Borrower's agent for service of process by or pursuant to this Section. Borrowers irrevocably agree that such service (y) shall be deemed in every respect effective service of process upon Borrowers in any such suit, action or proceeding, and (z) shall, to the fullest extent permitted by law, be taken and held to be valid personal service upon Borrowers. Nothing in this Section shall affect the right of Lender to serve process in any manner otherwise permitted by law or limit the right of Lender otherwise to bring proceedings against Borrowers in the courts of any jurisdiction or jurisdictions.

### Section 8.12  Duplicate Originals and Counterparts.

This Agreement may be executed in any number of duplicate originals or counterparts, each of such duplicate originals or counterparts shall be deemed to be an original and all taken together shall constitute but one and the same instrument.

TYSON01 298990v11 012845-000280

WELLS 000163

WF-EDVA 000572

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 378 of 418

Case 1:11-cv-01277-GBL-TRJ    Document 151-1    Filed 11/13/12    Page 69 of 223 PageID# 3336
Case 1:11-cv-01277-GBL-TRJ    Document 86-8    Filed 09/04/12    Page 53 of 62 PageID# 2446

### Section 8.13    Headings.

The headings in this Agreement are included herein for convenience only. shall not constitute a part of this Agreement for any other purpose. and shall not be deemed to affect the meaning or construction of any of the provisions hereof.

### Section 8.14    No Agency.

Nothing herein contained shall be construed to constitute Borrowers as Lender's agent for any purpose whatsoever or to permit Borrowers to pledge any of the credit of Lender. Lender shall not be responsible or liable for any shortage, discrepancy, damage, loss or destruction of any part of the Collateral wherever the same may be located and regardless of the cause thereof. Lender shall not, by anything herein or in any of the Financing Documents or otherwise, assume any of Borrowers' obligations under any contract or agreement assigned to Lender, and Lender shall not be responsible in any way for the performance by Borrower of any of the terms and conditions thereof.

### Section 8.15    Date of Payment.

Should the principal of or interest on the Notes become due and payable on other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and in the case of principal, interest shall be payable thereon at the rate per annum specified in the Notes during such extension.

### Section 8.16    Entire Agreement.

This Agreement is intended by Lender and Borrowers to be a complete, exclusive and final expression of the agreements contained herein. Neither Lender nor any Borrower shall hereafter have any rights under any prior agreements pertaining to the matters addressed by this Agreement but shall look solely to this Agreement for definition and determination of all of their respective rights, liabilities and responsibilities under this Agreement.

### Section 8.17    Waiver of Trial by Jury.

TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH BORROWER BY EXECUTION HEREOF AND THE LENDER BY ACCEPTANCE HEREOF, KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE FINANCING DOCUMENTS OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THIS AGREEMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO. THIS PROVISION IS A MATERIAL INDUCEMENT TO THE LENDER TO ACCEPT THIS AGREEMENT. EACH OF THE PARTIES AGREES THAT THE TERMS HEREOF SHALL SUPERSEDE AND REPLACE ANY PRIOR AGREEMENT RELATED TO ARBITRATION OF DISPUTES BETWEEN THE PARTIES CONTAINED IN ANY FINANCING DOCUMENT OR ANY OTHER DOCUMENT OR AGREEMENT HERETOFORE EXECUTED IN CONNECTION WITH, RELATED TO OR BEING

TYSON01 298990v11 012845-000280

WELLS 000164

WF-EDVA 000573

REPLACED, SUPPLEMENTED, EXTENDED OR MODIFIED BY, THIS AGREEMENT.

THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY BORROWERS AND LENDER, AND BORROWERS AND LENDER HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY INDIVIDUAL TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT. BORROWERS AND LENDER FURTHER REPRESENT THAT THEY HAVE BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, SELECTED OF THEIR OWN FREE WILL, AND THAT THEY HAVE HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

Section 8.18 LIMITATION ON LIABILITY; WAIVER OF PUNITIVE DAMAGES.

THE BORROWERS, INCLUDING THE LENDER BY ACCEPTANCE HEREOF, AGREES THAT IN ANY JUDICIAL, MEDIATION OR ARBITRATION PROCEEDING OR ANY CLAIM OR CONTROVERSY BETWEEN OR AMONG THEM THAT MAY ARISE OUT OF OR BE IN ANY WAY CONNECTED WITH THIS AGREEMENT, THE OTHER FINANCING DOCUMENTS OR ANY OTHER AGREEMENT OR DOCUMENT BETWEEN OR AMONG THEM OR THE OBLIGATIONS EVIDENCED HEREBY OR RELATED HERETO, IN NO EVENT SHALL ANY PARTY HAVE A REMEDY OF, OR BE LIABLE TO THE OTHER FOR, (1) INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES OR (2) PUNITIVE OR EXEMPLARY DAMAGES. EACH OF THE PARTIES HEREBY EXPRESSLY WAIVES ANY RIGHT OR CLAIM TO PUNITIVE OR EXEMPLARY DAMAGES THEY MAY HAVE OR WHICH MAY ARISE IN THE FUTURE IN CONNECTION WITH ANY SUCH PROCEEDING, CLAIM OR CONTROVERSY, WHETHER THE SAME IS RESOLVED BY ARBITRATION, MEDIATION, JUDICIALLY OR OTHERWISE.

Section 8.19 Indemnification.

The Borrowers agree to indemnify and hold harmless, Lender, the Lender's parent and Affiliates and the Lender's parent's and Affiliates' officers, directors, shareholders, employees and agents (each an "Indemnified Party," and collectively, the "Indemnified Parties"), from and against any and all claims, liabilities, losses, damages, costs and expenses (whether or not such Indemnified Party is a party to any litigation), including without limitation, reasonable attorney's fees and costs and costs of investigation, document production, attendance at depositions or other discovery, incurred by any Indemnified Party with respect to, arising out of or as a consequence of (a) this Agreement or any of the other Financing Documents, including without limitation, any failure of the Borrowers to pay when due (at maturity, by acceleration or otherwise) any principal, interest, fee or any other amount due under this Agreement or the other Financing Documents, or any other Event of Default (b) the use by the Borrowers of any proceeds advanced hereunder; (c) the transactions contemplated hereunder; or (d) any claim, demand, action or cause of action being asserted against (i) the Borrowers or any of their Affiliates by any other Person, or (ii) any Indemnified Party by the Borrowers in connection with the transactions

WELLS 000165

WF-EDVA 000574

contemplated hereunder.  Notwithstanding anything herein or elsewhere to the contrary, the Borrowers shall not be obligated to indemnify or hold harmless any Indemnified Party from any liability, loss or damage resulting from the gross negligence, willful misconduct or unlawful actions of such Indemnified Party.  Any amount payable to the Lender under this Section will bear interest at the Post-Default Rate from the due date until paid.

Section 8.20   Patriot Act Notice.

. To help fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.  For purposes of this section, account shall be understood to include loan accounts.

Section 8.21   Electronic Transmission of Data.

Lender and Borrowers agree that certain data related to the Loans (including confidential information, documents, applications and reports) may be transmitted electronically, including transmission over the Internet.  This data may be transmitted to, received from or circulated among agents and representatives of Borrowers and/or Lender and their Affiliates and other Persons involved with the subject matter of this Agreement.  Borrowers acknowledge and agree that (a) there are risks associated with the use of electronic transmission and that Lender does not control the method of transmittal or service providers, (b) Lender has no obligation or responsibility whatsoever and assumes no duty or obligation for the security, receipt or third party interception of any such transmission, and (c) Borrowers will release, hold harmless and indemnify Lender from any claim, damage or loss, including that arising in whole or part from Lender's strict liability or sole, comparative or contributory negligence, which is related to the electronic transmission of data.


**REMAINDER OF PAGE INTENTIONALLY LEFT BLANK**

TYSON01 298990v11 012845-000280

55

WELLS 000166

WF-EDVA 000575

IN WITNESS WHEREOF, each of the parties hereto have executed and delivered this Agreement under their respective seals as of the day and year first written above.

