RECORD NO. 13-1982

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

**BEST MEDICAL INTERNATIONAL, INC., A Virginia Corporation, HUESTIS MACHINE CORP., A Rhode Island Corporation and KRISHNAN SUTHANTHIRAN, an individual,**

*Plaintiffs-Appellants,*

Bruce W. Henry, Chapt. 11 Trustee
for Gunston Hall Realty, Inc.
and Best Industries, Inc.

*Plaintiff*

v.

**WELLS FARGO BANK, N.A. as successor of interest to Wachovia Bank, N.A. and J. KENT THOMPSON,**

*Defendants-Appellees.*

### OPENING BRIEF OF PLAINTIFFS-APPELLANTS

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA**

James M. Brady
Lauri M. Luxton
BEST MEDICAL
  INTERNATIONAL, INC.
7643 Fullerton Road
Springfield, Virginia 22153
(703) 451-2378 (Telephone)
james@teambest.com
lauri@teambest.com

Counsel for Plaintiffs-Appellants

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of <u>all</u> parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 13-1982          Caption: Best Medical International, Inc. et al, v. Wells Fargo Bank

Pursuant to FRAP 26.1 and Local Rule 26.1,

Best Medical International, Inc., Huestis Machine Corp., and Krishnan Suthanthiran
(name of party/amicus)

who is _____ Appellants _____, makes the following disclosure:
(appellant/appellee/amicus)

1.    Is party/amicus a publicly held corporation or other publicly held entity?  ☐YES ☑NO

2.    Does party/amicus have any parent corporations?                              ☐YES ☑NO
      If yes, identify all parent corporations, including grandparent and great-grandparent
      corporations:

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?                                                  ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?   ☐ YES ☑ NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)   ☐ YES ☑ NO
    If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?   ☐ YES ☑ NO
    If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: _____August 19, 2013_____

Counsel for: Appellants

## CERTIFICATE OF SERVICE
****************************

I certify that on ___August 19,2013___ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____
(signature)

_____August 19, 2013_____
(date)

# TABLE OF CONTENTS

| | | |
|---|---|---|
| I. | JURISDICTIONAL STATEMENT............................... | 1 |
| II. | STATEMENT OF ISSUES....................................... | 2 |
| III. | STATEMENT OF THE CASE.................................... | 3 |
| IV. | STATEMENT OF FACTS....................................... | 4 |
| | A. The Parties.............................................. | 4 |
| | 1. The Loans – 2004 to 2008............................ | 5 |
| | 2. Wells' Discriminatory Actions Prior to July 31, 2009.............................................. | 6 |
| | B. Wells Discriminatory Actions After July 31, 2009......... | 11 |
| | C. Wells Retaliated Against Krish and Best................... | 14 |
| V. | SUMMARY OF THE ARGUMENT............................. | 16 |
| VI. | ARGUMENT................................................. | 19 |
| | A. Standard of Review...................................... | 19 |
| | B. Does a Term Sheet Constitute Sufficient Evidence to Survive Summary Judgment that a Plaintiff Was Qualified for Credit?................................. | 21 |
| | 1. Best's Loan Qualifications Should Have Been Resolved in Best's Favor in Evaluating the Prima Facie Case............................................. | 22 |
| | 2. Precedent Does Not Require Plaintiffs to Have Flawless Financials to Qualify for an Extension of Credit.............................................. | 24 |

i

| | | |
|---|---|---|
| C. | Is a Plaintiff Proceeding Under the *McDonnell Douglas* Framework Required to Provide Direct Evidence of "Words or Other Actions Implicating Race" to Demonstrate a Causal Nexus between Race and Defendants' Actions?........................................... | 28 |
| | 1. Was Best Required to Present Direct Evidence of "Words or Other Actions Implicating Race" to Establish Causation?.............................................. | 28 |
| | 2. The Prima Facie Case and Pretext Inquiries May Overlap When Establishing a Causal Link Between Race and the Discriminatory Actions?.... | 33 |
| D. | What Constitutes Sufficient Evidence to Survive Summary Judgment that Wells' Allegedly Non-Discriminatory Reasons Were a Pretext for Lending Discrimination in a § 1981 Case?...................................... | 37 |
| | 1. Evidence of Animus Toward a Protected Group is Indicative of Pretext................................... | 38 |
| | 2. Best Submitted Evidence that Could Lead a Reasonable Factfinder to Believe that Wells' Articulated Reasons Were a Pretext for Discrimination........................................... | 39 |
| E. | Do Threats to Exercise Rights and Remedies Prior to the Protected Activity Constitute "Gradual Adverse Actions" that Preclude Any Inference of Retaliation?.... | 58 |
| | 1. Does the Doctrine of "Gradual Adverse Actions" Apply to Lending Discrimination?.......................... | 58 |
| | 2. Temporal Proximity Between the Protected Activity and the Adverse Action Suffice to Establish Causation *Even If* the Decision to Confess Judgment Was Already Made................ | 62 |
| VII. | CONCLUSION................................................ | 65 |

| | |
|---|---|
| **CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)**………………………………………………………... | 66 |
| **CERTIFICATE OF SERVICE**………………………………………... | 67 |

# TABLE OF AUTHORITIES

| CASES: | PAGE NUMBER(S) |
|---|---|
| *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001)…………………………………….. | 62 |
| *Adarand Constructors, Inc. v. Slater*, 228 F.3d 1147, 1169 (10th Cir. 2000)…………………………………………………. | 30 |
| *AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002)………………… | 32 |
| *Anderson v.  Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)……. | 20, 64 |
| *Anderson v. Wachovia*, 621 F.3d 261, 274 n. 11 (3d Cir. 2010)… | 25, 26, 29, 37 |
| *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998)…………………… | 40 |
| *Burgess v. Bowen*, No. 10-2081, 466 Fed. Appx. 272 (4th Cir. Feb. 17, 2012) ………………………………………………….. | 63 |
| *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 62 (2006)…………………………………………………. | 59, 60, 63 |
| *Burus v. Wellpoint Cos.*, No. 5:08-154, 2010 U.S. Dist. LEXIS 28798 (E.D. Ky. Mar. 25, 2010)………………………………… | 33 |
| *CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 457 (2008) …… | 58 |
| *Daniel v. Church's Chicken*, 942 F. Supp. 533 (S.D. Ala. 1996)… | 64 |
| *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003)………….. | 38 |
| *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008)……………………………………………………….. | 33 |
| *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998)…………………………………… | 64 |

| | |
|---|---|
| *Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002)…………………………………………………... | 38 |
| *DynaLantic Corp. v. United States D.O.D.*, 885 F. Supp. 2d 237, 258-260 (D.D.C. 2012)…………………………………………... | 30 |
| *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306 (4th Cir. 2008)……. | 32 |
| *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999)…….. | 20 |
| *Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005)……… | 37 |
| *Francis v. Booz Allen & Hamilton*, 452 F.3d 299, 309 (4th Cir. 2006)…………………………………………………………... | 58, 60 |
| *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir. 1994)……………. | 57 |
| *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 322 (3d Cir. 2000)………………………………………………………… | 37 |
| *Gross v. United States Small Business Admin.*, 669 F. Supp. 50 (N.D.N.Y 1987)…………………………………………………... | 23 |
| *Higgins v. E.I. Du Pont de Nemours & Co.*, 863 F.2d 1162, 1167 (4th Cir. 1988)…………………………………………………... | 19 |
| *Hughes v. Home Depot, Inc.*, 804 F. Supp. 2d 223 (D.N.J. 2011).. | 33 |
| *Ilori v. Carnegie Mellon Univ.*, 742 F. Supp. 2d 734, 761 (W.D. Pa. 2010)…………………………………………………………... | 62 |
| *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-174 (2005)……………………………………………………………… | 58 |
| *Jackson v. University of Pittsburgh*, 826 F.2d 230, 236 (3d Cir. 1987) ……………………………………………………………… | 29, 35 |
| *JAT, Inc. v. Nat'l City Bank of the Midwest*, No. 06-11937, 2008 U.S. Dist. LEXIS 45059 at *19-20 (E.D. Mich. June 10, 2008)… | 22 |

v

| | |
|---|---|
| *Kothe v. Cont'l Teves, Inc.*, 461 F. Supp.2d 466, 474 (W.D. Va. 2006)……………………………………………………….... | 37, 38 |
| *Lalau v. City & County of Honolulu*, No. 11-268, 2013 U.S. Dist. LEXIS 44997 (D. Haw. Mar. 28, 2013)……………………… | 33 |
| *Lewis v. Cent. Piedmont Cmty. Coll.*, 689 F.2d 1207, 1209 n.3 (4th Cir. 1982)……………………………………………… | 28 |
| *Lindsay v. Yates*, 578 F.3d 407, 418 (6th Cir. 2009)…………….. | 24, 25, 28 |
| *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)……………………………………………………….... | 20 |
| *Mayberry v. Vought Aircraft Co.*, 55 F.3d 1086, 1091 (5th Cir. 1995)…………………………………………………………….... | 37 |
| *McDonnell Douglas Corp. v. Green*, 411 U.S. 792. 802, n. 13 (1973)……………………………………………………………... | 24, 38 |
| *Moss v. City of Abbeville*, 740 F. Supp. 2d 738, 744 (D.S.C. 2010)……………………………………………………………... | 64 |
| *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931 (4th Cir. 1991)……………………………………………………………... | 21 |
| *Perez v. Region 20 Educ. Serv. Ctr.*, 307 F.3d 318, 325 (5th Cir. Tex. 2002)…………………………………………………….... | 37 |
| *Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003)……………… | 64 |
| *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)………….. | 64 |
| *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000). | 20, 33, 37, 38, 39 |
| *Royal v. Potter*, 416 F. Supp. 2d 442 (S.D. W. Va. 2006)………. | 32 |
| *Simpson v. Kay Jewelers*, 142 F.3d 639, 644 (3d Cir. 1998)……. | 39 |

| | |
|---|---|
| *Spears v. Patterson UTI Drilling Co.*, No. 09-10048, 337 Fed. Appx. 416, 420 (5th Cir. Tex. July 16, 2009)........................ | 39 |
| *Texas Dep't of Cmty Affairs v. Burdine,* 450 U.S. 248, 253 (1981)................................................................. | 24, 37 |
| *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003).................................................................. | 62 |
| *Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir. 1998)................................................................. | 63, 65 |
| *Twisdale v. Paulson*, 595 F. Supp. 2d 686 (S.D. W. Va. 2007).... | 65 |
| *Venter v. Potter,* 694 F. Supp. 2d 412, 422 (W.D. Pa. 2010)....... | 38 |
| *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006)... | 28 |
| *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989).. | 64 |
| *United States EEOC v. CTI Global Solutions, Inc.*, 815 F. Supp. 2d 897, 906 (D. Md. 2011)................................................ | 28 |
| *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983)................................................... | 29 |
| **STATUTES AND RULES:** | |
| *28 U.S.C. § 1331 (2012)*................................................ | 1 |
| *12 C.F.R. § 202.2(f)(2003)*............................................ | 27 |
| *FED. R. CIV. P. 56(c)*.................................................. | 20 |
| **OTHER AUTHORITIES:** | |
| 9A C. Wright & A. Miller, *Federal Practice and Procedure § 2529,* p. 299, 300 (2d ed. 1995)...................................... | 20 |
| **INTERNET SOURCES:** | |

| | |
|---|---|
| Charlie Savage, *Wells Fargo Will Settle Mortgage Bias Charges*, http://www.nytimes.com/2012/07/13/business/wells-fargo-to-settle-mortgage-discrimination-charges.html | 30 |
| Simon, Ruth and Zibel, Alan July 12, 2012, *Wells Fargo Settles Lending-Bias Cases*, http://online.wsj.com/article/SB100014240527023043738045775 22740578702890.html | 30-31 |

# I.    JURISDICTIONAL STATEMENT

The United States District Court for the Eastern District of Virginia possessed subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331 which grants District Courts original jurisdiction over all civil actions arising under the Constitution, laws, or treaties of the United States. *28 U.S.C. § 1331 (2012)*. Here, Plaintiffs-Appellants sued Defendant-Appellees for lending discrimination pursuant to 42 U.S.C. § 1981.