WITNESS/ATTEST:                              HUESTIS MACHINE CORPORATION

                                             By: _____ (Seal)
                                                 Name:
                                                 Title:

WITNESS/ATTEST:                              ARI HOLDING CORPORATION

                                             By: _____ (Seal)
                                                 Name:
                                                 Title:

WITNESS/ATTEST:                              WACHOVIA BANK, NATIONAL ASSOCIATION

_____                      By: _____ (Seal)
                                                 Name:
                                                 Title:

TYSON01 298990v11 012845-000280                      56

WELLS 000167

WF-EDVA 000576

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 382 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1    Filed 11/13/12   Page 73 of 223 PageID# 3340
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 57 of 62 PageID# 2450

## LIST OF EXHIBITS

A.    Term Note

B.    Supplemental Term Note

C.    Form of Compliance Certificate

TYSON01 298990v1 | 012845-000280

57

WELLS 000168

WF-EDVA 000577

## LIST OF SCHEDULES

Schedule 4.1.12        Other Indebtedness

TYSON01 298990v11 012845-000280

**WELLS 000169**

**WF-EDVA 000578**

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 384 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1    Filed 11/13/12   Page 75 of 223 PageID# 3342
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 59 of 62 PageID# 2452

Schedule 4.1.12

OTHER INDEBTEDNESS

TYSON01 298990v11 012845-000280

**WELLS 000170**
WF-EDVA 000579

Appeal: 13-1982   Doc: 14-1   Filed: 10/21/2013   Pg: 385 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 76 of 223 PageID# 3343
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 60 of 62 PageID# 2453

FINANCING AND SECURITY AGREEMENT

Dated

December 1, 2006

By and Among

HUESTIS MACHINE CORPORATION

ARI HOLDING CORPORATION

And

WACHOVIA BANK, NATIONAL ASSOCIATION

TYSON01 298990v11 012845-000280

WELLS 000171
WF-EDVA 000580

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 386 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 77 of 223 PageID# 3344
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 61 of 62 PageID# 2454

06 36 3P 15 506

### CERTIFICATE

I DO HEREBY CERTIFY that I am the Secretary of ARI Holding Corporation, a Rhode Island corporation (the "Corporation"), and the keeper of its records and corporate seal and that the following is a correct copy of resolutions duly adopted by the directors of said Corporation at a meeting of the Board of Directors duly held on the 1st day of December, 2006, at which meeting a quorum of the directors was present and voted in favor thereof and that said resolutions have not been amended or rescinded and are in full force and effect:

"WHEREAS, it is desirable that this Corporation enter into interest rate swaps, caps, collars, floors, or any similar transaction (including any option with respect to any of these transactions) from time to time to hedge or otherwise manage interest rate exposure in relation to assets or liabilities of this Corporation or those of its affiliates.

NOW, THEREFORE, BE IT RESOLVED, that each of the President, and the Secretary of this Corporation (each an "Authorized Officer"), acting singly, is hereby authorized to execute and deliver on behalf of this Corporation agreements evidencing this Corporation's obligations in relation to such transactions, any amendments or supplements thereto, and assignments or terminations thereof, all in such form and upon such terms as such Authorized Officer shall approve, such approval to be conclusively evidenced by the execution and delivery of said agreements by any Authorized Officer.

RESOLVED FURTHER, that all officers of this Corporation acting singly are hereby authorized to execute and deliver on behalf of this Corporation such other related agreements, certificates and documents and take such other and further action as may be necessary or desirable to carry out the transactions authorized by the foregoing resolution.

RESOLVED FURTHER, that all acts authorized by each of the foregoing resolutions taken heretofore by any officer authorized therein is hereby ratified as the authorized act of this Corporation."

I FURTHER CERTIFY that there is no provision in the Articles of Incorporation or By-laws of the Corporation limiting the power of the Board of Directors to pass the foregoing resolutions, and that the same are in conformity with the provisions of said Articles of Incorporation and By-laws.

**WELLS 000172**

WF-EDVA 000581

JA0370

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 387 of 418

Case 1:11-cv-01277-GBL-TRJ   Document 151-1   Filed 11/13/12   Page 78 of 223 PageID# 3345
Case 1:11-cv-01277-GBL-TRJ   Document 86-8   Filed 09/04/12   Page 62 of 62 PageID# 2455

I FURTHER CERTIFY that each of the persons named below presently holds the office in the Corporation set forth next to such person's name and that next to the specification of the office held by each such person is a genuine specimen of such person's signature.

| NAME | OFFICER | SIGNATURE |
|------|---------|-----------|
| Krishnan Suthanthiran | President | |
| Ruth Bergin | Secretary | |

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed the seal of the Corporation, this 1st day of December, 2006

Secretary of ARI Holding Corporation

[CORPORATE SEAL]

WELLS 000173
WF-EDVA 000582

EXHIBIT

C

RICHARD M. POLLAK
703.734.4354 telephone
703.448.6511 facsimile
richard.pollak@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
1660 International Drive
Suite 600
McLean, Virginia 22102
703.734.4334 telephone
703.734.4340 facsimile
troutmansanders.com

May 8, 2009

**BY FEDEX FOR MONDAY DELIVERY AND U.S. MAIL RETURN RECEIPT REQUESTED**

Best Medical International, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Shawn Weingast

Re:   $3,000,000 Revolving Line of Credit from Wachovia Bank, National Association (the "Lender") to Best Medical International, Inc. (the "Borrower")

Dear Mr. Weingast:

This firm represents the Lender in connection with the above referenced matter. Pursuant to the terms of that certain Promissory Note dated October 29, 2004, from Borrower in favor of Lender in the maximum principal amount of Three Million Dollars ($3,000,000) (as amended from time to time, the "Note"), in connection with the above-referenced loan (the "Loan"), the outstanding principal balance of the Loan and all accrued and unpaid interest thereon became due and payable in full on March 6, 2009. This letter shall constitute formal notice to you that, as of the date hereof, the Lender has not yet received payment of the sums due under the Loan. In addition, Krishnan Suthanthiran is currently in default under that certain Unconditional Guaranty dated October 29, 2004 and Best Industries, Inc. is currently in default under that certain Unconditional Guaranty dated October 29, 2004 for failing to maintain the liquidity requirement set forth therein. You are hereby notified that in accordance with the terms of the Note, the Lender hereby makes demand for payment in full of the Obligations.

The amount of the Obligations arising under the Note as of May 5, 2009 is set forth below:

| | |
|---|---|
| Principal | $2,719,136.72 |
| Interest | $      168.76 |

I urge you to make immediate arrangements satisfactory to the Lender in order to resolve this matter and to prevent the Lender from having to avail itself of any rights and remedies, since the Borrower is responsible for any expenses incurred by the Lender in connection with the collection of those sums due under the Loan, including without limitation, the Lender's legal fees. In the event that all amounts due and owing under the Loan has not been paid in full on or before May 15, 2009, the Lender shall have no option but to avail itself of its rights and remedies under the Note and the other Loan Documents.

ATLANTA    CHICAGO    HONG KONG    LONDON    NEW YORK    NEWARK    NORFOLK    ORANGE COUNTY
RALEIGH    RICHMOND    SAN DIEGO    SHANGHAI    TYSONS CORNER    VIRGINIA BEACH    WASHINGTON, DC

00093

WF-EDVA 000775

JA0372

TROUTMAN
SANDERS

Best Medical International, Inc.
May 8, 2009
Page 2

If you have any questions, please do not hesitate to call.

Sincerely,

Richard M. Pollak

cc:    J. Kent Thompson (by email)

Tyson01 393228v2 012845.000397

00094

WF-EDVA 000776

RICHARD M. POLLAK
703.734.4554 telephone
703.448.6511 facsimile
richard.pollak@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
1660 International Drive
Suite 600
McLean, Virginia  22102
703.734.4334 telephone
703.734.4340 facsimile
troutmansanders.com

May 8, 2009

**BY FEDEX FOR MONDAY DELIVERY AND U.S. MAIL RETURN
RECEIPT REQUESTED**

Best Industries, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Re:   $3,000,000 Revolving Line of Credit from Wachovia Bank, National Association (the
      "Lender") to Best Medical International, Inc. (the "Borrower")

Dear Mr. Suthanthiran:

   This firm represents the Lender in connection with the above referenced matter.  Pursuant
to the terms of that certain Promissory Note dated October 29, 2004, from Borrower in favor of
Lender in the maximum principal amount of Three Million Dollars ($3,000,000) (as amended
from time to time, the "Note"), in connection with the above-referenced loan (the "Loan"), the
outstanding principal balance of the Loan and all accrued and unpaid interest thereon became
due and payable in full on March 6, 2009.  This letter shall constitute formal notice to you that,
as of the date hereof, the Lender has not yet received payment of the sums due under the Loan.
In addition, you are currently in default under that certain Unconditional Guaranty dated October
29, 2004 by you in favor of Lender (the "Guaranty") for failing to maintain the liquidity
requirement set forth in the Guaranty.  You are hereby notified that in accordance with the terms
of the Guaranty, the Lender hereby makes demand for payment in full of the Guaranteed
Obligations (as defined in the Guaranty).

   The amount of the Guaranteed Obligations arising under the Note as of May 5, 2009 is
set forth below:

|           |                |
|-----------|----------------|
| Principal | $2,719,136.72  |
| Interest  | $    168.76    |

   I urge you to make immediate arrangements satisfactory to the Lender in order to resolve
this matter and to prevent the Lender from having to avail itself of any rights and remedies, since
you are responsible for interest on the Guaranteed Obligations and any expenses incurred by the
Lender in connection with the collection of those sums due under the Loan, including without
limitation, the Lender's legal fees.  In the event that all amounts due and owing under the Loan
has not been paid in full on or before May 15, 2009, the Lender shall have no option but to avail
itself of its rights and remedies under the Guaranty.

ATLANTA   CHICAGO   HONG KONG   LONDON   NEW YORK   NEWARK   NORFOLK   ORANGE COUNTY
RALEIGH   RICHMOND   SAN DIEGO   SHANGHAI   TYSONS CORNER   VIRGINIA BEACH   WASHINGTON, DC

00095

WF-EDVA 000777

TROUTMAN
SANDERS

Best Industries, Inc.
May 8, 2009
Page 2

If you have any questions, please do not hesitate to call.