On December 18, 2012, the Honorable Gerald Bruce Lee granted Defendant-Appellees' Summary Judgment Motion. JA1005-1006.   By Final Order dated March 29, 2013, the entire case was dismissed. JA1068.    Plaintiffs-Appellants timely filed a Motion to Alter or Amend pursuant to Rule 59(e) of the Federal Rules of Civil Procedure on April 25, 2012. JA1069-2087. The District Court denied Plaintiffs-Appellants motion on July 2, 2013. JA2104.   Plaintiffs-Appellants timely filed a Notice of Appeal on July 31, 2013. JA2105-2106.   This Court now has proper jurisdiction of this appeal pursuant to 28 U.S.C. § 1291, because the grant of final judgment in this matter constituted a final decision of the District Court.

1

## II.    STATEMENT OF ISSUES

1.    Does a term sheet constitute sufficient evidence to survive summary judgment that a lending discrimination plaintiff was qualified for credit?  This is an issue of first impression.

2.    Is a lending discrimination plaintiff proceeding under the *McDonnell Douglas* framework required to provide direct evidence of "words or other actions implicating race" to demonstrate a causal nexus between race and defendants' actions? This is an issue of first impression.

3.    What constitutes sufficient evidence to survive summary judgment that Wells' allegedly nondiscriminatory reasons for taking their adverse actions against Best were a pretext for lending discrimination?

4.    Do threats to exercise rights and remedies prior to the protected activity constitute "gradual adverse actions" that preclude any inference of retaliation?  This is an issue of first impression.

## III.   STATEMENT OF THE CASE

This case involves interpretation of 42 U.S.C. § 1981 in connection with Wells Fargo (hereafter "Wells") and J. Kent Thompson's ("Thompson") (collectively referred to as "Wells") refusal to extend credit to Huestis Machine Corporation (hereafter "Huestis") and Best Medical International, Inc. (hereafter "BMI") and  Krishnan Suthanthiran (hereafter "Krish") (Huestis, BMI, and Krish are collectively referred to as "Best") on the basis of Krish's race and Wells subsequent retaliation against Best for filing suit against Wells alleging civil rights violations and other claims.

On November 22, 2011, Best filed their Complaint in the District Court for the Eastern District of Virginia, Alexandria Division. JA0004 (Dkt. #1)[1]. After the initial Complaint was dismissed without prejudice, the Court granted leave to file an Amended Complaint. JA0005-6 (Dkt. #22); JA0008 (Dkt. #34).   Wells answered the Amended Complaint on July 2, 2012.  JA0010 (Dkt. #55).  Judge Lee agreed the Court would apply the same standards used by the Third Circuit in *Anderson v. Wachovia.* JA1033 (27:16-21). Thereafter, Best sought leave to file their Second Amended Complaint ("SAC") which was granted on August 20, 2012.  JA0013 (Dkt. #75).  Wells moved to dismiss the SAC.  JA0014 (Dkt. #85, 86). Best opposed the motion. JA0015 (Dkt. #92). On October 26, 2012, the Court

---

[1] These documents are not relevant to any issue on appeal and therefore have not been included in the Joint Appendix.

3

granted in part and denied in part Wells' third motion to dismiss. JA0021 (Dkt. #139).

Thereafter, Wells moved for summary judgment on November 13, 2012. JA0263-663. Best opposed the motion. JA0676-934. Best also sought leave to exceed the page limit which was denied. JA0025 (Dkt. #177, 178); JA0026 (Dkt. #182). A hearing was held on Wells' summary judgment motion on December 14, 2012. JA0028 (Dkt. #200); JA1007-1036. The District Court granted Wells' motion on December 18, 2012. JA1005-1006. On March 29, 2013, the Court entered a Memorandum Opinion and Final Order dismissing the case. JA1037-1068. Best timely filed their Motion to Alter or Amend Judgment on April 25, 2013. JA1069-2087. Wells opposed the motion. JA2088-2102. The District Court denied Best's motion on July 2, 2013. JA2104. Best timely filed this appeal. JA2105-106.

## IV.    STATEMENT OF FACTS

### A.    The Parties

1.    Krish, who was born in southern India, founded Best Industries (now Best Medical) in 1977. JA0478; JA0049 ¶5. From 1977 to 2004 BMI remained a small company. JA0478. BMI manufactures medical treatments and devices used to treat cancer and other life-threatening diseases in adults and children throughout the world. JA0048 ¶1; JA0859.

4

2.    In 2004, Krish began expanding the business by acquiring companies and real estate that would strengthen BMI's business. JA0478.

3.    The expansion continued with the purchase of Huestis in 2006. JA0859. Founded in the 1920's, Huestis manufactures radiotherapy simulators and other radiotherapy equipment and refurbishes used equipment. JA0859. Krish is the President and sole shareholder of these companies. JA0049 ¶5.

**1.    The Loans – 2004 to 2008.**

4.    In the beginning, Krish's acquisitions were financed with the profits of his medical business. JA0478. Krish and his companies maintained bank accounts with Wachovia and its predecessors for over 35 years.  JA0051 ¶14; JA0236 ¶14.

5.    In October 2004, BMI entered into a revolving line of credit in the amount of $3,000,000 with Wachovia Bank. JA0246 ¶3; JA0248 ¶A.

6.    In December 2006, Huestis entered into a ten year Term Loan for $5,000,000 and a ten year $2,000,000 mortgage which was used to refinance the purchase of Huestis.  JA0051 ¶¶15C, 15D; JA0267 ¶¶1(iii), (iv); JA0744-779.

7.    Both Huestis and Wachovia knew that Huestis would be unable to satisfy the loan covenants.  JA0710-711.  When Krish voiced this concern, Wachovia personnel advised him not to worry about the covenants.  JA0861 (37:14-19). Accordingly, when Huestis did not meet the debt to net worth ratio for

5

2007, Wachovia agreed to change the way tangible and intangible assets were calculated. JA0710-711; JA1091 ¶2 and footnote 5. Specifically, Wachovia agreed that Huestis could "break out assets and leasehold improvements from other types of intangibles … for purposes of our leverage covenant calculation" and made a note to the file to support this method of calculating the ratio. See JA0710; JA0696. Best's consultant later suggested doing the same thing. JA1153-1154 (38:10–39:13).

8.      BMI's revolving credit line was renewed each year from its inception until Wells took over the loans in late 2008. JA0724-732; JA0683-684 ¶¶2, 3.

9.      Wells merger with Wachovia Bank was completed on or about December 31, 2008. JA0247 ¶16. However, Wells took control of Wachovia earlier in the fourth quarter of 2008. JA1556 (60:4-13). Once Wells took over, the parties' relationship immediately deteriorated. JA0213 ¶10(A).

## 2.      Wells' Discriminatory Actions Prior to July 31, 2009[2].

10.     In November 2008, Wells transferred Best's loans to the Special Assets Management ("SAM"[3]) unit allegedly due to Huestis' inability to meet the debt to net worth ratio covenant in 2007. JA0859; JA1523 (27:1-13). In addition

---

[2] The District Court held Best waived any civil rights claims that predated July 31, 2009. JA0956-957. These facts are important, however, to understanding the events that occurred after July 31, 2009 on which Best's claims are based.
[3] "SAM" was a Wachovia acronym; Wells equivalent is "CMG" or Credit Management Group.

to the Huestis term loans, the lines of credit were also transferred to the SAM unit although all payments were made on time. JA0482; JA0684-685 ¶¶6, 7, 9; JA1491; JA1522 (26:17-22). BMI's credit line required BMI to maintain their primary depository accounts with Wachovia. JA1482 (Financial Covenants). Wells never disputed that BMI satisfied this covenant. Pursuant to the Guaranty, Krish and BMI[4] were required, on a combined basis, to maintain liquid assets of $2,000,000. JA1741.

11.    Krish was treated differently by Wells than he was by Wachovia. JA0559 (69:10-20); JA0869-871 (54:6–55:18; 56:17-21); JA0904-905 (23:9-24:5). Thompson's immediate reaction after he met Krish face-to-face on December 30, 2008, was to inquire as to Krish's plan to exit the relationship. JA1455.

12.    Best's Senior Vice President and Counsel responded to Thompson on January 21, 2009 stating she had been unsuccessfully trying to contact him and providing contact information. JA1465.

13.    Wells claimed that BMI's line of credit had become due on March 6, 2009 and that Krish was in violation of the liquidity requirement. JA0372-373, JA0052 ¶19. The BMI loan documents Wells relied on provided that the liquidity requirement of $2,000,000 was for BMI and Krish *on a combined basis*. JA1741

_____

[4] In 2004, BII was the medical business which was later moved to BMI; BII was transformed into a real estate holding company. The reference to BII in the loan document therefore is to the medical company, BMI.

(Financial Covenants); JA0678; JA1096 ¶10. "Liquid Assets" were defined as the sum of all cash, time deposits and marketable securities. JA1741. The evidence showed that Krish and BMI had over $2,000,000 in cash and other marketable securities in late 2008 and early 2009 when the loan was transferred to the SAM unit. JA1745-1749. Wells refused to acknowledge that the liquidity requirement included BMI. See JA0297 ¶9; JA0678.

14.    Thompson then downgraded BMI, used the downgrade to deny an extension of the loan, changed the relationship strategy from retain to exit, and declared the loan in default although all payments were being timely made and there were no valid covenant violations. JA1491; JA1817 (53:16-21); JA1554-1555 (58:8-59:10); JA1557 (61:9-20). Once he declared a default, Thompson could impose high interest rates on Best rather than the market rates BMI was paying which Thompson referred to as "the current pittance." JA0482; JA1272-1273 (157:15-158:5).

15.    In April 2009, Krish learned that Thompson wanted Best to move their banking relationship to another bank. JA1472. Meanwhile, when Best contacted Wells to open two new bank accounts Wells advised that Thompson's approval was required. JA1472. Thompson's handwritten notes indicate that he declined approval for the new bank accounts "given issues in other related credits." JA1487.

8

16.     On May 8, 2009, Wells declared Huestis in default for: (1) failure to deliver audited financial statements; (2) violation of the debt service coverage ratio set forth in § 6.1.12 of the Financing and Security Agreement (hereafter "FSA"); and (3) Krish's failure to maintain the liquidity requirement set forth in §3.5 of the Personal Guaranty. JA0248 ¶¶22, 23; JA0685; JA0739-742. Although there is no record evidence of prior defaults and all payments were being made on time, Wells demanded immediate payment of all the loans. JA0052-53 ¶20; JA0382-385. Huestis was not given an opportunity to cure the default. JA0386.

17.     The alleged defaults were bogus because Huestis was not required by the loan documents to provide audited financial statements. JA0339 ¶6.1.1(a). Wells has never produced a signed Personal Guaranty related to the Huestis loans that required Krish to maintain a liquidity requirement and there is no record evidence setting forth such a requirement prior to July 31, 2009. JA0678. Thompson referenced the Term Notes, FSA and Mortgage in his summary judgment affidavit but did not reference any personal guaranty that Krish violated in May 2009 relative to the Huestis loans. See JA0296, ¶¶6, 7. Accordingly, Wells could not produce any probative evidence that a liquidity requirement existed in May 2009 or that Krish violated that requirement. See JA0297, ¶9.

18.     Thompson used these bogus "defaults" to bundle all the credit facilities into one loan charged against all the borrowers. JA0392 ¶9. Best was

9

compelled to agree to the following terms, set forth in the Waiver and Amendment Agreement ("WAA") dated July 31, 2009, in exchange for Wells waiving those "defaults" and extending the loans to January 1, 2010 or face immediate foreclosure of Best's properties:

- Increased interest rates from LIBOR plus 2 to LIBOR plus 5; JA0390 ¶4.