Sincerely,

Richard M. Pollak

cc:    J. Kent Thompson (by email)

Tyson01 393250v2 012845.000397

00096

WF-EDVA 000778

RICHARD M. POLLAK
703.734.4334 telephone
703.448.6511 facsimile
richard.pollak@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
1660 International Drive
Suite 600
McLean, Virginia 22102
703.734.4334 telephone
703.734.4340 facsimile
troutmansanders.com

May 8, 2009

**BY FEDEX FOR MONDAY AND U.S. MAIL RETURN RECEIPT REQUESTED**

Gunston Hall Realty, Inc.
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Krishnan Suthanthiran

Re:   $5,000,000 Revolving Line of Credit from Wachovia Bank, National Association (the "Lender") to Gunston Hall Realty, Inc. (the "Borrower")

Dear Mr. Suthanthiran:

This firm represents the Lender in connection with the above referenced matter. Pursuant to the terms of that certain Promissory Note dated August 5, 2005, from Borrower in favor of Lender in the maximum principal amount of Five Million Dollars ($5,000,000) (as amended from time to time, the "Note"), in connection with the above-referenced loan (the "Loan"), the outstanding principal balance of the Loan and all accrued and unpaid interest thereon became due and payable in full on March 6, 2009. This letter shall constitute formal notice to you that, as of the date hereof, the Lender has not yet received payment of the sums due under the Loan. In addition, the Borrower and Krishanan Suthanthiran is in violation of the liquidity requirement set forth in that certain Unconditional Guaranty dated August 5, 2005 in favor of the Lender. Accordingly, you are hereby notified that in accordance with the terms of the Note, the Lender hereby makes demand for payment in full of the Obligations.

The amount of the Obligations arising under the Note as of May 5, 2009 is set forth below:

|            |                 |
|------------|-----------------|
| Principal  | $4,286,312.90   |
| Interest   | $     283.60    |

I urge you to make immediate arrangements satisfactory to the Lender in order to resolve this matter and to prevent the Lender from having to avail itself of any rights and remedies, since the Borrower is responsible for any expenses incurred by the Lender in connection with the collection of those sums due under the Loan, including without limitation, the Lender's legal fees. In the event that all amounts due and owing under the Loan has not been paid in full on or before May 15, 2009, the Lender shall have no option but to avail itself of its rights and remedies under the Note and the other Loan Documents.

ATLANTA    CHICAGO    HONG KONG    LONDON    NEW YORK    NEWARK    NORFOLK    ORANGE COUNTY
RALEIGH    RICHMOND    SAN DIEGO    SHANGHAI    TYSONS CORNER    VIRGINIA BEACH    WASHINGTON, DC

00097

WF-EDVA 000779

TROUTMAN
SANDERS

Gunston Hall Realty, Inc.
May 8, 2009
Page 2

If you have any questions, please do not hesitate to call.

Sincerely,

Richard M. Pollak

cc:    J. Kent Thompson (by email)

Tyson01 393215v2 012845.000397

393215-1

00098

WF-EDVA 000780

RICHARD M. POLLAK
703.734.4354 telephone
703.449.6511 facsimile
richard.pollak@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
1660 International Drive
Suite 600
McLean, Virginia 22102
703.734.4334 telephone
703.734.4340 facsimile
troutmansanders.com

May 8, 2009

**BY FEDEX FOR MONDAY AND U.S. MAIL RETURN RECEIPT REQUESTED**

Mr. Krishnan Suthanthiran
c/o Gunston Hall Realty, Inc.
7643 Fullerton Road
Springfield, Virginia 22153

Re:    $5,000,000 Revolving Line of Credit from Wachovia Bank, National Association (the "Lender") to Gunston Hall Realty, Inc. (the "Borrower")

Dear Mr. Suthanthiran:

This firm represents the Lender in connection with the above referenced matter. Pursuant to the terms of that certain Promissory Note dated August 5, 2005, from Borrower in favor of Lender in the maximum principal amount of Five Million Dollars ($5,000,000) (as amended from time to time, the "Note"), in connection with the above-referenced loan (the "Loan"), the outstanding principal balance of the Loan and all accrued and unpaid interest thereon became due and payable in full on March 6, 2009. This letter shall constitute formal notice to you that, as of the date hereof, the Lender has not yet received payment of the sums due under the Loan. In addition, the Borrower and you are in violation of the liquidity requirement set forth in that certain Unconditional Guaranty dated August 5, 2005 by Krishnan Suthanthiran (the "Guarantor") in favor of Lender (the "Guaranty"). You are hereby notified that in accordance with the terms of the Guaranty, the Lender hereby makes demand for payment in full of the Guaranteed Obligations (as defined in the Guaranty).

The amount of the Guaranteed Obligations arising under the Note as of May 5, 2009 is set forth below:

| | |
|---|---|
| Principal | $4,286,312.90 |
| Interest | $      283.60 |

I urge you to make immediate arrangements satisfactory to the Lender in order to resolve this matter and to prevent the Lender from having to avail itself of any rights and remedies, since the Guarantor is responsible for interest on the Guaranteed Obligations and any expenses incurred by the Lender in connection with the collection of those sums due under the Loan, including without limitation, the Lender's legal fees. In the event that all amounts due and owing under the Loan has not been paid in full on or before May 15, 2009, the Lender shall have no option but to avail itself of its rights and remedies under the Guaranty.

ATLANTA    CHICAGO    HONG KONG    LONDON    NEW YORK    NEWARK    NORFOLK    ORANGE COUNTY
RALEIGH    RICHMOND    SAN DIEGO    SHANGHAI    TYSONS CORNER    VIRGINIA BEACH    WASHINGTON, DC
00099

WF-EDVA 000781

TROUTMAN
SANDERS

Gunston Hall Realty, Inc.
May 8, 2009
Page 2

If you have any questions, please do not hesitate to call.

Sincerely,

Richard M. Pollak

cc:    J. Kent Thompson (by email)

Tyson01 393215v2 012845.000397

000100


WF-EDVA 000782

RICHARD M. POLLAK
703.734.4354 telephone
703.446.6511 facsimile
richard.pollak@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
1660 International Drive
Suite 600
McLean, Virginia 22102
703.734.4334 telephone
703.734.4340 facsimile
troutmansanders.com

May 8, 2009

**BY FEDEX FOR MONDAY DELIVERY AND U.S. MAIL RETURN
RECEIPT REQUESTED**

Krishnan Suthanthiran
c/o Best Medical International, Inc.
7643 Fullerton Road
Springfield, Virginia 22153

Re:  $3,000,000 Revolving Line of Credit from Wachovia Bank, National Association (the
     "Lender") to Best Medical International, Inc. (the "Borrower")

Dear Mr. Suthanthiran:

This firm represents the Lender in connection with the above referenced matter. Pursuant
to the terms of that certain Promissory Note dated October 29, 2004, from Borrower in favor of
Lender in the maximum principal amount of Three Million Dollars ($3,000,000) (as amended
from time to time, the "Note"), in connection with the above-referenced loan (the "Loan"), the
outstanding principal balance of the Loan and all accrued and unpaid interest thereon became
due and payable in full on March 6, 2009. This letter shall constitute formal notice to you that,
as of the date hereof, the Lender has not yet received payment of the sums due under the Loan.
In addition, you are currently in default under that certain Unconditional Guaranty dated October
29, 2004 by you, as guarantor, in favor of Lender (the "Guaranty") for failing to maintain the
liquidity requirement set forth in the Guaranty. You are hereby notified that in accordance with
the terms of the Guaranty, the Lender hereby makes demand for payment in full of the
Guaranteed Obligations (as defined in the Guaranty).

The amount of the Guaranteed Obligations arising under the Note as of May 5, 2009 is
set forth below:

| | |
|---|---|
| Principal | $2,719,136.72 |
| Interest | $     168.76 |

I urge you to make immediate arrangements satisfactory to the Lender in order to resolve
this matter and to prevent the Lender from having to avail itself of any rights and remedies, since
you are responsible for interest on the Guaranteed Obligations and any expenses incurred by the
Lender in connection with the collection of those sums due under the Loan, including without
limitation, the Lender's legal fees. In the event that all amounts due and owing under the Loan
has not been paid in full on or before May 15, 2009, the Lender shall have no option but to avail
itself of its rights and remedies under the Guaranty.

ATLANTA    CHICAGO    HONG KONG    LONDON    NEW YORK    NEWARK    NORFOLK    ORANGE COUNTY
RALEIGH    RICHMOND   SAN DIEGO    SHANGHAI  TYSONS CORNER  VIRGINIA BEACH  WASHINGTON, DC

000101

WF-EDVA 000783

JA0380

TROUTMAN
SANDERS

Krishnan Suthanthiran
May 8, 2009
Page 2

If you have any questions, please do not hesitate to call.