- Guaranties from several affiliates; JA0392 ¶8;

- The pledge of 65% of the beneficial interest of both Arplay USA in Arplay Medical SAS and Best Theratronics, Inc. in Best Theratronics, Ltd.; JA0392-393 ¶11;

- pledge of an additional $10,000,000 in collateral; JA0393-394 ¶12;

- Best had to use their best efforts to refinance the loans by January 1, 2010, and was obligated to pay the loans in full by then although the country was experiencing a severe financial crisis and credit crunch; JA0395 ¶¶17, 18;

- Payment of a $20,000 non-refundable extension fee; JA0397 ¶24; and

- Waiver of all claims and defenses and the right to a jury trial; JA0397-399 ¶¶25, 26, 28.

19.    Krish's race is the only justification for the substantial increase in interest rates imposed on the lines of credit since all payments were being timely made and there were no covenant violations prior to Thompson's refusal to extend

the loans. JA0214-215, ¶11. The bogus defaults underlying the WAA demonstrate it was designed to put Best in a position to fail. JA0533 (66:10-11); JA0668.

**B.    Wells Discriminatory Actions After July 31, 2009.**

20.    In late December, Best advised Wells that they would be unable to complete the refinance by January 1, 2010 and that they had retained Tatum, LLC to assist them in obtaining the necessary refinancing. JA0926.  Robert Martins ("Martins") assisted Best in obtaining refinancing of the debt.  JA0268-269 ¶15. Upon expiration of the WAA, Martins requested another extension of the loan facilities. JA1176 (61:1-18).

21.    On March 18, 2010, Thompson demanded the following terms for a second extension:

- $1,000,000 principal payment and pledge of a minimum $1,000,000 in additional collateral;

- $100,000 extension fee;

- an interest rate floor of 8% for BMI's loan although interest rates were at all-time lows;

- $250,000 additional monthly principal payments;

- payment of $6,000,000 within 90 days;

- fees of 1% on any balance owed on May 31, 1.5% on July 31, and 2% on September 30, 2010.

11

JA0686-687 ¶24; JA0781.

22.    On March 25, 2010, Martins asked Thompson to grant an extension so he could continue to work to get the loans refinanced.   JA1183-1184 (68:10-69:14).   Thompson insisted that the refinancing be completed by the end of March. JA1184 (69:15-22).

23.    Krish responded to Wells' demands on March 30, 2010 and offered to pay an additional $250,000 per month and advised that he was working with banks and hoped to pay a substantial part of the loan before year end.  JA0478.  On April 6, 2010, Thompson rejected Krish's offer. JA0270 ¶25; JA0480.   In a separate email on April 6, 2010, Thompson belittled Krish stating the offer to pay $250,000 additional per month was "a vast over simplification of what would be required for an extension…" and disparaged Krish's explanation of Best's R & D budget and inventory.  JA0482.

24.    Thompson later submitted a revised extension outline that required the additional principal payments of $250,000, increased the extension fee to $150,000, and required Best to pay an additional $475,000 by June 15, 2010. JA1762-1763.   Under this proposal, Best would have been in default if the outstanding balance of all the loans exceeded $5,500,000 on July 31st, and Wells could have charged fees of 1.5% on July 31st and 2.0% on September 30, 2010 on any remaining balance.  JA1762.

12

25.    Best attempted to negotiate more reasonable terms that Best could meet, but Wells response to Best's good faith requests was to attempt to penalize Best out of existence by increasing the extension fee from $100,000 to $150,000, requiring assignment of Krish's interest in various real estate to Wells, increasing the penalty fees, and imposing limitations on the amount Best could spend on R & D. JA0686-687 ¶24; JA867 (75:4-17); JA1762-1763.

26.    Although the parties were still attempting to work out an agreement, on April 21, 2010 Wells demanded payment of all the loans before April 30, 2010. JA0271 ¶¶ 26, 27; JA0486-489.

27.    Despite Wells aggressive and unreasonable stance, Best continued to pay the additional $250,000 payment toward the Huestis loans to show their good faith intention to repay the loans. JA696 ¶2; JA0714.

28.    On May 6, 2010, Best's General Counsel, Shawn Weingast ("Weingast"), asked to speak to Thompson's boss regarding extending the loans for a long-term bank customer who had never missed a payment. JA0083. Wells did not respond to Best's request. JA0539 (72:8-18), JA0866 (74:5-13).

29.    Negotiations for a second extension continued.  JA0490. On Monday, June 14, 2010, Best advised that by Thursday they would have a better understanding of the amounts and timing of the additional payments to Wells. JA0509.  Thompson authorized Best to proceed with their cash flow review on

June 15, 2010.  JA0509; JA0682 ¶ 31.

30.    On June 24, 2010, Krish wrote to Thompson stating his goal was to "transition all of our business from Wachovia to another bank, as you have been forcing us to do."  JA0511.  Krish further expressed his reasonable belief that he was being subjected to racial discrimination.  JA0511.

### C.    Wells Retaliated Against Krish and Best.

31.    Thompson received Krish's letter on Friday, June 25, 2010.  JA0034.  On Thursday, June 30, just four business days later, before Wells even responded to Krish's discrimination complaint, Wells confessed judgment against Krish, BII and Gunston.   JA300 ¶32; JA2080-2085.  Wells' counsel responded to Krish's discrimination complaint on July 1, 2010.  JA1720-1721.  Wells' president, John Stumpf, forwarded the complaint to Dee Dunlap who responded to Thompson only stating "our policy is to support the line of business."  JA0900.

32.    On August 3, 2010, Best sued Wells in the Fairfax County Circuit Court alleging violation of the Virginia Equal Credit Opportunities Act, breach of contract, and other claims and requested the confessed judgments be set aside.  JA0272 ¶35; JA0300 ¶33.

33.    Wells fought strenuously to get Best's lawsuit dismissed.  On March 2, 2011, the Circuit Court granted Wells' demurrer but permitted Best to amend the complaint so Wells did not get the dismissal with prejudice they sought. JA0920-

924.

34.    In April 2011, while Best was still making all loan payments required under the original loan documents, Best offered to pay off a portion of the loans if Wells would release collateral equal in value to the amount paid which Best could then use to refinance the balance of the loans. JA0693; JA0058 ¶31(B)(g).  Wells retaliation continued in their refusal to negotiate in good faith in this matter, which seriously impeded Best's ability to obtain refinancing. *Id.*

35.    Thereafter, in October 2011, Wells admittedly stopped accepting Best's loan payments, allegedly because they changed to a new system that would no longer accept payments on a matured loan. JA0283.

36.    On February 24, 2012, the Fairfax County Circuit Court entered final judgment against Best. JA0300 ¶34.

37.    On May 3, 2012, under the guise of collecting on their judgment, Wells issued a subpoena duces tecum to United Bank. JA0228-229.

38.    Best sought refinancing from United Bank and was close to obtaining financing when Wells issued their subpoena. JA0976 ¶19. Unsurprisingly, United Bank declined to refinance the loans after Wells issued their subpoena.  JA1002-004.

39.    In June 2012, Wells contacted BMI's customers advising them to pay all amounts owed to BMI directly to Wells and threatening them with penalties if

15

they failed to comply.  JA0059 ¶34; JA0979-980 ¶¶37-39.

40.    BMI's customers were alarmed about BMI's ability to continue to provide them with the products they require to treat their patients and began seeking other sources or alternatives from other suppliers.  JA0060 ¶¶35-36.

41.    Wells decision to collect BMI's accounts receivables ("AR") severely damaged both BMI's and Krish's reputation with their customers and seriously damaged Best's business.  JA0060 ¶37.

## V.    SUMMARY OF THE ARGUMENT

Issue No. 1:  The District Court granted Wells' summary judgment motion on Best's § 1981 claim based on Best's alleged failure to produce sufficient evidence of qualification for credit.  A genuine material disputed fact existed as to Best's qualification for credit because Best presented evidence they were qualified for credit in the form of three term sheets issued by different banks.  JA0851-853; JA1108-1114. While other jurisdictions have found that a term sheet constitutes evidence that the applicant was qualified for a loan, this issue has never been decided in the Fourth Circuit.  The District Court failed to view the term sheets as evidence in Best's favor, ignored testimony indicating Best was unable to refinance the debt due to Wells cross-default and cross-collateralization of the loans (JA1158-43:1-14), and instead found the testimony that Best had **contacted** over a dozen lenders in their search for refinancing during the financial crisis was

16

indicative of disqualification for credit.  JA0679 ¶16. Wells' cross-default, cross-collateralization of the loans made it impossible for Best to obtain refinancing, not Best's creditworthiness. JA1158 (43:5-14). Best timely made payments and provided sufficient collateral to secure the loans. Best's qualification for a loan was a disputed material fact for the jury to decide. JA0691.  Instead, the District Court weighed the evidence, made credibility determinations, and granted summary judgment despite Best's evidence of a material factual dispute regarding Best's qualification for credit.

Issue No. 2:  The District Court erred in holding that Best was required to produce direct evidence of "words or other actions implicating race" in order to satisfy the causation element of a § 1981 claim involving commercial lending discrimination.   Best relied on the *McDonnell Douglas* framework to prove causation which permitted Best, in the absence of direct evidence, to rely on circumstantial evidence to prove causation.  Circumstantial evidence is permitted in these cases because the discrimination that persists today is unlikely to manifest itself in "words or other actions implicating race" and is, therefore, more difficult to prove.

The District Court also erred in relying on hostile work environment cases for the proposition that words or other actions implicating race are necessary because the Supreme Court has established separate principles for claims alleging

17

discrete discriminatory acts and claims alleging hostile work environment. Moreover, the prima facie and pretext inquiries often overlap so courts may consider the same evidence at both stages of the *McDonnell Douglas* analysis. Best presented facts supporting the inference that Krish's race was a motivating factor in Wells' actions including, but not limited to, the terms imposed on Best in 2010 were typical of Wells treatment of minorities, Thompson's testimony established animus toward minorities, and Thompson's hostile, demeaning, and disrespectful treatment of Krish.

Issue No. 3:  Other courts have held that the pretext analysis does not involve whether a defendant made an erroneous decision but should instead focus on the motive behind the decision.  Here, Best established pretext by showing that 60% of the confessed judgments filed by Thompson were against minority borrowers although less than 20% of the principals in his portfolio were minorities. None of the other loans Thompson confessed judgment against were current on their payments.  This is strong evidence of pretext, particularly when Best was not only making all loan payments but paying an additional $250,000 per month towards the loans when Wells confessed judgment. Best submitted numerous examples of Wells' actions that could lead a reasonable juror to conclude that Wells adverse and draconian treatment of Best was a pretext for discrimination. Best further showed that Wells alleged justifications were conclusory, self-serving,

18

and inconsistent with or unsupported by the record evidence, or based on mischaracterizations or misrepresentations of the evidence.

Issue No. 4: Best's retaliation claim was dismissed because Wells' **threats** to exercise their rights and remedies constituted "gradual adverse actions" that negated any inference of retaliation. This is the first time the doctrine of "gradual adverse actions" has been applied to a lending discrimination claim and the first time it has been applied to threats rather than actions. If this doctrine is applied in lending discrimination cases, the District Court failed to evaluate the temporal proximity of the confession of judgment in the context of Wells' (1) refusal to negotiate a release of some collateral in exchange for payment of an amount equivalent to the value of the collateral; and (2) Wells decision to collect BMI's AR rather than foreclose on real property that would not impact BMI's business. Best was not required to prove that Krish's race was the sole factor motivating Wells' discriminatory actions but only a contributing factor in their discriminatory treatment of Best. Accordingly, the District Court erred in granting summary judgment in this matter.