Sincerely,

Richard M. Pollak

cc:    J. Kent Thompson (by email)

Tyson01 393229v2.012845.000397

000102

WF-EDVA 000784

RICHARD M. POLLAK
703.734.4264 telephone
703.448.6511 facsimile
richard.pollak@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
1660 International Drive
Suite 600
McLean, Virginia 22102
703.734.4334 telephone
703.734.4340 facsimile
troutmansanders.com

May 8, 2009

**BY FEDEX FOR MONDAY DELIVERY AND U.S. MAIL RETURN
RECEIPT REQUESTED**

Mr. Krishnan Suthanthiran
c/o Huestis Machine Corporation
7643 Fullerton Road
Springfield, Virginia 22153

Re:    $5,000,000 Term Loan and $2,000,000 Supplemental Term Loan from Wachovia Bank,
       National Association (the "Lender") to Huestis Machine Corporation (the "Borrower")

Dear Mr. Suthanthiran:

This firm represents the Lender in connection with the above referenced matter. This letter shall constitute formal notice to you that, in connection with the above-referenced loans (the "Loans"), the Borrower is in default under that certain Term Note dated December 1, 2006, from Borrower in favor of Lender in the principal amount of Five Million Dollars ($5,000,000) (as amended from time to time, the "Term Note"), that certain Supplemental Term Note dated December 1, 2006, from Borrower in favor of Lender in the principal amount of Two Million Dollars ($2,000,000) (as amended from time to time, the "Supplemental Note") and collectively with the Term Note, the "Notes") and that certain Financing and Security Agreement dated December 1, 2006 by and between Borrower and Lender (as amended from time to time, the "Financing Agreement"). Capitalized terms used but not defined in this Letter shall have the meanings given to them in the Financing Agreement. Borrower is currently in default under the Financing Agreement because (i) Borrower has failed to deliver to Lender, when and as due, its annual audited financial statements and (ii) Borrower is in violation of the Debt Service Coverage Ratio set forth in Section 6.1.12 of the Financing Agreement. In addition, you are currently in default under that certain Guaranty of Payment Agreement dated December 1, 2006 by Krishnan Suthanthiran (the "Guarantor") in favor of Lender (the "Guaranty") for failing to maintain the liquidity requirement set forth in Section 3.5 of the Guaranty. You are hereby notified that in accordance with the terms of the Guaranty, the Lender hereby makes demand for payment in full of the Obligations.

The amount of the Obligations arising under the Term Note as of May 5, 2009 is set forth below:

| | |
|---|---|
| Principal | $4,098,720.90 |
| Interest | $    1,651.87 |
| Swap Exposure as of May 4, 2009 | $  446,594.00 |

ATLANTA   CHICAGO   HONG KONG   LONDON   NEW YORK   NEWARK   NORFOLK   ORANGE COUNTY
RALEIGH   RICHMOND   SAN DIEGO   SHANGHAI   TYSONS CORNER   VIRGINIA BEACH   WASHINGTON, DC

00091

WF-EDVA 000773

TROUTMAN
SANDERS

Krishnan Suthanthiran
May 8, 2009
Page 2

The amount of the Obligations arising under the Supplemental Note as of May 5, 2009 is set forth below:

| | |
|---|---|
| Principal | $1,890,510.47 |
| Interest | $      634.93 |
| Swap Exposure as of May 4, 2009 | $   272,048.00 |

I urge you to make immediate arrangements satisfactory to the Lender in order to resolve this matter and to prevent the Lender from having to avail itself of any rights and remedies, since the Guarantor is responsible for interest on the Obligations and any expenses incurred by the Lender in connection with the collection of those sums due under the Loans, including without limitation, the Lender's legal fees. In the event that all amounts due and owing under the Loans have not been paid in full on or before May 15, 2009, the Lender shall have no option but to avail itself of its rights and remedies under the Guaranty.

If you have any questions, please do not hesitate to call.

Sincerely,

Richard M. Pollak

cc:    J. Kent Thompson (by email)

Tyson01 393211v4 012845.000397

393211-1

00092

WF-EDVA 000774

RICHARD M. POLLAK
703.734.4334 telephone
703.448.6511 facsimile
richard.pollak@troutmansanders.com

# TROUTMAN SANDERS

TROUTMAN SANDERS LLP
Attorneys at Law
1660 International Drive
Suite 600
McLean, Virginia 22102
703.734.4334 telephone
703.734.4340 facsimile
troutmansanders.com

May 8, 2009

**BY FEDEX FOR MONDAY DELIVERY AND U.S. MAIL RETURN RECEIPT REQUESTED**

Huestis Machine Corporation
7643 Fullerton Road
Springfield, Virginia 22153
Attn: Mr. Shawn Weingast

Re:   $5,000,000 Term Loan and $2,000,000 Supplemental Term Loan from Wachovia Bank, National Association (the "Lender") to Huestis Machine Corporation (the "Borrower")

Dear Mr. Weingast:

    This firm represents the Lender in connection with the above referenced matter. This letter shall constitute formal notice to you that, in connection with the above-referenced loans (the "Loans"), the Borrower is in default under that certain Term Note dated December 1, 2006, from Borrower in favor of Lender in the principal amount of Five Million Dollars ($5,000,000) (as amended from time to time, the "Term Note"), that certain Supplemental Term Note dated December 1, 2006, from Borrower in favor of Lender in the principal amount of Two Million Dollars ($2,000,000) (as amended from time to time, the "Supplemental Note" and collectively with the Term Note, the "Notes") and that certain Financing and Security Agreement dated December 1, 2006 by and between Borrower and Lender (as amended from time to time, the "Financing Agreement"). Capitalized terms used but not defined in this Letter shall have the meanings given to them in the Financing Agreement. Borrower is currently in default under the Financing Agreement because (i) Borrower has failed to deliver to Lender, when and as due, its annual audited financial statements and (ii) Borrower is in violation of the Debt Service Coverage Ratio set forth in Section 6.1.12 of the Financing Agreement. In addition, the Personal Guarantor is currently in default under the Personal Guaranty for failing to maintain the liquidity requirement set forth in Section 3.5 of the Personal Guaranty. You are hereby notified that in accordance with the terms of the Notes, the Lender hereby makes demand for payment in full of the Obligations.

    The amount of the Obligations arising under the Term Note as of May 5, 2009 is set forth below:

| | |
|---|---|
| Principal | $4,098,720.90 |
| Interest | $ 1,651.87 |
| Swap Exposure as of May 4, 2009 | $ 446,594.00 |

ATLANTA   CHICAGO   HONG KONG   LONDON   NEW YORK   NEWARK   NORFOLK   ORANGE COUNTY
RALEIGH   RICHMOND   SAN DIEGO   SHANGHAI   TYSONS CORNER   VIRGINIA BEACH   WASHINGTON, DC

00089

WF-EDVA 000771

JA0384

# TROUTMAN
## SANDERS

Huestis Machine Corporation
May 8, 2009
Page 2

       The amount of the Obligations arising under the Supplemental Note as of May 5, 2009 is set forth below:

| | |
|---|---|
| Principal | $1,890,510.47 |
| Interest | $ 634.93 |
| Swap Exposure as of May 4, 2009 | $ 272,048.00 |

       I urge you to make immediate arrangements satisfactory to the Lender in order to resolve this matter and to prevent the Lender from having to avail itself of any rights and remedies, since the Borrower is responsible for any expenses incurred by the Lender in connection with the collection of those sums due under the Notes, including without limitation, the Lender's legal fees. In the event that all amounts due and owing under the loans have not been paid in full on or before May 15, 2009, the Lender shall have no option but to avail itself of its rights and remedies under each Note and the other Loan Documents.

       If you have any questions, please do not hesitate to call.

Sincerely,

Richard M. Pollak

cc:    J. Kent Thompson (by email)

TysonO1 393212v4 012845.000397

393212-1

00090

WF-EDVA 000772





"Shawn Weingast"
<sweingast@teambest.com>
05/18/2009 05:30 PM

To  "Pollak, Richard M." <richard.pollak@troutmansanders.com>,
kent.thompson1@wachovia.com
cc  "Ruth Bergin" <rbergin@teambest.com>
Subject  Re: WB/Huestis

Dear Richard:

Thank you for your letter.

We do not agree with your assertion that the 10 day cure does not apply whenever more than one grounds for default is alleged nor do we believe that the one cure per 12 month period applies to the notice of default, and is not limited to just a single ground for default.

This said, as we mentioned to your client, it would be easy for the bank to send us new notice and re-start the clock to cure. However, we prefer and are proceeding in good faith, to assemble the information Wachovia has requested to determine whether there is a basis for the bank's short term renewal or modification of the indebtedness; and we hope that the bank will refrain from exercising its creditor remedies until that process runs its course.

To this end, Ruth Bergin and I are scheduled to meet with Kent Thompson tomorrow to discuss our loans and hope to find a way to move forward together.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Shawn R. Weingast

703 451-2378 x122 office
703 451-8421 fax
703 863-2724 cell

This e-mail and any attachments are for the exclusive and confidential use of the intended recipient. If you received this in error, please do not read, distribute, or take action in reliance upon this message. Instead, please notify us immediately by return e-mail and promptly delete this message and its attachments from your computer system. Attorney-client or work product privilege is not waived by the transmission of this message.