## VI.    ARGUMENT

### A.    Standard of Review

Review of a grant of summary judgment is de novo. *Higgins v. E.I. Du Pont de Nemours & Co.,* 863 F.2d 1162, 1167 (4th Cir. 1988). Federal appellate courts

19

apply the same legal test as the district court. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir. 1999). Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *FED. R. CIV. P. 56(c)*. The Supreme Court has held that the court "should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses'." *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 151 (2000) *quoting* 9A C. Wright & A. Miller, *Federal Practice and Procedure § 2529,* p. 300 (2d ed. 1995). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves,* 530 U.S. at 150 *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). Thus, although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves,* 530 U.S. at 151 *citing* Wright & Miller 299.

In reviewing a summary judgment motion, a court must view the facts, and any inferences drawn from the facts, in the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Where the party opposing summary judgment would have the burden of proof at trial, that party is entitled to have the credibility of his evidence as forecast assumed, his version of all that is in dispute accepted, all internal conflicts in it resolved favorably to him, the most favorable of possible alternative inferences from it drawn in his behalf; and to be given the benefit of all favorable legal theories invoked by the evidence. *Overstreet v. Kentucky Cent. Life Ins. Co.*, 950 F.2d 931, 937 (4th Cir. 1991). Where states of mind are decisive as elements of a claim or defense, summary judgment ordinarily will not lie. *Id.*

### B. Does a Term Sheet Constitute Sufficient Evidence to Survive Summary Judgment that a Plaintiff Was Qualified for Credit?

Whether a term sheet constitutes sufficient evidence of qualification for credit to survive summary judgment is an issue of first impression in the Fourth Circuit. Is a plaintiff required to accept offered loan terms to establish qualification for credit? The District Court held Best presented insufficient evidence of qualification for a loan because they "failed to refinance the loans or repay the same in full as of January 1, 2010." JA1053. The evidence showed Best obtained offers for financing. JA1108-1114; JA0851-853; JA1080-1081. The District Court selectively credited Martins' testimony that Best's "financial condition during this time would give pause to any potential lender" but disregarded Martins' testimony that he had located a lender who was willing to provide a loan on the owner occupied real estate. JA0691; JA1053; JA1135 (20:7-

21

19); JA1160 (45:4-10). Martins further testified that he could not point to any particular circumstance that caused any lender to make any decision. JA1140 (25:5-10). The District Court disregarded Martins' testimony that the reason Best was unable to refinance was due to Wells cross-default and cross-collateralization of the loans so that "if a bank wanted to take out one of the loans it would need to pay out all of the loans because of the cross collateralization, cross default provision." JA1082; JA1158 (43:5-14); JA0568 (94:2-15). Best failed to refinance the loans because Wells bundled and cross-collateralized the loans which were initially underwritten as four separate loans to three separate entities which made it impossible to refinance the loans. JA0568 (94:2-8); JA1082. Whether Best was qualified for credit was a disputed material fact. JA0274-275; JA0679-680 ¶¶16, 17; JA0691-692; JA0213 ¶ 10(C).

### 1. Best's Loan Qualifications Should Have Been Resolved in Best's Favor in Evaluating the Prima Facie Case.

Extensive research revealed no precedent defining what evidence of qualifications for credit would be sufficient to survive summary judgment. At least one District Court has found a term sheet to be sufficient evidence that a party was qualified for a loan. *See, JAT, Inc. v. Nat'l City Bank of the Midwest*, No. 06-11937, 2008 U.S. Dist. LEXIS 45059 at *19-20 (E.D. Mich. June 10, 2008). Best attached a term sheet to their opposition to Wells' summary judgment motion that

showed that Gunston and BII[5] were qualified for credit in July 2010. JA0851-853.
It is common sense that banks do not issue term sheets to prospective borrowers
without first determining at least preliminarily that the borrower is qualified for the
requested credit. Accordingly, if Best was unqualified for credit, as Wells alleged,
Best could not have obtained three term sheets from different lenders. The District
Court declined to view the term sheets as evidence in Best's favor. Given the
District Court's opinion about Best's qualifications for a loan, Best attached two
additional term sheets to their Motion to Alter or Amend to demonstrate Best's
qualifications for credit. JA1108-1114. The District Court again declined to find
that the term sheets constituted evidence that Best was qualified for credit. JA2104.

In *Gross v. United States Small Business Admin.*, 669 F. Supp. 50, 54
(N.D.N.Y 1987), the Court held that where the plaintiff testified she had adequate
collateral to secure the loan and projected adequate income to service the resulting
debt, the question of her loan qualifications would be resolved in her favor in
evaluating the prima facie case. Here, Alexander Arapoglou ("Arapoglou"), Best's
banking expert, testified that Best had enough money to cover their debts (JA1383
93:13-21) and that Wells held "more than sufficient collateral." JA1353 (63:13-
23). Best's ability to pay the loans was supported by the fact that all loan payments
were being made on time and $250,000 per month additional payments were being

---

[5]BII and Gunston are not participating in this appeal but this information shows the
District Court gave credence to Best's evidence in granting summary judgment.

made beginning in April 2010. JA0480-481; JA0714. After Best tendered additional collateral to Wells pursuant to the WAA, Best's loans were secured with margined collateral that Wells valued at over $19,000,000 when Wells exposure was only $12,000,000. JA1489. Accordingly, the District Court erred in finding that Best was not qualified for a loan.

### 2. Precedent Does Not Require Plaintiffs to Have Flawless Financials to Qualify for an Extension of Credit.

In *Lindsay v. Yates,* the Court reversed the grant of summary judgment in favor of defendants despite plaintiffs inability to show that the property "remained available" and held that so long as some "additional evidence" exists from which a reasonable juror could find an inference of discrimination such failure was not fatal to their claim. *Lindsay v. Yates,* 578 F.3d 407, 416 (6th Cir. 2009). The Supreme Court has emphasized that the prima facie standard set forth in *McDonnell Douglas* was not "inflexible" and the specific proof required of a plaintiff was "not necessarily applicable in every respect in differing factual situations." *Id. citing Tex. Dep't of Comm. Affairs v. Burdine,* 450 U.S. 248, 254, n. 6 (1981) *quoting McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, n. 13 (1973). Thus, rather than determining whether the prima facie elements of a discrimination claim were established, the District Court should have asked whether Best had "presented sufficient evidence to permit a reasonable jury to conclude [they] suffered" an adverse lending action "under circumstances giving rise to an inference of

24

unlawful discrimination." *Lindsay,* 578 F.3d at 416.

Best submitted evidence that Monument Bank was willing to lend up to $3,675,000 to Gunston and BII in July 2010 in their Rule 59(e) Motion (JA1108-1109) to refute the District Court's opinion that Best presented insufficient evidence to allow a reasonable juror to find that Best was qualified for credit. JA1053. Best also submitted a term sheet from Virginia Commerce Bank for a loan of up to $2,700,000 to refinance the Wachovia debt and provide an additional $2,000,000 credit line to BMI in August 2010. JA1111-1114. This probative evidence established that BMI was qualified for credit. This evidence was probative because (1) Wells alleged that Best's failure to pay off the loans as required by the WAA was evidence that Best was not qualified for credit; and (2) this evidence conclusively refuted Wells' allegation that there was no lender who was willing to lend to Best which justified their denial of credit. The District Court failed to view this evidence in the light most favorable to Best and declined to find a material issue of fact was created that precluded summary judgment.

The Third Circuit has held that the analysis of whether a plaintiff is "qualified" for credit should focus on the general form of credit and qualifications for such credit rather than on every possible condition that might need to be fulfilled to proceed to closing. *Anderson v. Wachovia,* 621 F.3d 261, 274 n. 11 (3d Cir. 2010). Moreover, the qualifications should encompass minimum

requirements. *Id.* A term sheet illustrates compliance with at least the minimum requirements to qualify for a loan because it would be absurd for a bank to issue a term sheet to a borrower who did not meet the minimum requirements. Wells and the District Court ignored precedent requiring only minimum requirements. Rather than focus on the general form of credit and qualifications, the District Court focused on Best's failure to refinance and concluded such failure meant Best was unqualified for credit. Moreover, the District Court's opinion required plaintiffs to accept the terms offered in order to be qualified for credit. JA1053-1054. The District Court equated failure to refinance with being unqualified for a loan without recognizing there could be, and were, other reasons for Best's failure to refinance. Best obtained offers for loans which established their qualification for credit. JA1108-1114; JA851-853. Best could not accept the offers because Wells refused to accept partial refinancing and refused to release collateral that could be used to refinance. See Statement of Facts ("SoF") ¶34.

The District Court also declined to distinguish between information gathering and tendering a formal loan application. JA1084; JA1167 (52:7-13); JA1168-1169 (53:2-54:2). The Court concluded that viewing the evidence in the light most favorable to Best somehow required the Court to read Weingast's testimony "to demonstrate that Plaintiffs sought financing from a variety of banks...." JA1054. However, Weingast's deposition testimony actually stated that

26

Best "approached" various lenders regarding refinancing the loans not that they "sought financing" from them. JA0534 (67:8-22)[6].    Under the Equal Credit Opportunity Act, a "completed application" is defined as an application where the creditor has received all the information that the creditor regularly obtains and considers in evaluating applications for the amount and type of credit requested. *12 C.F.R. § 202.2(f) (2003).* Under that definition, contacting a lender to solicit interest would not qualify as an application for credit. The Court disregarded Martins testimony that he "wasn't negotiating with many of these banks" but was "describing the situation in soliciting interest." JA1219 (104:3-5); JA0679. The District Court declined to find there was a difference between calling a lender to solicit interest and making a formal loan application. Information gathering does not determine qualification for credit as there are numerous reasons why a lender may not be interested. JA0691. This evidence shows that Best acted reasonably to refinance the loans. A reasonable juror could infer that since Best was able to obtain three term sheets in mid-2010, *after* Wells confessed judgment against Best, that Best was qualified for credit because the evidence illustrated Best was able to show sufficient income and collateral to satisfy these lenders that Best was an acceptable credit risk.    Accordingly, if this Court finds that a term sheet is sufficient evidence that a plaintiff is qualified for credit, as other jurisdictions have,

---

[6] The District Court incorrectly cited Weingast Dep. 66:17-22 (JA0533); the Court may have been referring to Weingast Dep. 67: 8-22 (JA0534).

then the grant of summary judgment was in error.

> **C. Is a Plaintiff Proceeding Under the *McDonnell Douglas* Framework Required to Provide Direct Evidence of "Words or Other Actions Implicating Race" to Demonstrate a Causal Nexus between Race and Defendants' Actions?**

The District Court erred in holding that Best did not establish a causal nexus to Krish's race because there was no "indication of words or other actions implicating race...." JA1055. Direct evidence is "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *United States EEOC v. CTI Global Solutions, Inc.*, 815 F. Supp. 2d 897, 906 (D. Md. 2011) *quoting Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006). Where a plaintiff has no direct evidence of discrimination, the plaintiff may rely on circumstantial evidence pursuant to the *McDonnell Douglas* framework, which applies to § 1981 cases. *Lewis v. Cent. Piedmont Cmty. Coll.*, 689 F.2d 1207, 1209 n.3 (4th Cir. 1982) ("[I]t has been held, and we think correctly, that the *McDonnell Douglas* criteria apply equally to cases arising under Title VII or § 1981") (additional citation omitted). Causation can be proven indirectly through circumstantial evidence such as suspicious timing. *Lindsay*, 578 F.3d at 418 (additional citation omitted).