-----Original Message-----
From: "Pollak, Richard M." <richard.pollak@troutmansanders.com>
To: <sweingast@teambest.com>
Date: Fri, 15 May 2009 08:23:02 -0400

WELLS 005211

JA0386

Subject: WB/Huestis

> Please see attached.
>
> Richard M. Pollak, Esq.
> Troutman Sanders LLP, 1660 International Drive, Suite 600,
> McLean,
> Virginia  22102
> ' 703  734-4354 7 703 448-6511 *
> richard.pollak@troutmansanders.com
> * www.troutmansanders.com
>
> This message may be protected by the attorney-client privilege
> and/or work product doctrine.  If you believe that it has been
> sent
> to you in error, do not read it.  Please reply to the sender
> that you
> have received the message in error.  Then delete it.  Thank
> you.
>
>
>
> IRS Circular 230 disclosure: To ensure compliance with
> requirements imposed by the IRS, we inform you that any tax
> advice that may be contained in this communication (including
> any attachments) is not intended or written to be used, and
> cannot be used, for the purpose of (i) avoiding any penalties
> under the Internal Revenue Code or (ii) promoting, marketing
> or recommending to another party any transaction(s) or
> tax-related matter(s) that may be addressed herein.
>
>
> This e-mail communication (including any attachments) may
> contain legally privileged and confidential information
> intended solely for the use of the intended recipient. If you
> are not the intended recipient, you should immediately stop
> reading this message and delete it from your system. Any
> unauthorized reading, distribution, copying or other use of
> this communication (or its attachments) is strictly
> prohibited.
>

WELLS 005212

EXHIBIT
E

## WAIVER AND AMENDMENT AGREEMENT

THIS WAIVER AND AMENDMENT AGREEMENT (this "Agreement") is made as of the 31st day of July, 2009 (the "Closing Date"), by and among HUESTIS MACHINE CORPORATION, a corporation organized and existing under the laws of the State of Rhode Island ("Huestis"), BEST MEDICAL INTERNATIONAL, INC., a corporation organized and existing under the laws of the Commonwealth of Virginia ("Best Medical"), GUNSTON HALL REALTY, INC., a corporation organized and existing under the laws of the Commonwealth of Virginia ("Gunston") and BEST INDUSTRIES, INC., a corporation organized and existing under the laws of the Commonwealth of Virginia ("Best Industries") and KRISHNAN SUTHANTHIRAN, a resident of the State of Washington (the "Personal Guarantor"; and together with Huestis, Best Medical, Gunston and Best Industries, each being called an "Obligor" and collectively, the "Obligors") and WACHOVIA BANK, NATIONAL ASSOCIATION, a national banking association, its successors and assigns (the "Lender").

### RECITALS

A.   The Obligors have entered into various credit facilities with the Lender (the "Credit Facilities" and each a "Credit Facility") and more fully described as: (i) a secured term loan in the principal amount of Five Million Dollars ($5,000,000) from the Lender to Huestis (the "Huestis Term Loan"), (ii) a secured term loan in the principal amount of Two Million Dollars ($2,000,000) from the Lender to Huestis (the "Huestis Supplemental Term Loan"), (iii) a secured line of credit in the maximum principal amount of Five Million Dollars ($5,000,000) from the Lender to Gunston (the "Gunston Line of Credit"), and (iv) a secured line of credit in the maximum principal amount of Three Million Dollars ($3,000,000) from the Lender to Best Medical (the "Best Medical Line of Credit").

B.   The Huestis Term Loan and the Huestis Supplemental Term Loan are governed by, and secured by the collateral described in that certain Financing and Security Agreement dated December 1, 2006 (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Huestis Financing Agreement") and that certain Mortgage, Assignment, Security Agreement and Fixture Filing dated December 1, 2006 by Huestis in favor of Lender, on certain property and improvements located in the town of Bristol, Rhode Island (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Huestis Mortgage").

C.   The Gunston Line of Credit is secured by (i) that certain Deed of Trust and Security Agreement dated August 5, 2005 from Best Industries in favor of Trste, Inc., as trustee for the benefit of the Lender, on certain property and improvements located in Fairfax County, Virginia (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Gunston Deed of Trust") and (ii) by that certain Deed of Trust and Security Agreement dated August 7, 2008 from Gunston in favor of Trste, Inc., as trustee for the benefit of the Lender, on certain property and improvements located in Fairfax County, Virginia (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Gunston Supplemental Deed of Trust").

Tyson01 395091v6 012845.000399

D.    The Best Medical Line of Credit is governed by, and secured by the collateral described in that certain Security Agreement dated October 29, 2004 (the same, as amended, modified, substituted, extended, and renewed from time to time, the "Best Medical Security Agreement").

E.    Each of the Credit Facilities are unconditionally guarantied by the Personal Guarantor, pursuant to one or more guaranties from the Personal Guarantor in favor of the Lender (collectively, the "Personal Guaranties" and each a "Personal Guaranty"). In addition, Best Industries has unconditionally guarantied repayment of the Best Medical Line of Credit pursuant to that certain Unconditional Guaranty dated October 29, 2004 from Best Industries in favor of the Lender (the "Best Medical Guaranty").

F.    Pursuant to those certain default letters dated May 8, 2009, the Lender has advised each of the Obligors that one or more events of defaults or defaults have occurred under the Credit Facilities (the "Existing Events of Default") and has demanded repayment of the Credit Facilities.

G.    The Obligors have requested that the Lender waive the Existing Events of Default in order to provide the Obligors sufficient time to refinance and repay the Credit Facilities.

H.    The Lender is willing to agree to the Obligors' request on the condition, among others, that this Agreement be executed.

## AGREEMENTS

NOW, THEREFORE, in consideration of the premises and for other good and valuable consideration, receipt of which is hereby acknowledged, the Obligors and the Lender agree as follows:

1.    _Recitals._ The Obligors acknowledge and agree that the recitals set forth herein are true and correct statements of fact, are incorporated herein, and form a substantive part of this Agreement. Unless otherwise expressly defined in this Agreement, terms defined in the Huestis Financing Agreement shall have the same meaning under this Agreement.

2.    _Acknowledgements._

(a)    The Obligors each acknowledge and agree that (i) each of the loan documents executed and delivered by any Credit Party in connection with the Credit Facilities (the "Loan Documents") remain in full force and effect in accordance with the original terms, except as expressly modified hereby, (ii) the security interests and liens granted by any Obligor to Lender under the Loan Documents shall remain in place, unimpaired by the transactions contemplated by this Agreement, and Lender's priority with respect thereto shall not be affected hereby or thereby, and (iii) the Loan Documents shall continue to secure all obligations as stated therein except as expressly amended and modified by this Agreement and the Amendment Documents (as hereinafter defined).

2

Tyson01 395091v6 012845.000399

(b)    Each Obligor and Lender confirm that except as provided herein, they have not heretofore waived or modified, and have not agreed to waive or modify, any term of the Loan Documents, and any actions any Obligor takes or fails to take (including the expenditure of any funds) is voluntary, informed and taken at its own risk.

3.    Waiver.    Subject to the terms of this Agreement, Lender hereby waives the Existing Events of Defaults. Lender's agreement to waive the Existing Events of Defaults shall in no way obligate Lender to make any other modifications to the Loan Documents or to waive any Obligor's compliance with any other terms of any of the Loan Documents, and shall not limit or impair the Lender's right to demand strict performance of all other terms and covenants as of any date.

4.    Interest.    From and after the Closing Date until the Obligations are repaid in full, the unpaid balance of the each Credit Facility shall accrue interest as follows:  (a) the Huestis Term Loan and the Huestis Supplemental Term Loan shall accrue interest at the Libor Rate, plus five percent (5.0%) per annum. The Gunston Line of Credit and the Best Medical Line of Credit shall accrue interest at the Libor Market Index Rate, plus five percent (5.0%) per annum. For purposes hereof, "LIBOR Rate" means, with respect to each Interest Period, the rate for U.S. dollar deposits with a maturity equal to one month, as reported on Telerate Successor page 3750 as of 11:00 a.m., London time, on the second London business day before such Interest Period begins (or if not so reported, then as determined by Bank from another recognized source or interbank quotation). For purposes hereof, "LIBOR Market Index Rate", for any day, means the rate for 1 month U.S. dollar deposits as reported on Telerate Successor page 3750 as of 11:00 a.m., London time, on such day, or if such day is not a London business day, then the immediately preceding London business day (or if not so reported, then as determined by Lender from another recognized source or interbank quotation). For purposes hereof, "Interest Period" means, each period commencing on the last day of the immediately preceding Interest Period and ending on the same day of the month that interest in respect of such Advance is due one (1) month thereafter for the then applicable interest rate; provided any Interest Period that ends in a month for which there is no day which numerically corresponds to the last day of the immediately preceding Interest Period shall end on the last day of the month and (iii) any Interest Period that would otherwise extend past the maturity date of a Credit Facility shall end on the last day of the Extension Period.

5.    Outstanding Loan Amounts.    The Obligors agree that as of July 23, 2009, (a) the outstanding principal balance under the Huestis Term Loan is $4,030,709.82, accrued and unpaid interest is $5,686.94, (b) the outstanding principal balance under the Huestis Supplemental Term Loan is $1,881,768.06, and unpaid interest is $2,654.99, (c) the outstanding principal balance under the Gunston Line of Credit is $4,286,312.90, and unpaid interest is $12,900.17 and the aggregate face amount of all outstanding Letters of Credit under the Gunston Line of Credit is $591,053.25, (d) the outstanding principal balance under the Best Medical Line of Credit is $2,719,136.72, and unpaid interest is $2,937.42, (e) the aggregate face amount of outstanding Letters of Credit for the benefit of Best Industries is $12,700.00 and (f) there are additional unpaid fees and expenses owing by the Obligors, including, without limitation, breakage fees on swap contracts  The Obligors acknowledge and agree that all principal, interest and unpaid fees and expenses are due without offset or defense of any kind or nature and that as of the Closing Date, the Obligors are unable to pay such sums. The Obligors understand and agree that no

3

Tyson01 39509146 012845.000399

additional advances, letters of credit or other credit extensions of any kind or nature will be made, or issued, by the Lender during the Extension Period. Notwithstanding the foregoing, Best Medical may request advances or letters of credit under the Best Medical Line of Credit, and the Lender will in its sole and absolute discretion determine whether or not to make advances, or issue letters of credit, under the Best Medical Line of Credit.