> **1. Was Best Required to Present Direct Evidence of "Words or Other Actions Implicating Race" to Establish Causation?**

Although Best proceeded under the *McDonnell Douglas* framework, the

28

District Court required direct evidence of "words or other actions implicating race" to establish a causal connection between Krish's race and Wells' decision to deny an extension of credit to Best. In *Anderson v. Wachovia*, the Third Circuit described the causation element in lending discrimination cases as "*some additional evidence ... that establishes a causal nexus between the harm suffered and the plaintiff's membership in a protected class, from which a reasonable juror could infer, in light of common experience, that the defendant acted with discriminatory intent.*" *Anderson*, 621 F.3d at 274 n. 11. The District Court apparently concluded that this 'additional evidence' must be "words or other actions implicating race" (JA1055) which is inconsistent with *Anderson* and other § 1981 cases where the plaintiff is proceeding under the *McDonnell Douglas* framework.

> The Third Circuit observed in 1987 that

> "In today's climate of public opinion, blatant acts of discrimination -- the true 'smoking gun' -- can easily be identified, quickly condemned and often rectified in the particular settings where they occur. Much of the discrimination that remains resists legal attack exactly because it is so difficult to prove. Discrimination victims often come to the legal process without witnesses and with little direct evidence indicating the precise nature of the wrongs they have suffered. That is one of the reasons why our legal system permits discrimination plaintiffs to 'prove [their] case[s] by direct *or circumstantial* evidence.'"

*Jackson v. University of Pittsburgh,* 826 F.2d 230, 236 (3d Cir. 1987) *citing United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n.3 (1983)

29

(emphasis added)(additional citations omitted).  Evidence also has been presented to Congress regarding the race-based denial of access to capital that showed that discrimination in business lending exists.  *See Adarand Constructors, Inc. v. Slater,* 228 F.3d 1147, 1169-1170 (10th Cir. 2000); *DynaLantic Corp. v. United States D.O.D.,* 885 F. Supp. 2d 237, 258-260 (D.D.C. 2012).  Empirical studies have corroborated these findings. See JA0087-0210. If words or other actions implicating race are necessary to survive summary judgment, race-based denial of access to credit will continue unabated.

Against this backdrop, Wells *modus operandi* historically has been to impose higher interest rates on minorities as evidenced by the "reverse redlining" cases brought against Wells in connection with residential mortgages.   The investigation conducted by the U.S. Department of Justice revealed that Wells routinely charged higher fees and interest rates, and imposed abusive and detrimental terms on minorities. Savage, Charlie, *Wells Will Settle Mortgage Bias Charges,* http://www.nytimes.com/2012/07/13/business/wells-fargo-to-settle-mortgage-discrimination-charges.html.  The  Justice  Department  action  was triggered by a 2009 examination by the Office of the Comptroller of the Currency which found that, after controlling for credit factors, it appeared that minority borrowers in the Washington, D.C. metro area were more likely than white borrowers to be placed in subprime loans.  Simon, Ruth and Zibel, Alan, July 12,

30

2012, *Wells Settles Lending-Bias Cases,* http://online.wsj.com/article/SB10001424

0527023043738045775227405787702890.html.   Springfield is in the Washington,

D.C. metro area. While the investigation did not cover commercial loans like the

ones here, it strains credulity to believe that Wells did not apply the same *m.o.* to

these loans, especially given the similarities between those cases and the facts of

this case.

Thompson's allegation that his decision was based on financial

considerations is highly suspect because:

- Wells Problem Asset Report dated October 1, 2009 stated that cash flow was trending upward in the first quarter of 2009.  JA1359 (69:11-70:24)

- All payments were being timely made and additional payments of $250,000 per month were being paid toward the Huestis loans beginning in April 2010; JA1804 – 40:12-15; JA0684 ¶6;

- Thompson's belief that minorities should pay higher interest rates is reflected in his remark to Krish regarding making "payments of $250,000 greater than the current pittance";  see JA0482;

- The high interest rates imposed on Best in the WAA and thereafter correspond to Wells practice of charging higher interest rates on minorities; JA0477.

- Wells imposed abusive and detrimental terms on Best as set forth above. See

31

"SoF" ¶¶ 21-22, 24-26.

- Wells imposed unreasonably high fees in connection with a very short extension. JA0477.

- Wells imposed unreasonable deadlines for refinancing the loans in 2010; JA1184 (69:15-17); and

- Wells chose collection methods designed to financially harm Best. JA1255-1256 (140:21-141:18); JA0059 ¶31(B)(i).

While explicit "words implicating race" were absent in this case, there was sufficient circumstantial evidence of discrimination to survive summary judgment.

The two cases cited by the District Court in support of its holding that "words or other actions implicating race" are necessary were both hostile work environment cases. These cases are neither controlling nor persuasive because hostile work environment cases are not based on discrete acts of discrimination but on a series of separate acts that collectively constitute one unlawful employment practice. *See Royal v. Potter*, 416 F. Supp. 2d 442 (S.D. W. Va. 2006) *citing AMTRAK v. Morgan*, 536 U.S. 101, 117 (2002). After carefully reviewing the statutory language, the Court in *Morgan* established separate principles for claims alleging discrete discriminatory acts and claims alleging hostile work environment. *Royal*, 416 F. Supp. 2d at 447 *citing Morgan*, 536 U.S. at 110-118. Accordingly, in *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306 (4th Cir. 2008), the Fourth Circuit

32

never mentioned the *McDonnell Douglas* framework in analyzing the hostile work environment claim because it is a substantively different claim from the race discrimination claim at issue here. Other courts are in accord. *See, e.g., Hughes v. Home Depot, Inc.,* 804 F. Supp. 2d 223 (D.N.J. 2011)(applying *McDonnell Douglas* framework to plaintiffs retaliation claim but not to plaintiff's hostile work environment claim); *Lalau v. City & County of Honolulu,* No. 11-268, 2013 U.S. Dist. LEXIS 44997 (D. Haw. Mar. 28, 2013) (applying *McDonnell Douglas* framework to ADEA claim but not hostile work environment claim); *Burus v. Wellpoint Cos.,* Civ. No. 5:08-154, 2010 U.S. Dist. LEXIS 28798 (E.D. Ky. Mar. 25, 2010)(same).

### 2. The Prima Facie Case and Pretext Inquiries May Overlap when Establishing a Causal Link between Race and the Discriminatory Actions.

The Third Circuit has recognized that "evidence supporting the prima facie case is often helpful in the pretext stage, and nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Doe v. C.A.R.S. Protection Plus, Inc.,* 527 F.3d 358, 370 (3d Cir. 2008)(additional citation omitted). The Supreme Court in *Reeves* held that "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated." *Reeves,* 530 U.S. at 148.

33

The District Court erred in stating Best presented "no facts providing any inference that race bore any relation to" Wells' decisions." JA1055; JA0694-695. Best argued that the inference that race was the motivating factor was found in the following:

- Best's attempts to negotiate in good faith in 2010 were belittled by Thompson; JA0681 ¶27; JA0482.

- the terms Wells demanded in 2010 are typical of Wells' treatment of minorities who are subjected to higher interest rates and fees, abusive terms and are required to provide more collateral than non-minority borrowers. See JA0694. Here, in 2010 Wells demanded an additional $1,000,000 in collateral although the value of the collateral already exceeded the outstanding loan balance by at least $7,000,000, payment of a $150,000 extension fee and an interest rate floor of 8% on the BMI line of credit. JA0686-687; JA0781-782; JA1762-1763. Moreover, when the fees and interest rate are combined the effective interest rate was over 17% when Best had been paying only about 3% before Wells declared the loans in default and interest rates were at all-time lows. Additionally, the fees totaled over $400,000 and did not result in any principal reduction. See JA0866-867 (74:5-75:17).

- Thompson was hostile, disrespectful, and demeaning to Krish but was

34

professional and respectful to the Caucasian members of Krish's staff. JA0559 (69:10-20); JA0699; JA0869-870 (54:6-55:18); JA0871-872 (56:17-57:5); JA0904-905 (23:9-24:5); and

- Thompson's immediate reaction to meeting Krish was to terminate his relationship with Wells (JA1455); Thompson's discriminatory bias toward Krish continued after July 31, 2009.

There is no rule of law that provides that a discrimination plaintiff may not testify in his own behalf, or that such testimony, standing alone, can never make out a case of discrimination that will survive a summary judgment motion. *Jackson,* 826 F.2d at 236. Here, the District Court held Krish's statements failed to "demonstrate any facts causally connecting his race and Defendant's actions" although Krish testified he was treated differently than the Caucasian members of his staff. JA1055. The Court overlooked Thompson's testimony that:

1.     Between five and seven of the approximately 40 loans in his portfolio had minority borrowers; JA1944 (180:4-12);

2.     Since the merger with Wachovia, he had confessed judgment on five borrowers and three of the five borrowers (including Krish) were minorities. JA1948-1950 (184:14-186:12); JA1958 (194:3-5). Krish is of Asian Pacific origin. JA0049 ¶5.

3.     Thompson's testimony established that 60% of the borrowers he

35

confessed judgments against were of Asian or Middle Eastern descent.

4.    Although less than 20% of his portfolio consisted of minority borrowers, 60% of the confessed judgments were filed against minorities;

5.    Thompson never before confessed judgment against a borrower who was current on their payments and the loan was fully collateralized. JA1975 (211:4-19); JA701.

This evidence combined with the above facts established pretext. JA1099-1100 ¶ 15; JA1948-1949 (184:14–185:9); JA1958 (194:3-5). While hostile and demeaning behavior alone may not establish pretext, when combined with Thompson's demonstrated animus toward minorities, Wells imposition of outrageous interest rates and penalties on Best, and Wells refusal to negotiate in good faith with Best, there is sufficient evidence to infer that discrimination was the motivation for Wells actions.

Additionally, Wells had a "Fair and Responsible Lending" policy ("FRL") that provided that Wells would "treat all customers fairly." JA1723.   The FRL policy required each business to implement and maintain a dedicated fair and responsible lending compliance program. JA1728. Wells did not follow their own policies under the FRL policy. See JA697-699.  Here, Wells' policy was a sham. Far from being irrelevant as Wells' counsel suggested (JA0945-946), violation of company policy can constitute a pretext for unlawful discrimination.   *See,*

36

*Anderson,* 621 F.3d 261 *citing Goosby v. Johnson & Johnson Med., Inc.,* 228 F.3d 313, 322 (3d Cir. 2000). See JA1094-1096 ¶8.

The District Court declined to view this compelling evidence in Best's favor and accepted without question Wells' justifications for their actions. Once Best discredited Wells' justifications, the only reasonable inference remaining was intentional discrimination against Krish and his companies. *See, Reeves,* 530 U.S. at 147. Accordingly, the District Court erred in holding that "words or other actions implicating race" were necessary to establish causation.

**D.    What Constitutes Sufficient Evidence to Survive Summary Judgment that Wells' Allegedly Non-Discriminatory Reasons Were a Pretext for Lending Discrimination in a § 1981 Case?**

At the third stage of the *McDonnell Douglas* framework, plaintiffs are required to show "in some other way…circumstances which give rise to an inference of unlawful discrimination." *Anderson,* 621 F.3d at 274 *citing Burdine,* 450 U.S. at 253 (1981). "The question is not whether an employer made an erroneous decision; it is whether the decision was made with discriminatory motive." *Perez v. Region 20 Educ. Serv. Ctr.,* 307 F.3d 318, 325 (5th Cir. Tex. 2002) *quoting Mayberry v. Vought Aircraft Co.,* 55 F.3d 1086, 1091 (5th Cir. 1995). Pretext "means a dishonest explanation, a lie rather than an oddity or an error." *Kothe v. Cont'l Teves, Inc.,* 461 F. Supp.2d 466, 474 (W.D. Va. 2006) *citing Farrell v. Butler Univ.,* 421 F.3d 609, 613 (7th Cir. 2005). A plaintiff can show

37

pretext by demonstrating that the defendant's explanation is "unworthy of credence" or by "offer[ing] other forms of circumstantial evidence sufficiently probative of intentional discrimination." *Kothe,* 461 F. Supp. 2d at 474 *citing Dugan v. Albemarle County Sch. Bd.*, 293 F.3d 716, 721 (4th Cir. 2002). To show pretext, a plaintiff need not produce any additional evidence of discrimination distinct from the evidence supporting his prima facie case, so long as that evidence is sufficient. *Kothe* 461 F. Supp. 2d at 475 *citing Reeves*, 530 U.S. at 148-49 (invalidating requirement that "a plaintiff must always introduce additional, independent evidence of discrimination" to survive summary judgment).