6.    Acknowledgment of Liens.

(a)    Best Industries hereby acknowledges and agrees that the property encumbered by the Gunston Deed of Trust is and shall remain in all respects subject to the lien, charge and encumbrance of the Gunston Deed of Trust, and nothing herein contained, and nothing done pursuant hereto, shall adversely affect or be construed to adversely affect the lien, charge or encumbrance of, or warranty of title in, or conveyance effected by the Gunston Deed of Trust, or the priority thereof over other liens, charges, encumbrances or conveyances, or to release or adversely affect the liability of any party or parties whomsoever who may now or hereafter be liable under or on account of the Gunston Line of Credit or any of the Loan Documents, nor shall anything herein contained or done in pursuance hereof adversely affect or be construed to adversely affect any other security or instrument held by the Lender as security for or evidence of the indebtedness evidenced and secured thereby.

(b)    Gunston hereby acknowledge and agree that the property encumbered by the Gunston Supplemental Deed of Trust is and shall remain in all respects subject to the lien, charge and encumbrance of the Gunston Supplemental Deed of Trust, and nothing herein contained, and nothing done pursuant hereto, shall adversely affect or be construed to adversely affect the lien, charge or encumbrance of, or warranty of title in, or conveyance effected by the Gunston Supplemental Deed of Trust, or the priority thereof over other liens, charges, encumbrances or conveyances, or to release or adversely affect the liability of any party or parties whomsoever who may now or hereafter be liable under or on account of the Gunston Line of Credit or any of the Loan Documents, nor shall anything herein contained or done in pursuance hereof adversely affect or be construed to adversely affect any other security or instrument held by the Lender as security for or evidence of the indebtedness evidenced and secured thereby.

(c)    Huestis hereby acknowledges and agrees that the property encumbered by the Huestis Mortgage is and shall remain in all respects subject to the lien, charge and encumbrance of the Huestis Mortgage, and nothing herein contained, and nothing done pursuant hereto, shall adversely affect or be construed to adversely affect the lien, charge or encumbrance of, or warranty of title in, or conveyance effected by the Huestis Mortgage, or the priority thereof over other liens, charges, encumbrances or conveyances, or to release or adversely affect the liability of any party or parties whomsoever who may now or hereafter be liable under or on account of the Heustis Term Loan, the Huestis Supplemental Term Loan or any of the Loan Documents, nor shall anything herein contained or done in pursuance hereof adversely affect or be construed to adversely affect any other security or instrument held by the Lender as security for or evidence of the indebtedness evidenced and secured thereby.

(d)    Huestis and Best Medical each hereby reaffirms, acknowledges and agrees that the liens and security interests granted by the Huestis Financing Agreement and the Best

Tyson01 395091v6 012845.000399

4

Medical Security Agreement shall continue as valid and binding fist priority liens and security interests in the Collateral described therein. Notwithstanding anything provided in any of Loan Documents to the contrary, Huestis and Best Medical hereby agree that the liens and security interests created pursuant to the Huestis Financing Agreement and the Best Medical Security Agreement in favor of the Lender shall secure all of the Obligations. For purposes hereof, "Obligations" are all of the Obligors' obligations to pay when due any debts, principal, interest, expenses and other amounts any Obligor owes Lender now or later, whether in under this Agreement, the Credit Facilities, the Loan Documents, or otherwise, including, without limitation, all obligations relating to letters of credit (including reimbursement obligations for drawn and undrawn letters of credit), and cash management services, if any, and including interest accruing after insolvency proceedings begin and debts, liabilities, or obligations of any Credit Party assigned to Lender, and the performance of each Obligor's duties under the Loan Documents.

7.    <u>Payments of Principal and Interest During the Extension Period</u>.   Except as otherwise set forth in this Agreement, during the Extension Period, all of the Credit Facilities shall continue to repaid in accordance with the Loan Documents.

8.    <u>Affiliate Guaranties</u>.  Best Medical International, Inc., a Delaware corporation, Brachytherapy Services, Inc., a Virginia corporation, Best Medical Engineering, Inc., a Virginia corporation, Best Medical Research, Inc., a Virginia corporation CNMC Co., Inc., a Tennessee corporation, Best Vascular, Inc., a Delaware corporation, Best Theratronics, Inc., a Virginia corporation, One Best Drive, L.P., a Pennsylvania limited partnership, and Arplay USA, Inc., a Virginia corporation (each an "Affiliate Guarantor" and collectively the "Affiliate Guarantors") shall execute and deliver to the Lender a Guaranty of Payment Agreement in substantially the form of <u>Exhibit A</u> attached hereto (the "Affiliate Guaranty") pursuant to which they shall jointly and severally guaranty repayment in full of the Obligations.

9.    <u>Huestis, Best Industries, Gunston and Best Medical Guaranties</u>.  Huestis, Best Medical, Gunston and Best Industries shall execute and deliver to the Lender a Guaranty of Payment Agreement in substantially the form of <u>Exhibit B</u> attached hereto (the "Restated Best Industries Guaranty") pursuant to which they shall jointly and severally guaranty repayment in full of the Obligations.

10.    <u>Personal Guaranty</u>.  The Personal Guarantor shall execute and deliver to the Lender a Guaranty of Payment Agreement in substantially the form of <u>Exhibit C</u> attached hereto (the "Restated Personal Guaranty") pursuant to which he shall guaranty repayment in full all of the Obligations.

11.    <u>Pledge Agreements</u>.

(a)    On the Closing Date, as additional collateral for the Obligations, the Obligors shall cause Arplay USA, Inc., a Virginia corporation ("Arplay USA") to execute and deliver to Lender, a Pledge and Security Agreement in substantially the form of <u>Exhibit C</u> attached hereto (as thereafter amended, restated, substituted or otherwise modified the "French Pledge Agreement"), which French Pledge Agreement shall grant the Lender a first priority lien in sixty-five percent (65%) of the beneficial interest of Arplay USA in Arplay Medical SAS,

5

Tyson01 395091v6 012845.000399

which as of the Closing Date is _____ (_____) shares of the common
stock of Arplay Medical SAS (the "French Stock Collateral"). In addition, Arplay USA shall
deliver to the Lender on or before August 7, 2009, the original certificates representing the
French Stock Collateral, together with stock powers and such other documents as Lender
requires to perfect its lien on the French Stock Collateral.

      (b)    On the Closing Date, as additional collateral for the Obligations, the
Obligors shall cause Best Theratronics, Inc., a Virginia corporation ("Best Theratronics") to
execute and deliver to Lender, a Pledge and Security Agreement in substantially the form of
Exhibit D attached hereto (as thereafter amended, restated, substituted or otherwise modified the
"Canadian Pledge Agreement"), which Canadian Pledge Agreement shall grant the Lender a first
priority lien in sixty-five percent (65%) of Best Theratronics' beneficial interest in Best
Theratronics Ltd., a Canadian corporation, which as of the Closing Date is
_____ (_____) shares of the common stock of Best Theratronics Ltd, (the
"Canadian Stock Collateral"). In addition, on or before July 31, 2009, Best Theratronics shall
deliver to the Lender on such date, the original certificates representing the Canadian Stock
Collateral, together with stock powers and such other documents as Lender requires to perfect its
lien on the Canadian Stock Collateral.

      12.    Deeds of Trust.

      (a)    Not later than July 28, 2009, as additional collateral for the Obligations,
Best Industries shall execute and deliver to the Lender a Deed of Trust, Assignment, Security
Agreement and Fixture Filing in the form attached hereto as Exhibit E (as thereafter amended,
restated, substituted or otherwise modified the "Renaissance Fair Deed of Trust"), which
Renaissance Fair Deed of Trust shall encumber and constitute a first priority lien on certain
property located in Stafford County, Virginia (the "Renaissance Fair Property") and shall be
immediately thereafter recorded in the land records of Stafford County, Virginia, at the Obligors'
expense. The principal amount secured by the Renaissance Fair Deed of Trust will be limited to
Six Million Dollars ($6,000,000). In addition, at the time of the delivery of the Renaissance Fair
Deed of Trust, the Lender shall have received a paid policy of title insurance on the current
ALTA Form or a valid and enforceable commitment to issue the same, from a company
satisfactory to the Lender in the amount of the Renaissance Fair Deed of Trust and which may be
endorsed or assigned to the successors and assigns of the Lender without additional cost,
insuring the lien of the Renaissance Fair Deed of Trust to be a valid first lien on the Renaissance
Fair Property, free and clear of all defects, exceptions and encumbrances except those permitted
under the Renaissance Fair Deed of Trust and containing affirmative insurance against such
matters as the Lender may require. In addition, the Lender shall receive evidence satisfactory to
the Lender of hazard and liability coverage on the Renaissance Fair Property. The Obligors shall
have paid all recording fees and taxes, title costs, appraisals and surveys legal fees and expenses
now or hereafter incurred by the Lender.