### 1.    Evidence of Animus Toward a Protected Group is Indicative of Pretext.

If the defendant articulates legitimate, nondiscriminatory reasons for the plaintiff's adverse treatment, the plaintiff must demonstrate that the reasons given by the defendant for such treatment are merely a pretext for unlawful discrimination. *Venter v. Potter,* 694 F. Supp. 2d 412, 422 (W.D. Pa. 2010) *citing McDonnell Douglas*, 411 U.S. at 804-05. Evidence that the stated reasons for an adverse action are unworthy of credence is one form of circumstantial evidence that can be used to establish the existence of intentional discrimination. *Id., citing Desert Palace, Inc. v. Costa,* 539 U.S. 90, 100 (2003). To survive summary judgment, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the

38

employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Simpson v. Kay Jewelers,* 142 F.3d 639, 644 (3d Cir. 1998)(additional citation omitted). Evidence of animus towards a protected group may indicate pretext. *Spears v. Patterson UTI Drilling Co.*, No. 09-10048, 337 Fed. Appx. 416, 420 (5th Cir. Tex. July 16, 2009) citing *Reeves*, 530 U.S. at 151.

> ### 2. Best Submitted Evidence that Could Lead a Reasonable Factfinder to Believe that Wells' Articulated Reasons were a Pretext for Discrimination.

Thompson's testimony established that less than 20% of the borrowers in his portfolio were minorities but that 60% of the confessed judgments were filed against minorities (counting the Best loans as one). JA1944 (180:1-12); JA1948-1949 (184:14–185:9); JA1958 (194:3-5). Two of the four borrowers (including Krish) who had confessed judgments filed against them were from Springfield, Virginia. JA1953 (189:20-22). According to the most recent Census data, Springfield, Virginia's population is just over 20% Asian compared to the Commonwealth of Virginia with only a 3.7% Asian population.

Unsurprisingly, the majority of the evidence relied on by Wells comes from the discriminator, Thompson, Thompson's supervisor who turned a blind eye to Thompson's discriminatory actions, and others in Wells chain of command who did nothing following Krish's discrimination complaint. The testimony of Wells'

expert, Steven Kohlhagen, a former Wachovia employee, is not persuasive because Kohlhagen is not a disinterested witness in this matter. Moreover, expert testimony must have a traceable, analytical basis in objective fact before it may be considered on summary judgment. *Bragdon v. Abbott*, 524 U.S. 624, 653 (1998). Therefore, Wells' experts testimony should not have been considered by the District Court because it was not based on a traceable, analytical basis in objective fact. Below are Wells' allegedly non-discriminatory justifications for their actions and Best's response showing that the justifications are unworthy of credence with references to record evidence supporting Best's response:

1.     Wells' non-discriminatory justifications for imposing unreasonable and overly burdensome conditions on Best in the WAA. JA0280.

**Wells:**     Plaintiffs loans matured in 2009; Plaintiffs were in default on the debt service coverage ratio and liquidity covenants. JA0280. Note: Wells omitted the inaccurate default justifications contained in their May 8, 2009 default notice to Huestis.

**Best:**     See SoF ¶¶13-19; JA1391 (101:3-24).

-The BMI loan matured only because Thompson refused to extend it; JA0685 ¶13; JA1817 (53:16-21);

-The debt service coverage ratio applied only to the Huestis term loans. JA0343, ¶6.1.12(b); JA0677-678 ¶5.

40

-Failure to meet the debt service coverage ratio was a technical default that did not justify acceleration of the loans particularly since all payments were being timely made. JA0696; JA1398 (108:3-24).

**Wells:**      Best failed to maintain sufficient cash flow and collateral. JA0280.

**Best:**      These conclusory and self-serving allegations are not based on any record evidence other than Thompson's deposition testimony.    Thompson's affidavit does not even address these reasons nor is there any corroborating record evidence to support this claim.  See JA0295-302; JA0694-695.

-Wells internal records show that cash flow was trending upward in the first quarter of 2009.  JA1359 (69:11-18).

-After July 31, 2009, Wells held collateral with a margined valued of at least $7,000,000 more than the balance of the loans. JA0686 ¶18; JA0926.

**Wells:**      Best was in financial distress. JA0280.

**Best:**      This alleged justification is based on Ross' opinion that failure to immediately pay the BMI loan in full meant the company was in financial distress. JA0580-581 (40:7–41:1).

-Ross accepted the numbers that were provided by Thompson and Wells.  JA0598 (86:15-19).

-Ross does not have "a traceable, analytical basis in objective fact" for this opinion.

-This is a disputed fact. Best's expert testified that Best was creditworthy. JA0692; JA0213 ¶10(C); JA0275-276; JA1085.

-Best obtained three terms sheets that contradict Ross's opinion. JA0851-853; JA1080-1086; JA1108-1114.

**Wells:**    Without liquidity, Best's net-worth was insufficient. JA0280.

**Best:**    This is a mischaracterization of the testimony which specifically referred only to Krish not to the net worth of the companies. See JA0694-0695.

-Ross incorrectly assumed that the liquidity requirement was for Krish alone. See SoF ¶13; JA0601 (89:13-15).

-Best submitted evidence that the liquidity requirement was met when combined with BMI so a reasonable juror could infer that this was a pretext for discrimination. See JA1096 ¶10; JA1745-1746, JA1749; JA0678.

**Wells:**    Gunston and Huestis had negative incomes in 2008. JA0280.

**Best:**    This evidence was based on Thompson's self-serving testimony which was contradicted by Wells own internal documents. See JA1489, Repayment Source Analysis, stating the preliminary year-end financials for Gunston showed a net income of $185,000.

-The record evidence showed that Gunston had positive income in 2008 of over $629,000 and Huestis had positive cash flow after paying debts. See JA1285-87

-Wells mischaracterized the testimony because it never refers to Gunston. JA1818.

42

**Wells:**    Wells had already "bent over backwards" in granting Best the first extension after covenant defaults.  JA0280.

**Best:**    This is not a "nondiscriminatory reason" for the onerous conditions imposed on Best but a conclusory opinion not based on objective fact made by a former Wachovia employee.

-This statement implies that Wells did Best a favor or did not benefit from the WAA which is untrue given that Wells benefitted from the substantially increased interest rates and collateral and collected significant fees under the WAA. JA0388-402.

      2.     Wells justifications for accelerating the Huestis loans: JA0280

**Wells:**    Wells had a legitimate right to exit the relationship after Huestis' profits were sliding.  JA0280.

**Best:**    This evidence is based solely on Kohlhagen's opinion, is not corroborated by any record evidence, and is not supported by a traceable, analytical basis in objective fact.

-This is a disputed fact because record evidence showed that income was trending upward when the loans were accelerated in 2009. JA1359-1360 (69:11-70:16).

-Assuming *arguendo* that Wells had a legitimate right to exit the relationship, this justification does not address Wells' motivations.

-Thompson decided to exit the relationship before he had Best's 2008 year-end

financials so Thompson's immediate desire to oust Best could not have been based on final year-end financial information. JA0694-695; JA1098-1099 ¶13-14.

**Wells:**    Huestis' default on the debt service coverage ratio was an indication that Huestis' assets were substandard.  JA0280.

**Best:**    Wells mischaracterizes this deposition testimony because it does not state that Huestis' assets were substandard.  JA1622-1624 (126:15-128:17).

-Any collateral shortfall was remedied by the additional collateral added under the WAA but Wells still refused to renew any of loans. JA0695; JA1799 (35:13-17); JA1892-1893 (128:17-129:4)

**Wells:**    Best's loans received a facility default grade of 7.5, which meant transfer to the SAM unit, the decision to exit the relationship, and ultimate exit strategy.  JA0280.

**Best:**    Thompson assigned the default grade.  JA1559-1561 (63:1-4; 64:19-65:6).

-This is a material disputed fact. Thompson completed a form on December 26, 2008, prior to meeting Krish, which showed the facility default grade for the Best loans to be 42 and strategy was to retain. JA1461.  Best can present evidence at trial that on December 26, 2008, prior to meeting Krish but after the loans had been transferred to the SAM unit, Huestis had a facility default grade of 58 and that the strategy was to retain the borrower.  Therefore, Best's loans were not transferred to

44

the SAM unit for the reason stated in Puckhaber's deposition testimony.

      3.    Wells discriminated against Best by requiring repayment within six months in March 2010 although the loans were fully-collateralized and "substantially performing."  JA0281.

**Wells:**    Wells had every right to be paid as soon as possible.  JA0281.

**Best:**    The issue is not Wells right to be paid but whether their actions were motivated by discriminatory animus. Wells' motivations are suspect particularly when viewed in light of the above facts. See SoF ¶¶7-41.

-There was no valid default by BMI prior to Wells' refusal to extend the loan in March, 2009. The liquidity required by the Guaranty was maintained. SoF ¶10 and footnote 4; SoF ¶13; JA1096 ¶10; JA1741; JA1745-1749.

-It is undisputed that the loans were performing prior to June 2010.  See JA0667; JA1582-1583 (86:22-87:12); JA1932-1933 (168:18-169:8).

**Wells:**    Six-month deadline was absolutely normal to get the parties to start working again.  JA0281.

**Best:**    Kohlhagen's testimony is not supported by any record evidence and is taken out of context since Kohlhagen appears to be referring to the 2009 extension that ended January 1, 2010. See JA0630-632 (87:16-89:12).

-This testimony does not address Wells' motivations in requiring Best to repay all of the loans within a short time particularly when the loans were fully-

collateralized, substantially performing, and the alleged defaults were bogus. See

SoF ¶¶13-19; 20-30.

**Wells:**     Best's loans were not "performing" because they went to nonaccrual

nonperforming status in June 2010.  JA0281.

**Best:**     Best's loans were accruing up through June 2010.  JA0701; JA1632

(136:17-22.) Puckhaber testified that banks do not "generally...don't...undertake a

foreclosure action if the loan is still on accrual status.  You've got to move it to

nonaccrual status."     JA1539 (43:18-21).  Wells moved performing loans to

nonaccrual status so it could proceed with rights and remedies although the loan

was being timely repaid.  JA1585 (89:1-15); JA1932-1933 (168:18–169:8).

-Confessing judgment on performing loans is inconsistent with reasonable and

customary banking practices.  JA668.

-Best's loans were moved into nonaccrual status "based on Mr. Thompson's

recommendation...." JA0036.

-There is no documentation disclosing the precise date Wells moved Best's loans

into nonaccrual status so there is no reliable evidence that it was done prior to

Krish's June 24, 2010 discrimination complaint.

> 4.    Wells discriminated against Best by proposing unreasonable terms in

exchange for another extension.  JA0281.

**Wells:**     Wells' offer was not unreasonable based on the limited financial

information it received from Plaintiffs. JA0281.

**Best:**      Wells misrepresented the cited testimony which does **not** state that Wells had "limited" financial information. JA0591 (71:2-7).

**Wells:**      The deposit of $1,000,000 was required to determine the borrowers' good faith in extending the maturity date. JA0281.

**Best:**      Wells misrepresented the cited testimony. See JA0781.

-Puckhaber's self-serving, conclusory, and uncorroborated testimony was only that Wells asked for this and it was reasonable. JA1591-1592 (95:3-96:2). The cited testimony contains no mention of $1,000,000 being required to show good faith in extending the maturity date.