      (b)    Not later than July 28, 2009, as additional collateral for the Obligations,
the Personal Guarantor shall execute and deliver to the Lender a Deed of Trust, Assignment,
Security Agreement and Fixture Filing in the form attached hereto as Exhibit F (as thereafter
amended, restated, substituted or otherwise modified the "Interchange Deed of Trust"), which
Interchange Deed of Trust shall encumber and constitute a first priority lien on certain property

6

Tyson01 395091v6 012845.000399

located in New Kent County, Virginia (the "Interchange Property") and shall be immediately thereafter recorded in the land records of New Kent County, Virginia, at the Obligors' expense. The principal amount secured by the New Kent Deed of Trust will be limited to Six Million Dollars ($6,000,000). In addition, at the time of the delivery of the Interchange Deed of Trust, the Lender shall have received a paid policy of title insurance on the current ALTA Form or a valid and enforceable commitment to issue the same, from a company satisfactory to the Lender in the amount of the Interchange Deed of Trust and which may be endorsed or assigned to the successors and assigns of the Lender without additional cost, insuring the lien of the Interchange Deed of Trust to be a valid first lien on the Interchange Property, free and clear of all defects, exceptions and encumbrances except those permitted under the Interchange Deed of Trust and containing affirmative insurance against such matters as the Lender may require. In addition, the Lender shall receive evidence satisfactory to the Lender of hazard and liability coverage on the Interchange Property. The Obligors shall have paid all recording fees and taxes, title costs, appraisals and surveys legal fees and expenses now or hereafter incurred by the Lender.

13.    Net Income Covenant.    Borrowers and the Affiliate Guarantors shall have combined net income of not less than (a) ($250,000) for the calendar quarter ending March 31, 2009, (b) $0.00 for the calendar quarter ending June 30, 2009, and (c) $1,000,000 on a combined basis for the calendar quarters ending June 30, 2009 and September 30, 2009.

14.    Appraisals.    Not later than August 31, 2009, the Lender shall have received one or more appraisals, at the Obligors' expense, on the additional collateral being pledged pursuant to this Agreement, including without limitation, the Renaissance Fair Property and the Interchange Property, which appraisals shall show a combined "as is" value of the Renaissance Fair Property and the Interchange Property of not less than $7,000,000 and which appraisal shall be satisfactory to the Lender in all material respects. In the event the "as is" value shown on such appraisals is less than $7,000,000, the Obligors may within ten (10) business days of Lender's notice, provide the Lender with other collateral satisfactory to Lender having a market value (as determined by the Lender) equal to not less than the difference between $8,000,000 and such appraised value. The Obligors will reimburse the Lender for any and all expenses incurred by the Lender for any and all appraisals obtained in connection with the Obligations, within five (5) business days demand.

15.    Financial Statements.    Not later than August 15, 2009, the Obligors shall provide the Lender with reviewed and consolidating fiscal year end financial statements for each of the Obligors, which financial statements shall be satisfactory to the Lender in all material respects. Obligors shall provide Lender with current quarterly financial statements for the quarters ending June 30, 2009 and September 30, 2009 not later than sixty (60) days after each quarter end. In addition, the Personal Guarantor will provide the Lender with his personal financial statements as of June 30, 2009, not later than August 31, 2009. Not later than August 26, 2009, the Obligors shall provide the Lender with the Obligors' financial statements for the calendar quarter ending March 31, 2009 which financial statements shall be satisfactory to the Lender in all material respects.

16.    Subordination Agreement.    Not later than August 26, 2009, the Obligors shall deliver to the Lender a Subordination Agreement in form and substance satisfactory to the Lender and duly executed by Roynat Inc. and The Bank of Nova Scotia (collectively, the

Tyson01 395091v6 012845.000399

7.

"Subordinated Creditors") pursuant to which the Subordinated Creditors shall subordinate, on
terms acceptable, all Obligors' now or hereafter indebtedness to Subordinated Creditors to all of
Obligors' now or hereafter indebtedness to the Lender.

17.    Refinance Plan. Obligors shall use their best efforts to cause the Obligations to be
refinanced and repaid in full during the Extension Period. Not later than August 31, 2009,
Obligors shall provide Lender with a written plan in detail satisfactory to Lender for obtaining
such financing. Obligors shall provide Lender with an update of such plan on September 30,
2009 and October 30, 2009. In addition, not later than October 30, 2009, Obligors shall provide
Lender with one or more written commitments or term sheets from one or more financial
institutions to refinance the entire outstanding balance of the Obligations, not later than
December 15, 2009.

18.    Extension Period. Subject to the Obligors strict compliance with the terms of this
Agreement and each of the Amendment Documents, from the Effective Date through and
including January 1, 2010 (the "Extension Period"), Lender shall not accelerate or take any
action to collect amounts owed to it under the Loan Documents or foreclose on any lien or
security interest.

19.    Repayment in Full of the Credit Facilities.  Unless sooner paid, the Credit
Facilities, shall be due and payable in full by Obligors upon the earlier to occur of (i) a
Termination Event (as hereinafter defined) or (ii) the termination of the Extension Period.

20.    Covenants. During the Extension Period, each Obligor covenants and agrees with
Lender that:

(a)    It will not, and will not permit any Obligor or any Affiliate Guarantor
(each a "Credit Party") to, incur any other indebtedness without Lender's prior written consent,
which Lender may give or withhold in its sole discretion, other than customary trade payables,
and other indebtedness incurred in the ordinary course of their business; provided, however that
Gunston may incur additional indebtedness from other lenders for use in connection with land
development provided that (i) at the time such indebtedness is incurred no Termination Event has
occurred and is continuing under this Agreement, (ii) the amount of such indebtedness in
connection with the Kentland project does not exceed $350,000, (iii) the amount of such
indebtedness in connection with certain construction in Nashville, Tennessee does not exceed
$800,000 and amortizes on the basis of an amortization period of not less than ten years with a
maturity of not less than five years. In addition, the Personal Guarantor, Best Medical and
CNMC Co., Inc. may guaranty (x) indebtedness described in clause (ii) above on an unsecured
basis in an aggregate amount not to exceed $100,000 and (y) indebtedness described in clause
(iii) above on an unsecured basis in an aggregate amount not to exceed $800,000;

(b)    It will not, and will not permit any Credit Party to, sell, transfer or
otherwise convey any interest in any assets owned by any Credit Party, other than in the ordinary
course of business;

Tyson01 395091v6 012845.000399

8

(c)     It will not, and will not permit any Credit Party to, permit any liens on any of their respective assets not existing as of the date of this Agreement and disclosed to and acknowledged by Lender;

(d)     It will not, and will not permit any Credit Party to, make any transfers, loans or other distributions, other than distributions necessary to pay the actual tax liabilities of such Credit Party; and

(e)     It will promptly provide Lender with all environmental reports and other information on any environmental issues on the Renaissance Fair Property and the Interchange Property;

(f)     It will timely perform each covenant set forth in this Section 20 and each condition precedent set forth in Section 21 of this Agreement, time being of the essence.

21.     Conditions Precedent. The effectiveness of this Agreement and the extension described herein is subject to the satisfaction of each of the following conditions precedent:

(a)     The Lender's receipt of all of the Affiliate Guaranties, together with copies of the organizational documents for each Affiliate Guarantor;

(b)     The Lender's receipt of the Restated Best Medical Guaranties;

(c)     The Lender's receipt of the Restated Personal Guaranty;

(d)     The Lender's receipt of resolutions from each Affiliate Guarantor;

(e)     The Lender's receipt of the French Pledge Agreement;

(f)     The Lender's receipt of the Canadian Pledge Agreement;

(g)     The Lender's receipt of the Extension Fee; and

(h)     All legal fees and expenses of the Lender shall have been paid in full.

22.     Extension Default. The occurrence of any one or more of the following events shall constitute a default under this Agreement and shall constitute an immediate default under the Loan Documents (each, a "Extension Default"):

(a)     breach by any Credit Party of any covenant, agreement, or undertaking under this Agreement or any Amendment Document, including, without limitation, the agreements set forth in Sections 11 and 12, TIME BEING OF THE ESSENCE;

(b)     the dissolution or liquidation of any Credit Party or the death of the Personal Guarantor, as applicable, or any action taken under any federal or state law for the adjustment or reorganization of any Credit Party's financial affairs without the consent of Lender, or the entry of any order seeking the reorganization, liquidation, adjustment or arrangement of any Credit Party under any state or federal law;

Tysxe01 395091v6 012845.000399

9

(c)     a change in the condition or affairs (financial or otherwise) of any Credit Party that, in Lender's sole opinion, impairs the security of Lender or materially increases its risk; and

(d)     occurrence of any additional default under any of the Loan Documents.

23.     Remedies Upon Termination Event.  Upon the earlier of (such event being called a "Termination Event") (i) the occurrence of any Extension Default described in Section 22 above or (ii) the expiration of the Extension Period, at the sole discretion of Lender, Lender shall be, entitled to immediately pursue any and all remedies available under applicable law or pursuant to the Loan Documents and the Amendment Documents.