-Best paid $250,000 extra per month for six months in 2010 to show their good faith. JA0696.

**Wells:**      $1,000,000 in extra collateral was necessary due to collateral discounts attributed to raw land. JA0281.

**Best:**      This allegation is based solely on Thompson's self-serving testimony and is contradicted by record evidence. See JA0926. In January 2010, Wells' internal documentation indicated that the **margined** value of the land, the AR and inventory was over $19,000,000. JA0696-697; JA0926; JA1489; JA1491.

**Wells:**      Higher interest rates and fees were necessary because Best was proposing to proceed with significant research and development instead of paying

the debt.  JA0281.

**Best:**        This allegation is based solely on Thompson's self-serving testimony.
-Wells misrepresented the testimony which does not state that higher interest rates
and fees were necessary.  JA1921 (157:6-11).  This testimony establishes only that
Best could use a portion of their cash flow for R & D but if they did so, Wells
would penalize Best by charging equity rates. JA1921 (157:6-11);  JA1093 ¶5.

**Wells:**        Demanding payment on a matured loan is typical and not extreme.
JA0281.

**Best:**        This is not a nondiscriminatory reason for Wells actions. Martins
testified only that "it's fairly common that a loan gets demanded typically."
JA1241 (126:14-17). Martins further testified that often payment could not be
made immediately but that would be the starting point. *Id.*

5.        Wells discriminated against Best by refusing to accept Krish's offer to
pay an extra $250,000 a month.  JA0281.

**Wells:**        Wells rejected Best's offer because the offer was unreasonable and
did not reflect on Best's ability to repay the debt in the long run.  JA0281.

**Best:**        Wells mischaracterized Best's allegations. Best alleged that Wells
discriminated against Best by refusing to negotiate in good faith and continuing to
make outrageous, unreasonable demands in 2010 for a second extension although
Best was making $250,000 additional payments as a show of good faith. See

48

JA0063 ¶52(B)(iii); JA0066 ¶53(B)(iii).

-Thompson mischaracterized Krish's offer to make additional payments of $250,000 per month as a request to pay the loans over a four year period. JA0512. Krish's offer, however, was to "pay down the loan by $250,000/month beginning in April, if you are agreeable. We are working with banks and hope to pay a substantial part of the loan this year." JA0483; JA0681 ¶24. The offer was to make the additional payments while continuing to seek refinancing to retire the debt before the end of 2010. JA0483.

      6.     Wells was driven by discriminatory animus when they demanded pay-off or refinancing of the loans even though Best made their payments on time or early. JA0282.

**Wells:**     Best's past payment history was not a determinative factor in deciding whether they qualified for credit. Best's present ability to pay was important so Wells had a legitimate reason to discount Best's past payment history. JA0282.

**Best:**     See SoF ¶¶11, 14, 18, 19, 23, 24, 25, 27.

-All payments required by the original loan documents were being made on time which is evidence of present ability to pay. JA0482; JA0684-685 ¶¶6, 7, 9; JA1491. Best continued to make payments until Wells refused to accept them.

-Best tendered $250,000 per month in additional payments to demonstrate their ability to pay and their good faith intention to repay the loans. JA0478; JA0481.

49

-Best submitted term sheets that demonstrated their creditworthiness. JA0851-853; JA1108-1114.

7.    Wells discriminated against Best by demanding pay-off although the loans were fully collateralized. JA0282.

**Wells:**    Wells, as a cash flow lender, had a legitimate nondiscriminatory reason in requesting other sources of repayment, such as available cash flow, in addition to collateral. JA0282.

**Best:**    This conclusory, self-serving justification is based solely on the testimony of Thompson and is not corroborated by any other record evidence. JA1805 (41:13-17).

-Kohlhagen's opinion is not based on any record evidence nor objective fact.

8.    Wells discriminated against Best by not allowing Best's representatives to speak with a person authorized to make decisions regarding their loans. JA0282.

**Wells:**    Thompson was the officer assigned to Best's loans and he acted as the officer of record for Wells. JA0282.

**Best:**    This is a mischaracterization of Best's allegations. JA0055 ¶28; JA0687 ¶¶25, 26.

-This justification is based on the testimony of Thompson's supervisor, Puckhaber. JA1587 (91:9-22). This policy allowed Thompson to continue his discriminatory

50

actions against Best.

**Wells:** Puckhaber was informed of the negotiations and discussions Thompson had with Best.

**Best:** Puckhaber was only informed of what Thompson wanted him to know and in the way Thompson wanted it presented. JA1103; JA1606 (110:6-8).

-Thompson prepared the problem asset reports that Puckhaber reviewed. JA1544 (48:4-9); JA1571 (75:8-9).

-Puckhaber simply rubber-stamped Thompson's decisions. JA1098-1099 ¶14; JA1587-1588 (91:19-92:1-21.

-Loans were not discussed unless Thompson was making a recommendation. JA1552 (56:11-19).

9. The penalty fees and interest rate Wells demanded in May 2010 were indicative of a discriminatory motive. JA0283.

**Wells:** The fees were customary and aimed to motivate Best to repay. JA0283.

**Best:** This is a disputed material fact. JA0283; JA0214 ¶¶G, H.

-Ross' testimony is conclusory, not based on objective fact, and not corroborated by documentary evidence.

-Ross does not provide a comparison to other similar borrowers to establish what is customary nor does she reference any other cases she has worked on where similar

terms were imposed on the borrowers.

-Wells has historically imposed higher interest rates and fees on minorities. Here, Wells attempted to impose rates that were more than double the default interest rate. JA0214 ¶H; JA476-477.

**Wells:**    The fees were reasonable because they were applied to a mature loan. JA0283.

**Best:**    The loans matured because Thompson refused to extend the lines of credit. JA1096 ¶¶9-10; JA0267 ¶5; JA0270 ¶25; JA0678.

-Wells accelerated the Huestis loans immediately following the first minor covenant deviation.  SoF ¶¶16-19.

-Thompson admitted that refusing to extend the loans benefitted Wells because "maturity permits the Bank to immediately and without notice exercise any and all of its rights and remedies" including raising the interest rate, imposing higher fees, and imposing other onerous terms. JA0480.

-But for Thompson's discriminatory animus motivating his decision to refuse to extend the loans and to accelerate the Huestis loans, the loans would have been extended and would not have matured.  JA0678.

**Wells:**    Equity interest rates are applied to higher risk loans. JA0283.

**Best:**    Martins cited testimony sets forth his definition of "equity rates" but does not establish that Best's loans were "higher risk." JA0679-680; JA1175 (60:2-

14).

-Thompson intended to impose "equity rates" in 2010 to penalize Best for spending money on R&D rather than directing their entire nondiscretionary R&D budget to Wells. JA1493; JA1760; JA1921 (157:6-17).

       10.    Wells discriminated against Best by not accepting payments from Best beginning in October 2011. JA0283.

**Wells:**      Wells switched to a new system in 2011 that could not automatically debit for payments that had matured. JA0283.

**Best:**      This self-serving and conclusory justification is supported only by Thompson's testimony. JA1973 (209:11-20).

-This justification does not address why Wells would not allow Best to continue making the monthly payments in some other manner.

       11.    Wells' discriminatory animus is evidenced by Wells' refusal to release collateral in April 2011 in return for payment. JA0283.

**Wells:**      Best's repayment terms were unreasonable and unacceptable to Wells therefore Wells had a legitimate reason not to release the collateral. JA0283.

**Best:**      Wells' justification is conclusory and does not explain what is unreasonable or unacceptable about paying off a portion of debt in exchange for release of an equivalent amount of collateral, particularly when Wells held excessive collateral compared to their exposure.

-This corroborates Best's argument that they would have at least partially paid off the loans through refinancing but for Wells refusal to cooperate or negotiate in good faith. JA0692-693; JA700.

12.    Wells extended loans to white customers but refused to extend Krish's loans due to Krish's race. JA0283.

The District Court correctly held that Best was not required to present evidence of similarly situated borrowers. JA1052. Wells had previously argued that such evidence was not relevant. JA0962-963 (23:24-24:3).

13.    Wells retaliated against Best by filing confessions of judgment on June 30, 2010, just four business days after Krish lodged his discrimination complaint. JA0242 ¶76; JA0284.

**Wells:**    Wells confessed judgment because of Best's repeated defaults under the Loan Documents and the WAA, failure to refinance, and failure to cure the covenant violations. JA0284.

**Best:**    There was no valid default on the BMI loan yet Thompson refused to extend the loan although all payments were being made on time. SoF ¶¶10, 13, 14-41.

-By refusing to extend the line of credit, a default situation would be created if Best was unable to immediately pay off the loans. SoF ¶13.

-The Huestis term loans had been accelerated based on **one** immaterial deviation

54

from the loan covenants. JA0248-249 ¶25; JA0214 ¶J.

-Best was unable to refinance during the term of the WAA because Wells cross-collateralized, cross-defaulted, and cross-guaranteed the loans so that any lender who was willing to take out part of the loan – and there were lenders who were interested in providing such refinancing – had to take out the entire indebtedness with no collateral. JA0692; JA1157-1158 (42:18-43:14). This made it impossible for Best to obtain the refinancing and continues to do so to this day. JA0692.

-The only covenant violation that Best could have failed to cure was the Huestis debt service coverage ratio which was an immaterial covenant deviation. JA0214 ¶J.

**Wells:**       The loans' past due status and the parties' inability to agree on another extension. JA0284.

**Best:**       The parties could not agree on another extension because the terms that Wells attempted to impose on Best in 2010 were even more onerous than those in the WAA. JA0681; JA0686-687 ¶24.

-Best could not have met the onerous terms and conditions Wells demanded and remained a viable business therefore Best could not in good faith agree to those terms. JA1093; JA0869-870 (54:17-55:2); JA1093.

14.    Wells destroyed Best's opportunity to refinance and directed Best's customers to pay Wells instead of Best. JA0284.

**Wells:**        Wells sent a subpoena duces tecum to United Bank to obtain financial information that Plaintiffs had consistently failed to provide.

**Best:**        This allegedly nondiscriminatory reason is based solely on Thompson's conclusory and self-serving testimony. See SoF ¶¶37, 38.

-Best was attempting to obtain refinancing from United Bank at that time. JA0680 ¶19. Wells was collecting on their judgment and unreasonably refused to believe Best had provided all the requested financial information although Best had produced over 5,000 pages of financial documents and produced Best's accounting supervisor for deposition. Although the Fairfax County Circuit Court quashed the subpoena, the damage was done as United Bank, who had been ready to provide refinancing to Best prior to the subpoena, reversed course and refused to lend to Best. JA0670; JA0687 ¶27; JA1004.

-Kohlhagen opined that "suing the bank and accusing it of racial discrimination" had "the potentially huge impact of making it difficult for the plaintiffs to refinance." JA0650 (135:10-21); JA0699. Accordingly, Wells knew that issuing a subpoena to United Bank would have a deleterious effect on Best's refinancing efforts. JA0222.

**Wells:**        Wells instructed Best's customers to pay Wells directly.

**Best:**        While Wells may have had a statutory and/or contractual right to collect Best's AR if the defaults were valid, this does not address their motivation

56

for taking the unreasonable actions they took in this case.

-Wells knew that collecting Best's AR undermined Best's ability to repay the loans. JA1417 (127:12-19). As a result of the collection of Best's AR, Best's sales declined. JA0705; JA1423 (133:17-25). Moreover, the collection of Best's AR has destroyed Best's reputation with their customers and their vendors who have not been timely paid due to Wells' actions. JA1420 (130:5-8).