24.     Extension Fee.  In consideration of Lender's agreement to enter into this Agreement and the Amendment Documents the Obligors shall pay to the Lender a non refundable extension fee (the "Extension Fee") on the Closing Date in the amount of Twenty Thousand Dollars ($20,000).

25.     Representations of Each Obligor.  Each Obligor warrants and represents to the Lender as follows:

(a)     Each Obligor has no defenses, affirmative or otherwise, rights of setoff, rights of recoupment, claims, counterclaims, actions or causes of action of any kind or nature whatsoever against the Lender or any past, present or future agent, attorney, legal representative, predecessor-in-interest, affiliate, successor, assign, employee, director or officer of the Lender, directly or indirectly, arising out of, based upon, or in any manner connected with, any transaction, event, circumstance, action, failure to act, or occurrence of any sort or type, whether known or unknown, which occurred, existed, was taken, permitted, or began prior to the execution of this Agreement and accrued, existed, was taken, permitted or begun in accordance with, pursuant to, or by virtue of the Obligations or any of the terms or conditions of the Loan Documents, or which directly or indirectly relate to or arise out of or in any manner are connected with the Obligations or any of the Loan Documents; TO THE EXTENT ANY SUCH DEFENSES, AFFIRMATIVE OR OTHERWISE, RIGHTS OF SETOFF, RIGHTS OF RECOUPMENT, CLAIMS, COUNTERCLAIMS, ACTIONS OR CAUSES OF ACTION EXIST OR EXTEND, SUCH DEFENSES, RIGHTS, CLAIMS, COUNTERCLAIMS, ACTIONS AND CAUSES OF ACTION ARE HEREBY FOREVER WAIVED, DISCHARGED AND RELEASED.

(b)     Each Obligor has freely and voluntarily entered into this Agreement after an adequate opportunity and sufficient period of time to review, analyze and discuss all terms and conditions of this Agreement and all factual and legal matters relevant hereto with counsel freely and independently chosen by it. Each Obligor further acknowledges that it has actively and with full understanding participated in the negotiation of this Agreement after consultation and review with its counsel and that this Agreement has been negotiated, prepared and executed without fraud, duress, undue influence or coercion of any kind or nature whatsoever having been exerted by or imposed upon any party to this Agreement.

10

Tyson01 395091v6 012845.000399

(c)     As of the date hereof, there are no proceedings or investigations pending or, so far as any Obligor knows, threatened against it, before any court or arbitrator or any governmental, administrative or other judicial authority or agency.

(d)     There is no statute, rule, regulation, order or judgment, no charter, by-law or preference stock provision with respect to any Obligor, and no provision of any mortgage, indenture, contact or other Agreement binding on any Obligor or any of its properties which would prohibit or cause a default under or in any way prevent the execution, delivery, performance, compliance or observance of any of the terms or conditions of this Agreement.

(e)     No Obligor has voluntarily or involuntarily, granted any liens or security interests to any creditor not previously disclosed to the Lender in writing on or before the date of this Agreement or taken any action or failed to take any action which could or would impair, change, jeopardize or otherwise adversely affect the priority, perfection, validity or enforceability of any liens or securing interests securing all or any portion of the Obligations or the priority or validity of the Lender's claims with respect to the Obligations relative to any other creditor of any Obligor.

(f)     Each Obligor has the full legal right, power and authority to enter into and perform its obligations under this Agreement and the other documents being delivered by any Obligor in connection with this Agreement (together with the Affiliate Guaranties, collectively, the "Amendment Documents"), and the execution and delivery of this Agreement and the other Amendment Documents by any Obligor and the consummation by the Obligors of the transactions contemplated hereby and thereby and performance of their obligations hereunder and thereunder have been duly authorized by all appropriate action (corporate or otherwise).

(g)     This Agreement, the Loan Documents and each of the other Amendment Documents to which it is a party constitutes the valid, binding and enforceable Agreement of each Obligor, enforceable against each Obligor in accordance with the terms thereof.

26.     Release of Claims.  By execution of this Agreement, each Obligor, on behalf of itself and on behalf of all those entities claiming by, through, or under it, together with its successors and assigns (collectively with Obligors, the "Obligor Affiliates"), acknowledges and confirms that such party does not have any offsets, defenses, recoupments, or claims against Lender, Lender's parent company, or any of Lender's present and former affiliates and subsidiaries, predecessors in interest, present and former officers, agents, directors, attorneys and employees, and the respective heirs, executors, successors and assigns of all of the foregoing, whether past, present or future (collectively with Lender, the "Lender Affiliates"), whether asserted or unasserted.  To the extent that any Obligor Affiliate may have such offsets, defenses, recoupments or claims, Obligor Affiliates, jointly and severally, release and forever discharge each Lender Affiliate of and from any and all manner of action and actions, cause and causes of action, suits, debts, torts, controversies, damages, judgments, executions, recoupments, claims and demands whatsoever, asserted or unasserted, in law or in equity which, against any Lender Affiliate, any Obligor Affiliate ever had or now has by reason of any matter, cause, causes or thing whatsoever, including, without limitation, any presently existing claim, recoupment, or defense, whether or not presently suspected, contemplated or anticipated.

11

27.    Non-Interference.  Each Obligor agrees not to interfere with the exercise by the Lender of any of its rights and remedies.  Each Obligor further agrees that it shall not seek to distrain or otherwise hinder, delay, or impair the Lender's efforts to realize upon the Collateral, or otherwise to enforce its rights and remedies pursuant to the Loan Documents.  The provisions of this Section 27 shall be specifically enforceable by the Lender.

28.    JURY TRIAL.  EACH OBLIGOR BY EXECUTION HEREOF AND LENDER BY ACCEPTANCE HEREOF, HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION (I) ARISING UNDER THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR ANY RELATED AGREEMENT OR (II) IN ANY WAY RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS EVIDENCED HEREBY OR THEREBY, IN EACH CASE WHETHER NOW EXISTING OR HEREAFTER ARISING, AND EACH OBLIGOR BY EXECUTION HEREOF AND LENDER BY ACCEPTANCE HEREOF, HEREBY AGREES THAT ANY SUCH CLAIM OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY, AND THAT EITHER OBLIGORS OR LENDER MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION 28 WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF EACH OBLIGOR AND LENDER TO THE WAIVER OF HIS/HER/ITS RIGHT TO TRIAL BY JURY.

29.    No Waiver.  This Agreement provides for the terms pursuant to which the Lender will forbear from exercising its rights and remedies under the Loan Documents, but Lender does not waive any default or Event of Default under any other Loan Document whether arising before or after the date hereof or as a result of the transactions contemplated hereby.

30.    Consistent Changes.    The Loan Documents are hereby amended wherever necessary to reflect the changes described above.

31.    Successors and Assigns.  This Agreement shall inure to the benefit of and be binding upon the heirs, successors, and permitted assigns of the parties.

32.    Governing Law and Jurisdiction.    This Agreement shall be construed and enforced in accordance with the terms of the laws of the Commonwealth of Virginia without regard to its conflicts of laws principles.  If any provision of this Agreement is not enforceable, the remaining provisions of the Agreement shall be enforced in accordance with their terms. Each Obligor and Lender represents and warrants to each other that each is duly authorized to execute and deliver this Agreement on their respective behalves.

33.    Counterparts.  This Agreement may be executed in two or more counterparts each of which shall constitute an original and all of which shall, when taken together, constitute one and the same agreement, notwithstanding that all parties may not have signed all counterparts of this Agreement.

34.    Modifications.  This Agreement may not be supplemented, changed, waived, discharged, terminated, modified or amended, except by written instrument executed by the parties.

Tyson01 395091v6 012845.000399

12

JA0399

Appeal: 13-1982    Doc: 14-1    Filed: 10/21/2013    Pg: 416 of 418

REMAINDER OF PAGE INTENTIONALLY LEFT BLANK

Tyson01 395091v6 012845.000399

13

IN WITNESS WHEREOF, the Obligors and the Lender have executed this Agreement under seal as of the date and year first written above.

WITNESS/ATTEST:

HUESTIS MACHINE CORPORATION

By: _____ (SEAL)
Name: Krishnan Suthanthiran
Title: President

WITNESS/ATTEST:

BEST MEDICAL INTERNATIONAL, INC.

By: _____ (SEAL)
Name: Krishnan Suthanthiran
Title: President

WITNESS/ATTEST:

GUNSTON HALL REALTY, INC.

By: _____ (SEAL)
Name: Krishnan Suthanthiran
Title: President

WITNESS/ATTEST:

BEST INDUSTRIES, INC.

By: _____ (SEAL)
Name: Krishnan Suthanthiran
Title: President

WITNESS:

_____ (SEAL)
KRISHNAN SUTHANTHIRAN

[Signature Page to Waiver and Amendment Agreement]

WITNESS:

WACHOVIA BANK, NATIONAL
ASSOCIATION

By: _____ (SEAL)
Name: J. Kent Thompson
Title: Senior Vice President

A COPY TESTE:
JOHN T. FREY, CLERK

BY: _____
       C. Deputy Clerk
Date: _____
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

Tyson01 395091v6 012845.000399