After a defendant provides the reasons for their adverse actions, the burden shifts back to plaintiff to show that the explanations are pretextual. *Fuentes v. Perskie,* 32 F.3d 759, 762 (3d Cir. 1994). The above evidence satisfied the third leg of the *McDonnell Douglas* framework and precluded the grant of summary judgment because this evidence, particularly when coupled with Wells' failure to conduct any meaningful investigation of Krish's discrimination complaint (JA0682-683) and to follow their own internal policies regarding discrimination complaints, (JA0697-0699) would cause a reasonable juror to discredit Wells' articulated reasons for the adverse actions taken against Best. *Fuentes,* 32 F.3d at 763. Moreover, Thompson's testimony established that 60% of the borrowers that he confessed judgment against were of Asian or Middle Eastern descent which supports the inference that Thompson harbored racial animus to that protected group, of which Krish is a member. JA1948-1950 (184:14-186:12); JA1958 (194:3-5). Unsurprisingly, Thompson treated Krish in a demeaning and hostile

manner. JA0554 (60:10-13); JA0559 (69:4-6). The District Court erred in finding that Best did not submit sufficient evidence of pretext to survive summary judgment.

### E. Do Threats to Exercise Rights and Remedies Prior to the Protected Activity Constitute "Gradual Adverse Actions" that Preclude Any Inference of Retaliation?

The U.S. Supreme Court has held that § 1981 encompasses claims of retaliation. *CBOCS West, Inc. v. Humphries,* 553 U.S. 442, 457 (2008). Retaliation is an intentional act. *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-174 (2005). It is a form of "discrimination" because the complainant is being subjected to differential treatment. *Id.* at 174. Whether "gradual adverse actions" should be applied in a lending discrimination case and whether threats to exercise rights and remedies constitute "gradual adverse actions" that preclude an inference of retaliation are issues of first impression in the Fourth Circuit.

### 1. Does the Doctrine of "Gradual Adverse Actions" Apply to Lending Discrimination?

The District Court granted summary judgment on Best's retaliation claim on the grounds that Wells' "gradual adverse actions" prior to Krish's June 24, 2010 discrimination complaint negated any inference of retaliation citing *Francis v. Booz Allen & Hamilton,* 452 F.3d 299, 309 (4th Cir. 2006). JA1063. A thorough search of precedent revealed no precedent applying this doctrine to a lending discrimination case or where the "gradual adverse actions" consisted only of

threats to take action. If this doctrine is applicable to lending discrimination, is a threat to exercise rights and remedies by a lender equivalent to a reprimand, demotion, or termination in the employment context? What if the alleged defaults that trigger the threats are bogus and the threats are unacted upon prior to the protected activity? In the employment context, when an employee is demoted, reprimanded, or terminated, an action actually occurs. Here, Wells had been threatening to exercise rights and remedies but had not taken any action until they confessed judgment four business days after Krish complained of discrimination. Best was told only that Wells "may" exercise their rights and remedies. JA0509; JA0702. At the same time, Best was told to continue their cash flow review so they could determine the amount and timing of the additional payments to Wells. JA0682 ¶31; JA509. This situation is simply not analogous to termination or demotion of an employee.

If the doctrine of "gradual adverse actions" is applicable, the District Court disregarded controlling precedent holding that the actions taken "must be material and significant and not trivial." *Burlington Northern & Santa Fe Railway Co. v. White,* 548 U.S. 53, 67 (2006). There was nothing material or significant about Wells' unacted upon threats prior to Krish's discrimination complaint. Confessing judgment, like a demotion or termination in the employment context, is a material and significant adverse action. Wells confessed judgment against Best four

business days after Krish lodged his discrimination complaint, before Wells responded to Krish's discrimination complaint, and in the absence of any proper civil rights investigation.

If the doctrine of "gradual adverse actions" is applicable to lending discrimination, the grant of summary judgment on Best's retaliation claim was still improper because this doctrine applies only where the timing of the protected activity and the alleged retaliatory actions are the only evidence presented of causation. *Francis*, 452 F.3d at 309. Here, in addition to temporal proximity and the evidence of pretext discussed hereinabove, including Thompson's demonstrated animus toward minorities, Best also cited controlling precedent establishing that the District Court should evaluate the circumstances under which the claim arose because "context matters." *Burlington*, 548 U.S. at 69; JA0702-705. Specifically, Best argued that Wells' refusal to negotiate the release of an equivalent amount of collateral in exchange for payment so Best could refinance the entire debt should be looked at in the context of the circumstances as they existed at the time. See SoF ¶¶31-41; JA0703-704. Best's offer to pay money in exchange for release of an equivalent amount of collateral was deemed "unacceptable" by Wells shortly after their motion to dismiss Best's lawsuit was denied. JA0703-704. Accordingly, a reasonable jury could find that Wells actions constituted retaliation for Best alleging discrimination against Wells in the Fairfax

60

County Circuit Court. Similarly, in June 2012, when Wells was unsuccessful in obtaining dismissal of this case, they retaliated by collecting BMI's AR and destroying Best's reputation. See JA0010 (Dkt. 52).

The District Court stated Best did not dispute the contents, meaning or receipt of the notice that Thompson had been instructed to proceed with rights and remedies. JA1064. The Court stated that "Defendants had decided prior to the letter to confess judgment against Plaintiffs." JA1063. This is contrary to the evidence presented which showed that although Thompson had instructions, he allowed Best to continue their cash flow review and that "steps **may** be taken." JA0509. Best did not dispute they received Thompson's June 15, 2010 email (JA0509) but disputed the email had the definitive meaning assigned by the District Court. JA0682 ¶31. The evidence showed the parties were still trying to work out an agreement. JA0490. Best further argued that in the precedent cited by Wells, an adverse action had actually occurred, which is contrary to the facts of this case because Wells did not confess judgment until **after** Krish lodged a discrimination complaint. JA0702. Best also argued that no precedent supported the theory that a threat to exercise rights and remedies in a lending discrimination case constituted a "gradual adverse action" such that a borrower has to lodge their discrimination complaint before the threat is made or no inference of retaliation arises. JA0702-704.

61

## 2. Temporal Proximity Between the Protected Activity and the Adverse Action Suffice to Establish Causation *Even If* the Decision to Confess Judgment Was Already Made.

To establish the existence of a causal connection, the court considers: (1) timing, and/or (2) evidence of ongoing antagonism. *Ilori v. Carnegie Mellon Univ.*, 742 F. Supp. 2d 734, 761 (W.D. Pa. 2010) *citing Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001). The first factor requires a close temporal proximity between the protected activity and the adverse employment action. *Id.* "[T]he timing of the alleged retaliatory action must be unusually suggestive of retaliatory motive before a causal link will be inferred." *Thomas v. Town of Hammonton*, 351 F.3d 108, 114 (3d Cir. 2003) (additional citation omitted). Wells immediately confessed judgment against Krish after he complained he was being discriminated against on the basis of his race so temporal proximity is established. JA2080-2085. There is also ample evidence of ongoing antagonism from Wells toward Krish. See SoF ¶¶8-41. Thompson repeatedly belittled Krish both in person and in writing. JA0482; JA0559 (69:4-6). Thompson's testimony that he confessed judgment more often against minority principals supports the inference that he harbors racial animus against minorities particularly Asians, a group to which Krish belongs.

Precedent does not support the theory that making a decision constitutes a "gradual adverse action" where the decision is not acted upon prior to the protected

activity. In *Burgess v. Bowen,* the Fourth Circuit vacated the grant of summary judgment where Burgess, an African American female, challenged the fairness and equality of the decision to terminate another African American female and was subsequently terminated and replaced by a Caucasian female after her supervisor received the complaint. *Burgess v. Bowen,* No. 10-2081, 466 Fed. Appx. 272 (4th Cir. Feb. 17, 2012). Burgess was also denied a transfer and brought a claim for retaliation based on that denial. *Id.* The Fourth Circuit held that even if the decision to terminate Burgess had already been made, denying Burgess a transfer constituted an adverse action and entitled her to present her retaliation claim to the jury. *Burgess,* 466 Fed. Appx. at 283 *citing Burlington,* 548 U.S. at 62. The Fourth Circuit reiterated that "very little evidence of a causal connection is required to establish a prima facie case of retaliation." *Id. citing Tinsley v. First Union Nat'l Bank,* 155 F.3d 435, 443 (4th Cir. 1998)(overruled on other grounds). The Fourth Circuit held that temporal proximity between the protected activity and the employer's adverse action would suffice *even if* the decision to terminate Burgess had already been made. *Burgess,* 466 Fed. Appx. at 283 and n. 7.

Here, even if Wells had already made the decision to confess judgment prior to Krish's discrimination complaint, the confession of judgment four business days after the discrimination complaint was lodged constituted an adverse action that entitled Best to present their retaliation claim to the jury. In this Circuit, a Plaintiff

63

may establish a prima facie case of causality by showing close temporal proximity between the adverse employment decision and the protected activity. *Moss v. City of Abbeville*, 740 F. Supp. 2d 738, 744 (D.S.C. 2010) *citing Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir. 1989) (While temporal proximity "far from conclusively establishes the requisite causal connection, it certainly satisfies the less onerous burden of making a prima facie case of causality.")

In the Fourth Circuit, a plaintiff does not have to prove that the protected activity was the sole factor motivating the employer's challenged actions in order to establish the causation element of a prima facie case. *Peters v. Jenney*, 327 F.3d 307, 321 (4th Cir. 2003) (additional citation omitted). The Fourth Circuit has held that a causal connection for purposes of demonstrating a prima facie case exists where an adverse action is taken shortly after learning of the protected activity. *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004). To establish a causal connection, Plaintiff "must have evidence from which a reasonable factfinder could conclude that a causal connection exists between the protected activity and the adverse action." *Dowe v. Total Action Against Poverty in Roanoke Valley*, 145 F.3d 653, 657 (4th Cir. 1998) *citing Anderson v. Liberty Lobby*, 477 U.S. at 248. A plaintiff need only show that the protected activity and the adverse action are not completely unrelated, *see, e.g., Daniel v. Church's Chicken,* 942 F. Supp. 533 (S.D. Ala. 1996), and the causal connection can be indirectly shown by proximity in

64

time. *Twisdale v. Paulson*, 595 F. Supp. 2d 686 (S.D. W. Va. 2007) *citing Tinsley*, 155 F.3d at 443. Here, Wells immediate reaction to Krish's discrimination complaint was to confess judgment against him just four working days after they received the complaint although the parties were still engaged in negotiations for a second extension. Accordingly, Best submitted sufficient evidence of retaliation following Krish's discrimination complaint and Best's filing suit against Wells to survive summary judgment.

## VII.  CONCLUSION

For the reasons set forth herein, Best prays that this Court reverse the District Court's grant of summary judgment in favor of Wells in this matter in its entirety and remand this case to the District Court for a jury trial on the merits of Best's discrimination and retaliation claims under 42 U.S.C. § 1981.

Respectfully submitted,

By:  /s/ James M. Brady
James M. Brady
Virginia State Bar No. 80002
*Counsel for Plaintiffs/Appellants*
Best Medical International, Inc.
7643 Fullerton Road
Springfield, VA 22153
Telephone: (703) 451-2378
Facsimile: (703) 451-8421
Email: james@teambest.com

65

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)

This brief complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because this brief contains 13,983 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14 point font.

DATED: October 21, 2013                    /s/ James M. Brady,
                                           Attorney for Plaintiffs-Appellants

**CERTIFICATE OF SERVICE**

I hereby certify that on October 21, 2013, I electronically filed the foregoing document with the Clerk of the Court for the Fourth Circuit Court of Appeals using the electronic case filing system of the Court. The electronic case filing system will send notification of such filing to all counsel of record. Counsel may access such document using the Court's system.

/s/ James M. Brady
James M. Brady
Virginia State Bar No. 80002
*Counsel for Plaintiffs/Appellants*
Best Medical International, Inc.
7643 Fullerton Road
Springfield, VA 22153
Telephone: (703) 451-2378
Facsimile: (703) 451-8421
Email: james@teambest.com

Dated October 21, 2013.